## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IPOC INTERNATIONAL GROWTH | ) | |
| FUND LIMITED | ) | |
| | ) | Civil Action No. 06-1109 (PLF) |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DILIGENCE LLC, et al. | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

## MEMORANDUM IN SUPPORT OF
## DILIGENCE, INC.'S MOTION TO DISMISS

Defendant Diligence Inc., by and through undersigned counsel, respectfully moves the Court to dismiss this action under Federal Rule of Civil Procedure 12(b)(6) for failure to state claims upon which relief can be granted, for the following reasons; *first*, Count I fails to state any computer loss or damage compensable under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and fails to allege any such fraud with specificity; *second*, each of Plaintiff's common law claims is preempted by the District of Columbia's Uniform Trade Secrets Act ("UTSA"), D.C. Code § 36-401 et seq.; and *third*, even absent UTSA preemption, each of Plaintiff's common law counts fails to state a claim under well-settled caselaw.

## BACKGROUND

In its Complaint, Plaintiff IPOC International Growth Fund Limited ("IPOC") alleges a litany of claimed injuries to its business, while at the same time assiduously avoiding any description of the nature of that business—with good reason. IPOC has been the focus of considerable attention – media, regulatory, and prosecutorial – in the wake of revelations that it is, in fact, a money-laundering front used to hide over a billion dollars' worth of illicitly-acquired assets beneficially owned by Leonid Reiman, the Russian Minister of Information Technology and Communications.[1] Indeed, in the Zurich arbitration proceedings referenced throughout IPOC's Complaint in this case, the tribunal recently issued its findings that, despite IPOC's protestations to the contrary, Mr. Reiman is in fact the beneficial owner of IPOC "and that he had misused his official position to benefit companies he controlled."[2] Having been revealed and adjudged for

---

[1]  See Glenn R. Simpson, Gregory L. White and David Crawford, *Putin Ally May Control Big Mobile-Phone Stake,* The Wall Street Journal, January 19, 2006 ("Russia's telecommunications minister was secretly named by his own law firm as the true owner of a Bermuda-based mutual fund that has amassed control of a large share of Russia's mobile-phone industry, according to a filing in a London court"); David Crawford, Glenn R. Simpson, and Gregory L. White, *Close Putin Ally Implicated in Probe into Laundering,* The Wall Street Journal, Dec. 2, 2005 (German prosecutors "say they suspect Mr. Reiman 'illegally enriched himself through a series of transactions,' and then set up [IPOC and eleven affiliated companies and trusts] to secure and conceal more than $1 billion in assets"); Jonathan Kent, *Millions paid into IPOC fund in bogus deals, BVI court told*, The Royal Gazette, March 24, 2006 ("Documents on the $1-billion IPOC International Growth Fund Ltd., revealed in a British Virgin Islands court case, showed that millions of dollars were paid into the Fund in bogus transactions "). This Court may take judicial notice of newspaper accounts such as these. See, e.g., Washington Post v. Robinson, 935 F.2d 282, 291 (D.C. Cir. 1991); Rwanda v. Rwanda Working Group, 227 F. Supp. 2d 45, 60 (D.D.C. 2002).

[2]  See Gregory L. White and Glenn R. Simpson, *Swiss Tribunal Finds Putin Ally Misused Position,* The Wall Street Journal, May 23, 2006, at A3 ("An [arbitration] tribunal in [Zurich] has concluded that the Russian communications minister, Leonid Reiman, is the 'sole beneficial owner' of a mutual fund [IPOC] that owns a large swath of Russia's telecom industry and that he misused his official position to benefit companies he controlled . . . The ruling says that based on a range of documents and other evidence produced at the proceeding, Mr. Reiman's denials 'have no credibility' and that he was 'the sole beneficial' owner of IPOC while a minister in 2001 and 2002"); Jonathan Kent, *Swiss tribunal implicates two more locally-based firms in scandal*, The

what it is – a money-laundering enterprise – IPOC now seeks to hold Defendants liable for purported harms to that "business."

IPOC's claims arise out of an investigation of IPOC's affairs by the Government of Bermuda.  According to the Complaint, KPMG Financial Advisory Services Limited ("KPMG FAS") – also a Bermudian LLC – and two of its managing directors were appointed official Inspectors by the Minister of Finance of Bermuda pursuant to Section 132(1) of the Bermuda Companies Act of 1981.[3]  Compl. ¶¶ 1, 14.  The subjects of the investigation were IPOC and eleven of its Bermudian affiliates.  Id.  KPMG FAS's appointment as Inspectors of the Bermuda Government required them to report to the Bermuda Government principally on whether these Bermuda companies were in compliance with "various Bermuda laws and regulations."  Compl. ¶¶ 13-16.

According to the Complaint, during the Zurich arbitration initiated by IPOC against LV Finance Group ("LVFG") over a 25% ownership stake in a Russian mobile phone operator, LVFG allegedly submitted papers that included material "almost verbatim" from KPMG FAS's internal draft of its report to the Minister of Finance of Bermuda, as well as interview transcripts. Compl. ¶ 21.  IPOC alleges that Diligence, through allegedly fraudulent means, obtained from KPMG FAS the internal draft of its report and the interview transcripts, Compl. ¶¶ 19-20, and that Defendants and/or LVFG (or its alleged affiliate, Alfa) leaked these materials to the media.  Id.

---

Royal Gazette, May 26, 2006 ("The [Zurich arbitration] tribunal also ruled that Mr. Reiman is the 'sole beneficial owner' of [IPOC] . . . .The three-member tribunal also clearly stated its opinion that the money in [IPOC] included the laundered proceeds of crime").

[3] In repeating IPOC's allegations, Diligence does not, of course, concede the accuracy of any factual allegation or legal conclusions set forth in the Complaint.  Rather, these allegations are assumed to be true – as they must be – for purposes of this Motion to Dismiss only.

IPOC asserts seven causes of action based on Defendants' allegedly wrongful conduct: (i) Tortious Interference With Business Expectations; (ii) Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; (iii) Procuring Information By Improper Means; (iv) Tortious Interference With Contractual Relations; (v) Common Law Unfair Competition; (vi) Common Law Conspiracy; and (vii) Unjust Enrichment.

## ARGUMENT

### I. IPOC HAS FAILED TO STATE A CFAA CLAIM BECAUSE IPOC HAS NOT ALLEGED – AND CANNOT ALLEGE – ANY LOSS FROM DAMAGE TO, OR THE INOPERABILITY OF, KPMG'S COMPUTER SYSTEMS, AND FAILS TO MEET THE PLEADING REQUIREMENTS OF FRCP RULE 9(b)

IPOC's only Federal claim, under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), fails for two discrete reasons. First, and most glaringly, IPOC does not allege any facts that would give rise to a compensable "loss" under the CFAA, a carefully-delineated statute providing a narrow cause of action. Second, IPOC's skeletal CFAA claim alleges essentially no factual detail at all, and certainly not the level of factual detail required by Federal Rule of Civil Procedure 9(b), which applies to its CFAA claim.

### A. IPOC Has Not, and Cannot, Allege the "Loss" Required to Sustain Its Claim Under 18 U.S.C. § 1030.

IPOC does not allege any facts that would give rise to a compensable "loss" necessary for a statutory claim under the CFAA. The reason is simple: the computer systems at issue belong to KPMG FAS, not IPOC, and any damage to, or losses from, the inoperability of KPMG FAS's computer system would have been suffered by KPMG FAS, not IPOC. As set forth below, the caselaw interpreting the narrow scope of losses compensable under the CFAA make clear that IPOC has not stated – and, indeed, cannot state – any facts to support a compensable loss under the CFAA.

