## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IPOC INTERNATIONAL GROWTH FUND LIMITED | ) ) ) | |
| *Plaintiff,* | ) ) | Civil Action No. 06-1109 (PLF) |
| v. | ) ) | |
| DILIGENCE LLC, et al. | ) ) | |
| *Defendants.* | ) ) ) | |

## REPLY MEMORANDUM IN SUPPORT OF
## DILIGENCE, INC.'S MOTION TO DISMISS

Facts are stubborn things, and the stubbornness of facts dooms IPOC's Complaint,

notwithstanding its straw-man arguments and attempts to amend the Complaint *sub silencio* to

avoid dismissal. The <u>facts</u> alleged in IPOC's Complaint simply do not support its seven causes of

action – indeed, the facts alleged in the Complaint actually require the dismissal of all of IPOC's

state-law claims, and only serve to highlight the fatal deficiencies in its lone federal claim.[1]

As detailed below, IPOC has failed to plead any facts to support the required "loss

or damage" component of a claim under the Computer Fraud and Abuse Act ("CFAA").

Moreover, as evidenced by IPOC's own description of Defendants' allegedly wrongful conduct as

"misappropriation" of its confidential information, Opp. at 8, the facts alleged in the Complaint

---

[1] IPOC's Opposition Memorandum contains a recurring theme that, to survive a Rule 12(b)(6) motion to dismiss, a complaint need only state, in conclusory fashion, the hornbook elements of each cause of action. Of course, if IPOC were correct, complaints would be extremely short documents with no factual allegations whatsoever—just legal conclusions. But that is not the law. On a Rule 12(b)(6) motion, the court does not "accept as true those legal conclusions or inferences drawn by plaintiffs that are not supported by the facts recited in the complaint." <u>Doe v. State of Israel</u>, 400 F. Supp. 2d 86, 100 (D.D.C. 2005). Rather, to survive a Rule 12(b)(6) motion, the complaint must allege facts to support each required element of the claim. <u>See id.</u>; <u>see also Kowal v. MCI Comm. Corp.</u>, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (in deciding a Rule 12(b)(6) motion, the court does not "accept [as true] legal conclusions cast in the form of factual allegations").

mandate preemption of each of IPOC's common law claims under D.C.'s Uniform Trade Secrets

Act, D.C. Code § 36-401 *et seq.*, which specifically preempts all common law claims for

"misappropriation" of confidential material.

        Indeed, even if IPOC's common law claims were not preempted (and they are),

each fails to state a cognizable claim based upon the facts alleged in the Complaint. IPOC's

tortious interference claims (Counts I and IV) fail because IPOC has not identified any legitimate

business interest or any contract with which to interfere. Count III (procuring information by

improper means) simply does not exist in the District of Columbia. The remaining Counts – unfair

competition (V), civil conspiracy (VI), and unjust enrichment (VII) – are nothing more than

derivative, tag-along claims that must be dismissed along with IPOC's other flawed claims.

## ARGUMENT

## I.    DILIGENCE'S MOTION TO DISMISS IS TIMELY.

        IPOC leads off its Opposition with a most curious argument:  IPOC argues that the

Consent Order entered at the outset of the case extended only the deadline to "answer" the

complaint, not the "time to file a motion under Rule 12(b)."  Opp. at 2-3 n.2.  Tellingly, IPOC fails

to cite any supporting authority.  There is none.  Under Federal Rule of Civil Procedure 12(b), the

deadline to file a Rule 12(b)(6) motion is the deadline to answer the complaint.[2]  Simply put, they

are one and the same deadline.  The extension until July 20 of Diligence's deadline to answer the

complaint automatically – indeed, necessarily – extended Diligence's deadline to file a Rule 12(b)

motion.

---

[2] See Fed. R. Civ. P. 12(b) ("A motion making any of these defenses [under Rule 12(b)] shall be made
before pleading if a further pleading is permitted"); 5C Charles Alan Wright and Arthur R. Miller, *Federal
Practice and Procedure* § 1361, p. 97 (3d ed. 2004 & 2005 Supp.) ("Of course, any effective extension of
the period in which to serve a responsive pleading preserves the right to make a motion under Rule 12(b)
during the enlarged time period").

## II.     IPOC FAILS TO ALLEGE THE STATUTORILY-DEFINED "DAMAGE OR LOSS" REQUIRED TO STATE A CFAA CLAIM.

Section §1030(g) of the CFAA creates a narrow civil cause of action for "any person who suffers damage or loss" in connection with a violation of the CFAA. 18 U.S.C. §1030(g). As Diligence detailed in its Opening Memorandum ("Mem.") at 4-7, the caselaw interpreting the definitions of "damage," §1030(e)(8), and "loss," §1030(e)(11), makes clear that the only "damage[s] or loss[es]" compensable under the CFAA are the "cost of investigating or remedying damage to a computer, or a cost incurred because the computer's system was interrupted." Nexans Wires S.A. v. Sark-USA, Inc., 319 F. Supp. 2d 468, 475 (S.D.N.Y. 2004), aff'd, 2006 WL 328292 (2d Cir. Feb. 13, 2006). Here, however, the Complaint is devoid of any factual allegation that IPOC suffered any such damages. Rather than discuss this inconvenient caselaw, IPOC twists Diligence's arguments and then cites cases purporting to defeat points not even raised by Diligence. Similarly, faced with Rule 9(b)'s requirements that fraud allegations be pleaded with particularity, IPOC shifts ground by claiming, falsely, that its CFAA claim is predicated on a different provision of the CFAA than the one quoted verbatim in its Complaint – a provision, in any event, whose elements IPOC wholly fails to plead.

### A.     IPOC Ignores Recent On-Point Authority, Cited by Diligence, On What Constitutes Compensable "Damage or Loss" Under the CFAA.

Relying on extensive citations to, and quotations from, inapposite caselaw, IPOC brushes aside the recent, on-point authority cited by Diligence interpreting the scope of compensable damages under the CFAA. Rather than squarely address these precedents, IPOC instead sets up and knocks down two straw-man arguments – neither of which Diligence has made – and then goes on to describe at length the alleged damages to its general business interests from

3

Defendants' alleged CFAA violations. Under well-settled caselaw, however, harms to such interests are not cognizable under the CFAA.

> **1.    IPOC Has Failed to Allege That It Incurred Any "Cost of Investigating or Remedying Damage to a Computer, or a Cost Incurred Because the Computer's System Was Interrupted."**

As Diligence noted in its opening Memorandum, courts interpreting the CFAA have made it clear that compensable "damage or loss" under 18 U.S.C. § 1030(g) is limited to the "cost of investigating or remedying damage to a computer, or a cost incurred because the computer's system was interrupted." Nexans Wires, 319 F. Supp. at 475; Civic Center Motors, Ltd. v. Mason Street Import Cars, Ltd., 387 F. Supp. 378, 381 (S.D.N.Y. 2005) ("'losses' under the CFAA are compensable only when they result from damage to, or the inoperability of, the accessed computer system").[3] Here, IPOC's Complaint fails to plead that anyone – much less IPOC – incurred the "cost of investigating or remedying damage to a computer, or a cost incurred because the computer's system was interrupted." Nexans Wires, 319 F. Supp. 2d at 475.

