# EXHIBIT 1

**SECOND PARTIAL AWARD**
of
May 16, 2006

in the *ad-hoc* arbitration before

**the Arbitral Tribunal**
consisting of

Dr. Daniel Wehrli, Chairman
Ian L. Meakin, Dr. Boris O. Kojevnikov
in the matter of

**IPOC International Growth Fund Ltd.,**
Chancery Hall, 52 Reid Street, Hamilton, HM 12, Bermuda,

**Claimant,**

represented by Mr. Nicolas Ulmer, Mr. Ricardo Ugarte and
Dr. Franz Stirnimann, Winston & Strawn,
43 Rue du Rhône, 1204 Geneva, Switzerland
(Tel: +41 22 317 75 75; Fax: +41 22 317 75 00
nulmer@winston.com; rugarte@winston.com;
fstirnimann@winston.com ),

and Mr. Thomas J. Benz, Mr. Barry Vitou and Mr. Danvers Baillieu, Winston & Strawn, Bucklersbury House,
3 Queen Victoria Street, London EC4N 8NH, Great Britain,
(Tel. +44 207 429 0000, Fax: +44 207 429 0100,
tbenz@winston.com; bvitou@winston.com;
dbaillieu@winston.com),

and Mr. Martin Mann, Q.C. and Mr. Adrian Francis, XXIV Old
Buildings, Lincoln's Inn, London, Great Britain,

versus

**LV Finance Group Ltd.,**
Pasea Estate, Road Town, British Virgin Islands,

**Respondent,**

represented by Dr. Balz Gross, Dr. Georg Naegeli and
Ms. Mariella Orelli, Homburger Rechtsanwälte,
Weinbergstrasse 56/58, Postfach 338,
8035 Zurich, Switzerland
(Tel : +41 43 222 10 00 ; Fax : +41 43 222 15 00
balz.gross@homburger.ch; georg.naegeli@homburger.ch;
mariella.orelli@homburger.ch ),

and Mr. Michael Jones and Justin Michaelson, Weil Gotshal &
Manges, One South Place, London EC2M 2WG, Great Britain,
(Tel. +44 207 903 1000; Fax: +44 207 903 0990,
michael.jones@weil.com),

regarding

**Claim for Specific Performance, Declaratory Relief and/or Damages**

# Table of Contents

|  |  | page |
|---|---|---|
| Quotations |  | 12 |
| Defined Terms |  | 12 |
| **I.** | **PARTIES AND BACKGROUND TO THE PRESENT DISPUTE** | **18** |
| A. | Parties | 18 |
| B. | Background | 20 |
|  | a) April Option Agreement | 20 |
|  | b) December Option Agreement | 22 |
|  | c) Dispute Between the Parties | 23 |
|  | d) Status of the Geneva ICC-Arbitration | 25 |
| **II.** | **PROCEDURAL HISTORY** | **28** |
| A. | Constitution of the Arbitral Tribunal | 28 |
| B. | Procedural Agreements Made at the First Hearing | 30 |
| C. | Proceedings on the Preliminary Issues | 33 |
|  | a) Major Procedural Steps | 33 |
|  | b) Orders | 35 |
|  | c) Confidentiality Order | 36 |
|  | d) Witness Hearing | 38 |
|  | e) The Parties' Prayers for Relief | 40 |
|  | f) The Relevance of the Parties' Prayers for the Preliminary Issues | 47 |
| D. | Partial Award | 49 |
| E. | BID-Phase | 60 |
|  | a) Major Procedural Steps | 61 |

| | | | |
|---|---|---|---|
| b) | | Orders | 63 |
| c) | | Production of Documents | 76 |
| | aa) | The Documentation Supporting the Funding Report | 76 |
| | bb) | The Palmer Acquisition Documents | 78 |
| | cc) | Documents Produced in Relation to the Disputed Beneficial Ownership and the Structure of the W4-Group | 79 |
| | dd) | Further Palmer Acquisition Documents | 81 |
| | ee) | Further FCT-Documents | 82 |
| | ff) | Documents Attached to Affidavit of Involved Person No. 7 | 83 |
| d) | | Related Criminal Investigations | 84 |
| | aa) | Seizure of Files at the Chairman's office | 84 |
| | bb) | The German Investigation | 84 |
| | cc) | Production of the German Criminal Complaint | 85 |
| | dd) | Production of the Russian Criminal Complaints | 88 |
| | ee) | Unsealing of Seized Files | 89 |
| | ff) | Affected Witnesses | 90 |
| e) | | Confidentiality Regimes | 91 |
| | aa) | Protection of Witnesses | 91 |
| | bb) | Protection of Confidential Documents | 93 |
| | cc) | Confidential Pleadings, Hearings and Decisions | 94 |
| | dd) | Incidents of Alleged Confidentiality Violations | 95 |
| f) | | Hearing of Witnesses at Second Witness Hearing and later Witness Hearings | 95 |
| | aa) | Witnesses Who Filed a Witness Statement and/or Testified in the BID-Phase | 95 |
| | bb) | Special Efforts to Secure the Hearing of Witnesses | 99 |
| | cc) | Documents Submitted by Witnesses | 103 |

|     | g)  | Related Proceedings | 103 |
| --- | --- | --- | --- |
|     |     | aa) BVI Proceedings | 104 |
|     |     | bb) BVI Enforcement Proceedings | 106 |
|     |     | cc) Stockholm Arbitration | 106 |
|     |     | dd) BMA Investigation | 107 |
|     |     | ee) The Russian Action | 108 |
|     | h)  | Prayers for Relief | 110 |

| III. | JURISDICTION AND APPLICABLE LAW | 116 |
| --- | --- | --- |
| A. | Jurisdiction | 116 |
| B. | Applicable Law | 117 |

| IV. | RES IUDICATA | 118 |
| --- | --- | --- |
| A. | Of the Matters Decided by the Geneva ICC-Award | 118 |
| B. | Of Claimant's Claim for Specific Performance | 120 |

| V. | GENERAL COMMENTS OF THE ARBITRAL TRIBUNAL | 122 |
| --- | --- | --- |
| A. | Lack of Transparency | 122 |
| B. | Credibility of Witnesses | 123 |
| C. | The Role of Witnesses Nos. 4 and 6 | 125 |
| D. | Alleged Threats and Security Concerns | 126 |

| VI. | BENEFICIAL OWNERSHIP OF CLAIMANT | 130 |
| --- | --- | --- |
| A. | In the Geneva ICC-Arbitration | 130 |
| B. | Claimant's Position in the Zurich Ad-Hoc Arbitration | 131 |
|     | a) In the First Phase | 131 |
|     | b) In the BID-Phase | 133 |
| C. | The Affidavit of Involved Person No. 7 and the IP7-Documents | 135 |
| D. | Conclusions | 137 |

4

| | | | |
|---|---|---|---|
| E. | | Further Evidence | 139 |
| | | | |
| **VII.** | | **VALID EXERCISE OF THE APRIL OPTION** | **141** |
| A. | | Introduction | 141 |
| B. | | Respondent's Crystallisation Argument | 143 |
| | a) | Respondent's Position | 143 |
| | b) | Claimant's Position | 144 |
| | c) | The Arbitral Tribunal's Analysis | 146 |
| C. | | Formal Validity of the Second Purported Option Notice | 148 |
| | a) | The Context of the Second Purported Option Notice and the Correspondence Referred to Therein | 148 |
| | b) | Respondent's Position | 149 |
| | c) | Claimant's Position | 151 |
| | d) | The Arbitral Tribunal's Analysis | 152 |
| D. | | Validity of the Third Purported Option Notice | 155 |
| E. | | Conclusions | 158 |
| | | | |
| **VIII.** | | **VALIDITY/ENFORCEABILITY OF THE APRIL OPTION AGREEMENT** | **159** |
| A. | | Introduction | 159 |
| | a) | The Relevant Prayers | 159 |
| | b) | Summary of Respondent's BID-Defences | 161 |
| | c) | Void, Voidable and Unenforceable Contracts under English Contract Law | 162 |
| | | aa)   Introduction | 162 |
| | | bb)   Application to the Principal BID-Defences | 162 |
| | | (i)    Duress | 162 |
| | | (ii)   Illegality | 163 |
| | | (iii)  Sham | 163 |

