> *C-359[28] and the somewhat unusual defences such as the ML-Defence and the duress objection of Respondent as well as Claimant's allegation of the existence of an 'illegal sale and scheme' are in the Arbitral Tribunal's view special circumstances justifying to protect the confidentiality of the testimonies."*

and, based on this and other considerations, ordered the following:

> *"1.     The Parties, their counsel and assistants and the members of the Arbitral Tribunal and their assistants are hereby ordered to keep all oral statements of (expert) witnesses made in this arbitration and all written (expert) witness statements prepared for and filed in this arbitration strictly confidential. In particular, they shall not disclose to any third party (i.e. parties other than the Parties to this Arbitration and their counsel and assistants) (i) the fact that certain individuals are witnesses in this arbitration and (ii) the content of the oral statements (including the transcripts thereof) given by the (expert) witnesses testifying before this arbitration and of the written (expert) witness statements prepared for by the (expert) witnesses and filed in this arbitration, unless the Arbitral Tribunal has upon a justified application of a Party expressly granted leave to do so in a specific case.*
>
> *2.     This Order shall not apply for (expert) witness statements prepared for and the transcript of (expert) witness testimonies rendered in the Geneva ICC-Proceeding or other proceedings."*

42.     In view of the Confidentiality Order, the Arbitral Tribunal did not, in the Partial Award, mention the names of the (expert) witnesses heard at the Witness Hearing but referred to them as **"Witnesses No. 1 to 13"** as per the list of witnesses enclosed with the accompanying letter serving the Partial Award to the Parties (the **"List of Witnesses"**), whereby the Parties were requested to keep the List of Witnesses confidential in accordance with the Confidentiality Order.

---

[28]     The account of the Chairman in the Geneva ICC-Arbitration on the intrusion in his private sphere is recorded in the transcript of the Geneva ICC-Witness Hearing (see C-359, p. 53 line 6 et seq.).

43.  Likewise, the witnesses the Parties proposed to be heard at the Witness Hearing but who did not testify, either because they were, despite the respective request of a Party, not invited by the Arbitral Tribunal or, despite such invitation, not prepared to participate, or the hearing of which had been waived by the Parties or the Arbitral Tribunal, were referred to in the Partial Award as **"Proposed Witnesses Nos. 1 to 24"** as per the List of Witnesses.

44.  In para. 44 of the Partial Award, the Arbitral Tribunal indicated that in the event a Party were to file an action for the annulment of the Partial Award with the Swiss Federal Supreme Court pursuant to Art. 190/191 PIL, the List of Witnesses may be filed together with the Partial Award[29].

**d)  Witness Hearing**

45.  The Witness Hearing took place from September 20 to 24, 2004. Apart from the Confidentiality Order, some further matters have to be noted.

46.  On August 12, 2004 Respondent filed a motion that Witnesses Nos. 6 and 10 and the Proposed Witnesses Nos. 4 to 7 *"confirm ... that they will testify"* at the Witness Hearing and that, in the event these (Proposed) Witnesses refuse to give the confirmation sought, Respondent be *"granted leave to request judicial assistance from the competent court for compelling [these (Proposed) Witnesses] to give evidence ... or that the Arbitral Tribunal request judicial assistance from the competent court to compel [these (Proposed) Witnesses] to give evidence"*.

47.  In a letter dated August 26, 2004 Claimant requested that the Arbitral Tribunal write a letter of invitation to Witness No. 8 in order that he would testify at the Witness Hearing.

48.  In response to Respondent's motion and Claimant's request, the Arbitral Tribunal sent letters of invitation to the Witnesses (respectively their coun-

---

29    See also para. 121 hereinafter.

sel) Nos. 6 and 8 and the Proposed Witnesses (respectively their counsel) Nos. 4 and 6 on August 27, 2004[30] and to Witness No. 10 and Proposed Witness No. 5 on September 2, 2004. By telefaxes dated September 2, 2004 and September 14, 2004, the Arbitral Tribunal communicated to the Parties its decision not to send a letter of invitation to Proposed Witness No. 7.

49. All other witnesses testifying at the Witness Hearing were invited by the Parties.

50. All of the Parties' factual witnesses who had filed a written witness statement prior to the Witness Hearing gave testimony, except for Proposed Witness No. 2 who was ill and could not travel[31] and Proposed Witness No. 1 who alleged in a letter dated September 21, 2004 that the giving of oral testimony in Zurich could result in *"serious troubles"* and stated: *"I am deeply concerned about my physical safety and safety of those dear to me"* (R-171). Proposed Witness No. 8 did not give testimony at the Witness Hearing as previously agreed between the Arbitral Tribunal and the Parties.

51. Among the Witnesses invited by the Arbitral Tribunal, Witnesses Nos. 6, 8 and 10 filed a witness statement and/or gave testimony at the Witness Hearing. The Proposed Witnesses Nos. 4 and 5 denied filing a witness statement or giving testimony. Proposed Witness No. 6 did not answer the Arbitral Tribunal's letter of invitation.

52. Witness No. 6 presented himself as an independent Witness, although he was called by Respondent. The independent Witness No. 8 invited upon a request of Claimant gave testimony without filing a written witness statement.

---

[30] This procedure was agreed with the Parties' counsel at a telephone conference held on August 26, 2004. Due to a failure to deliver the letters of invitation to the proposed witnesses no. 17 and 19 these letters were re-sent on September 14, 2004.
[31] See the medical certificate filed by Respondent as R-170.

53.    Two of Respondent's expert Witnesses testified at the Witness Hearing (No. 7 on the financial structure of Claimant and No. 13 on *res iudicata*). Respondent's Proposed expert Witness No. 3 did not give any testimony explaining in a letter dated September 20, 2004 that he had *"learnt that"* he had been *"misled about the basis for the allegations and assumptions"* made in his witness statement (R-174). The other expert witnesses of the Parties (Nos. 9 to 18) did not give testimony at the Witness Hearing as previously agreed between the Arbitral Tribunal and the Parties[32].

54.    Overall the Witnesses Nos. 1 to 13 testified at the Witness Hearing, i.e. five factual witnesses for Claimant (Nos. 1 to 5), four factual Witnesses for Respondent (Nos. 9 to 12), two independent factual Witnesses (Nos. 6 and 8) and two of Respondents expert Witnesses (Nos. 7 and 13).

55.    The Proposed Witnesses Nos. 19, 20, 22 and 23 filed for Respondent an expert opinion on *res iudicata* after the Witness Hearing (RE-18 and RE-19) rebutting the expert opinion on this issue filed earlier by Claimant (C-518d and exhibit to Claimant's submission dated September 17, 2004), but did not testify as expert witnesses at the Fourth Hearing. The Proposed Witnesses Nos. 21 to 23 were, however, part of the respective Party's legal team.

e)    **The Parties' Prayers for Relief**

56.    While Claimant's Initial PA-Prayers and Claimant's Further Initial Prayers were submitted in the Request for Arbitration (see paras. 28 and 29 hereinabove), Respondent submitted on pp. 2/3 Skeleton Answer, the following initial prayers for relief (**"Respondent's Initial Prayers"**)[33]:

---

[32]    All of the expert Witnesses (Witnesses Nos. 8 and 13 and Proposed Witnesses Nos. 9 to 18) filed a written witness statement prior to the Witness Hearing. Pursuant to an agreement between the Arbitral Tribunal and the Parties the witness statement of Witness No. 3 was, after its refusal to testify, treated as a mere expert report and not an expert witness statement.

[33]    Emphasis made in bold letters omitted.

