duction was accompanied by a proposal to allow the inspection of these documents by the co-arbitrators and Respondent at the Chairman's office subject to Respondent's right to request copies of documents based on Claimant's agreement or the Arbitral Tribunal's decision[93]. This proposal was accepted by the Arbitral Tribunal in the Ninth Order (the **"Confidential DFR-Documents"** or **"C-DFR"**) as an interim regime[94]. The Confidential DFR-Documents were inspected (and confidentiality declarations signed) by Respondent's counsel on March 3, 10, 11, and 14, 2005.

77.    Accordingly, the Arbitral Tribunal did not have to decide on the possible relevance of the Disclosed Funding Report Documents (consid. (v) on p. 3 of the Ninth Order). Moreover, the Arbitral Tribunal dismissed as premature Respondent's requests relating to the documents described in Annex C and to the Funding Report (consid. (x) and (xi) Ninth Order).

78.    In response to Respondent's request for delivery of copies of the Confidential DFR-Documents dated April 7, 2005, the Arbitral Tribunal in its telefax of April 12, 2005 proposed to make these available to Respondent subject to a regime analogous to that applicable to the Confidential DPA-Documents[95]. After the Arbitral Tribunal's proposal was agreed to by the Parties, Respondent's counsel signed corresponding confidentiality undertakings on May 6 and 9, 2005, whereupon the Confidential DFR-Documents were sent to Respondent's counsel on May 9, 2005. Thereafter, confidentiality undertakings were also signed by Witness No. 7 on May 31, 2005, by the Proposed Witness No. 16 and an associate of his on June 2 and 3, 2005, by the Proposed Witness No. 33 on July 26, 2005 and by associates of the Proposed Witness No. 24 on August 11 and 18, 2005.

79.    On May 18, 2005, Respondent submitted an *"Application to permit [Witness No. 9] to receive the"* Confidential DFR-Documents, which application was partially approved by the Arbitral Tribunal in its telefax dated June 14,

---

[93]    See Claimant's letter of January 21, 2005.
[94]    See in particular the description of this confidentiality regime in consids. (vii), (viii) and (ix) of the Ninth Order.
[95]    See para. 82 hereinafter.

2005. A corresponding confidentiality undertaking was finalized on June 30, 2005 and signed by Witness No. 9 on July 25, 2005.

**bb)    The Palmer Acquisition Documents**

80.    In the Tenth Order, Respondent was ordered to produce the *"Transaction Documents relating to the purported sale of Respondent's shares to Palmer"* (the **"Palmer Acquisition Documents"**)[96], which documents were deemed relevant for the question whether, in said documents, the Parties to the Palmer Acquisition referred *"back to what they thought about the validity or the non-existing validity of the April Option Agreement"* or *"the dilution of Central Telegraph"*. As to the further requested *"Transaction Documents"*, e.g. documents relating to the Onward Sales of the *"MegaFon Interests"* to third parties and ultimately to Alfa-Eco, these were not ordered to be produced as the Arbitral Tribunal *"does at this stage of the proceedings not see a link to an issue the Arbitral Tribunal is interested in"*[97].

81.    Pursuant to the Tenth Order, Respondent produced to the Chairman on March 18, 2005 Volumes 1 to 16 of documents consisting *inter alia* of the Palmer Share Purchase Agreement between Respondent's shareholders and Palmer dated July 2, 2003 as well as the thereto-relating *"Disclosure Letter"*[98] and the documents referenced therein (the **"Disclosed Palmer Acquisition Documents"** or **"DPA-Documents"**). These documents were produced to the Chairman only for inspection by the Arbitral Tribunal and Claimant's counsel at the Chairman's office, i.e. with a request for confidential treatment.

82.    In its telefax of March 30, 2005, the Arbitral Tribunal proposed a confidentiality regime for the DPA-Documents. A draft confidentiality undertaking was submitted with the Arbitral Tribunal's telefax of April 4, 2005. After the proposed regime had been accepted by the Parties, Claimant's counsel signed

---

[96]    See item 1 and consid. (iv) of the Tenth Order and consid. (iii) of the Tenth Order, referring in part to the transcript of the Fifth Hearing.
[97]    See item 2 and consid. (viii) Tenth Order.
[98]    See Vol. 1 Tab 7 C-DPA.



a confidentiality undertaking and a copy of the sixteen volumes of the DPA-Documents was sent to Claimant's counsel on April 6, 2005 (the "**Confidential DPA-Documents**" or "**C-DPA**"). Further confidentiality undertakings were signed by Claimant's counsel on April 13 and 20, 2005 as well as on June 23, June 28 and July 5, 2005 and by Witness No. S2 on August 28, 2005.

### cc) Documents Produced in Relation to the Disputed Beneficial Ownership and the Structure of the W4-Group

83.    In the Thirteenth Order, Claimant was ordered to produce to the Arbitral Tribunal and Respondent

(i)    charts of the corporate structures of the alleged investments of Witness No. 4 made up to December 31, 2001 (item 1 Thirteenth Order)[99];

(ii)    the documentation relating to Danco's acquisition or financing of the summer house (item 3 (iii) Thirteenth Order)[100]; and

(iii)    the name of the *"foreign investor"* referred to in para. 894(a) BID-Answer as well as the *"Shareholders Agreement"* and the promissory notes referred to in paras. 894(d) and (e) BID-Answer (item 3(iv) Thirteenth Order)

and to the Chairman only

---

[99]    See also item 1 of the Arbitral Tribunal's telefax dated June 23, 2005, specifying that these charts shall *"enable the Tribunal to see Claimant's ownership relationship to Gamma Group and"* to Witness No. 4 at the dates mentioned in item 1 on p. 10 of the Thirteenth Order and shall include charts reflecting the *"major changes in the composition of the Group"* up to December 31, 2001.

[100]    See also item 2 of the Arbitral Tribunal's telefax dated June 23, 2005, specifying that *"item 2 of the Thirteenth Order should be read in connection with consid. (vi) to (viii) of the Thirteenth Order".*

(iv)    an explanation of the *"tax situation of Witness No. 4"* on certain dates *"together with the thereto relating appropriate evidence"* as well as information on the *"Sovereign Capital Trust"*[101], Liechtenstein (**"SCT"**) (item 2 and consid. (vii) Thirteenth Order);

(v)    the *"entire corporate documentation of FCT"* (the **"FCT-Documents"**)[102] (item 3(i) Thirteenth Order)[103]; and

(vi)    the *"disclosure documents"* addressed to Telia and Commerzbank (the **"Additional DFR-Documents"**) (item 3(ii) and consid. (xiii) Thirteenth Order).

84.    The documents ordered to be produced by the Thirteenth Order were deemed relevant *inter alia* because they relate to facts within the relevant period, i.e. *"the period up to December 31, 2001"* (consid. (iv) Thirteenth Order) and/or because they relate to the disputed beneficial ownership of Claimant and the credibility of Witness No. 4 (consid. (viii) Thirteenth Order). Further production requests of Respondent were dismissed as the relevance of the requested documents had insufficiently been explained by Respondent and/or part of the said requests had already been complied with by the filing of Claimant's exhibits to the BID-Answer.

85.    Claimant produced the documents referred to in para. 83 hereinabove on June 23/24, 2005 and on July 5/8, 2005, but not to the extent expected by the Arbitral Tribunal (see fn. 103 hereinabove). The FCT-Documents and the Additional DFR-Documents, which had been produced to the Chairman only, were included in the file as Volume 6 of the Confidential DFR-Documents and forwarded to Respondent by letter of the Chairman of July 26, 2005.

---

[101]  This trust is erroneously referred to in consid (vii) of the Thirteenth Order as the *"Southern Capital Trust"*.

[102]  The abbreviation *"FCT"* stands for *"Fiduciare Commerce Trust"* domiciled in Liechtenstein (**"FCT"**).

[103]  See also item 3 of the Arbitral Tribunal's telefax dated June 23, 2004, specifying that *"the term 'the entire corporate documentation of FCT' is to be interpreted in a broader manner than Claimant does and thus relates to the entire file of the legal entity FCT"*.

86.   As provided for in consids. (xii) and (xiii) of the Thirteenth Order, the FCT-
      Documents and the Additional DFR-Documents were produced subject to
      the confidentiality regime applicable to the Confidential DFR-Documents.
      Documents produced pursuant to item 2 of the Thirteenth Order (explana-
      tion regarding the tax situation of Witness No. 4) were inspected, and cor-
      responding confidentiality declarations signed, by Respondent's counsel on
      July 11 and 14, 2005.

