### B.    *Damage Findings and Award*

*1016.     In subsequent proceedings, and without prejudice to the foregoing claims, and subject to the terms of, and Respondent's compliance with, the above-solicited declarations, findings and Award, the Tribunal make further findings and Award IPOC:*

> *(1) damages, interests, and/or equitable compensation in addition to or in lieu of specific performance;*
>
> *(2) further costs, inclusive of attorneys fees, through date of the final damage Award, and*
>
> *(3) such further or other relief as may be just and proper."*

164.  The Arbitral Tribunal interprets Claimant's BID-Prayers as replacing Claimant's Prayers quoted in para. 57 hereinabove (as it interprets the latter to replace Claimant's Initial Prayers and Additional Initial Prayers quoted in para. 28 hereinabove).

165.  In para. 471 BID-Reply, Respondent submitted with regard to Claimant's BID-Prayers the following *"Amended Prayers for Relief"* (**"Respondent's BID-Prayers"**)[186] which mainly relate to the Jurisdictional Objections referred to in para. 175 hereinafter:

> *"1.  That the Arbitral Tribunal decline jurisdiction for the following of IPOC's amended prayers for relief:*
>
> (a)  *"A declaration that, having validly exercised the Option, IPOC is entitled to purchase 77.7% of the share capital of TMI, together with TMI's ownership rights over substantially 100% of the capital of CT-Mobile, and CT-Mobile's 25.1% of the capital of MegaFon (collectively the "MegaFon Interests") in accordance with the agreement arising from the valid exercise of the Option (the "Agreement")" (ML-BID Reply paragraph 1009);*

---

[186]     Respondent's BID-Prayer No. 1 of the operative part of the Partial Award corresponds substantially to Respondent's Prayers Nos. 1 and 2 quoted in para. 58 hereinabove. Respondent's BID-Prayer No. 2 corresponds substantially to Respondent's Prayer No. 3.

(b)   "An order for specific performance of the Agreement"
      (ML-BID Reply paragraph 1010);

(c)   "An order that Respondent transfer the MegaFon Inter-
      ests to Claimant" (ML-BID Reply paragraph 1011);

(d)   "Alternatively, and in any event, a declaration that IPOC
      has validly exercised the Option and is entitled to the
      specific performance of the Agreement' (ML-BID Reply
      paragraph 1012);

(e)   "A declaration and finding that LV Finance's purported
      dispositions of TMI and the MegaFon Interests were in
      knowing and intentional violation of IPOC's prior and
      valid rights under the Option Agreement and part of a
      scheme to deprive IPOC of such rights' (ML-BID Reply
      paragraph 1013).

In the alternative, respectively to the extent the Arbitral Tribu-
nal does not decline jurisdiction:

That the Arbitral Tribunal refuse to take at hand IPOC's
amended prayers for relief in paras. 1008-1015 of IPOC's ML-
BID Reply. (Nichteintreten)

2.   In the alternative, respectively to the extent the Arbitral Tribu-
     nal resolves to take IPOC's prayers for relief at hand:

That IPOC's claims be dismissed in their entirety."

166.  In para. 472 BID-Reply, Respondent stated that it *"upholds its counter-
claims in p. 3 et seq. of its Statement of Defence"*, i.e. Respondent's
Prayers Nos. 4 to 10, *"with the exception of Prayer No. 6 that has already
been affirmed by the Arbitral Tribunal in paras. 8 of the operative Part of its
Partial Award"*[187]. Claimant has not submitted any new prayers for relief or
modifications of previous prayers in the BID-Rejoinder.

---

[187]   Since this para. 8 relates only to Claimant's purported option notices of July 29, 2003 (C-
177) and August 12, 2003 (C-189), one could have argued that Respondent's Prayer No.
6 is still in place with regard to the Second Purported Option Notice and the Third
Purported Option Notice referred to in para. 240 hereinafter. However, in view of this clear

167. The Parties' respective prayers were tacitly confirmed at the Tenth Hearing. In its pleadings presented at the Tenth Hearing, Claimant explained the meaning of the terms *"MegaFon Interests"* referred to in para. 1009 BID-Answer[188] as well as the distinction to be made between Claimant's BID-Prayers submitted in para. 1010 BID-Answer (*"order for specific perform-ance"*) and in para. 1012 BID-Answer (*"declaration that IPOC ... is entitled to the specific performance of the Agreement"*)[189].

168. It results from the above that Claimant's Prayers quoted in para. 57 herein-above are superseded by Claimant's BID-Prayers and that Respondent's Prayers Nos. 1 to 3 quoted in para. 58 hereinabove are superseded by Re-spondent's BID-Prayers Nos. 1 and 2.[190] Therefore, Respondent's Prayers which had not been decided by the Arbitral Tribunal in the Partial Award remain pending. Accordingly, the prayers still before the Arbitral Tribunal at the present stage are Claimant's BID-Prayers, Respondent's BID-Prayers Nos. 1 and 2 and Respondent's Prayers Nos. 4, 5, 7, 8, 9, 10 and 11.

169. In addressing the said Prayers before it in this BID-Phase, the Arbitral Tri-bunal will first determine the relevance of the Jurisdictional Objections and thus of Respondent's BID-Prayer No. 1[191]. Then, after some *"General Comments"* in Chapter V, the Arbitral Tribunal will proceed in Chapter VI with the determination of the much disputed *"Beneficial Ownership of Claimant"*, since this issue is, contrary to Claimant's view, not only relevant for the credibility of Witness No. 4 but also for the decision on the merits of the BID-Defence[192].

170. After the determination of the beneficial ownership of Claimant, the Arbitral Tribunal will in view of its statement in consids. (vii)(b) and (ix) of the Twen-

---

statement of Respondent, Respondent's Prayer No. 6 is not before the Arbitral Tribnal in the BID-Phase and a decision on said prayer would be *ultra petita*.

[188] See p. 384 lines 12-22 T10H Day 2.
[189] See pp. 385-395 T10H Day 2.
[190] See fn. 186 hereinabove.
[191] See para. 177 hereinafter under the heading *"Jurisdiction"* and para. 189 hereinafter under the heading *"Res Judicata"* relating to *"Claimant's Claim for Specific Performance"*.
[192] See e.g. paras. 200, 234 and 336 hereinafter.

114

tieth Order address in Chapter VII on the "VALID EXERCISE OF THE APRIL OPTION" the validity of the Second Purported Option Notice referred to in para. 240 hereinafter and to some extent of the Third Purported Option Notice also referred to in para. 240 hereinafter and the closely related Crystallization Argument which Respondent invoked as an issue to be examined before the disputed validity of the Second Purported Option Notice[193]. The further issue under the said heading of Chapter VII, relevant in the context of Claimant's BID-Prayer submitted in para. 1008 quoted in para. 163 hereinabove on the valid exercise of the April Option, will not be dealt with in Chapter VII as this issue requires first a decision of the validity and/or enforceability of the April Option Agreement[194] and therefore will be addressed to the extent necessary in a later part of this Second Partial Award[195].

171.    After having dealt with the formal validity of the Second Purported Option Notice, the Arbitral Tribunal will in Chapter VIII deal with the key issues of this arbitration, i.e. Respondent's various defences invoked in support of its submission that the April Option Agreement is invalid, unbinding or unenforceable as pleaded in Respondent's Prayers 4 and 5. After having addressed this principal issue, the Arbitral Tribunal will then proceed in Chapter IX with Claimant's BID-Prayers relating to specific performance submitted in paras. 1009 and 1012 BID-Answer quoted in para. 163 hereinabove.

172.    Claimant's further BID-Prayer submitted in para. 1013 BID-Answer relating to the breach of contract by the Onward Sales will be dealt with in para. 708 hereinafter.

173.    All the other pending prayers, i.e. Claimant's BID-Prayers filed in paras. 1015 and 1016 BID-Answer and Respondent's Prayers 7 to 9 are not relevant for the BID-Phase and therefore will be dealt with in the next phase following the rendering of this Second Partial Award.

---

[193]    For this argument see paras. 243 and 247 et seq. hereinafter.
[194]    See paras. 282 et seq. hereinafter.
[195]    See paras. 281 and 706 hereinafter.

### III.    JURISDICTION AND APPLICABLE LAW

### A.    Jurisdiction

174.    The Arbitral Tribunal's jurisdiction lies in the Arbitration Clause quoted in para. 24 hereinabove and has been accepted by the Parties except that Respondent submits

    a)    in para. 27 on p. 15 SD that the *"Arbitral Tribunal has no jurisdiction to issue a ruling affecting, or even binding on, parties other than IPOC or LVFG, respectively, or to rule on the validity of agreements between parties other than IPOC and LVFG"*;

    b)    in para. 33 on p. 16 SD that neither TMI nor CTM nor MegaFon are subject to the Arbitral Tribunal's jurisdiction with the effect that the Arbitral Tribunal has *"no power to declare the entitlements or property rights of TMI and CTM in the manner sought"* by Claimant's Prayer A/1 by Claimant, respectively - as Claimant attempts by Claimant's Prayer A/2 in para. 43 on p. 19 SD - of *"companies who are not parties to the arbitration agreement"*; and

    c)    in para. 44 on p. 19 SD any award of this Arbitral Tribunal for declaratory relief affecting the *"property rights (or lack thereof)"* of companies which *"dealt with and currently own shares in TMI and CTM [...] would not bind those entities, and would be wholly unenforceable against them"* .

