Agreement, the Proposed Exercise Date specified in the Purported Option Notice (August 29, 2003) would constitute a Structure Crystallisation Date and thereby mark the expiration of the April Option Period. The Arbitral Tribunal must therefore examine whether such is the case.

251.  According to the above-quoted definition, a Crystallisation Notice must be

  (i)  an Option Notice, i.e. according to the definition in Clause 1.1 AOA, *"a written notice substantially in the form set out in Schedule 2 from IPOC to LV Finance exercising the Option in whole or in part pursuant to Clause 3"*,

  (ii)  for the purchase of 50% or more of the shares of TMI.

252.  While the second of these conditions is clearly met in the present case[286], it results from the Arbitral Tribunal's findings in the Partial Award that the first is not. In this regard, the Arbitral Tribunal recalls its conclusion in para. 151 PA that *"by the Purported Option Notice, Claimant has not given a valid option notice under the April Option Agreement"*. Indeed, as determined in para. 149 PA, the Purported Option Notice does not comply with the specification requirement of Clause 3.2.2 AOA. It follows that the Purported Option Notice, which is formally invalid, cannot have any effect[287]. In other words, the Purported Option Notice does not constitute an Option Notice under the April Option Agreement, and - as it is without any effect - can neither be a Crystallisation Notice nor a Final Option Notice within the meaning of the April Option Agreement[288]. As a result, the Proposed Exercise

---

[286]  Claimant's Purported Option Notice was intented for *"all Option Shares as defined in the Agreement"* (see p. 1512 of C-189).

[287]  As it is the case in civil law countries which qualify the right to exercise an option as a *"droit de formateur"*, the reason why under English law an option notice must be valid as to form is that the recipient must understand very clearly that the sender is exercising a right to alter the legal position between the parties. If this is not the case, no right is exercised and the notice is without any effect.

[288]  This is in spite of Claimant's statement on p. 1512 of C-189 that *"[t]his Option Notice is a Final Option Notice"*.

Date specified in the Purported Option Notice cannot have been a Structure Crystallisation Date, putting an end to the April Option Period.

253. Since the first requirement for triggering a *"Structure Crystallisation"* as described in Clause 4 AOA is missing, the Arbitral Tribunal does not need to decide on the applicability of Clause 4 AOA[289] or the alleged default of Claimant under the December Option Agreement[290], or the preliminary question whether the question of Claimant's default under the December Option Agreement is *res iudicata*[291].

254. Since the April Option Period had not expired as a result of Claimant's Purported Option Notice, the Arbitral Tribunal was correct in reserving in para. 155 PA the possibility that *"Claimant issues a fresh Option Notice and brings its validity before this Arbitral Tribunal"*.

C.    Formal Validity of the Second Purported Option Notice

a)    The Context of the Second Purported Option Notice and the Correspondence Referred to Therein

255. The Second Purported Option Notice filed as p. 3 of C-749 purports to exercise the April Option for all April Option Shares and states as *"Applicable Purchase Price: $18,000,000"*, i.e. the Total Purchase Price[292], and names *"17 June 2005"* as the Proposed Exercise Date. After these data required by Schedule 2, the Purported Second Option Notice goes on to state the following:

> *"So far as payment of the Applicable Purchase Price is concerned, we refer you to an exchange of letters between our re-*

---

[289]  See Claimant's argument in para. 248(iii) hereinabove.
[290]  See the Parties' arguments in paras. 247(i) and (ii) and 248(iv) and (v) hereinabove.
[291]  See Claimant's arguments in para. 248(v) hereinabove.
[292]  The *"Applicable Purchase Price"* pursuant to Clause 1.1 AOA is the price Claimant has to pay for the number of April Option Shares for which the April Option is exercised and corresponds, if the April Option is exercised for all April Option Shares, to the Total Purchase Price.

> *spective Swiss law firms and between our Swiss lawyers and the*
> *arbitral tribunal, copies of which are included in the clip of corre-*
> *spondence attached."*

256.  The *"clip of correspondence"* attached to the Second Purported Option No-
tice is also included in C-749 and consists of three letters of Claimant to
Respondent and the Arbitral Tribunal, respectively, and two letters from
Respondent to Claimant exchanged between January 7 and February 10,
2005[293].

257.  The second page of Claimant's letter to Respondent dated January 6, 2005
(p. 6 of C-749) contained the following phrase (the **"Without Prejudice
Phrase"**):

> *"When IPOC serves this notice, it will be without prejudice to all its*
> *accrued rights, which (in case these proceedings go further on*
> *these issues or these issues arise in other proceedings) are*
> *strictly reserved, and, in particular, **without prejudice to its con-***
> ***tentions that the $18 million 'purchase price' is not payable***
> *(and that a valid option notice has already been given)"* (emphasis
> added).

258.  The question therefore arises whether the reference to the Without Preju-
dice Phrase in the Second Purported Option Notice affects the validity of
the latter.

**b)     Respondent's Position**

259.  Referring to the text of the Second Purported Option Notice, as well as to
the correspondence attached thereto (C-749), Respondent submitted the
following arguments:

---

[293]    Claimant's letter to Respondent dated January 6, 2006 with a fax coversheet dated
January 7, 2005, Claimant's letter to the Arbitral Tribunal dated January 18, 2005,
Respondent's letter to Claimant of same date (also filed as C-615) Respondent's letter to
Claimant dated February 2, 2005 and Claimant's letter to Respondent dated February 10,
2005.

(i)     The indication of the Total Purchase Price was made with reserva-
tions (see paras. 341 to 343 BID-Reply), i.e. Claimant *"still contests
its obligation to pay the Applicable Purchase Price"* so that Claimant
*"has not served a valid option notice"* (para. 345 BID-Reply).

(ii)    By referring in the Second Purported Option Notice to an exchange
of correspondence in regard of the Applicable Purchase Price and
suggesting payment on the second business day prior to *"Comple-
tion"* (see pp. 293 to 295 T10H), Claimant *"declare[s] a variation"*
and *"incorporate[s] uncertainty"* (p. 295 lines 19 to 22 T10H).

(iii)   The Without Prejudice Phrase at the top of page 6 of C-749 and the
proposed waiver or variation of Clause 5.3 in Schedule 2 AOA on
pp. 8/9 of C-749 (deferral of the deposit of the applicable purchase
price *"until on or before the second business day prior to actual
completion of the sale of the option shares"* and immediate service
of a valid fresh Option Notice *"without specifying the bank account
into which the payment has to be made"*) (pp. 295 to 297 T10H),
mean that Claimant again is offering payment *"as waived or varied"*.
Therefore, the Second Purported Option is a non-conforming Option
Notice (p. 298 lines 3 to 8 T10H).

(iv)    With regard to the Without Prejudice Phrase, *"the reader of that res-
ervation ... would not see the nuance and limitation and qualification
postulated by"* Claimant (p. 453 lines 16 to 18 T10H) and Claimant's
respective reservation in the correspondence relating to the last
paragraph of the Second Purported Option Notice goes beyond the
scope as construed by Claimant in its pleadings and is in fact *"some
kind of conditional tender or conditional offer"* (p. 453 lines 21 to 26
T10H). Moreover, being a conditional offer, it does not matter
*"whether it is a condition precedent or a condition subsequent"* (p.
454 lines 11/12 T10H; see also p. 456 lines 18 to 20 T10H).

    (v)    Finally, because of Claimant's inability to provide clean funds, the notice is not capable of performance and thereby is non-conforming (p. 298 lines 9 to 19 T10H)[294].

### c)    Claimant's Position

260.  Claimant rejected Respondent's arguments on the following grounds:

    (i)    The Second Purported Option Notice *"is substantially in the form of the notice set out in Schedule 2, AOA"* and therefore *"is valid"* (para. 998 BID-Answer).

    (ii)    *"Under the definition of an option notice, to be a valid notice, the notice only need be in substantially the form of that contained in the Annex to the April Option Agreement"* (p. 377 line 28 to p. 378 line 3 T10H). In this regard, the Second Purported Option Notice *"indicate[s] a clear intention to wish to exercise the notice"* as well as *"an intention to pay"* (p. 378 lines 16 to 20 T10H), thereby communicating the *"essential information required for such notice"*[295].

