347. The relevant undisputed events within the meaning described in the pre-
ceding paragraph are the following events:

| | Date | Event | Doc. or Ref. No. |
|---|---|---|---|
| 347.1 | October 14, 1998 | Incorporation of LVFG | R-452 |
| 347.2 | November 26, 1999 | Incorporation of TMI | p. 1 Annex A to SC |
| 347.3 | January 31, 2000 | Shareholders' agreement between First National Holding S.A., Luxembourg ("FNH") and its two shareholders, Commerzbank AG, Germany and Telia AB, Sweden (the "TCI SH Agreement") relating to FNH's equity interest in TCI (at the time 75%) which in turn held at least on August 2001 45% of the shares of ZAO North-West GSM, Russian Federation ("North-West GSM")[360] (see para. 310 BID-Statement and Exhibit B (p. 20) to C-65). | C-982 |
| 347.4 | February 10, 2000 | Incorporation of CT-Mobile following the meeting of the founders of CT-Mobile held on January 21, 2000. | pp. 99 and 207 at Tabs 30 and 54 C-DPA Vol. 2 |
| 347.5 | May 19, 2000 | Sonic Duo Licence granted | C-12 = RE-11/32 = CT-CHB Tab 4[361] |
| 347.6 | May 19, 2000 | Minutes in Russian of an extraordinary general meeting of the participants of CT-Mobile (the Involved Person No. 1 acting on behalf of Central Telegraph) resolving to acquire 65% of Sonic Duo and to conclude a sharehold-ers' agreement with Sonera and Sonic Duo named in C-30a the *"Share Retention Agreement"* and signed on the same day (see item 347.18 hereinafter in this list and para. 356 hereinafter). | p. 205 at Tab 53, C-DPA Vol. 2 |
| 347.7 | May 19, 2000 | First shareholders' agreement between Sonera, CT-Mobile and Sonic Duo ("First Sonic Duo SH Agree-ment") providing in the fifth Whereas Clause that *"CTM and Sonera desire to include the Investor ... as an addi-tional shareholder of the [Sonic Duo] by 30 June 2000, at which time this Agreement shall be amended"*; and in Section 1.1 on p. 3 that the loan *"'Investor' shall mean the outside investor into the Company that (i) is agreed to by Sonera and CTM; (i) shall become a party to this Agreement; (iii) will own 50.5% of the Shares of the* | C-13 |

---

[360]  Before the completion of the transaction referred to in Section 3.3 TCI SH Agreement, TCI held 31% of North-West GSM (p. 3 of C-982).

[361]  "CT-CHB" is the Central Telegraph Closing Hearing Bundle handed out by Respondent at the Tenth Hearing.

| | | Company; and (iv) is described in the letter from CTM to Sonera dated the date hereof". | |
|---|---|---|---|
| 347.8 | May 19, 2000 | Telefax from CT-Mobile to Sonera whereby CT-Mobile informs the latter that "the Investor under the Share-holders Agreement shall be ZAO 'SonicInvest'". | C-14 |
| 347.9 | June 19, 2000 | Incorporation of IPOC | p. 9 of C-508 = p. 15 of R-152 |
| 347.10 | November 17, 2000 | Letter from the Proposed Witness No. 4 to the Involved Person No. 1 stating that the business plan approved by the shareholders of Sonic Duo for their "financing ... in 2000-2001" foresees "additional contributions of its shareholders including" CT-Mobile, which requires Cen-tral Telegraph, as a 51% owner of CT-Mobile, to contrib-ute in 2001 an amount of USD 12'597'000.00 in two stages "in 2000-2001", i.e. first USD 6'630'000.00 and later USD 5'967'000.00. | C-23 |
| 347.11 | December 10, 2000 | Incorporation of Sonic-Duo | p.I 1 Annex A to SC |
| 347.12 | December 28, 2000 | Letter from the Proposed Witness No. 4 to the Involved Person No. 1 regarding a capital increase of Sonic Duo at a par value of Roubles 280'000'000.00 (approx. USD 10'000'000.00) requiring from CT-Mobile "... additional financing by means of participation in the increase of the charter capital of CT-Mobile for the total sum of 177,800,000 Rubles by means of additional contribu-tions of its participants in proportion to the existing shares in the charter capital " (the "First Capital In-crease") whereby the stake of Central Telegraph "shall constitute 90,678,000 Rubles, i.e. 51% from the total sum" of Roubles 177'800'000.00. | C-25a = C-26 |
| 347.13 | December 29, 2000 | Minutes of Participants' meeting of CT-Mobile signed by Witness No. 6 and the Involved Person No. 1 approving an increase of CT-Mobile's charter capital by Roubles 177'80'000.00 within six months by TMI (see paras. 360 and 361 hereinafter at fn. 378 and 379) and confirming the "new version" of the agreement on the "setting up and the Charter" of CT-Mobile, both decisions being subject to the "preliminary consent of the Ministry for Antimonopoly Policy ... and the adoption of the decision to refuse to participate in the increase of the charter capital of the Company [CT-Mobile] by the Council of Directors of OJSC 'Central Telegraph'" (the text in quotes is from the English translation of R-8). | C-25b = R-8 |
| 347.14 | January 2001 | January 2001 Meeting, i.e. the meeting referred to in paras. 325(i) and 335 hereinabove, between Witness No. 6 and the Proposed Witness No. 7. | para. 167 and 169 PA |
| 347.15 | January 31, 2001 | Approval of the Ministry of the Antimonopoly Policy of TMI's "purchase of the shares in" CT-Mobile "at the rate of 100%". | C-33A |
| 347.16 | January or | Telephone call from Witness No. 4 to Witness No. 6 on | para. 203 |

| | February 2001 | the possibility to finance Sonic Duo, possibly upon a suggestion of Involved Person No. 5. | T10H Day 1[362] |
|---|---|---|---|
| 347.17 | February 12, 2001 | Memorandum of Understanding between TCI, Sonera, Telia and CT-Mobile regarding the combination of their stakes in North-West GSM and Sonic Duo in one company, i.e. a *"National Mobile Company"* by *"entering no later than April 30, 2001 into legally binding agreements"* and the aim for an IPO in 2002 or 2003. | C-30 |
| 347.18 | February 14, 2001 | Letter approval of Sonera of the dilution of Central Telegraph by waiving Central Telegraph's representation to Sonera in Article 2.1(g) of the *"Share Retention Agreement to retain its"* 51% *"stake in CTM for a period of 3 ... years"* and consenting to the First Capital Increase *"as a result of which the participatory share of Central Telegraph in CT-Mobile will comprise 0.014 ... percent of the charter capital of"* CT-Mobile. | C-30a = p. 49 DPA Vol. 2 |
| 347.19 | February 28, 2001 | Minutes of the meeting of Central Telegraph's board of directors deciding unanimously:<br><br>• in item 4 to *"refuse from participating"* in the First Capital Increase; and<br><br>• in item 10 to *"assign ["request"] the general director prior to April 15 of the current year to prepare and sign an agreement with"* CTM *"on reverse purchase ... of stake in LLC CT-Mobile".* | C-792 (=CT-CHB Tab 25) of which R-9 is an extract |
| 347.20 | March 2001 | March 2001 Meeting, i.e. the meeting referred to in paras. 325(i) and 336 hereinabove, between Witness No. 6, the Proposed Witness No. 7 and Witness No. 4. | para. 167 and 173 PA |
| 347.21 | March 19, 2001 | *"Interconnection and Numbering in Capacity Agreement"* between Sonic Duo and Central Telegraph referred to on p. 12 of the loan agreement between Sonic Duo and international Finance Corporation dated November 30, 2001. | C-82, p. 12 |
| 347.22 | April 2, 2001 | Letter from LVFG signed by Witness No. 6 to representatives of the other shareholders of Sonic Duo and North-West GSM (including Witness No. 4) regarding the proposed *"merger of Sonic Duo and the Regions into North-West GSM"* and the thereto relating valuation and corporate governance stating, *infer alia*, that LVFG accepts that<br><br>• North-West GSM is *"entitled to a premium as compared with Sonic Duo"*; and<br><br>• with *"the merger into North-West GSM structure outlined above, then the following approximate shareholdings would result"*: Telecominvest 27%, Sonera 28%, CT-Mobile 26%, Telia 7.6 %, Telenor | C-34 |

---

[362]     See p. 234 lines 13 to 25 TWH Day 2 and p. 914 to 917 TSWH Day 5.