The CFAA is principally a criminal statute that penalizes computer "hacking," and, consistent with this general purpose, it creates a civil remedy for a narrow range of harm to computer systems caused by such activities.  Under the CFAA, a plaintiff may maintain a private cause of action if it suffers "damage or loss"[4] exceeding "$5,000 in value during any 1-year period."  18 U.S.C. § 1030(e)(8).  Courts interpreting the CFAA have held that compensable "damage or loss" under the statute is limited to the "cost of investigating or remedying damage to a computer, or a cost incurred because the computer's system was interrupted."  Nexans Wires, S.A. v. Sark-USA, 319 F. Supp. 2d 468, 475 (S.D.N.Y. 2004), aff'd, 2006 WL 328292 (2d Cir. 2006); Civic Center Motors, Ltd. v. Mason Street Import Cars, 387 F. Supp. 2d 378, 381 (S.D.N.Y. 2005) ("'losses' under the CFAA are compensable only when they result from damage to, or the inoperability of, the accessed computer system"); Tyco Int'l Inc. v. John Does, No. 01-CV-3856, 2003 WL 21638205 (S.D.N.Y. July 11, 2003) (the "types of damages awarded by courts under the [CFAA] have generally been limited to those costs necessary to assess the damage caused to the plaintiff's computer system or to resecure the system in the wake of a hacking attack") (citing EF Cultural Travel BV v. Explorica, 274 F.3d 577, 584-85 (1st Cir. 2001) (awarding costs of assessing damage [to plaintiff's computer system]); United States v. Middleton, 231 F.3d 1207, 1213-14 (9th Cir. 2000) (awarding costs of investigating and repairing the damage [to plaintiff's computer system]); In re DoubleClick Inc. Privacy Litig., 154 F. Supp. 2d 497, 524-525 (S.D.N.Y. 2001) (only the costs of remedying damage [to plaintiff's computer systems]  recoverable under the CFAA).  In sum, the caselaw is clear: the only cognizable claim under the statute stems from

---

[4] The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, or information."  Id.  Initially, "loss" was not defined in the statute.  In 2001, the CFAA was amended to define "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).

5

injury to the computer system <u>itself</u>.

IPOC's Complaint is devoid of any allegation that it suffered damages from the "cost of investigating or remedying damage to a computer, or a cost incurred because the computer's system was interrupted." <u>Nexans Wires</u>, 319 F. Supp. 2d at 475.  Of course, there is no allegation whatsoever in the Complaint that IPOC's <u>own</u> computer systems were hacked by Defendants (or anyone else).  Compl. ¶ ¶ 29-34.  Rather, IPOC's CFAA claim is founded upon an allegedly unauthorized access into KPMG FAS's computer systems by "one or more agents of Diligence and/or BGR."  Compl.¶ 31.  But nowhere in IPOC's 15-page Complaint is there any suggestion – much less an express allegation – that KPMG FAS's computer systems were damaged or rendered in any way inoperative in connection with the allegedly unauthorized access, or in any event that <u>IPOC</u> had to pay for any such damage to, or costs to repair, KPMG FAS's computer systems.  Lacking this essential predicate, it is thus not surprising that IPOC wholly fails to allege facts indicating any loss compensable under the CFAA – specifically, that IPOC incurred the "cost of investigating or remedying damage to [any KPMG FAS Computer], or a cost incurred because [KPMG FAS's] computer system was interrupted."  <u>Nexans Wires</u>, 319 F. Supp. 2d at 475.

IPOC's lone factual reference to the nature of its alleged damages is a tangential one, and underscores the inapplicability of the CFAA under the facts alleged.  IPOC alleges that, by wrongfully accessing the KPMG FAS Computers, the Defendants "thereby obtained information and documents related to the Investigation [of IPOC by the Bermudian government], which have considerable value to IPOC's adversaries."  Compl. ¶ 31.  Courts routinely dismiss CFAA claims where, as here, the plaintiff alleges damages to its <u>business interests</u> rather than damage to computer systems or the costs of re-securing a system following a hacking incident.

See Civic Center Motors, Ltd., 387 F. Supp. 2d at 381 ("lost profits resulting from Defendant's unfair competitive edge and for their now wasted investment in the development and compilation of the database information . . . . neither of these kinds of losses are the result of computer impairment or computer damage.  Therefore they are not compensable 'losses' under the CFAA"); Nexans Wires, S.A., 319 F. Supp. 2d at 477 (plaintiffs failed to state a CFAA claim because "plaintiffs are not claiming to have lost money because the computers [at issue] were inoperable, but rather because of the way the information was later used by defendants."); In re DoubleClick Inc. Privacy Litig., 154 F. Supp. 2d 497, 524-525 (S.D.N.Y. 2001) (complaint failed to state a CFAA claim where plaintiffs "have not pled that [defendant] caused any damage whatsoever to plaintiffs' computers, systems, or data that could require economic remedy").[5]

For the reasons set forth above, Count II of the Complaint must be dismissed under Fed. R. Civ. P. 12(b)(6) because IPOC fails to allege that it suffered any monetary loss from damage to a computer system caused by unauthorized access or re-securing a computer system following an attack.

**B.      Count II Fails to Meet Fed. R. Civ. P. 9(b)'s Particularity Requirements.**

Even if IPOC had properly alleged the factual elements necessary to sustain a claim under 18 U.S.C. § 1030 – and, for the reasons described above, it has not – IPOC's claim should nonetheless be dismissed for failure to meet the pleading requirements of Federal Rule of Civil Procedure 9(b).  See Miller v. International Business Machines Corp., No. 03-16675, 2005 WL 1253909 (9th Cir. May 27, 2005) (dismissing § 1030 claim under Rule 9(b) for failure to plead

---

[5]  Accord Register.com, Inc. v. Verio, 126 F. Supp. 2d 238, 252 n.12 (S.D.N.Y. 2000), aff'd 356 F.3d 393 (2d Cir. 2004) (damages alleged from defendant's "end use" of information retrieved from its website which allegedly allowed defendant to compete unfairly with plaintiff and harmed plaintiff's goodwill not compensable under CFAA because "[h]ow [defendant] uses the [data at issue], once extracted, has no bearing on whether [defendant] has impaired the availability or integrity of [plaintiff's] data or computer systems in extracting it").

fraud with sufficient particularity); see generally Gold v. Morrison-Knudsen Co., 68 F.3d 1475, (2d Cir. 1995) (noting that Rule 9(b) has commonly been applied to statutory fraud claims). To meet the heightened standard of Rule 9(b): "plaintiffs must plead the 'who, what, when, where, and how' with respect to the circumstances of the fraud." Burman v. Phoenix Woldwide Indus., 384 F. Supp.2d 316, 325 (D.D.C. 2005). Conclusory allegations that a defendant's actions were fraudulent and deceptive are not sufficient to satisfy Rule 9(b), nor are allegations based on naked "information and belief" – precisely what IPOC alleges in Count II. See id. ("Rule 9 requires more than pleadings based on information and belief") (internal quotation omitted). Count II fails to meet this heightened pleading standard, and must, accordingly, be dismissed on Rule 9(b) grounds, in addition to its substantive failure, as discussed above, to state a claim.


## II.    EACH OF IPOC'S COMMON LAW CLAIMS IS PREEMPTED BY THE DISTRICT OF COLUMBIA UNIFORM TRADE SECRETS ACT.

Count I and Counts III-VII assert various common law claims based on the same nucleus of alleged facts: that Defendants harmed IPOC by wrongfully obtaining, and disseminating, IPOC materials and information in the possession of KPMG FAS. But each of IPOC's common law claims is preempted by the District of Columbia's adoption of the Uniform Trade Secrets Act. Indeed, the very purpose of a jurisdiction adopting the UTSA is to create one – and only one – cause of action (a claim under the UTSA) for an alleged misappropriation of trade secrets under a nationally consistent standard. By its terms, therefore, the UTSA "supersedes [all other] conflicting tort, restitution and other law of the District of Columbia providing civil remedies for misappropriation of a trade secret." D.C. Code § 36-407. As detailed below, abundant caselaw interpreting the UTSA makes clear that the statute preempts each of the common

law causes of action asserted by IPOC.  Consequently, Count I and Counts III-VII must be dismissed for failure "to state a claim upon which can be granted." Fed. R. Civ. P. 12(b)(6).