Faced with this recent, on-point authority defeating its CFAA claim, IPOC sets up a straw-man. According to IPOC, Diligence's argument turns on the fact that the allegedly hacked computers belonged to KPMG FAS, not IPOC. See Opp. at 7. In fact, Diligence argues that

---

[3] See also Worldspan, L.P. v. Orbitz, LLC, No. 05-C-5386, 2006 WL 1069128, at *5 (N.D. Ill. April 19, 2006) ("Given these definitions of 'damage' and 'integrity' [in the CFAA], we reject [plaintiff's] argument that the mere 'taking of information' constitutes 'damage' under the CFAA"); Tyco Int'l (US) Inc. v. John Does, No. 01CV3856, 2003 WL 21638205, at *1 (S.D.N.Y. July 11, 2003) (the "types of damages awarded by courts under the [CFAA] have generally been limited to those costs necessary to assess the damage caused to the plaintiff's computer system or to resecure the system in the wake of a hacking attack") (citing EF Cultural Travel BV v. Explorica, Inc., 274 F.3d 577, 584-85 (1st Cir. 2001) (awarding costs of assessing damage to plaintiff's computer system); United States v. Middleton, 231 F.3d 1207, 1213-14 (9th Cir. 2000) (awarding costs of investigating and repairing the damage to plaintiff's computer system); In re DoubleClick Inc. Privacy Litig., 154 F. Supp. 2d 497, 524-25 (S.D.N.Y. 2001) (recognizing only the costs of remedying damage to plaintiff's computer systems as recoverable under the CFAA)).

> nowhere in IPOC's 15-page Complaint is there any suggestion – much less an express allegation – that KPMG FAS's computer systems were damaged or rendered in any way inoperative in connection with the allegedly unauthorized access, or in any event that <u>IPOC</u> had to pay for any such damage to, or costs to repair, KPMG FAS's computer systems.

Mem. at 6 (emphasis in original).  Both points are fatal to IPOC's claim.  <u>See, e.g.</u>, <u>Civic Center Motors</u>, 387 F. Supp. 2d at 381.

IPOC's second straw-man argument accuses Diligence of asserting that only physical damage to a computer system is compensable under the CFAA.  <u>See</u> Opp. at 7.  This misreads Diligence's argument.  As noted above, Diligence's actual argument is that IPOC's CFAA claim fails because the only compensable "damage or loss" under the CFAA – whether physical or not – is the cost of investigating or remedying damage to a computer, or a cost incurred because the computer's system was interrupted.  IPOC alleges neither of these.

IPOC simply has no answer to <u>Nexans Wires</u> – affirmed just six months ago by the Second Circuit – or to <u>Civic Center Motors</u>, which the Second Circuit cited with approval in affirming <u>Nexans Wires</u>, <u>see</u> 2006 WL 328292 at *2.  IPOC's Opposition instead attempts to minimize both cases by avoiding any discussion of their holdings.[4]  Indeed, IPOC goes so far as to suggest that <u>Civic Centers Motors</u> might actually <u>help</u> its efforts to avoid dismissal of its CFAA claim because, according to IPOC, the court "even suggested that a plaintiff could recover for the

_____

[4] IPOC brushes aside <u>Nexans Wires</u> on the ground that it dismissed the plaintiff's CFAA claim on summary judgment, not on a Rule 12(b)(6) motion.  <u>See</u> Opp. at 9.  In fact, the <u>Nexans Wires</u> court exercised its discretion under Rule (12)(b)(6) to convert the defendant's motion to dismiss into a motion for summary judgment, <u>see</u> 319 F. Supp. 2d at 468-69, and then dismissed plaintiff's CFAA claim for failure to plead any facts supporting a compensable "damage or loss" under the CFAA.  <u>See id.</u> at 478.  <u>Nexans Wires</u> applies with equal force to a motion to dismiss, as evidenced in <u>Civic Center Motors</u>, which relied explicitly on <u>Nexans Wires</u> to dismiss a CFAA claim under Rule 12(b)(6) because the plaintiff failed to plead any facts to support damages compensable under the CFAA.  <u>See Civic Center Motors</u>, 387 F. Supp. 2d at 381-82; <u>see also</u> <u>Worldspan</u>, 2006 WL 1069128 at *5 (noting alternative ground for dismissing CFAA claim on Rule 12(b)(6) motion was plaintiff's "failure to allege that [defendant's] conduct caused damage" to the computer system wrongfully accessed).

5

cost of 'losses resulting from data corruption,' 'responding to and repairing the computer

problems,' and 'exposure to liability' due to impairment of information systems." Opp. at 11.

This is a gross distortion. In fact, <u>Civic Center Motors</u>' analysis and holding <u>compel</u> dismissal of

IPOC's CFAA claim. There, as here, the plaintiff predicated its CFAA claim on alleged unfair

uses of confidential information that defendant obtained from unauthorized access into its computer

systems. The court dismissed the CFAA claim:

> In the instant case, Plaintiffs are seeking compensation for lost profits
> resulting from Defendant's unfair competitive edge and for their now
> wasted investment in the development and compilation of the database
> information. However, <u>neither of these kinds of losses are the result of
> computer impairment or computer damage</u>. Therefore, they are not
> compensable "losses" under the CFAA.
>  . . . .
> Because the allegations of losses in the complaint fail to state a valid claim
> for relief under the CFAA, Plaintiff's CFAA claim must be dismissed.

<u>Civic Center Motors</u>, 387 F. Supp. 2d at 382 (emphasis added). The case does not even remotely

support IPOC's position.

### 2. The Only Damages Alleged by IPOC Arise Out of Defendants' Alleged Uses of Its Confidential Information, Which Are Not Compensable Under the CFAA.

IPOC's CFAA claim ultimately rests on the Complaint's allegation "that

Defendants' misappropriation of IPOC's business information has damaged IPOC in several

specific respects, including the unfair advantaging of IPOC's litigation adversaries by giving them

insight into a confidential" investigation of IPOC by the Bermuda Minister of Finance. Opp. at 8.