|  |  | cc) | Relevance for the Prayers to be Decided in the BID-Phase | 164 |
|---|---|---|---|---|
|  | d) |  | Principles of English Contract Law on Illegality | 165 |
|  |  | aa) | In General | 165 |
|  |  | bb) | Consequence of these Principles on the Onward Sales | 166 |
|  |  | cc) | Applicable Burden and Standard of Proof | 166 |
|  |  |  | (i) The Applicable Law | 166 |
|  |  |  | (ii) Burden of Proof under English Law | 167 |
|  |  |  | (iii) Standard of Proof under English Law | 168 |
|  | e) |  | Are any of the BID-Defences *Res Iudicata*? | 170 |
| B. |  |  | Duress Defence | 171 |
| C. |  |  | Complicity Defence | 179 |
| D. |  |  | Dilution Defence | 181 |
|  | a) |  | The Relevant Events | 181 |
|  | b) |  | The Parties' Positions | 187 |
|  |  | aa) | Respondent's Position | 187 |
|  |  | bb) | Claimant's Position | 195 |
|  | c) |  | The Arbitral Tribunal's Factual Findings | 202 |
|  |  | aa) | Financing Capacity of Central Telegraph? | 202 |
|  |  | bb) | Central Telegraph's Intention on May 19, 2000 | 203 |
|  |  | cc) | Central Telegraph's Decision Not to Participate in the First Capital Increase | 204 |
|  |  | dd) | Reverse Call Option | 207 |
|  |  |  | (i) Conclusion of the Reverse Call Option Agreement | 207 |
|  |  |  | (ii) Awareness of Claimant of the Reverse Call Option? | 208 |
|  |  |  | (iii) Second Capital Increase | 208 |

|  |  |  |  |
|---|---|---|---|
| (iv) | | Non-Exercise of the Reverse Call Option | 209 |
| (v) | | Conclusion | 210 |
| ee) | | Existence and Adequacy of Compensation for Central Telegraph's Decision not to Participate | 211 |
| | (i) | Introduction | 211 |
| | (ii) | Valuations in February 2001 | 212 |
| | (iii) | In December 2001 | 213 |
| | (iv) | Testimony of Witnesses Nos. 10 and S38 | 214 |
| | (v) | Conclusion | 216 |
| ff) | | The Significance of the Dilution of Central Telegraph for the April Option Agreement | 217 |
| gg) | | The Role of the Proposed Witness No. 7 | 219 |
| | (i) | In General | 219 |
| | (ii) | As Chairman of Svyazinvest | 220 |
| | (iii) | Conclusions | 224 |
| hh) | | Summary and Conclusion | 227 |
| d) | | The Arbitral Tribunal's Analysis of Russian Criminal Law | 228 |
| aa) | | Introduction | 228 |
| | (i) | General Aspects | 228 |
| | (ii) | The Proper Translation of the Russian Term "Deyaniye" | 229 |
| bb) | | Art. 160 RCrC on Misappropriation and Embezzlement | 233 |
| | (i) | The Wording of Art. 160 RCrC in Effect in the Relevant Period | 233 |
| | (ii) | The Official Definition of Certain Terms Relevant to the Application of Art. 160 RCrC | 234 |
| | (iii) | The Four Elements Constituting a Crime under Art. 160 RCrC and the Thereto-relating Doctrine | 236 |
| | (iv) | Are the Four Elements Met *in Casu*? | 237 |

|  |  | (v) | Organizing the Misappropriation of Property in Particular | 238 |
|  |  | (i) | Misappropriation Resulting from Action/Inaction | 239 |
|  |  | (ii) | Was the Criminal Offence Completed? | 242 |
|  |  | (iii) | Conclusions | 242 |
|  | cc) | | Art. 285 RCrC on *"Abuse of Official Powers"* | 243 |
|  |  | (i) | The Wording of Art. 285 RCrC | 243 |
|  |  | (ii) | The Four Elements Constituting a Crime under Art. 285 RCrC | 245 |
|  |  | (iii) | Are the Four Elements Met *in Casu*? | 245 |
|  | dd) | | Art. 289 RCrC on Unlawful Participation in Business Activity | 246 |
|  |  | (i) | The Wording of Art. 289 RCrC | 246 |
|  |  | (ii) | The Four Elements Constituting a Crime under Art. 289 RCrC | 247 |
|  |  | (iii) | Are the Four Elements Met *in Casu*? | 248 |
|  |  | (iv) | Summary and Conclusion | 251 |
| e) | | | Implications of Criminal Offences under English Contract Law | 252 |
|  | aa) | | In General | 252 |
|  | bb) | | The Relevance of an Involvement of Respondent in the Illegality | 253 |
|  | cc) | | Detailed Analysis of English Case Law | 255 |
|  | dd) | | Conclusions | 259 |
| E. | ML-Defence | | | 260 |
| a) | | | Augmentation Payment | 260 |
|  | aa) | | Respondent's Position | 260 |
|  | bb) | | Claimant's Position | 264 |
|  | cc) | | The Arbitral Tribunal's Analysis | 267 |



dd)  The Arbitral Tribunal's Analysis of the Augmentation
Payment under Russian Criminal Law                              275

    (i)  Article 285 RCrC on *"Abuse of Official Powers"*     275

    (ii)  Article 289 RCrC on *"Unlawful Participation in
Business Activity"*                                               279

    (iii)  Conclusion                                      282

ee)  Does the Augmentation Payment of the Option Price
Constitute Money Laundering?                                     282

    (i)  The Applicable Money Laundering Law            282

    (ii)  Article 305bis Swiss Penal Code               284

    (iii)  Requirements of Article 305bis SPC           284

    (iv)  Applicability of Article 305bis SPC to the
Behaviour of the Claimant (Objective
Requirements)                                                     285

    (v)  The Intention of the Perpetrator (Subjective
Requirement)                                                      294

    (vi)  Conclusion                                     295

ff)  Implications of Money Laundering under English
Contract Law                                                      295

    (i)  Applicability of English Law on the Proceeds of
Crime?                                                            295

    (ii)  The English Public Policy Perspective         297

gg)  Summary and Conclusion                                      299

b)  Riversand Payment                                            300

F.  Currency Law Defence                                         302

a)  Introduction                                                 302

b)  Respondent's Position                                        302

c)  Claimant's Position                                          304

d)  The Arbitral Tribunal's Analysis                             305

G.  Sham                                                         307

a)  Introduction                                                 307

9

| | | | |
|---|---|---|---|
| | b) | Respondent's Position | 309 |
| | c) | Claimant's Position | 311 |
| | d) | The Arbitral Tribunal's Analysis | 313 |
| H. | | Assisting and Procuring a Breach of Contract Defense | 314 |
| | a) | Introduction | 314 |
| | b) | Respondent's Position | 314 |
| | | aa) Procuring and Assisting a Breach of Fiduciary Duties | 314 |
| | | bb) Procuring and Assisting in a Breach of Contract | 317 |
| | c) | Claimant's Position | 318 |
| | | aa) Procuring and Assisting in a Breach of Fiduciary Duties and Breach of Contract | 318 |
| | | bb) Respondent's Comments on the House of Lords Decision in Criterion Properties plc v. Stratford UK Properties LLC [2004] 1 W.L.R. 1846 | 319 |
| | d) | The Arbitral Tribunal's Analysis | 320 |
| | | aa) Procuring and Assisting in a Breach of Fiduciary Duties | 320 |
| | | bb) Procuring and Assisting in a Breach of Contract | 322 |
| **IX.** | | **CLAIMANT'S CLAIM FOR SPECIFIC PERFORMANCE** | **323** |
| A. | | Introduction | 323 |
| B. | | Respondent's Position | 324 |
| C. | | Claimant's Position | 327 |
| D. | | The Arbitral Tribunal's Analysis | 330 |
| **X.** | | **RESPONDENT'S COUNTERCLAIM FOR DECLARATORY JUDGMENTS** | **331** |
| A. | | Introduction | 331 |
| | a) | Respondent's Prayers for Relief | 331 |
| | b) | Declaratory Judgment in English Law | 332 |