*"Prayers for Relief:*

*With regard to IPOC's claims:*

1. *That the Arbitral Tribunal decline jurisdiction for the following of IPOC's Prayers for Relief:*

   a)  *'that the underlying economic right to own and control a stake of 25.1% of MegaFon ... must be transferred to IPOC' (Request, prayers, first part, 1 b).*

   b)  *'that ... any Escrow Agent or other agent acting for the parties is ORDERED ...' (Request, prayers, first part, 2)*

2. *To the extent the Arbitral Tribunal does not decline jurisdiction:*

   *'That the Arbitral Tribunal refuse to hear IPOC's prayers for declaratory relief.'*

3. *To the extent the Arbitral Tribunal does not decline jurisdiction, or does not refuse to hear IPOC's prayers:*

   *'That IPOC's claims be dismissed in their entirety.'*

*With regard to LVFG's counterclaims:*

4. *That the Arbitral Tribunal declare that the April Option Agreement is void, unbinding and/or unenforceable, in particular because of simulation, violation of public policy, inducement/procuring of breach of fiduciary and contractual duties duress.*

   *In the alternative: That the Arbitral Tribunal avoid and/or annul the April Option Agreement.*

5. *That the Arbitral Tribunal declare that the April Option Agreement, if not void, unbinding and/or unenforceable, were an illegal contract, and a claim brought under it would be against public policy and arising ex turpi causa.*

6. *That the Arbitral Tribunal declare that IPOC has not validly exercised its options under the April Option Agreement.*

41



> 7. *That IPOC be ordered to pay LVFG damages, or alternatively compensation in equity, in particular by reason of*
>
>> a) *IPOC's actions in procuring or inducing a breach of contract and trust on the part of its officer, [Witness No. 6][34], and knowing assistance in breach of fiduciary duties;*
>>
>> b) *the various disputes, and legal proceedings, in particular costs and legal expenses not recovered directly in those proceedings;*
>>
>> c) *the fact that TMI was forced to sell its shares in CTM at an undervalue, and LVFG received less in dividends and other assets.*
>
> 8. *That IPOC be ordered to pay LVFG IPOC's illegal profit out of IPOC's procurement, or inducement of breach of contract and trust, and knowing assistance in breach of fiduciary duties.*
>
> *With regard all Prayers:*
>
> *That IPOC is ordered to pay the costs of this arbitration, including the costs of the arbitrators (including VAT, where applicable), costs of court reporters and experts, and the costs of LVFG, the fees of LVFG's counsels and the related costs."*

57.   On pp. 70/71 SC, Claimant filed the following prayers for relief ("**Claimant's Prayers**"), which do not fully correspond to Claimant's initial PA-Prayers and Claimant's Further Initial Prayers and no longer request that the April Option Shares *"including the underlying economic right ... must be transferred to IPOC"*[35,36].

---

34   For confidentiality reasons, the Arbitral Tribunal has replaced the name of the officer by the relevant number on the Confidential List of Witnesses (see para. 42 hereinabove).

35   However, on p. 71 SC, Claimant stated that it *"expressly reserves the right to submit such supplemental or additional claims, evidence or arguments, and to join such additional parties, as may be necessary or appropriate to respond to any defence or claim advanced by Respondent, or as required to do effective justice in this case."*

36   In part A, the numbers 1 to 4 were added by the Arbitral Tribunal to allow e. g. a reference to Claimant's Prayers for Relief A/2.

**"A. Declaration of Rights, Costs and Remedies**

1.  *IPOC has validly exercised and paid for its option under its 10 April 2001 Option Agreement with LV Finance, entitling IPOC to 77.7% of the share capital of TMI, with TMI holding substantially 100% of the capital of CTM, and CTM holding 25.1% of the capital of MegaFon (collectively the "MegaFon Interests") as envisioned by the 10 April 2001 Option Agreement;*

2.  *LV Finance's sales or transfers, or attempted sales and transfers, of its direct or indirect interests in TMI and the MegaFon Interests and its refusal to accept due payment and performance from IPOC, were in knowing and intentional violation of IPOC's prior and valid rights under the 10 April 2001 Option Agreement and part of a scheme to deprive IPOC of such rights;*

3.  *IPOC is awarded the costs of arbitration, inclusive of attorneys fees, through the date of the above Award; and*

4.  *IPOC is further awarded such other relief as may be just and proper.*

**B. Damage Findings and Award**

*In subsequent proceedings and subject to the terms of, and Respondent and others parties compliance with, the above solicited declaration, findings and Award, the Tribunal make further findings and Award as follows:*

1.  *Awarding IPOC all damages (including those related to Claimant's enforcement of orders for or declarations of rights of specific performance), inclusive of interest, caused to it by LV Finance's breaches of the 10 April 2001 Option Agreement;*

2.  *Awarding IPOC further costs, inclusive of attorneys fees, through date of the final damage Award, and*

3.  *Awarding IPOC any further relief as may be just and proper.*

43



58.    On p. 2 to 4 SD, Respondent submitted the following prayers for relief ("**Respondent's Prayers**") which modify Respondents' Initial Prayers quoted in para. 56 hereinabove:

*"Prayers for Relief*

*With regard to IPOC's claims*

1.    *That the Arbitral Tribunal take note that IPOC has withdrawn the following prayers for relief ("IPOC's Prayers for Specific Performance"):*

    a)    *that this Tribunal 'issue [...] a binding ruling that [...] [t]he Company [i.e. TMI] shares, including the underlying economic right to own and control a stake of 25.1% of MegaFon, should belong, and must be transferred, to IPOC;' and*

    b)    *that 'LV Finance [i.e. LVFG], and any Escrow Agent or other agent acting for the parties, is ORDERED to take all necessary and appropriate steps to give immediate effect the transfer of Company [i.e. TMI] shares and corresponding ownership and economic rights in MegaFon to IPOC';*

    *In the alternative, respectively to the extent that IPOC's Prayers for Specific Performance are not deemed withdrawn:*

    *that the Arbitral Tribunal decline jurisdiction for IPOC's prayers for specific performance mentioned above;*

2.    *That the Arbitral Tribunal decline jurisdiction for the following of IPOC's amended prayers for declaratory relief:*

    a)    *'IPOC has validly exercised and paid for its option under its 10 April 2001 Option Agreement with LV Finance, entitling it to 77.7% of the share capital of TMI, with TMI holding substantially 100% of the capital of CTM, and CTM holding 25.1% of the capital of MegaFon' (CV II, p. 70)*



b) 'LV Finance's sales or transfers, or attempted sales and transfers, of its direct or indirect interests in TMI and the MegaFon Interests and its refusal to accept due payment and performance from IPOC, were in knowing and intentional violation of IPOC's prior and valid rights under the 10 April 2001 Call Option Agreement and part of a scheme to deprive IPOC of such rights'

In the alternative, respectively to the extent the Arbitral Tribunal does not decline jurisdiction:

'That the Arbitral Tribunal refuse to hear IPOC's prayers for declaratory relief.' (Nichteintreten)

3.  In the alternative, respectively to the extent the Arbitral Tribunal does not grant the relief requested above:

'That IPOC's claims be dismissed in their entirety.'

With regard to LVFG's counterclaims:

4.  That the Arbitral Tribunal declare that the April Option Agreement is void, unbinding and/or unenforceable, in particular because of simulation, violation of public policy, inducement/procuring of breach of fiduciary and contractual duties or duress.

In the alternative: That the Arbitral Tribunal avoid and/or annul the April Option Agreement.

5.  That the Arbitral Tribunal declare that the April Option Agreement, if not void, unbinding and/or unenforceable, were an illegal contract, and a claim brought under it would be against public policy and arising ex turpi causa.

6.  That the Arbitral Tribunal declare that IPOC has not validly exercised its options under the April Option Agreement.

7.  That IPOC be ordered to pay LVFG damages, or alternatively compensation in equity, in an amount to be determined by the Arbitral Tribunal, in particular by reason of

   a)   *IPOC's actions in procuring or inducing a breach of contract and trust on the part of its officer, [Witness No. 6], and knowing assistance in breach of fiduciary duties;*

   b)   *the various disputes, and legal proceedings, in particular costs and legal expenses not recovered directly in those proceedings.*

8.   *Moreover, LVFG explicitly reserves its right to claim that IPOC be ordered to pay damages by reason of the fact that TMI was forced to sell its shares in CTM at an undervalue, and LVFG received less in dividends and other assets.*

9.   *That IPOC be ordered to pay LVFG, the illegal profit out of IPOC's procurement, or inducement of breach of contract and trust, and knowing assistance in breach of fiduciary duties, in an amount to be determined by the Arbitral Tribunal following production by IPOC of all relevant documents and disclosure of all relevant information.*

*With regard to the costs of this Arbitration:*

10.   *That IPOC is ordered to pay the costs of this arbitration, including in particular the costs of the arbitrators (including VAT, where applicable), costs of court reporters and experts.*

11[37].   *That IPOC is ordered to compensate LVFG for all costs arisen in connection with this arbitration, including attorney's fees, costs of in house counsel, costs of lost executive time and experts' costs, if any."*

59.   Claimant's Prayers were reiterated on p. 96 of the Reply while Respondent's Prayers were not explicitly reiterated but impliedly confirmed in the Rejoinder.

---

[37]   Erroneous number of Respondent corrected by the Arbitral Tribunal.