**dd)    Further Palmer Acquisition Documents**

87.   In the Fifteenth Order, Respondent was ordered to produce to the Chair-
      man *"internal due diligence reports and/or other documents relating to the
      due diligence, legal opinions and indemnity provisions or indemnification
      agreements not yet disclosed relating to the [Palmer Acquisition] as well as
      the drafts of the Palmer Share Purchase Agreement and the 'disclosure let-
      ter' "*[104], all further requests of Claimant being dismissed.

88.   The relevance of Claimant's request relating to *"Further DPA-Disclosure"*
      was approved as the documents requested in effect fall within the scope of
      the Tenth Order[105]. However, the relevance of Claimant's *"Further Re-
      quested Disclosure not Falling within the Tenth Order"*, i.e. documents re-
      garding Respondent's Onward Sales *"of the optioned MegaFon stake"* and
      the so-called *"sales from Panama"* as well as documents relating to the *"ti-
      tle to the shares of Sonic Duo or MegaFon"*, was denied as not relevant to
      the issues presently before the Tribunal[106].

89.   In response to the Fifteenth Order, Respondent produced on July 1, 2005
      Volume 17 of the Confidential DPA-Documents to the Chairman, who for-
      warded said documents to Claimant on July 4, 2005. Respondent produced
      translations of these documents on July 18 and 28, 2005. The produced
      translations were included in the file as Volume 17T of the Confidential

---

[104]   See item 1 of the Fifteenth Order.
[105]   See consids. (vii) to (x) Fifteenth Order.
[106]   See consids. (xii) to (xiv) Fifteenth Order.

DPA-Documents and forwarded to Claimant by letters of the Chairman of July 19 and 29, 2005.

90.   As per item 2 of the Fifteenth Order, the documents produced pursuant to said order are subject to the confidentiality regime applicable to the Confidential DPA-Documents.

**ee)   Further FCT-Documents**

91.   On September 16, 2005, Respondent requested the production of the following documents ("**Respondents FCT-PoD Request**"):

    (i)   email from Witness No. 4 dated May 31, 2005 and attached questionnaire (referred to in the letter of Proposed Witness No. 34 at Vol. 6, p. 175 C-DFR);

    (ii)   email from Witness No. 4 dated February 15, 2005 and attached letter to Witness No. 4 dated February 11, 2005 (referred to in the letter of Proposed Witness No. 34 at Vol. 6, p. 167 C-DFR); and

    (iii)   *"Agreement on Adherence to Shareholders Agreement"* between Telia, Comtel Eastern, First National Holding and Commerzbank dated November 30/December 6, 2001 (referred to in letter of Commerzbank at Vol. 6, p. 135 C-DFR and in para. 347.34 hereinafter).

92.   On September 30, 2005, Respondent extended Respondent's FCT-PoD Request for the production of the so-called *"TCI Shareholder's Agreement"* dated January 31, 2000 further described in para. 347.3 hereinafter.

93.   By telefax dated September 29, 2005, the Arbitral Tribunal ordered Claimant to produce the two emails referred to in Respondent's FCT-PoD Request as well as the *"Agreement on Adherence to Shareholders' Agreement"*. Claimant produced the two emails on October 3, 2005 (C-973 and C-974) and a copy of the *"Agreement on Adherence to Shareholder's Agreement"* (C-979) at the end of the Seventh Hearing on October 7, 2005.

82



94.    By telefax dated November 15, 2005, the Arbitral Tribunal ordered Claimant to produce the *"TCI Shareholders' Agreement"* and, to the Chairman only, the attachments to the emails previously produced as C-973 and C-974 (also referred to as the **"Questionnaires"**). Following Claimant's objection to the production of the Questionnaires dated November 21, 2005, the Arbitral Tribunal in its telefax of December 5, 2005 confirmed its order for the production of the Questionnaires, with the qualification that the Questionnaires were to be produced merely *"for inspection by Homburger"*[107].

95.    Claimant produced the *"TCI Shareholders' Agreement"* (C-982) to the Chairman and the Co-Arbitrators on November 21, 2005 with a request that such agreement be kept confidential. After Respondent agreed that the TCI Agreement be subject to the same confidentiality regime as the Confidential DFR-Documents (as proposed in the Arbitral Tribunal's telefax dated November 23, 2005), the Chairman sent a copy of the TCI Agreement to Respondent on November 28, 2005.

96.    Claimant produced the Questionnaires to the Chairman on December 9, 2005, which Questionnaires were included in the file as C-986 and C-987. The Questionnaires were inspected by Respondent's counsel at the office of the Chairman (and a corresponding declaration was signed) on December 9, 2005.

**ff)    Documents Attached to Affidavit of Involved Person No. 7**

97.    Following the production of the so-called *"Affidavit"* of Involved Person No. 7 (C-991) on January 13, 2006, Respondent, on January 19, 2006, requested the production of the three documents referred to in paras. 5 to 7 of this affidavit (the **"IP7-Documents"**[108]).

---

[107]    See item 2 of the Arbitral Tribunal's telefax of December 5, 2005.
[108]    In the procedural correspondence merely referred to as the *"Documents"*.

98.  On January 24, 2006, the Arbitral Tribunal ordered Claimant to produce the said IP7-Documents, specifying that these are subject to the confidentiality regime suggested in the Arbitral Tribunal's telefax of January 20, 2006, i.e. that the IP7-Documents be submitted by Claimant to the Chairman only for inspection by the Co Arbitrators and Respondent's counsel[109]. The IP7-Documents were produced by Claimant on the same day, January 24, 2006, and inspected by Respondent's counsel on January 25, 2006 after the signing of the corresponding confidentiality declarations[110].

**d)    Related Criminal Investigations**

**aa)    Seizure of Files at the Chairman's office**

99.  On July 20, 2005, the Staatsanwaltschaft I of the Canton of Zurich (the **"Zurich Prosecutor"**), based on (i) a request for judicial assistance (*"Internationales Rechtshilfeersuchen"*) of the *"Staatsanwaltschaft bei dem Landgericht Frankfurt am Main"* (the **"German Prosecutor"**) dated July 12, 2005 (the **"German Assistance Request"**), (ii) an interim order to assist (*"Eintretens- und Zwischenverfügung"*) of the Staatsanwaltschaft I dated July 19, 2005 and (iii) a search warrant issued on July 20, 2005, visited the Chairman's office and seized the Chairman's procedural files. The seized files were immediately sealed pursuant to the Chairman's request.

**bb)    The German Investigation**

100.  The German Assistance Request was made in the context of a criminal investigation initiated in Germany (the **"German Investigation"**). According to the German Assistance Request of July 12, 2005, the German Investigation began essentially on the basis of a criminal complaint filed by LVFG on charges of breach of trust (*"Beihilfe zu Untreue"*) and money laundering (*"Geldwäscherei"*)[111]. According to the German Assistance Request, the

---

[109]    See items 1 and 2 of of the Arbitral Tribunals telefax of January 24, 2006.
[110]    These documents are further discussed in paras. 225 to 228 hereinafter.
[111]    According to Respondent's production of the German Criminal Complaint referred to in para. 102 hereinafter, Respondent filed a first submission with the German Prosecutor on

84

suspects in the German Investigation are, *inter alia*, Witnesses Nos. 4, 9 and S9. In essence, the allegations referenced in the Search Order are that:

(i)     the Proposed Witness No. 7 allegedly used his capacity as the deputy director of LGTS, Russian Federation (now Petersburg Telecom Network, "**PTN**") to enrich himself in connection with the privatization of certain Russian telecommunication interests;

(ii)    sham companies, trustee arrangements, and share participations were allegedly used to conceal and transfer these ill-gotten assets to Bermuda; and

(iii)   share participations and other assets were allegedly held for officials of the Russian government as part of an alleged bribery scheme.

**cc)    Production of the German Criminal Complaint**

101.  By letter of July 29, 2005, Claimant requested that Respondent be ordered to produce *"(i) the Criminal Complaint, and any supplements or amendments thereto, it filed in Germany, with a list of 'Beilagen' and (ii) any and all other communications to the German authorities whereby they transmitted or characterized the Partial Award or evidence in this case"*. Respondent replied to this request with its submission of August 2, 2005 stating it

---

April 20, 2004 communicating various documents to the German Prosecutor, including Witness No. 9's ICC witness statement, and referring to the German Prosecutor's investigation reported in two articles of *Focus* of 2004 into the background, under the optic of money laundering, of a former subsidiary of Commerzbank, First National Holding, which held participations in TCI, and had alleged connections to the Proposed Witness No. 7 (R-449/1). By letter dated May 3, 2004, the German Prosecutor informed LVFG's counsel that a case *"Commerzbank"* was already registered at his office, but that there was no connection between Respondent's complaint and this case (R-449/2). Respondent filed a further criminal complaint on July 19, 2004 against Witness No. S9 and *"other responsible persons of a group of certain allegedly open-ended investment funds and asset management companies"*, including Claimant, for *inter alia* breach of trust and money laundering (p. 1 of R-449/3). Further submissions to the German Prosecutor were made on November 8, 2004 and December 22, 2004 (R-449/4.1 to 4.3 and R-449/5.1 to 5.3).

was willing to make voluntary production subject to permission by the German Prosecutor.