175.    The above-summarised jurisdictional objections (the **"Jurisdictional Objections"**) were the subject of Respondent's motion for bifurcation, which was dismissed by the Third Order on July 20, 2004 and in which it was decided to defer the Arbitral Tribunal's decision on the Jurisdictional Objections to a later stage of proceedings. Respondent has reconfirmed the Jurisdictional Objections in Respondent's BID-Prayer No. 1 quoted in para. 165 hereinabove.



176.  The Arbitral Tribunal noted already in consideration (iii) of the Third Order
      that:

> *"the dispute before this Arbitral Tribunal relates to the April Option
> Agreement and that the Parties thereto are IPOC and LVFG only
> and that Claimant does not allege that a third party has become a
> party to the April Option Agreement or is a third party beneficiary
> of the April Option Agreement."*

and stated in consid. (x) of the Third Order that the Arbitral Tribunal's deci-
sion on the Jurisdictional Objections is to be deferred

> *"since the Jurisdictional Objections, if justified, might be dealt with
> by reducing Claimant's prayers for declaratory relief to the per-
> missible[196]. In fact, in an award, an arbitral tribunal may in appli-
> cation of the principle minus in maior grant a party less than it re-
> quested[197]."*

177.  For the above reasons, the Arbitral Tribunal deferred in para. 61 on p. 130
      and in item 3 on p. 133 PA its decision on the Jurisdictional Objections to a
      *"later stage of proceedings"*. The Arbitral Tribunal must decide this issue in
      this Second Partial Award only in the event Claimant's BID-Prayer submit-
      ted in para. 1013 BID-Answer replacing Claimant's Prayer A/2 could be
      considered to be upheld and refers in this regard to para. 708 hereinafter.

**B.     Applicable Law**

178.  Clause 13.1 AOA states that the April Option Agreement *"is governed by
      English law"*. Accordingly, the English law is the substantive law to be ap-
      plied by the Arbitral Tribunal.

---

[196]  See p. 159 lines 5 and 6 T2H where the Chairman asked the Parties whether it would not
be possible just to delete the phrase *"with TMI holding substantially 100% of the capital of
CTM, and CTM holding 25...% of the capital of MegaFon"* (see p. 158 lines 23 et
seq.T2H).

[197]  See Paolo Michele Patocchi/Cesare Jermini, International Arbitration in Switzerland, Basel
2000, N 40 to Art. 192 PIL stating that *"there is no bar against the enforcement of awards
made infra petita"*.

179. As in any complex arbitration, the Arbitral Tribunal might have to determine certain preliminary issues of substantive nature which are subject to a different substantive law[198]. In the event this is the case, the Arbitral Tribunal will specifically state in this Second Partial Award when a preliminary issue is subject to substantive law other than English law[199].

180. As stated in para. 32 hereinabove, this arbitration proceeding is subject to Chapter 12 of the PIL. Accordingly, these provisions of Swiss law and not English procedural law apply to the Zurich *Ad-Hoc* Arbitration. It is to be added that Chapter 12 PIL does not refer to any specific code of Swiss procedural law, but requires an arbitral tribunal to apply generally accepted arbitration practice to matters not specifically addressed in Chapter 12 of the PIL.

## IV.   RES IUDICATA

### A.   Of the Matters Decided by the Geneva ICC-Award

181. Claimant submitted shortly before the Witness Hearing that, under English law, the following issues are *res iudicata* because they have already been decided in the Geneva ICC-Award[200]:

> "(i)    *[Witness No. 6] did not act under duress in signing either of the Options;*
>
> (ii)    *The Claimant is not engaged in money-laundering and its funds are not the proceeds of crime; and*
>
> (iii)   *The disposal of the underlying shares was not to a bona fide purchaser without notice of the Options but part of a scheme agreed between the Respondent and the Alfa group in full knowledge of the Options."*

---

[198]   For the Arbitral Tribunal's jurisdiction to decide preliminary issues, see p. 6 of the Third Order.

[199]   See para. 409 to 466 and 511 to 531 hereinafter with regard to Russian criminal law and para. 532 to 545 hereinafter with regard to Swiss criminal law.

[200]   See p. 10 of Claimant's submission on *res iudicata* dated September 17, 2004.

182.  In support of its position, Claimant filed an expert opinion by the Proposed Witnesses Nos. 17 and 18 dated September 9, 2004 on the Swiss law aspects of *res iudicata* (C-518e) and by the Proposed Witness No. 21 dated September 14, 2004 on the English law aspects of *res iudicata* exhibited to Claimant's letter to the Arbitral Tribunal dated September 17, 2004[201]. Respondent rebutted the submissions summarised in the preceding para. 181 at the Fourth Hearing and shortly before the Fourth Hearing submitted in support of its position an expert opinion by the Proposed Witnesses Nos. 19 and 20 dated September 22, 2004 on the Swiss law aspects of *res iudicata* (RE-18) and by the Proposed Witnesses Nos. 22 and 23 an expert opinion dated September 29, 2004 on the English law aspects of *res iudicata* (RE-19).

183.  At the Fourth Hearing, the Parties addressed not only the aspects discussed in the above mentioned four legal opinions, but specifically pleaded on the issues mentioned in items 18 to 20 of the List of Issues established by the Arbitral Tribunal shortly before the Fourth Hearing[202] relating to the procedural or substantive law nature of the concept of *res iudicata*, the law applicable thereto and the conflicts between two possibly applicable laws, in particular with regard to the English substantive law concept of estoppel.

184.  In the Partial Award, the Arbitral Tribunal dealt with *res iudicata* not in a general manner, but by analysing the individual claims relating to the Preliminary Issues and thus refers to paras. 164, 166, 179/180 and 215 PA. In general terms, the Arbitral Tribunal noted that even the expert opinion of the Proposed Witness No. 21 leaves room for at least an exception to *res iudicata* under the estoppel concept of English law in the event of *"special circumstances"* or, as he explained at the Fourth Hearing, if the court or arbitral tribunal determines that there are *"overriding reasons [to] justify an exception"*[203] (para. 78 PA). In the aforementioned paragraphs 164, 166, 179/180 and 215 PA, the Arbitral Tribunal found that such *"overriding rea-*

---

[201]  No exhibit number was given to this legal expert opinion.
[202]  See para. 40 hereinabove.
[203]  In this context see paras. 320 and 324/325 hereinafter.

*sons"* existed with regard to Respondent's defences affecting the validity of the April Option Agreement, namely the Duress Defence, the ML-Defence and the BID-Defence. Accordingly, the findings of the Geneva ICC Tribunal are not *res iudicata*.

**B.    Of Claimant's Claim for Specific Performance**

185.    From the file, it results that Claimant's initial PA-Prayers quoted in para. 28 hereinabove contained in item 2 a request for the *"transfer of [the April Option Shares] and corresponding ownership and economic rights in Mega-Fon to IPOC"*, a request which could no longer be found in Claimant's Prayer A/1. At the First Hearing, which took place before Claimant's Prayers were filed, Claimant's counsel clearly stated that *"we want specific performance"* and that the *"keyword really is specific performance"*[204]. After this statement the issue was raised whether Claimant's Initial PA-Prayers *"should be more specific"* whereupon the Chairman invited *"Claimant to make precise prayers for relief"*[205]. As results from p. 83 line 13 T1H and item 18 on p. 5 SMFH, Claimant stated at the First Hearing that it might in the Statement of Claim slightly amend its prayer for declaratory relief and specific performance.

186.    Thereafter, these issues were no longer discussed until Claimant filed on March 30, 2004 in its Statement of Claim as Claimant's Prayer A/1 quoted in para. 57 hereinabove a prayer relating to the allegedly valid exercise of the April Option without requesting a transfer of the April Option Shares to Claimant. In doing so, Claimant did not give any explanation for this change in Claimant's prayers for relief. Accordingly, Claimant never expressed an explicit withdrawal of its alleged claim for specific performance of the April Option and thus, logically, has never expressed that it withdrew this claim with prejudice. On the other hand, on p. 2 SD, Respondent requested in Respondent's Prayer No. 1 to note that *"IPOC has withdrawn"* its prayers for specific performance referred to in Claimant's Initial PA-Prayers

---

[204]    See p. 83 line 16 and p. 84 line 6 T1H.
[205]    See p. 85 lines 16 to 25 T1H.

("**Claimant's Initial Prayers for Specific Performance**") and clarified at the Second Hearing that it considers such withdrawal to be *"with prejudice"* (p. 143 line 22 T2H).