    (iii)    The Without Prejudice Phrase is a mere reservation of rights in the event the payment of the Total Purchase Price and the validity of the Purported Option Notice arise in the context of an appeal in these proceedings or in the context of other proceedings against third parties[296] and the reservation contained therein *"does not make the offer of payment contained in the notice in any sense conditional"*[297]. In particular, *"a reservation of rights imposes no condition precedent to the handing over of that money"* (p. 375 lines 9/10 T10H). Moreover, *"[i]f the reservation of rights, when analyzed, amounts to the*

---

[294]  See also para. 346 BID-Reply, where Respondent states that *"no valid offer exists if LVFG is not satisfied that the offered money stems from illegitimate source"*.

[295]  See p. 378 lines 14/15 T10H; see also p. 380 lines 19 to 23 T10H.

[296]  See p. 371 lines 6 to 13 T10H Day 2.

[297]  See p. 371 lines 25 to 28 T10H and p. 373 lines 3 to 7 and p. 374 lines 1 to 7 T10H.

*imposition of a condition subsequent, then that is irrelevant and does not matter"* (p. 376 lines 16 to 18 T10H).

(iv)    The Arbitral Tribunal shall, in considering the intrinsic validity of the Second Purported Option Notice, consider that the *"predicament"* in which Claimant finds itself *"is entirely due to the breach of LVFG"* and its *"refusal to cooperate ... in bad faith, making life as difficult as possible for IPOC to comply with the terms of the April Option Agreement"* (p. 381 lines 5 to 13 T10H).

(v)    Respondent's argument that a valid offer cannot be made because Claimant is suspected of money laundering is incorrect as *"[t]he question of whether or not this is a valid notice and contains a valid offer is an entirely separate question as to what the source of the funds will be in order to comply with the offer"* (p. 382 lines 7 to 19 T10H)[298].

**d)    The Arbitral Tribunal's Analysis**

261.    The Arbitral Tribunal recalls its conclusion in para. 140 PA that *"the Total Purchase Price of USD 18 million is payable under the April Option Agreement"* and in para. 149 PA that the *"specification requirement"* of Clause 3.2.2 AOA means that *"an Option Notice must state the Applicable Purchase Price in an unequivocal manner so that it constitutes an unconditional offer to pay the Applicable Purchase Price"* and that the stating of the amount of USD 18 million followed by the words *"as waived and/or varied"* in the Purported Option Notice *"makes the offer to pay the Total Purchase Price conditional"* and that these words therefore *"do not comply with the specification requirement of Clause 3.2.2 AOA"*.

---

[298]    See also p. 382 line 23 to p. 383 line 4 T10H, where Claimant states that even if the Arbitral Tribunal found in its award that in the past or up to this present time, IPOC has been engaged in money laundering, it cannot be assumed that at the time of payment the source of the moneys to make that payment will represent laundered funds and that *"even if there were such a finding, a clean source of funds could still be found"* (p. 383 lines 2 to 4 T10H).

262. The Arbitral Tribunal must therefore examine whether, in view of the Without Prejudice Phrase, the Second Purported Option Notice includes an unequivocal and unconditional offer to pay the Total Purchase Price[299].

263. While the Second Purported Option Notice (p. 3 of C-749) itself correctly states after the words *"Applicable Purchase Price"* merely the amount *"$18,000,000"* corresponding to the Total Purchase Price, it refers, so *"far as payment of the Applicable Purchase Price is concerned"*, to *"an exchange of letters"* between Claimant and Respondent, *"copies of which are included in the clip of correspondence attached"* (see the quote in para. 255 hereinabove)[300] and thus, *inter alia*, to the Without Prejudice Phrase quoted in para. 257 hereinabove.

264. The Arbitral Tribunal agrees with Claimant's assertion that the first part of the Without Prejudice Phrase, to the effect that the Second Purported Option Notice is served *"without prejudice to all [Claimant's] accrued rights, which (in case these proceedings go further on these issues or these issues arrive in other proceedings) are strictly reserved"*, may be interpreted as a mere reservation of rights in the context of such further proceedings. However, the second part of the Without Prejudice Phrase, to the effect that the Second Purported Option Notice is served *"without prejudice to [Claimant's] contentions that the $18 million 'purchase price' is not payable ..."*, indicates that Claimant contests its obligation to pay the Total Purchase Price. This is in direct contradiction with the specification requirement of Clause 3.2.2 AOA, as construed in para. 149 PA, namely that *"an Option Notice must state the Applicable Purchase Price in an unequivocal*

---

[299]  The Arbitral Tribunal sees no relevance, however, in Claimant's statement at the bottom of p. 7 of C-749, referred to by Respondent at pp. 297/298 and 454 T10H, that *"sensible and most straightforward solution in the current situation is for the provisions in clause 5.3 and schedule 2 AOA to be waived or varied in writing by LV Finance..."*. Although the words *"waived or varied"* are almost identical to the qualification *"as waived and/or varied"* added by Claimant after the indication of the *"Applicable Purchase Price"* in the Purported Option Notice (p. 4 of C-189), they refer here merely to the payment mechanism and not to the Total Purchase Price.

[300]  As to the manner and timing of the payment of the Total Purchase Price, the Second Purported Option Notice states in the next paragraph that Claimant shall pay it *"no later than the second Business Day prior to Completion as defined in the Agreement ..."* (see p. 3 of C-749) thereby referring to the statement quoted in fn. 299 hereinabove.

*manner so that it constitutes an unconditional offer to pay the Applicable Purchase Price"*.

265. In this regard, it is not relevant what Claimant now alleges it meant by the Without Prejudice Phrase. Rather, the Arbitral Tribunal must consider what a reasonable recipient of the Second Purported Option Notice could, under the circumstances, understand in good faith. The many arguments in the *"clip of correspondence"* attached to the Second Purported Option Notice are equivocal and allowed Respondent in good faith to conclude that Claimant does not accept the Arbitral Tribunal's finding in para. 140 PA and thus does not unconditionally promise to pay the Total Payment Price.

266. In view of the considerations in paras. 264/265 hereinabove, the Arbitral Tribunal concludes that Claimant's Second Purported Option Notice does not contain an unequivocal and unconditional offer to pay the Total Purchase Price and therefore is not a valid Option Notice under the April Option Agreement.

267. Since neither Party has requested a declaratory judgment relating to the formal validity or invalidity of the Second Purported Option Notice[301], the Arbitral Tribunal does not incorporate its finding that the Second April Option Notice is invalid in the operative part of this Second Partial Award.

268. Having reached the conclusion that the Second Purported Option Notice is not a valid Option Notice, the Arbitral Tribunal need neither address Claimant's request for the determination of a *"reasonable and realistic mechanism"* for the payment of the Total Purchase Price as foreseen in item 1 of the Sixteenth Order nor the question raised by Respondent whether the existence or compliance with such a mechanism affects the valid exercise of the April Option or merely the performance of a validly exercised April Option.

---

[301] As stated in para. 243 and fn. 279 hereinabove, Claimant's BID-Prayer filed in para. 1008 BID-Answer relates merely to the valid exercise of the April Option and not to the validity of the thereto relating Option Notice.

269.  As to Respondent's further argument that a valid offer to pay the Total Purchase Price only exists if the offered funds can be accepted and used by Respondent as *"legal money"*, the Arbitral Tribunal finds that, irrespective of the origin of the funds so far in Claimant's possession, no assumptions can be made today as to Claimant's capacity to pay the Total Purchase Price with untainted funds in the future. This is therefore an issue of performance, which does not affect the validity of the Option Notice itself. Accordingly, this argument of Respondent is without merit.

**D.     Validity of the Third Purported Option Notice**

270.  The Third Purported Option Notice for the exercise of the April Option for all April Option Shares[302] filed as R-463 is a photocopy of Schedule 2 of the April Option Agreement, which Claimant dated and filled in by hand with an *"Applicable Purchase Price"* of *"$ 18.000.000"*, i.e. the Total Purchase Price, and *"23 March 2006"* as *"Proposed Exercise Date"* and in which it deleted the text in parentheses in the penultimate paragraph[303]. Apart from the aforementioned data, the Third Purported Option Notice – contrary to the Second Purported Option Notice – does not contain any additional text not foreseen in Schedule 2. In particular, it does not refer to any correspondence between the Parties. Likewise, Claimant's letter dated February 7, 2006, by which it sent the Third Purported Option Notice to Respondent, does not contain any such reference or other reservation; it merely requests Respondent to *"provide details as to an alternative mechanism for the payment"* of the Total Purchase Price.