| | | 7.6%, others 3.6%. | |
|---|---|---|---|
| 347.23 | April 10, 2001 | April Option Agreement referring *inter alia* to the dilution of Central Telegraph in the Clauses quoted in para. 387 hereinafter. | C-36 |
| 347.24 | April 27, 2001 | Amended and restated shareholders' agreement between Sonera, CT-Mobile and Sonic Duo ("**Second Sonic Duo SH Agreement**"), no longer providing for the "*Investor*" defined Section 1.1 on p. 3 of the First Sonic Duo SH Agreement (C-13). | C-47 |
| 347.25 | May 16, 2001 | Registration of the new charter of CT-Mobile with the increased capital resulting from the First Capital Increase. | p. 130 at Tab 32 C-DPA Vol. 2 |
| 347.26 | July 2, 2001 | Fourth draft of business combination agreement signed later on August 6, 2001 (see there) attached to an e-mail exchange between Witnesses Nos. 1 and 6. | C-63 |
| 347.27 | July 26, 2001 | "*Agreement on Purchase of the Equity Interest*" between TMI and Central Telegraph for the "*right to purchase an equity interest in CT-Mobile with a nominal value of rubles 90'678'000.00*" (the "**Reverse- Call Option Agreement**") granting Central Telegraph a so-called reverse call option (the "**Reverse Call Option**" or "**RCO**"). | C-863;   CT-CHB Tab 26 |
| 347.28 | July 31, 2001 | Press release by Central Telegraph informing that it is "*for the time being, refusing to finance its participatory interest in CT-Mobile*" and that it concluded the Reverse Call Option Agreement described as an agreement under which "*Central Telegraph has the ability to return to the previous distribution of participatory interests by contributing the required funds by the end of the year*". | R-265;   CT-CHB Tab 30 |
| 347.29 | August 6, 2001 | Business combination agreement between TCI, Sonera, Telia, Sweden, Telia Management, CT-Mobile and IPOC on the terms and transaction steps for the merger of North-West GSM and Sonic Duo eventually resulting in MegaFon (the "**Business Combination Agreement**") superseding and restating the earlier agreement dated July 5, 2001 (see its Article 20), providing, *inter alia* for (description on p. 6 of Annex A to the Statement of Claim commented in para. 7.29 et seq. Rejoinder):<br><br>"• *The purchase of the Telenor\* shares in NorthWest GSM by Telia and Sonera.*<br><br>• "*An increase in capital in NorthWest GSM and a subscription for new shares. Payment for the new shares was to be in kind, namely, the transfer to NorthWest GSM of: (i) TCI's stakes in the regional operators; and (ii) the respective stakes of CTM and Sonera in Sonic Duo.*<br><br>• *Re-registration of NorthWest GSM as an open joint stock company.* | C-65 |

|  |  | • Several post closing transfers, including: (i) the purchase by IPOC from Telia and Sonera of the shares in NorthWest GSM subject to an unrelated option; (ii) other transfers to bring the parties' stake in North-West GSM (later to be renamed as a pan-Russian operator known as "MegaFon") up to agreed final levels (in the case of CTM 25.1%, and in the case of IPOC 6.5%).<br><br>• Telenor is a Norwegian telecoms operator, which was obligated to leave because it was a shareholder in VimpelCom, a MegaFon competitor." |  |
|---|---|---|---|
| 347.30 | August 6, 2001 | Companies and share valuations based on the transactions in Exhibit B of the Business Combination Agreement stating in item 3(e):<br><br>*Sonic Duo valuation at the Business Combination date is at least $301,5mln.*<br><br>*CTM share of Sonic Duo (65%) is valued as $196mln*<br><br>*Sonera share of Sonic Duo (35%) is valued as $105,5mln.*" | C-64 |
| 347.31 | August 10, 2001 | Participants' meeting of CT-Mobile deciding on a further increase of CT-Mobile's capital by Roubles 190'515'000.00 (corresponding to USD 6'500'000.00) (the **"Second Capital Increase"**) and noting that the *"participatory interest"* of Central Telegraph *"will not change"* and will thereafter constitute 0.007% of CT-Mobile's charter capital. | p. 195 to 197 at Tab 49 C-DPA Vol. 2; CT- CHB Tab 35 |
| 347.32 | November 30, 2001 | Sonic Duo's loan agreement with four *"senior lenders"* | described on pp. 8/9 annex A to SC |
| 347.33 | November 30, 2001 | Extraordinary meeting of participants of CT-Mobile in the presence of Witness No. S38 deciding on the value of Sonic Duo shares for the purpose of the merger with North-West GSM and thereby taking into account the appraisal of an independent expert who determined the value of 65% of Sonic Duo as 1'059'165'929 Roubles (corresponding at that time to about USD 34'000'000.00). | p. 193 at Tab 48 C-DPA Vol. 2 |
| 347.34 | November 30, 2001 | Agreement on Adherence to the TCI SH Agreement whereby ComTel Eastern Limited, an asset management fund organised under the laws of Bermuda ("ComTel Eastern"), adhered in lieu of Commerzbank to the TCI SH Agreement. | C-979 |
| 347.35 | December 14, 2001 | December Option Agreement | C-91 |
| 347.36 | December 14, 2001 | Agreement on the Pledge of Shares in Sonic duo between TM and the European Bank for Reconstruction and Development ("EBRD" and "EBRD Pledge Agree- | Tab 6 C-DPA Vol. 7 |



| | | ment"). | |
|---|---|---|---|
| 347.37 | December 31, 2001 | Contractually foreseen expiration of the Revised Call Option in the Reverse Call Option Agreement defined as end of the *"Term of Implementation"*. | Articles 1.4 and 4.19 C-863 para. 57/58 of RW-17 |
| 347.38 | February 2002 | Expiration of the verbal extension of the contractually foreseen expiration date for the Reverse Call Option pursuant to Articles 1.1 and 4.1 of C-863. | Witness No. S38[363] |
| 347.39 | March 13, 2002 | Completion of the merger between North-West GSM and Sonic Duo agreed in the Business Combination Agreement. | p. 11 of Annex A to SC |
| 347.40 | August 29, 2002 | Letter from Witness No. 4 to Bermuda Commercial Bank regarding the Option Agreements, funding of Sonic Duo and development of MegaFon stating that during *"August 2001 the shareholders in the largest cellular telephone operator in St. Petersburg ZAO North-West GSM ... came to the conclusion that they would like to combine their interests with the third GSM telephone operator in Moscow, OAO Sonic Duo"* and that at *"that point in time Sonic Duo was a start-up operator, but given the fact that EBRD granted the company a facility of approximately 250 million dollars for the initial roll-out of the network the prospects of the company seemed very promising"*. | C-118 |

**b)    The Parties' Positions**

**aa)    Respondent's Position**

348.    In the First Phase and the BID-Phase Respondent submitted the following factual arguments in support of the Dilution Defence:

(i)    The Proposed Witness No. 7 has an interest in IPOC (p. 221 lines 8 to 14 T4H) and it was *"an open secret that [the Proposed Witness No. 7] was planning to put in place"* a *"pan-Russian concept of the third mobile operator in late 1999/early 2000"* (p. 325 T10H referring to Witness No. S5 in para. 66 of RW-12 and box 81 of R-334C).

---

[363]    See p. 148 lines 7 to 13 and p. 151 lines 1 to 16 T9H.

(ii)     Central Telegraph was an *"important element in the development of the proposed new GSM venture"*, as it owned a *"valuable number of sequence bank"* and eventually *"withdrew from equity participation"* in Sonic Duo (para. 79 SD).

(iii)    *"The idea of an 'investor' was invented to dilute the Central Telegraph holding in CTM"* and *"arose long before the April Option Agreement was signed"* (para. 112 SD).

(iv)     *"It is common ground that Central Telegraph was never intended to be a long-term participant in the venture, and was not prepared to provide any funding"* (para. 7.18 Reply), which decision *"must have stemmed from Svyazinvest"* (p. 322 T10H referring on p. 324 to Witness No. S38 conceding to that suggestion filed as Tab 18 CT-CHB = pp. 86/87 and pp. 91/92 T9H).

(v)      Under the heading *"ILLEGAL PURPOSE OF THE APRIL OPTION AGREEMENT-DILUTION OF CENTRAL TELEGRAPH"*, Respondent summarises such *"illegal purpose"* as follows (para. 161 BID-Reply)[364]:

*"(a)    the absence of any consideration for the dilution of Central Telegraph's interest from over 50% to 0.01%;*

*(b)     the absence of any consideration for the creation of the option under the AOA, or for the subsequent transfer from LVFG to IPOC of 77.7% of TMI;*

*(c)     the persistent efforts to conceal the true identity of the owners/controllers of IPOC;*

*(d)     the reality of the political and economic control over Central Telegraph exercised by Svyazinvest, [the Involved Person No. 2] and [the Proposed Witness No. 7];*

---

[364]    In para. 161 BID-Reply the numbering is (i) to (vi) which has in this para. 348(v) been changed to (a) to (f).

188

(e)    Witness No. 4's prior and concurrent (i.e. in 2000 and 2001) associations with [the Proposed Witness No. 7], [the Involved Person No. 2] and state owned enterprises controlled by them; and

(f)    the transfer of Central Telegraph's majority interest in Sonic Duo to IPOC achieved a similar result to the Peter-star, TCI and TRC-Leasing acquisitions, albeit by a different route."