> **A.      By Its Express Terms, UTSA Jurisprudence From Other Jurisdictions Applies When Interpreting the District of Columbia's UTSA Statute.**

In addition to the District of Columbia, the UTSA has been adopted in at least 41 other jurisdictions.  See, e.g., Hauck Manufacturing Co. v. Astec Industries, Inc., 375 F. Supp. 2d 649, 655 (E.D. Tenn. 2004) (noting that 42 states have adopted the UTSA).  As this Court has noted, by its terms, D.C.'s UTSA statute "was intended 'to make uniform the law with respect to trade secrets among the District of Columbia and those states enacting it.'"  Catalyst & Chemical Services, Inc. v. Global Ground Support, 350 F. Supp. 2d 1, 7 n.3 (D.D.C. 2004) (*quoting* D.C. Code § 36-408)).  Thus, given the "paucity" of District of Columbia cases interpreting the UTSA, "[i]t is particularly appropriate to look to the [Uniform] Trade Secrets Act decisions of courts in other jurisdictions" when interpreting D.C.'s UTSA statute.  Id.; see also Auto Channel, Inc. v. Speedvision Network, 144 F. Supp. 2d 784, 788 (W.D. Ky. 2001) (because the UTSA is a uniform statute, the court properly looks to UTSA caselaw in other jurisdictions to interpret Kentucky's UTSA statute).  As detailed below, under the UTSA preemption doctrine as developed in other UTSA jurisdictions, IPOC's common law claims must be dismissed for failure to state cognizable causes of action in the wake of D.C.'s adoption of the UTSA.

> **B.      The Expansive Reach of UTSA Preemption.**

By its terms, the District of Columbia's UTSA statute "supersedes conflicting tort, restitution and other law of the District of Columbia providing civil remedies for misappropriation

of a trade secret."  D.C. Code § 36-407 (emphasis added).  This preemption provision tracks the

language in the model UTSA virtually verbatim.[6]

      The reach of the UTSA's preemption provision is wide.  As a leading district court

opinion on UTSA preemption observed:

> Despite its apparently limiting language displacing only "conflicting tort,
> restitutionary, and other law . . . providing civil remedies for
> *misappropriation of a trade secret*,  the UTSA's preemption provision has
> generally been interpreted to abolish all free-standing alternative causes of
> action for theft or misuse of confidential, proprietary or otherwise secret
> information falling short of trade secret status (e.g., idea misappropriation,
> information piracy, theft of commercial information, etc.).

Hauck Manufacturing Co., 375 F. Supp. 2d at 655 (alterations and italics in original); see also

PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1269 (7th Cir. 1995) ("The [Illinois UTSA] abolishes

any common law remedies or authority contrary to its own terms"); Convolve, Inc. v. Compaq

Computer Corp., No. 00CV5141 2006 WL 839022, at *6 (S.D.N.Y. March 31, 2006) (noting the

"broad preemptive effect" of the model UTSA); Learning Curve Toys, L.P. v. Playwood Toys,

1999 WL 529572, *3 (N.D. Ill. July 20, 1999) ("if the operative facts [alleged in the complaint] are

arguably cognizable under the [Illinois Uniform Trade Secrets Act], any common law claim that

might have been available on those facts in the past now no longer exist in Illinois"); UTSA § 7,

comment (the UTSA preemption provision covers all common law claims alleging "a duty to

protect competitively significant secret information that is imposed by law").

      After a wide-ranging survey of preemption cases nationwide, the Hauck court held

that the proper touchstone for analyzing whether a plaintiff's common law claims are preempted by

the UTSA is whether, "as plead, they would succeed or fail dependent on proof [that the

---

[6] The only difference between the District of Columbia's preemption provision and the model UTSA is non-substantive: "supersedes" appears in D.C. Code § 36-407 in lieu of "displaces."

defendant] acquired, disclosed, or used Plaintiff's trade secrets or otherwise confidential information knowing or having reason to know such information was obtained through 'theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy . . . .'" Id. at 658 (*quoting* UTSA's definitions "improper means" and "misappropriation").[7]  If so, the common law claim is preempted by the UTSA; if not, the claim may proceed.  Id.  Other courts have stated the test in a different, but equally broad fashion: "if the operative facts are arguably cognizable under the UTSA, any common law claim that might have been available on those facts in the past no longer exists."  Convolve, Inc., 2006 WL 839022  at *7; see also Learning Curve Toys, L.P., 1999 WL 529572, at *3.

Importantly, just as a finding of ERISA preemption of a state law claim does not mean that a plaintiff *has* a cognizable ERISA claim, so too does the caselaw make clear that a finding of UTSA preemption does not mean that the plaintiff *has* a cognizable UTSA claim.  To the contrary, the UTSA preemption doctrine bars common law claims even where the allegedly misappropriated information fails to constitute a "trade secret" as defined by the UTSA.  As the Hauck Manufacturing Co. court explained:

> Plaintiff argues, at least in part, certain of its non-UTSA claims against [defendant] are not preempted because they do not depend on the information at issue qualifying as a "trade secret" [as defined by the UTSA].  While some courts have employed language seemingly indicating as much, a plaintiff surely cannot use general tort causes of action to revive claims which would otherwise not be cognizable in light of the UTSA (i.e., claims alleging theft of non-trade secret information).  It is a legal *non sequitor* to suggest general tort causes may be employed to protect legal rights which otherwise do not exist. . . .  Such an approach would be wholly inconsistent with the UTSA's goals of promoting uniformity and predictability . . . .  If the information is a trade secret, the plaintiff's claim is preempted; if not, the plaintiff has no legal interest upon which to base his or her claim.  Either way, the claim is not cognizable.

---

[7] This language tracks verbatim the definitions of "improper means" and "misappropriation" under D.C.'s UTSA statute.  See § 36-401(1) and (2).

11

<u>Hauck Manufacturing Co.</u>, 375 F. Supp. 2d at 656-57 (internal citations omitted).

Despite this authority squarely addressing the issue, IPOC may nevertheless contend that there can be no UTSA preemption of its common law claims because the UTSA applies only to "trade secrets" as defined in the statute, and that the materials and information allegedly misappropriated by Defendants do not qualify as "trade secrets" under the UTSA. Any such contention would be flatly contrary to the caselaw and should be rejected. As the Seventh Circuit succinctly put it, the UTSA "has abolished all common law theories of misuse of [confidential] information. Unless defendants misappropriated a . . . trade secret [as defined under the UTSA], they did no legal wrong." <u>Composite Marine Propellers, Inc. v. Van Der Woude,</u> 962 F.2d 1263, 1265 (7th Cir. 1992); <u>see</u> <u>Auto Channel, Inc.</u>, 144 F. Supp. 2d at 789 (the UTSA "replaces other law relating to the misappropriation of trade secrets, regardless of whether the Plaintiffs demonstrate that the information at issue qualifies as a trade secret"); <u>BioCore, Inc. v. Khosrowashahi</u>, 96 F. Supp. 2d 1221, 1233 (D. Kan. 2000) ("Even if confidential information can be something less than a trade secret, it must at least be a trade secret to give its owner a property right in it") (*quoted in* <u>Hauck Manufacturing Co.</u>, 375 F. Supp. 2d at 656).