Such harms to business interests are, however, simply not compensable under the CFAA. <u>See</u>

<u>Worldspan</u>, 2006 WL 1069128, at *5 (rejecting argument that "mere taking of information"

constitutes compensable damage under CFAA); <u>Civic Center Motors</u>, 387 F. Supp. 2d at 381 ("lost

profits resulting from Defendant's unfair competitive edge" not compensable under CFAA);

Nexans Wires, 319 F. Supp. 2d at 477 (no compensable CFAA damages alleged because "plaintiffs are not claiming to have lost money because the computers [at issue] were inoperable, but rather because of the way the information was later used by defendants").[5]

Notably, IPOC relies upon the same two cases cited by the plaintiffs in Nexans Wires in their unsuccessful attempt to salvage their CFAA claim for alleged use of their confidential information. See 319 F. Supp. 2d at 477-78. These two cases – which IPOC quotes from, and cites to, extensively, see Opp. at 4-9 – are Four Seasons Hotels and Resorts BV v. Consorcio Barr, 267 F. Supp. 2d 1268 (S.D. Fla. 2003), aff'd in part and rev'd in part, 138 Fed. Appx. 297 (11th Cir. 2005), and Shurgard Storage Centers, Inc. v. Safeguard Self Storage, 119 F. Supp. 2d 1121 (W.D. Wash. 2000). In dismissing the plaintiffs' CFAA claim because they failed to plead damages compensable under the CFAA, the Nexans Wires court examined and rejected both cases, concluding:

> Lastly, the cases on which plaintiffs rely are not persuasive. In Four Seasons Hotels and Resorts BV v. Consorcio Barr, S.A., the court made an explicit finding that the hotel: "suffered 'loss' under the statute of $28,000 in expenses incurred in investigating and responding to these offenses, which occurred within a one-year period." Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc. stands only for the proposition that an employer can state a claim against a faithless former employee even where the computer data was not physically impaired. The Shurgard court was not considering whether the $5,000 [jurisdictional damages] threshold had been met. In sum, revenue lost because the information was used by the defendant to unfairly compete after extraction from a computer does not appear to be the type of "loss" contemplated by the statute.

---

[5] See also Register.com, Inc. v. Verio, 126 F. Supp. 2d 238, 252 n.12 (S.D.N.Y. 2000), aff'd 356 F.3d 393 (2d Cir. 2004) (damages alleged from defendant's "end use" of information retrieved from its website which allegedly allowed defendant to compete unfairly with plaintiff and harmed plaintiff's goodwill not compensable under CFAA because "[h]ow [defendant] uses the [data at issue], once extracted, has no bearing on whether [defendant] has impaired the availability or integrity of [plaintiff's] data or computer systems in extracting it").

Nexans Wires, 319 F. Supp. at 477-78 (citations omitted). For precisely the same reasons, IPOC's allegations that it suffered damage from Defendants' alleged use of its (allegedly) confidential information are simply not compensable under the CFAA.

In the end, IPOC is left only with its conclusory allegation that Defendants' alleged violation of the CFAA "caused damage and loss to IPOC in excess of $5,000." Opp. at 6 (quoting Complaint ¶ 33). According to IPOC, "[t]his allegation alone is more than sufficient," to survive a Rule 12(b)(6) motion. Opp. at 6-7. It is well settled, however, that when considering a Rule 12(b)(6) motion, the court does not "accept as true those legal conclusions or inferences drawn by plaintiffs that are not supported by the facts recited in the complaint." Doe, 400 F. Supp. 2d at 100. Where, as here, "the complaint merely parrots the 'causing damage' text of the CFAA in conclusory fashion and fails to allege any facts indicating that the completeness, useability, or availability of [plaintiff's] data was impaired," the CFAA claim is properly dismissed on a Rule 12(b)(6) motion. Worldspan, 2006 WL 1069128 at *5.

**B.      FRCP 9(b) applies to IPOC's CFAA Claim, and IPOC Does Not Dispute That the Claim Fails to Meet Rule 9(b)'s Specificity Requirements.**

Finally, IPOC closes its CFAA argument with a bit of doublespeak, claiming that Count II of the Complaint is not a fraud claim, see Opp. at 12-13, even though it alleges in two places that defendants accessed computers "knowingly [or 'intentionally'] and with intent to defraud," Compl. ¶¶ 31, 32, and did so "in furtherance of a plan to damage IPOC, knowingly and with intent to defraud." Compl. ¶ 33. Indeed, IPOC goes so far as to assert that the Court should not consider Count II a fraud claim under 18 U.S.C. § 1030(a)(4), see Opp. at 12, even though the Complaint quotes almost word-for-word from the text of that section. Compare Compl. ¶ 31 (defendants "with intent to defraud, accessed, without authorization or in excess of authorized

8

access . . .") with 18 U.S.C. § 1030(a)(4) (penalizing one who "with intent to defraud, accesses . . . without authorization, or exceeds authorized access").[6]

> The reason for IPOC's sleight-of-hand is clear: IPOC cannot dispute, nor does it, that fraud claims brought under 18 U.S.C. § 1030 must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). IPOC also cannot dispute, nor does it even try to, see Opp. at 12-13, that the skeletal allegations of its CFAA claim fail to meet those heightened pleading requirements. Instead, IPOC falls back on the only argument available to it; it contends that its CFAA claim, littered with references to "intent to defraud" and "fraudulent . . . access," and tracking the language of a CFAA fraud claim exactly, is not, in fact, an "averment of fraud" subject to Rule 9(b). Diligence respectfully urges the Court to reject IPOC's efforts to wriggle free of Rule 9(b) by recasting this fraud claim as something it is not. See generally BMC Indus., Inc. v. Barth Indus., Inc., 160 F.3d 1322, 1337 (11th Cir. 1998) ("we adhere to the time-tested adage: if it walks like a duck, quacks like a duck, and looks like a duck, then it's a duck" (footnote omitted)).

---

[6] For the very first time, plaintiff now contends that its claim is actually brought under 18 U.S.C. § 1030(a)(5)(A)(iii). Opp. at 12. The Court should recognize this sudden shift for what it is – a belated effort to escape Rule 9(b)'s heightened pleading requirements for averments of fraud. Defendant notes that even this does not salvage IPOC's CFAA claim, however, because § 1030(a)(5)(A)(iii) expressly requires a plaintiff to have suffered "damage," as that term is defined in the statute. Damage is, in turn, defined in § 1030(e)(8) as "any impairment to the integrity or availability of data, a program, a system, or information." As discussed above, IPOC has completely failed to allege "damage" as defined in the statute. Thus, even if the Court were to accept IPOC's efforts to characterize their claim as one under 18 U.S.C. § 1030(a)(5)(A)(iii), it would still fail. See Worldspan, 2006 WL 1069128, at *5 (rejecting argument that "mere taking of information" constitutes damage under CFAA); Fischer v. Mt. Olive Lutheran Church, Inc., 207 F. Supp. 2d 914, 926-27 (W.D. Wis. 2002) (rejecting claim that copying plaintiff's emails constituted "damage" under CFAA).