|   |   | c) | Application of English Law to the Requests for Declaratory Relief of the Respondent | 334 |
| B. | | | Respondent's Specific Prayers for Declaratory Relief and English Law | 335 |
| | a) | | Respondent's Prayer No. 4 | 335 |
| | | aa) | Respondent's Primary Prayer | 335 |
| | | bb) | Respondent's Alternative Prayer | 336 |
| | b) | | Respondent's Prayer No. 5 | 337 |
| C. | | | Summary | 339 |
| **XI.** | | | **THE COSTS OF ARBITRATION** | **339** |
| A. | | | Introduction | 339 |
| B. | | | Deferral of Decision on Arbitration Costs | 341 |
| C. | | | Possible Criteria to be Considered in a Future Award on Costs | 342 |
| **XII.** | | | **CONCLUSIONS** | **342** |
| A. | | | Summary of Decisions Made | 343 |
| | a) | | In Partial Award | 343 |
| | b) | | In Second Partial Award | 343 |
| B. | | | Final Comments | 346 |
| C. | | | Matters yet to be Dealt With | 347 |



## Quotations and Defined Terms

### Quotations

This Second Partial Award generally refers to C-... for the exhibits filed by Claimant (IPOC International Growth Fund Limited) and R-... for the exhibits filed by Respondent (LV Finance Group Limited).

### Defined Terms

This Second Partial Award defines a number of terms. When it is used for the first time, the defined term is added in parenthesis in bold letters. For ease of reference, a list of these defined terms and the numbers of the paragraphs in which they are first defined is provided hereinafter.

| Defined Term | Para. No. | Defined Term | Para. No. |
|---|---|---|---|
| Abandonment Defence | (ii) | Arbitration Clause | 24 |
| Accounting Chamber | fn. 218 | Arbitration Costs | 688 |
| Additional DFR-Documents | 73 | Assisting and Procuring a Breach Defence | 68(iv) |
| Affected Witnesses | 114 | Assumed CTM-Funding | 65(ii) |
| Alfa-Eco | 14 | Augmentation | 66(ii) |
| Alleged Payment Period | 66(ii) | Augmentation Payment | 66(ii) |
| Amended CTM-Funding | 65(ii) | BID-Answer | 72 |
| Annulment Action Against the Geneva ICC-Award | 21 | BID-Defence | 66(iii) |
| Anticipatory Breach Defence | 68(iii) | BID-Phase | 71 |
| | | BID-Rejoinder | 72 |
| AOA | 4 | BID-Reply | 72 |
| AOA Escrow Agreement | 10 | BID-Statement | 72 |
| April Option | 5 | BMA | 154 |
| April Option Agreement | 4 | BMA Investigation | 154 |
| April Option Period | 9 | Broader Illegality Defence | 66(iii) |
| April Option Shares | 6 | Business Combination Agreement | 353.29 |
| April Option Termination Date | 9 | BVI Enforcement Proceedings | 148 |
| Arbitral Tribunal | 15 | BVI Proceedings | 146 |

| Defined Term | Para. No. |
|---|---|
| C-DFR | 76 |
| C-DPA | 82 |
| C&I Ministry | 493 |
| Central Telegraph | 3(v) |
| Chairman | 27 |
| Claimant | 1 |
| Claimant's Amendment on Specific Performance | 60 |
| Claimant's BID-Prayers | 163 |
| Claimant's Bullet-Point Submission | 72 |
| Claimant's Further Initial Prayers | 29 |
| Claimant's Initial PA-Prayers | 28 |
| Claimant's Initial Prayers for Specific Performance | 186 |
| Claimant's Prayers | 57 |
| Claimant's SfC-Request | 73 |
| Comitas | 488(ii) |
| Complus | 222 |
| ComTel Eastern | 347.34 |
| Confidential DFR-Comments | |
| Confidential DFR-Documents | 76 |
| Confidential DFR-Rejoinder | 72 |
| Confidential DPA-Comments | 72 |
| Confidential DPA-Documents | 81 |
| Confidential DPA-Rejoinder | 72 |
| Confidential DPA-Reply | 72 |

| Defined Term | Para. No. |
|---|---|
| Confidential DPA- and DFR-Rejoinder | 72 |
| Confidential FCT-Comments | 72 |
| Confidential FCT-Reply | 72 |
| Confidentiality Order | 41 |
| Confidentiality Orders | 117 |
| Constituting Order | 30 |
| CoO | 30 |
| Corporate Charts | 83 |
| Costs of Arbitrations | 688 |
| Crystallisation Argument | 242 |
| Crystallisation Notice | 249 |
| CT-CHB | fn. 361 |
| CT-Mobile | 3(iii) |
| CTM | 3(ii) |
| Currency Law Defence | 566 |
| Danco Finans | 238(iii) |
| December Option | 12 |
| December Option Agreement | 12 |
| December Option Shares | 12 |
| DFR-Documents | 76 |
| Dilution Defence | 344 |
| Disclosed Funding Report Documents | 76 |
| Disclosed Palmer Acquisition Documents | 80 |
| DOA | 12 |
| DPA-Documents | 81 |
| Draft Transcript of the Fourth Hearing | fn. 25 |
| DTFoH | fn. 25 |
| Duress Defence | 66(i) |
| EBRD | 347.36 |

| Defined Term | Para. No. |
|---|---|
| EBRD Pledge Agreement | 347.36 |
| Eighteenth Order | 73 |
| Eighth Hearing | 72 |
| Eighth Order | 39 |
| Eleventh Order | 73 |
| Escrow Account | 11 |
| Escrow Agent | 10 |
| FCT | fn. 102 |
| FCT-Documents | 83 |
| February Accounting | 689 |
| Fifteenth Order | 73 |
| Fifth Hearing | 72 |
| Fifth Order | 39 |
| Final Option Notice | 249 |
| First Capital Increase | 347 |
| First Hearing | 30 |
| First Phase | 71 |
| First Sonic Duo SH Agreement | 347 |
| FNH | 347.3 |
| FNH SH Agreement | |
| Fourteenth Order | 73 |
| Fourth Hearing | 37 |
| Fourth Order | 39 |
| Funding Call Notice | 5 |
| Funding Price | 5 |
| Funding Report | 76 |
| Gamma Holding | 3(vii) |
| Geneva ICC-Arbitration | 18 |
| Geneva ICC-Award | 20 |
| Geneva ICC-Tribunal | 15 |
| Geneva ICC-Witness Hearing | 19 |

| Defined Term | Para. No. |
|---|---|
| German Assistance Request | 99 |
| German Criminal Complaint | 102 |
| German Investigation | 100 |
| German Prosecutor | 99 |
| GG Advisors | 219 |
| Honestas | 488(ii) |
| IBA-Rules of Evidence | 33 |
| Inspectors | 154 |
| Involved Person Nos. 1 to 9 | 119 |
| IP7-Documents | 97 |
| IPOC | 1 |
| IPOC Capital | 3(vi) |
| January 2001 Briefing | 330 |
| January 2001 Meeting | 325(i) |
| Joint Inspection | 39 |
| JSC-Act | 398 |
| Jurisdictional Objections | 175 |
| KK-Report | 137 |
| List of Issues | 37 |
| List of Witnesses | 42 |
| List of Witnesses and Involved Persons | 120 |
| LV Finance | 1 |
| LVFG | 1 |
| March 2001 Meeting | 325(i) |
| MegaFon | 3(iv) |
| MegaFon Interests | 163 |
| ML-Defence | 66(ii) |
| MTS | 488(iii) |
| NAC | 74 |
| Nineteenth Order | 73 |
| Ninth Hearing | 72 |