60.   After Claimant, during the Witness Hearing, referred several times to its alleged right for specific performance[38], and was reminded by the Arbitral Tribunal that the wording of Claimant's Prayers under its heading *"A. Declaration of Right, Costs and Remedies"* no longer included a reference to specific performance and that this was already noted at the Second Hearing[39], Claimant submitted at the beginning of the Fourth Hearing an amendment to Claimant's Prayers to the effect that it added, in the first paragraph under the heading *"A. Declaration of Right, Costs and Remedies"*, the words *"and Respondent is ordered to transfer such MegaFon Interests to Claimant"* (**"Claimant's Amendment on Specific Performance"**).

61.   Respondent's objection to Claimant's Amendment on Specific Performance[40] was dealt with in paras. 79 et seq., 93 and 155 PA. In para. 155 PA, the Arbitral Tribunal decided that the disputed admissibility of Claimant's Amendment on Specific Performance became moot as a result of the dismissal of Claimant's Prayer A/1, which made the dispute described in paras. 63/64 PA obsolete.

**f)    The Relevance of the Parties' Prayers for the Preliminary Issues**

62.   In para. 65 PA, the Arbitral Tribunal found that, with the exception of Claimant's Prayer A/3 and Respondent Prayers Nos. 10 and 11 on the arbitration costs, only

   (i)    Claimant's Prayers A/1 (declaration that Claimant *"has validly exercised and paid for its option"* under the April Option Agreement), A/2 (declaration that Respondent's *"attempted sales or transfers"* of its *"interests in TMI and the MegaFon Interests"* were in violation of

---

[38]    For example in Claimant's opening statement (see p. 21 lines 10 to 18 TWH Day 1) and in Claimant's counterstatement to the witness statement of Proposed Witness No. 2 (see p. 60 lines 2 and 3 TWH Day 5).

[39]    See p. 57 lines 12 and 13 and p. 133 lines 24 to 26 T2H and in particular p. 165 line 27 to p. 166 line 12.

[40]    See para. 63 PA, including the references in fn. 42/43 PA. See also Claimant's arguments summarised in para. 64 PA and the reference in fn. 44 PA.

Claimant's rights under the April Option Agreement) and A/4 ("*such other relief as may be just and proper*")[41] and

(ii) Respondent's Prayers No. 3 (dismissal of Claimant's claims "*in their entirety*"), No. 4 (declaration that the April Option Agreement is void, unbinding and/or unenforceable), No. 5 (declaration that "*the April Option Agreement were an illegal contract and a claim brought under it would be against public policy and arising ex turpi causa*") and No. 6 (declaration that Claimant "*has not validly exercised its options under the April Option Agreement*")[42]

relate to the merits of the Preliminary Issues and were thus to be dealt with in the Partial Award. Moreover, in para. 66 PA, the Arbitral Tribunal saw in Respondent's Prayers No. 1 (relating to the alleged withdrawal of Claimant's prayer for specific performance) and No. 2 (partial jurisdictional objection to Claimant's Prayers A/1 and A/2) two procedural prayers which were relevant for the Preliminary Issues[43].

63.   Not subject to the proceedings on Preliminary Issues and thus not covered by the Partial Award were

(i)   Claimant's Prayers B/1 to B/3 (award of "*all damages ... caused to*" Claimant by Respondent's "*breaches*" of the April Option Agreement as well as "*further costs, inclusive of attorneys fees*" and "*any further relief as may be just and proper*") and

(ii)  Respondent's Prayer No. 7 (award of damages or "*compensation in equity*" for Claimant's actions in "*procuring or inducing a breach of contract and trust*" and "*knowing assistance in breach of fiduciary*

---

[41]   For Claimant's Prayers see para. 57 hereinabove.

[42]   For Respondent's Prayers see para. 58 hereinabove.

[43]   Respondent's Prayer No. 1 relating to the alleged withdrawal of Claimant's prayer for specific performance was dealt with in para. 79 to 81 PA (see also item 1 of para. 64 and paras. 186/187 hereinafter). Respondent's partial jurisdictional objection was dealt with in para. 68 to 71 and 261 PA and is addressed in paras. 175 et seq., 189 and para. 711 hereinafter.

48

duties" and for "the various disputes, and legal proceedings"), No. 8 (reservation of right to claim damages for the "forced" sale by TMI of its shares in CT-Mobile "at an undervalue") and No. 9 (payment of the "illegal profit" out of Claimant's "procurement, or inducement of breach of contract and trust, and knowing assistance in breach of fiduciary duties") (para. 67 PA).

**D.    Partial Award**

64.    On October 19, 2004 the Arbitral Tribunal rendered a "Partial Award" which was served on the Parties with the Chairman's accompanying letter dated November 1, 2004 (the **"Partial Award"** or **"PA"**), the operative part of which reads as follows:

> "1.    Respondent's Prayer No. 1 referred to in para. 60 hereinabove, requesting to note that Claimant's Initial Prayers for Specific Performance are withdrawn with prejudice, is hereby dismissed.
>
> 2.    The question whether Claimant's Initial Prayers for Specific Performance have been withdrawn without prejudice has become obsolete so that no decision on Respondent's alternative Prayer No. 1 referred to in para. 60 hereinabove must be made.
>
> 3.    The decision on Respondent's Jurisdictional Objections referred to in paras. 68 et seq. hereinabove is deferred to a later stage of proceedings.
>
> 4.    Claimant's claim in Claimant's Prayer A/1, quoted in para. 59 hereinabove, is hereby fully dismissed.
>
> 5.    A decision on Claimant's claim in Claimant's Prayer A/2 quoted in para. 59 hereinabove, is deferred to a later stage of proceedings.
>
> 6.    Claimant's claim in Claimant's Prayer A/4 quoted in para. 59 hereinabove is deferred to a later stage of proceedings.



7.   *Respondent's counterclaims in Respondent's Prayers Nos.
     4 and 5 quoted in para. 60 hereinabove are deferred to a
     later stage of proceedings.*

8.   *Affirming Respondent's counterclaim in Respondent's
     Prayer No. 6 quoted in para. 60 hereinabove it is hereby
     declared that, Claimant has not validly exercised the April
     Option under the April Option Agreement by its purported
     option notices of July 29, 2003 (C-177) and August 12,
     2003 (C-189).*

9.   *A decision on the cost of the Arbitral Tribunal and the Par-
     ties' costs relating to the proceedings on the Preliminary Is-
     sues is deferred to a later stage of proceedings.*

10.  *Notice of this Partial Award will be given to the Parties by
     registered mail against return receipt."*

65.  In addition to the decisions in items 4 and 8 of the operative part of the Par-
     tial Award relating to Claimant's Prayer A/1 (declaration that Claimant *"has
     validly exercised and paid for its option"* under the April Option Agreement)
     and the corresponding Respondent's Prayer No. 6 (declaration that Claim-
     ant *"has not validly exercised its options under the April Option Agree-
     ment"*), the Arbitral Tribunal further made the following findings:

(i)  Claimant paid on account of the Option Price of USD 15'225'000.00
     an amount of USD 11'565'000.00[44] (the **"Paid OP-Portion"**). There-
     fore, the Option Price *"has not been paid in full"* and, provided the
     April Option Agreement is a valid contract, the outstanding funding
     amount of USD 3'660'000.00 (the **"Outstanding Funding"**)[45] *"may
     still become due"* following a Funding Call Notice[46] to be issued by
     Respondent to Claimant (para. 109 PA).

---

[44]  See fn. 64 PA: Claimant paid USD 5'065'000.00 upon the signature of the April Option
      Agreement and USD 6'500'000.00 on August 16, 2001.
[45]  See para. 95 (i) PA. This is the difference between the Option Price of USD 15'225'000.00
      and the Paid OP-Portion of USD 11'565'000.00.
[46]  See para. 5 hereinabove and para. 98 PA. The word *"Call"* is missing in para. 109 PA.

(ii)     In addition to the Paid OP-Portion, Claimant made in November 2001, an indirect payment of USD 11'387'000.00 to Renaissance Invest & Finance Corporation, Grenada (**"RIFCO"** documented as a loan for a minimum period of eight years (C-83) (the **"RIFCO Amount"**). This payment was made through Tanur Ventures Limited, Cyprus (see para. 95 (i) PA). Part of this amount, i.e. USD 8'500'000.00, was transferred on November 19, 2001 through the so called *"Further TMI-Account"* to LV Investment Limited, Cyprus - as the Arbitral Tribunal assumes - for a *"partial back-financing"* of LV Investment Limited for *"its loan granted two days earlier to CTM""* (the **"Assumed CTM-Funding"**)[47]. Unanswered remained the question *"what happened with the difference"* of USD 2'887'000.00[48].

(iii)    Claimant is *"entitled to serve an Option Notice irrespective of the fact that it did not fully pay the Option Price"* and was therefore *"entitled to deliver to Respondent ... an Option Notice, provided it complied with the form and specification requirements set forth in the April Option Agreement"*, without having to *"first offer to pay the Outstanding Funding"* (para. 114 PA)[49].