102. In its telefax dated August 10, 2005, the Arbitral Tribunal ordered Respondent to produce to the Chairman and the Co-Arbitrators copies of the criminal complaint filed by Respondent and referred to on p. 6 of the German Assistance Request, any supplement or amendment thereto and the list of exhibits (the **"German Criminal Complaint"**) subject to a confidentiality regime allowing the inspection of the German Criminal Complaint by Claimant's counsel for its internal use only and ensuring that no third party, including the persons subject to the German Investigation, will receive information on the German Criminal Complaint and requiring moreover that the German Criminal Complaint may be addressed only in confidential oral pleadings for which a separate confidential transcript will be established[112]. Claimant's request for the production of *"all other communications to German authorities"* was dismissed as not specific enough to be considered[113]. Upon a renewed (limited) request of Claimant, the Arbitral Tribunal in its telefax dated August 16, 2005 then ordered Respondent to produce to the Chairman and to the Co-arbitrators copies of *"any communications to German authorities other than the [German Prosecutor]"* with which it submitted the Partial Award or in which it gave an interpretation thereof (item 7 of the Arbitral Tribunal's telefax of August 16, 2005).

103. After Respondent expressed concerns that compliance with the Arbitral Tribunal's order to produce the German Criminal Complaint *"may disrupt the German Prosecutor's investigation strategy and compromise the success of the inquiry"*, the Arbitral Tribunal again ordered Respondent to produce the German Criminal Complaint as per its telefax of August 10, 2005[114].

---

[112]    See item 2 of the Arbitral Tribunal's telefax of August 10, 2005.
[113]    See item 3 of the Arbitral Tribunals' telefax of August 10, 2005.
[114]    See item 1 of the Arbitral Tribunal's telefax of August 17, 2005.

104.  On August 19, 2005, Respondent submitted the German Criminal Complaint to the members of the Arbitral Tribunal only. On August 22, 2005, Respondent informed that there have been no communications to the German authorities other than the German Prosecutor in relation to the Partial Award.

105.  In its telefax dated August 18, 2005, the Arbitral Tribunal provided directives regarding the inspection of the German Criminal Complaint.

106.  A first draft confidentiality undertaking relating to the German Criminal Complaint, providing *inter alia* that the German Criminal Complaint was only to be inspected at the offices of members of the Arbitral Tribunal by a selected number of Claimant's counsel who were not to disclose the contents thereof to their client, was submitted to the Parties with the Arbitral Tribunal's telefax dated August 31, 2005. Claimant commented on the draft in its letter of September 1, 2005 and on days 1, 2 and 9 of the Second Witness Hearing, at which occasions Claimant informed that it did not agree to sign the draft undertaking in its then current form, invoking its right to *"Waffengleichheit"*[115], as well as concerns from the ethics committee of Claimant's counsel's law firm[116]. In view of the concerns put forward by Claimant, the Chairman undertook to contact the German Prosecutor to find a solution that could accommodate Claimant's concerns[117]. Following subsequent discussions between the Parties and the Arbitral Tribunal and contacts between the Chairman and the German Prosecutor, a revised version of the confidentiality undertaking for the German Criminal Complaint was finalized and signed by Claimant's counsel on October 31, 2005, whereupon the German Criminal Complaint was sent to Claimant's counsel on November 1, 2005. Further copies of the confidentiality undertaking were signed by Claimant's counsel on November 2, 22, 25 and 30, 2005, by counsel for Witness No. 4 on November 18, 2005 and by counsel for Witness No. S14 on December 8, 2005.

---

[115]   See para. 95 lines 3 to 13 and p. 236, lines 18 to 21 TSWH.
[116]   See p. 1822 lines 11 to 15 TSWH.
[117]   See e.g. the Chairman's remark at p. 826/827 TSWH informing of his intention *"to contact the German Authorities after the witness hearing"*.



107. During Claimant's confidential pleading on the second day of the Eighth Hearing, Claimant requested the production of several attachments (*"Anlagen"*) referred to in the German Criminal Complaint as well as the translations of the Partial Award submitted to the German criminal authorities by Respondent[118]. By telefax dated February 13, 2006, the Arbitral Tribunal dismissed Claimant's request for the production of the *"Anlagen"* while confirming Respondent's agreement to produce the German translations of parts of the Partial Award[119]. Accordingly, Respondent produced on February 14, 2006 the German translations of two sections of the Partial Award (R-464a and b).

**dd)     Production of the Russian Criminal Complaints**

108. Having been informed that certain criminal proceedings had been initiated by Claimant against Witness No. 6 in Russia[120], the Arbitral Tribunal, at the same occasion it ordered the production of the German Criminal Complaint, ordered Claimant to produce to the Chairman and the Co-Arbitrators the six criminal complaints filed against Witness No. 6 addressed in the Parties' submissions of July 15, 2005, any supplement or amendment thereto and the list of exhibits (the **"Russian Criminal Complaints"**) subject to a confidentiality regime analogous to the one applicable to the German Criminal Complaint[121].

109. Claimant produced the Russian Criminal Complaints together with English translations on August 16, 2005. Respondent, however, did not request to inspect the Russian Criminal Complaints and consequently no confidentiality undertaking was signed.

110. It results from Claimant's production of the Russian Criminal Complaints that between October 9, 2003 and April 30, 2004 Claimant filed with the General Prosecutor of the Russian Federation in Moscow four complaints

---

[118]   See pp. 374-380 T8H.
[119]   See p. 474 lines 26 to 28 T10H.
[120]   See in particular the Parties' submissions dated July 15, 2005.
[121]   See item 4 of the Arbitral Tribunals' telefax of August 10, 2005.

(as well as two undated letters) against Witness No. 6, Respondent and the so-called *"Alfa Consortium"* for fraud and breach of trust against Claimant in connection with the alienation of the MegaFon Interests pursuant to the transactions described in para. 14 hereinabove. Although these complaints were initially rejected on August 10, 2004 for lack of an *"event of crime"* (C-339g), a criminal investigation was subsequently opened against Witness No. 6 for fraud under part 4 of Article 159 of the criminal code of the Russian Federation, which investigation was then closed on May 20, 2005 (R-298) and reopened on May 30, 2005 (R-298). The current status of the criminal investigation in Russia is unknown to the Arbitral Tribunal.

### ee)    Unsealing of Seized Files

111.    In response to the Chairman's invitation at the telephone conference of August 4, 2005, both Parties, on August 4 and 5, 2005, respectively, confirmed that they did not object to the unsealing of the documents seized at the Chairman's offices by the Zurich Prosecutor, except for the evidence of the Witnesses and Proposed Witnesses protected by the Confidentiality Orders (the **"Protected Evidence"**).

112.    The unsealing of the Arbitral Tribunal's files took place in the presence of the Chairman on August 24, 2005. On this occasion, the Chairman took out for re-sealing the Protected Evidence as well as related correspondence with Witnesses and Proposed Witnesses' counsel as per a *"List of Protected and Non-protected Testimonies"* communicated to the Parties by letter of the Chairman dated August 17, 2005. This list was, as the List of Witnesses referred to in paras. 42 and 43 PA declared confidential in accordance with the Confidentiality Order[122]. A protocol of the unsealing was communicated to the Parties with the Chairman's letter of August 29, 2005.

113.    After the resealing of the Protected Evidence, the Arbitral Tribunal, had originally planned to agree with the Parties on the names of the Witnesses

---

[122]    See the Arbitral Tribunal's telefax to the Parties dated August 17, 2005 and the Chairman's letter to the Zurich Prosecutor of August 23, 2005.

who should be asked to give their consent to the unsealing of their evidence. Since this became impossible[123], the Protected Evidence remained sealed with the Zurich Prosecutor. On January 21, 2006, the Chairman met with the Zurich Prosecutor and the German Prosecutor. By letter dated January 25, 2006 addressed to the Zurich Prosecutor, the German Prosecutor requested to receive the evidence of the Witnesses who actually testified during the first phase, i.e. the Witnesses Nos. 1 to 13 mentioned in para. 42 PA. This letter was communicated by the Zurich Prosecutor to the Chairman on the same date. As the Chairman explained to the German Prosecutor at the aforementioned meeting, the Arbitral Tribunal had first to seek the position of the Parties on the said request and the consent of the Witnesses Nos. 1 to 13 for the unsealing of their Protected Evidence. After the Parties in their letters dated February 10 and 18, 2006 the Parties informed the Chairman that they did not object to the proposed unsealing of the Protected Evidence of the said witnesses. On this basis, the Chairman wrote to the Witnesses Nos. 1 to 13 in the period from March 16 to April 13, 2005 and has so far received the consent of eight witnesses, while the answers of five witnesses are still outstanding. The unsealing of the Protected Evidence of the Witnesses who have given their consent will take place in the near future.