187.  Considering the legal views expressed in commentaries and shared by this Arbitral Tribunal that at the beginning of an arbitration proceeding a party may withdraw a claim without prejudice[206] and considering that Claimant omitted the prayer for the transfer of the April Option Shares in its first full brief, i.e. the Statement of Claim, i.e. at the relatively early stage of the Zurich *Ad-Hoc* Arbitration, and furthermore considering that Claimant did not express an explicit withdrawal of the prayer in question, the Arbitral Tribunal concluded in para. 81 PA

  (i)    that a *"withdrawal, if any, of Claimant's Initial Prayers for Specific Performance is a withdrawal without prejudice so that Claimant is entitled to reinstate the respective claim for specific performance if it has ever withdrawn it"* and that , therefore, *"Claimant's Initial Prayers for Specific Performance are not res iudicata"*[207]; and

  (ii)   *"Respondent's Prayer No. 1 requesting to note that IPOC has withdrawn Claimant's Initial Prayers for Specific Performance with prejudice must be dismissed"*.

188.  Respondent's alternative request that Arbitral Tribunal has no jurisdiction for Claimant's Initial Prayer for Specific Performance became obsolete in the First Phase because Claimant's Prayer A/1 was dismissed in the Partial Award[208].

---

[206]  See e. g. Klaus Peter Berger, International Economic Arbitration, Deventer 1993, p. 634.

[207]  Because of this finding, the Arbitral Tribunal did not in this context examine in the Partial Award (i) whether Claimant has actually in an implicit manner withdrawn the disputed right for specific performance, (ii) whether its statements referred to in para. 185 hereinabove amount to a valid reservation so that in the Statement of Defence it did not have to make a reservation with regard to a reintroduction of such claim for specific performance or (iii) whether – as Claimant seems to submit – its claim for specific performance is impliedly included in Claimant's Prayer A/1.

[208]  See para. 155 PA referring to paras. 62 and 82 PA.



189. As Claimant has, in paras. 1010 to 1012 BID-Answer, submitted prayers for specific performance (see Claimant's BID-Prayers quoted in para. 163 hereinabove) replacing Claimant's Amendment on Specific Performance referred to in para. 60 hereinabove and para. 62 PA, and because Respondent maintained the Jurisdictional Objections[209], the disputed jurisdiction of these prayers of specific performance must be decided in this Second Partial Award if the Arbitral Tribunal upholds Claimants BID-Prayer submitted in para. 1008 BID-Answer[210].

## V.  GENERAL COMMENTS OF THE ARBITRAL TRIBUNAL

190. In para. 83 et seq. PA, the Arbitral Tribunal noted, with regard to the First Phase, the *"Parties' lack of transparency and the witnesses' selective memory"*. This impression has not changed in the BID-Phase.

### A.  Lack of Transparency

191. In the BID-Phase the Arbitral Tribunal requested from Claimant transparency on the beneficial ownership of the W4-Group and the funding of IPOC during the Alleged Payment Period referred to in para. 66(ii), particularly on the funding related to the two major transfers received by IPOC, i.e. the Riversand Payment and the Augmentation Payment[211].

192. In this context, the Arbitral Tribunal notes that, in the BID-Phase, Claimant sufficiently explained the source of the Augmentation Payment but failed to give full transparency on the beneficial ownership and the necessary details on the sources of the Riversand Payment.

---

[209] See para. 165 hereinabove.
[210] These prayers are dealt with in Chapter VII of this Second Partial Award (see paras. 240 to 281 (in particular 279) and the conclusion in para. 706).
[211] See para. 66(ii) hereinabove.

193. Although the details of the Onward Sales were, in the Arbitral Tribunal's view, not of particular interest in the BID-Phase[212], the Arbitral Tribunal had also in the BID-Phase the impression *"that there might be some undisclosed relationships between Respondent, Alfa-Eco, Palmer, the Witnesses No. 6 and 11 and the Proposed Witness No. 7"* (para. 86 PA). Accordingly, the comment made also in para. 86 PA on the impossibility for the Arbitral Tribunal to determine the true interest at stake remains valid in the BID-Phase, in particular because of the alleged refusal of Witness No. 6 to testify again and the lack of a fully plausible explanation of his independence. The last comment applies also for Witness No. S17 and the Proposed Witness No. 4.

194. Transparency was further jeopardized by the fact that the Affected Witnesses of both Parties (in particular the Witnesses Nos. 4, 10, S9 and S14)[213] in application of their right against self-incrimination in giving evidence in civil proceedings[214], were entitled to refuse to testify on matters which could possibly be to their detriment in the German Investigation.

**B.    Credibility of Witnesses**

195. In para. 88 PA, the Arbitral Tribunal noted for the First Phase the *"often selective memory of some of the witnesses"*. The same was noticed in the BID-Phase, e.g. during the testimony of the Witnesses Nos. S14, S15, S22, S27, and S38 and must be taken into account particularly in the event that – as pleaded by Respondent – the Proposed Witness No. 7 and not Witness No. 4 should be the beneficial owner of Claimant[215]. Other witnesses, such as Witnesses Nos. S7 and S21, drew from a personal experience conclusions which go beyond the scope of the testimony of a fact witness.

---

[212]    See para. 80 at fn. 97 hereinabove and para. 285 hereinafter (on the Onward Sales see also paras. 14 and 66 hereinabove).

[213]    Although the Witnesses Nos. 10 and S14 seem not to be accused persons in the German Investigation, they are affected by this investigation as well because they are privy to information which is obviously very sensitive in this context.

[214]    See para. 114 hereinabove.

[215]    See para. 231 hereinafter.

196. The Arbitral Tribunal has taken note of the fact that some of Respondent's witnesses, i.e. the Witnesses Nos. 9, S20 and S19[216], have received for the preparation and the signing of their witness statements and their oral testimony in this arbitration and related proceedings a remuneration which exceeds the customary remuneration for such services and raises the question whether the evidence of these witnesses was, because of such remuneration, influenced in Respondent's favour. Therefore, the Arbitral Tribunal relied on the evidence of these witnesses, always with caution, except where the evidence of Witness No. S20 corresponds to the transcript of the secretly videotaped meeting with Witness No. 4 filed as R-334C[217] or testimony of other more reliable witnesses.

197. The Arbitral Tribunal, apart from the above remarks, does not further comment in this Chapter V on the individual witnesses' credibility and will do so only if and when it refers in the following Chapters to the evidence of a witness as either particularly convincing or not convincing. In other words, if the Arbitral Tribunal, in the text or a footnote of these Chapters, refers without qualifying comments to a statement of a particular witness, this means that the Arbitral Tribunal has accepted such statement and relies on it without expressing a view on the credibility of other parts of the evidence of such witness.

198. In the Partial Award, the Arbitral Tribunal referred in the context of the description of the *"suspicious circumstances"* in paras. 197 et seq. at several occasions to the Proposed Witness No. 3 and the KK-Report (RE-11) and the therein-referred report of the Accounting Chamber[218] (Enclosure 19 to RE-11) as a mere reason for its decision that the Broader Illegality Defence is not yet ripe for decision and that the *"allegations of money laundering,*

---

[216]    For Witness No. 9 see R-175, p. 79 line 18 TWH Day 4 and pp. 2321/2322 TSWH Day 10 and for Witnesses Nos. S19 and S20 see R-335 and paras. 296 et seq. of RW-9, pp. 1776 et seq. TSWH Day 9.

[217]    See para. 135 hereinabove for the dispute regarding the admissibility of this transcript.

[218]    The **"Accounting Chamber"** is the Accounting Chamber of the Russian Federation referred to in para. 194 PA. The Report of the Accounting Chamber has been filed by the Parties in two different versions: the above-mentioned version and a shortened version filed by Claimant, C-820 (in this context, see also fn. 228).

*corruption and abuse of state property require a more detailed examination
by the Arbitral Tribunal"* which cannot be done without giving the *"Parties
the opportunity to further substantiate their position"* in the BID-Phase[219]
and not - as Respondent sometimes put it - as a finding and conclusion of
the Arbitral Tribunal. The said intent of the Arbitral Tribunal results clearly
from its statement in para. 189 PA that in a case as the present one, in
which *"suspicious circumstances exist"*, an arbitral tribunal's duty is *"not to
ignore its suspicions, but to seek an explanation from the parties"*[220].

199.   The Parties will note that this Second Partial Award will refer to the KK-
Report and the therein-referred report of the Accounting Chamber only to a
limited extent. This is partly due to the fact that the KK-Report and the re-
port of the Accounting Chamber has not been accepted as expert witness
statement and because of the further evidence before the Arbitral Tribunal
which made some of the alleged findings in the KK-Report and the report of
the Accounting Chamber less relevant.