271.  Although the Parties have been invited by the Arbitral Tribunal's telefax dated April 6, 2006 to comment on the *"timeliness and formal validity"* of the Third Purported Option Notice, in its submission dated April 12, 2006 Respondent did not address these issues and instead *inter alia* submitted that the Arbitral Tribunal should not decide the said issues in this Second

---

[302]   Verbatim: *"ALL OPTION-SHARES AS DEFINED IN THE AGREEMENT"*.
[303]   See Claimant's statement on p. 1 of its submission dated April 12, 2006 to the effect that *"the format and wording or the Third Option Notice was copied directly from the AOA and the relevant parts filled in as far as possible in the absence of an Escrow Agent"*.

Partial Award and alleged that Claimant had not complied *"with the applicable payment mechanism"*.

272.  On the other hand, in its submission dated April 12, 2006, Claimant addressed the formal validity of the Third Purported Option Notice and explained its timeliness by stating that it filed it *"more than 60 days before the termination of the Option Period on 10 April 2006"*.

273.  In view of the fact that the Third Purported Option Notice corresponds in essence to the text of Schedule 2 and contains the relevant data and has been made unequivocally and unconditionally and without references to correspondence[304], the Arbitral Tribunal notes that the Third Purported Option Notice appears to be a formally valid Option Notice under the April Option Agreement. As is the case for the Second Purported Option Notice, there is no prayer for relief before the Arbitral Tribunal requesting it to render a declaratory judgment that the Third Purported Option Notice is a valid Option Notice[305], the Arbitral Tribunal does not make in the operative part of this Second Partial Award any declaration or other ruling with regard to the validity of the Third Purported Option Notice.

274.  Having determined that the Third Purported Option Notice formally complies with Schedule 2, with regard to the applicable payment mechanism[306] and the determination of a *"reasonable and realistic mechanism"*, respectively, the Arbitral Tribunal refers to para. 268 hereinabove and para. 279 hereinafter.

275.  As to the timeliness of the Third Purported Option Notice, the Arbitral Tribunal refers to item 2 of the Twentieth Order, which redefines the term *"Option Termination Date"* to mean:

---

[304]  Respondent in its submission dated April 12, 2006 does not allege that any such correspondence has been received.

[305]  Claimant's BID-Prayer in para. 1008 BID-Answer requests a declaration that *"IPOC has validly exercised its option"* and not a declaration that an Option Notice given by Claimant is valid.

[306]  See Respondent's heading on p. 5 of its submission dated April 12, 2006.

> "(i)   the last day of a period of 60 (sixty) calendar days as of
> the date of service of an award of this Arbitral Tribunal
> which determines that Claimant after it issued the Pur-
> ported Option Notice remained entitled to issue a further
> Option Notice, but that Claimant's Second Purported Op-
> tion Notice is not a valid Option Notice under the April Op-
> tion Agreement; or
>
> (ii)  the fifth anniversary of the date of the April Option Agree-
> ment if no such award is rendered by Monday, September
> 11, 2006."

276. Because this Second Partial Award determines that (a) Claimant after it
issued the Purported Option Notice remained entitled to issue a further Op-
tion Notice (see para. 254 hereinabove) and (b) Claimant's Second Pur-
ported Option Notice was not a valid Option Notice (see para. 266 herein-
above) and is rendered before September 11, 2006, the Option Termina-
tion Date corresponds, in accordance with item 2(i) of the Twentieth Order,
to *"the last day of a period of 60 (sixty) calendar days as of the date of ser-
vice of"* this Second Partial Award. As this period has not yet begun to run,
the April Option Period has not expired. Accordingly, the Third Purported
Option Notice was given in a timely manner.

277. That said, and notwithstanding the redefinition of the Option Termination
Date in item 2 of the Twentieth Order, the Arbitral Tribunal notes that in its
submission dated February 8, 2006 Respondent alleged that the Third Pur-
ported Option Notice was *"received today from IPOC's London lawyers"*
and enclosed the coversheet of the respective telefax from Claimant's Lon-
don counsel which appears to have been sent on February 8, 2006 and re-
ceived by Respondent's counsel on the same date, while Claimant in its
submission of the same date stated that the Third Purported Option Notice
has been *"delivered late yesterday in accordance with the terms of the
AOA"*, i.e. on April 7, 2006. Claimant further explained on p. 2 of that sub-
mission that it *"calculated that the absolutely last safe day for service of*



*any third option notice was February 8" 2006*[307]. Considering that February 2006 has 28 days and the month of March 31 days, it seems that the last day for serving an Option Notice would have been February 9, 2006 (April 10, 2006 minus sixty days pursuant to Clause 3.1.2(c) AOA) and that Claimant's Third Purported Option Notice, delivered on February 8, 2006, seems therefore timely even if the Twentieth Order had not been rendered[308]. Nevertheless, since neither Party has addressed the issue how the 60 day period, pursuant to Clause 3.1.2(c) AOA, has to be computed under the April Option Agreement, and respectively under the applicable English Law, the Arbitral Tribunal does not make in this Second Partial Award any finding on this aspect of the timeliness of the Third Purported Option Notice.

### E.    Conclusions

278.   Although the Arbitral Tribunal has determined in paras. 266 and 273 hereinabove that the Second Purported Option Notice is formally not valid and further determined that the Third Purported Option Notice is formally valid, it does not, for the reasons given in paras. 267 , 268 and 273 hereinabove, make a declaration or other ruling on the formal validity of these purported Option Notices in this Second Partial Award.

279.   In the event the Arbitral Tribunal should in its analysis of the validity and enforceability of the April Option Agreement in Chapter VIII hereinafter determine that the April Option Agreement is valid and enforceable[309], then it would have to render a decision on Claimant's BID-Prayer in para. 1008 BID-Answer requesting a declaration that it *"has validly exercised"* the April Option. In the context of this analysis, the Arbitral Tribunal would first have to determine whether this prayer relates to an attempted exercise of the

---

[307]   At that time, the Twentieth Order, dated February 9, 2006, had not yet been rendered, so that the last date for serving an Option Notice was, according to Clause 3.1.2(c) AOA *"the date falling 60 days prior to the [Option] Termination Date"*, i.e. sixty days prior to the fifth anniversary of the April Option Agreement, which is April 10, 2006 (see para. 9 hereinabove).

[308]   See e.g. the second paragraph on p. 1 of Claimant's submission dated April 12, 2006 .

[309]   See paras. 704 and 706 hereinafter.

April Option by the Third Purported Option Notice and, if so, confirm the timeliness of the Third Purported Option Notice. Following this, the Arbitral Tribunal would then decide the other issues which might be connected with the valid exercise of the April Option going beyond the formal validity of the relevant Option Notice such as Respondent's position on the noncompliance with the applicable payment mechanism or alternatively the setting of a *"reasonable and realistic mechanism"* by the Arbitral Tribunal.

280.    Because this Second Partial Award is rendered before September 11, 2006, there is no need to amend the Twentieth Order in application of item 6(i) of said order. Moreover, because the Arbitral Tribunal does not, in this Second Partial Award, make a finding on the timeliness of the Third Purported Option Notice and because Respondent still criticises the Third Purported Option Notice in items 2 and 3 of its submission dated April 12, 2006, contrary to Respondent's arguments in its submission of February 8, 2006, the Twentieth Order has not become obsolete. Accordingly, there is no need to modify the Twentieth Order in application of item 7 of said order.

281.    The Arbitral Tribunal's conclusion that the Third Purported Option Notice seems to be formally valid does not mean that Claimant has validly exercised the April Option. The Arbitral Tribunal will have to examine the valid exercise of the April Option only if it reaches the conclusion that the April Option Agreement is valid and enforceable.

## VIII.    VALIDITY/ENFORCEABILITY OF THE APRIL OPTION AGREEMENT

### A.    Introduction

#### a)    The Relevant Prayers

282.    In this Chapter VIII the Arbitral Tribunal analyses the disputed validity and enforceability of the April Option Agreement. As stated in paras. 279 and 281 hereinabove, this is a preliminary issue to be decided in connection with Claimant's BID-Prayers submitted in paras. 1008 to 1012 and possibly also 1013 of the BID-Answer and is at the centre of the still pending Prayer



No. 4 of Respondent's Prayers quoted in para. 58 hereinabove requesting a declaratory judgment that the *"April Option Agreement is void, unbinding and/or unenforceable"* or, in the alternative, that the Arbitral Tribunal decides to *"avoid and/or annul the April Option Agreement"*.

283.  Since the said Prayer No. 4 of Respondent's Prayers is a defence to the aforementioned prayers of Claimant, the analysis of the Arbitral Tribunal in this Chapter VIII will first have to deal with the various defences Respondent submits in support of Respondent's Prayers No. 4. As a consequence thereof, the Arbitral Tribunal will always first summarise Respondent's argument and then Claimant's arguments submitted in support of its rebuttal of these defences.