(vi)    In "relation to Central Telegraph", the purpose of the April Option Agreement "was unlawful" (pp. 47/48 T10H) and the April Option Agreement addresses the dilution of Central Telegraph in the third Whereas Clause, Clauses 7.1.3 and 7.3 (pp. 49/50 T10H). In fact, the third Whereas Clause provides that the "structure and underlying feature of the April Option Agreement was this dilution of Central Telegraph down to vanishing point" and that it "was absolutely central to and underlay the whole basis upon which the April Option Agreement proceeded" (p. 129, lines 7 to 12 T4H Day 1; also p. 184 lines 27/28 T4H Day 2).

(vii)    From the testimony of Witness No. 3 on Svyazinvest results that the "overwhelming inference from these facts is that those behind IPOC were indeed closely connected to, or were, individuals with considerable influence within Svyazinvest". The "AOA underlay a corrupt arrangement to loot assets of Central Telegraph and transfer them to interests which lay behind IPOC" (paras. 517 to 519 BID-Statement) and the testimonies of Witnesses Nos. 10 and S38 confirm that the decision not to exercise the option was taken by the Involved Person No. 2 (p. 329 T10H).

(viii)    At all material times, Svyazinvest had the ability to control the actions of Central Telegraph (p. 61 T10H, referring to Tab 18, 19 and 21 of CT-CHB). Thus, the Proposed Witness No. 7 and the Involved Person No. 2 "have been able to exercise control over the actions of Central Telegraph" as it is "well known that the boards of all subsidiaries of Svyazinvest vote almost exclusively upon directives from the

*parent company"* (para. 173 BID-Reply; see also p. 196 lines 19 to 22 T4H Day 2).

(ix)    Moreover, Central Telegraph always had Svyazinvest as *"majority shareholder ... which, in turn, is majority state-owned and, since 1999, has had"* the Involved Person No. 2 in an important position (para. 173 BID-Reply, see also p. 182, lines 2 to 17 T4H and p. 66 T10H referring to Witness No. 10) and the Proposed Witness No. 7 as *"an officer"*, namely its chairman (p. 322 lines 3 et seq. T10H Day 2 and para. 3.1.2 RE-11).

(x)    The Involved Person No. 2 took the *"final decision on behalf of Central Telegraph not to participate in CT-Mobile"* (para. 173 BID-Reply). When *"the expiring date"* of the Reverse Call Option approached at the end of 2001, such decision was *"indefensible on commercial grounds"* (para. 167 BID-Reply).

(xi)    Central Telegraph's stake in Sonic Duo had considerable value: it *"had obtained (on May 19th 2000) the third GSM license for Moscow, without any competition and in circumstances where there were rumours in the press and elsewhere that"* it had been *"favoured because of its connections"* with the Proposed Witness No. 7 (para. 514 BID-Statement).

(xii)    *"Sonera would not have been prepared to put in such substantial funds in return for its shareholding unless it had assessed Sonic Duo as being very valuable"* (para. 514 BID-Statement) and was aware of the usefulness of the *"direct link to Svyazinvest"*, which *"was one of the main players in the Russian Telecom market with very strong lobbying force"* (p. 1192, lines 5 to 11 TSWH Day 6 referred to on p. 52, lines 1 to 10 T10H Day 1) and of the Involved Person No. 6's good relationship with the Proposed Witness No. 7 (p. 51, lines 17 to 28 T10H Day 1 referring to the testimony of Witness No. S12 on p. 1178, line 24 to p. 1179, line 19 TSWH Day 6).



(xiii)    *"The dilution was entirely to increase the share capital of CTM, which was then used to make a funding into Sonic Duo. Central Telegraph never received a penny"* (p. 195, line 30 to p. 196, line 3 T4H).

(xiv)    The Proposed Witness No. 7 is *"on both sides of the events"* as he is on one end an *"officer of the Russian State"* exercising *"his powers abusively"* as such and as *"an officer of Svyazinvest working with"* the Involved Person No. 2 and on the other end *"he is IPOC"*, the *"vehicle"* acquiring *"the benefits, the products, the fruits of his activities in office"* (p. 322, lines 3 to 14 T10H).

(xv)    The Proposed Witness No. 7 directed the grant of the Sonic Duo licence in gross violation of licensing law and this even before Sonic Duo had an allocation of appropriate frequencies (p. 53 et seq. T10H referring to the testimony of Witness S1 at Tab 6 CT-CHB and Witnesses Nos. S4, S3, S22 (=No. 3) and S6 at Tabs 9, 10, 11 and 24 CT-CHB = para. 10 RW-10).

(xvi)    Central Telegraph could have raised the necessary money to fund the capital increase with Svyazinvest's help (p. 63 T10H referring to the testimony of Witness No. 10 at Tab 22 CT-CHB). The testimony of Witness No. S38 is contradictory as he gave the recommendation not to participate and tried to receive help from Svyazinvest to find funding (p. 326 T10H referring to Tabs 19/20 CT-CHB).

(xvii)    The decision of Central Telegraph to give up its interests in CTM was taken in December 2000 and was a *"decision already ... taken"* when the meeting of the participants of CT-Mobile took place on December 29, 2000 as the minutes speak of an *"adoption of the decision to refuse to participate"* (p. 60, lines 4 to 25 T10H quoting from C-23).

(xviii)    There were two dilutions of Central Telegraph: the first was agreed in December 2000 *"effected by the first payment under the April Op-*

tion Agreement" and the second dilution was in 2001 effected by the "second payment under the April Option Agreement" before the remaining "small balance in CTM held by Central Telegraph" was "sold out" (p. 70, line 21 to p. 71, line 7 T10H). Accordingly, there "was clear[ly] the agreement not to fund, even though the reverse call option was called into existence" (p. 71, lines 8 to 15 T10H Day 1).

(xix)   The Reverse Call Option Agreement (C-863) clearly shows "it cannot be correct that Central Telegraph never had any intention of becoming substantially involved in CT-Mobile/Sonic Duo" (para. 170 BID-Reply) and that it was "either mere window dressing or ... put forward by [the Involved Person No. 4], an independent director, [as] an attempt to save the position to enable Central Telegraph later to recover its position because without that there does appear to be a quite flagrant transfer for no value of a state interest to the private company" (p. 64, lines 13 to 18 T10H Day 1 and p. 328 T10H Day 2).

(xx)    IPOC was aware of the Reverse Call Option Agreement (C-63) (para. 171 BID-Reply). This "reinforces the complicity between the individuals behind CT and IPOC, with [Witness No. 6] in the middle" (para. 5 of Respondent's Confidential DPA Comments) and Svyazinvest and the Proposed Witness No. 7 had knowledge thereof as well (p. 330 T10H referring, inter alia, to the testimony of Witness No. S17 who stated that prior to signing the Reverse Call Option, he got, via Witness No. 4, the approval of the Proposed Witness No. 7).

349.   Based on the above arguments, Respondent submitted that the April Option Agreement is unenforceable for the following legal reasons:

(i)     The dilution of Central Telegraph is a "looting of the public companies, the state-owned companies of the Russian state, by private interests at the very highest levels within the organs of the Russian state" (p. 182 lines 21 to 26 T4H Day 1, with reference to Proposed Witness No. 3).

192



(ii)   There is *"a clear nexus, ... that each of the steps through and from the original offences of criminal activity in Russia, through the money stream ... to the application of those funds to the AOA were, on behalf of and in the interests of one common owner and therefore ... that agreement is unenforceable by reason of illegality in its performance"* (p. 47 lines 15 to 22 T10H).

(iii)  In *"relation to Central Telegraph, ... the purpose of the AOA was, in fact unlawful"* (p. 47/48 T10H). *"That is the illegality, the function of the AOA"* (p. 335 line 2 T10H).

(iv)   One of the purposes of the April Option Agreement *"was to dilute out Central Telegraph and [Proposed Witness No. 31] makes it clear that's an offence in Russia in the circumstances described in the evidence and ... amounts to an offence of illegality, the purpose of the agreement having been the commission of an offence"* (p. 74/75 T10H). As such dilution is *"a criminal offence"* in Russia (p. 69 line 1 T10H with reference to para. 23 and 25 RE-20), the offence falls under Article 201 RCrC (*"actions by a director or officer so as to endow a benefit on himself, his family..."* or *"a close friend"*), and the *"conferring a benefit on [him]self"* by the proposed Witness No. 7 under Articles 160 or 285 RCrC (p. 76 T10H with references to para. 28 to 33 RE-20, also para. 39.2 BID-Statement).

(v)    A dilution *"without any form of proportionate economic value ... would involve a criminal offence and does not require the participation of an official"* under Russian law (lines 5 to 10 p. 73 T10H with reference to para. 95 to 98 RE-30) and, therefore, the Arbitral Tribunal is *"satisfied that there was in effect a dilution away of Central Telegraph's controlling interest in Sonic Duo and replacement of it by IPOC for no consideration, then the inference is more than strong enough ... to find that there is corruption"* (p. 182 Day 2 T4H).



(vi) *"In connection with the obtaining of the license [of Sonic Duo]"* there is an *"abuse of power"* (p. 59 lines 5 and 11 T10H, with reference to p. 17/18 RE-20).