**C.      Each of IPOC's Common Law Claims Is Preempted by D.C.'s UTSA Statute.**

IPOC's artful pleading cannot save its common law claims from UTSA preemption. In analyzing whether common law claims are preempted by the UTSA, "the issue is not what label the plaintiff puts on their claims. Rather, the court is to look beyond the label to the facts being asserted in support of the claim." <u>Convolve, Inc.</u>, 2006 WL 839022 at *6; <u>see</u> <u>Hauck Manufacturing Co.</u>, 375 F. Supp. 2d at 658 ("Certainly a claim does not miraculously become 'not based upon misappropriation of a trade secret' simply because a plaintiff denotes it by a different label") (*quoting* UTSA's preemption provision)).

As detailed below, each of IPOC's common law claims, as plead in the Complaint, necessarily "would succeed or fail dependent on proof [that defendants] acquired, disclosed, or used Plaintiff's trade secrets or otherwise confidential information knowing or having reason to know such information was obtained through 'theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy . . . .'"  Hauck Manufacturing Co., 375 F. Supp. 2d at 658 (*quoting* UTSA's definitions "improper means" and "misappropriation").[8] Consequently, they are preempted by the District of Columbia's UTSA statute and must be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state claims upon which relief can be granted.  See id.

### 1.     Tortious Interference With Business Expectancies (Count I)

Tortious interference with business expectancies and/or relations claims are routinely dismissed on UTSA preemption grounds where, as here, they are based upon the defendant's alleged acquisition and/or use of the plaintiff's confidential material.  Convolve, Inc., 2006 WL 839022, at *6 ("The California UTSA preempts [plaintiff's] claims for tortious interference with contract/prospective economic advantage"); Easton Sports, Inc. v. Warrior Lacrosse, No. 05-CV-72031, 2005 WL 2234559, at *2 (E.D Mich. Sept. 14, 2005) ("[plaintiff's] claims of intentional interference with business expectations are preempted by [the UTSA] to the extent the tort claims rely upon the misappropriation of [plaintiff's] trade secrets and confidential information"); Thomas & Betts Corp. v. Panduit Corp., 108 F. Supp. 2d 968, 974 (N.D. Ill. 2000) (tortious interference claim preempted because "[plaintiff's] claims that defendants tortiously interfered with [plaintiff's] relationships with its customers by engaging in a misappropriation –

_____

[8] This language tracks verbatim the definitions of "improper means" and "misappropriation" under D.C.'s UTSA statute.  See § 36-401(1) and (2).

i.e., unauthorized use of – trade secrets and confidential information") (internal quotation omitted); C&F Packing Co. v. IBP, No. 93-CV-1601, 1998 WL 1147139, *9-*10 (N.D. Ill. March 16, 1998), *adopted in full,* 1998 WL 160915 (N.D. Ill. March 31, 1998) (interference with business expectancy claim preempted under Illinois' UTSA statute).

   Here, IPOC's tortious interference with business expectancies claim is preempted by the District of Columbia's adoption of the UTSA. In an attempt to establish the elements of its claim, IPOC alleges that it "possessed [various] reasonable business expectancies," Compl. ¶ 25, and that Defendants engaged in "improper, fraudulent, deceptive and illegal conduct calculated to interfere with" those expectancies. Id. at ¶ 27. But the only "improper, fraudulent, deceptive and illegal conduct" alleged against Diligence is that it "obtained through fraud and bribery confidential documents and information about the IPOC investigation, which involved confidential financial and other business records of IPOC and transcripts of interviews of individuals who have relevant information about IPOC." Compl. ¶ 20 (internal quotations and alterations omitted). As such, Count I plainly "would succeed or fail dependent on proof [that Defendants] acquired, disclosed, or used [IPOC's] trade secrets or otherwise confidential information knowing or having reason to know such information was obtained through 'theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy . . . .'" Hauck Manufacturing Co., 375 F. Supp. 2d at 658 (*quoting* UTSA's definitions "improper means" and "misappropriation"). It therefore must be dismissed as preempted by D.C.'s UTSA statute, D.C. Code § 36-407. Id.

### 2. <u>Procuring Information By Improper Means (Count III)</u>

   Count III is IPOC's so-called claim for "Procuring Information By Improper Means." See Compl. ¶¶ 35-39. Even its title belies its clear preemption by the UTSA. As an element of this putative claim, IPOC alleges that Defendants "procured by improper and illegal

means information about IPOC's business that was held by KPMG FAS in the strictest confidence pursuant to agreement and statute." Id. at 37. IPOC further alleges that this confidential material was procured by Defendants "for the purpose of advancing rival business interests and was used and disclosed by [Defendants] for the purpose of advancing such rival business interests." In light of these allegations, it cannot seriously be disputed that Count III "would succeed or fail dependent on proof [that Defendants] acquired, disclosed, or used [IPOC's] trade secrets or otherwise confidential information knowing or having reason to know such information was obtained through 'theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy . . . .'" Hauck Manufacturing Co., 375 F. Supp. 2d at 658 (*quoting* UTSA's definitions "improper means" and "misappropriation"). Accordingly, it is preempted by D.C.'s UTSA statute, D.C. Code § 36-407. Id.

### 3. <u>Tortious Interference With Contractual Relations (Count IV)</u>

Count IV, alleging "tortious interference with contractual relations" also is preempted by the UTSA. According to the Complaint, Defendants "intentionally and maliciously induced and/or procured a breach of [a putative] Agreement between IPOC and KPMG FAS," Compl. ¶ 43, that KPMG FAS would "hold strictly confidential all information provided by, or received as a result of, IPOC's submissions to KPMG FAS." Id. at ¶ 42.

IPOC's tortious interference claim is on all fours with the claim asserted by the plaintiff (and preempted by the UTSA) in Thomas & Betts Corp., 108 F. Supp. 2d at 974. There, as here, the plaintiff alleged that defendants' "conduct induced [a third party] to breach his confidentiality agreement with plaintiff" by disclosing, among other things, plaintiff's "confidential information" Id. The court held that because the tortious interference claim alleged wrongful taking of confidential information, it was preempted by Illinois' adoption of the UTSA. Id.

IPOC's tortious interference claim is likewise premised on an alleged interference with a confidential agreement to which IPOC is party, and accordingly is preempted by D.C.'s UTSA statute for precisely the same reasons set forth in <u>Thomas & Betts Corp.</u>[9]  108 F. Supp. 2d at 974.

### 4.    Common Law Unfair Competition (Count V)

Count V similarly alleges that Defendants "exploited and misused the stolen IPOC business information for the benefit of IPOC's litigation adversaries and commercial rivals." Compl. ¶ 47.  Yet, again, this allegation places IPOC's common law unfair competition claim squarely within the ambit of UTSA preemption because it "would succeed or fail dependent on proof [that Defendants] acquired, disclosed, or used [IPOC's] trade secrets or otherwise confidential information knowing or having reason to know such information was obtained through 'theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy . . . .'" <u>Hauck Manufacturing Co.</u>, 375 F. Supp. 2d at 658 (<i>quoting</i> UTSA's definitions "improper means" and "misappropriation").[10]

---

[9] Numerous courts have dismissed tortious interference with contract claims as preempted by a state's adoption of the UTSA.  <u>See, e.g.</u>, <u>Convolve, Inc.</u>, 2006 WL 839022 at *7-*8 (dismissing tortious inference with contract claim as preempted by the California UTSA because claim "based on [plaintiff's] allegation that the defendants, in violation of [their confidentiality obligations under a Non-Disclosure Agreement], misappropriated [plaintiff's] confidential and/or trade secret information by stealing [plaintiff's] disk drive technologies") (internal quotations omitted); <u>Hauck Manufacturing Co.</u>, 375 F. Supp. 2d at 659 (tortious interference and unlawful procurement claims preempted "at least to the extent they rely on the confidentiality agreements [prohibiting disclosure of plaintiff's confidential information]"); <u>Higher Gear Group, Inc. v. Rockenbach Chevrolet Sales</u>, 223 F. Supp. 2d 953, 960 n. 2 (N.D. Ill. 2002) ("The Court recognizes that . . . Count VI (tortious interference with contract relations) [is] subject to preemption under the [Illinois UTSA statute]"); <u>Labor Ready, Inc. v. Williams Staffing</u>, 149 F. Supp. 2d 398, 409-10 (N.D. Ill. 2001) ("tortious interference with contract claim is preempted to the extent that it is based on trade secret misappropriation").