**III.    THE APPLICABLE CASELAW, TOGETHER WITH IPOC'S OWN CHARACTERIZATION OF DEFENDANTS' CONDUCT AS "MISAPPROPRIATION," REQUIRES DISMISSAL OF IPOC'S COMMON LAW CLAIMS AS PREEMPTED BY THE DISTRICT'S UTSA STATUTE.**

IPOC's own Opposition brief captures the essence of this case: it arises out of Defendants' alleged "misappropriation" of IPOC's confidential information. Opp. at 8.[7] However, the District of Columbia's UTSA statute, by its express terms, "supersedes" other "tort, restitution, and [other common] law" claims for alleged "misappropriation," D.C. Code § 36-407, requiring dismissal of each and every one of IPOC's common law claims. IPOC's principal argument against preemption is that the UTSA does not apply because IPOC does not claim that the allegedly confidential information at issue constitutes "trade secrets" as defined by the UTSA. See Opp. at 13. But as the caselaw cited in Diligence's Memorandum, at 16-18 – cases that IPOC either wholly ignores or dismisses as outliers – makes clear, the UTSA preempts all common law causes of action for misappropriation of confidential information, regardless of whether that information constitutes a trade secret.

**A.    The UTSA Preempts Common Law Causes of Action Even Where, As Here, the Information at Issue Does Not Rise to the Level of a Trade Secret.**

Despite its title, the Uniform Trade Secrets Act protects a far broader category of information and data than classic examples of trade secrets, such as the recipe for Coca-Cola. Included in the UTSA's expansive definition of "trade secret" is any "information . . . that [d]erives actual or potential independent economic value" from not being generally known. D.C. Code § 36-401(4)(A). As detailed below, the majority view that has arisen in UTSA jurisdictions is that if

---

[7] See Opp. at 8 ("IPOC alleges that Defendants' misappropriation of IPOC's business information has damaged IPOC in several specific respects . . ."); see also Opp. at 28-29 (citing cases for the proposition that "misappropriation" constitutes a legally cognizable claim under "§§ 757 and 759 of the *First Restatement of Torts*").

allegedly misappropriated confidential information has no "actual or potential independent economic value," id., then the plaintiff has neither a UTSA claim nor any common law claims arising out of its alleged misappropriation.

As Diligence correctly anticipated in its opening Memorandum, IPOC argues strenuously that UTSA "preemption is not an issue in this case," Opp. at 14, because "[n]owhere in its complaint does IPOC allege that the information that Diligence stole was 'trade secret' information." Opp. at 13. IPOC makes this argument despite the numerous, recent cases rejecting precisely this argument. For example, after a searching review of UTSA preemption jurisprudence nationwide[8], the court in Hauck Manufacturing Co. v. Astec Industries, 375 F. Supp. 2d 649 (E.D. Tenn. 2004) noted

> Plaintiff argues, at least in part, certain of its non-UTSA claims against [defendant] are not preempted because they do not depend on the information at issue qualifying as a "trade secret" [as defined by the UTSA]. While some courts have employed language seemingly indicating as much, a plaintiff surely cannot use general tort causes of action to revive claims which would otherwise not be cognizable in light of the UTSA (i.e., claims alleging theft of non-trade secret information). It is a legal non sequitur to suggest general tort causes may be employed to protect legal rights which otherwise do not exist. . . . [S]uch an approach would be wholly inconsistent with the UTSA's goals of promoting uniformity and predictability . . . . If the information is a trade secret, the plaintiff's claim is preempted; if not, the plaintiff has no legal interest upon which to base his or her claim. Either way, the claim is not cognizable.

Hauck Manufacturing, 375 F. Supp. 2d at 656-57 (internal citations omitted).[9]

---

[8] On one point IPOC and Diligence agree: "[b]ecause [D.C.'s UTSA statute] is based on the Uniform Trade Secrets Act, the Court should consider authorities from other jurisdictions that have adopted the UTSA." Opp. at 14 n.6. The fundamental purpose underlying the creation of a model UTSA for adoption by individual states was the creation of one – and only one – cause of action, under a nationally consistent standard, for misappropriation of trade secrets or confidential information. Indeed, by its express terms, D.C.'s UTSA statute is "intended to 'make uniform the law with respect to trade secrets among the District of Columbia and those states enacting it.'" Catalyst & Chemical Services, Inc. v. Global Ground Support, 350 F. Supp. 2d 1, 7 n.3 (D.D.C. 2004) (quoting D.C. Code § 36-408)).

[9] Curiously, IPOC suggests that the Hauck court's use of the statute suffices to "discredit the decision in Hauck," Opp. at 17, even though it has never been overruled by another court, and even though IPOC

Hauck is hardly alone; numerous courts have considered, and rejected, the very argument IPOC makes here.  See, e.g., Composite Marine Propellers, Inc. v. Van Der Woude, 962 F.2d 1263, 1265 (7th Cir. 1992) (the UTSA "has abolished all common law theories of misuse of [confidential] information.  Unless defendants misappropriated a . . . trade secret [as defined under the UTSA], they did no legal wrong"); Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co., 270 F. Supp. 2d 943, 948-49 (W.D. Mich. 2003) ("the Court concludes that the disputed status of information as a trade secret does not preclude a court from [dismissing common law claims as preempted because] . . . . allowing otherwise displaced tort claims to proceed on the basis that the information may not rise to the level of a trade secret would defeat the purpose of the UTSA"); Auto Channel, Inc. v. Speedvision Network, 144 F. Supp. 2d 784, 789 (W.D. Ky. 2001) (the UTSA "replaces other law relating to the misappropriation of trade secrets, regardless of whether the Plaintiffs demonstrate that the information at issue qualifies as a trade secret"); Savor, Inc. v. FMR Corp., 812 A.2d 894, 898 (Del. 2002) (rejecting plaintiff's contention that preemption is contingent upon finding of a "trade secret" as defined by the UTSA).

Indeed, on July 26, 2006 (six days after Diligence filed this Motion), the Supreme Court of New Hampshire decided this very issue in Mortgage Specialists, Inc. v. Davey, No. 2005-067, 2006 WL 2060395 (N.H. July 26, 2006).  After an extensive analysis of the purpose motivating the drafters of the UTSA, and the text that resulted from their work, id. at *6-*7, the court concluded that "[w]ith the enactment of the UTSA, confidential information not rising to the

_____

acknowledges that "the Court should consider authorities from other jurisdictions that have adopted the UTSA." Opp. at 14 n.6.  Contrary to IPOC's suggestions, Hauck remains good, applicable law.  Indeed, less than three months ago, the Eastern District of Tennessee reaffirmed the continuing validity of Hauck in that judicial District.  See Vincit Enterprises, Inc. v. Zimmerman, No. 1:06-CV-57, 2006 WL 1319515 (E.D. Tenn. May 12, 2006) (dismissing with prejudice under Rule 12(b)(6) plaintiff's common law claims for intentional interference with business relationships and unfair competition as preempted by Tennessee's UTSA statute).

level of a statutory trade secret was left largely unprotected by the law." Id. at *7. In so doing, the

court held:

> [plaintiff] urges us to adopt the position of a minority of courts that have held that
> common law and statutory claims are not preempted by the UTSA if they involve
> information that does not meet the statutory definition of a trade secret. We do not find
> these cases persuasive, however, and the weight of authority among courts that have
> considered the preemption provision is that the history, purpose, and interpretation of
> the statutory scheme, as discussed above, do not support [plaintiff's] position. If a
> common law claim for unauthorized use of information that did not meet the statutory
> definition of a trade secret were permitted, the result would undermine the uniformity
> and clarity that motivated the creation and passage of the UTSA.