| Defined Term | Para. No. | Defined Term | Para. No. |
|---|---|---|---|
| Ninth Order | 73 | RCO | 347 |
| North-West GSM | 347.3 | RCrC | |
| Onward Sales | 14 | Rejoinder | 37 |
| Operative Part | fn. 741 | Rejoinder on Counter- | 37 |
| Option Agreements | 14 | claim | |
| Option Notice | 9 | Reply | 37 |
| Option Price | 5 | Request for Arbitration | 23 |
| Outstanding Funding | 65(i) | Respondent | 1 |
| PA | 64 | Respondent's BID- | 164 |
| Paid OP-Portion | 65(i) | Prayers | |
| Palmer | 3(viii) | Respondent's Bullet-Point | 72 |
| Palmer Acquisition | 14 | Submission | |
| Palmer Acquisition | 80 | Respondent's FCT-PoD | 91 |
| Documents | | Request | |
| Palmer Share Purchase | 14 | Respondent's Initial | 56 |
| Agreement | | Prayers | |
| Partial Award | 64 | Respondent's Prayers | 58 |
| Parties | 1 | Reverse Call Option | 347 |
| Parties' Costs | 688 | Reverse Call Option | 347 |
| PIL | 32 | Agreement | |
| PLD | 488(vii) | RfA | 23 |
| POCA | 546 | RIFCO | 65(ii) |
| Preliminary Issues | 35 | RIFCO Amount | 65(ii) |
| Pre-Signing Events | 66(ii) | Riversand | 66(ii) |
| Procedural Conference I | 37 | Riversand Payment | 66(ii) |
| Procedural Conference II | 37 | RJ | 37 |
| Proposed Exercise Date | 249 | RY | 37 |
| Proposed Witnesses | 43 | Russian Action | 159 |
| No. 1 to 24 | | Russian Criminal Com- | 108 |
| Protected Evidence | 111 | plaint | |
| PSPA | 81 | SC | 37 |
| PTN | 100(i) | Schedule 2 | 9 |
| Purported Option Notice | 65(v) | SCT | 83 |
| RC | 37 | SD | 37 |
| | | Second Capital Increase | 347 |



| Defined Term | Para. No. | Defined Term | Para. No. |
|---|---|---|---|
| Second Confidentiality Order | 73 | Summary Minutes of the Fifth Hearing | fn. 75 |
| Second Hearing | 37 | Summary Minutes of the First Hearing | 31 |
| Second List of Witnesses | 117 | Svyazinvest | 3(v) |
| Second Order | 39 | Svyazinvest Charter | 394 |
| Second Purported Option Notice | 240 | Swiss Penal Code | 536 |
| Second Sonic Duo SH Agreement | 347 | T1H | fn. 21 |
| Second Witness Hearing | 72 | T2H | fn. 22 |
| Selective Memory | 327(ii) | T4H | fn. 25 |
| Seventeenth Order | 73 | T5H | fn. 75 |
| Seventh Hearing | 72 | T7H | fn. 79 |
| Seventh Order | 39 | T8H | fn. 81 |
| Sham Defence | 68(i) | T9H | fn. 82 |
| Share Escrow Agreement | 10 | T10H | fn. 83 |
| Share Retention Agreement | 347 | TCI | 151 |
| Sixteenth Order | 73 | TCI SH Agreement | 347.3 |
| Sixth Order | 39 | Telecom XXI | 488(ii) |
| Skeleton Answer | 37 | Telecom XXI Licence | 492 |
| SMFH | 31 | Tenth Hearing | 72 |
| SMFiH | fn. 75 | Tenth Order | 73 |
| Sonera | 8 | Third Order | 39 |
| Sonic Duo | 3(iii) | Third Purported Option Notice | 240 |
| Sonic Duo Licence | 3(iii) | Thirteenth Order | 73 |
| SPC | 536 | TMI | 3(i) |
| Statement of Claim | 37 | Total Purchase Price | 6 |
| Statement of Defence | 37 | Transcript of the Eighth Hearing | fn. 80 |
| Stockholm Arbitral Tribunal | 151 | Transcript of the Fifth Hearing | fn. 75 |
| Stockholm Arbitration | 151 | Transcript of the First Hearing | fn. 21 |
| Structure Crystallisation Date | 249 | Transcript of the Fourth Hearing | fn. 25 |

| Defined Term | Para. No. |
|---|---|
| Transcript of the Ninth Hearing | fn. 82 |
| Transcript of the Second Hearing | fn. 22 |
| Transcript of the Second Witness Hearing | fn. 78 |
| Transcript of the Seventh Hearing | fn. 79 |
| Transcript of the Tenth Hearing | fn. 83 |
| Transcript of the Witness Hearing | fn. 23 |
| Twelfth Order | 73 |
| Twentieth Order | 73 |
| Twenty-First Order | 73 |
| TWH | fn. 23 |
| Undertaking | 10 |

| Defined Term | Para. No. |
|---|---|
| Undertaking Escrow Agreement | 10 |
| W4-Group | 2 |
| Witness Hearing | 37 |
| Witnesses Nos. 1 to 13 | 42 |
| Witnesses Nos. S1 to S38 | 117 |
| Without Prejudice Language | 257 |
| Zurich Ad-Hoc Arbitration | 16 |
| Zurich Prosecutor | 99 |

**considers:**

## I.     PARTIES AND BACKGROUND TO THE PRESENT DISPUTE

### A.     Parties

1.     The Parties to the present dispute (the "**Parties**") are IPOC International Growth Fund Ltd., incorporated on June 19, 2000 (p. 9 of C-508 = p. 15 of R-152) as a company with limited liability under the laws of the islands of Bermuda ("**IPOC**") as claimant (the "**Claimant**") and LV Finance Group Ltd., incorporated on October 14, 1998 (R-452) in the British Virgin Islands ("**LVFG**", and in the relevant agreements also referred to as "**LV Finance**") as respondent (the "**Respondent**")[1].

2.     IPOC is an *"open-ended mutual fund investment company"* and forms part of a group of companies which Claimant described as group belonging to Witness No. 4 (the "**W4-Group**") and LVFG is an investment *"company with offices in Moscow"*[2].

3.     There are no further parties to this arbitration, but some companies are of significance for this arbitration and therefore merit to be mentioned at the outset of this Second Partial Award:

> (i)     Transcontinental Mobile Investment Limited, a company registered under the laws of the Bahamas ("**TMI**")[3];

> (ii)    OOO CT-Mobile, a limited liability company registered under the laws of the Russian Federation ("**CT-Mobile**" or "**CTM**")[4];

---

[1]    See p. 5 RfA and paras. 34 to 38 Skeleton Answer and para. 347.1 hereinafter.
[2]    See p. 5 RfA and para. 37 Skeleton Answer.
[3]    See Whereas Clause (1) AOA and p. 1 of Annex A to the Statement of Claim stating that TMI was incorporated on November 26, 1999 (see also p. 5 of C-163).
[4]    See Whereas Clause (2) AOA stating that it was incorporated on February 10, 2000 (see also p. 5 of C-163).

(iii)    ZAO Sonic Duo, a closed joint stock company registered under the laws of the Russian Federation (**"Sonic Duo"**) which received on May 19, 2000 a licence for ten years *"to upgrade a cellular network in the GPM 900/1800 standard in Moscow and Moscow oblast"* (the **"Sonic Duo Licence"**[5].

(iv)    OAO MegaFon, a company registered under the laws of the Russian Federation, being one of the largest mobile telephone operators in Russia (**"MegaFon"**)[6];

(v)    OAO Central Telegraph, an open joint stock company registered under the laws of the Russian Federation (**"Central Telegraph"**) which is controled by the open joint stock company OAO Svyazinvest, Russian Federation (**"Svyazinvest"**) of which the Russian Federation is a majority shareholder[7];

(vi)    IPOC Capital Partners Limited, a company registered under the laws of Bermuda (**"IPOC Capital"**) which owns 100% of the management shares of IPOC[8];

(vii)    Gamma Holding AG, Frauenfeld, Switzerland, (**"Gamma Holding"**) owning since December 22, 2000 75% and since April 25, 2001 100% of the share capital of IPOC Capital (C-531); and

(viii)    Palmer Trading Limited, a company registered under the laws of the Seychelles (**"Palmer"**), which owns since July 18, 2003 100% of the shares of LVFG (see para. 14 hereinafter).