(iv)     The *"Total Purchase Price of USD 18 million is payable under the April Option Agreement as stipulated in Clause 2.4 AOA"* (para. 140 PA).

(v)      Claimant's counsel's letter dated August 12, 2003 enclosing the *"FORM OF OPTION NOTICE"* of even date (C-189) *"could be a valid notice (the **"Purported Option Notice"**), provided it complies with the requirements set forth in the definition of Clause 1.1 AOA and in Clause 3.2 AOA"* (para. 143 PA).

---

[47]  See R-177 and paras. 99 (viii), 109 and 110 (ii) PA.
[48]  The Rifco Amount of USD 11'387'000.00 less the amount of USD 8'500'000.00 assumedly received by CT-Mobile (see para. 110 (v) PA). The Assumed CTM-Funding was according to the allegations on p. 3 of Claimant's submission dated October 12, 2004 *"ultimately resulting in an investment into Sonic Duo of US$ 11.187 [recte USD 11'187'000.00] on November 23, 2001"*.
[49]  In the latter context see also the remarks of the Arbitral Tribunal in para. 115 PA.

(vi)    The Purported Option Notice does *"not comply with the specification requirement of Clause 3.2.2 AOA"*[50] (para. 149 PA) so that *"Claimant has not given a valid Option Notice under the April Option Agreement"* (para. 151 PA).

(vii)    The question whether Respondent *"must refuse to accept the payment of the Total Purchase Price because its acceptance would constitute a violation of the applicable money laundering legislation ... possibly becomes an issue at the time Claimant unconditionally offers payment of the Total Purchase Price and when it is known with which funds Claimant intends to pay the Total Purchase Price"* (para. 153 PA).

(viii)    In *"the event, provided that the April Option Agreement is a valid contract, Claimant issues a fresh Option Notice and brings its validity before the Arbitral Tribunal, Claimant would be free to request specific performance at that time"* (para. 155 PA).

66.    In the context of its deferral of the decision on Claimant's Prayer A/2 (declaration that Respondent's *"attempted sales or transfers"* of its *"interests in TMI and the MegaFon Interests"*, i.e. the Onward Sales referred to in para. 14 hereinabove, were in violation of Claimant's rights under the April Option Agreement), the Arbitral Tribunal found that the issue whether Respondent's Onward Sales violated the April Option Agreement must only be decided *"if the April Option Agreement is a valid contract"* (para. 163 PA). It therefore first examined Respondent's defences affecting the validity and enforceability of the April Option Agreement summarised in para. 157 PA[51]. In this context, it made the following findings:

---

[50]    Para. 151 PA erroneously refers to *"Clause 2.2.2"* AOA.

[51]    See items (i), (ii) and (v) of the list in para. 157 PA. In this list, the Arbitral Tribunal described Respondent's defences merely by taking over the headings from the table of contents on p. 5 SD and in (v) the caption *"Illegality of the April Option Agreement and Complicity"* of Respondent's overall conclusions submitted at the Fourth Hearing.

(i)     On the alleged duress (the **"Duress Defence"**): The testimony of Witness No. 6 relating to the alleged threats does not fully disclose the *"real course of events"*, shows a *"selective memory"* and does not *"completely describe the conversation he had with Proposed Witness No. 7"*[52] so that the Arbitral Tribunal cannot conclude that the *"Duress Defence, as pleaded by Respondent, affects the validity of the April Option Agreement"* (para. 171 PA).

(ii)    On the alleged IPOC money laundering scheme (the **"ML-Defence"**): The *"ML-Defence is to the extent as it relates to events occurring in the period as from January 2002 not relevant"* for the purposes of the Partial Award since the Total Purchase Price is, if payable, to be paid in the future so that the issue whether the acceptance of the Total Purchase Price *"would have to be qualified as money laundering"* does not yet arise (para. 174 PA). However, the *"other two periods described in para. 15 of the Fifth Order ... remain at the centre of the dispute"*, i.e. the periods relating to the *"circumstances at the time of and shortly before the signing of the April Option Agreement, i.e. as from about December 20, 2000*[53] *until April 10, 2001 (the "Pre-Signing Events")"*[54] *and the payments made under or in connection with this agreement which (allegedly) occurred in the period from the signing of the April Option Agreement, i.e. April 10, 2001 until December 14, 2001*[55] *(the "Alleged Payment Period")"* (para. 175 PA) because the Pre-Signing Events and the Alleged Payment Period are relevant for the questions whether

---

[52]    See the further summary of these reasons in the section on the Duress Defence in para. 325 hereinafter.

[53]    This is the date when the first subscription was allegedly paid into the IPOC fund (see para. 3.59 of the first statement of Witness No. 9 filed as R-28).

[54]    Which period commenced four months after the incorporation of IPOC on June 19, 2000 referred to in para. 84 PA being the relevant commencement date for the IPOC Funding there defined.

[55]    See pp. 61 et seq. SC, in particular line 5 on p. 62 and paras. 480 to 490 on pp. 135 to 137 SD and RE-4, Tab 12.

- Claimant *"pursued at the time of the conclusion of the April Option Agreement an illegal purpose ... or an illegal object ... in order to achieve a legal or illegal purpose"* (para. 176(i) PA), and

- *"the funds used during the Alleged Payment Period for the payments actually made under the April Option Agreement, i.e. the Paid OP-Portion, originate from illegal sources"* (para. 176(ii) PA).

The source of the funds for those payments are the two major transfers received by IPOC of USD 1'999'980.00 and USD 3'999'980.50[56] from Riversand Holding Ltd., Cyprus (**"Riversand"**) on December 20, 2000 (the **"Riversand Payment"**) and of USD 30'500'000.00 from Augmentation Investment Ltd "A1", Bermudas (**"Augmentation"**[57]) on March 30, 2001 (the **"Augmentation Payment"**)[58]. These payments could not be *"looked at in an isolated manner, but have to be seen in the broader context of the alleged illegality of the April Option Agreement and the alleged complicity"*. Therefore, and for the reasons given in paras. 216 et seq. PA, the Partial Award could *"not yet make a final determination on the ML-Defence"* without first allowing Respondent *"to substantiate the relevance of the ML-Defence for the alleged illegality of the April Option Agreement and the alleged complicity"* and Claimant to further explain how the *"funds used"* for these payments were *"earned"* as well as to address the *"transactions making these earnings possible, including their nature as genuine commercial transactions"* (para. 184 PA).

(iii)  On the alleged illegality of the April Option Agreement and alleged complicity (the **"Broader Illegality Defence"** or **"BID-Defence"**): The BID-Defence goes beyond the Duress Defence and the ML-Defence and *"does not merely look at the Pre-Signing Events and into the Al-*

---

[56]  See para. 181(i) PA and pp. 15, 16 and 17 of C-549.
[57]  In the Partial Award, defined as *"Augmentation A1"* (see para. 85 PA).
[58]  See para. 181(ii) PA and C-765.

leged Payment Period" (para. 185 PA), but includes Respondent's allegations *"that the Gamma Group[59] or some of its subsidiaries hold assets which have been acquired as a result of bribery of public officials, or a fraud such as misappropriation of state property, which might have been laundered through IPOC or by the structure achieved by the April Option Agreement"* (para. 186 PA). In this context, the Arbitral Tribunal concluded in para. 221 PA that the *"Broader Illegality Defense is not yet ripe for a decision by the Arbitral Tribunal"*. In coming to this conclusion, it

- first determined that the duty of an arbitral tribunal in a case as the present one, in which *"suspicious circumstances"* exist, is *"not to ignore its suspicions but to seek an explanation from the Parties"* (para. 189 PA);

- then, based on a review of the evidence before it, concluded that it had received materials *"containing serious, though not conclusive, indications of the existence of illegal activities, such as money laundering, corruption and misappropriation of state property, which might affect the validity of the April Option Agreement or have tainted the funds with which Claimant was financed in 2001 and used for the IPOC Funding, including the RIFCO Amount"* (para. 190 PA)[60];

- found that the *"suspicious circumstances"* alleged by Respondent were *"not properly developed and unfolded at the Witness Hearing and during the Fourth Hearing and were only to [a] limited extent addressed by [Respondent] [in the] Statement of Defence and [the] Rejoinder"*, and consequently *"not adequately ad-*

---

[59]    For the term *"Gamma Group"* see para. 219 hereinafter.
[60]    For details on the *"suspicious circumstances"* and related transactions see paras. 197 to 214 PA (dilution of state ownership in TCI and RTC-Leasing; sales of standard NMT-450 operators to entities belonging to the Gamma Group; issuance of GSM licences in connection with Telecom XXI and Westvector and dilution of Central Telegraph's ownership in CTM).

dressed by Claimant in the Reply and the Rejoinder on the Coun-
terclaim" (para. 216 PA); and

- noted that "many of the witness statements and witness testimo-
  nies not only contain mutually excluding and contradictory de-
  scriptions of events, but perplexed by their 'selective memory' and
  have a low degree of reliability, indicating thereby that discovery
  of the true events and factual developments of this case has not
  yet taken place" (para. 218 PA); so that the Arbitral Tribunal

- must "request further substantiation and detailed pleadings by the
  Parties" before determining the "legality and, correspondingly, the
  validity and enforceability of the April Option Agreement" (para.
  216 PA).