**ff)**    **Affected Witnesses**

114.    In its telefax dated August 10, 2005, and taking into account the universal notion that witnesses who are subject to criminal investigations have a right against self-incrimination in giving evidence in civil proceedings (reflected e.g. in § 159(1) of the Zurich Procedure Code)[124], the Arbitral Tribunal invited the Parties to consider whether the witnesses affected by the German Investigation who are reluctant to testify on the matters relating thereto (the

---

[123]    See item 9 of the Arbitral Tribunal's telefax of September 1, 2005, Respondent's telefax dated October 25, 2005, Claimant's telefax dated October 28, 2005 and the Arbitral Tribunal's letter to the Zurich Prosecutor dated November 10, 2005 copied to the Parties' Swiss counsel.

[124]    An English translation of § 159(1) of the Zurich Procedure Code was read to all fact witnesses.

"**Affected Witnesses**") should nevertheless file a written witness statement on these matters and indicate on which paragraphs they wish not to be cross-examined or questioned by the Arbitral Tribunal. The Arbitral Tribunal confirmed this approach in its telefax dated August 16, 2005. A copy of the Arbitral Tribunal's telefaxes of August 10 and 16, 2005 was sent to counsel for Witness No. 4 on August 23, 2005.

115.   Several Affected Witnesses, most of which were assisted by counsel, testified at the Second Witness Hearing and made use of their aforementioned right not to answer certain questions[125]. The Arbitral Tribunal reserved its decision on whether it should recall the Affected Witnesses at a later stage of the proceedings.

**e)    Confidentiality Regimes**

**aa)   Protection of Witnesses**

116.   In the Eleventh Order, the Arbitral Tribunal, having recalled the purpose of the Confidentiality Order and the fact that "*both Parties went overboard, violating either the wording or the spirit of the Confidentiality Order, both of which the Arbitral Tribunal expects the Parties to adhere to in the future*", rendered the "*Second Confidentiality Order*" stating in items 1 and 2 of the operative part the following:

> "*1.    The Parties are hereby reminded of, and admonished to respect, the wording and the spirit of the Confidentiality Order and to request leave when they believe that there is a need to produce, in another arbitration, court or administrative proceeding, a(n) (expert) witness statement, an excerpt thereof or an excerpt of the transcript of the testimony of a witness testimony given in this Zurich Ad-Hoc Arbitration.*

---

[125]   See e.g. Witness No. S9 and Witnesses Nos. 4 and 9 whose testimonies were recorded at pp. 822-880, 881 -974 and 2255-2361 TSWH.

> 2.    *The Confidentiality Order applies also for the present phase of the arbitration relating to the Broader Illegality Defense and thus also to the (expert) witnesses filing witness statements in this phase of the arbitration and testifying at the witness hearing presently scheduled for September 12 to 23, 2005."*

117.    In view of the Confidentiality Order and the Second Confidentiality Order (the **"Confidentiality Orders"**), the Arbitral Tribunal does not, in this Second Partial Award, mention the names of the (expert) witnesses heard at the Witness Hearing, at the Second Witness Hearing and at the Seventh, Eighth and Ninth Hearings but refers to them also in this Second Partial Award as *"Witnesses Nos. 1 to 13"* as per the confidential List of Witnesses enclosed with the Partial Award[126] and **"Witnesses Nos. S1 to S38"**, respectively.

118.    Likewise, the witnesses the Parties proposed to be heard at the Witness Hearing, at the Second Witness Hearing and at the subsequent hearings but who did not testify, either because they were, despite the respective request of a Party, not invited by the Arbitral Tribunal or despite such invitation, were not prepared to participate or because their hearing was waived by the Parties or the Arbitral Tribunal, are referred to in this Second Partial Award as the **"Proposed Witnesses Nos. 1 to 35"**.

119.    In addition, several persons involved in the facts relating to this dispute, who have not been called or proposed as witnesses by either Party are referred to in this Award as **"Involved Person Nos. 1 to 9"**.

120.    In order to identify the Witnesses Nos. 1 to 13, Witnesses Nos. S1 to S38, the Proposed Witnesses Nos. 1 to 35 and the Involved Persons Nos. 1 to 9, a list entitled **"List of Witnesses and Involved Persons"** will be enclosed with the letter serving this Second Partial Award to the Parties. As with the List of Witnesses enclosed with the Partial Award, the Parties are

---

[126]    See para. 42 hereinabove and para. 42 PA.

hereby ordered to keep this List of Witnesses and Involved Persons confidential in accordance with the Confidentiality Orders.

121. In the event a Party files an action for the annulment of this Second Partial Award with the Swiss Federal Supreme Court pursuant to Articles 190/191 PIL, the List of Witnesses and Involved Persons as well as the List of Witnesses referred to in para. 44 hereinabove may be filed together with this Second Partial Award. In such event, the Parties are invited to inform the Swiss Federal Supreme Court of the Confidentiality Orders and of the sensitivity of the matter, so that the Swiss Federal Supreme Court can undertake the necessary to keep the files strictly confidential and to exclude the public from hearings, if any[127].

**bb)    Protection of Confidential Documents**

122. In connection with the production of documents, the question arose as to what documents, because of their contents, deserved confidential treatment. In application of Article 3(12) of the IBA Rules of Evidence, the Arbitral Tribunal issued various orders and proposals for confidentiality regimes. Thus, the Confidential DFR-Documents and the Confidential DPA-Documents are subject to the Confidentiality Undertakings referred to in paras. 78 and 82 hereinabove (see also paras. 86 and 95 hereinabove regarding the confidentiality of the FCT-Documents and the *"TCI Shareholders' Agreement"*) and the German Criminal Complaint is subject to the Confidentiality Undertaking referred to in para. 106 hereinabove. Documents such as the Questionnaires and the IP7-Documents were submitted to the Chairman only for inspection by Respondent (see paras. 94 and 98 hereinabove).

123. According to the confidentiality undertakings signed in connection with the Confidential DFR-Documents and the Confidential DPA-Documents, counsel for the Party to which said documents were produced, undertook, *inter*

---

[127]    See para. 44 PA, referring also to Article 17(3) of the Swiss Statute on the Organization of the Judicial System.

*alia*, only to use the concerned documents for internal purposes, only to show them to limited representatives of their clients and members of their legal teams and only to comment on these documents in confidential submissions. According to the confidentiality undertakings signed in connection with the German Criminal Complaint, counsel for Claimant undertook only to show or copy the German Criminal Complaint to members of their legal team who have signed an undertaking, only to allow certain Affected Witnesses to review the German Criminal Complaint at counsel's offices and only to refer to the German Criminal Complaint in confidential pleadings.

**cc)    Confidential Pleadings, Hearings and Decisions**

124.   In accordance with the confidentiality regimes established for the Confidential DFR-, DPA- and FCT-Documents, these documents were commented upon in the confidential pleadings listed in para. 72 hereinabove, i.e. Claimant's Confidential DPA-Comments, Respondent's Confidential DFR-Comments and Confidential DPA-Reply, Claimant's Confidential DPA-and DFR-Rejoinder, Respondent's Confidential FCT-Comments and Claimant's Confidential FCT-Reply. In addition, separate confidential transcripts were made when said confidential documents were addressed at the various hearings in the BID-Phase (see e.g. Witness No. 2's testimony regarding the Confidential DPA-Documents at the Second Witness Hearing). Likewise Claimant's pleading on the German Criminal Complaint at the Eighth Hearing was recorded in a special confidential transcript.

125.   Moreover, following incidents of alleged violations of confidentiality reported by the Parties between the issuing of the Partial Award and the Fifth Hearing, the Parties, at the request of the Arbitral Tribunal, undertook to keep the discussions at the Fifth Hearing and its transcript confidential (see item 3 on p. 2 SMFiH).

126.   Finally, certain decisions of the Arbitral Tribunal, such as the Twentieth Order and the Arbitral Tribunal's decisions on Respondent's request to receive a copy of the IP7-Documents and for leave to use the information



contained in the IP7-Documents in other proceedings[128], were also de-
clared confidential.