## C.    The Role of Witnesses Nos. 4 and 6

200.   In the next Chapter VI, the Arbitral Tribunal will, before dealing with the in-
dividual prayers to be decided in the BID-Phase, specifically address the al-
leged and much discussed beneficial ownership and credibility of Witness
No. 4, which credibility is - as the Arbitral Tribunal stated in consid. (viii) of
the Thirteenth Order rendered on June 13, 2005 - relevant *"even in the
event the beneficial ownership of Claimant and the Gamma Group"*[221]

---

[219]   See para. 67 hereinabove and 219 PA.
[220]   See the authors referred to in fn. 132 to 137 PA as well as Fabian von Schlabrendorff,
Geldwäsche in internationalen Schiedsverfahren, Festschrift für Peter Schlosser,
Tübingen 2005, pp. 851 et seq., in particular pp. 860 et seq. and Alexis Mourre, Arbitration
and Criminal Law: Reflections on the Duties of the Arbitrator, Arbitration International, Vol.
22 (2006), pp. 95 et seq, in particular pp. 111 and 115 et seq.; Matthias Scherer,
Beweisfragen bei Korruptionsfällen vor internationalen Schiedsgerichten, ASA Bulletin,
2001, p. 689 at fn. 22 with reference to Pierre Tercier, La corruption et le droit des
contrats, Sem Jud 1999 II, p. 270 stating that *"S'il y a quelque chose de pourri dans le
royaume de Mammon, ayons le courage d'agir: Toute autre attitude pourrait faire de nous
des victimes, quand ce ne sont pas des complices"*.
[221]   On this term, see para. 219 and fn. 247 hereinafter.

*should not be of relevance for the Arbitral Tribunal's decision on the BID-Defense".*

201.  The Parties will note that there is no chapter on Witness No. 6 corresponding to the beneficial ownership Chapter on Witness No. 4. The reasons for this are twofold: First the beneficial ownership of Witness No. 4 became of utmost *"relevance"* for the Arbitral Tribunal's decision on the BID-Defence in this Second Partial Award[222], which relevance was always an issue but pleaded in detail only at the Tenth Hearing (see p. 14 et seq. T10H Day 1)[223]. Second, the role of Witness No. 6 - although it continued to lack transparency[224] - because of the conclusion reached in para. 231 hereinafter on the beneficial ownership of Claimant and the legal reasons given in para. 473 hereinafter, became less relevant than one might have originally thought. This is also the reason why the Arbitral Tribunal did not want to hear Witness No. 6 by judicial assistance[225]. Instead, the Arbitral Tribunal adequately considers the not fully clarified role of Witness No. 6 in several parts of this Second Partial Award[226].

**D.    Alleged Threats and Security Concerns**

202.  In para. 89 PA, the Arbitral Tribunal stated with reference to para. 193 et seq. PA that it takes the security concerns expressed by some witnesses *"seriously"* and did not consider them as a *"mere tactical manoeuver"* by Respondent or the parties related to it referred to in para. 193 hereinabove.

203.  Respondent reported also in the BID-Phase, at several occasions, threats and security concerns of witnesses (e.g. of the Witnesses Nos. S7 and the

---

[222]    See paras. 367, 391/392, 399, 401, 404/405, 429, 432, 436, 456 to 458, 463, 483, 503, 506 to 510, 518 to 521 and 526 hereinafter.

[223]    To be remembered is that Respondent for a long time did not clearly demonstrate the legal relevance of the beneficial ownership, this e.g. despite item 2 of the Arbitral Tribunal's telefax dated June 6, 2005.

[224]    See para. 193 hereinabove.

[225]    See the thereto-relating telefax of the Chairman to Witness No. 6's counsel dated December 5, 2005 and his reply dated December 20, 2005.

[226]    See paras. 141(iii) hereinabove and paras. 335/336, 343, 391, 470 and 638 hereinafter.

126

Proposed Witnesses Nos. 1, 3 and 4), which according to Respondent made their participation at the Second Witness Hearing or a later hearing somewhat risky or even impossible. The Arbitral Tribunal took these reports seriously again, but noted several times that the reports on the alleged events were not supported by a sworn affidavit signed by the witness concerned or by the person whom the witness concerned informed of such event. Instead, Respondent's counsel, at several occasions, merely reported what it had heard from his Russian colleagues or from the client and, despite the Arbitral Tribunal's observation that such reports resulted only from written statements by the concerned witnesses[227], did not bring the informant of such events as a witness to the Second Witness Hearing or one of the later hearings.

204. The only person who testified on a direct report by one of the witnesses concerned was Witness No. 7 who informed at the beginning of his testimony at the Eighth Hearing of a casual conversation he had had at a conference with Proposed Witness No. 3[228]. This account by Witness No. 7 turned out to be much less dramatic than the thereto-relating report by Respondent's counsel given in its letter dated November 25, 2005.

205. The only concrete evidence of a security concern was the prevention of Proposed Witness No. 4 to leave Russia by the confiscation of his passport and boarding card at the Moscow airport on September 20, 2005, the day before he was scheduled to give testimony at the Second Witness Hearing[229].

---

[227] See the Chairman's remark at p. 69 lines 22 to 24 TSWH.

[228] See pp. 14/14 T8H Day 1 where Witness No. 7 explained that the Proposed Witness No. 3 had told him *"that he had been threatened"*, that the first report of the Accounting Chamber was *"meant to be the final draft"* and as *"a crucial piece of information was taken out, a second version was written"*, and that his feeling was that *"this whole procedure was overall about a fight over the control of the Russian telecommunication business"*.

[229] Apart from a telephone conversation between the Chairman and the Proposed Witness No. 4 organised by his London counsel held on September 26, 2005 (see the Arbitral Tribunal's telefax dated September 28, 2005), the Proposed Witness No. 4 submitted by his counsel's letter dated December 12, 2005 copies of his passport showing that the *"exit stamp"* dated September 20, 2005 had been *"cancelled"* (see the Arbitral Tribunal's telefax dated December 30, 2005 and para. 141(ii) hereinabove).

206. The above-mentioned reports on alleged threats and security concerns, combined with the unusual and regular press reports on the Zurich *Ad-Hoc* Arbitration and its background as well as the German and the Russian Criminal Complaints, were one of the reasons for the Arbitral Tribunal to establish the various confidentiality regimes summarised in paras. 116 to 127 hereinabove in order to ensure - to the extent possible - the participation of the concerned witnesses and to protect them as well as the Parties and the persons close to them from fear, harassment and undue interference by the press.

207. In making the said statement, the Arbitral Tribunal has both Parties in mind and notes that while the reports on alleged threats and security concerns came mostly from Respondent, it was Claimant who had, in the BID-Phase, to be concerned more often than Respondent of leaks to the press and partly misleading press reports, in particular on the content and the findings of the Arbitral Tribunal in the Partial Award. In this context, the Arbitral Tribunal also noticed Respondent's lack of transparency described in para. 193 hereinabove.

208. For the said reasons, the Arbitral Tribunal was concerned that

   (i)   the documents and evidence of this arbitration would be filed to courts, administrative bodies or arbitral tribunals in related proceedings without the assurance that they also respect and protect the confidentiality of these documents and evidence. This is why the protected documents and evidence could only be filed to these courts, administrative bodies and arbitral tribunals after having received specific leave to do so from the Arbitral Tribunal.

   (ii)  Claimant did not request a respective leave for its filing of certain Protected Evidence to two member of KPMG Bermuda in their capacity as Inspectors in the BMA Investigation referred to in paras. 154 and 156 hereinabove summarising also the Arbitral Tribunal's thereto relating steps.



(iii)    certain documents produced by the Parties of a rather personal or confidential nature such as the Confidential DPA-Documents of Respondent and the Confidential DFR-Documents and FCT-Documents and the IP7-Documents of Claimant and the information on the tax status of Witness No. 4 will not leak to third parties and the press[230]. This was also in the interest of the Arbitral Tribunal, as it wanted to avoid that the said documents would be commented and qualified in press articles before the Arbitral Tribunal had completed its internal deliberations and the drafting of this Second Partial Award.

209.    The alleged threats and security concerns are a further reason for the Arbitral Tribunal not to mention the names of the Witnesses, Proposed Witnesses and Involved Persons in this Second Partial Award[231].

210.    The aforementioned alleged threats and security concerns considered by the Arbitral Tribunal in the manner described in the preceding paras. 202 to 206 were, however, because of the lack of concrete evidence, not serious enough to affirm the existence of *"exceptional circumstances"* within the meaning of Art. 4(8) or 5(5) of the IBA Rules of Evidence in order to admit the (expert) witness statements filed by the concerned (expert) witnesses as such without hearing these (expert) witnesses and allowing a cross-examination by the other Party. Accordingly, the (expert) witness statement of the Proposed Witnesses Nos. 1, 3, 3A, 4, and the statement attached to the statement of Witness No. S35 were either not admitted as (expert) witness statements or withdrawn and therefore not considered at all or in certain cases only as *"documentary evidence"*[232].