284.  The same applies for Respondent's Prayer No. 5 to declare that the April Option Agreement *"[is] an illegal contract"* and the claim brought under it *"would be against public policy and arising ex turpi causa"*[310].

285.  In the event that Respondent's Prayers Nos. 3, 4 and 5 should be dismissed, Respondent accepts *"that the sale of its interest in TMI, i.e. the April Option Shares violates the April Option Agreement if the April Option Agreement were valid and enforceable agreement"*[311]. Accordingly, in that event, the Arbitral Tribunal would have to examine whether this violation of the April Option Agreement would entitle Claimant to be granted the relief requested in Claimant's BID-Prayers submitted in paras. 1008 to 1012 of the BID-Answer relating the valid exercise of the April Option, specific performance[312] of its rights under the April Option, and finally a decision on the requested finding on an intentional breach in the context of the scheme, i.e.

---

[310]  See para. 58 hereinabove.

[311]  On p. 59 lines 10 to 14 T2H Respondent stated the following: *"As we have outlined in our answer, if the underlying agreements are valid, enforceable, and performance is legal under the applicable law, then there will be a breach of these covenants"* (see also p. 64 lines 21 to 23 T2H).

[312]  To the extent these prayers relate to the MegaFon Interests, Respondent submits that Claimant's BID-Prayers in paras. 1009 to 1013 BID-Answer exceed the Arbitral Tribunal's jurisdiction (see Respondent's BID-Prayer No. 1 in para. 165 hereinabove).

the Onward Sales referred to in Claimant's BID-Prayer in para. 1013 BID-Answer.

**b)     Summary of Respondent's BID-Defences**

286.   In support of Respondent's Prayers Nos. 4 and 5, Respondent submitted under the overall heading *"Broader Illegality Defence"* in the BID-Phase the following defences in support of its suggestion to determine that the April Option Agreement is void (i.e. invalid) and/or unenforceable[313], i.e. the:

   (i)     Duress Defence

   (ii)    Complicity Defence

   (iii)   Dilution Defence

   (iv)    ML-Defence, in particular with regard to the Augmentation Payment and Riversand Payment

   (v)     Currency Law Defence

In addition to these defences, the Arbitral Tribunal will have to analyse the further defences listed in para. 157 PA, which it deferred in para. 260 PA to the BID-Phase, i.e.[314]:

   (vi)    Sham Defence

   (vii)   Assisting and Procuring a Breach of Contract Defence

---

[313]   For the definition of the terms *"Duress Defence"*, *"ML-Defence"* and *"BID-Defence"*, see paras. 66(i) to (iii) hereinabove while the Dilution Defence and the Currency Law Defence are sub-arguments of the BID-Defence explained in paras. 344 and 566 hereinafter.

[314]   For the definition of these defences see paras. 68(i) and (iv) hereinabove.

287.  Before analysing the aforementioned defences of Respondent, the Arbitral Tribunal will first summarise the general principles of English law applicable to the illegality of the April Option Agreement alleged by Respondent.

**c)    Void, Voidable and Unenforceable Contracts under English Contract Law**

**aa)    Introduction**

288.  A void contract is not a contract at all. It is a nullity. It is nothing at all and it gives rise to no rights or duties. Neither party may sue upon it. An example of a void contract is entered into by mistake (unilateral or mutual). If the contract is entered into by mistake it is said to be void *ab initio*.

289.  A voidable contract is one where one or more of the parties may avoid or affirm the legal relations created by the contract. An example of a voidable contract is one entered into by duress.

290.  An unenforceable contract is one which is valid in all respects except that a party to it may not sue upon it. An example of an unenforceable contract is one which is illegal.

**bb)    Application to the Principal BID-Defences**

**(i)    Duress**

291.  A contract entered into as a direct consequence of duress may be avoided by the party who was threatened. In the House of Lords case of Lynch v. D.P.P. of Northern Ireland [1975] A.C. 653 it was held that a contract entered into as a result of duress gives the threatened party a choice to either avoid or affirm the contract when the duress has ceased. Such a contract is not void: it is voidable. In the words of Lord Wilberforce (p. 680 of judgment), *"duress does not destroy the will, for example, to enter into a contract, but prevents the law from accepting what has happened as a contract valid in law"*.

162



292.   In cases of duress, the threatened party may affirm the contract or if that party subsequently acts in a manner which illustrates he does not intend to avoid it or if he takes no steps to set aside the transaction then he may be found to have ratified or affirmed it[315].

**(ii)    Illegality**

293.   The majority view in English law is that a contract entered into for an illegal purpose is unenforceable but not void.

294.   There are cases in English law in which judges made the finding that an illegal contract was void[316], or void *ab initio*[317].

295.   The preferred view is that an illegal contract is unenforceable. In other words, the contract comes into existence but a court or arbitral tribunal will refuse to assist in its enforcement[318].

**(iii)    Sham**

296.   The leading case is Snook v. London & West Riding Investments 1967 2 Q.B. 786. It is a contract entered into to give third parties or the court the appearance of creating legal rights and obligations different from the actual rights and obligations. In short, it is where parties say one thing intending another[319]. There must be a common subjective intention between the parties to mislead[320]. It is a transaction made with *"no intention ... to create*

---

[315]   See North Ocean Shipping Co. Ltd v. Hyundai Construction Ltd [1979] Q.B. 705.
[316]   See Garforth v. Fearon (1787) 1 H. Bl. 327, 329 per Lord Loughborough L.C.; Victorian Daylesford Syndicate Ltd v. Dott [1905] 2 Ch. 624, 631 per Buckley J.
[317]   See Heymen v. Darwins Ltd [1942] A.C. 356, 366 per Viscount Simon L.C.
[318]   See Cleaver v. Mutual Reserve Fund Life Association [1892] 1 Q.B. 147, 152; re Mahmoud and Ispahani [1921] 2 K.B. 716; Bennett v. Bennett [1952] 1 K.B. 260, 260; Marles v. Philip Trant & Sons [1954] 1 Q.B. 29; Aratra Potato v. Taylor J. Garrett [1995] 4 All E.R. 695.
[319]   See Donald v. Baldwyn [1953] NZLR 313, 321, per F B Adams J, cited by Binham LJ, AG Securities v. Vaughan [1990] 1 A.C. 417.
[320]   See Stone v. Hitch [2001] EWCA Civ 63.

*bona fide legal relations*"[321]. This would tend to suggest that a sham con-tract is not a contract at all and therefore void.

cc)    **Relevance for the Prayers to be Decided in the BID-Phase**

297.    The distinction between void contracts, voidable contracts and unenforce-able contracts is relevant in view of Respondent's Prayer No. 4 quoted in para. 58 hereinabove requesting from the Arbitral Tribunal a declaration that the *"April Option Agreement is void, unbinding and/or unenforceable"* or, in the alternative, *"to avoid and/or annul the April Option Agreement"*. Therefore, the Arbitral Tribunal must, in view of this prayer, answer all these possible defects in a contract.

298.    The above-quoted term *"unbinding"* in Respondent's Prayer No. 4 is not a term of art of English contract law, but seems to be inspired by the term *"non-binding"* (in German: *"Unverbindlich"* and the similar term, in German: *"nicht verbindlich"*) in Art. 23, 28 and 29 of the Swiss Code of Obliga-tions[322]. These provisions of Swiss law allow a court to declare a contract non-binding by a party which is subject to a material error or has been in-duced or forced to enter into a contract by a willful deception or duress. The Tribunal is of the view that a party's remedy under Swiss law to declare such a contract *"unbinding"* (in German: *"unverbindlich"*) corresponds quite closely to the English law concept of a *"voidable"* contract and since Re-spondent invokes in the Duress Defence that the April Option Agreement has been entered into under duress, the Arbitral Tribunal will interpret the term *"unbinding"* in Respondent's Prayer No. 4 as corresponding to the English term of art *"voidable"*.

---

[321]    See Glatzer & Warwick Shipping Co. v. Bradstone Ltd (The Ocean Enterprise) [1997] 1 Lloyd's Rep. 449, 484 (RL-6).

[322]    The English translation of the Swiss-American Chamber of Commerce uses in Art. 23 and 24 of the Swiss Code of Obligations the phrase *"not bound"* and in Art. 28 *"shall not bind"*.

### d)    Principles of English Contract Law on Illegality

### aa)    In General

299.    Illegality in this context in English law is where a transaction is prohibited by law either because it involves the commission of a legal wrong or involves illegal conduct which is contrary to public policy.