(vii) *"The use of ministerial power and authority to promote and further personal financial interests 'is a corrupt and illegal practice'"* (para. 39.1 BID-Statement referring to Proposed Witness No. 3 at para. 2.2.2 RE-11).

(viii) Therefore, the *"illegal purpose behind the April Option Agreement is either giving effect to an illegal transfer of a State asset into private hands, that is a State asset which was the interest of Central Tele-graph, or it is transferring the benefit of a corrupt licensing process into private hands, ... responsible for the corrupt licensing process"* (p. 110 lines 12 to 21 TSWH Day 1).

(ix) Under English law the purpose of the April Option Agreement *"to procure the dilution out of Central Telegraph... in circumstances which, inevitably, amounted to a crime within Russia"*, i.e. the *"trans-fer of a [state] asset to private hands at a gross undervalue"*, would *"obviously be criminal if committed in England and dealings in the proceeds (by those with knowledge of or reasonable grounds to suspect the criminal origin) would amount to money laundering"* (p. 69 T10H quoting RE-25) although *"money laundering would not need to be addressed to establish illegality in English Law in respect of those who assist in the disposal of stolen goods (including money) or their proceeds: such conduct would in any event be criminally ille-gal as handling stolen goods"* (p. 70 lines 1 to 5 T10H quoting RE-25).

(x) *"An English court would [not] lend its assistance to the enforcement of a contract which involved theft from or the defrauding of a foreign state"* (p. 70 lines 6 to 9 T10H with reference to RE-25).



(xi)    Even if the Arbitral Tribunal were to find that Respondent was *"party to this wrongdoing of extracting value from Central Telegraph"* it can still take the defence that the April Option Agreement is *"illegal and unenforceable"* (p. 74 T10H with reference to para. 58 RE-7).

(xii)   Respondent's case is summarised on p. 339 T10H concluding the pleadings on Central Telegraph as follows :

> *"1.      There is a crime or a predicate offence ...*
>
> *2.      Funds or assets are generated or diverted to private ownership as a result.*
>
> *3.      They are transferred or laundered. Money laundering.*
>
> *4.      The funds are used in performance of the AOA. Those payments have been actually the only means of performance that IPOC had, illegally obtained payments, and the action of applying those illegally obtained/laundered payments gives rise to the English law defence of illegality in performance.*
>
> *5.      The agreement in question was the AOA. ... One of its purposes was removal of the dilution of Central Telegraph."*

**bb)    Claimant's Position**

350.    Claimant rejected Respondent's argument that the Dilution Defence is a valid ground to hold the April Option Agreement is invalid or unenforceable by putting the relevant facts in a different perspective (see the following paragraph) and on the legal grounds listed in para. 352 hereinafter.

351.    Claimant's factual assessment of the dilution of Central Telegraph can be summarised as follows:

(i)     *"The agreement by which Central Telegraph was to be diluted was made in June 1999 ... well before the April Option Agreement and it was not reached by [Witness No. 4] and IPOC"* (para. 492 BID-Answer referring to paras. 17 and 23 RW-8).

(ii)     An underlying premise of the April Option Agreement was that TMI would obtain approximately 100% ownership of CT-Mobile using funding principally provided by Claimant as TMI, at the time of the conclusion of the April Option Agreement, did not own 100% of CT-Mobile (p. 11-12 SC).

(iii)    The April Option Agreement is not absent of consideration: *"IPOC significantly exceeded the minimum funding of USD 15'225'000, and made discretionary funding in 2002"* (para. 138 BID-Rejoinder). Already *"IPOC's approximately $5 million initial payment was used to increase CTM's capital (in which Respondent and Claimant both held an interest"* and *"puts to bed Respondent's repeated cry that Respondent received 'no consideration' or economic benefit from the AOA"* (para. 484 BID-Answer).

(iv)     When the Arbitral Tribunal determines the adequacy of *"consideration"* agreed between the Involved Person No. 1 and Witness No. 6 it *"must consider the following uncontested facts that prevailed in June 1999 ...* [365]

- *Sonic Duo did not exist*

- *It was not known whether frequencies for a third GSM operator were available*

- *No license for a third GSM operator had been issued, nor even an application for a license in train*

- *Sonera, an eventual key financier of the initial project, with the technical expertise to apply for license, was not on board*

---

[365]    See para. 496 on pp. 184/185 BID-Answer referring to paras. 17, 22-24, 28, 32 and 44 of the witness statement of Witness No. 6 (RW-8) and for the second bullet point to C-684 also p. 60/61 T4H citing p. 196 lines 19 to 26 of the ICC witness statement of Witness No. 12.

- *MegaFon did not exist, even as a concept*

- *Two of the largest GSM operators, MTS and VimpelCom already dominated Moscow*

- *VimpleCom had only a few months earlier, in late 1998, received the first dual-band GSM 900/1800 license ever, ...*

- *Russia had only recently suffered a financial crisis in August 1998, the effects of which were significant on the telecom sector ...*

- *Cellular penetration rates in Russia were in single digits".*

(v)    *"There is nothing sinister about the CT dilution, or IPOC's funding of the corresponding increase in capital"* as it is *"basic that a share-holder either does or does not participate in an increase in capital. If they do not it is axiomatic that they are 'diluted', but they also do not have to come up with money for the capital increase"* (para. 485 BID-Answer, see also p. 195 T10H). The decision *"was duly minuted and unanimously approved at a Central Telegraph Board meeting (C-792), attended by Respondent's [the Proposed Witness No. 4]"* (para. 502 BID-Answer).

(vi)    Respondent did not submit evidence supporting its *"corrupt dilution theory ... but if it were true, Respondent and Alfa are fully impli-cated"* (paras. 514, 517 BID-Answer, paras 127(ii) and (iii) BID-Rejoinder, p. 104 lines 6 to 14 TSWH Day 1). If anything illegal hap-pened, Respondent did it and *"they have to bring the proof of their own illegality"* (p. 431 T10H).

(vii)    Furthermore, *"Respondent's theories are in contradiction with each other inasmuch as they simultaneously maintain: (i) 'those behind IPOC' could control Central Telegraph, through Svyazinvest, in order to 'loot' its assets and (ii) they exerted duress and pressure on [Wit-*

197



*ness No. 6] so that he would cause Central Telegraph to be diluted so that 'looting' could be carried out through April Option Agreement funding"* (para. 488.3 BID-Answer).

(viii)   On the contrary, the directors of CT-Mobile were the Involved Person No. 1, Witness No. 6 and the Proposed Witness No. 4. Accordingly, these persons decided for Central Telegraph and thus allowed its dilution, which is *"consistent with"* the testimony of Witness No. 6 that *"he maintained control, even though in fact he had only 49 percent"* of Central Telegraph (p. 421 T10H referring to the testimony of Witness No. 6 on p. 103 lines 1 to 12 TWH Day 3).

(ix)   The Central Telegraph dilution had, moreover, the approval of the Ministry of Anti-Monopoly - not controlled by the Ministry of the Proposed Witness No. 7 - and Sonera (p. 203 T10H). It was very well-known that Central Telegraph was diluted, and it was completely approved by independent third parties (p. 213 T10H).

(x)   Respondent and IPOC envisaged and anticipated the dilution of Central Telegraph's 51% interest in CT-Mobile, as it was understood that Central Telegraph did not have the financial resources/budget to contribute the financial investment envisaged by CT-Mobile and Sonera under the First Sonic Duo Agreement to fund Sonic Duo (pp. 11-12 SC, para. 500 BID-Answer).

(xi)   Central Telegraph was indeed *"unable to fund the amounts required"* for the development of Sonic Duo and therefore was diluted by LV Finance from holding a 33.15% stake in Sonic Duo *"to an effective 0%"* (p. 11 Reply line 6, fn. 3, para. 505 BID-Answer with reference to para. 29-30 RW-8 and p. 196 lines 12 to 19, p. 199 lines 1 to 8 of the testimony of Witness No. 12, TWH Day 5, para. 134 BID-Rejoinder referring to R-265, p. 61 lines 8 to 19 T4H Day 2).

(xii)   Central Telegraph did not participate in the First Capital Increase because Witness No. S38 believed he would have entered an open-

ended commitment for his company that was indebted and had 1000 employees. Committing would have bankrupted Central Telegraph (p. 197 T10H).

(xiii)   The Proposed Witness No. 7 *"is not involved at all in the creation of Sonic Duo"* (para. 504 BID-Answer referring to para. 10 to 11 C-518e and p. 172 ICC Transcript filed as C-359).

(xiv)   The Reverse Call Option Agreement was known neither to Witness No. 4 nor to IPOC. Witness No. S38 had never met Witness No. 4 and had not even heard of IPOC (p. 428 T10H). The Reverse Call Option Agreement (C-863) *"is on its face wholly inconsistent with IPOC's rights and interests under the AOA, and is a breach of the Undertakings at §§ 7.1.1 and 7.1.2 of the AOA"* (para. 129 BID-Rejoinder). Moreover, if Respondent's case with duress were true, they would have filed the Reverse Call Option Agreement earlier and examined Witness No. 6 on it (p. 193 T10H). In fact, Respondent failed to disclose the full version of R-9, i.e. the part where the general director was required to draw up the Reverse Call Option Agreement (p. 426 T10H Day 2).