[10] Reported decisions dismissing common law unfair competition claims on UTSA preemption grounds are legion.  <u>See, e.g.</u>, <u>Enreach Technology, Inc. v. Embedded Internet Solutions</u>, 403 F. Supp. 2d 968, 978 (N.D. Cal. 2005) (dismissing unfair competition claim because "a common law cause of action based upon allegations of a trade secret misappropriation is preempted by the Uniform Trade Secrets Act."); <u>Higher Gear Group, Inc.</u>, 223 F. Supp. 2d at 960 n.2 ("The Court

5.    **Common Law Conspiracy (Count VI)**

This claim, too, plainly is preempted by the District of Columbia's UTSA statute. See D.C. Code § 36-407. Where, as here, a plaintiff's common law conspiracy claim is founded upon an alleged theft of plaintiff's confidential information (or trade secrets), the claim is preempted by the UTSA. See Hauck Manufacturing Co., 375 F. Supp. 2d at 660; (dismissing common law civil conspiracy claim as preempted by UTSA where "the object of the alleged conspiracy was to steal Plaintiff's trade secrets and other confidential information"); Thomas & Betts Corp., 108 F. Supp. 2d at 973-74 (dismissing civil conspiracy claim as preempted by UTSA because plaintiff's "allegations state nothing more than an accusation that defendants conspired to take [plaintiff's] confidential information by improper means—i.e., by 'theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship.") (quoting Illinois UTSA statute's definition of "misappropriation").

6.    **Unjust Enrichment (Count VII)**

Finally, IPOC's unjust enrichment claim must be dismissed under the caselaw as preempted by D.C.'s UTSA statute, D.C. Code § 36-407. This claim alleges that Defendants have been unjustly enriched because they allegedly received payment "as a result of their wrongful conduct . . . earned at the expense of and to the detriment of IPOC." Compl. ¶ 56. Again, however, the gravamen of the allegedly wrongful conduct forming the basis of IPOC's Complaint is that Defendants

———————————————

recognizes that count[] IV (unfair competition) . . . [is] subject to preemption under the [Illinois UTSA statute]"); Auto Channel, Inc., 144 F. Supp. 2d at 790 (because plaintiff alleged theft and use of trade secret information, its "unfair competition claim would arise from the misappropriation of trade secrets. This claim is precisely the type replaced by [Kentucky's Uniform Trade Secrets Act]"); Thomas & Betts Corp., 108 F. Supp. 2d at 973-74 (dismissing unfair competition claim as "expressly preempted" by the UTSA where the "factual allegations, though lengthy, simply describe how the defendants used the confidential information taken from [plaintiff]").

used wrongful means to acquire information regarding IPOC that KPMG FAS had
obtained as part of its Investigation [of IPOC on behalf of the Government of
Bermuda].  Diligence then disclosed that information to third parties, including
IPOC's litigation adversaries, as directed by BGR.

Compl. ¶ 1.  As such, IPOC's unjust enrichment claim "would succeed or fail dependent on proof

[that Defendants] acquired, disclosed, or used [IPOC's] trade secrets or otherwise confidential

information knowing or having reason to know such information was obtained through 'theft,

bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy . . . .'"

Hauck Manufacturing Co., 375 F. Supp. 2d at 658 (*quoting* UTSA's definitions "improper means"

and "misappropriation").  Consequently, it is preempted by D.C.'s UTSA statute, D.C. Code § 36-

407.[11]

   In sum, for the reasons set forth above, each of IPOC's common law causes of

action (Count I and Counts III-VII) is preempted by D.C.'s UTSA statute, D.C. Code § 36-407,

and must therefore be dismissed for failure "to state a claim upon which relief can be granted."

Fed. R. Civ. P. 12(b)(6).

---

[11] Federal courts routinely dismiss common law unjust enrichment claims as preempted by the
UTSA.  See, e.g., Penalty Kick Management v. Coca Cola, 318 F.3d 1284, 1297-98 (11th Cir.
2003) (plaintiff's claims for unjust enrichment preempted by UTSA); Health Alliance Network,
Inc. v. Continental Cas. Co., 354 F. Supp. 2d 411, 423 (S.D.N.Y. 2005) (dismissing on UTSA
preemption grounds unjust enrichment claim based upon  allegations that "Defendants unfairly and
unjustifiably disclosed the confidential information to the third parties"); Hauck Manufacturing
Co., 375 F. Supp. 2d at  662 (common law unfair competition claim preempted by Tennessee's
adoption of UTSA); Learning Curve Toys, L.P, 1999 WL 529572, at *2-*3 (unjust enrichment
claim preempted by Illinois's Uniform Trade Secrets statute).

III.   **EVEN IF THE UTSA DID NOT PREEMPT IPOC'S COMMON LAW CLAIMS, IPOC HAS FAILED TO STATE COGNIZABLE CLAIMS UNDER DISTRICT OF COLUMBIA LAW.**

As set forth above, the UTSA preempts each of IPOC's common law claims. But even if it did not (and it plainly does[12]), IPOC's Complaint fails to state common law claims upon which relief can be granted for the reasons set forth below. Accordingly, they must be dismissed under Fed. R. Civ. P. 12(b)(6).

A.   **IPOC Fails to State a Claim of Tortious Interference with Business Expectancies.**

As discussed above, Count I of the Complaint – "Tortious Interference with Business Expectancies – is preempted by the District of Columbia Uniform Trade Secrets Act, and fails for that reason alone. Preemption aside, Count I also fails because it does not allege an essential element necessary to state such a claim: a valid "business expectancy" within the meaning of the tort. This provides a second, independent reason to dismiss Count I of the Complaint.

In the District of Columbia, a claim of intentional interference with business expectancy consists of four elements: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage. Bennett Enters., Inc. v. Domino's Pizza, Inc., 45 F.3d 493, 499 (D.C. Cir. 1995); PM Services Co. v. Odoi Associates, Inc., No. 03-Civ-1810(CKK), 2006 WL 20382, at *34 (D.D.C. 2006).

_____

[12] By including this Section III, Diligence does not in any way concede that any of IPOC's common law claims survive UTSA preemption. They cannot. Diligence includes this analysis to further underscore the utter lack of legal merit in each such claim.