Id. at *8 (citations and quotations omitted; emphasis added). The court thus dismissed the

plaintiff's common law claims for alleged misuse of its confidential information as preempted by

the UTSA, noting that the UTSA "essentially creates a system in which information is classified

only as either a protected trade secret or unprotected general . . . knowledge." Id. at *9 (internal

quotations omitted).[10]

       Contrary to IPOC's protestations, Opp. at 17-19, the Seventh Circuit's decision in

Hecny Transportation, Inc. v. Chu, 430 F.3d 402 (7th Cir. 2005), is not dispositive of the

preemption issue.[11] In Hecny, the plaintiff alleged that the defendant, a manager at plaintiff's

---

    [10] IPOC also relies heavily on Stone Castle Financial, Inc. v. Friedman, Billings, Ramsey & Co., 191
F. Supp. 2d 652 (E.D. Va. 2002), for the proposition that the UTSA preempts common law claims only
where the information at issue qualifies as a "trade secret" as defined by the UTSA. See Opp. at 18-19.
To the extent Stone Castle Financial can be read as such, courts in other UTSA jurisdictions have roundly
criticized the case and have expressly declined to follow it as recently as three weeks ago. See Mortgage
Specialists, 2006 WL 2060395, at *8 (noting that Stone Castle and similar cases are against the "weight of
authority" and are not persuasive).

    [11] Oddly, while at the same time urging application of the Seventh Circuit's (inapposite) decision in
Hecny, IPOC contends that "this Court should give . . . little (if any) weight," Opp. at 18 n. 8, to two other
Seventh Circuit decisions—specifically, PepsiCo, Inc. v. Redmond, 54 F.3d 1262 (7th Cir. 1995), and
Composite Marine Propellers, 962 F.2d 1263. In PepsiCo, the court noted that the Illinois Trade Secrets
Act "abolished common law causes of action for misappropriation of trade secrets." 54 F.3d at 1271. The
decision in Composite Marine Propellers is even more problematic for IPOC because, in holding that the
Illinois Trade Secrets Act preempted plaintiff's unfair competition claim for alleged misuse of confidential
information, the court noted that "Illinois has abolished all common law theories of misuse of

Chicago worksite, breached his fiduciary duties by using plaintiff's "assets and personnel to operate his own ventures out of the Chicago station." Id. at 403. As the Seventh Circuit noted, "[t]hese activities may be classified as the diversion of corporate opportunities, as fiduciary defalcations, and as outright theft," because the defendant stole company "files, computers, software, and other office equipment." Id. at 404. In holding that the plaintiff's claims were not preempted by Illinois' UTSA statute, the Seventh Circuit held that "[a]n assertion of trade secret in a customer list does not wipe out claims of theft, fraud, and breach of the duty of loyalty . . ." Id. at 405. Hecny is simply not this case. IPOC does not allege any of these causes of action.[12]

In sum, as demonstrated by the recent, directly-on-point authorities from other UTSA jurisdictions, IPOC is simply wrong in arguing that because it "has not even suggested that the stolen information would qualify as 'trade secret' information [UTSA] preemption is not an issue in this case." Opp. at 14.

---

[confidential] information. . . . Unless defendants misappropriated a (statutory) trade secret, they did not legal wrong." 962 F.2d at 1265. Although IPOC suggests that Hecny overruled these two Seventh Circuit precedents, Opp. at 18 n.8, the Hecny opinion does not even cite, much less discuss, PepsiCo or Composite Marine Propellers. Because it is simply not plausible that the Hecny court intended to implicitly overrule two of its own precedents without even citing them, IPOC's à la carte approach to Seventh Circuit jurisprudence—whereby it urges that Hecny is good law but that PepsiCo and Composite Marine Propellers are not—has no basis and should be rejected.

[12]  The reason, of course, is transparent: whereas Hecny involved theft of the plaintiff's own property, IPOC's claims are founded upon an alleged theft by Defendants of a third party's property (KPMG FAS's). Consequently, IPOC lacks the privity or duty relationship with Defendants necessary to sustain a theft, fraud, or breach of fiduciary duty claim. To be sure, if IPOC thought it had standing to assert such claims here, all indications are that IPOC would have tacked them onto its Complaint.

IV.    **EVEN IF THE UTSA DID NOT PREEMPT IPOC'S COMMON LAW CLAIMS, IPOC HAS FAILED TO STATE COGNIZABLE CLAIMS UNDER DISTRICT OF COLUMBIA LAW.**

IPOC's Opposition also fails to rebut Diligence's arguments as to why each common law action in the Complaint—even if not preempted by the UTSA—fails to state a claim upon which relief can be granted.

A.    **IPOC Fails to State a Claim of Tortious Interference with Business Expectancies (Count I).**

IPOC' Opposition does not dispute, nor could it, that a claim of tortious interference with business expectancies requires a valid business expectancy, and that in this jurisdiction, "[a] valid business expectancy requires a probability of future contractual or economic relationship," Washington Metropolitan Area Transit Authority v. Quik Serve Foods, Inc., No. 04-Civ-838(RCL), 2006 WL 1147933, at *6 (D.D.C. April 28, 2006) or, in another formulation, "a prospective advantageous business transaction" Casco Marina Development, LLC v. District of Columbia Redevelopment Land Agency, 834 A.2d 77, 84 (D.C. 2003).[13]  Instead, IPOC's Opposition belatedly seeks to shoehorn its claimed "business expectancies" into a form recognized under District of Columbia law.  Its efforts do not succeed.

*First*, IPOC argues – without citation to authority – that it had a legitimate business expectancy that the KPMG FAS investigation would be conducted without interference because "some aspects of IPOC's relationship with KPMG were voluntarily created and indeed,

---

[13]  IPOC does cite one Oregon case for the proposition that an expected inheritance might be an "expectancy" covered by the tort, Opp. at 25, but stops short of suggesting that this is the law in the District of Columbia, or that the case does anything to rescue IPOC's claim here.  Indeed, it is noteworthy that a subsequent Oregon case refused to extend the earlier holding to cover tortious interference with expectancies in ongoing litigation – one of the "business expectancies" that IPOC claims in this case.  See Fox v. Country Mut. Ins. Co., 7 P.3d 677, 690 (Or. 2000) ("we have found no reported decision from any jurisdiction in which a court has extended the tort of intentional interference with a prospective economic advantage to protect civil litigation").

commercial." Opp. at 26. This is fanciful. The relationship of KPMG FAS to IPOC is that of the government inspector to the inspected – nothing more. While IPOC protests that it "agreed to submit to interviews that were outside of the scope of the Bermuda Companies Act of 1981," id., it does not dispute that all such interviews are mandatory under the Act.[14] See Bermuda Companies Act of 1981 § 132(4)(b) (penalizing company personnel who "refuse[] to answer any question relating to the affairs of the company"). Similarly, although IPOC contends that the KPMG FAS investigation was bought and paid for, giving IPOC "a legitimate, vested pecuniary interest" in its fairness, Opp. at 26, in fact the Bermuda Companies Act of 1981 requires IPOC to pay these costs. Id. at § 132(2) ("[a]ll expenses incidental to the investigation shall be defrayed by the exempted company"). Indeed, it is a good measure of IPOC's desperation that it seeks to pass off a government investigation into the legality of its affairs as a "voluntary" and "commercial" enterprise sufficient to support a business tort.