---

[5]    See Whereas Clause (2) and (4) AOA and pp. 1/2 of the Annex A to the Statement of Claim stating that Sonic Duo was incorporated on December 3, 1999 (see also p. 5 of C-163) and describing the Sonic Duo Licence.

[6]    See p. 6 RfA and para. 39 Skeleton Answer.

[7]    For Central Telegraph see Whereas Clause (3) AOA and C-11a, on its control by Svyazinvest see para. 363 hereinafter at fn. 383 and for Svyazinvest shareholders see p. 8 of C-820 (the Russian Federation owned at least since July 1998 50% + 1 share).

[8]    See para. 3.32 R-28 and R-152 Exhibit 7.

**B.      Background**

**a)      April Option Agreement**

4.      Almost ten months after its incorporation, IPOC entered on April 10, 2001 into an agreement with LVFG entitled *"Call Option Agreement"* (C-36) (the **"April Option Agreement"** or **"AOA"**).

5.      In Clause 2.1 AOA, *"LV Finance irrevocably grants to IPOC an option to buy ... the Option Shares"*, i.e. a 77,7% interest in TMI (the **"April Option"**), for the total option price set forth under the definitions in Clause 1.1 AOA of USD 15'225'000.00 (the **"Option Price"**) of which an amount of USD 15'150'000.00 was for CT-Mobile's proportion of capital contributions to Sonic Duo (the **"Funding Price"**) and an amount of USD 75'000.00 for expenditures (see the definitions of *"Option Price"* and *"Funding Price"* in Clause 1.1 AOA. In order to request Claimant to pay on account of the Funding Price an amount exceeding the first tranche of USD 5'050'000.00 set forth in Clause 2.2.1 AOA a funding call notice pursuant to Clause 2.2.3 had to be issued by Respondent (a **"Funding Call Notice"**).

6.      The *"Option Shares"* are defined in Clause 1.1 AOA as *"such number of [shares of TMI[9]] registered in the name of LV Finance as shall immediately prior to an Option Exercise Date, when added to the [shares of TMI] (if any) transferred by LV Finance pursuant to a previous exercise of the Option, be equal to 77.7% of the total number of [shares of TMI] issued and outstanding ..."* (the **"April Option Shares"**). Pursuant to Clause 2.4 AOA, the Purchase Price for the April Option Shares is USD 18'000'000.00 (the **"Total Purchase Price"**).

7.      At the time of the signing of the April Option Agreement, TMI was pursuant to Whereas Clause (2) AOA the *"legal and beneficial owner (free from any*

---

[9]      In the original language of the definition of *"Option Shares"*: the *"Shares"*, which Clause 1.1 AOA defines as ordinary shares of USD 1 in TMI for which company the April Option Agreement uses the term *"Company"*.

Encumbrance) of 49% of ... the participatory shares of" CTM which in turn "legally and beneficially own[ed] (free from any encumbrances) 65% of the issued share capital" of Sonic Duo.

8.    Whereas Clause (2) AOA further states that the charter capital of Sonic Duo was at the time Russian Roubles 200'000.00 "divided into 2,000 common shares of [Roubles] 100 each, of which 1,300 are registered in the name of CTM, the balance being registered in the name of Sonera Holding B.V., a company registered under the laws of the Netherlands" ("**Sonera**").

9.    Clause 1.1 AOA defines further the term "Option Period" to mean the "period commencing on" April 10, 2001 and expiring on the "earlier of (a) the Option Termination Date and (b) the Structure Crystallisation Date" (the "**April Option Period**"). Except in case of a "Structure Crystallisation Event" as defined in Clause 1.1 AOA, the April Option Period ends on the "Option Termination Date" which Clause 1.1 AOA defines as the "Fifth anniversary of the date of this agreement", which is April 10, 2006 (the "**April Option Termination Date**"). Clause 3 AOA states that during the April Option Period, Claimant may "at any time" exercise the April Option "in whole or in part" by the delivery to Respondent of an "Option Notice" defined in Clause 1.1 AOA as "a written notice substantially in the form set out in Schedule 2" of the April Option Agreement (an "**Option Notice**"). The said schedule 2 is entitled "FORM OF OPTION NOTICE" (the "**Schedule 2**").

10.   Together with the April Option Agreement, the following thereto relating agreements were signed:

(i)    an agreement dated April 10, 2001 (R-10) entitled "ESCROW DEPOSIT AGREEMENT" between LVFG, IPOC, the Witnesses No. 4 and 6[10] and the Zurich based law firm von Meiss, Blum & Partner as escrow agent (the "**Escrow Agent**") for the deposit of two originals of the April Option Agreement with the Escrow Agent (the "**AOA Escrow Agreement**").

---

[10]    For the identification of these witnesses, see para. 42 hereinafter.

    (ii)    an agreement dated also April 10, 2001 (C-39) entitled *"SHARE CERTIFICATES ESCROW AGREEMENT"* between the same individuals and entities being the parties to the AOA Escrow Agreement for the deposit of the share certificates for the April Option Shares with the Escrow Agent (the **"Share Escrow Agreement"**).

    (iii)    an undertaking signed on April 10, 2001 (C-38a) by Witness No. 6[11] relating to the total purchase price referred to in Clause 2.4 AOA (the **"Undertaking"**)[12].

    (iv)    an agreement dated April 10, 2001 (C-37a) entitled *"ESCROW DEPOSIT AGREEMENT"* between the parties to the Undertaking and the Escrow Agent for the deposit with the Escrow Agent of the only original of the Undertaking (the **"Undertaking Escrow Agreement"**).

11.    The Escrow Agent's responsibility extended also to the acceptance of funds to be paid under the April Option Agreement[13]. Although this was not specifically stipulated in any of the escrow agreements, the Escrow Agent opened for this purpose in the name of its office trust company Trevus Aktiengesellschaft a separate USD account (the **"Escrow Account"**) which on April 18, 2001 first was opened with Credit Suisse, Zurich, under the account number 276 517-82-5 (R-184) and thereafter on July 7, 2002 (C-116) transferred to Hyposwiss Privatbank Ltd, Zurich, under the account number 1.706.037.255 (C-116) and finally upon instructions from Respondent (C-178a) was closed in July 2003 (C-178b).

**b)**    **December Option Agreement**

12.    Eight months after the signing of the April Option Agreement, on December 14, 2001, the Parties signed a further agreement entitled *"Call Option*

---

[11]    See fn. 10 hereinabove.
[12]    For details see para. 132 et seq. PA.
[13]    See e.g. Clause 3 of the AOA Deposit Agreement and Clause 2 of the Share Escrow Agreement.

*Agreement"* (C-91) (the **"December Option Agreement"** or **"DOA"**) which sets forth in Clause 2.1 DOA that LVFG grants IPOC an option to buy the remaining 22,3% of the shares of TMI for a total option price of USD 26'000'000.00 (the **"December Option"** and the **"December Option Shares"**, respectively), for which a similar escrow arrangement with the Escrow Agent was agreed (C-94 and C-95).