67.  With regard to this substantiation, the Arbitral Tribunal stated in para. 219
PA that it would in a "separate procedural directive" order the initial steps[61]
of the phase of proceedings triggered by the conclusion made in para.
259/260 PA such as:

(i)    a detailed substantiation by Respondent of "among other matters ...
the 'suspicious transactions' and matters" referred to in paras. 197 et
seq. and 218 PA as well as "their nexus to Claimant in a manner ex-
plaining the alleged illegal purpose of Claimant and/or purported in-
validity of the April Option Agreement" (para. 219(i) PA);

(ii)   a detailed reply by Claimant "whereby Claimant must be aware of
the fact that it cannot simply deny such allegations, but has a burden
to substantiate its position that the 'suspicious transactions' are legal
and the funds paid into Claimant are of clean origin" and "shall con-

---

[61]    These steps were discussed at the telephone conference of the Arbitral Tribunal and the
Parties' counsel of November 18, 2004 and at the Fifth Hearing (see the Arbitral Tribunal's
telefax dated November 25, 2004 and items 7 and 10 SMFiH).

sider that *Claimant's Funding Report has little evidentiary value"* (para. 219 (ii) PA)[62];

(iii)　an explanation that this *"burden of substantiation of Claimant does not mean that Claimant has the burden of proof that the Broader Il-legality Defence is without factual merits (which shifting would violate the principle that 'negativa non sunt probanda'), but requires Claim-ant to give evidence on the allegations Claimant will make in the said substantiation which for some allegations such as e.g. money trans-fers from bank to bank requires a full proof and disclosure"* (para. 219 (iv) PA); and

(iv)　the instruction to both Parties *"to plead in the forthcoming submis-sions also on the standard of a proof to be applied by the Arbitral Tribunal in making its decision on the Broader Illegality Defence, es-pecially in a situation in which, as a result of the complexity, it seems not possible to give full proof for all relevant allegations, and to give their views whether a shifting of the burden of proof for specific fac-tual allegations relevant for this decision is possible under the appli-cable English substantive law and Article 182 PIL"*, including the *"cri-teria to be applied by the Arbitral Tribunal in its consideration of the evidence ('freie Beweiswürdigung'/'appréciation des preuves')"* (para. 219(v) PA).

68.　From the other defences of Respondent listed in para. 157 PA, the defence of *"Unconscionable bargain"* and, as far as it relates to the Preliminary Is-sues, also its defence of *"Russian competition law"* were withdrawn by Re-spondent at the Fourth Hearing[63]. In view of the withdrawal of these de-

---

[62]　In this context, fn. 148 PA explains that Claimant is expected to *"submit, inter alia, the missing credit and debit notes ordered by the Arbitral Tribunal's telefaxes dated September 27, 2004 p. 5 and September 28, 2004, para. 21a referred to in fn. 127 to fn. 130 hereinabove and to address the source of the funds which Riversand and Augmentation A1 used for the Riversand Payment and the Augmentation Payment (see paras. 182 and 185 hereinbove) and to answer the question raised in fn. 77 hereinabove".*

[63]　See para. 158 PA and fn. 102 PA referring to the following statement of Respondent's counsel made at the Fourth Hearing: *"[w]e are not pursuing unconscionable bargain"* (p.

fences, listed in (iii) and (iv) of para. 157 PA, the Arbitral Tribunal had in the Partial Award yet to analyse the defences listed under (vi) to (viii) of para. 157 PA and came with regard to these defences to the following findings:

(i)    Respondent's defence that the April Option Agreement *"was a sham, a device merely to disguise the taking by IPOC of 77.7% of TMI shares from LVFG for nothing"*[64] (the **"Sham Defence"**) is based on the five principles set out by Arden LJ in Stone v. Hitch (2001 EWCA Civ. 68, summarised in para. 224 PA), but the arguments put forward by Respondent in support of this defence *"such as the assertion that the April Option Agreement is artificial in that it was a mere façade put up to disguise the circumstances behind the granting of the option to IPOC relate specifically to other matters that for the time being the Arbitral Tribunal has decided to reserve judgment"* so that the judgment on Respondent's Sham Defence must be reserved as well (para. 229 PA).

(ii)   Respondent's defence that Claimant, by remaining inactive from February 26, 2002 until July 29, 2003, *"failed to assert its purported rights and thereby abandoned the April Option Agreement"* so that the Option Agreements *"were at an end by mutual consent, abandonment or renunciation"*[65] (the **"Abandonment Defence"**) was dismissed on the ground that *"there is no evidence that is persuasive to demonstrate that the Parties have either mutually agreed to abandon the April Option Agreement or that Claimant so conducted himself as to entitle Respondent to assume, and that Respondent did assume, that the April Option Agreement was agreed to be abandoned sub silentio"* (para. 234 PA).

---

111 lines 7 and 8 DTFoH Day 1) and the *"question of whether or not the agreement was voidable because of the Russian anti-monopoly legislation ... is not pursued"* (p. 115 lines 4 to 7 DTFoH Day 1).
[64]  See para. 223 PA.
[65]  See para. 230 PA.

(iii)   Respondent's alternative defence that Claimant, when attempting to enforce the option, *"repudiated and renounced its obligations under the Option Agreements by making it clear that the USD 18'000'000.00 would not be paid and that it would not pay any further funding at all"*[66], i.e. renounced its obligation to pay the Total Purchase Price (the **"Anticipatory Breach Defence"**), was dismissed on the grounds that *"there is no evidence in the file to suggest that Claimant's anticipatory breach was accepted by Respondent"* and that, *"even at the time of the Purported Option Notice, Respondent did not request payment of the Total Purchase Price"* (para. 237 PA).

(iv)   Respondent's **"Assisting and Procuring a Breach Defence"**, i.e. the arguments that

    (a)   Witness No. 6 *"by entering into the April Option Agreement at a gross undervalue and against LVFG's interests failed to act bona fide in the best interests of Respondent"* and thereby breached his *"duty of care and skill"* and *"his fiduciary duty"* towards Respondent[67] as well as his *"obligation to act in good faith and loyally towards his employer, LVFG"*[68] and that

    (b)   Claimant, who *"was aware that the terms of the April Option Agreement were grossly undervalue and contrary to LVFG's interests"*[69] and *"must be deemed to know of the almost certain existence of a contract"*[70], assisted in or procured the breach of Witness No. 6's fiduciary duties and contractual obligations towards Respondent[71] so that

---

[66]   See para. 230 PA referring to para. 34.11 RJ.
[67]   See paras. 239/240 PA.
[68]   See para. 253 PA.
[69]   See para. 248 PA.
[70]   See para. 253 PA.
[71]   See paras. 247/248 and 254/255 PA.

    (c)    as a result, the April option Agreement is invalid and unen-
forceable, respectively Respondent is entitled to rescind (and
allegedly has rescinded) it[72]

was deferred to later proceedings because the merits of this defence could
depend to a substantial degree on the reserved decision on Respondent's
Broader Illegality Defence[73].

69.    For the reasons summarised in paras. 66 to 68 hereinabove, the Arbitral
Tribunal concluded in paras. 259 to 260 PA that a ruling on the validity of
the April Option Agreement cannot be made without deciding the Broader
Illegality Defence and/or Respondent's defences under the headings
*"Sham"* and/or *"Assisting and Procuring a Breach"*.

70.    Reviewing Respondent's Prayers Nos. 4 to 6 quoted in para. 60 PA relating
to the Preliminary Issues, the Arbitral Tribunal found that the first two of
these counterclaims, i.e. Respondent's Prayers Nos. 4 and 5 must be de-
ferred to later proceedings since a decision thereon *"requires first a ruling
... on the validity of the April Option Agreement"* (see paras. 264 and 266 in
connection with para. 259 PA) but upheld Respondent's Prayer No. 6 by
declaring that Claimant, by its two purported option notices of July 29, 2003
(C-177)[74] and August 12, 2003, i.e. the Purported Option Notice (C-189),
has not validly exercised the April Option (paras. 269 and 272 PA).