### dd)    Incidents of Alleged Confidentiality Violations

127.    In the course of the BID-Phase, there were complaints by both Parties that
the other Party had violated the confidentiality regimes applicable to confi-
dential documents and the witness testimonies. These alleged violations do
not need to be further elaborated in this Second Partial Award except as
they are dealt with hereinafter[129].

### f)    Hearing of Witnesses at Second Witness Hearing and later Witness Hearings

### aa)    Witnesses Who Filed a Witness Statement and/or Testified in the BID-Phase

128.    The witnesses who testified in the BID-Phase were heard at the Second
Witness Hearing, the Seventh Hearing, the Eighth Hearing and the Ninth
Hearing.

129.    Overall Witnesses Nos. S1 to S35 testified in the BID-Phase, i.e:

  (i)    15 factual witnesses for Claimant (Witnesses Nos. S9, S10 [= Wit-
ness No. 4][130], S14, S15, S16, S18 [= Witness No. 1], S21, S22 [=
Witness No. 3], S24 to S27, S34 and S38);

---

[128]    See item 5 of the Twentieth Order and the last paragraph of the Arbitral Tribunal's
telefaxes dated April 3 and 10, 2006.

[129]    See e.g. para. 155 hereinafter referring to the disclosure of Protected Evidence by
Claimant to the Inspectors in the BMA Investigation.

[130]    This witness testified by videoconference at the place where the principal office of his firm
is domiciled.

(ii)    15 factual witnesses for Respondent (Witnesses Nos. S1, S3 to S8
[= Witness No. 10], S11, S12, S13 [= Witness No. 11], S19, S20,
S23[131], S28 and S29 [= Witness No. 9]);

(iii)   three expert witnesses for Claimant (Witnesses Nos. S 2, S33 and
37);

(iv)   five expert witnesses for Respondent (Nos. S30 to S32, S35 and
S36 [= Witness No. 7]); and

(v)·    one factual witness who presented himself as an independent wit-
ness (No. S17)[132]

130.   Witnesses who testified in the First Phase and in the BID-Phase are here-
inafter referred to by their original number, e.g. Witness No. 4 instead of
Witness No. S10.

131.   With the exception of Witness No. 11, all witnesses heard in the BID-Phase
filed a (new) witness statement. The exhibit numbers of these (expert) wit-
ness statements are listed on the List of Witnesses and Involved Persons
referred to in para. 120 hereinabove.

132.   All of the Parties' factual witnesses who had filed a written witness state-
ment in the BID-Phase gave testimony, except for Proposed Witness No.
25, who filed a statement dated September 9, 2005 (CW-10) but did not
appear at the Second Witness Hearing *"due to important and pressing per-
sonal commitments"*[133], Proposed Witness No. 4, who filed a statement
dated September 15, 2005 (RW-24) but was prevented from traveling to
Zurich for the Second Witness Hearing because his passport was taken

---

[131]   This witness testified by videoconference in Helsinki.
[132]   In its Telefax dated October 31, 2005, the Arbitral Tribunal informed the Parties that it
would *"not render decision on the disputed issue whether"* this witness as well as Witness
No. 6 and Proposed Witness No. 4 *"are deemed to be 'independent witnesses', but that it
would consider this in the ambit of the 'Beweiswürdigung' after the evidencery proceedings
have been closed"*.
[133]   See Proposed Witness No. 25's letter dated September 10, 2006.

from him by the Russian authorities after the passport control at Moscow Airport immediately before his departure to Zurich[134], and Proposed Witness No. 26, who filed a written witness statement dated August 26, 2005 (RW-15) but whom Respondent was *"not able to persuade"* to attend the Second Witness Hearing[135]. Likewise, Proposed Witness No. 27, who filed a statement dated September 14, 2005 (C-963), and Proposed Witness No. 28, who filed a letter dated September 7, 2005 (RW-26), did not testify in the BID-Phase.

133.    Moreover, the Arbitral Tribunal decided in a procedural conference at the end of the Second Witness Hearing not to hear some of the Parties' expert witnesses, i.e. the Proposed Witnesses Nos. 13 (RE-25) and 29 (RE-26) on English law, 30 (CE-3) and 31 (RE-20 and RE-30) on Russian law and, in its telefax dated September 29, 2005 further not to hear the Proposed Witnesses Nos. 32 (CE-2) and 33 (RE-29) on Liechtenstein law. On the other hand, in its telefax of September 28, 2005, the Arbitral Tribunal expressed its wish to hear the Witnesses Nos. S30 (RE-21 and RE-22) S31 (RE-28), S32 (RE-23), S33 (RE-5) and S35 (RE-24 and RE-24A)[136] as expert witnesses and requested to hear Witness No. S34 on a specific issue, i.e. as factual witness at the Seventh Hearing. Witness No. S34 filed a written witness statement on this issue (CW-15) and testified at the Seventh Hearing.

134.    As a rule, the written (expert) witness statements of witnesses who did not testify were not admitted into evidence (see the Arbitral Tribunal's specific rulings with respect to CW-10 of Proposed Witness No. 25[137], C-963 of Proposed Witness No. 27[138], RW-26 of Proposed Witness No. 28[139] and

---

[134]    See the Arbitral Tribunal's telefax dated September 28, 2005, summarizing Proposed Witness No. 4's account of the incident given to the Chairman. In view of this incident, Proposed Witness No. 4 declined to testify at the Seventh Hearing and indeed at any hearing thereafter (see in particular Proposed Witness No. 4's counsel's letter dated November 18, 2005).

[135]    See Respondent's email dated September 27, 2005.

[136]    For details relating to Witness No. S35, see para. 134 hereinafter at fn. 142.

[137]    See p. 427 lines 8-13 TSWH specifying, however, that the doucments attached or referred to in CW-10 *"are accepted provided they are put to a witness in cross-examination"*.

[138]    See item 2 of the Arbitral Tribunal's telefax of September 28, 2005.

[139]    See item 3 of the Arbitral Tribunal's telefax of January 26, 2006.



Respondent's declarations with respect to RW-24 of Proposed Witness No. 4[140] and RW-15 of Proposed Witness No 26[141]). In addition, the Arbitral Tribunal decided that the statements filed by Witness No. S35 (RE-24 and RE-24A) were not accepted as written expert witness statements or other forms of evidence as such statements merely refer to an anonymous statement of which Witness No. S35 cannot be considered to be a co-author[142].

135. Witness No. S20 submitted together with his witness statement a video recording made secretly in London, i.e. without the knowledge of Witness No. 4, of a conversation between the said two Witnesses (R-333) as well as a transcript thereof (R-334). The Arbitral Tribunal raised the issue of the admissibility of the video recording and its transcript in its telefax dated September 5, 2005, after which Claimant filed an objection, and the issue was further discussed at the Second Witness Hearing. After the Arbitral Tribunal initially decided not to look at the video or the transcript[143], Respondent submitted a selection of extracts from the transcript which it deemed most relevant (R-334A)[144], whereafter Claimant agreed to admit the entire transcript subject to any objection as to its correctness[145]. Thereafter, Claimant submitted a list of proposed corrections to the transcript (R-334B) and the Parties agreed on a definitive version of the transcript which was filed as R-334C[146]. Therefore, there was no reason for the Arbitral Tribunal to watch the video recording filed as R-333.

---

140    See p. 474 line 23 T8H.
141    See Respondent's email cited in fn. 135 hereinabove.
142    Witness No. S35's capacity as an expert witness was disputed by Claimant. After hearing his testimony, the Arbitral Tribunal decided not to regard Witness No. 35 as an expert witness and accordingly did not admit his statement as an expert witness statement (see item 2 of the Arbitral Tribunal's telefax of October 21, 2005). However, the exhibits attached to his statements (R-342 and R-343/1 to 81) were admitted as "documents" (see item 3 of the Arbitral Tribunal's telefax of October 21, 2005).
143    See p. 240 lines 6 to 20 TSWH Day 2.
144    See pp. 496 and 651 TSWH Day 3 and 4.
145    See pp. 395/396 T7H, confirmed by the Arbitral Tribunal's telefax dated October 28, 2005.
146    The only remaining disagreement between the Parties relates to the impression created by Witness No. 4 at one point of his conversation with Witness No. S20, which Respondent interprets as an affirmation ("Yuh") and Claimant interprets as a "neutral grunt" ("Mm") (see box 157 of R-334C and p. 502 lines 5-14 T8H.