211.    In view of the above-described concerns, the Arbitral Tribunal will hear the Parties in the next phase of this arbitration on the question whether and, if so, to what extent the Confidentiality Order and the Second Confidentiality

---

[230]    See the confidentiality regimes described in paras. 116 et seq. hereinabove.
[231]    See paras. 118 to 120 hereinabove.
[232]    See paras. 140, 141(ii) and 205 hereinabove.

Order and any of the other confidentiality regimes established during the Zurich *Ad-Hoc* Arbitration[233] shall survive the conclusion of this arbitration by a final award or order[234] and, if yes, for how long.

## VI.    BENEFICIAL OWNERSHIP OF CLAIMANT

### A.    In the Geneva ICC-Arbitration

212.    The beneficial ownership of Claimant was already an issue in the Geneva ICC-Arbitration. The Geneva ICC-Tribunal examined this issue in its sub-chapter on money laundering in paras. 164 et seq. of C-424. The Geneva ICC-Tribunal first in its sixth order dated March 9, 2004 denied Respondent's application to order Claimant *"to disclose its beneficial owners"* but later concluded that because of the allegations of the witness statement of Witness No. 9[235] *"it was now necessary for the Arbitral Tribunal to identify the beneficial owner of Claimant"* (para. 149 on p. 37 of C-424).

213.    In the course of the Geneva ICC-Witness Hearing[236] of May 10 to 14, 2004, Witness No. 1 testified that Witness No. 4 was the *"principal beneficial owner of Claimant"* with a small interest of Witness No. S9[237].

214.    Witness No. 4 confirmed this in the Geneva ICC-Witness Hearing and testified that he *"had ownership and control and was the 'controlling force' "* and that he is *"the owner"* of Claimant *"because the investor-companies are my companies"*[238]. The Geneva ICC-Tribunal then examined the assertions of the witness statement made by Witness No. 9 (who did not testify at the Geneva ICC-Witness Hearing) suggesting that Proposed Witness no. 7 is the *"ultimate owner"* and noted the statement of Proposed Witness No. 10 that *" 'it is equally possible that the real beneficial ownership rested else-*

---

233    See paras. 116 to 125 hereinabove.
234    See para. 719 hereinafter.
235    In the Zurich Ad-Hoc Arbitration filed as R-28 and R-29.
236    In the Geneva ICC-Award defined as *"Evidentiary Hearing"*.
237    See para. 149 on p. 37 of C-424 and p. 214 of C-359.
238    See p. 38 of C-424 and p. 307 of C-359.

*where', but that there is no evidence to this effect"* and then concluded that it accepts the evidence of Witness No. 4 that he *"owned and controlled the companies and funds in question"* and thus also Claimant and consequently rejected the evidence of Witness No. 9 *"where it is in conflict"* and added that it considered the latter's evidence as *"generally unreliable"* and referred in this context to the fact that he *"was dismissed by Claimant in October 2003 following the revelation ... that he had served a jail term following conviction on fraud charges"* (see p. 38 of C-424)[239].

215.    In conclusion, the Geneva ICC-Tribunal assumed in the Geneva ICC-Award *inter alia* that Witness No. 4 was a majority and controlling beneficial owner of Claimant

**B.      Claimant's Position in the Zurich Ad-Hoc Arbitration**

**a)      In the First Phase**

216.    In its Statement of Claim, Claimant confirmed that it *"has repeatedly stated that [the Proposed Witness No. 7] is not a legal or beneficial owner of IPOC, nor is he 'instructing' this case"* (p. 68 SC). In the Reply Claimant quoted Witness No. 4, who had testified in the Geneva ICC-Arbitration that he is the *"beneficial owner of IPOC and the companies that invest in it"*[240]. Additionally, Claimant referred to Witness No. 4 testifying that he is *"the sole beneficial owner of Riversand"*[241], and that *"Comitas and Honestas are owned by Augmentation and [Witness No. 4] is the beneficial owner of Augmentation"*[242].

217.    Respondent on the other hand stated that the Proposed Witness No. 7 *"is the beneficial owner of Claimant and its related entities"* (para. 23.1 SD)

---

[239]    E.g. Witness No. 4 denied that he had conversations with Witness No. 9 on the beneficial ownership of Claimant (pp. 403/404 of C-359).

[240]    See p. 80 Reply with references to p. 307 of C-359 and the testimony of Witness No 1 at pp. 231/232 and 263 of C-359.

[241]    See p. 76 Reply referring to p. 307 of C-359.

[242]    See p. 77 Reply referring to p. 307 to 313 of C-359.

and that Witness No. 4 *"does not own any of these companies, and certainly not the Gamma Group and Riversand"* (para. 24.1 SD).

218.   At the Witness Hearing the beneficial ownership of some of the legal entities belonging to the W4-Group was discussed with Witness No. 4 and he testified upon very specific questions that he is the owner of such legal entities[243] and when Respondent's counsel put forward the suggestion that he is not the *"beneficial owner of all"* the companies of the W4-Group which appear in his evidence, Witness No. 4 replied that he did not agree with Respondent's counsel's allegation[244]. This in line with the fact that neither Claimant nor Witness No. 4 stated in the first phase that the beneficial owner(s) of Claimant was or were (a) person(s) other than Witness No. 4. Accordingly, the Arbitral Tribunal understood Claimant's position to be that Witness No. 4 is its beneficial owner.

219.   In the Partial Award, the Arbitral Tribunal did not analyse in detail the beneficial ownership of Claimant and of what it defined in para. 185 PA as the *"Gamma Group"*, which includes the Claimant[245], and explained that *"Gamma Holding in turn was at the time a subsidiary of G.G. Emerging Markets Advisors Limited, Cyprus"* (**"GG Advisors"**)[246] and defined the group of GG Advisors as the *"Gamma Group"*[247].

---

243    See for example p. 51 and p. 205 TWH Day 2.

244    See p. 195 lines 5 to 11 TWH Day 2.

245    In para. 185 PA, the Arbitral Tribunal stated that it *"looks from a broader perspective also to the background of Gamma Holding AG, Switzerland which bought 75% of the share capital of IPOC Capital, the management company of Claimant on December 22, 2000 (C-531)for a price of USD 125'000.00 and acquired the remaining 25% on April 25, 2001 (C-531)"* (see also para. 237 on p. 79 of C-518f).

246    See paras. 231 to 234 on p. 78 of C-518 f.

247    As stated in fn. 131 PA, from the *"charts filed as Exhibit 1 to Claimant's Funding Report and C-535"*, it was at that time *"not clear to the Arbitral Tribunal, which companies composed the Gamma Group at the time of the signing of the April Option Agreement and whether GG Advisors is the ultimate holding company of Witness no. 4 or whether there is a holding company at a higher level"*. In para. 299 BID-Answer, Claimant rightly drew the Arbitral Tribunal's attention to the fact that the use of the term *"Gamma Group"* as representing the entire group of Companies of Witness No. 4 *"is misconceived"* and that the *"Gamma companies ... hold only certain of [Witness No. 4]'s assets"*. Accordingly, the Arbitral Tribunal refers in this Second Partial Award to the *"W4-Group"* (see para. 2 hereinabove), which includes the *"Gamma Group"* referred to in para. 185 PA.

220. Since the Broader Illegality Defence had not to be decided in the Partial Award, the Arbitral Tribunal did not have to make a determination on the beneficial ownership of Claimant. Instead, it stated in para. 218(ii) on p. 116 PA that the *"assertion of Claimant that Witness No. 4 is the beneficial owner of the Gamma Group cannot be blindly accepted by the Arbitral Tribunal"*[248] while it considered on the other hand that at that time there was no conclusive evidence proving Respondent's allegation that Claimant and/or the W4-Group had a principal beneficial owner other than Witness No. 4.

**b)    In the BID-Phase**

221. Rather than positively alleging in the BID-Answer and in the BID-Rejoinder that Witness No. 4 is the beneficial owner of Claimant and/or the W4-Group, Claimant took the position that the *"issue of beneficial ownership is of little or no relevance"*[249], that Respondent has the burden of proof for its allegation that Proposed Witness No. 7 is the beneficial owner of Claimant and/or the W4-Group and that the evidence presented by Respondent analysed in the Confidential FCT-Comments has *"at most an indirect and limited probative value"*[250]. Consequently, Claimant analysed in the BID-Phase Respondent's thereto relating allegations and the testimony invoked in this context and concluded that Respondent did not succeed in proving the beneficial ownership of Proposed Witness No. 7[251].

---

[248]   The Arbitral Tribunal then continued by emphasizing that there *"are a number of reasons for that cited in the Further Expert Report of Proposed Witness No. 10 dated September 9, 2004"* (see para. 4.1 also referred to in para. 195 PA) *"which needs to be considered by the Arbitral Tribunal irrespective of the question mark behind the reliability of Witness No. 9"* referred to in para. 196 hereinabove and para. 183 PA.

[249]   See e.g. para. 738 BID-Answer, admitting the relevance at least for *"allegations of corruption"* and para. 213 BID-Rejoinder as well as para. 7 of Claimant's Confidential FCT-Comments emphasizing that an *"abuse of position"* must further be established.