300.    English law distinguishes between illegality as to formation of a contract and illegality as to its performance. In both situations the court will not enforce the contract or provide a party with any remedies arising therefrom. This is a matter of public policy: *"ex dolo malo non oritur actio"*[323]. Therefore, if the claim appears to arise *ex turpi causa*, or is a transgression of English law, the claimant cannot be assisted by the courts[324].

301.    The fact that an illegal contract is unenforceable does not mean the contract itself is void, such as a contract entered into by parties, one or both of whom lacked the capacity to conclude it.

302.    A contract is illegal as to its formation when it cannot be performed without contravening the law in that the parties contract to do something forbidden by the law (Levy v. Yates (1838) 8 A. & E. 129).

303.    A contract is illegal as to its performance if one or both parties intend to perform the contract in an illegal way or to put into effect some illegal purpose. In this situation, the contract may appear to be perfectly valid on its face but either one or both parties intend to perform it in an illegal way or to further an illegal purpose (Ashmore, Benson, Pease & Co Ltd v. A.V. Dawson Ltd [1973] 1 W.L.R. 828).

---

[323]    See Lord Mansfield in Holman v. Johnson (1775) 1 Cowp. 341, 343.
[324]    See also Euro-Diam Ltd. v. Bathurst (1990) 1 Q.B, 1, 35 per Kerr L.J., with the exception that the House of Lords in Tinsley v. Milligan [1994] 1 A.C. 340 rejected the so-called *"public conscience"* test set out by his Lordship.

165

304. One or both parties may have an illegal purpose when entering into a contract. This can apply either to its formation or to its performance.

**bb)  Consequence of these Principles on the Onward Sales**

305. In view of these paragraphs of English contract law, Respondent, by its admitted Onward Sales, i.e. the disposal of the April Option Shares to a third party - irrespective of the question whether such third party is a bona fide purchaser -- could not be held to be in breach of the April Option Agreement if Respondent's position proves to be correct that the April Option Agreement is an invalid or unenforceable contract. Accordingly, Claimant's BID-Prayer submitted in para. 1013 BID-Answer suggesting that the Onward Sales violated the April Option Agreement, can - if all the other requirements are met - only be upheld if the April Option Agreement is a valid and enforceable contract.

306. As a result of English contract law, the Arbitral Tribunal will, therefore, have to examine the defences listed in para. 286 hereinabove. Before doing so, the Arbitral Tribunal will, however, first analyse the rules of the burden and standard of proof to be applied in this examination.

**cc)  Applicable Burden and Standard of Proof**

    **(i)     The Applicable Law**

307. In order to determine what is the relevant burden and standard of proof to be applied one must first determine what is the applicable law to such issues.

308. Both Claimant and Respondent made submissions on both English and Swiss law on the burden and standard of proof. Respondent argued that whether one applies English or Swiss law to these matters it *"leads very much to the same result"* (para. 64 BID-Statement). Claimant dealt with the applicable law in more detail and suggested that the Tribunal *"may, and*



*should, take into account the standard and burden of proof pursuant to Swiss law and international arbitral practice"* (para. 155 BID-Answer).

309.  The problem as to which law to apply to the standard and burden of proof arises out of the fact that in looking to the law of the seat of the arbitration, namely Zurich, Switzerland, and applying Swiss law one finds that in Swiss law such questions are to be dealt with according to the *lex causae* applicable to the merits of the arbitration, which in this case is English substantive law[325] (CL-67).

310.  But as a matter of English law, the burden and standard of proof are matters of procedure and therefore determined not in accordance with English substantive law but by the procedural law applicable at the *lex fori*, in this case Swiss procedural law.

311.  In such circumstances the Tribunal must be guided by international arbitral practice where there is a tendency to determine the burden and standard of proof in accordance with the substantive law of the dispute, namely English law[326].

**(ii)    Burden of Proof under English Law**

312.  English law distinguishes between *"a legal burden, properly so called, which is imposed by the law itself, and a provisional burden which is raised*

---

[325]  See Paolo Michele Patocchi & Ian L. Meakin, Procedure and the taking of Evidence in International Arbitration – The interaction of Civil Law and Common Law Procedure, in: International Business Law Journal No 7 – 1996, 884-899 (889), CL-37; Michael E. Schneider, Commentary to Article 184 SPIL, in: International Arbitration in Switzerland (Stephen Berti ed.), Basel/Geneva/Munich/The Hague/London/Boston 2000, note 11 in RL-162; Article 14 of the EC Convention on the Law Applicable to Contractual Obligations (Rome Convention) of 19 June 1980: *"The law governing the contract under this Convention applies to the extent that it contains, in the law of the contract, rules which raise presumptions of law and determine the burden of proof"* (p. 6 of CL-67).

[326]  See Andreas Reiner, Burden of Proof and General Standards of Proof, in: vol 10, No 3, 1994, p.331 et seq. in RL-166; Michael E. Schneider, Commentary to Article 184 SPIL, in: International Arbitration in Switzerland (Stephen Berti ed.), Basel/Geneva/Munich/The Hague/London/Boston 2000, note 8 in RL-162; ICC Award 6401 rendered by Professor Claude Reymond, in: International Arbitration Report 1/1992, B 19ff (C-405).

by the state of the evidence"[327]. The provisional burden is sometimes referred to as the evidentiary burden. It may make out a prima facie case. The legal burden may be put succinctly as "he who asserts must prove" and no matter how much of a prima facie case has been made out on the evidence a claimant must satisfy the legal burden of proof. The legal burden does not shift but the provisional burden may shift as the case proceeds where evidence has been adduced and therefore must be answered but "at the end of the day the court has to ask itself – not whether the provisional burden has been discharged – but whether the legal burden has been discharged"[328], in proving what he has asserted.

313.   In the context of allegedly illegal contracts there is a general rebuttable presumption in English law in favour of legality. A party alleging illegality of the contract bears the burden of proving it[329]. This means that if a contract can be reasonably susceptible to two meanings or two modes of performance, one legal and the other illegal, and the burden of proving its illegality is undischarged, the contract should be interpreted in a manner which will support it and give it operation[330].

314.   If, on the other hand, the contract on its face evidences an illegal intention, the burden lies upon the party seeking to uphold the contract to adduce evidence showing the legality of intention[331].

(iii)   **Standard of Proof under English Law**

315.   The standard of proof as a matter of English law is the balance of probabilities. In Re H [1996] A.C. 563 Lord Nicholls said:

"The balance of probabilities standard means that a court is satisfied an event occurred if the court considers that, on the evidence, the occurrence of the event was more likely than not. When as-

---

[327]    See Brown v. Rolls Royce Ltd [1960] 1 W.L.R. 210 per Lord Denning (RL-126).
[328]    See above fn. 327.
[329]    See Hire-Purchase Furnishings Co. v. Richens (1887) 20 Q.B.D. 387, 389.
[330]    See Archbolds (Freightage) Ltd v. Spanglett Ltd [1961] 1 Q.B. 374, 391-2.
[331]    See Holland v Hall (1817) 1 B & Ald. 53.

> *sessing the probabilities the court will have in mind the factor, to whatever extent appropriate in the particular case, that the more serious the allegation the less likely it is that the event occurred and hence, the stronger should be the evidence before the court concludes that the allegation is established on the balance of probability. Fraud is usually less likely than negligence. Deliberate physical injury is usually less likely than accidental physical injury. ... Built into the preponderance of probability standard is a generous degree of flexibility in respect of the seriousness of the allegation. Although the result is much the same, this does not mean hat where a serious allegation is in issue the standard of proof is higher. It means only that the inherent probability or improbability of an event is itself a matter to be taken into account when weighing the probabilities and deciding whether, on balance, the event occurred. The more improbable the event, the stronger must be the evidence that it did occur before, on the balance of probability, its occurrence will be established."* (p. 586)

316.    In Re H, the case concerned a local authority's application for care orders within the context of allegations of child abuse. The case is particularly relevant for the Arbitral Tribunal when assessing which standard of proof to apply because Re H was a civil case dealing with allegations of criminal conduct. It was held that the standard of proof was the balance of probabilities. This, Lord Nicholls stated, did not mean that *"where a serious allegation is in issue the standard of proof required is higher"* but it *"means only that the inherent probability or improbability of an event is itself a matter to be taken into account when weighing the probabilities and deciding whether, on balance, the event occurred"*, so that the *"more improbable the event, the stronger must be the evidence that it did occur before, on the balance of probability, its occurrence will be established"* (p. 586).