(xv)   There *"is no evidence that Central Telegraph had an obligation to adhere to any decision made by [the Involved Person No. 2] ... as [the Involved Person No. 2] is not on its board"* (para. 133 BID-Rejoinder) and IPOC *"does not believe"* that the Involved Person No. 2 decided to allow the Reverse Call Option to expire (para. 132 BID-Rejoinder).

(xvi)   The *"EBRD financing agreement for MegaFon was only signed on 14 December 2001 and the ... closing and disbursement occurred months later ... in November-December 2001"*. Before, on December 7, 2001 an *"emergency loan of $13 million from IPOC to TMI was required ... to meet EBRD capital requirements"* at which time *"Telia was seriously considering pulling out of the MegaFon project ..."* (para. 136 BID-Rejoinder).

(xvii)   Had Central Telegraph or Witness No. S38 come and said that Respondent must *"pay us not to exercise"* the Reverse Call Option, the answer of Respondent would have been that Central Telegraph could not sell its *"renunciation ... because LV Finance would have been perfectly happy to have them contribute"* (p. 196 lines 6 to 16 T10H referring to the testimony of Witness No. S17).

(xviii)  From the schedule in para. 128 on p. 58 BID-Rejoinder results that Respondent's Dilution Defence *"flipped 180 degrees"* (see p. 189 et seq. T10H) as Respondent alleged

- in August 2004, in para. 7.18 Rejoinder, that *"it is common ground that CT was never intended to be a long-term participant in the venture, and was not prepared to provide any funding"*;

- in October 2004, on pp. 137, 163 and 220 T4H Day 1, that the dilution of Central Telegraph is *"corrupt"*[366] or *"either duress or complicity"*;

- in January 2005, in para. 520 BID-Statement, that the *"removal of Central Telegraph as part of the operation of the AOA is obviously inextricably linked to the duress imposed on"* Witness No. 6; and

- in July 2005, in para. 164 BID-Reply, without mentioning the Duress Defence that the explanation of Witness No. 6 that it *"could not afford to participate"*[367] cannot be believed.

352.  Based on the above assessment of the dilution of Central Telegraph, Claimant drew the following legal conclusions:

---

[366]  Corruption is merely mentioned on p. 139 T4H Day 1, p. 137 speaks of *"collusive arrangement"*.
[367]  On p. 58 BID-Rejoinder.

(i)     The *"concept of illegal dilution is not a legal concept. A dilution is not per se illegal"* (p. 195 lines 14 to 16 T10H).

(ii)    If Central Telegraphs dilution is not *"clearly illegal or it was done for an illegal purpose, or the decision ... was some breach of fiduciary duty ... none of which has been shown"* it has *"no legal relevance"* (p. 201/202 T10H).

(iii)   The illegality has *"to be put at IPOC's door"*, it is *"not a situation where there has been any demonstration that IPOC has the evidence and can bring"* it. Respondent did the dilution, and, therefore if it is *"illegal, they could bring the evidence"* (p. 202 T10H, see also p. 429 lines 27/28 T10H). Accordingly, there *"has not been proof"* that Respondent's *"dilution ... rises to the level of illegality"* which affects the April Option Agreement.

(iv)    The dilution of Central Telegraph is not illegal under Russian law, as the Ministry of Anti-Monopoly and Sonera approved it (p. 203 lines 4 to 21 T10H, see also p. 212 lines 23 to 26 T10H and p. 421 lines 1 to 9 T10H).

(v)     The awarding of the Sonic Duo Licence was not illegal (p 158ff BID-Answer).

(vi)    On the evidence that is available, the Arbitral Tribunal cannot find that the dilution and the obtention of the Sonic Duo Licence were illegal (p. 434 lines 15 to 20 T10H). Respondent did not bring the evidence as to IPOC's or the Involved Person No. 2's illegality (p. 433 lines 1 to 4 T10H).

(vii)   An *"illegal licensing, which is a necessary corollary ... to the illegal dilution ... implicates Sonera"*. Respondent would not only have to show that the granting of the licence is illegal, but also that Sonera *"is illegal, because they applied for that licence"* (p. 203 lines 22 to 27 T10H).

(viii)   Beneficial ownership does not *"equate with illegality"* under Russian law, *"and the same is true as to English law and the April Option Agreement"*. The April Option Agreement *"cannot, substantively or jurisdictionally"* be struck down *"because of its ownership"* (p. 237 T10H referring to paras. 121 to 126 BID-Reply).

### c)   The Arbitral Tribunal's Factual Findings

### aa)   Financing Capacity of Central Telegraph?

353.   As stated in para. 351(xi) hereinabove, Claimant alleges that Central Tele-graph was *"unable to fund the amounts required"* to develop Sonic Duo. Al-though the Arbitral Tribunal accepts that Central Telegraph might not have had sufficient funds of its own to do so[368], for the following reasons it does not agree with Claimant's proposition that Central Telegraph was unable to fund Sonic Duo in the manner anticipated by the First Sonic Duo SH Agreement.

354.   Witness No. 10 testified that there were possibilities to arrange for the re-quired financing should Central Telegraph's majority state-owned mother company have decided to involve itself in arranging or facilitating such fi-nancing[369]. Witness No. S38 admitted that he asked *"Svyazinvest to ar-range loan facilities"* and addressed the Involved Person No. 3 and Witness No. 10 *"for support"*[370]. Despite the fact that Witness No. 3 testified in the Geneva ICC Proceeding when asked about the dilution of Central Tele-graph that the Involved Person No. 2 *"enjoyed the project"* Sonic Duo and *"thought it was a good project"*, Svyazinvest did not make available *"its sys-tems"* to Central Telegraph in order to find money for this project[371, 372].

---

[368]   This is also the testimony of Witness No. 10 at p. 775 lines 20 et seq. TSWH.
[369]   See p. 686-688 TSWH Day 4.
[370]   See p. 126 lines 10 to 25 and p. 129 lines 16/17 T9H.
[371]   See pp. 462 to 468 of C-359, in particular p. 466 lines 3 to 7, p. 467 line 12 to p. 468 line 4 where Witness No. 3 also stated that in his own thinking he thought that *"someone else friendly, it could be a sister company to Svyazinvest"*, would step in and finance.
[372]   See p. 688 line 2 TSWH Day 4.

355.  Considering that Svyazinvest thought that the development of Sonic Duo was a *"good project"* and in view of the fact that Central Telegraph - as admitted by Witness No. S38 - was in the relevant period a profitable enterprise with an annual profit of *"$2.5/3 million"* and revenues of approximately *"$24 million"*[373], and that Central Telegraph provided Sonic Duo in 2000 and 2001 with short and mid-term financing of about USD 2'000'000.00[374], the Arbitral Tribunal concludes that Central Telegraph was, despite its debts[375], financially stable with positive mid- and long-term perspectives. This means that its parent company, Svyazinvest, could have assisted Central Telegraph in finding the necessary funds of approximately USD 6.5 million (which represents roughly a half of CTM's increase in its statutory capital in 2001 financed by TMI) to participate in the development of the *"good project"* Sonic Duo. This would have been possible without using Svyazinvest's own funds but by way of supporting Central Telegraph in securing loans from a bank operating within the telecommunications industry. In the opinion of the Arbitral Tribunal, Central Telegraph's own financial position allowed it - even without securing a loan - to retain, with perhaps a reduced -- but nonetheless meaningful - participation in CTM by contributing an amount of USD 1 to 2 millions.

### bb)  Central Telegraph's Intention on May 19, 2000

356.  On May 19, 2000, the Sonic Duo Licence was granted and Central Telegraph agreed that CT-Mobile acquires 65% of Sonic Duo and allowed that the First Sonic Duo SH Agreement (C-13) be signed setting forth the financing requirements for Sonic Duo and signed the Share Retention Agreement requiring Central Telegraph to keep 51% of CT-Mobile for at least three years[376]. Therefore, when participating in the project of Sonic Duo, Central Telegraph knew from the outset not only the fact that financ-

---

[373]   See p. 78 lines 2 to 8, p. 77 lines 23 to 26 and p. 166 lines 24 to 28 T9H.
[374]   See pp. 108/109 T9H referring to two loans of approximately *"30 million roubles"* each at the then valid exchange rate of about 30 Roubles per USD.
[375]   Witness No. S38 also emphasized that the *"debts amounted to more than $30 million"* (p. 77 line 25 and p. 166 lines 18 to 23 T9H).
[376]   See the documents listed and described in paras. 347.6 and 347.7 hereinabove.

ing would be required but also the magnitude of such financing and despite (or taking into account) this knowledge agreed to proceed with the project under an obligation to participate for at least three years.