To allege "a valid business relationship or expectancy," a plaintiff must first allege that the plaintiff and a third party intended to do business together. As the D.C. courts have noted, "[f]or the most part, the 'expectancies' thus protected have been those of future contractual relations, such as the prospect of obtaining employment or employees, or the opportunity of obtaining customers." Carr v. Brown, 395 A.2d 79, 84 (D.C. 1978). Nevertheless, whether contractual or otherwise, the "expectancies" protected by the tort are limited to pecuniary, profit-making business relationships. See Washington Metropolitan Area Transit Authority, No. 04-Civ-838(RCL), 2006 WL 1147933, at *6 (D.D.C. April 28, 2006) ("[a] valid business expectancy requires a probability of future contractual or economic relationship"); Casco Marina Development, LLC v. District of Columbia Redevelopment Land Agency, 834 A.2d 77, 84 (D.C. 2003) (tort requires "a prospective advantageous business transaction").[13]

Thus, where a plaintiff does not allege that a defendant interfered with an expected contract or other profit-making transaction with a third party, courts do not hesitate to dismiss the claim for failure to allege the "business relationship or expectancy" element of the tort. See, e.g., Kwang Dong Pharmaceutical Co. v. Han, 205 F. Supp. 2d 489, 496-97 (D. Md. 2002) (dismissing claim under D.C. law where plaintiff failed to allege "specific contractual relations" with employer); Paul v. Howard University, 754 A.2d 297, 310 (D.C. 2000) (no viable claim where plaintiff did not have "a contract, or even a prospective contract" with defendant); Amatulli

---

[13] See also Seabury Smith, Inc. v. Payne Financial Group, 393 F. Supp. 2d 1057, 1064 (E.D. Wash. 2005) (valid business expectancy "includes any prospective contractual or business relationship that would be of pecuniary value"); Singh v. Blue Cross & Blue Shield of Massachusetts, 182 F. Supp. 2d 164, 178 (D. Mass. 2001) (tort protects a "probable future business relationship anticipating a reasonable expectancy of financial benefit"); Kidd v. Bass Hotels & Resorts, 136 F. Supp. 2d 965, 970 (E.D. Ark. 2000) ("It is elementary that some precise business expectancy or contractual relationship be obstructed"); Blank v. Kirwan, 703 P.2d 58, 70 (Cal. 1985) ("[t]he tort has traditionally protected the expectancies involved in ordinary commercial dealings").

Imports, Inc. v. Nargezian, No. 30-90-84, 1993 WL 11937, at *3 (Conn. Super. Jan. 19, 1993) (finding a "fatal flaw in the failure to sufficiently identify a business expectancy or opportunity, which includes a reasonable probability of entering into a contract or making a profit"). The same failure dooms IPOC's "business expectancy" claim here.

Count I of the Complaint alleges that the Defendants tortiously interfered with four specific business expectancies:

> (a) that the Zurich arbitration in which it sought to enforce its rights would be conducted without malicious interference and would not be tainted by improper or illegal activities calculated to corrupt the Zurich arbitration for the benefit of IPOC's litigation adversaries;

> (b) that the [IPOC] Investigation would be conducted in a evenhanded and impartial manner and in accord with the requirements imposed upon KPMG FAS in its position as investigator;

> (c) that the materials and information provided to KPMG FAS would be held in strict confidence, used solely in connection with the [IPOC] Investigation and would not be utilized to further the interests of IPOC's litigation adversaries; and

> (d) that IPOC's charter would not be attacked by improper or illegal means, including bribery, fraud and deception.

Compl. ¶ 25.

None of these allegations states a "business expectancy" sufficient to sustain a tort claim for intentional interference with that business expectancy. IPOC's first claimed "expectancy" – that the Zurich arbitration would be conducted without "malicious interference" or "taint[]," plainly does not involve the type of "prospective advantageous business transaction," Casco Marina Development, 834 A.2d at 84, protected by the tort. Indeed, the highest court of at least one state has expressly rejected the applicability of tortious interference claims to similar allegations of malicious interference with litigation. See Fox v. Country Mut. Ins. Co., 7 P.3d 677, 690 (Or. 2000) ("we have found no reported decision from any jurisdiction in which a court has

extended the tort of intentional interference with a prospective economic advantage to protect civil litigation").  Likewise, to the extent that IPOC is effectively claiming that Defendants have interfered with its "expectancy" of an ultimate judgment in its favor in the Zurich arbitration or some other proceeding, a "judgment" is not a business expectancy protected by D.C. law.  <u>See</u> <u>Nicor International Corp. v. El Paso Corp.</u>, 292 F. Supp. 2d 1357, 1376-77 (S.D. Fla. 2003) (noting "no legal authority" under D.C. law for claim that "a judgment qualifies as a contract or business relationship" for purpose of tortious interference claim).

IPOC's second and third alleged "expectancies" are related; neither alleges the type of pecuniary, profit-making business relationship covered by the tort.  IPOC claims (i) that it had a business expectancy that the KPMG FAS investigation of IPOC would be conducted in a evenhanded and impartial manner and in accord with the requirements imposed upon KPMG FAS in its position as investigator, including (2) the right to have its information held in strict confidence by the investigator.  Compl. ¶ 25.

On its face, the relationship between IPOC and KPMG is not a <u>business</u> relationship at all.  Rather, it is the relationship between Government of Bermuda inspectors appointed by statute and the subject of those inspectors' investigation.  This is not a "voluntary economic relationship" that "would have very likely resulted in a pecuniary benefit to the plaintiff but for the defendant's interference."  <u>Fox</u>, 7 P.3d at 690.  To the contrary, the relationship of the inspector and the inspected is profoundly involuntary – indeed compulsory[14] – and is certainly not intended

---

[14]  Section 132(3) of the Bermuda Companies Act provides that "[e]very officer, agent or employee of the company shall produce to the inspector such books or documents as the inspector may require for the purpose of his investigation"; section 132(4) establishes penalties for officials of a subject company who fail to cooperate in the investigation; and section 132(12) treats the inspectors' investigation as a judicial proceeding with respect to the applicability of the perjury statute.

to be a money-making opportunity for IPOC.  It is simply not a "prospective advantageous business transaction," Casco Marina Development, 834 A.2d at 84, within the scope of the tort.

IPOC's final alleged "business expectancy" is "that IPOC's charter would not be attacked by improper or illegal means, including bribery, fraud and deception."  Compl. ¶ 25.  It is, however, well-established under D.C. law that a plaintiff possesses absolutely no "business expectancy" in governmental licenses or permits such as the corporate charter at issue here.  In Carr v. Brown, 395 A.2d 79 (D.C. 1978), the D.C. Court of Appeals considered – and rejected – a "business expectancy" very similar to the one IPOC alleges here.  In Carr, the plaintiff real estate developer charged that a business competitor had tortiously, through malicious acts and false statements, interfered with zoning permits that were essential to develop the plaintiff's property.  Id. at 83.  Noting that the plaintiff was "claiming interference with expectations of profit that were wholly contingent upon the decisions of . . . governmental bodies," the Carr court rejected plaintiff's tort claim, holding that the "'expectancies' which [plaintiff] claims" were "simply too remote, depending as they do on governmental approval."  Id. at 84.  Likewise, IPOC cannot realistically claim a business expectancy in obtaining and maintaining its corporate charter from the Government of Bermuda – particularly not when any alleged threat to that charter arises out of a Government of Bermuda investigation into IPOC's own activities.  See generally Blank, 703 P.2d at 70 (intentional interference tort does not protect "the 'expectancies,' whatever they may be, involved in the governmental licensing process"); Democratic State Committee of the District of Columbia v. Bebchick, 706 A.2d 569 (D.C. 1998) (citing Carr and affirming dismissal of tortious

interference claim when ultimate decision on an appointment was under supervision of U.S. Court of Appeals for the D.C. Circuit).[15]

In short, IPOC does not state a claim for tortious interference with business expectancies, for the simple reason that it cannot allege a valid business expectancy, as required to state a cognizable claim.  Count I of the Complaint should be dismissed.[16]

**B.    IPOC's Tortious Interference Claim Fails For Lack of a Valid and Enforceable Underlying Contract between IPOC and KPMG FAS.**

In Count IV of the Complaint, IPOC asserts that Defendants tortiously interfered with an alleged agreement between IPOC and KPMG FAS "whereby IPOC would provide to KPMG FAS information, including documents and testimony of witnesses, on a confidential basis, to assist KPMG FAS in carrying out its Investigation [of IPOC by the Bermudian Minister of Finance]."  Compl. ¶ 41.  Any "agreement" that KPMG FAS would keep confidential information provided to it by IPOC cannot form the basis of any legitimate, enforceable contract – and, thus, an action for tortious interference with such a contract – for at least two reasons.