Second, recognizing that Fox v. Country Mut. Ins. Co., 7 P.3d at 690 and Nicor International Corp. v. El Paso Corp., 292 F. Supp. 2d 1357, 1376-77 (S.D. Fla. 2003) establish that there is no valid "business expectancy" in the outcome of civil litigation such as the Zurich arbitration, IPOC seeks to shift ground, claiming that the "business expectancy" is not "rooted in the outcome of the Zurich arbitration but in the fairness of that arbitration," Opp. at 26. But that is a distinction without a difference; in both Fox and Nicor, the plaintiff alleged unfair conduct tainting or interfering with legal proceedings, just as IPOC does here. This did not cure the basic flaw in their argument: litigation is simply not the type of "prospective advantageous business

---

[14] Notably, IPOC cites to two paragraphs of its Complaint to support the proposition that it submitted to interviews "outside of the Companies Act," but neither paragraph says any such thing. See Compl. ¶¶ 16-17. Indeed, it is difficult to see how IPOC could make such an assertion; as discussed below, IPOC's obligation to provide those interviews is absolute.

transaction" protected by the tort. See Casco Marina Development, 834 A.2d at 84. IPOC's claim fails for the same reason.

Third, and finally, IPOC seeks to avoid the straightforward application of Carr v. Brown, 395 A.2d 79 (D.C. 1978), a controlling case which dooms IPOC's purported business expectancy that its "charter would not be attacked by illegal or improper means." Opp. at 25 (citing Compl. ¶ 25). IPOC tries to avoid Carr by making a temporal distinction, explaining that it "does not await the issuance of a charter," but "already has a charter which permits it to conduct business." Opp. at 27. That temporal distinction, however, is completely irrelevant under Carr, which precludes tortious interference with "business expectancies" that are "wholly contingent upon the decisions of . . . governmental bodies." 395 A.2d at 84. It is irrelevant whether IPOC is seeking a corporate charter or facing the prospective possibility that its charter will be revoked by the Bermudian government for wrongdoing:  the "'expectancies' which [plaintiff] claims" are "simply too remote, depending as they do on governmental approval." Id. at 84; see also Blank v. Kirwan, 703 P.2d 58, 70 (Cal. 1985) (intentional interference tort does not protect "the 'expectancies,' whatever they may be, involved in the governmental licensing process").

IPOC's Opposition does nothing to remedy the basic deficiency in its Complaint: it still does not allege a valid business expectancy, an essential element of a tortious interference claim.

**B.      "Procuring Information By Improper Means" (Count III) Is Not a Recognized Cause of Action in the District of Columbia.**

IPOC does not dispute that "procuring information by improper means" is not a recognized cause of action under District of Columbia law, but rather argues that it should nevertheless be allowed to proceed because the D.C. courts have never expressly rejected such a cause of action. See Opp. at 27-28.

Federal courts sitting in D.C. have repeatedly declined invitations by plaintiffs –

such as IPOC – to create new D.C. common law claims.  In <u>Bouchet v. National Urban League,</u>

<u>Inc.</u>, 730 F.2d 799 (D.C. Cir. 1984), the D.C. Circuit refused to create a create a new cause of

action asserted by the plaintiff, flatly stating that "[w]e cannot create a new tort on behalf of the

District. . . ." <u>Id.</u> at 807.  This Court has consistently followed this sensible principle.  <u>See</u>

<u>Athridge v. Aetna Casualty & Surety Co.</u>, No. 96-cv-2708 (RMU/JMF), 2001 WL 214212, at *5

(D.D.C. March 2, 2001) ("with respect to the tort claim alleged, since the District of Columbia has

not yet seen fit to create a bad faith tort, I will not create one"); <u>Wadley v. Aspillaga</u>, 163 F. Supp.

2d 1, 6 (D.D.C. 2001) (refusing to create claim for social host liability where neither D.C. courts

nor the City Council had done so).  For precisely the same reasons, Count III of the Complaint

must be dismissed for failure to state a recognized claim under District of Columbia law.[15]

### C.    IPOC's Tortious Interference With Contract Claim (Count IV) Fails For Lack of a Valid and Enforceable Underlying Contract between IPOC and KPMG FAS.

Diligence argued in its opening Memorandum that there was no valid consideration

to support a contract between IPOC and KPMG FAS and, thus, there could be no tortious

interference with such a contract.  Mem. at 24-26.  IPOC responds by glossing over the issue,

simply repeating that it has alleged an "agreement," and asserting that this conclusory allegation

---

[15] The cases relied upon by IPOC are not to the contrary.  <u>FMC Corp. v. Boesky</u>, on which IPOC relies for "the proposition that 'misappropriation constitutes a distinct and palpable injury that is legally cognizable," makes no mention whatsoever of "procurement of information by improper means" as a separate tort.  Opp. at 28, citing <u>FMC Corp.</u>, 852 F.2d 981, 989-90 (7th Cir. 1988).  Rather, the case considered misappropriation in the context of federal securities laws, RICO, and state common law fraud and negligence.  <u>See FMC Corp.</u> at 985-86.  Nor does <u>Chevron, U.S.A., Inc. v. Federal Energy Regulatory Comm'n</u>, in which the plaintiff challenged federal reporting regulations, have any real relevance here. <u>See</u>193 F. Supp. 2d 54, 61 (D.D.C. 2002).  <u>Westech Gear Corp. v. Department of Navy</u>, No. Civ-87-2609, 1988 WL 170558 (D.D.C. May 9, 1988), also cited by plaintiff, Opp. at 29, pointedly addressed a claim of <u>trade secret</u> misappropriation – a claim which plaintiff expressly disavows.  <u>See, e.g.</u>, Opp. at 14.

suffices to support a tortious interference with contract claim.  Opp. at 30-31.[16]  But this argument

sidesteps the fatal flaw in IPOC's claim.  As IPOC itself recognizes in its Opposition, to state a

claim for tortious interference with contract, a plaintiff must allege the "existence of a contract,"

Opp. at 30, not just an agreement.  "[T]he existence of a contract" in turn requires consideration,

and "the lack of consideration results in no contract being formed."  3 *Williston on Contracts* §

7:11 (4th ed. & Supp. 2006).

       In particular, as Diligence noted in its opening brief, Mem. at 25, courts (including

this one) routinely find that there is no contract – a plaintiff's conclusory allegations of the

existence of an "agreement" notwithstanding – where a party is already legally obligated to do

what it "agrees" to do, because such agreements lack valid consideration.  See, e.g., Steele v.