13.    Whereas Clause (2) DOA makes specific reference to the April Option Agreement[14]. The option period of the December Option Agreement is defined differently than in the April Option Agreement, but expires pursuant to the definition of the *"Option Termination Date"* in Clause 1.1 DOA also on the fifth anniversary of the April Option Agreement, i.e. on April 10, 2006.

c)    **Dispute Between the Parties**

14.    When Claimant intended, by its option notices dated July 29, 2003 and August 12, 2003 (C-177 and C-189), to exercise the April Option and the December Option, Respondent, in a letter to Claimant dated August 28, 2003, contested the *"validity of the exercise"* of the April Option and *"the validity of the Call Option Agreements"* (C-202). Shortly before this, i.e. on July 2, 2003, the shareholders of Respondent and Palmer entered into a *"Share Purchase Agreement"* (the **"Palmer Share Purchase Agreement"**) for the purchase of the shares of Respondent which closed on July 18, 2003 (the **"Palmer Acquisition"**). Before the Palmer Acquisition, in December 2002, TMI had sold 49.9% of the shares of CTM to three Panama companies by the names of LV Investment I, II and III. After the Palmer Acquisition, on July 21, 2003, these three companies sold their respective shares in CTM to Alamosa Holdings Limited, Carbert International Ltd. and Rampton Enterprises Ltd. Also on July 21, 2003, TMI sold the remaining 50.1% of the shares of CTM to three companies by the names of Normanton Ltd., Smart Finance Ltd. and Carbonell Trading Company Ltd. Furthermore, on July 28,

---

[14]    In the December Option Agreement, the April Option Agreement is defined as *"First Option Agreement"* and referred to in Whereas Clauses 2 and 3 in the definition of the term *"Option termination date"* and in Clauses 1.1 and 7 DOA.

2003, three further companies, Barrows Alliance, Cormack Select and Stegman Universal contributed promissory notes to the charter capital of CTM, in exchange of which they received an aggregate of 50.1% of the shares of CTM. On August 1, 2003, the nine companies who then owned CTM sold all their shares in CTM to three BVI companies, Avenue, Janow Properties and Santel, belonging to OOO Alfa-Eco, Russian Federation ("**Alfa-Eco**")[15]. These transactions other than the Palmer Acquisition are hereinafter referred to as the "**Onward Sales**"[16]. As a result of Claimant's contestation of the Onward Sales, a dispute arose out of the April Option Agreement and out of the December Option Agreement (the "**Option Agreements**").

15.    The dispute relating to the April Option Agreement is before this arbitral tribunal (the "**Arbitral Tribunal**"), while the dispute arising out of the December Option Agreement had been submitted, based on a request for arbitration to the International Court of Arbitration of the ICC, Paris, dated August 15, 2003, to an arbitral tribunal with a place of arbitration in Geneva, constituted by the International Court of Arbitration of the ICC on October 16, 2003, formed by three different arbitrators, i.e. Dr. Bernhard F. Meyer-Hauser as Chairman and Prof. Alexander S. Komarov and Mr. Christopher Style as co-arbitrators (the "**Geneva ICC-Tribunal**").

16.    Contrary to the December Option Agreement, the April Option Agreement does not provide for an institutional arbitration and states in Clause 13.2.1 AOA merely that the *"place of arbitration shall be Zurich, Switzerland"*; therefore, this arbitration is hereinafter sometimes referred to as the "**Zurich *Ad-Hoc* Arbitration**".

---

[15]    See Claimant's summary of facts pp. 25-32 SC as well as C-348 referred to at the top of p. 25 SC. Respondent gave a similar account of the same facts in paras. 48-52 Skeleton Answer. Omitted from the above description is Respondent's sale of TMI to Toliara Limited, Kristel Ventures, Inc. and Rosales Investments Limited on July 21, 2003, referred to on p. 29 SC and in para. 50 Skeleton Answer, as by this time TMI had already been divested of its shares in CTM.

[16]    The Onward Sales are mainly referred to by Claimant in the context of its *"Scheme"* argument. Respondent uses the term *"onward sales"* as only relating to the last transactions, i.e. the sales by which *"Alfa has subsequently acquired CTM in its entirety"* (para. 51 Skeleton Answer).

17.   Many of the issues subject to the Geneva ICC Arbitration and the Zurich
      *Ad-Hoc* Arbitration are, if not identical, at least similar. While the contractual
      dispute over the question whether the option granted by the relevant option
      agreement has been properly exercised relate to different sets of facts, the
      Parties discuss in both arbitrations the issues (i) whether the sale of the op-
      tion shares by Respondent was an intentional violation of Claimant's rights
      under the Option Agreements and (ii) whether Respondent was allowed to
      sell the April Option Shares and December Option Shares to a third party
      on the ground that the April Option Agreement and the December Option
      Agreement are voidable because they were entered into under duress or
      constitute a sham or unconscionable bargain and are void or unenforceable
      because they or IPOC serve an illegal purpose such as money laundering
      or violate Russian competition law.

**d)   Status of the Geneva ICC-Arbitration**

18.   The Geneva ICC-Arbitration with the case No. 12875/MS (the **"Geneva
      ICC-Arbitration"**) was initiated one month before the Zurich *Ad-Hoc* Arbi-
      tration and its constitution was completed three months ahead of the Zurich
      *Ad-Hoc* Arbitration[17].

19.   The witness hearing of the Geneva ICC-Arbitration took place from May 10
      to May 14, 2004 (the **"Geneva ICC-Witness Hearing"**). Although LVFG
      and its counsel left the Geneva ICC-Witness Hearing on Monday, May 10,
      2004[18], the Geneva ICC-Tribunal nevertheless decided to hear the oral
      evidence offered by IPOC's witnesses[19] who, as a consequence of LVFG's
      absence, could not be cross-examined by LVFG's counsel and, therefore,
      were to a great extent questioned by the Geneva ICC-Tribunal.

---

[17]   Compare para. 15 hereinabove with paras. 27/30 hereinafter.
[18]   For the reasons of LFVG's decision not to participate at the Geneva ICC-Witness Hearing
       and the Geneva ICC-Tribunal's decision to continue see paras. 110 et seq. of the Geneva
       ICC-Award referred to in para. 20 hereinafter.
[19]   The witnesses heard at the Geneva ICC-Witness Hearing are the same witnesses who
       appeared before this Arbitral Tribunal as Witnesses Nos. 1 to 5 (for their identification see
       para. 42 hereinafter).

20.    The Geneva ICC-Tribunal rendered its award on August 16, 2004 (C-424) (the "**Geneva ICC-Award**") with the following here relevant decisions in the operative part:

>    "1.    *Confirms its jurisdiction and its right to examine and decide on the merits of the Claim and Counterclaim.*
>
>    2.    *Decides and declares that claimant has validly exercised and paid for its option under the December Option Agreement and is therefore entitled to the transfer by Respondent of 22.3% of the shares capital of TMI, with TMI holding 99.99% of the share capital of CTM and with CTM holding 25.1% of the share capital of MegaFon (the "MegaFon Interest").*
>
>    3.    *Orders Respondent, upon the tendering by Claimant to Respondent of US$ 16 million, to transfer to Claimant the MegaFon interest.*
>
>    4.    *Declares that this award is final as to the question of specific performance, but does not constitute res judicata as to Claimant's potential damage claim if specific performance for reasons beyond Claimant's control should no longer be possible.*
>
>    5.    *Rejects the Respondent's Counterclaim.*"

21.    On September 24, 2004[20], LVFG filed an action for annulment pursuant to Art. 190 et seq. PIL to the Swiss Federal Supreme Court (R-182) on the alleged grounds, *inter alia*, that the Geneva ICC-Tribunal's refusal to postpone the Geneva ICC-Witness Hearing violates LVFG's right to be heard and that the non-acceptance of LVFG's money laundering defence raised also in the Geneva ICC-Arbitration is incompatible with public policy and therefore violates Art. 190(2)(e) PIL. By its decision dated December 14, 2004 (R-245), the Swiss Federal Supreme Court dismissed the aforemen-

---

[20]    This is the last day of the five-day Witness Hearing in the Zurich *Ad-Hoc* Arbitration referred to para. 45 hereinafter.

tioned annulment action against the Geneva ICC Award, to the extent such action was admissible, in particular on the following grounds:

(i)     LVFG was not able to assert any unpredictable obstacles to the provision of evidence due to the non-postponement of the Geneva-ICC-Witness Hearing, the dates of which had been agreed by the Parties on the occasion of an organizational hearing held on December 15, 2003, when the Parties agreed on a provisional timetable (p. 12).