E.    **BID-Phase**

71.    Having summarised hereinabove the phase of proceedings leading up to
the Partial Award (the **"First Phase"**), the Arbitral Tribunal hereinafter de-
scribes the phase of proceedings triggered by the Partial Award on the
BID-Defence and the issues related therewith (the **"BID-Phase"**).

---

[72]    See paras. 241, 249 and 254 PA.
[73]    See paras. 246, 252, 258 and 260 PA.
[74]    Please note that in para. 269 the thereto relating date of *"July 24"* is erroneous.

a)    **Major Procedural Steps**

72.    In accordance with the Arbitral Tribunal's directives and the Parties' agree-
ments, the following major submissions were filed and hearings held in this
BID-Phase:

| **Date** | **Event** | **Abbreviation** |
|---|---|---|
| January 11, 2005 | *"Respondent's Brief on Money Laundering and Broader Illegality"* | **BID-Statement** |
| January 24, 2005 | Fifth Hearing on procedural and confidentiality issues, including Respondent's and Claimant's production requests, scope of proceedings and timetable for the BID-Phase | **Fifth Hearing**[75] |
| April 26, 2005 | Claimant's *"Statement of the Case Before the Tribunal and Reply to ML-BID"* (CV XVIII) | **BID-Answer** |
| May 2, 2005 | Claimant's *"Confidential DPA Comments"* (CV XXXVI) | **Confidential DPA-Comments** |
| July 1, 2005 | Respondent's *"ML-BID Reply"* including Section 10 on *"The [DFR] Documents"* (the **"Confidential DFR-Comments"**) | **BID-Reply**[76] |

---

[75]    A Summary of the agreements reached, decisions made and discussions held at the Fifth Hearing is recorded in the **"Summary Minutes of the Fifth Hearing"** or **"SMFiH"**. Moreover, a *verbatim* transcript of the Fifth Hearing (the **"Transcript of the Fifth Hearing"** or **"T5H"**) was prepared by a professional court reporter.

[76]    This brief was initially submitted in a confidential *"Format B"* containing unredacted references to the DFR-Documents and a non-confidential *"Format A"* where such references were redacted. After the Arbitral Tribunal reminded Respondent that *"comments, if any, on the Confidential [DFR] Documents"* were to be filed in *"a separate confidential document"* (see item 8 of the Arbitral Tribunal's telefax dated June 6, 2005) Respondent submitted a revised *"Format A"* on July 18, 2005.

| July 1, 2005 | Respondent's "Confidential DPA-Documents Reply | **Confidential DPA-Reply** |
| August 12, 2005 | Claimant's "Rejoinder" (CV XXXVII) | **BID-Rejoinder** |
| August 18, 2005 | Claimant's "Confidential DPA and [DFR] Rebuttal and Comments" (CV XL) | **Confidential DPA-and DFR-Rejoinder** |
| September 12-23, 20 | Second Witness Hearing (i.e. Sixth Hearing): Hearing of Witnesses S1 to S29 and pro-cedural issues[77] | **Second Witness Hearing[78]** |
| October 6/7, 2005 | Seventh Hearing: Hearing of Witnesses S30 to S35 and procedural issues | **Seventh Hearing[79]** |
| October 27, 2005 | Respondent's "Comments on Vol. 6 of the Confidential [DFR] Documents" | **Confidential FCT-Comments** |
| November 16, 2005 | Claimant's "Response to LVFG's Comments on volume 6 of the Confidential [DFR] Documents" (CV XLI) | **Confidential FCT-Reply** |
| November 29 to December 1, 2005 | Eighth Hearing: Hearing of Witnesses S36 and S37 and discussion of various proce-dural issues[80] | **Eighth Hearing[81]** |

---

[77]  See the "list of issues" communicated to the Parties by telefax on September 5, 2005 and the "List of Procedural Matters" communicated by email on September 18, 2005.

[78]  A verbatim transcript of the Second Witness Hearing (the "**Transcript of the Second Witness Hearing**" or "TSWH") has been prepared by a professional court reporter.

[79]  A verbatim transcript of the Seventh Hearing (the "**Transcript of the Seventh Hearing**" or "**T7H**") has been prepared by a professional court reporter.

[80]  See the "List of Topics for the Eighth Hearing" attached to the Arbitral Tribunals' telefax of November 28, 2005.

[81]  A verbatim transcript of the Eighth Hearing (the "**Transcript of the Eighth Hearing**" or "**T8H**") has been prepared by a professional court reporter.

| | | |
|---|---|---|
| December 12, 2005 | Claimant's *"Bullet-Point Submission"* | **Claimant's Bullet-Point Submission** |
| December 12, 2005 | Respondent's *"Bullet-Points Submission"* | **Respondent's Bullet-Point Submission** |
| December 20, 2005 | Ninth Hearing: Hearing of Witness S38 and procedural matters (in particular Respondent's *"Deposit-Splitting Application"* referred to in the Eighteenth Order and in para. 699 hereinafter) | **Ninth Hearing**[82] |
| January 30/31, 2006 | Closing Hearing: Respondent's and Claimant's closing pleadings and rebuttals and discussion of procedural questions | **Tenth Hearing**[83] |

**b)     Orders**

73.    Between the Partial Award and the Rendering of this Second Partial Award the Arbitral Tribunal issued the following orders:

| **Date** | **Event** | **Abbreviation** |
|---|---|---|
| February 16, 2005 | Ninth Order accepting Claimant's production, pursuant to Respondent's request dated December 3, 2004 and January 14, 2005, of the Disclosed Funding Report Documents referred to in para. 76 hereinafter as well as of the therefor proposed confidentiality re- | **Ninth Order** |

---

[82]    A *verbatim* transcript of the Ninth Hearing (the **"Transcript of the Ninth Hearing"** or **"T9H"**) has been prepared by a professional court reporter.

[83]    A *verbatim* transcript of the Tenth Hearing (the **"Transcript of the Tenth Hearing"** or **"T10H"**) has been prepared by a professional court reporter.

gime and deferring a decision on the production of further documents upon a renewed motion by Respondent

| | | |
|---|---|---|
| February 23, 2005 | Tenth Order partially granting Claimant's production request dated December 20, 2004 relating to the Palmer Acquisition Documents referred to in para. 80 hereinafter and deferring a decision on the production of further documents to a later stage of the proceedings upon a renewed motion by Claimant | **Tenth Order** |
| February 23, 2005 | Eleventh Order confirming the Confidentiality Order as to the BID-Phase and setting forth the conditions and requirements to apply for leave under the Confidentiality Order and the Second Confidentiality Order | **Eleventh Order** or **Second Confidentiality Order** |
| March 4, 2005 | Twelfth Order dismissing Claimant's request for leave under the Confidentiality Order and the Second Confidentiality Order dated February 23, 2005 except with regard to the production of Witness No. 9's evidence[84] in the Stockholm Arbitration referred to in para. 151 hereinafter , which was accepted by Respondent, and setting forth the criteria for leave to file witness evidence | **Twelfth Order** |

---

[84]   The term witness *"evidence"* includes the written witness statement(s) filed by a witness in this Zurich *Ad-Hoc* Arbitration as well as any documents submitted therewith and the transcript(s) of the oral testimony given by a witness in this Arbirtaion as well as any documents submitted during such testimony.

in the Stockholm Arbitration

| | | |
|---|---|---|
| June 13, 2005 | Thirteenth Order granting in part Respondent's production request dated January 14 2005 and May 13, 2005 relating to the disputed beneficial ownership and structure of the W4-Group (see para. 83 hereinafter) | **Thirteenth Order** |
| June 13, 2005 | Fourteenth Order dismissing Claimant's request for security for costs made in paras. 966 to 994 BID-Answer | **Fourteenth Order** |
| June 13, 2005 | Fifteenth Order granting in part Claimant's production request made in paras. 940 to 956 BID-Answer relating to the *"Further Palmer Acquisition Documents"* (see para. 87 hereinafter) | **Fifteenth Order** |
| July 15, 2005 | Sixteenth Order affirming the Arbitral Tribunal's power to reset the sixty day period and the *"Proposed Exercise Date"* of June 17, 2005 stated in Claimant's *"Fresh Option Notice"*[85] or to order the replacement thereof by another *"reasonable and realistic mechanism"* | **Sixteenth Order** |
| December 27, 2005 | Seventeenth Order declaring the proceedings in the BID-Phase closed effective as per the end of the Eighth Hearing | **Seventeenth Order** |