136.  Witness No. 4 as an Affected Witness chose not to travel to Zurich for the Second Witness Hearing but to testify instead by video from the city where the principal office of his firm is located, which place was, for alleged security reasons, disclosed to the Parties and the co-arbitrators only after the Second Witness Hearing[147]. Moreover, Witness No. S23, who came to Zurich on the fourth day of the Second Witness Hearing but for lack of time could not be heard, was later, on the ninth day of the Second Witness Hearing, heard by videoconference from his home town, which place did not have to be kept confidential.

**bb)  Special Efforts to Secure the Hearing of Witnesses**

137.  In its *"Review of Witness Issues and Related Applications"* dated July 5, 2005, which partially recapitulated various motions and requests made earlier in the BID-Phase, Claimant applied for the Arbitral Tribunal to order the appearance and the examination at an appropriate location, respectively, of Proposed Witnesses Nos. 1, 2, 4 and 6 and that Witness No. 11 be *"recalled to testify"*. Moreover, in view of the expected non-participation of Proposed Witnesses Nos. 3 and 3A or of another member of NAC, Claimant requested that the report prepared by Proposed Witness No. 3 (Exhibit 19 to RE-11, the **"KK-Report"**) be disregarded[148].

138.  The Arbitral Tribunal sent a letter of invitation to **Proposed Witness No. 1** on May 31, 2005. By letter dated June 20, 2005, Proposed Witness No. 1, replied that, being *"still subject to serious pressure from persons linked with IPOC"*, participation in the Second Witness Hearing had to be declined, in

---

[147]  See the Chairman's statement at p. 1439 line 23 TSWH Day 7.
[148]  Claimant's request to disregard the KK-Report was preceded by a request for production of documents and information on the *"Undisclosed Ties"* between Proposed Witnesses No. 3 and 3A and NAC on the one hand and Respondent and *"Alfa"* on the other hand (see Claimant's production request dated December 20, 2005). At the Fifth Hearing, the Arbitral Tribunal expressed the wish that Proposed Witness No. 3 or another member of NAC be heard on the KK-Report and stated that *"in the event this should not be the case, it would consider addressing a letter to the NAC with the request to submit particular documents and answer specific questions including the relationship of the NACC and/or [Proposed Witness No. 3] with the Parties or third parties close to them"* (item 9(d) on p. 8 SMFiH; see also the Arbitral Tribunal's telefax of March 11, 2005 confirming the discussions held at the *"KK-Conference Call"*).

order *"not to expose myself and my family to any further risks"*. As a result of Proposed Witness No. 1's non-appearance to testify, the witness statement of this proposed witness was not admitted into evidence[149].

139.  In view of the health condition of **Proposed Witness No. 2**, on which Respondent reported periodically, the Arbitral Tribunal did not send a letter of invitation to Proposed Witness No. 2. Although Proposed Witness No. 2 did not testify, his statement was admitted into evidence on the ground that his medical certificates showed that *"there are justified circumstances under the IBA-Rules"*[150].

140.  On July 29, 2005, after Respondent had reported that it was *"unable to confirm"* the participation of a representative of the NAC (e.g. the **Proposed Witness No. 3 or 3A**) in the Second Witness Hearing[151], the Arbitral Tribunal sent a letter to the NAC to the attention of Proposed Witness No. 3A requesting answers to certain questions relating to the KK Report. In response to the Arbitral Tribunal's letter of July 29, 2005, NAC sent to the Arbitral Tribunal a one-page statement on the letterhead of NAC signed by Proposed Witnesses Nos. 3 and 3A and notarised on August 17, 2005. On August 23, 2005, Proposed Witness No. 3A signed a letter answering questions Nos. 1 to 10 of the Arbitral Tribunal's letter of July 29, 2005. In spite of these answers by NAC, the KK Report (RE-11) was not accepted as an expert witness statement but was nevertheless admitted *"in its entirety"* as *"documentary evidence"*, the conclusiveness of which the Arbitral Tribunal is to appreciate in assessing the overall evidence[152].

141.  By telefax dated July 28, 2005, the Arbitral Tribunal ordered Respondent to use its best efforts to secure the participation of *inter alia* **Witness No. 6** and **Proposed Witnesses Nos. 4 and 6** at the Second Witness Hearing[153].

---

[149]  See p. 239 lines 17/18 TSWH Day 2.
[150]  See p. 239 lines 6 to 10 TSWH Day 2.
[151]  See Respondent's letter dated April 18, 2005.
[152]  See item 4 of the Arbitral Tribunal's telefax dated October 21, 2005.
[153]  See item 6 of the Arbitral Tribunal's telefax of July 28, 2005. Respondent reported for the last time on December 9, 2005 on its efforts to provide the appearance of Witness No. 6 and Proposed Witness No. 4 in the BID-Phase.

These efforts and the Chairman's direct contact with the common counsel of these three witnesses[154] had the following result:

(i)     **Proposed Witness No. 6** filed a written witness statement and testified at the Second Witness Hearing as Witness No. S17.

(ii)    **Proposed Witness No. 4** filed a written witness statement but did not testify in the BID-Phase due to the incident described in para. 132 hereinabove. As the Arbitral Tribunal indicated that it may not consider this as an excuse not to testify at a later hearing either in person or by videoconference, Respondent withdrew the witness statement of Proposed Witness No. 4 it had filed as R-3 and declared that it would not rely upon the witness statement RW-24 filed by the Proposed Witness No. 4 himself[155].

(iii)   **Witness No. 6**'s counsel indicated on September 16, 2005 that Witness No. 6 would not be filing a further witness statement and would not be providing further evidence at the Second Witness Hearing. Without providing any further explanation, Witness No. 6's counsel informed the Arbitral Tribunal on October 3, 2005 that his client *"stands by the substantial evidence contained in his Witness Statement dated 15, September 2004 and in the oral testimony he gave to the Tribunal on September 22, 2004"*. On November 18, 2005 counsel for Witness No. 6 again informed the Arbitral Tribunal that he would not testify as requested.

---

[154]   In view of Witness No. 6's non-responsiveness to the Arbitral Tribunal's invitation and Proposed Witness No. 4's reluctance to give testimony after the incident described in para. 132 and fn. 134 hereinabove, the Arbitral Tribunal wrote to Witness No. 6's and Proposed Witness No. 4's common counsel on October 21, 2005, requesting that Witness No. 6 reconsider his decision not to testify in this phase of the proceedings and that Proposed Witness No. 4 *"come to Zurich for his testimony"* or that he *"give his testimony by video conference from a appropriate place in Russia or elsewhere"*. By the same occasion, the Arbitral Tribunal requested Respondent to *"undertake best efforts to convince Witness No. 6 and Proposed Witness No. 4 to testify at the Eighth Hearing"*. The Arbitral Tribunal made a last attempt to secure the participation of Witness No. 6 on December 5, 2005 requesting his counsel to persuade him to come to Zurich for the Ninth Hearing.

[155]   See p. 474 lines 14/15 and 21-28 T8H. For the background see fn. 134 and 154 hereinabove and paras. 205 and 210 hereinafter.



142. While in the First Phase Respondent had requested that **Proposed Witness No. 7** *"confirm ... that [he] will testify"*, it indicated in its letter dated July 15, 2005 that it did not request that a letter of invitation be sent to him in the BID-Phase, thereby leaving it to Claimant to decide whether it wished to call him as a witness. However, Respondent did not object to Claimant's subsequent proposal that the Arbitral Tribunal send Proposed Witness No. 7 a letter of invitation[156]. In accordance with this proposal, the Chairman wrote a letter of invitation to Proposed Witness No. 7 on September 9, 2005, which letter was delivered to Proposed Witness No. 7 by Claimant's counsel. Although he declined to acknowledge receipt of the Arbitral Tribunal's letter, Proposed Witness No. 7 gave Claimant's counsel an *"oral undertaking"* that he would, subject to the approval of his government, which he would endeavor to obtain, *"attend before the Tribunal"* and *"answer fully all proper and relevant questions put to him that he is able to answer"*[157]. After providing several updates on its efforts to convince him to testify[158], Claimant in its letter dated December 9, 2005 informed the Arbitral Tribunal that *"Proposed Witness No. 7 [would] not be attending the 9th hearing"*.