[250]   See para. 36 of Claimant's Confidential FCT-Reply.

[251]   See the Chapter on beneficial ownership on pp. 258 to 259 BID-Answer, particularly dealing with the beneficial ownership of IPOC in paras. 285/286 stating, *inter alia*, that Claimant challenges the suggestion that Proposed Witness No. 7 is its beneficial owner and paras. 213 to 218 BID-Rejoinder.

222.  In para. 39 on p. 17 of his witness statement filed as CW-8, Witness No. 4 confirmed with regard to Complus Holding, Luxemburg ("**Complus**"), which is another part of the W4-Group and thus not a parent company of IPOC, that he is the *"sole beneficial owner"* and denied that he is a *"front man for"* the Proposed Witness No. 7. During the oral testimony at the Second Witness hearing, the beneficial ownership was, for the reasons set out in paras. 115/116 hereinabove, not a part of the examination of Witness No. 4, except that he confirmed, despite an objection of his counsel, in answer to a question of Respondent's counsel on the list of companies in R-405 submitted by Respondent with Witness No. 10's witness statement, that he is the owner of all of those companies[252].

223.  Throughout the proceedings and particularly in the BID-Phase, Claimant has always and insistently maintained that Witness No. 4 is the sole beneficial owner of the W4-Group[253]. Most demonstratively this could be seen from the charts and descriptions of the structure of the W4-Group produced by Claimant at various times[254]. In item 5 of its comments to the charts submitted on July 8, 2005 (entitled *"Supplement to item 1"*), Claimant stated that the *"Gamma Group[255] does not represent the entire group of companies in which [Witness No. 4] has an interest"* and in item 7 that *"the Charts reflect the evolution of [Witness No. 4]'s ownership of various assets"* (see item 1 of Vol. 6 C-DFR).

224.  In the *verbatim* transcript of the videotaped conversation between Witness No. 4 and Witness No. S20 filed as R-334C, Witness No. 4 – unaware of

---

[252]  See p. 967 line 28 to p. 968 line 6 TSWH Day 5. Exhibit R-405 was also put to the Witnesses Nos. 8 and 9 but as Affected Witnesses they refused to give further evidence on the beneficial ownership of the companies listed thereon (see p. 1367 line 2 TSWH Day 5 and p. 852 lines 26/27 TSWH Day 5). Witness No. 8 states however in para. 7 of RW-11 that those companies "*are part of the Group*" of which Commerzbank "*is not the real ultimate owner*" and that the owners include Proposed Witness No. 7 and Involved Person No. 2.

[253]  See the many references to the W4 Group in the BID-Answer, e.g. in paras. 279, 299, 353 (relating to Telecom XXI), 366, 368, 390, 426, 842(e) on p. 294 and para. 926 BID-Answer.

[254]  See C-527, C-528, C-535, the charts produced on June 23, 2005 and July 8, 2005 and in response to the Thirteenth Order.

[255]  For this term see para. 219 and fn. 247 hereinabove.

the conversation being recorded – admits, however, at least with regard to a part of the W4-Group that Proposed Witness No. 7 is the decision-maker and beneficial owner[256].

## C.    The Affidavit of Involved Person No. 7 and the IP7-Documents

225.   Involved Person No. 7 signed on January 13, 2006, i.e. shortly before the Tenth Hearing scheduled for the closing arguments of the BID-Phase, an affidavit which was at that time filed in the BVI-Proceedings to the Privy Counsel (C-991)[257]. In para. 10 of this affidavit Involved Person No. 7 states that Claimant's board of directors *"concluded that it will not maintain that [Witness No. 4] is the sole beneficial owner of IPOC and the wider Group and that it should henceforth leave it to its opponents in the litigation to satisfy the relevant court or tribunal of the relevance of this issue and their burden of proving the identity of the true owner or owners"*. The basis for this statement was, according to paras. 5 to 7 of this affidavit, the dis- covery of three documents, which *"have not been exhibited to this affida- vit"*, partly *"out of a concern that they will be misused outside"* of the litiga- tion proceeding before the Privy Counsel and partly because of an alleged issue of privilege and confidentiality protection under Liechtenstein law. These three documents are the *"IP7-Documents"* defined in para. 97 here- inabove.

226.   As discussed in para. 98 hereinabove, the IP7-Documents were ordered to be produced and were later produced by Claimant's letter dated January 24, 2006 in compliance with item 1 of the Arbitral Tribunal's telefax of the

---

[256]   See e.g. boxes 84 to 86 of R-334C with regard to Witness No. 6's request to get more money after he had signed the December Option Agreement, and boxes 228/29 and 411 of R-334C with regard to FNH and consequently its subsidiary TCI.

[257]   This affidavit has been accepted by the Arbitral Tribunal's telefax dated January 16, 2006 as *"an affidavit presented in another proceeding and not in the Zurich Ad-Hoc Arbitration"* and thus is *"not considered as a written witness statement, but as ordinary documentary evidence"*. This acceptance occurred - despite the Seventeenth Order dated December 27, 2005 declaring the proceedings in the BID-Phase closed - on the ground that both Parties submitted this affidavit in their e-mail correspondence with the Arbitral Tribunal of January 13, 2006. Accordingly, the Chairman already stated in his e-mail of the said date sent at 19:50h that in view of this joint agreement, the affidavit of Involved Person No. 7 is accepted.

135



same date and included in the file as C-993, C-994 and C-995 and de-
clared confidential.

227.    The first IP7-Document (C-993) is a letter dated June 11, 2002 to Proposed
Witness No. 34[258]. This letter clearly states that the *"ultimate beneficial
owner"* of Claimant is Proposed Witness No. 7, who has been *"represented
for more than ten years"* by Witness No. 4. Considering the evident value of
the letter, the Arbitral Tribunal took into account *inter alia* the identity of the
signatory of the letter and accepted it as reliable evidence. Therefore, the
Arbitral Tribunal concludes that Proposed Witness No. 7 was the beneficial
owner of IPOC not only on June 11, 2002 but already on April 10, 2001
when the April Option Agreement was signed.

228.    The second IP7-Document (C-994) is a bank form in the nature of the so-
called *"Form A"* of a bank in Liechtenstein, stating that Proposed Witness
No. 7 is the beneficial owner of an establishment in Liechtenstein, while the
third IP7-Document is a file note, i.e. an *"Aktennotiz"* in German (C-995a)
with an English translation thereof (C-995b) in which it is stated that Wit-
ness No. 4 and Proposed Witness No. 35 declared to Proposed Witness
No. 34 that three legal entities in Liechtenstein are beneficially owned by
Proposed Witness No.7. Neither C-994[259] nor C-995 make any reference to
Claimant.

229.    Claimant has commented on the affidavit of the Involved Person No. 7 by
submitting in item 1 of its telefax dated January 24, 2006, that the state-
ment quoted in para. 225 hereinabove *"is not an admission"* that Proposed
Witness No. 7, Involved Person No. 2 or *"any other party is a beneficial
owner of IPOC"* and repeating in item 4 of the said telefax that IPOC's
beneficial ownership *"is of limited relevance"* as the Arbitral Tribunal *"must
rely on the entirety of the evidence before it"*.

---

[258]    For his denial to testify see para. 143 hereinabove.
[259]    The back of this document has not been filed and is not in possession of Claimant's
counsel (see the Chairman's confirmation of a respective telephone conversation in his
letter dated January 25, 2005). Accordingly, C-994 bears no signature since the signature,
if any, would be on the back of this document.

230.  Moreover, at the Tenth Hearing, Claimant indirectly referred to an article in the Wall Street Journal of January 19, 2006 (R-460), which states that the Proposed Witness No. 7 is, in spite of the affidavit of Involved Person No. 7, insisting that he has *"no relation to IPOC"* and that Witness No. 4 is of the view that the statements in the IP7-Documents were made *"by his staff in error"*[260]. In view of the signatory of the letter referred to in para. 227 hereinabove (C-993) these statements have no credibility.

**D.     Conclusions**

231.  In view of the clear statement in C-993 referred to in para. 227 herein-above, the Arbitral Tribunal concludes that the Proposed Witness No. 7 was in June 2002 and in April 2001 the sole beneficial owner of IPOC. Accordingly, the BID-Defence has to be analysed by the Arbitral Tribunal based on the clearly established fact that during the Pre-Signing Events, the Alleged Payment Period and, therefore, also, at the time of the signing of the Option Agreements, Proposed Witness No. 7 was the sole beneficial owner of the Claimant. In the context of this analysis, the Arbitral Tribunal will, as suggested by Claimant in item 4 of its submission dated January 24, 2006[261], not only rely on this fact but on all relevant evidence before it and examine the question whether *"an abuse of position"*[262] or other violation of law affecting the validity or enforceability of the April Option Agreement has occurred.