317.    Therefore, the need for more cogent evidence to prove a serious allegation of facts does not mean that in a civil case the standard of proof is anything higher than the balance of probabilities.

318.    In the case of Secretary of State for the Home Department v. Rehman [2003] 1 A.C. 153 Lord Hoffmann interpreted the remarks of Lord Nicholls in Re H and noted as follows:

169



> "By way of preliminary I feel bound to say that I think that a "high civil balance of probabilities" is an unfortunate mixed metaphor. The civil standard of proof always means more likely than not. The only higher degree of probability required by the law is the criminal standard. But, as Lord Nicholls of Birkenhead explained in Re H (minors) (sexual abuse: standard of proof)...[1996] A.C 563 at 586, some things are inherently more likely than others. It would need more cogent evidence to satisfy one that the creature seen walking in Regent's Park was more likely than not to have been a lioness than to be satisfied to the same standard of probability that it was an Alsatian. In this basis, cogent evidence is generally required to satisfy a civil tribunal that a person has been fraudulent or behaved in some other reprehensible manner. But the questions is always whether the Tribunal thinks it is more likely than not" (p. 194)."

319.  The effect of the above means that the Arbitral Tribunal in applying English law to the issue of the standard of proof will apply the test of the balance of probabilities. That said, given the very serious allegations of illegality and money laundering in this case, the Arbitral Tribunal will, in examining the factual aspects of these issues, whether a claim is founded or not, on balance, require cogent and strong evidence on the facts that a particular event occurred in order to decide whether such a claim is, on the balance of probabilities, founded or not[332]. The Arbitral Tribunal can begin its assessment of the evidence on the basis – for example - that illegal acts or other conduct allegedly committed in the dilution of Central Telegraph are less likely than a commercial explanation as to why Svyazinvest decided not to participate in the development of Sonic Duo and therefore cogent and strong evidence is required to prove, on balance, that illegality occurred.

e)  **Are any of the BID-Defences *Res Iudicata*?**

320.  Claimant's view expressed at the Fourth Hearing that these issues are as a result of the Geneva ICC-Award *res iudicata*, is for the reasons stated in paras. 183/184 hereinabove and paras. 78, 164, 166, 179/180 and 215 PA

---

[332]  For civil law see e.g. Fabian von Schlabrendorff, opus cit. in fn. 220 above, pp. 865/866.

not shared by the Arbitral Tribunal because it considers that there are with regard to the defences referred to in para. 286(i)to (iv) hereinabove[333] *"overriding reasons"* within the meaning explained by Claimant's counsel at the Fourth Hearing[334].

**B.    Duress Defence**

321.    With the Duress Defence Respondent alleges that *"as at the signing of the April Option Agreement, [Witness No. 6] was subject to pressure of a wholly illegitimate nature designed to procure LVFG's acquiescence to the wholly one-sided terms of that agreement"*. For Respondent it is *"beyond doubt that the threats[335] to [Witness No. 6]'s life or physical security were a cause of his signing that agreement"*, and that the threats made to the latter's career in Russia, *"built up since the early 1990s, were a significant cause of his entry into the April Option Agreement"* so that in the *"circumstances, it was legitimate for [Witness No. 6] to enter into the Option Agreements as not doing so would have jeopardized not only his professional career, but his personal safety"* and *"was the product of duress"*[336].

322.    The reported threats were allegedly made at the meetings disclosed in para. 325 hereinafter[337].

323.    Respondent further submits that circumstantial evidence strongly supports the Duress Defence:

---

[333]    Which defences in essence correspond to the defences listed in para. 157(i), (ii) and (v) PA.

[334]    See also paras. 12 and 15 of the opinion on the English law aspect of *res iudicata* by the Proposed Witness No. 21 enclosed to Claimant's submission dated September 17, 2004 stating that there must be *"special circumstances"* to escape the consequences of estoppel.

[335]    I.e. the threats mentioned in paras. 359 to 373 SD and para. 3.1 to 3.9 RJ.

[336]    See para. 390 SD and para. 1.71 and 1.72 Rejoinder.

[337]    See para. 360 and 632 SD where Respondent speaks of a meeting in February 2001 but probably means the meeting Witness No. 6 dates in March 2001 but alleges that it was requested by Proposed Witness No. 7 in late February 2001 (see para. 79 RW-8).

(i)    the absence of any evidence of meaningful negotiation (para. 4.1 to 4.6 RJ)

(ii)    the recourse to an escrow agent (para. 4.7 to 4.13 RJ)

(iii)    the USD 18 million Undertaking, which was allegedly never intended to be paid (para. 4.14 to 4.17 RJ).

(iv)    the uncommerciality of the April Option Agreement (para. 7.1 ff RJ).

324.    In the Partial Award the Arbitral Tribunal first quoted from the one-page witness statement R-6 referred to in para. 131 on p. 32 Geneva ICC Award the vaguely worded threats allegedly expressed by the Proposed Witness No. 7 to Witness No. 6. The Arbitral Tribunal then determined that this vague description of the threats in R-6 was *"so unsubstantiated that the much more detailed account of the alleged threat Witness No. 6 gave in this Zurich Ad-hoc Arbitration in his detailed written witness statement"* dated September 16, 2004 filed as RW-8 which was subject to a detailed examination at the Witness Hearing[338] is to be considered an *"overriding reason"* for concluding that the Geneva ICC-Award does not make Respondent's Duress Defence *res iudicata* (see paras. 165/166 PA)[339].

325.    Having found that Respondent's Duress Defence is not *res iudicata* and that Respondent is therefore *"not estopped from raising the Duress Defence again in the Zurich Ad-hoc Arbitration"* (see para. 166 on p. 92 PA) the Arbitral Tribunal summarised the account Witness No. 6 gave on the alleged threats on which Respondent bases its Duress Defence in paras. 167 and 168 PA as follows[340]:

---

[338]    See p. 37 to p. 51 and pp. 62 to 65 Day 3 TWH.
[339]    For the discussion of the alleged *res iudicata* effect of the Geneva ICC Award and the significance of the expression *"overriding reasons"* see para. 75 to 78 PA and paras. 183/184 and 320 hereinabove.
[340]    Although not put in quotes, the text in the following sub-paragraphs (i) and (ii) corresponds exactly to the text of paras. 167 and 168 PA.

(i)     Witness No. 6 explains in his detailed witness statement filed in this
        Zurich *Ad-Hoc* Arbitration in RW-8, paras. 63 to 82 that he was
        threatened by the proposed Witness No. 7 during two meetings
        which occurred in early 2001, the first one on an unspecified date in
        January 2001 between Witness No. 6 and the Proposed Witness No.
        7 alone (the "**January 2001 Meeting**") and the second one on an
        unspecified date in March 2001 at which in addition to Witness No. 6
        and the Proposed Witness No. 7 also Witness No. 4 participated (the
        "**March 2001 Meeting**"). According to the account of Witness No. 6,
        the real threat was made at the January 2001 Meeting while the ac-
        count of the March 2001 Meeting speaks merely of an *"extremely
        agitated"* and *"firm and aggressive"* Proposed Witness No. 7 (RW-8,
        para. 82).

(ii)    According to the witness statement and the testimony of Witness No.
        6 the threat made by the Proposed Witness No. 7 consisted in the
        conversation in which the Proposed Witness No. 7 told Witness No.
        6 that he *"must remember Konstantin Kuzovoi"*, who was assassi-
        nated in March 1999, which Witness No. 6 interpreted to the effect
        that the same would occur to him if he did not allow the Proposed
        Witness No. 7 to take a *"controlling package of the shares"* in Sonic
        Duo and would instead *"stand in his way"* (RW-8, paras. 66/67).

326.    In paras. 169/170 PA the Arbitral Tribunal then examined the aforemen-
        tioned account of Witness No. 6 of the threats allegedly made during the
        January 2001 Meeting and the March 2001 Meeting and the reaction of
        Witness No. 6 to the alleged threats and stated in para 171 PA that it *"can-
        not conclude at this point that duress, in the manner pleaded by Respon-
        dent, has occurred and that, therefore, the Duress Defence as pleaded by
        Respondent affects the validity of the April Option Agreement"*.