357.  Despite this mid-term commitment, Central Telegraph's decision to proceed with the Sonic Duo project was based on the assumption that the required financing, or a major part of it, would be provided by an outside investor. The First Sonic Duo SH Agreement (C-13) provided in Section 1.3 of its attachment A that the increase of Sonic Duo's charter capital, and thus a funding by CT-Mobile, would become necessary only after the *"investor"*, being the outside investor defined in Section 1.1 on p. 3 of the First Sonic Duo SH Agreement, had become a party to the said agreement (C-13). Therefore, Central Telegraph was, according to the intentions set forth in May 2001, not even supposed to provide financing.

358.  Under this concept, after the joining of the new *"investor"*, Central Telegraph would still have retained its 51% equity interest in CT-Mobile and through it an equity interest in Sonic Duo of 7.395%[377].

359.  In this setting, Claimant's argument that at the end of 2000, i.e. when the First Capital Increase of CT-Mobile was discussed and resolved by CT-Mobile's participant's meeting of December 29, 2000, Central Telegraph found itself incapable of financing the *"good project"* Sonic Duo does not stand scrutiny.

cc)   **Central Telegraph's Decision Not to Participate in the First Capital Increase**

360.  The decision to increase the charter capital of CT-Mobile taken by CT-Mobile's participants on December 29, 2000 (R-8) was made before the proposed investor joined the existing shareholders of Sonic Duo. The new

---

[377]   Initial situation: CT-Mobile 65% - Sonera 35%; situation after this new *"investor"* joins: new *"Investor"* 50,5%, CT-Mobile 14,5%, Sonera 35%. 51% of CT-Mobile's share of 14,5% is 7,395%, which is Central Telegraph's share in Sonic Duo on a see-through basis as planned by the First Sonic Duo SH Agreement.

business plan referred to in the letter from the Proposed Witness No. 4 to the Involved Person No. 1 dated November 17, 2000 and the invitation sent on December 28, 2000 by the Proposed Witness No. 4 to the Involved Person No. 1 to participate in the capital increase of Sonic Duo through the First Capital Increase of CT-Mobile, indicate that at that time it was known that the *"investor"* referred to in Section 1.1 on p. 3 of the First Sonic Duo SH Agreement was no longer the Russian Company *"ZAO SonicInvest"* referred to in CT-Mobile's letter to Sonera dated May 19, 2000, but the minority owner of CT-Mobile, namely TMI[378].

361.    The said decision of CT-Mobile's participants (R-8), namely TMI[379] and Central Telegraph provided that the First Capital Increase must be subscribed by the other shareholder TMI with the consequence that it was TMI, which was diluting the majority shareholding of Central Telegraph and becoming in fact the sole owner of CT-Mobile leaving Central Telegraph with a 0.014% share. This shows that the financing of Sonic Duo originally foreseen in the First Sonic Duo SH Agreement to be made by a direct investment of ZAO SonicInvest, and allowing Central Telegraph to retain through CT-Mobile not a totally insignificant indirect share in Sonic Duo of about 7.4%[380], was replaced by a financing structure which left Central Telegraph with a mere symbolic indirect participation in Sonic Duo.

362.    The intention of this new financing structure to dilute Central Telegraph is further evidenced by the fact that the decision of the participants of CT-Mobile of December 29, 2000 was conditioned on Central Telegraph's *"adoption of the decision to refuse to participate"* in the First Capital Increase[381]. In other words, the decision to dilute Central Telegraph's share in CT-Mobile in favour of TMI was to enter into force only if approved by Central Telegraph's board of directors.

---

378    See C-23, C-26 and C-14 described in para. 347.8, 347.10 and 347.12 hereinabove. The minority share of TMI corresponds to the 49% referred to in the second Whereas Clause AOA (C-36).

379    TMI is mentioned in part II/1 line 3 on p. 3 of R-8 as making an *"application to introduce an additional contribution"*.

380    See para. 358 hereinabove.

381    See the last paragraph of item (ii)/1 on p. 2 of R-8.

363.  This new structure was ready to be implemented in early 2001 after receipt of the approval of the Ministry of the Antimonopoly Policy of January 31, 2001 allowing TMI to become the sole shareholder of CT-Mobile (C-33A), and the approval given on February 14, 2001 by Sonera of the dilution of Central Telegraph and the waiving of the latter's representation to keep its 51% participation in CT-Mobile for at least three years[382]. Accordingly, on February 28, 2001, the board of directors' meeting of Central Telegraph could take the unanimous decision to *"refuse from participating"* in the First Capital Increase of CT-Mobile (p. 4 of C-792). Svyazinvest had at that time 51% of the voting shares of Central Telegraph[383]. Out of the five members of Central Telegraph's board of directors present at that meeting, three were employees of Svyazinvest[384]. Moreover, at the time, the main occupation of the chairman of the board, the Involved Person No. 3, was his position of a deputy general director of Svyazinvest (see p. 2 of C-792).

364.  The above shows that Central Telegraph's decision not to participate in the First Capital Increase and thereby accepting the dilution of its equity interest in CT-Mobile was fully supported by Svyazinvest and reflected the position of its management. In fact, Witness No. 10 testified that this decision *"was approved by [the Involved Person No. 2]"*[385] and that the general director of Central Telegraph, Witness No. S38, asked for *"an official decision from Svyazinvest, which would justify his refusal to take part"* in the First Capital Increase[386]. In view of this finding that Svyazinvest approved Central Telegraph's decision not to participate in the First Capital Increase, it can be left open whether Witness No. 10's assumption that *"[the Involved*

---

[382]  See p. 49 (= C-30A) and p. 205 of the Volume 2 of the confidential DPA-Documents described in para. 347.18 hereinabove.

[383]  See the testimony of Witness No. S38 at pp. 86/87 T9H. See also p. 88 T9H, where Witness No. S38 stated: *"I already said that Svyazinvest has 51% of the voting shares"*. Accordingly, the criticism in fn. 4 of Claimant's Confidential FCT-Reply is, with regard to the control over Central Telegraph, not justified.

[384]  The three employees are the Involved Persons Nos. 3, 8 and 9.

[385]  See para. 56 of RW-17 and p. 805 lines 11 to 23 TSWH Day 4.

[386]  See p. 688 lines 11 et seq. TSWH Day 4.

*Person No. 2] would not have taken a decision without consulting with"* the Proposed Witness No. 7 is correct[387].

### dd)    Reverse Call Option

#### (i)    Conclusion of the Reverse Call Option Agreement

365.    Acting in accordance with the instructions received, on February 28, 2001 Central Telegraph's board of directors decided to decline participating in the First Capital Increase of CT-Mobile (p. 4 of C-792). However, this agreement to dilute Central Telegraph's share in CT-Mobile was subject to a condition. One of the directors representing a minority shareholder proposed to make a reverse call option agreement with TMI allowing Central Telegraph to buy back the shares in CT-Mobile. Witness No. 10 believed that this proposal was made in order to avoid a scandal due to the dilution of Central Telegraph's shareholding in CT-Mobile (p. 690 TSWH Day 4). This decision was made at the same board of directors' meeting , and the general director of Central Telegraph was instructed to prepare and sign with TMI an agreement *"on reverse purchase of stake in LLC CT-Mobile"* (p. 5 of C-792).

366.    Witness No. S17 testified that he was instructed by Witness No. 6 to sign the Reverse Option Agreement with Central Telegraph on behalf of Transcontinental Mobile Investment Ltd. and a draft of such an agreement signed on the part of Transcontinental Mobile Investment Ltd. was sent to Central Telegraph in the end of March/beginning of April 2001 (C-863, p. 1524 of TSWH Day 8). It was signed on the part of Central Telegraph in July 2001 and announced at the annual general shareholders' meting of Central

---

[387]    As will be seen in para . 401 hereinafter, this issue can also from a legal point of view be left open. In fact, although it is because of the personal relationship between the Involved Person No. 2 and the Proposed Witness No. 7 highly probable that Proposed Witness No. 7 was consulted, there is no direct evidence that this was the case and how Proposed Witness No. 7 reacted. On the other hand, there is also no evidence at all that Proposed Witness No. 7 undertook any effort to see to it that Svyazinvest supports a participation of Central Telegraph in the First Capital Increase.

Telegraph of July 30, 2001 and thereafter mentioned in a press-release of Central Telegraph on July 31, 2001 (R-265).

### (ii)    Awareness of Claimant of the Reverse Call Option?

367.   Since the existence of the Reverse Call Option was made known, not only in the course of the annual shareholders' meeting, but to the media by the press release of July 31, 2001 filed as R-265[388], the Arbitral Tribunal concludes that, given Claimant's interest in the Sonic Duo project, Claimant must have known about it. Witness No. S17 even stated that he was informed by Witness No. 6 that Witness No. 4 and the Proposed Witness No. 7 approved the signing of the Reverse Call Option Agreement (pp. 1525-1526 TSWH Day 8). The testimony to the contrary by Witness No. 4[389] merely serves his false testimony that the Proposed Witness No. 7 is not behind IPOC and cannot be believed by the Arbitral Tribunal[390].