First, there was no valid consideration provided by KPMG FAS under the putative contract.  As IPOC itself acknowledges in the Complaint, the "Bermuda Companies Act of 1981

---

[15]  Even if IPOC had a "business expectancy" in obtaining and maintaining its Bermuda corporate charter (and it does not), IPOC would still fail to state a claim for tortious interference because IPOC wholly fails to allege that there was a "breach or termination of the relationship or expectancy."  PM Services, 2006 WL 20382, at *34; see also Bennett Enters. v. Domino's Pizza, Inc., 45 F.3d 493, 499 (D.C. Cir. 1995) (interference must induce or cause a breach or termination of the relationship or expectancy); Bannum, Inc. v. Citizens for a Safe Ward Five, Inc., 383 F. Supp. 2d 32, 45 (D.D.C. 2005) (same).

[16]  It is clear that IPOC does not premise its claim on interference with a "business expectancy" as that term has been defined in the caselaw, but rather on a claimed right to recover for the general effects of allegedly intentional tortious conduct – in other words "prima facie tort."  D.C. law does not, however, recognize such a tort claim. Nix v. Hoke, 139 F. Supp. 2d 125, 132 n.5 (D.D.C. 2001).  See also Art Metal-U.S.A. v. United States, 577 F. Supp. 182, 184 (D.D.C. 1983) ("District of Columbia Courts have not embraced a form of generic tort like the prima facie tort"); Schwartz v. Franklin Nat'l Bank, 718 A.2d 553, 556-57 (D.C. 1998) (same).

(the 'Act') <u>requires</u> that the Investigation remain confidential unless the company under

investigation requests that it be made public." Compl. ¶ 14 (emphasis added).  Because IPOC

acknowledges that neither it nor its affiliates under investigation by KPMG FAS ever requested

that the investigation be made public, Compl. ¶ 16, KPMG FAS had a pre-existing statutory

obligation under the Bermuda Companies Act of 1981 to maintain the confidentiality of all aspects

of the investigation <u>irrespective</u> of any alleged agreement between IPOC and KPMG FAS.  Thus, a

promise by KPMG FAS not to divulge information provided to it by IPOC cannot have formed the

basis of a valid, enforceable contract because there was an existing legal duty, and thus an absence

of valid consideration.  <u>See</u>, <u>e.g.</u>, <u>Murray v. Northrup Gruman Info. Tech.</u>, 444 F.3d 169, 178 (2d

Cir. 2006) ("A promise to perform a pre-existing legal obligation does not amount to

consideration"); <u>Kamya & Assoc. v. Jackson</u>, 368 F.3d 1318, 1322 (Fed. Cir. 2004) ("Performance

of a pre-existing legal duty is not consideration") (*citing* Restatement (Second) of Contracts § 73

(1981)); <u>United States v. Brideman</u>, 523 F.2d 1099, 1110 (D.C. Cir. 1975) ("The prisoners' tacit

guarantee that no further violence would ensue promised only the performance of a pre-existing

legal duty, a typical example of invalid consideration"); <u>Littlepage v. Neale Publishing Co.</u>, 34

App. D.C. 257,  260 (1910) ("It of course goes without saying that the promise to do a thing which

the promisor is already bound to do is not a good consideration upon which to found another

promise").

            <u>Second</u>, there likewise was no valid consideration provided by IPOC under the

putative contract IPOC alleges in Count IV.  Although the Complaint misleadingly suggests that

IPOC <u>voluntarily</u> assisted KPMG FAS in its investigation of IPOC (and its affiliated companies)

by agreeing to provide materials and information, in fact IPOC had no choice in the matter: it was

<u>required</u> to do so.  The Bermuda Companies Act of 1981 expressly requires that "[e]very officer,

agent, or employee of the company [under investigation by the Minister of Finance] shall provide

to the inspector such books or documents as the inspector may require for purposes of his

investigation."  Bermuda Companies Act of 1981, § 132(3).[17]  Because IPOC was required by law

to do so, a promise by IPOC to divulge information to KPMG FAS during the course of its

investigation cannot provide the consideration necessary to form a valid, enforceable contract, as

demonstrated by the authorities cited above.  There simply was no valid contract between IPOC

and KPMG FAS with which to tortiously interfere.

### C.     Count III of the Complaint Is Not a Recognized Cause of Action in the District of Columbia.

Count III of the Complaint is IPOC's so-called claim for "Procuring Information By

Improper Means."  Compl.¶ ¶ 35-44.  A search of District of Columbia caselaw reveals no such

cause of action recognized in the District of Columbia.  Indeed, IPOC telegraphs as much by citing

two Pennsylvania trial court opinions as its only support for its cause of action.[18]  Id. at  ¶ 36.

IPOC cites no District of Columbia authority to support its novel theory of liability.

The absence of a District of Columbia statutory or common law basis for Count III

is fatal to IPOC's claim.  Where, as here, a plaintiff attempts to assert a cause of action not

recognized under applicable state law, the claim is properly dismissed under Fed. R. Civ. P.

12(b)(6) for failure to state a claim upon which relief can be granted.  See, e.g., Wadley v.

Aspillaga, 163 F. Supp. 2d 1, 5 (D.D.C. 2001) (social host liability claim dismissed for failure to

state a claim because "the District of Columbia has no [such] statutory or common law cause of

---

[17] The Court may take judicial notice of statutes.  See Rahmaan v. Federal Nat'l Mortgage Ass'n, No. 02CV1822, 2003 WL 21940044 *2 (D.D.C. May 19, 2003) ("The Court can take judicial notice of statutes and regulations").

[18] There are, of course, no factual allegations whatsoever in the Complaint to suggest application of Pennsylvania law to this case.

action"; "The District of Columbia has yet to rule on this precise issue"); Nix, 139 F. Supp. 2d at 132 (dismissing plaintiff's claim under Ohio law because "Ohio law does not recognize such a claim").

### D.    IPOC's Tag-Along Unfair Competition Claim Must Be Dismissed With Its Other Claims.

IPOC's common law unfair competition count should be dismissed as redundant and derivative of IPOC's other flawed claims. Under District of Columbia law, unfair competition does not exist as an independent tort, but rather as a general category of wrongs into which various other torts may be grouped. "Unfair competition is not defined in terms of specific elements, but by the description of various acts that would constitute the tort if they resulted in damage . . . . These acts include interference with access to business." Furash & Co., Inc. v. McClave, 130 F. Supp. 2d 48, 57 (D.D.C. 2001) (dismissing unfair competition count as "essentially a restatement" of plaintiff's other claims) (citing Business Equip. Ctr. v. DeJur-Amsco Corp., 465 F. Supp. 775, 788 (D.D.C. 1978) and B & W Mgmt. v. Tasea Inv. Co., 451 A.2d 879, 881 n.3 (D.C. 1982)); see also B&W Mgmt., 465 F. Supp. at 881 n.3 (listing types of torts which "may constitute unfair competition at common law"). Accordingly, failure of the underlying tort claims leads to the dismissal of the unfair competition claim. See Business Equip. Ctr., 465 F. Supp. at 788 (dismissing unfair competition claim for failure to allege damage independent of harm allegedly resulting failed under Sherman Act and interference with business relations claims); Goddard, Inc. v. Henry's Foods, Inc., 291 F. Supp. 2d 1021, 1034 (D. Minn. 2003) ("Under this doctrine, if we find that the underlying tort is duplicative of another Count of the Complaint, the claim for unfair competition must be dismissed"); Dade Int'l, Inc. v. Iverson, 9 F. Supp. 2d 858, 862 (M.D. Tenn. 1998) (dismissing unfair competition count where plaintiff failed to allege cognizable cause of action "for a violation of any tort independent of the tort of unfair competition").