Isikoff, 130 F. Supp. 2d 23, 33 (D.D.C. 2000) (rejecting contract claim: "It is a basic tenet of

contract law that a party's agreement to perform a preexisting duty is 'a typical example of invalid

consideration'" (citation omitted)); 46th Circuit Trial Court v. County of Crawford, No. 128878,

2006 WL 2109519, at *11 (Mich. July 28, 2006) (where party promises to do what it is legally

bound to do, contract fails for lack of consideration and contract claim fails).

       IPOC does not plead valid consideration here.  Paragraph 41 of the Complaint

succinctly sets out the terms of IPOC's alleged "agreement" with KPMG FAS: (1) "IPOC and

KPMG FAS entered into an agreement whereby IPOC would provide to KPMG FAS information,

including documents and testimony of witnesses," and in return, (2) "KPMG FAS promised to hold

strictly confidential all information provided by, or received as a result of, IPOC's submissions to

KPMG FAS."  Compl. ¶ 41; see also Compl. ¶¶ 15-17.  Every component of this would-be

---

[16] As Diligence explains above at footnote 1, these conclusory allegations are insufficient: in deciding a Rule 12(b)(6) motion, the court does not "accept [as true] legal conclusions cast in the form of factual allegations." Kowal, 16 F.3d at 1276.

contract, on both sides, was already mandated by a preexisting statutory duty under Bermuda law, and thus none of them can provide the consideration essential for the formation of a contract.

Contrary to IPOC's suggestion, the Bermuda Companies Act of 1981 expressly required IPOC to provide KPMG FAS with "documents and testimony of witnesses." Section 132 of that Act prescribes that "[e]very officer, agent or employee of the company [under investigation by the Minister of Finance] shall produce to the inspector such books or documents as the inspector may require for the purpose of his investigation," and any such person who "refuses to produce any book or document required by the inspector to be produced [or] refuses to answer any question relating to the affairs of the company [] shall be liable to a fine. . ." Bermuda Companies Act of 1981 § 132(3) & (4). Because IPOC was required by law to do so, a promise by IPOC to divulge information to KPMG FAS during the course of its investigation cannot provide the consideration necessary to form a valid, enforceable contract. See, e.g., Lufthansa Cargo A.G. v. County of Wayne, Michigan, No. 01-cv-74579(DT), 2002 WL 31008373, at *4 (E.D. Mich. Aug. 16, 2002) ("[a] pledge to undertake a preexisting statutory duty is not supported by adequate consideration") (citation omitted).

For its part, KPMG FAS also had a pre-existing statutory duty: to "hold strictly confidential all information provided by, or received as a result of, IPOC's submissions to KPMG FAS." Compl. ¶ 41. Indeed, IPOC itself quotes this pre-existing statutory duty in its Complaint, acknowledging that the "Bermuda Companies Act of 1981 (the 'Act') requires that the Investigation remain confidential unless the company under investigation requests that it be made

public." Compl. ¶ 14 (emphasis added).[17] KPMG FAS thus provided no consideration whatsoever when it "promised" to do what Bermuda law already required.

Finally – perhaps recognizing that every component of its purported "contract" was already required by statute – IPOC seeks to avoid dismissal of Count IV by asserting (without authority) that "[t]he question whether a contract did indeed exist is a question of fact and is outside the scope of a motion to dismiss." Opp. at 30. That is simply wrong.

Where, as here, plaintiffs have failed, as a matter of law, to allege valid consideration sufficient to support a contract, courts may – and do – dispose of claims premised on that would-be "contract" under Federal Rule of Civil Procedure 12(b)(6). Indeed, this was precisely the situation in Lufthansa Cargo, a case in which the court granted a Rule 12(b)(6) motion to dismiss the plaintiffs' contract claim. The court explained that "accepting Plaintiffs' allegations in the Complaint as true, even if Plaintiffs had a written, signed agreement," a preexisting statutory obligation precluded the existence of valid consideration. 2002 WL 31008373, at *4. Thus, "in the context of a Rule 12(b)(6) motion, accepting Plaintiffs' claims as true, it [was] clear that Plaintiffs 'undoubtedly can prove no set of facts in support of [their] claims that would entitle [them] to relief.'" Id. (alterations in original; quotes and internal citations omitted). The Lufthansa Cargo court dismissed the claim, just as the Court should do here.

**D.    IPOC's Unfair Competition Claim (Count V) Must Be Dismissed With Its Other Claims.**

IPOC's Opposition simply ignores the import of Furash & Co. v. McClave, 130 F. Supp. 2d 48 (D.D.C. 2001) when discussing IPOC's unfair competition claim. There, this Court

_____

[17] IPOC concedes that neither it nor its affiliates under investigation by KPMG FAS ever requested that the investigation be made public, Compl. ¶ 16, thus requiring KPMG FAS, by statute, to keep it confidential.

dismissed the plaintiff's unfair competition claim against defendant Towers when it concluded that none of plaintiff's other claims against Towers could survive, thus rejecting the notion that an unfair competition claim can survive as the lone count in a complaint. See id. at 57.  As Furash & Co. makes clear, where, as here, all other claims in a complaint must be dismissed, so too must the unfair competition claim be dismissed. See id. (dismissing unfair competition count as "essentially a restatement" of plaintiff's other flawed claims).[18]

IPOC's argument against dismissal also improperly attempts to remove the word "competition" from "unfair competition."  Plainly, there can be no "unfair competition" claim in this context without a recognized form of business competition between the parties.  Notably, even in the wake of Diligence's opening Memorandum – which highlighted the Complaint's failure to identify the nature of IPOC's business – IPOC still refuses to identify its line of business.  As detailed in Diligence's brief, IPOC's allegation that Defendants are "agents" of IPOC's "litigation and business competitors" in arbitration proceedings over ownership of an interest in a Russian mobile telephone concern, Compl. ¶¶ 11, 46, falls far short of what is needed to sustain an unfair

---

[18]  See also Business Equip. Ctr., Ltd. v. DeJur-Amsco Corp., 465 F. Supp. 775, 788 (D.D.C. 1978) (dismissing unfair competition claim for failure to allege damage independent of harm allegedly resulting under other, failed claims); Goddard, Inc. v. Henry's Foods, Inc., 291 F. Supp. 2d 1021, 1034 (D. Minn. 2003) ("Under this doctrine, if we find that the underlying tort is duplicative of another Count of the Complaint, the claim for unfair competition must be dismissed"); Dade Int'l, Inc. v. Iverson, 9 F. Supp. 2d 858, 862 (M.D. Tenn. 1998) (dismissing unfair competition count where plaintiff failed to allege cognizable cause of action "for a violation of any tort independent of the tort of unfair competition").

competition claim.  See Mem. at 28.[19]  IPOC's common law unfair competition count should be

dismissed as redundant and derivative of IPOC's other flawed claims, and for failure to identify a

legitimate competitive market in which it has been the victim of unfair competition.[20]