(ii)    Although LVFG complains that the Geneva-ICC-Witness Hearing was not postponed despite the illness of its counsel, it did not explain to which extent his replacement was not able to sufficiently preserve LVFG's interests in the evidentiary proceedings (p. 13).

(iii)   LVFG's counsel left the Geneva ICC-Witness Hearing already on the first day, and LVFG did not allege any measures which would have worked to its disadvantage for lack of due preparation in the context of the Geneva-ICC-Witness Hearing (p. 13).

(iv)    LVFG's money laundering defence was rejected by the Arbitral Tribunal on the grounds that (a) the predicate offense had not been substantiated by LVFG, (b) the origin of the funds was made plausible by IPOC, (c) the intricate offshore structure was considered to be justified by organic growth, and (d) law firms had conducted satisfactory due diligence procedures concerning IPOC (p. 15).

(v)     LVFG's money laundering defence was rejected after an assessment of the allegations and evidence brought by LVFG so that the decision ordering LVFG to perform the December Option Agreement does not violate public policy (p. 15).

22.     On April 12, 2006, Respondent filed an application for revision of the Geneva ICC-Award to the Swiss Federal Supreme Court pursuant to Art. 136 et seq. of the Swiss Statute on the Organization of the Judicial System (R-468). Respondent's application for revision is based on the information con-



tained in the *"Affidavit"* of Involved Person No. 7 (C-991) referred to in para. 100 hereinafter and the inspection of the IP-7 Documents also referred to in para. 100 hereinafter, which affidavit and documents were produced in this Arbitration on January 13 and 24, 2005 and requests that the Geneva ICC-Award be set aside and the case be sent back to the Geneva ICC-Tribunal for a new decision. As of the date of this Second Partial Award, no further information is available on Respondent's request for revision of the Geneva ICC-Award.

## II.  PROCEDURAL HISTORY

### A.  Constitution of the Arbitral Tribunal

23.  With its letter dated September 22, 2003, Claimant served on Respondent its request for arbitration of even date (the **"Request for Arbitration"** or **"RfA"**) and thereby initiated the Zurich *Ad-Hoc* Arbitration relating to the dispute out of the April Option Agreement.

24.  The April Option Agreement contains in its Clause 13.2 the following arbitration clause (the **"Arbitration Clause"**):

> *"13.2    Any dispute, controversy or claim arising out of, relating to or in connection with this Agreement, including any question regarding its existence, validity or termination, or regarding a breach of this Agreement, shall be referred to, and finally settled by arbitration under and in accordance with the arbitration rules under the Code of Civil Procedure of the Canton of Zurich, Switzerland. With regard to any such arbitration:*
>
> *13.2.1   The Place of arbitration shall be Zurich, Switzerland, and the award shall be deemed to have been made there. The arbitral tribunal may, however, hold hearings, meetings or sessions anywhere convenient.*
>
> *13.2.2   The arbitral tribunal shall consist of three arbitrators, all of whom shall be appointed in accordance with the said rules. The language to be used in the arbitral proceeding shall be English.*



> *13.2.3  The award of the arbitral tribunal shall be in writing and state the reasons upon which it is based. Any monetary award shall be made in United States dollars.*
>
> *13.2.4  The award of the arbitral tribunal shall be final and binding on the Parties. Judgment upon an arbitral award rendered by the arbitral tribunal may be entered in any court having jurisdiction."*

25.  As already stated in para. 16 hereinabove, it results from the Arbitration Clause that the Zurich Ad-Hoc Arbitration is, contrary to the Geneva ICC Arbitration, not an institutional arbitration proceeding, but an *ad-hoc* arbitration proceeding.

26.  In its letter dated October 10, 2003 Claimant appointed Mr. Ian L. Meakin as its arbitrator. Respondent on its part appointed Dr. Boris O. Kojevnikov as its arbitrator in its letter dated November 17, 2003.

27.  Following a telephone conference held on January 14, 2004, the party-appointed arbitrators, by an email correspondence dated January 16/17, 2004, appointed Dr. Daniel Wehrli as chairman of the present arbitration proceeding (the **"Chairman"**). By his letter to the Parties dated January 30, 2004, the Chairman confirmed the acceptance of his appointment.

28.  On p. 12 RfA, Claimant requested that the Arbitral Tribunal, in a partial award, first issue (**"Claimant's Initial PA-Prayers"**):

> *"1.    A binding ruling that:*
>
> *a)    IPOC is DECLARED to have validly exercised, and paid for, its option rights under the April Option Agreement and otherwise, such that, together with IPOC's other rights,*
>
> *b)    The Company shares, including the underlying economic right to own and control a stake of 25.1% of MegaFon, should belong, and must be transferred, to IPOC; and*

29



2.      *LV Finance, and any Escrow Agent or other agent acting for the parties, is ORDERED to take all necessary and appropriate steps to give immediate effect the transfer of Company shares and corresponding ownership and economic rights in MegaFon to IPOC."*

29.    On p. 13 RfA, Claimant furthermore requested the Arbitral Tribunal to *"then ... issue Orders and an Award granting Claimant"* (**"Claimant's Further Initial Prayers"**):

"1.    *All damages (including those related to Claimant's enforcement of Orders for specific performance), inclusive of interest, suffered as a consequence of Respondent's breaches and illegal behavior;*

2.    *The costs of this arbitration, inclusive of attorneys fees;*

3.    *Such other relief as the Tribunal may deem just and proper under the circumstances."*

30.    After consultation of the Parties, the Arbitral Tribunal issued, on February 24, 2004, the constituting order (the **"Constituting Order"** or **"CoO"**) and convened in item (ix) thereof a hearing for the *"discussion of various procedural matters and the setting of a time-table"* (the **"First Hearing"**). Item (xii) CoO confirmed that - as set forth in Clause 13.2.1 AOA - *"the place of arbitration is Zurich"* and item 4 CoC stated that the *"determination of the rules applicable to the arbitration proceeding will be made on or shortly after the First Hearing"*. This became necessary in order to determine the meaning of the reference in the Arbitration Clause to the *"arbitration rules under the Code of Civil Procedure of the Canton of Zurich, Switzerland"*. In item 8 CoO, the Arbitral Tribunal requested each Party to pay an initial deposit of CHF 100'000.00.

**B.    Procedural Agreements Made at the First Hearing**

31.    The First Hearing took place as planned on March 4, 2004. A summary of the procedural agreements made and matters discussed at the First Hearing has been set forth in the Arbitral Tribunal's telefax dated March 17,

2004 (the **"Summary Minutes of the First Hearing"** or **"SMFH"**), whereby item 16 SMFH has been modified as set forth in the Arbitral Tribunal's tele-fax dated April 1, 2004. The thereby-modified version of the Summary Min-utes of the First Hearing has been declared in the Arbitral Tribunal's telefax dated April 22, 2004 *"as final"*[21].

32.    As to the *"rules applicable to the arbitration proceeding"* referred to in para. 30 hereinabove, item 1 SMFH states the following:

> *"1.    The Parties agree that the phrase "under and in accor-dance with the arbitration rules under the Code of Civil Procedure of the Canton of Zurich, Switzerland" in the Ar-bitration Clause of the April Option Agreement means that Chapter 12 of the Swiss Private International Law ("PIL") is applicable and that the Code of Civil Procedure of the Canton of Zurich shall, with the exception of its §§ 238 and 239, not be applicable to this proceeding. Conse-quently, the rules for this arbitration proceeding shall be determined in accordance with Art. 182 PIL. Based thereon, the Parties and the Arbitral Tribunal have agreed on the procedural rules set forth in parts B to F of these Summary Minutes of the First Hearing. Further procedural rules may be determined in accordance with Art. 182 PIL, if necessary."*

33.    Item 2 SMFH states that the IBA-Rules on the Taking of Evidence in Inter-national Commercial Arbitration (the **"IBA-Rules of Evidence"**) *"shall be used as guidelines for the taking of evidence in this proceeding"* and gives in item 3 SMFH an interpretation of Article 3(12) of the IBA-Rules of Evi-dence.