---

[85]   See also para. 240 hereinafter, where the *"Fresh Option Notice"* is, as in the later procedural correspondence and the Twentieth Order, and in line with the term *"Purported Option Notice"* referred to in para. 143 PA and in para. 65(v) hereinabove, defined *as "Second Purported Option Notice"*.

|  |  |  |
|---|---|---|
|  | except for certain matters expressly mentioned therein |  |
| January 6, 2006 | Eighteenth Order dismissing Respondent's *"Deposit Splitting Application"* referred to in para. 699 hereinafter dated November 28, 2005 requesting the Arbitral Tribunal to fix separate deposits for Claimant's claims and Respondent's counterclaims, ordering Claimant to undertake best efforts to find a solution for paying further deposits with *"clearly untainted funds"* and to report thereon with respective legal opinions and ordering Respondent to pay the remaining amount of its outstanding deposit[86] | **Eighteenth Order** |
| January 24, 2006 | Nineteenth Order dismissing Claimant's request for leave to disclose all or some of the Confidential DPA-Documents referred to in para. 81 hereinafter to the Stockholm Arbitral Tribunal | **Nineteenth Order** |
| February 9, 2006 | Twentieth Order redefining the term *"Option Termination Date"* as defined in the April Option Agreement and varying Clause 3.1.2 AOA by the deletion of subclause 3.1.2(c) AOA | **Twentieth Order** |
| February 14, 2006 | Twenty-First Order extending the deadline for the payment of Claimant's and Respon- | **Twenty-First Order** |

---

[86]  In its letter dated February 10, 2006 Respondent announced that it would submit a renewed *"Deposit-Splitting Application"*. However, after the Arbitral Tribunal's comments in consid. (iv) of the Twenty-First Order, such renewed application was not filed.

> dent's additional deposits re-
> quested in the Arbitral Tribu-
> nal's telefax of February 2,
> 2006

74.    In addition to these thirteen orders rendered in the BID-Phase, the Arbitral Tribunal communicated, among other decisions, the following relevant decisions to the Parties in the form of telefaxes, some of which reflect matters agreed upon or argued during telephone conferences held with the Parties' counsel at various occasions throughout the proceedings in the BID-Phase and during the procedural discussions held with the Parties' counsel during the Second Witness Hearing and later hearings[87]:

| Date | Event |
|---|---|
| October 22, 2004 | Leave granted to Claimant, based on Respondent's consent, to file Witness Nos. 7's and 9's evidence with the Swiss Federal Supreme Court and Witness No. 9's evidence in the BVI Proceedings referred to in para. 146 hereinafter[88] |
| November 10, 2004 | Leave granted to Claimant, based on Respondent's qualified consent, to file Witness No. 4's evidence with the BVI Court of Appeal |
| November 25, 2004 | Timetable for the first steps of the BID-Phase |
| December 17, 2004 | Invitation to the Parties' lead counsel to come to Zurich before the Christmas holidays to discuss and solve the confidentiality issues raised in the |

---

[87]    Such telephone conferences were, inter alia, held on November 18, 2004, January 19, 2005, March 8, 2005, July 5, 2005, August 8, 2005, August 16, 2005, September 1, 2005, October 4, 2005, November 11, 2005, November 25, 2005, December 13, 2005 and January 23, 2006.

[88]    Already in the First Phase, the Arbitral Tribunal dealt with the question of what documents the Parties were allowed to file with Witness No. 9's evidence. On October 16, 2004, the Arbitral Tribunal submitted the final version of the "Disclosure Declaration" relating to Respondent's consulting agreement with Witness No. 9 (R-154) referred to in para. 40 PA and in para. 196 hereinafter and authorised the Parties to file said declaration in the BVI Proceedings and with the Swiss Federal Supreme Court deciding on the Annulment Action Against the Geneva ICC-Award.

| Date | Event |
|------|-------|
| | Parties' submissions following the issuance of the Partial Award |
| January 11, 2005 | Request for an undertaking by the Parties that the discussions at the Fifth Hearing and its transcript be kept confidential |
| February 4, 2005 | Deferral of a decision on Claimant's request dated January 26, 2005 to disclose in the Stockholm Arbitration the *"statements and decisions at the Fifth Hearing"* upon a respective reasoned request for leave |
| February 15, 2005 | Confirmation of the discussions held at the Fifth Hearing regarding the three *"potential errors"* in the Partial Award clarified at the Fifth Hearing |
| February 28, 2005 | Decision that the summary minutes of the Fifth Hearing *"be modified in order to make them compatible with the Confidentiality Order and the Second Confidentiality Order"*, which revised summary minutes *"are not subject to the Confidentiality Order, the Second Confidentiality Order or the confidentiality undertaking given with respect [to] the Fifth Hearing"* |
| March 2, 2005 | Decision in advance of the Twelfth Order granting leave to Claimant to submit Witness No. 9's evidence in the Stockholm Arbitration |
| March 11, 2005 | Confirmation of the agreements reached and decisions made at the *"KK conference call"* of March 8, 2005 regarding the participation of a representative of the NAC in the Second Witness Hearing |
| March 30, 2005 | Proposal of a confidentiality regime for the DPA-Documents referred to in para. 81 hereinafter |
| April 4, 2005 | Submission of a draft confidentiality undertaking for the Confidential DPA-Documents referred to in para. 82 hereinafter |

| Date | Event |
|------|-------|
| April 6, 2005 | Submission of a revised confidentiality undertaking for the Confidential DPA-Documents and dismissal of Respondent's request for a farther-reaching confidentiality protection |
| May 2, 2005 | Submission of a draft confidentiality undertaking for the Confidential DFR-Documents referred to in para. 76 hereinafter |
| May 6, 2005 | Submission of a revised confidentiality undertaking for the Confidential DFR-Documents |
| May 20, 2005 | Directions regarding the contents of Respondent's forthcoming BID-Reply, Confidential DPA-Reply and comments on Claimant's request for security for costs dated June 13, 2005 |
| June 6, 2005 | Further directions regarding the contents of Respondent's BID-Reply and Confidential DPA-Reply and deadline for Confidential DFR-Comments |
| June 1, 2005 | *"Proposed order"* on Claimant's Second Purported Option Notice[89] |
| June 13, 2005 | Directions on various matters relating to the Second Witness Hearing (health of Proposed Witness No. 2, participation of a representative of the National Anti-Corruption Committee in Moscow (**"NAC"**), letters of invitation to witnesses who might not be prepared to testify) |
| June 14, 2005 | Comments and directions regarding the Confidential DFR-Documents and Confidential DPA-Documents |
| June 16, 2005 | Revised language for the *"proposed order"* regard- |

---

[89]     See fn. 85 hereinabove and paras. 240 and 243 hereinafter.

| Date | Event |
|------|-------|
| | ing Claimant's Second Purported Option Notice. |
| June 23, 2005 | Precisions regarding compliance with the Thirteenth Order to (see fn. 100, 101 and 105 hereinafter) |
| July 6, 2005 | Precisions concerning the confidentiality of the FCT-Documents referred to in para. 83(v) hereinafter and the Additional DFR-Documents referred to in para. 83(vi) hereinafter |
| July 8, 2005 | Directions regarding Claimant's BID-Rejoinder and Confidential DPA- and DFR-Rejoinder |
| July 14, 2005 | Communication of an order issued in the Stockholm Arbitration between Claimant and other parties regarding the *"Zurich Protected Evidence"* |
| July 22, 2005 | Communication of a copy of the Order *"entering into the matter"* of the Zurich Public Prosecutor dated July 19, 2005 referred to in para. 99 hereinafter |
| July 22, 2005 | Submission of a draft letter with questions to the NAC |
| July 27, 2005 | Information on the seizure of files at the Chairman's office, extension of deadlines and further procedural directions |
| August 10, 2005 | Order for production of the German and Russian Criminal Complaints; confirmation of the Parties' consent to the unsealing of the seized files (except for the protected evidence of Witnesses and Proposed Witnesses); dismissal of Claimant's *"Partial Stay Application"* dated August 5, 2006; directives regarding the Affected Witnesses referred to in para. 114 hereinafter; further directions for Claimant's BID-Rejoinder |