143. In its telefax dated September 28, 2005 the Arbitral Tribunal requested to hear the **Proposed Witness No. 34** as a factual witness at the Seventh Hearing and deferred a decision to hear **Proposed Witness No. 35**, who has knowledge of the same or related facts, to a later stage of proceedings. On October 3, 2005, the Proposed Witness No. 34 informed that he would not testify at the Seventh Hearing on the alleged ground that professional secrecy provisions of the Liechtenstein criminal code do not permit him to do so. After the Chairman sent him a letter of invitation on October 21, 2005 asking him to reconsider his decision not to testify and to testify at the Eighth Hearing, Proposed Witness No. 35 informed the Arbitral Tribunal on

---

[156]    The eventuality of sending a letter of invitation to Proposed Witness No. 7 was first discussed at Claimant's initiative at a meeting between the Chairman and lead counsel for Claimant and Respondent at the Chairman's office on September 8, 2005. As this matter was deemed sensitive, it was thereafter only discussed between selected members of the Parties' legal teams in what was referred to as the *"petit comité"*.

[157]    See Claimant's letters dated September 12 and 23, 2005.

[158]    See e.g. item 11 on the list of *"Topics for the Eighth Hearing"*.

October 28, 2005, invoking § 128 of the Liechtenstein criminal code, that he declines to give testimony in these proceedings.

**cc)    Documents Submitted by Witnesses**

144.    In addition to the exhibits attached to certain witness statements and the exhibits filed by the Parties during the hearing of witnesses, certain witnesses agreed to submit documents themselves, at the request of the opposite Party or of the Arbitral Tribunal. Thus:

(i)    Although Witness No. 3 first undertook to enquire whether the two agreements the Arbitral Tribunal referred to in its letter of September 29, 2005[159] could be produced, this was declined because of alleged confidentiality obligations.

(ii)    Witness No. S11 produced on October 11, 2005 most of the documents the Arbitral Tribunal requested from him in its first letter of September 29, 2005 and further documents (regarding a criminal complaint against Witness No. S24) on October 24, 2005[160]; and

(iii)    Witness No. S20's counsel produced on September 30, 2005 the agreement the Arbitral Tribunal requested from him in its second letter of September 29, 2005 (R-335a).

**g)    Related Proceedings**

145.    In addition to the German and Russian criminal investigations described in paras. 99 et seq. hereinabove, several related civil and administrative proceedings were ongoing during the BID-Phase. To the extent the Arbitral Tribunal was informed of their status, these proceedings are briefly described hereinafter.

---

[159]    See paras. 93 and 95 hereinabove showing that these agreements were submitted instead by Claimant.

[160]    The exhibits produced by Witness No. S11 relating to the testimony and credibility of Witness No. S24 were not admitted into evidence.

**aa)    BVI Proceedings**[161]

146.    In the autumn of 2003, Claimant initiated civil proceedings in the British Virgin Islands against Respondent and 15 other parties, namely TMI, CTM as well as the twelve companies, apart from LV Investment I, II and III[162], parties to the Onward Sales and other transactions described in para. 14 hereinabove and Alfa-Eco, as defendants (the "**BVI Proceedings**"). In these proceedings, Claimant claimed[163]

against Respondent[164]:

(i)     Specific performance of the Option Agreements;

(ii)    damages for breach of contract, conspiracy and deceit;

(iii)   equitable compensation for breach of trust and fiduciary duty;

against the other 15 defendants:

(iv)    damages for intentional interference with the Option Agreements, procurement of breach of contract, conspiracy and deceit;

(v)     equitable compensation for assistance of breach of trust and/or fiduciary duty;

---

[161]    See generally the Parties' description of these proceedings at pp. 254 to 274 T8H.

[162]    These three companies, as well as nine further parties, were however named as additional defendants in Claimant's "*Draft Amended Statement of Claim*" filed as C-267.

[163]    See pp. 81-83 of C-267.

[164]    Addressing the question of a possible overlap between the Zurich *Ad-Hoc* Arbitration and other proceedings, Claimant explained at the Eighth Hearing that its prayers for relief directed against Respondent in the BVI Proceedings, in particular its prayer for specific performance of the Option Agreements, were only made "*out of an abundance of caution either in case this Tribunal finds it has no jurisdiciton or cannot give us the remedy we need, or if LVFG so obstructs these proceedings that we cannot get the effective relief we need*" (p. 259 lines 19-24 T8H; see also generally pp. 258 to 270 T8H). At this occasion, Claimant repeatedly confirmed that it does not challenge this Arbitral Tribunal's jurisdiction over its claims against Respondent in the Zurich *Ad-Hoc* Arbitration (see p. 264 lines 19-22, p. 266 lines 13-17 and p. 268 lines 8-12 T8H).

against all defendants:

(vi)  an *"account"* of all dealings with the shareholdings in TMI and CTM and their traceable proceeds and payment to Claimant of *"all sums found to be due upon the taking of such account"*;

(vii)  a declaration of Claimant's absolute control, through TMI and CTM, of the *"Megafon stake"*[165]; and

(viii)  injunctive relief restraining the defendants *"from interfering with the business, affairs or assets of IPOC, TMI or CTM, including the Megafon stake"*.

147.  By decision of January 21, 2004, Claimant's claims were dismissed for lack of jurisdiction and the interlocutory relief then in place, which had first been granted *ex parte* in the form of a receivership order and ancillary injunctions and later partially confirmed after a hearing *inter partes*, was fully discharged. The dismissal of Claimant's claims and the discharge of the injunctions were confirmed, upon an appeal of Claimant, by the BVI Court of Appeal in its decision of September 19, 2004 filed as R-442. Claimant thereafter filed a petition for special leave for an appeal to the Privy Council in London and was at that occasion granted a preservatory injunction against all defendants except Respondent pending the Privy Council's decision in the form of an interdiction on the current owners of CTM to transfer the MegaFon shares[166]. At its hearing of January 17, 2006, the Privy Council did not grant Claimant special leave to appeal, wherefore the BVI Proceedings are ended and the preservatory relief is no longer in place.

---

[165]  The *"MegaFon Stake"* is defined in p. 24 of C-267 as *"[a] 25.1% blocking equity stake in Megafon that from on or about 6 August 2001 to the events the subject of these proceedings was held by CTM"*.

[166]  The Arbitral Tribunal assumes that the *"Megafon shares"* as referred to in this context are the same as the MegaFon Interests defined in para. 163 hereinafter.



**bb)   BVI Enforcement Proceedings**

148.   Also in the British Virgin Islands, Claimant has initiated proceedings to en-
force the Geneva ICC-Award against Respondent (the **"BVI-Enforcement
Proceedings"**).

149.   The Arbitral Tribunal understands that Respondent has resisted enforce-
ment of the Geneva ICC-award on the ground that it does not regard it as
enforceable under the New York Convention as implemented by the law of
the British Virgin Islands[167].

150.   The Parties have not communicated further information on these proceed-
ings except that Respondent referred to them in its letters dated March 23
and April 6, 2006 regarding the use of the IP7-Documents in proceedings
relating to the Geneva ICC-Award.

**cc)   Stockholm Arbitration**

151.   In addition to its claims in the BVI Proceedings, Claimant has initiated arbi-
tration proceedings before an arbitral tribunal of the Stockholm Chamber of
Commerce against CTM, Telecominvest, Russian Federation (**"TCI"**) and
*"three entities within the TeliaSonera Group"* (the **"Stockholm Arbitral Tri-
bunal"** and the **"Stockholm Arbitration"**, respectively) based on an al-
leged violation of, *inter alia*, Article 11 of the Shareholders' Agreement be-
tween the same parties dated August 6, 2001 (C-66), which in Claimant's
words *"forbids direct or indirect competitors from being shareholders in
MegaFon"* [168].

152.   According to Claimant, CTM has raised money laundering allegations as a
defence in the Stockholm Arbitration, albeit in a different manner than Re-

---

[167]   See p. 246 lines 3-8 T5H and item 3 on p. 2 of Respondent's submission dated March 11,
2005.

[168]   See items 1 and 3 of Claimant's submission dated February 25, 2005. As the Arbitral
Tribunal understands, Claimant alleges specifically, that Alfa-Eco's participation through
CTM in MegaFon is prohibited because of Alfa's (competing) interest in Vimpelcom.



spondent's ML-Defence in this *Ad-Hoc* Arbitration[169]. Further, following the rendering of the Arbitral Tribunal's Partial Award and new evidence filed in the BVI Proceedings, CTM filed an application to suspend the proceedings in the Stockholm Arbitration on December 10, 2004 (C-620).

153. According to the Arbitral Tribunal's information, the status of the Stockholm Arbitration is ongoing, with the exchange of briefs having been completed and an evidentiary hearing having taken place in February 2006, in which some of the same witnesses as in this *Ad-Hoc* Arbitration were to be heard.

**dd)    BMA Investigation**

154. In 2004, a statutory investigation was ordered by the Bermuda Monetary Authority (the "**BMA**") into the affairs of IPOC and its Bermuda affiliated companies concerning suspicions of money laundering (the "**BMA Investigation**"), in which investigation two individuals of KPMG Bermuda were appointed as inspectors under Section 32 of the Bermuda Companies Act 1981 (the "**Inspectors**").