232.  As a result of the conclusion made in para. 231 hereinabove, the repeated testimony and allegation of Witness No. 4 that he is the beneficial owner of IPOC are proven to be clearly incorrect. The testimony to the contrary of

---

[260]   See Claimant's counsel's statement on p. 466 lines 1 to 6 T10H Day 2 stating that Witness No. 4 *"continues to maintain his beneficial ownership"*. This article in the Wall Street Journal has also been commented by Claimant on p. 11 T10H Day 2. See also a similar statement in the last column to the right of the article published on p. 13 of the Financial Times of April 24, 2006.

[261]   See also the reference to this letter in para. 226 and 229 hereinabove.

[262]   See Respondent's counsel's statement on p. 278 lines 20 to 23, T7H Day 2 quoted in para. 7 of Claimant's Confidential FCT-Reply.

Witness No. 9, not accepted by the Geneva ICC-Tribunal[263], despite its limited credibility[264], turned out to be accurate. By the said testimony, and by allowing Claimant to file the charts referred to in para. 223 hereinabove, Witness No. 4 intentionally misled the Arbitral Tribunal.

233. In paras. 4, 9, 18 et seq. and 38 of Claimant's Confidential FCT-Reply, Claimant suggested that the Affected Witnesses, in particular Witness No. 4, must be recalled in the context of the disputed beneficial ownership of the companies discussed by Respondent in its Confidential FCT-Comments. In view of the clear admission in C-993 referred to in para. 251 hereinabove that Proposed Witness No. 7 and not Witness No. 4 is the *"ultimate beneficial owner"* of Claimant, there is at least for the beneficial ownership of IPOC no need to hear any of the Affected Witnesses, including Witness No. 4.

234. The fact that Witness No. 4 gave to the Geneva ICC-Tribunal and to this Tribunal a clearly wrong account of his alleged beneficial ownership of Claimant is of significance not only for this issue, but also because it reduces the credibility and reliability of his evidence unless confirmed by documentary evidence, credible witness statements or reliable oral testimony of other witnesses. In areas where this is not the case, the Arbitral Tribunal must approach the evidence of Witness No. 4 with extreme caution.

235. The finding of the Arbitral Tribunal that Proposed Witness No. 7 was at the relevant time the sole beneficial owner of IPOC does not necessarily apply for all the legal entities forming part of the W4-Group. With regard to these legal entities it cannot be excluded that there were co-owners or that the W4-Group held one such legal entity in a fiduciary capacity for a third party. Accordingly, the Arbitral Tribunal must analyse the beneficial ownership for

---

[263]    See para. 214 hereinabove.
[264]    See the reference to the Geneva ICC-Award in para. 214 hereinabove and the Arbitral Tribunal's own analysis of the credibility of Witness No. 9 in paras. 88 and 183 PA.

other legal entities of the W4-Group separately, if this issue should become of relevance[265].

236.   In this context the Arbitral Tribunal notes that some of Claimant's Witnesses, such as Witnesses Nos. S14, S16, S21, S25, S26 and S27 have worked together with the Proposed Witness No. 7 or are his subordinates or executives of companies beneficially owned by Proposed Witness No. 7[266]. This raises the question to what extent such relations influenced the credibility and the sometimes surprisingly selective memory of these witnesses.

**E.     Further Evidence**

237.   In view of the finding in para. 231 et seq. hereinabove, there is no need for the Arbitral Tribunal to examine the further evidence submitted by Respondent in the context of the beneficial ownership of Claimant and the W4-Group and to determine whether this evidence relates to the beneficial ownership of the entire W4-Group, of IPOC or any of the other legal entities forming at various times the W4-Group[267]. For the said reasons, the Arbitral Tribunal does not have to determine whether this further evidence, without considering C-994, allows it to conclude that IPOC is beneficially owned by Proposed Witness No. 7.

238.   Nevertheless, the Arbitral Tribunal wishes to summarise hereinafter some of this additional evidence which would have to be considered in an analy-

---

[265]   With regard to Comitas, Telecom XXI and TCI see paras. 503 and 508 hereinafter. For Complus, one of the key elements of the W4-Group, see, however, boxes 177-182 of R-334C, where Witness No. 4 admits that there was no involvement of other persons, except Proposed Witness No. 7, in Complus and compare with statements made by Witness No. 4 in these proceedings to the Arbitral Tribunal as described in para. 222 hereinabove.

[266]   See fn. 265 hereinabove.

[267]   The W4-Group was developing throughout the years and therefore did not at all relevant times consist of the same legal entities. The various stages of the W4-Group have been explained by Claimant in the BID-Answer and, more specifically, in the charts filed pursuant to item 1 of the Thirteenth Order included in item 1 of Vol. 6 C-DFR, which charts have not been contested by Respondent except by Respondent's limited comments in para. 105 to 112 of its confidential FCT-Comments and Respondent's position as to the beneficial ownership of W4-Group. See also fn. 99, fn. 247 and fn. 254 hereinabove.

sis of the evidence submitted by Respondent in support of its argument that Proposed Witness No. 7 is the beneficial owner of IPOC and/or the W4-Group:

(i)  Boxes 86 and 90 of the *verbatim* transcript of the videotaped conversation between Witness No. 4 and Witness No. S20 (R-334C) seem to indicate an interest of Proposed Witness No. 7 in the April Option Agreement and therefore also in Claimant and boxes 80 to 84, 242/243, 269, 287, 347, 376 to 378 and 407 to 414 of R-334C in the outcome of the Zurich *Ad-Hoc* Arbitration.

(ii)  The letters of Witness No. 4 dated August 7, 1998 and Proposed Witness No. 35 dated July 16, 2004 stating that Proposed Witness No. 7 is *"a beneficiary"* or one of the *"beneficiaries"* of FCT (see p. 153 in Tab 3 and p. 186 in Tab 4 of C-DFR Vol. 6) despite the fact that the second letter alleges that FCT *"is dormant"*.

(iii)  The side-letter to the trust agreement with Commerzbank dated July 31, 1996 co-signed by Proposed Witness No. 7 regarding Danco Finans A/S, Complus and FNH (pp. 181/182 in Tab. 4 of C-DFR Vol. 6).

(iv)  The letter of wishes (C-773) regarding Protec Trust Management Establishment, Vaduz, indicating Proposed Witness No. 7 as a beneficiary of this trust.

(v)  The (expert) witness statements RW-2, RW-6, RW-8, RW-9, RW-25, RE-29, CE-2 and oral testimonies of those of these witnesses who testified in these proceedings, including the credibility of their evidence.

239.  The above summary of the further evidence submitted by Respondent on the beneficial ownership of IPOC and/or the W4-Group does not consider



all of the evidence submitted by Respondent nor inconsistencies in certain testimonies[268] and does not analyse the arguments of Claimant in response thereto[269]. This summary may therefore not be interpreted by the Parties as a finding of the Arbitral Tribunal.

## VII.   VALID EXERCISE OF THE APRIL OPTION

### A.   Introduction

240.  In para. 1008 BID-Answer, Claimant sought a *"declaration that IPOC has validly exercised its option (...) under its 10 April 2001 Option Agreement with LV Finance"*. This prayer for relief relates to Claimant's second purported *"Option Notice"* served on Respondent on April 22, 2005 (C-749) (the **"Second Purported Option Notice"**)[270] in line with the Arbitral Tribunal's statement in para. 155 PA that a fresh Option Notice might be issued. Moreover, on February 8, 2006, Respondent filed a third purported option notice dated February 7, 2006 (R-463) (the **"Third Purported Option Notice"**) served by Claimant on Respondent by Claimant's letter of same date (R-462).

241.  In support of its request, Claimant stated that the Second Purported Option Notice, *"which is substantially in the form of the notice set out in Schedule 2, AOA"*[271], has been *"served in accordance with the directions for service of notices in the AOA"*, that *"receipt of the Notice has been acknowledged by LV Finance in the BVI"* and that the Second Purported Option Notice *"has also been copied to Respondent's and Alfa's respective Swiss, London and BVI counsel for their information"* (para. 997 BID-Answer). Concluding that the April Option has been validly exercised, Claimant requests the Arbitral Tribunal to *"seize itself of the task of deciding upon a mecha-*

---

[268]  E.g. why Witness No. S27 was backdating R-109 relating to GG Advisors referred to in para. 220 hereinabove (see pp. 2170 et seq. and pp. 2238 et seq. TSWH Day 10).

[269]  Some of these arguments are referred to in para. 221 hereinabove and others are, *inter alia*, contained in Claimant's FCT-Comments.

[270]  Also referred to in the procedural correspondence as Claimant's *"Fresh Option Notice"*.

[271]  See para. 998 BID-Answer.

*nism to give effect to the plain intention of the AOA"*, i.e. to fill the contractual gap in the April Option Agreement resulting from the Escrow Agent's ceasing to act[272] (para. 999 BID-Answer)[273].