327.    In the context of this conclusion the Arbitral Tribunal further noted in the
        Partial Award (paras. 171 to 173 PA):

(i)     the possibility that *"the testimony of Witness No. 6 on the events af-
        ter the January 2001 Meeting until the signing of the April Option
        Agreement on April 10, 2001"* might not fully disclose the *"real
        course of events"*;

(ii)    the ***"Selective Memory"*** of Witness No. 6 on these events;

(iii)   its belief that Witness No. 6 *"did not completely describe the conver-
        sation he had with the Proposed Witness No. 7 at the alleged Janu-
        ary 2001 Meeting and the March 2001 Meeting"*;

(iv)    the fact that its findings do not exclude *"that the January 2001 Meet-
        ing and the March 2001 Meeting did actually occur and that the ac-
        tual discussion at these meetings included elements of pressure by
        the Proposed Witness No. 7"* as it had *"difficulties to accept the tes-
        timony of Witness No. 4 on Day 5 of the Witness Hearing when he
        categorically denied that the March 2001 Meeting between him, Wit-
        ness No. 6 and the proposed Witness No 7 had occurred so that it is
        possible that the March 2001 Meeting did occur, however, with a
        more shaded or different conversation."*

328.   In the BID-Phase Respondent did not plead in detail the Duress Defence
       except that it casually mentioned that the April Option Agreement was en-
       tered into *"under duress"*[341] and that the arrangements agreed in the April
       Option Agreement *"represented results of the pressure, amounting to du-
       ress, to which he [Witness No. 6] had been subjected"*[342]. Likewise, in the
       closing pleadings at the Tenth Hearing Respondent did not devote a spe-
       cific chapter to the Duress Defence and limited itself to recall that Witness
       No. S17 *"understood fully the duress argument"* and that Respondent re-
       mains entitled *"to continue to evaluate the evidence"* given in the First
       Phase and that it is up to the Arbitral Tribunal to decide *"which of the de-*

---

[341]   See para. 81.10 on p. 44 of the BID-Statement (see also para. 340 on p. 124 BID-Reply).
[342]   See para. 520 on p. 207 BID-Statement.

*fences holds up, duress or illegality"[343]*. Irrespective of these limited refer-
ences of Respondent to the Duress Defence in the BID-Phase, the Arbitral
Tribunal must examine the Duress Defence in this Second Partial Award
again as the conclusion made in para. 171 PA was made *"at this point"*, i.e.
with the meaning that the Arbitral Tribunal would re-examine its conclusion
in the light of new evidence filed or heard in the BID-Phase.

329.    In the BID-Phase no documentary evidence supporting the Duress Defence
was filed and the only witness statements addressing the Duress Defence
are those of Witness No. S17 (formerly the Proposed Witness No. 6) dated
September 16, 2005 (RW-25) and of the Proposed Witness No. 4 dated
September 15, 2005 (RW-24[344]). While Witness No. S17 testified at the
Second Witness Hearing, the Proposed Witness No. 4 did not testify for the
reasons mentioned in para. 141(ii) hereinabove. Therefore, his witness
statements filed as R-23 and RW-24 could not be considered[345].

330.    Witness No. S17 participated neither in the January 2001 nor in the March
2001 Meeting but reports in para. 37 to 41 RW-25 on a meeting he had in
January 2001 with the Witnesses Nos. 2 and 6 and the Proposed Witness
No. 4[346]. During this meeting Witness No. 6 informed them of the January
2001 Meeting, the Proposed Witness No. 7's request made at that meeting
to receive a controlling stake in Sonic Duo and of the threats to Witness
No. 6's life if he did not cooperate (the **"January 2001 Briefing"**). This ac-

---

343    See T10H p. 340 lines 14 to 23.
344    The witness statements dated March 3, 2003 of Witness No. S17 and Proposed Witness
No. 4 filed at the beginning of the Zurich Ad-hoc Arbitration as R-4 and R-3 (the latter was
withdrawn at Day 3 of the Eighth Hearing, pp. 474/475 T8H Day 3) do not mention facts
relating to the Duress Defence as the threats described in these witness statements in
paras. 6 to 8 of R-4 and paras. 7 to 9 of R-3 relate to events after the conclusion of the
April Option Agreement, i.e. to a conversation between the said two witnesses and the
Witnesses Nos. 1 and 4 held on November 9, 2003 about three months after the Geneva
ICC Arbitration was initiated on August 15, 2003 (see paras. 15 PA and para. 7 on p. 4 of
the Geneva ICC Award filed as C-424) and address the alleged solicitation of written
witness statements in favour of Claimant.
345    See paras. 205 and 210 at fn. 232 hereinabove.
346    With regard to Witness No. 2 see also p. 48 line 18 TWH Day 3.

175

count is thus far in line with the testimony of Witness No. 6, namely that he spoke to his partners at LV Finance about the January 2001 Meeting[347].

331.  Although the credibility of Witness No. S17 is, compared to the credibility of some other relevant witnesses, at a much higher level, his testimony is no direct evidence of the January 2001 Meeting and therefore – if anything at all – can only be hearsay evidence for the fact that the January 2001 Meeting took place[348] but is not sufficient proof to establish the content of the alleged meeting between the Proposed Witness No. 7 and Witness No. 6 since it can only convey the account of events given by Witness No. 6. The same would be the case if the Proposed Witness No. 4 had testified in the BID-Phase and confirmed the account given of the January 2001 Briefing by Witness No. S17. The Arbitral Tribunal also notes that the fact that Witness No. S17 was at that time not fluent in Russian and therefore might not have always properly understood what Witness No. 6 told him during the January 2001 Briefing in Russian is not particularly relevant for the assessment of the latter's testimony.

332.  Moreover, assuming the alleged threats of the Proposed Witness No. 7 did in fact reach the degree of real and immediate threats then there is – as already stated with regard to Witness No. 6 in para. 170 PA – no explanation why three professionals such as Witnesses Nos. 2[349] and S17 and the Proposed Witness No. 4 did not record the January 2001 Meeting and/or the account given by Witness No. 6 at the January 2001 Briefing and each further threatening step until the signing of the April Option Agreement. This account could have been given in a sworn affidavit or in another appropriate manner in order to be better able to establish the fact that they signed the April Option Agreement merely because they were under duress. The Arbitral Tribunal notes that this approach was adopted by Witness No. S17

---

347   See (p. 48 line 18 et seq. Day 3 TWH). To be noted is that the witness statement of Witness No. 6 (R-6 and RW-8) as the first witness statement of Witness No. S17 (R-4) do not mention the January 2001 Briefing by Witness No. 6 to the Witnesses Nos. 2 and S17 and the Proposed Witness No. 4.

348   In this context see para. 335 hereinafter.

349   See para. 330 hereinabove.

(the Proposed Witness No. 6) with respect to a much less important alleged threat, namely the meeting with Witness No. 1 in the lobby of the Dorchester Hotel in London in 2003[350]. Witness No. 6, Proposed Witness No. 4 and Witness No. S17 should have adopted a similar approach whith regard to the January and March 2001 Meetings and the January 2001 Briefing.

333.    The Arbitral Tribunal is of course aware that the Proposed Witness No. 7, having a much greater economic interest in the conclusion of the April Option Agreement than Witness No. 6 and being in a position of power, could have exercised some form of pressure on Witness No. 6, urging him to enter into the April Option Agreement. However, due to the above-stated reasons and the lack of sufficient evidence such possible pressure did not amount to a threat resulting in duress.

334.    In view of the above consideration, the Arbitral Tribunal concludes that Respondent has not submitted sufficient evidence to prove its Duress Defence. Accordingly, the Duress Defence must be dismissed.

335.    The dismissal of the Duress Defence does not - as stated in para. 331 hereinabove - necessarily mean that the January 2001 Meeting did not take place. In this context the Arbitral Tribunal finds that Witness No. S17 has credibly established that the January 2001 Briefing occurred and that Witness No. 6 accounted in detail the meeting he had with the Proposed Witness No. 7. The Arbitral Tribunal has, despite the fact that Witness No. 6 refused to testify before the Arbitral Tribunal for a second time, no reason to assume that Witness No. 6 invented the January 2001 Meeting, nor any reason to doubt that he thereafter reported such meeting to his friends and business partners, i.e. Witnesses Nos. 2 and S17 and the Proposed Witness No. 4, at the January 2001 Briefing. Accordingly, the Arbitral Tribunal finds that the January 2001 Meeting between Witness No. 6 and the Proposed Witness No. 7 took place but that the content of their discussion was likely to be somewhat different than the account given by Witness No. 6 in paras. 63 to 70 RW-8 and at the Witness Hearing, but addressed an

---

[350]    P. 1599 line 2 et seq. Day 8 TSWH.

agreement with Respondent regarding the latter's participation in Sonic Duo[351].