### (iii)    Second Capital Increase

368.   On August 10, 2001 the meeting of the participants of CT-Mobile decided on the Second Capital Increase of CT-Mobile[391]. According to the testimony of Witness No. S38 he was not aware of this Second Capital Increase[392], although the minutes of this meeting show that this witness was present at that meeting[393]. In any case, it is undisputed that the Reverse Call Option Agreement signed in July 2001 was not amended or supplemented by a second reverse call option agreement and therefore partly frustrated by the Second Capital Increase as it reduced the Reverse Call Option for an eq-

---

[388]   See para. 347.28 hereinabove and para. 166 on p. 73 BID-Reply.
[389]   See p. 960 line 15 to p. 961 line 18 and p. 966 line 19 to p. 967 line 18 TSWH Day 5.
[390]   See para. 231 hereinabove.
[391]   See the minutes filed on pp. 196 to 198 C-DPA Vol. 2 described in para. 347.31 hereinabove and the English translation in CT-CHB TAB 35.
[392]   See p. 144 and p. 157 lines 14/15 T9H.
[393]   See p. 1 under (i) of the document referred to in fn. 391 hereinabove.

uity interest in CT-Mobile of 51% under the Reverse Call Option Agreement to about 24.62%[394].

369.    In the opinion of the Arbitral Tribunal, Respondent's or TMI's failure to discuss with representatives of Central Telegraph the consequences of the Second Capital Increase[395] or to arrange for the signing of a second reverse call option agreement clearly demonstrates that Respondent (through TMI and CT-Mobile) was well aware that the Reverse Call Option Agreement was not meant to be an agreement to be performed, but rather a disguise or a justification for the dilution of the Central Telegraph in case it drew attention and questions from the shareholders of Central Telegraph or other third parties. This, in turn, was possible only if Central Telegraph and Svyazinvest intended not to exercise or allow the exercise of the Reverse Call Option.

(iv)    **Non-Exercise of the Reverse Call Option**

370.    The Reverse Call Option was to expire on December 31, 2001[396]. At this point a finding of the "Svyazinvest" commission on property was prepared and a board meeting of Central Telegraph was conducted adopting the decision not to exercise the option[397]. This board meeting took place in February 2002, after expiration of the contractual reverse option period, but Witness No. S38 explained that there was an oral agreement with TMI that the option period would be extended until the board of directors of Central

---

394    Central Telegraph had originally 50'000 shares. After the Second Capital Increase, the charter capital of Central Telegraph was constituted of 368'365'000 shares (50'000 original shares + 177'800'000 from the First Capital Increase + 190'515'000 from the Second Capital Increase). If Central Telegraph had exercised the Reverse Call Option after the Second Capital Increase, it would have had 24.62% (90'678'000 + 25'500 of 368'365'000) (see C-26, R-8 and p. 196 at Tab 48 C-DPA referred in paras. 347.12, 347.13 and 347.31 hereinabove).

395    As results from para. 382 hereinafter, Witness No. S38 does not recall such a discussion. In the event the minutes referred to in above fn. 391 erroneously list Witness No. 38 as present, Respondent should have drawn his/Central Telegraph's attention to the fact that the Second Capital Increase dilutes the Reverse Call Option.

396    See para. 347.37 hereinabove and Articles 1.1 and 4.1. of the Reverse Call Option Agreement (C-863).

397    Witness No. 10 on pp. 772 to 777 TSWH Day 4 and Witness No. S38 on pp. 148 to 151 T9H.

Telegraph could convene and take a decision regarding the Reverse Call Option (pp. 148-151 T9H). Such informal and uncertain arrangement for the extension of the reverse option period confirms the Arbitral Tribunal's conclusion that the Reverse Call Option of Central Telegraph was never meant to be exercised.

### (v)    Conclusion

371.  Witness No. S17 described the decision taken in February 2001 not to participate in the First Capital Increase but instead to sign the Reverse Call Option Agreement in detail in his oral testimony in answer to questions of the Arbitral Tribunal (pp. 1518 to 1527 TSWH Day 8) and concluded that the Reverse Call Option Agreement was *"probably the best decision Central Telegraph has ever made"* as it *"allowed Central Telegraph not to participate in the funding of the project, which they had said from the beginning they were not ready to commit to, but to have the ability over a nine month period to see how the project would develop and then be able to come back into the project nine months later at the same price"* (p. 5021 lines 6 to 14 TSWH Day 8). Provided the Reverse Call Option Agreement (signed on July 26, 2001 two months after the First Capital Increase was registered[398]) was a genuine alternative to the First Capital Increase and not a mere cover-up[399] as suggested by Witness No. 10 (see para. 365 hereinabove)[400], the respective decision of the board of directors and the partici-

---

[398]    See paras. 347.25 and 347.27 hereinabove.

[399]    For a mere cover-up would speak the fact that Respondent, CT-Mobile and TMI, in the *"Share Retention and Project Support Agreement"* dated December 14, 2001, they signed together with Sonic Duo, Sonera, on the one side, with the three financing institutions defined as *"Senior Lenders"*, including EBRD, on the other side, undertook in Section 2.01 to continue to own at least 75.0% plus one share of TMI and in Section 4.01(d) confirmed that the said agreement nor its performance *"will conflict with ... any ... agreement or other instrument or arrangement"* to which they are a party. While Respondent considered that this misrepresentations *"supports the proposition"* that the Proposed Witness No. 7 and Witness No. 6 *"were complicit"* (see para. 22 Confidential DPA-Reply). Claimant in the Confidential DPA-Rejoinder did not comment the issue identified in item 7(ii) of the Arbitral Tribunal's telefax dated June 6, 2005.

[400]    Witness No. S38 admitted that it was very important for him to have the Reverse Call Option Agreement *"in such a way that in no case the management of the company could be responsible and guilty if anything would have happened in accordance with this*

pants of Central Telegraph can be accepted as reasonable with the consequence that the decisive issue became whether it was justified not to sign a second reverse call option agreement at the time of the Second Capital Increase and whether it was justified not to exercise the Reverse Call Option.

372. Under these premises the decision to agree on the Reverse Call Option makes the issue whether in February 2001 Central Telegraph should have participated in the First Capital Increase of CT-Mobile and the valuation in February 2001 of Central Telegraph's indirect share in Sonic Duo of 33.15% (51% of CT-Mobile's shares of 65% referred to in para. 356 hereinabove) less relevant. Accordingly, the Arbitral Tribunal will in paras. 378/379 hereinafter place special emphasis on the valuation of Sonic Duo in December 2001/February 2002 and the reasons for not exercising at that time the Reverse Call Option even though its value had been substantially reduced by the Second Capital Increase[401].

ee)  **Existence and Adequacy of Compensation for Central Telegraph's Decision not to Participate**

(i)  **Introduction**

373. The Arbitral Tribunal now examines the issue of pertinence, existence and adequacy of the consideration for the withdrawal of Central Telegraph from its participation in CT-Mobile. The Arbitral Tribunal recognises that in certain situations the dilution of a shareholder in a company can take place for no compensation[402]. Such situations can reasonably exist , e.g. (i) when a shareholder without financial means or possibility to raise money is con-

---

*agreement"* (p. 139 lines 24-28 T9H) although he later testified that the Reverse Call Option Agreement *"was not a public relations exercise"* (p. 141 lines 21-28 T9H).

[401]  See para. 368 hereinabove.

[402]  As results, e.g. from para. 348(v)(b) and para.351(iii) hereinabove, the Parties used, in the context of this discussion, the term *"consideration"*. In the Arbitral Tribunal's view, this is not the proper term, since it only could be used if there were a contractual arrangement between Central Telegraph and Respondent and/or Claimant and should not be used in the context of corporate decisions of Central Telegraph's board of directors and participants. In this latter context, the question is rather whether Central Telegraph received an adequate compensation for allowing to be diluted.

fronted with the necessity to finance an unplanned development of the company and abandons it, or (ii) when a dilution represents a form of financing of the planned development of the company and a shareholder, though being diluted, retains a meaningful part of the shares while their value grows as a result of a capital increase by the subscription to new shares by an existing or a new shareholder. Neither set of circumstances is present in the case of the dilution of Central Telegraph's shareholding in CT-Mobile.

374.   In the second situation, if the shares represent some value, a compensation should be provided in return for the dilution. Applying this to the present case, one possibility would, for example, have been a capital increase by a new investor or existing shareholder for a lower nominal value, i.e. less shares, but with a premium (*"agio"*) so that Central Telegraph would have kept a reasonable percentage of CT-Mobile's share capital and CT-Mobile received through the premium the same amount of new cash. Another possibility would be the sale of a subscription right (*"Bezugsrecht"*) to the new investor. None of these possibilities have been pursued by Central Telegraph.

375.   The question of the value of CT-Mobile, respectively Sonic Duo, was addressed in a very early stage of the proceedings. This was discussed not from the point of view of the adequacy of a compensation for Central Telegraph's withdrawal from CT-Mobile, but in the context of the arms length nature of the April Option Agreement[403].