27

At a minimum, the claim, to the extent it exists at all, must assert a recognized form of business competition between the parties, allegations which notably are absent from the Complaint—indeed, as noted above, IPOC steadfastly refuses to disclose what it actually does. "[T]he practices which are prohibited by the tort of unfair competition must relate to <u>competition</u> in some form.  Not every form of commercial immorality takes the form of the misappropriation of the commercial advantage that belongs to another." <u>Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano</u>, 331 F. Supp. 2d 247, 255 (S.D.N.Y. 2004) (interpreting New York law).  Here, Defendants are not alleged to be competitors of IPOC's in any recognized market.  Rather, Defendants are merely alleged to be "agents" of IPOC's "litigation and business competitors" in arbitration proceedings over ownership of an interest in a Russian mobile telephone concern. Compl. ¶¶ 11, 46.  Being a litigation adversary and challenging another's private ownership interest in a business (even if IPOC's agency theory is accepted for purposes of this motion) is not among the listed types of unfairly competitive behavior which supports an unfair competition theory under District of Columbia law.  See <u>B&W Mgmt.</u>, 465 F. Supp. at 881 n.3.  In the absence of any allegation of a recognized market or competitive environment, the unfair competition count fails to state a claim, even if the Court declines to dismiss Count V as a duplicative, repackaged version of IPOC's other flawed claims.

### E.     IPOC's Failure to State Viable Tort Claims Require Dismissal of Count VI, its Civil Conspiracy Claim.

Because IPOC has failed to allege viable underlying claims of tortious conduct, IPOC has also failed to state a claim for common law civil conspiracy.  As the U.S. Court of Appeals for the D.C. Circuit has explained, "there is no recognized <u>independent</u> tort action for civil conspiracy in the District of Columbia." <u>Halberstam v. Welch</u>, 705 F.2d 472, 479 (D.C. Cir. 1983) (emphasis in original); <u>Executive Sandwich Shoppe, Inc., v. Carr Realty Corp.</u>, 749 A.2d 724, 738

(D.C. 2000) (same).  Under D.C. law, a claim of civil conspiracy is, instead, a means for establishing vicarious liability for an underlying tort.  Halberstam, 705 F.2d at 479; Weishapl v. Sowers, 771 A.2d 1014, 1023-24 (D.C. 2001) (same).  Thus, a "civil conspiracy" is not actionable in and of itself, but depends upon the performance of some specific underlying tortious act.  Levi v. Brown & Williamson Tobacco Corp., No. 04-7096, 2005 WL 3778636, at *1 (D.C. Cir. June 26, 2005) ("appellant's conspiracy claim fails, because he has not made out a claim for an underlying tort"); Hall v. Clinton, 285 F.3d 74, 82-83 (D.C. Cir. 2002) (same); Halberstam, 705 F.2d at 479 (same).

Where, as here, a plaintiff fails to state a claim of an actionable tort underlying the alleged conspiracy, the civil conspiracy claim must also be dismissed.  See, e.g., Daisley v. Riggs Bank, N.A., 372 F. Supp. 2d 61, 73 (D.D.C. 2005) (dismissing civil conspiracy claim on ground that there was "no longer an 'underlying tortious act' to support [plaintiff's] claim of civil conspiracy" where plaintiff's tort claims had been dismissed); Executive Sandwich Shoppe, 749 A.2d at 738 (noting that civil conspiracy claim premised on impermissible tort theory "fails as a matter of law for lack of an underlying tortious act"); Mazloum v. District of Columbia, No. 06-Civ-0002(JDB), 2006 WL 1770500, at *8 (D.D.C. June 27, 2006) (dismissing civil conspiracy claim; failure to state claim of underlying tort "is fatal to the viability of the common law conspiracy claim").  Because, for the reasons discussed above, IPOC's Complaint has failed to state a viable tort claim,[19] Count VI of the Complaint must be dismissed as a matter of law.

------------------------------

[19] Diligence notes that even if IPOC's Computer Fraud and Abuse Act claim could survive dismissal – and, for the reasons stated above in Section I.B above, it cannot – that statutory claim would appear insufficient, standing alone, to support IPOC's civil conspiracy claim under D.C. law.  See Mazloum, 2006 WL 1770500, at *8 n.6 (discussing D.C. Court of Appeals "skepticism" of civil conspiracy claim predicated on statutory violation); Executive Sandwich Shoppe, 749 A.2d at 739 (inviting trial court to consider case "authority which suggests that a claim of civil conspiracy does not lie for violation of a statute").

**F.    Because IPOC's Other Counts Fail, Its Unjust Enrichment Claim Fails.**

Finally, Count VII, for unjust enrichment, should also be dismissed because it depends explicitly on the other flawed counts in the Complaint for its viability. <u>See</u> Compl. ¶ 55 (alleging Defendants have "received substantial sums of money in exchange for their <u>tortious interference</u> with IPOC's business relationships, expectancies and contracts, and <u>violation of the Computer Fraud Act</u>") (emphasis added). IPOC's failure to state a claim on the Complaint's other causes of action dooms its piggyback unjust enrichment claim. <u>See</u>, <u>e.g.</u>, <u>HI Ltd. Partnership v. Winghouse of Florida, Inc.</u>, No. 05-10074, 2006 WL 1642222, at *1 (11th Cir. June 15, 2006) (plaintiff's "state-law claim of unjust enrichment must also fail" where founded on other claims which failed as a matter of law). As the Third Circuit has reasoned:

> In the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted  to keep the benefit of his tortious conduct, he will be unjustly enriched). As the Restatement of Restitution puts it:
>
> The desirability of permitting restitution in [tort] cases is ordinarily not so obvious as in the cases where there has been no tort since the tortfeasor is always subject to liability in an action for damages and . . . the right to maintain an action for restitution in such cases is largely the product of imperfections in the tort remedies, some of which imperfections have now been removed. Restatement of Restitution § 3 cmt. a (1937); *see also id.* at ch. 7 introductory note ("Actions of tort are ordinarily not restitutionary . . . . They are based primarily upon wrongdoing and ordinarily, through the payment of money, compensate the injured person for the harm suffered by him as a result of the wrongful conduct, irrespective of the receipt of anything by the defendant."). We can find no justification for permitting plaintiffs to proceed on their unjust enrichment claim once we have determined that the District Court properly dismissed the traditional tort claims because of the remoteness of plaintiffs' injuries from defendants' wrongdoing.

<u>Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.</u>, 171 F.3d 912, 936-37 (3d Cir. 1999). Although IPOC has asserted a slew of other claims against Defendants, for the reasons

set forth above, not one of them states a cognizable claim. Without any predicate claim, IPOC cannot state an unjust enrichment claim upon which relief can be granted.

## **CONCLUSION**

For the foregoing reasons, Diligence respectfully requests that each claim in the Complaint be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

Respectfully submitted,

July 20, 2006                                        AEGIS LAW GROUP LLP

By:        /s/ Paul Rauser
           Paul C. Rauser (D.C. Bar No. 461722)
           Michael K. Ross (D.C. Bar No. 458573)
           Oliver Garcia (D.C. Bar No. 456600)
           901 F Street, N.W., Suite 500
           Washington, D.C. 20004
           T: 202-737-3500
           F: 202-737-3330

           *Attorneys for Defendant Diligence Inc.*