### E.    IPOC's Failure to State Viable Tort Claims Requires Dismissal of Count VI, its Civil Conspiracy Claim.

IPOC's discussion of Count VI, its civil conspiracy claim, is more noteworthy for

what it does not say than for what it does:  IPOC does not mention, let alone dispute, two key

points of law discussed in Diligence's Memorandum.  *First*, IPOC does not dispute that its civil

conspiracy claim must be dismissed if its tort claims are dismissed (as they should be).  See, e.g.,

Mazloum v. District of Columbia, No. 06-cv-0002(JDB), 2006 WL 1770500, at *8 (D.D.C. June

---

[19]  IPOC's reliance on inapposite cases, which it distorts, cannot salvage its unfair competition claim. IPOC relies upon B&W Management, Inc. v. Tasea Investment Co., 451 A.2d 879, 881 n.3 (D.C. 1982), to argue that the common law of unfair competition includes "intimidation of . . . employees" in the list of "unfair competition" practices.  B&W Management, however, omitted a few key words from its repetition of Prosser, which reads, "intimidation or harassment of the *plaintiff's* customers or employees."  *Prosser & Keeton on Torts* 1014 (5th ed. 1984).  Actionable unfair competition entails intimidation of plaintiff's customers or employees, not a third party's, as IPOC alleges here.  See, e.g., cases cited at Prosser, 1014-15 n.94 and n.95; Toy Biz v. Centuri Corp., 990 F. Supp. 328, 331 (S.D.N.Y. 1998) (intimidation of plaintiff's customer-retailers); Dynamic Instrument Corp. v. Fedtro, Inc., 266 F. Supp. 848, 852 (intimidation of plaintiff's customers) (E.D.N.Y. 1967).  Similarly, plaintiff also names "bribery" as a listed form of unfair competition, omitting the key word "commercial" that makes it a term of art.  Compare Opp. at 34; B&W Management, 451 A.2d at 881 n.3 ("commercial bribery"); see also JSG Trading Corp. v. Dep't of Agriculture, 235 F.3d 608, 611 (D.C. Cir. 2001) ("commercial bribery" occurs when "a seller offers consideration to a buyer's agent or employee, without the knowledge of the principal or employer, with intent to induce purchase of the seller's product").  Finally, in citing A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935), IPOC again omits the key phrase to suggest that all misappropriation constitutes unfair competition.  See Opp. at 31.  The Schechter Poultry court, however, explicitly defined – in the same sentence IPOC quotes – the type of misappropriation it considered to be unfair competition: "the selling of another's goods as one's own."  Id. at 532 (citing International News Serv. v. Associated Press, 248 U.S. 215, 241-42 (1918), which entailed just such a claim).

[20]  The cases relied upon by IPOC do not even remotely resemble the facts alleged in IPOC's Complaint.  See Roy Export Co. v. Columbia Broadcasting System, Inc., 672 F.2d 1095 (2d Cir. 1982) (use of plaintiff's copyrighted film to compete with plaintiff's second film on the same subject); Perkins School for the Blind v. Maxi-Aids, Inc., 274 F. Supp. 2d 319 (E.D.N.Y. 2003) (passing off of Braille machines); Blank v. Pollack, 916 F. Supp. 165 (N.D.N.Y. 1996) (reverse passing off; use of plaintiff's window crank design to create and sell product, without remuneration of plaintiff); Vantage Point, Inc. v. Parker Brothers, Inc., 529 F. Supp. 1204 (E.D.N.Y. 1981) (alleged use of board game idea for creation of competing product, without remuneration; no unfair competition found).

27, 2006) (dismissing civil conspiracy claim; failure to state claim of underlying tort "is fatal to the viability of the common law conspiracy claim"); Mem. at 28-29 (discussing cases). *Second*, IPOC apparently concedes that even if its CFAA claim could survive dismissal (and it cannot), that statutory claim, standing alone, cannot support IPOC's civil conspiracy claim under D.C. law. See Mem. at 29 n.19 (discussing cases). IPOC's civil conspiracy claim thus must be dismissed upon dismissal of its other common-law tort claims.

> **F.    IPOC's Unjust Enrichment Claim (Count VII) Must be Dismissed With Its Other Claims, and Also Fails on Its Face for an Independent Reason Pointed Out by IPOC.**

Finally, as noted in Diligence's opening Memorandum, IPOC's unjust enrichment claim fails because the traditional tort claims underlying it fail. See Memorandum, at 30-31. Moreover, IPOC's own Opposition identifies yet another, independent reason for dismissing its unjust enrichment claim regardless of the disposition of its underlying tort claims.

IPOC directs the Court to Rapaport v. United States Dep't of the Treasury, 59 F.3d 212 (D.C. Cir. 1995), a case against a savings and loan proprietor who refused to make a government-mandated personal investment in the bank when it faced difficulties. When the bank failed, the government sought payment from Rapaport, arguing that he had been unjustly enriched in that he had retained funds "belonging to" the S&L while the S&L received the benefits of deposit insurance. See id. at 213-16. The court rejected the claim, pointing out that the first requirement of unjust enrichment is that "the plaintiff conferred a benefit on the defendant":

> If Rapaport 'benefited' from his failure to contribute capital to Great Life . . . it was not because the [Office of Thrift Supervision] or its predecessor conferred something upon him. . . . [U]njust enrichment simply does not lie when the plaintiff has not bestowed some sort of benefit upon the defendant.

Id. at 216. Here, too, IPOC fails to allege that IPOC conferred any benefit whatsoever on Diligence. In this regard, it is worth echoing IPOC's own words: "whether there has been unjust

enrichment must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution. . . ." Opp. at 36, citing <u>In re Lorazepam & Clorazepate Antitrust Litigation</u>, 295 F. Supp. 2d 30, 51 (D.D.C. 2003). Plaintiff has alleged no such dealings with Diligence <u>at all</u>. Yet under <u>Lorazepam</u>, just as under <u>Rapaport</u>, "[a] necessary element of a claim of unjust enrichment is that the <u>plaintiff conferred a benefit</u> on the defendant." <u>Lorazepam</u>, 295 F. Supp. 2d at 51. (emphasis added). IPOC's own Opposition thus identifies yet another reason to dismiss its unjust enrichment claim.

## **CONCLUSION**

For the reasons set forth above and in Diligence's opening Memorandum, Diligence respectfully requests that each claim in Complaint be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

Respectfully submitted,

AEGIS LAW GROUP LLP

By: _____/s/ Paul Rauser_____
Paul C. Rauser (D.C. Bar No. 461722)
Michael K. Ross (D.C. Bar No. 458573)
Oliver Garcia (D.C. Bar No. 456600)
901 F Street, N.W., Suite 500
Washington, D.C. 20004
T: 202-737-3500
F: 202-737-3330

August 10, 2006                                    *Attorneys for Defendant Diligence, Inc.*

25