34.    Items 10 to 14 and 16 SMFH contain certain agreements and clarifications regarding the *"transparency"* in relation to the Geneva ICC Arbitration and item 15 SMFH states that the *"Parties did not reach an agreement upon the confidentiality obligations of the Parties"* and that *"Respondent's proposal*

---

[21]    A *verbatim* transcript of the First Hearing (the **"Transcript of the First Hearing"** or **"T1H"**, defined as "TFH" in the Partial Award) has been prepared by a professional court reporter.

*to apply Article 43 of the Swiss Rules of International Arbitration"* has been rejected by Claimant.

35.    Articles 17 and 18 SMFH finally record the agreement that a partial or interim award on preliminary issues shall be rendered and that in this context, the *"Chairman will contact the Parties to determine, based on Claimant's prayers for declaratory relief and specific performance contained on p. 12 RfA, which Claimant announced to slightly amend in its statement of claim, and the thereto relating arguments of defence, to what issues the further proceedings shall be limited for this purpose"* (the **"Preliminary Issues"**).

36.    Therefore, the proceedings were insofar limited so that Claimant's reply and Respondent's rejoinder and the Witness Hearing including the Parties' written witness statements had to address the Preliminary Issues only. In the Arbitral Tribunal's telefax dated July 8, 2004, the Parties were requested to address in these submissions:

>    *"among others, the following matters relating to the Preliminary Issues:*

>    (i)    *the payments allegedly made under the April Option Agreement;*

>    (ii)    *the question whether a formal Option Notice as per Schedule 2 to the April Option Agreement must be delivered for a valid exercising of the April Option and, if yes, if such Option Notice has been validly delivered;*

>    (iii)    *the significance and relevance of the Final Option Notice referred to in the April Option Agreement;*

>    (iv)    *the economic significance and legal nature of the Total Purchase Price of USD 18'000'000.00 referred to in Clause 2.4 of the April Option Agreement and the Escrow Deposit Agreement and the thereto-relating "UNDERTAKING" filed as RE-4/15, including, but not limited to, its relevance for Respondent's defences of "Sham" and "Unconscionable Bargain", and*

    (v)      *whether the facts alleged in [Witness No. 9's] Statement (R-28) relating to the period in which the April Option Agreement was signed and the alleged payments thereunder were made, if true and accurate, would, without considering later facts alleged in [Witness No. 9's] Statement, entitle Respondent to raise the money laundering objection and under which legal provision and legal concepts".*

**C.**    **Proceedings on the Preliminary Issues**

**a)**    **Major Procedural Steps**

37.    Apart from the Request for Arbitration and the First Hearing, the following major submissions were filed and hearings held until the rendering of the Partial Award referred to in para. 64 hereinafter:

| Date | Event | Abbreviation |
|---|---|---|
| March 15, 2004 | *"Skeleton Answer to the Request of Arbitration and Statement of Counterclaim"* | **Skeleton Answer** |
| March 30, 2004 | *"Statement of Claim"* (CV II) | **Statement of Claim or SC** |
| June 7, 2004 | *"Statement of Defence and Counterclaim"* | **Statement of Defence or SD** |
| June 24, 2004 | Second Hearing on Claimant's requests for the production of documents dated June 3, 2004 and June 11, 2004 and Respondent's request for the production of documents and motion for bifurcation dated June 4, 2004[22] | **Second Hearing** |

---

[22]    A *verbatim* transcript of the Second Hearing (the **"Transcript of the Second Hearing"** or **"T2H"**, defined as *"TSH"* in the Partial Award) has been prepared by a professional court reporter.

| | | |
|---|---|---|
| July 15, 2004 | Claimant's *"Rebuttal"* (CV XI) | **Reply or RY** |
| August 30, 2004 | Respondent's *"Rejoinder"* | **Rejoinder or RJ** |
| September 9, 2004 | Claimant's *"Rejoinder"* on the counterclaim | **Rejoinder on Counterclaim or RC** |
| September 20-24, 2004 | Witness Hearing (= Third Hearing)[23] | **Witness Hearing** |
| September 24, 2004 | Procedural conference on various matters held at the end of the fifth day of the Witness Hearing[24] | **Procedural Conference I** |
| October 1 and 2, 2004 | Final oral pleadings during which the Parties specifically addressed the list of issues the Arbitral Tribunal communicated to the Parties in its telefax dated September 4, 2004 (the **"List of Issues"**)[25] | **Fourth Hearing** |
| October 2, 2004 | Procedural conference held at the end of the second day of the Fourth Hearing on various matters, in particular Claimant's request for leave from the confidentiality obligations of the Parties as set out in the Eighth Order[26] | **Procedural Conference II** |

---

[23]    A *verbatim* transcript of the Witness Hearing (the **"Transcript of the Witness Hearing Day 1 to 5"** or **"TWH"**) has been prepared by professional court reporters.

[24]    The summary minutes of this Procedural Conference are set forth in the Arbitral Tribunal's telefax dated September 28, 2004.

[25]    A *verbatim* transcript of the Fourth Hearing (the **"Transcript of the Fourth Hearing"** or **"T4H"**, defined as *"TFoH"* in the Partial Award) has been prepared by a professional court reporter.

[26]    The summary minutes of this Procedural Conference II are set forth in the Arbitral Tribunal's telefax dated October 4, 2004.

38.    After the Fourth Hearing, in accordance with the Arbitral Tribunal's direc-
tives given on October 2, 6, 7, 8 and 10, 2004[27], the Parties submitted fur-
ther the submissions summarised in para. 38 PA.

**b)    Orders**

39.    Between the Constituting Order and the rendering of the Partial Award, the
Arbitral Tribunal issued the following orders:

| **Date** | **Event** | **Abbreviation** |
|---|---|---|
| March 31, 2004 | Second Order on the payment of the second share of the initial deposit in the amount of CHF 150'000.00 by each Party | **Second Order** |
| July 20, 2004 | Third Order dismissing Respondent's motion for bifurcation and deferring Respondent's Jurisdictional Objections referred to in para. 68 PA and para. 175 hereinafter to a later stage of proceedings | **Third Order** |
| July 26, 2004 | Fourth Order dismissing partly Claimant's request for the production of documents dated June 3, 2004 and June 11, 2004 thereby ordering a joint inspection of the Escrow Agent's file (the "**Joint Inspection**") and dismissing Claimant's additional request for the production of documents | **Fourth Order** |
| July 26, 2004 | Fifth Order deferring mainly Respondent's request for the | **Fifth Order** |

---

[27]    See para. 40 PA towards the end.

| | | |
|---|---|---|
| | production of documents dated June 4, 2004 to a later stage of proceedings thereby inviting Claimant to file certain documents voluntarily | |
| July 26, 2004 | Sixth Order on the payment of a further deposit in the amount of CHF 150'000.00 by each Party | **Sixth Order** |
| August 17, 2004 | Seventh Order dismissing Claimant's request for witness disclosure contained in the Reply | **Seventh Order** |
| August 17, 2004 | Eighth Order granting in part Respondent's request for the confidentiality of witness evidence dated July 27, 2004 | **Eighth Order** |

40.  In addition to these eight orders, the Arbitral Tribunal communicated to the Parties in the form of telefaxes, among other decisions, the decisions listed in para. 40 PA, some of which reflect matters agreed or argued during telephone conferences with the Parties' counsel held at various occasions throughout the proceedings on the Preliminary Issues.

**c)   Confidentiality Order**

41.  Among the eight orders referred to in para. 37 hereinabove, the Eighth Order on Respondent's request for confidentiality dated July 27, 2004 (the **"Confidentiality Order"**) deserves specific attention. In this order, the Arbitral Tribunal noted in consid. (xii) the following:

> "*In view of the publicity this case has attracted in the international press, the unusual events the chairman of the Geneva ICC-Proceeding reported on pp. 53 to 58 of the ICC-Transcript filed as*