70



| Date | Event |
|------|-------|
| August 16, 2005 | Confirmation that the Second Witness Hearing will take place as planned; confirmation of the previously agreed approach and further directions regarding the hearing of Affected Witnesses; extension of the deadline for the Confidential DPA-Rejoinder; approval of Claimant's request for the production of the Partial Award and its interpretation to the German Authorities |
| August 17, 2005 | Setting forth of procedures for the unsealing of witness testimonies |
| August 18, 2005 | Directives regarding the inspection of the German and Russian Criminal Complaints |
| August 31, 2005 | Submission of a draft confidentiality undertaking for the inspection of the German Criminal Complaint |
| September 1, 2005 | Directions regarding the planning and modalities of the Second Witness Hearing |
| September 5, 2005 | Communication of a *"list of issues"*, mainly procedural in nature, to be dealt with at the Second Witness Hearing |
| September 9, 2005 | Further directions regarding the Second Witness Hearing and the Seventh Hearing (security and precautionary measures) |
| September 18, 2005 | Communication of a *"List of Procedural Matters"* yet to be dealt with at the Second Hearing |
| September 28, 2005 | Decision on the admissibility of the documents produced by Claimant at the Second Witness Hearing, and the witness statements of the Proposed Witnesses Nos. 27 and 28. |
| September 28, | Indication of (expert) witnesses the Arbitral Tribu- |

71



| Date | Event |
|------|-------|
| 2005 | nal wants to hear at the Seventh Hearing (see para. 133 hereinafter) |
| September 29, 2005 | Decision on Respondent's FCT-PoD-Request referred to in para. 91 hereinafter |
| September 29, 2005 | Decision not to hear further (expert) witnesses at the Seventh Hearing |
| October 5, 2005 | Confirmation of Respondent's waiver of the confidentiality regime with regard to the DPA-Documents relating specifically to Central Telegraph |
| October 5, 2005 | Communication of a *"list of open procedural issues"* for the Seventh hearing |
| October 18, 2005 | Communication regarding witnesses to be heard at the Eighth Hearing |
| October 21, 2005 | Decision on the admissibility of certain witness statements and their attachments |
| October 24, 2005 | Submission of a new confidentiality undertaking for the German Criminal Complaint referred to in para. 106 hereinafter |
| October 27, 2005 | Submission of a revised draft confidentiality undertaking for the German Criminal Complaint |
| October 31, 2005 | Submission of the final text of the confidentiality undertaking for the German Criminal Complaint |
| November 15, 2005 | Order to Claimant to produce the *"Questionnaires"* referred to in the emails previously produced as C-973 and C-974 as well as the so-called *"TCI Shareholders Agreement"* (see para. 95 hereinafter) |

72



| Date | Event |
|------|-------|
| November 15, 2005 | Confirmation of various deadlines, in particular for the filing of Claimant's and Respondent's Bullet Point Submissions |
| November 28, 2005 | Communication of a list of (mainly procedural) *"Topics for the Eighth Hearing"* |
| December 5, 2005 | Confirmation of deadlines set at the Eighth Hearing |
| December 6, 2005 | Revised text of the *"Proposed language for closure of proceedings"* originally submitted at the Eighth Hearing |
| December 14, 2005 | Confirmation of procedural agreements and decisions made at the telephone conference with the Parties' counsel of December 13, 2005 in anticipation of the Ninth Hearing |
| December 19, 2005 | Directives regarding the Parties' pleadings on Respondent's *"Deposit Splitting Application"* referred to in the Eighteenth Order and para. 699 hereinafter |
| December 22, 2005 | Confirmation of deadlines set at the Ninth Hearing |
| January 5, 2006 | Dismissal of Respondent's request for reconsideration of the timetable |
| January 12, 2006 | Communication of a *"List of Selected Issues to be Addressed by the Parties at the Closing Hearing"* |
| January 19, 2006 | Submission of a draft *"Nineteenth Order on the Option Period/Option Termination Date"*[90] revising the *"Proposed Language for the Extension of the Option Period"* submitted to the Parties at the |

---

[90]   This order was later rendered as the Twentieth Order.

| Date | Event |
| --- | --- |
| | Eighth Hearing |
| January 23, 2006 | Confirmation of organizational agreements made with the Parties' counsel for the Tenth Hearing |
| January 24, 2006 | Order for Claimant to produce the documents referred to in the *"Affidavit"* of Involved Person No. 7 (see paras. 97/98 and 226 hereinafter) |
| February 2, 2006 | Submission of a revised draft of the Twentieth Order relating to the *"Option Period/Option Termination Date"* |
| February 6, 2006 | Confirmation of the Chairman's report given at the end of the Tenth Hearing on the unsealing of the Protected Evidence referred to in para. 111 hereinafter and request for the Parties' consent, subject to the concerned witnesses' agreement, to such unsealing |
| February 6, 2006 | Decision granting leave to Claimant to submit the evidence of Witnesses Nos. S15, S26, S33 and S37 in the Stockholm Arbitration |
| February 13, 2006 | Dismissal of Claimant's request made at the Eighth Hearing for the production of several *"Anlagen"* referred to in the German Criminal Complaint and confirming Respondent's agreement to produce the translations of the Partial Award submitted to the German Criminal Authorities |
| February 16, 2006 | Decision granting leave to Claimant to file Witness No. 10's evidence in the Stockholm Arbitration |
| March 17, 2006 | Decision on Claimant's request dated February 8, 2006 regarding the disclosure by Respondent to CTM of the corporate charts referred to in para. 83(i) hereinafter |



| Date | Event |
|------|-------|
| April 3, 2006 | Invitation to the Parties to comment on the timeliness and validity of the Third Purported Option Notice referred to in para. 240 hereinafter and on the Arbitral Tribunal's revised translations of Articles 14, 160 and 285 of the Russian criminal code, in particular part 1 and 2 of Art. 14 thereof which have not been mentioned and translated in RE-20 and RE-30, but assist to understand the meaning of the term *"conduct"* used in part. 2 and part 3 of Art. 160 and Art. 285 of this code (see para. 411 hereinafter) |
| April 3, 2006 | Dismissal of Respondent's request dated March 23, 2006 to receive a copy of the IP7-Documents |
| April 10, 2006 | Decision on Respondent's *ex parte* request dated April 6, 2006 for leave to use the information contained in the IP7-Documents *"in a possible application for revision of the ICC Award with the Swiss Federal Court and/or in a application for dismissal of the enforcement proceedings ... and any other proceedings relating to the ICC Award"*, setting forth the conditions and procedure for the disclosure of the IP7-Documents in the context of proceedings relating to the Geneva ICC-Award |
| April 13, 2006 | Invitation to the Parties to comment on the differences in the translations relating to the terms *"conduct"*, *"act"* and *"omission"* as well as to the other Party's remarks on the charter of Svyazinvest |
| April 20, 2006 | Implementation of the procedures described in the Arbitral Tribunal's telefax dated April 10, 2006 relating to the IP7-Documents following receipt of Respondent's request for revision referred to in para. 22 hereinabove |
| May 5, 2006 | Dismissal of Claimant's submission dated May 1, 2006 for *"leave to submit significant evidence that has just surfaced in the lawsuit filed by KPMG* |

75

| Date | Event |
|------|-------|
| | *against Diligence"* referred to in para. 157 hereinafter |
| May 8, 2006 | Invitation to Claimant to comment on the *"Russian Action"* referred to in para. 159 hereinafter of which the Arbitral Tribunal was informed in Respondent's submission dated May 3, 2006 |
| May 12, 2006 | Comments on Claimant's letter relating to the Arbitral Tribunal's letter to *"Investigators"* referred to in para. 156 hereinafter. |

**c)     Production of Documents**

75.     This Chapter describes the documents produced pursuant to the Parties' respective requests as well as the Arbitral Tribunal's reasons granting or denying said requests and the confidentiality measures adopted for the protection of the documents produced. The confidentiality regimes as such are described in Subchapter II.E.e)bb) hereinafter.

**aa)     The Documentation Supporting the Funding Report**

76.     Following Respondent's submissions of December 3, 2004 and January 14, 2005 requesting the production of the documents listed in Annexes A to C thereto, i.e. the supporting documentation to the *"Funding Report"* prepared by Proposed Witness No. 24 dated August 24, 2004 referred to in para. 85 PA (the **"Funding Report"**)[91], Claimant produced on January 21, 2005 to the Chairman but not to Respondent and the co-arbitrators a documentation of five volumes consisting of the documents described in annexes A and B to Respondent's production request (the **"Disclosed Funding Report Documents"** or **"DFR-Documents"**)[92]. Claimant's pro-

---

[91]     In the Partial Award, the Arbitral Tribunal used the term *"Claimant's Funding Report"* (see para. 85 PA).

[92]     In the correspondence and in the Tenth Order, the Arbitral Tribunal used different terms, which for the reasons explained in paras. 116 to 118 hereinafter had to be changed.