155. Little information is available on the status of this investigation except that the Inspectors and Claimant have complained of an alleged breach of confidentiality resulting in a leak to Alfa-Eco and/or Respondent of materials compiled by the Inspectors in the context of their investigation and Claimant informed that a lawsuit for damages filed by KPMG against Diligence LLC *"an intelligence gathering firm located in Washington D.C."* relating to this leak is pending in Washington[170].

156. On the other hand, Claimant disregarded the Confidentiality Order by disclosing Protected Evidence to the Inspectors without requesting leave to do

---

[169]  See p. 16 lines 16 et seq. T5H, pp. 289/290 T8H and p. 2 of Claimant's submission of July 15, 2005.
[170]  See the Inspectors' counsel's letter to Respondent dated August 2, 2005 (C-878) and Claimant's telefaxes dated February 7 and 20, 2006, May 1 and 4, 2006 and Respondent's comments dated February 20, 2006.

so from the Arbitral Tribunal[171] as provided for under the Confidentiality Order even for the event that a statutory obligation to disclose documents from this arbitration exists[172]. Therefore, the Arbitral Tribunal endeavored to protect this Protected Evidence by sending a letter to the Inspectors on April 26, 2006 drawing their attention to the confidentiality of such evidence[173].

157.  Claimant's request dated May 1, 2006 for *"leave to submit significant evidence that has just surfaced in the lawsuit filed by KPMG against Diligence"* has been dismissed by the Arbitral Tribunal's telefax dated May 5, 2006 without prejudice to a renewed request in the event proceedings continue after this Second Partial Award has been served on the Parties. The reason for this decision was that (i) Claimant has not alleged that Respondent filed in the Zurich *Ad-Hoc* Arbitration illegally received documents and (ii) neither the Riversand Payment[174] nor the Onward Sales[175] will be analysed in detail in the Second Partial Award, so that the *"credibility of Respondent"*[176] is not at the centre of the issues to be decided in this Second Partial Award[177].

158.  The Arbitral Tribunal understands that no report has yet been issued in this investigation, which is therefore ongoing[178].

ee)  **The Russian Action**

159.  On pp. 2/3 of its submission dated May 3, 2006, Respondent informed that *"[o]n or around 30 March 2006, IPOC issued new civil proceedings against*

---

[171]  See Claimant's statements and the Chairman's remark at p. 286 lines 15 to 28 T8H and the Arbitral Tribunal's letter to the Inspectors dated April 26, 2006.
[172]  See also the Arbitral Tribunal's telefaxes dated February 12, 2006 an May 12, 2006.
[173]  In this context, see also the Arbitral Tribunal's telefax dated January 26, 2006, C-778, Claimant's comments dated February 7 and 20, 2006 and Respondent's comments dated February 20, 2006.
[174]  See paras. 562 et seq. hereinafter.
[175]  See paras. 14 hereinabove.
[176]  See p. 2 of Claimant's telefax dated May 1, 2006.
[177]  In this context, see paras. 656, 708, 711 and 715 hereinafter.
[178]  See p. 279 lines 27/28 T8H.

*LVFG in Russia ... in the Arbitration Court of the City of St. Petersburg and the Leningrad Oblast"* (the **"Russian Action"**) and this action is allegedly a *"blatant breach"* of the Arbitration Clause.

160. In its telefax dated May 10, 2006, Claimant (i) informed that it filed a statement of claim with the Arbitrazh Court of St. Petersburg on March 27, 2006 in an action primarily directed against CT-Mobile and MegaFon, but also naming *"LV Finance amongst other respondents"* and that this action was filed together with *"an application for provisional injunctive relief prohibiting Alfa from transferring, alienating, cancelling or reorganizing CT-Mobile's shares in MegaFon and thus to protect IPOC against a further aggravation of the ongoing illegal violation of its rights"* and (ii) alleged that it obtained from the St. Petersburg Arbitrazh Court such injunction which *"in effect replaces the injunction granted in connection with the proceedings brought by IPOC in the BVI ... dismissed (...) earlier this year by the Privy Council on forum non conveniens grounds, i.e., that Russia was deemed to be a more appropriate forum"*.

161. In the said comments of May 10, 2006, Claimant quoted the prayers for relief submitted to the Arbitrazh Court of St. Petersburg and the Leningrad Oblast, but did not comment the breach of the Arbitration Clause Respondent complained of. Should it be the case that Claimant seeks in the Russian Action the adjudication of a claim arising out of the April Option Agreement, this would be an obvious violation of the arbitration agreement in the Arbitration Clause which Claimant has never challenged. In this context, the Arbitral Tribunal recalls that in the contexts of its earlier concern relating to a possible jurisdictional overlap with the BVI proceeding, Claimant specifically confirmed that there is no such overlap and that it does not challenge the jurisdiction of this Arbitral Tribunal[179].

---

[179]    See para. 146 at fn. 164 hereinabove.

**h)    Prayers for Relief**

162.  As results from para. 64 hereinabove, the following prayers were not de-
cided in the First Phase concluded by the Partial Award:

    (i)    Claimant's Prayers B/1 to B/3 and Respondent's Prayers Nos. 7 to 9
           (because not subject to the proceedings on the Preliminary Is-
           sues[180]);

    (ii)   Claimant's Prayers A/2 and A/4 and Respondent's Prayers Nos. 4
           and 5 (because deferred to a later stage of proceedings[181]).

    (iii)  Respondent's Jurisdictional Objections, corresponding to Respon-
           dent's Prayer No. 2 (because also deferred to a later stage of pro-
           ceedings[182]; and

    (iv)   the Parties' prayers regarding the costs of the arbitration, corre-
           sponding to Claimant's Prayer A/3 and Respondent's Prayers Nos.
           10 and 11 (because also deferred to a later stage of proceedings[183].

163.  While Respondent did not submit any new prayers in the BID-Statement,
Claimant submitted in paras. 1008 to 1016 BID-Answer the following *"Fur-
ther Amended Request for Relief"* (**"Claimant's BID-Prayers"**)[184]:

    **"A.    *Declaration of Rights, Costs and Remedies***

          *IPOC seeks the following relief:*

---

180    See para. 67 PA and para. 65 hereinabove.
181    See para. 259/260 PA on Claimant's Prayer A/2, paras. 263/264 PA on Respondent's
       Prayer No. 4 and paras. 265/266 PA on Respondent's Prayer No. 5; no particular finding
       with respect to Claimant's Prayer A/4 or Respondent's Prayer No. 3.
182    See para. 261 PA, para. 64 hereinabove and paras. 176/177 hereinafter.
183    See paras. 273/274 PA and para. 64 hereinabove.
184    With the exception of Claimant's prayers regarding specific performance in paras. 1010 to
       1012 BID-Answer, these prayers are almost identical to Claimant's Prayers quoted in para.
       57 hereinabove.

1008.    *A declaration that IPOC has validly exercised its option (the "Option") under its 10 April 2001 Option Agreement with LV Finance (the "Option Agreement");*

1009.    *A declaration that, having validly exercised the Option, IPOC is entitled to purchase 77.7% of the share capital of TMI, together with TMI's ownership rights over substantially 100% of the capital of CTM, and CTM's 25.1% of the capital of MegaFon (collectively the "MegaFon Interests")[185] in accordance with the agreement arising from the valid exercise of the Option (the "Agreement");*

1010.    *An order for specific performance of the Agreement;*

1011.    *An order that Respondent transfer the MegaFon Interests to Claimant;*

1012.    *Alternatively, and in any event, a declaration that IPOC has validly exercised the Option and is entitled to the specific performance of the Agreement;*

1013.    *A declaration and finding that LV Finance's purported dispositions of TMI and the MegaFon Interests were in knowing and intentional violation of IPOC's prior and valid rights under the Option Agreement and part of a scheme to deprive IPOC of such rights;*

1014.    *An order that IPOC is awarded the costs of arbitration, inclusive of attorneys fees, through the date of the above Award; and*

1015.    *Such further or other relief as may be found to be just and proper.*

---

[185]    The term *"MegaFon Interests"* was used by Claimant already in Claimant's Prayer A/1, however, with a slightly (not necessarily relevant) different wording (see para. 57 hereinabove and the use of this term in Claimant's Prayer A/2 and Respondent's Prayers 2(b) and in paras. 60, 62(i), 66 and 80 hereinabove). Moreover, the Geneva ICC-Tribunal uses this term in the singular form *"MegaFon Interest"* (see para. 20 hereinabove).