242.   According to Respondent, a decision on the validity of the Second Purported Option Notice *"first require[s] a determination that the AOA is valid, binding, legal and enforceable"* (see para. 338 BID-Reply)[274,275]. As to substance, Respondent argued that Claimant's Second Purported Option Notice is invalid (see paras. 341 to 346 BID-Reply) and that the Purported Option Notice referred to in para. 143 PA and para. 65(v) hereinabove constitutes a so-called *"Crystallisation Notice"* so that Claimant has forfeited its right to issue a fresh Option Notice (the **"Crystallisation Argument"**). As to the *"reasonable and realistic mechanism"* requested by Claimant, Respondent submitted that *"[s]ince the Option Period has expired on August 29, 2003, and at any rate no valid Fresh Option Notice has been issued, a discussion of the 'reasonable and realistic mechanism' to ensure the exercise of the Option is moot"*[276].

243.   Notwithstanding Respondent's correct argument that a decision on the validity of the Second Purported Option Notice first requires a determination that the April Option Agreement is valid, the Arbitral Tribunal will hereinafter examine, as per the *"modified approach"* described in the Twentieth Or-

---

[272]   See in this regard item 8 on p. 6 SMFiH.
[273]   See also paras. 1000 and 1005 BID-Answer, requesting the Arbitral Tribunal to determine *"a reasonable and realistic mechanism"* which will *"carry the parties' contractual intention into effect"*.
[274]   See also para. 339 BID-Reply, where Respondent states that *"[c]ommon sense requires that first the Tribunal needs to decide whether there is a valid agreement"* as a matter of *"procedural efficiency"*, wherefore this issue cannot be *"dealt with in this phase of the arbitration"*.
[275]   In response to this argument, Claimant states that *"there is no reason why the validity of the Fresh Option Notice cannot be ruled upon now"* and that *"in the Partial Award the Arbitral Tribunal has already ruled on the subject of validity of Option Notices served under the AOA at an early stage of the proceeding"* (apra. 122 BID-Rejoinder) and, moreover, that *"determining the validity of the Fresh Option Notice now is procedurally efficient and legitimately required by Claimant so that it is not prejudiced and its rights are preserved"* (para. 126 BID-Rejoinder)
[276]   See para. 353 BID-Reply.

der[277], the validity of Claimant's Second Purported Option Notice irrespective of its decision on the validity and binding nature of the April Option Agreement. One of the reasons for this modified approach, in addition to the *"Arbitral Tribunal's duty to establish legal certainty"* (*"Rechtsfrieden"*)[278], is that the validity of the Second Purported Option Notice constitutes a different matter from the valid exercise of the April Option[279].

244. Since Claimant has also issued the Third Purported Option Notice[280] before the issuance of this award, the Arbitral Tribunal will also examine the timeliness and formal validity thereof (although Claimant's respective prayer for relief relates only to the Second Purported Option Notice)[281].

245. However, before deciding on the validity of the Second Purported Option Notice, or possibly the validity of the Third Purported Option Notice, the Arbitral Tribunal must address Respondent's Crystallisation Argument, as this affects the question whether Claimant was even entitled in the first place to issue a fresh Option Notice after it issued the Purported Option Notice.

### B.    Respondent's Crystallisation Argument

### a)    Respondent's Position

246. Respondent's Crystallisation Argument can be summarised as follows:

(i)    Claimant's Purported Option Notice of August 12, 2003 (C-189) was for the purchase of more than 50% of the shares of TMI issued and, as such, constituted a *"Crystallisation Notice"* (para. 347 BID-Reply).

---

[277]    See consids. (vii)(b) and (ix) and item 1 of the Twentieth Order. See also para. 279 hereinafter.

[278]    See consids. (vii)(b) and (xi)(c) of the Twentieth Order.

[279]    See p. 2 of the Arbitral Tribunal's telefax dated January 27, 2006 (see also paras. 268 and 281 hereinafter).

[280]    See para. 240 hereinabove and paras. 270 et seq. hereinafter.

[281]    In this context see also para. 271 hereinafter on Respondent's contrary position submitted in its telefax dated April 12, 2006.

     (ii)     A Crystallisation Notice is a *"Final Option Notice"* within the meaning of the definition in Clause 1.1 AOA (para. 348 BID-Reply), wherefore the *"Proposed Exercise Date"* specified therein constitutes a *"Structure Crystallisation Date"* (paras. 349/350 BID-Reply).

     (iii)    *"The Proposed Exercise Date August 29, 2003, specified in IPOC's [Purported] Option Notice of August 12, 2003 ... therefore marks the expiration of the Option Period"* (para. 351 BID-Reply), from where it follows that *"IPOC's right to exercise the option has expired on August 29, 2003"* (para. 352 BID-Reply).

247.    On the question whether the provisions of the April Option Agreement dealing with *"Structure Crystallisation"* have become obsolete as a result of the entering into the December Option Agreement, Respondent argues that[282]:

     (i)     Claimant did not pay the USD 16 million under the Promissory Note referred to in the December Option Agreement, which payment was to be made *"on or after maturity and before the Default Date"* (para. 1.26 RJ).

     (ii)    There has therefore been *"a default under the Promissory Note"* within the meaning of Clause 7.1.1 DOA (para. 1.26 RJ).

     (iii)   As a consequence, *"the structure crystallisation provisions of the April Option Agreement remain in full force and effect"* (para. 1.27 RJ).

**b)**    **Claimant's Position**

248.    Claimant rebutted Respondent's position with the following arguments:

     (i)     In the Partial Award, the Arbitral Tribunal *"has already ordered that while the [Purported Option Notice] was non-conforming and ineffec-*

---

[282]    See generally paras. 1.21 to 1.28 Rejoinder.

*tive, this was without prejudice to Claimant's right to serve a further Option Notice ... because the [April] Option Period has not expired"* (para. 106 BID-Rejoinder).

(ii) As previously pleaded by Respondent and decided by the Arbitral Tribunal, the Purported Option Notice *"is not an option notice under the AOA"* (para. 109 BID-Rejoinder) and therefore cannot constitute a *"Crystallisation Notice"* within the meaning of the April Option Agreement (para. 113 BID-Rejoinder, summarizing the arguments developed in paras. 110-112 BID-Rejoinder).

(iii) The *"Structure Crystallisation"* provisions in Clause 4 AOA have been rendered *"inoperative"* as a result of the amendment of the April Option Agreement by the December Option Agreement (Clause 7.1.1 DOA), *"in turn rendering the concept of a Crystallisation Notice redundant"* (para. 115 BID-Rejoinder)[283], which *"conclusion comports with the obvious rationale for striking the Structure Crystallisation section from the AOA"* (para. 116 BID-Rejoinder).

(iv) The promissory note under Clause 2.2.2 DOA was offered to be paid, so that there was no default under the said promissory note (p. 367 lines 12/13 T10H) or, if there was any, such default is not attributable to Claimant as the account on which the Option Price under the December Option Agreement was to be paid was closed by Respondent's counsel *"so that the money could not go in"* (p. 367 lines 13-15 T10H).

(v) The Geneva ICC-Tribunal held that Claimant had made due payment under the December Option Agreement, that Respondent's contentions to the contrary *"must be rejected"* and that *"Respondent is in complete bad faith in asserting this defense"* (p. 368 lines 12-22

---

[283] See also Claimant's statement that the provisions relating to Structure Crystallisation *"were overtaken by the subsequent execution of the December Option Agreement"* (last two lines on p. 37 RY).

T10H, referring to para. 22 of the Geneva ICC-Award), so that the question of Claimant's due payment/default under the December Option Agreement is *res iudicata* (p. 368 lines 23/24 T10H) and *"it continues … to be bad faith to maintain"* this point in the Zurich *Ad-Hoc* Arbitration (p. 368 lines 27/28 T10H).

**c)    The Arbitral Tribunal's Analysis**

249.    According to the definitions in Clause 1.1 AOA:

> ***"Crystallisation Notice"*** means *"an Option Notice which, when implemented, would result in the transfer by LV Finance of such number of Shares as, when added to the number of Shares transferred pursuant to any prior exercise of the Option, equals 50% or more of the Shares issued and outstanding at the date on which such Option Notice is issued";*

> ***"Final Option Notice"*** means *"either a Crystallisation Notice or an Option Notice delivered following the delivery of an IPO Notice";*

> *"Option Period"*, i.e. the April Option Period[284], means *"the period commencing on the date hereof and expiring on the earlier of (a) the [April] Option Termination Date[285] and (b) the Structure Crystallisation Date"; and*

> ***"Structure Crystallisation Date"*** means *"(a) where a Final Option Notice is delivered, the Proposed Exercise Date specified therein".*

The aforementioned *"Proposed Exercise Date"* is, pursuant to Art. 3.2.3 AOA, the *"proposed date of exercise of the"* April Option and defined as the **"Proposed Exercise Date"**.

250.    Based on the above, if the Purported Option Notice is to be deemed a Crystallisation Notice, i.e. a Final Option Notice under the April Option

---

[284]    See the definition in para. 9 hereinabove.
[285]    See the definition of the term *"April Option Termination Date"* in para. 9 hereinabove.