336. Likewise, the Arbitral Tribunal finds that the March 2001 Meeting between the Proposed Witness No. 7 and the Witnesses No. 4 and 6 must have taken place as well. In coming to this conclusion, the Arbitral Tribunal considers the fact that it doubted the denial by Witness No. 4 of the proposition that the March 2001 Meeting took place at all, already dealt with in para. 173 PA. This denial, taken in the light of the established incredibility of Witness No. 4, and of the categorical nature of the denial by Witness No. 4, cannot be believed[352]. The fact that neither the witness statements nor the oral testimony of Witness No. S17 specifically detail the March 2001 Meeting[353], astonishing though that may be, does not affect the Arbitral Tribunal's finding that the March 2001 Meeting must have taken place as well, albeit possibly with a somewhat different scope than described by Witness No. 6. It is, however, clear to the Arbitral Tribunal that the content of the discussions at the March 2001 Meeting which took place shortly before the signing of the April Option Agreement involved this agreement and related issues.

---

351  See also para. 168 PA referring to paras. 66/67 RW-8 p. 40 lines 20 and 28 and p. 43 line 13 TWH Day 3, mentioning Proposed Witness No. 7's desire to take a *"controlling package of the shares"*. See also the similar expressions *"take control of Sonic Duo"* on p. 41 line 15, *"controlling interest"* on p. 46 line 10 and *"controlling shareholding"* on p. 48 line 27 TWH Day 3.

352  See p. 180 line 26 to p. 183 line 24 TWH Day 5, where Witness No. 4 denied the occurrence of the March 2001 Meeting three times with a quadruple *"no"* (see p. 181 line 4, p. 182 lines 20 and 28) and recommended to the Chairman not to *"believe a word which [Witness No. 6] is saying"* (p. 183 lines 13/14) and concluding his testimony by saying that *"no doubt, psychiatrists will find him [Witness No. 6] interesting"* (p. 183 lines 18/19) (see also the denial by Witness No. 4 of the Duress Defence in para. 70 on p. 27 of his first witness statement filed as C-518 f.).

353  However, Witness No. S17 recalled in para. 42 RW-25 that *"in February 2001, [Witness No. 6] told me he had met [Witness No. 4] ..."* and on p. 1523 lines 8 et seq. TSWH Day 8, without dating the meeting, stated the following: *"I consulted with [Witness No. 6], because by that time - this was in late March 2001 - we were aware, or I was aware, of the meetings [Witness No. 6] had had with [Witness No. 4 and [Proposed Witness No. 7] ..."*.

## C.    Complicity Defence

337.    Respondent raised the Complicity Defence for the first time on the first day of the Fourth Hearing with the argument that Witness No. 6 *"never expected to hang on to control of Sonic Duo"*, i.e. the *"kind of complicity"* to which Witness No. 6 or Respondent *"became one of the parties lying behind the shareholding and they paid their 18 million into the fund in order to join ... IPOC"*[354].

338.    On the second day of the Fourth Hearing, this argument was further developed by the explanation that *"if it was not duress, then it was complicity by [Witness No. 6] in the scheme, effectively to deprive the Russian State of its assets in Central Telegraph ..."*[355]. Then, upon a question of the Arbitral Tribunal, Respondent explained that the Complicity Defence starts *"from the proposition that [the April Option Agreement] is an uncommercial deal"* to which Witness No. 6 would not *"voluntarily agree"*. The *"only reason ... for this to be happening ... is that it was all part of a prior arrangement"* to pass control *"to the interests who represented those who had the power to pass these things away from Central Telegraph"*, i.e. complicity by Witness No. 6 in the *"overall arrangements"* of which he knew that they were *"going to happen"* justifying *"to pay it away for nothing"*[356].

339.    This undeveloped Complicity Defence is part of the *"shifting of the relevant story"* noted by the Arbitral Tribunal in paras. 216/217 PA. Moreover, the Arbitral Tribunal stated in para. 172 PA in the Subchapter on the Duress Defence that the January 2001 Meeting and the March 2001 Meeting might possibly be of relevance in connection with the Complicity Defence and noted in para. 185 PA that the *"alleged complicity goes beyond"* the Duress Defence.

---

[354]    See p. 163 lines 27 et seq. and p. 166 lines 1-10 and line 27 to p. 167 line 7 T4H Day 1.
[355]    See p. 181 lines 12-18 T4H Day 2.
[356]    See pp. 183-186 T4H Day 2, in particular p. 183 lines 24/25, p. 184 line 13, p. 185 lines 16-28.

340. In the BID-Phase, Respondent did not develop the Complicity Defence as an independent defence and considered the complicity argument as a part of the Broader Illegality Defence (see para. 23 BID-Statement). Likewise, *"complicity"* was not further developed in the BID-Reply and the Confidential DPA-Reply both filed on July 1, 2005, which merely raised the issue in para. 340 without developing further arguments[357]. In line with this, Respondent did not at the Tenth Hearing argue *"complicity"* as an independent defence.

341. The reason for not developing the Complicity Defence further at the Tenth Hearing as an independent defence, might have been the fact that Witness No. 6 declined to testify a second time and that the Proposed Witness No. 4 could not be heard. Therefore, it was not possible to confront Witness No. 4 with testimonies of the said witnesses in order to establish his and the Proposed Witness No. 7's involvement in the alleged complicity.

342. In view of the above, *"complicity"*, to the extent it is an independent defence, is not sufficiently substantiated and therefore does not have to be further dealt with in this Second Partial Award.

343. This finding does not exclude that the protagonists of this case, in particular Witnesses Nos. 4 and 6 and the Proposed Witness No. 7, might have acted

---

[357] In para. 340 BID-Reply, Respondent distinguishes two *"complicity"* issues, i.e. its own, i.e. the *"question of whether the AOA was entered into under duress, or as a result of a complicit scheme"* from the one invoked by Claimant under the alleged *"scheme"* relating to the Onward Sales. In para. 22 Confidential DPA-Reply, Respondent comments the reference in item 7(ii) on p. 3 of the Arbitral Tribunal's telefax dated June 6, 2005 to Section 4.02 of the *"Share Retention and Project Support Agreement dated December 14, 2001"* in which Respondent represents and warrants to the senior lenders that *"it owns one hundred percent (100%) of the voting share capital in TMI as of the date hereof, free of any Liens, share option or any other encumbrance"*(see p. 23 of Tab 4 in C-DPA Volume 7) and submits that this incorrect warranty *"supports the proposition"* that the Proposed Witness No. 7 and Witness No. 6 *"were complicit in the dilution of Central Telegraph out of CT-Mobile"*, while it *"previously disclosed to the lenders and TCI"* the existence of the Option Agreement despite of the Parties therein-stated obligation to treat them confidential (in this context, see also fn. 399 hereinafter). Also this explanation is not a sufficient substantiation of the Complicity Defence as an independent defence.

180

in a complicit manner relevant for other aspects of the Broader Illegality Defence, and in particular the Dilution Defence[358].

**D.    Dilution Defence**

344.    In para. 486 et seq. of the BID-Statement, Respondent addressed the dilution of Central Telegraph and referred to the Arbitral Tribunal's description in para. 208 PA of the fact that *"due to some arrangements and/or agreements undisclosed"* in the First Phase the *"share indirectly owned by the Russian state in CTM was diluted to a negligible level, obtained by Respondent and indirectly optioned under the April Option Agreement to Claimant"*. In para. 160 et seq. BID-Reply Respondent then concluded that *"the dilution of Central Telegraph referred to in several clauses of the April Option Agreement results in an illegal purpose of the"* April Option Agreement (the **"Dilution Defence"**).

345.    Recognizing that a dilution of a company such as Central Telegraph is *per se* not illegal, the Arbitral Tribunal will in this Subchapter D examine the Dilution Defence in detail. Before dealing with the individual factual and legal issues, the Arbitral Tribunal will first recapitulate the relevant events and the Parties' positions.

**a)    The Relevant Events**

346.    Before summarizing the Parties' positions, the Arbitral Tribunal first lists, in the schedule in para. 347 hereinafter, in a chronological order the undisputed events referred to by one or both Parties in connection with the Dilution Defence as well as undisputed events the Arbitral tribunal considers to be of relevance in this context. The expression *"undisputed events"* applies also to factual findings of the Arbitral Tribunal in the Partial Award or in earlier Subchapters of this Second Partial Award[359] or in the said schedule.

---

[358]    In this context, see para. 404 hereinafter.
[359]    See e.g. paras. 325(i) and 335/336 hereinabove.