   **(ii)    Valuations in February 2001**

376.   A review of Sonic Duo's financial statements as of December 31, 2000 (p. 201 of C-29) reveals that the total assets of Sonic Duo as of December 31, 2000 amounted to USD 10'502'000.00 (including USD 5'887'000.00 cash). Witness No. 10 could not give a figure on the value of Central Telegraph's

---

[403]    See e.g. paras. 182 et seq. SD and pp. 8 et seq. Reply.

shareholding in CT-Mobile but told that it was *"substantial"* already in 2000 (p. 692 TSWH Day 4).

377.   In his letter to the Commercial Bermuda Bank of August 29, 2002 Witness No. 4 confirmed that at least in August 2001 Sonic Duo *"seemed very promising"*[404], which he and the Proposed Witness No. 7 must have known already in February 2001 as they had already conceived their idea to create a *"Pan-Russian Network"*[405]. This idea was taken up by Witness No. 6 in his letter of April 2, 2001 (C-34) referred to in para. 347.22 hereinabove and is confirmed in his witness statement to have developed by December 2000[406]. Witness No. S17 was also aware of this and was actively involved in its implementation and admitted at least for July 2001 a *"high value placed on Sonic Duo"*[407]. Accordingly, at least the said four persons, two of whom had a direct or indirect possibility to inform the other persons responsible for CT-Mobile[408], knew in February 2001 or perhaps even earlier, of the potential of what was already considered to be a *"good project"*[409] and that this potential had a meaningful value.

**(iii)     In December 2001**

378.   According to C-64 (contemporaneous document reflecting companies and share valuations based on the transactions in Exhibit B of the Business Combination Agreement dated August 6, 2001), CT-Mobile's share in Sonic Duo (65%) was valued as high as USD 196 million. As of December 31, 2001, Sonic Duo's total assets amounted to USD 105'127'000.00, including USD 5'417'000.00 cash (p. 201 of C-29). Witness No. 10 confirmed that the

---

[404]   See C-118 summarised in para. 347.40 hereinabove.
[405]   See paras. 402/403 hereinafter.
[406]   See para. 45 of RW-8 as well as in para. 47 referring to the *"relative valuation ranges"* in C-34.
[407]   See paras. 31 to 36 of RW-25 while they were not subject to Claimant's cross examination.
[408]   I.e. Witness No. 6 and Proposed Witness No. 7. Also Witness No S17 had direct contacts with Central Telegraph as he was actively involved in the drafting of the Reverse Call Option Agreement (see para. 366 hereinabove).
[409]   See para. 354 hereinabove.

value of Central Telegraph's shareholding in CT-Mobile was *"substantial"* both in 2000 and 2001 (p. 692 lines 13 to 21 TSWH Day 4).

379. According to another valuation made in June 2003, 100% of Sonic Duo was assessed at USD 52'000'000.00 as of December 31, 2001 (pp. 3 and 8 of C-160a). In line with this valuation, the extraordinary general meeting of participants of CT-Mobile held on November 30, 2001 (the minutes again indicate the presence of Witness No. S38) determined the value of 65% of Sonic Duo held by CT-Mobile, on the basis of recommendations made by an independent appraiser, in the amount of Roubles 1'059'165'929.10 (approximately USD 34 million)[410].

### (iv)    Testimony of Witnesses Nos. 10 and S38

380. On this basis, the Arbitral Tribunal concludes that Central Telegraph's share in CT-Mobile had a considerable value already in February 2001 when the decision not to participate in the First Capital Increase was made, and a substantial value in February 2002, when the decision not to exercise the Reverse Call Option was taken. The Arbitral Tribunal thus rejects as unreliable the estimates of the value suggested by Witness No. S38 (USD 50'000.00 - 60'000.00 for February 2001 and USD 100'000.00 for February 2002). Evaluating the evidence given by Witness No. S38, the Arbitral Tribunal notes its inconsistency: at first he stated that no valuation of the shares in CT-Mobile in February 2002 (when final decision to abandon participation in CT-Mobile was taken) was carried out, admitting that it was a mistake not to have made an evaluation. But after being intensively questioned by the Arbitral Tribunal, he declared that a valuation had in fact been carried out, even named a person in charge of it and indicated the value to be USD 100'000.00[411].

381. The Arbitral Tribunal concludes from the above that the 51% shareholding in CT-Mobile was even on its own, i.e. without taking into account the pos-

---

[410]    See pp. 193/194 at Tab. 48 C-DPA Vol. 2.
[411]    See pp. 157 to 161 T9H.

sible increase in value due to the merger with MegaFon[412], was a valuable asset worth, at the end of 2001, at least USD 17'238'000.00[413]. This conclusion does not yet even take into account the fact that 0,007% of shares in CT-Mobile, remaining in Central Telegraph's ownership after the two dilutions were effected, sold four months later (after the February 2002 decision not to exercise the Reverse Call Option and after the merger with MegaFon) for USD 120'000.00[414]. On this basis, at that point of time, the value of 51% in CT-Mobile would have been more than USD 874 million.

382.    Evaluating the witness statements and oral testimony of Witness No. 10 and of Witness No. S38 on the issue of Central Telegraph's dilution the Arbitral Tribunal notes the above-described inconsistency in the testimony by Witness No. S38, his general evasiveness, as well as the following apparent distortion of the factual picture: Being confronted with the fact that there was no action on the part of Central Telegraph with regard to the Second Capital Increase[415], he stated that he was not aware of that increase[416], however, later he testified that the remainder of Central Telegraph's stake in CT-Mobile was sold in June of 2002 (pp. 143-146 T9H). At the time of this sale it was obvious that the Second Capital Increase had taken place – Central Telegraph's share was reduced from 0,014% to 0,007%[417]. In these circumstances, Witness No. S38 could not have been ignorant of the second dilution resulting from the Second Capital Increase, but chose to avoid saying anything about it to the Arbitral Tribunal. As a result, in assessing

---

[412]    As of April 2002 25% of MegaFon (representing CT-Mobile's share in MegaFon) was valued as high as USD 326'300'000.00, the total value being the amount of USD 1'300'000'000.00 referred to on the top of p. 3 of C-160a.

[413]    This amount corresponds to 33.15% (see para. 372 hereinabove) of USD 52'000'000.00 (see pp. 3 and 8 of C-160a).

[414]    Witness No. S38 confirmed this amount on p. 156 T9H.

[415]    See in this context also Respondent's counsel's answer to a question of the Arbitral Tribunal on p. 332 lines 2 to 23 T10H Day 2.

[416]    Which contradicts the fact that the minutes list him as attending (see para. 368 hereinabove).

[417]    The Second Capital Increase was registered by the Moscow Registration Chamber on August 29, 2001 (see Tab. 35 p. 162, C-DPA Vol. 2). In fact, the Arbitral Tribunal has difficulties to comprehend how the registration of a reduction of a shareholding can be carried out without the knowledge of Central Telegraph, the shareholder concerned.

the evidence the Arbitral Tribunal put more weight and credibility on the evidence provided by the Witness No. 10.

### (v)    Conclusion

383.    Accordingly, the Arbitral Tribunal, having considered the documentary evidence and the testimony of the Witnesses No. 6, 10, S17 and S38[418], concludes that Central Telegraph's dilution in favour of TMI brought substantial benefit to this company and for this required compensation or something of value in return.

384.    There was no evidence submitted that Central Telegraph received something of value in return for the dilution. The only compensation for giving up Central Telegraph's share in CT-Mobile Claimant has named was the elimination of Central Telegraph's funding obligations[419]. However, as was noted in para. 356 hereinabove, these obligations were self-imposed by Central Telegraph, well-known and pre-planned and, as it was envisaged, did not require the involvement of Central Telegraph's own funds[420]. The elimination of funding obligations could have had some value in case Central Telegraph retained a meaningful part of shares in CT-Mobile and thus would have benefited from the influx of money into CT-Mobile so that the increase in the value of the shares remained with Central Telegraph.

385.    The said logical and reasonable possibility was even discussed within Central Telegraph, but never materialized because of the position on this issue taken by the management of Svyazinvest (para. 28 on p. 9 of RW-25). In view of the earlier findings of the Arbitral Tribunal that there was a possibil-

---

[418]    The evidence of Witness No. 4 addressing the value of Sonic Duo at the time of the conclusion of the April Option Agreement (see e.g. p. 966 TSWH Day 5) has no evidentiary value for the reasons explained in para. 234 hereinabove.

[419]    See para. 485 on p. 181 BID-Answer.

[420]    Also the testimony of Witness S38 that Central Telegraph *"did receive compensation in the amount of 3'100'000.00 Roubles"* in Summer 2002, corresponding to about USD 100'000.00 (p. 131 lines 17 to 26 T9H) cannot be considered a compensation for the dilution as it is a consideration for the sale of the remaining capital interest in CT-Mobile of 0.007% and is - as stated in para. 381 hereinabove - evidence that Central Telegraph's participation in CT-Mobile, respectively Sonic Duo, was worth much more.