ity for Central Telegraph to secure outside financing with the assistance from Svyazinvest and to continue full-scale participation in the Sonic Duo project, and that it was at least possible for Central Telegraph to retain a meaningful part of shareholding in CT-Mobile through the use of its own funds. An elimination of Central Telegraph's financing obligations coupled with a practically total elimination of its shareholding in CT-Mobile cannot be considered as having a value for Central Telegraph. Thus, the Arbitral Tribunal cannot accept the logic according to which a company establishes an obligation for itself and, then, obtains a discharge from that obligation in exchange for giving up its valuable asset. With this unacceptable logic, Central Telegraph not only lost the potential to participate in the likely success of a *"good project"*[421] but also received nothing in return.

386. The Arbitral Tribunal concludes that dilution of Central Telegraph in CT-Mobile and in effect the transfer of the majority ownership of CT-Mobile to TMI was carried out for no value.

**ff) The Significance of the Dilution of Central Telegraph for the April Option Agreement**

387. The April Option Agreement contains an agreement between Claimant and Respondent on the dilution of Central Telegraph's shareholding in CT-Mobile. In fact, this dilution is one of the major premises of the April Option Agreement and is reflected in the following clauses:

Third WHEREAS-Clause AOA:

> *"The 51% participatory share in the charter capital of CTM not owned (free from any Encumbrances) by the Company is registered in the name of Central Telegraph, an open joint stock company registered under the laws of the Russian federation. CTM has resolved to increase its charter capital in the amount of Roubles 177,800,000 to be subscribed by the Company (the "CTM Subscription Price"). Following such increase, the participatory*

---

[421] For the likeliness of the success, see para. 377 hereinabove and para. 433 hereinafter and for the expression *"good project"*, para. 354 hereinabove.

> shares in the charter capital of CTM will be owned as to 99.99%
> by the Company and as to 0.01% (the "Outstanding Participatory
> Share") by Central Telegraph."

Clause 7.1 AOA:

> "LV Finance shall not, to the extent that it is able to prevent it by
> exercise of its voting rights or otherwise and subject to any re-
> quirements of applicable law and to the rights of Sonera under the
> constitutive documents and shareholder arrangements in respect
> of Sonic Duo:
>
> 7.1.1    ...
>
> 7.1.2    allow the issue of any shares or other form of equity par-
>           ticipation in any of the Company, CTM and Sonic Duo,
>           other than
>
>           (a)      ...
>
>           (b)      in the case of CTM, the increase in the participa-
>                    tory shares of the Company in the charter capital
>                    thereof;"

Clause 7.3 AOA:

> "LV Finance shall... ensure... that such funds are applied solely
> for the relevant Approved Purpose (and in particular that the initial
> Required Funding Amount shall be sufficient and shall be used by
> the Company to increase the charter capital of CTM to such an
> extent as to reduce the participatory share of Central Telegraph in
> such charter capital to the Outstanding Participatory Share)."

388.  This, together with the circumstances described above, leads the Arbitral
      Tribunal to the factual finding that Claimant and Respondent purposefully
      acted so as to deprive Central Telegraph of its shareholding in CT-Mobile
      by diluting the shares of the former for nothing. This dilution was designed
      to benefit Claimant substantially. Such a course of action required and
      found the support of Svyazinvest. The April Option Agreement served as
      an instrument for achieving this desired result. It was negotiated and signed
      in time to secure Claimant's interests although it contained terms and con-
      ditions which cannot be considered as acceptable in a normal course of
      business (e.g. the right to exercise the April Option at any moment after

signing without paying the full Option Price, and the undertaking with regard to the Total Purchase Price[422]).

gg)    **The Role of the Proposed Witness No. 7**

    (i)    **In General**

389.    In view of Respondent's allegations on the role of the Proposed Witness No. 7[423], the Arbitral Tribunal must now consider the role of the Proposed Witness No. 7 in the process of diluting Central Telegraph's shareholding in CT-Mobile and acquiring ownership of the entire CT-Mobile by TMI and obtaining an option to 77,7% of the shares of TMI by the Claimant.

390.    In the relevant period (2000-2002), the Proposed Witness No. 7 served as a high-ranking officer of the Russian Federation with the function of coordination and regulation of activity in the sphere of communication of Russia[424]. In 2001 to 2003 the Proposed Witness No. 7 represented the Russian Federation in voting at general meetings of shareholders of Svyazinvest with regard to federally owned shares. He was a chairman of the board of directors of Svyazinvest, and in the period "01.01.2001 – 01.01.2002"[425] participated in all board meetings of Svyazinvest that took place[426].

391.    At the same time, the Proposed Witness No. 7 was a beneficial owner of Claimant[427] and, as such, was perfectly aware of the transactions relating to Central Telegraph, CT-Mobile and Sonic Duo and their economic effect. In paras. 325(i) hereinabove the Arbitral Tribunal found that the January 2001 Meeting and the March 2001 Meeting did take place but likely with a somewhat different scope than described by Witness No. 6. The content of

---

[422]    See the detailed analysis on pp. 64 to 81 PA.
[423]    See pp. 98 and 134 BID-Statement and para. 173 on p. 74 BID-Reply.
[424]    See p. 54 of C-820.
[425]    See p. 8 of C-820.
[426]    See pp. 52/53 of C-820.
[427]    See paras. 231 to 236 hereinabove.

the discussions at these meetings can be described by the participants in various ways, however, it is accepted by the Arbitral Tribunal that during the course of those meetings the Proposed Witness No. 7 sought to obtain an agreement with Respondent under which the Proposed Witness No. 7 would become an ultimate co-owner of Sonic Duo. At these meetings, the Proposed Witness No. 7 was fully informed of the developments that were taking place or were supposed to take place around Central Telegraph, CT-Mobile, Sonic Duo and of Sonic Duo's business plan.

392.    It is also undoubted that Witness No. 4 was informed of these details. He personally participated in drafting and signing the April Option Agreement. Being an adviser to the Proposed Witness No. 7 he could not possibly have withheld from his principal and client information of such importance as the obtaining of an option to considerably valuable shares with a promising potential as well as the financial and legal risks associated with the financing of the Sonic Duo (MegaFon) project. It is not possible to assume that the substantial amounts required for the dilution of the Central Telegraph and funding of Sonic Duo could be moved without the knowledge, instructions or at least agreement of the owner of Claimant, the Proposed Witness No. 7.

(ii)    As Chairman of Svyazinvest

393.    As Claimant rightly noted in footnote 1 on p. 2 of its submission dated April 12, 2006, commenting on the charter of Svyazinvest, Respondent alleges that Proposed Witness No. 7 was *"abusing his position within Svyazinvest"* (see p. 44 lines 12-13 T10H Day 1). This is in line with Respondent's arguments that *"Svyazinvest did have the ability to control the actions of Central Telegraph"*[428] and that the Arbitral Tribunal does not need to *"decide whether"* the Proposed Witness No. 7 *"actually put"* Involved Person No. 2 *"to making ... the decision not to participate"* in the First and Second Capital Increase and not to exercise the Reversed Call Option, respectively, as (i)

---

[428]    See the summary of Respondent's allegations in para. 348(viii) hereinabove and para. 173 BID-Reply.

this *"was not necessary because ... the decision not to participate"* was *"taken by an official within Svyazinvest"* (i. e. the Proposed Witness No. 7) and (ii) the Russian Federation *"through Svyazinvest was certainly in a position to require TMI to pay handsomely for obtaining 100%"* of CT-Mobile but *"did not so do"*[429], i.e. did not act. Accordingly, the Arbitral Tribunal has to examine whether Proposed Witness No. 7 abused his position within Svyazinvest in the context of the dilution of Central Telegraph and what his thereto relating obligations and powers were.

394. Pursuant to the charter of Svyazinvest in the English version filed by Claimant as C-1002 (the **"Svyazinvest Charter"**)[430], as chairman of Svyazinvest's board of directors, the Proposed Witness No. 7 was responsible for carrying out the *"general management of the Company's activities"* (Art. 19.1 Svyazinvest Charter), to perform his duties *"reasonably and in good faith"* (Art. 22.1 Svyazinvest Charter) and to achieve the *"main objectives"* of Svyazinvest which include the *"creation of conditions for gaining of profit by the subsidiary and dependant companies"*[431] (Art. 7.1 Svyazinvest Charter) which may also provide *"mobile radio-telecommunications network"* services (Art. 7.2.1 Svyazinvest Charter). In addition, Proposed Witness No. 7's activity as a member of the board should be evaluated taking into account the *"customary business practices"* referred to in Art. 22.3 Svyazinvest Charter[432].

395. As chairman of the board of Svyazinvest, Proposed Witness No. 7 had the duty to organise the work of the board of directors and to convene *"meetings of the board of Directors"* and to notify the agenda (Art. 19. 5 and 20.1

---

[429]    See p. 67 line 7 to 17 T10H and para. 169 BID-Reply.
[430]    For the purposes of this Second Partial Award, the Arbitral Tribunal relies on the English version of the Svyazinvest Charter (C-1002) and will refer to Respondent's English version (R-466) only if there is a relevant discrepancy.
[431]    Pursuant to Art. 6.2 Svyazinvest Charter Central Telegraph is to be considered *"a subsidiary"* as Svyazinvest majority voting power (see para. 363) constitutes a *"predominant participation"*.
[432]    The Arbitral Tribunal relies on Respondent's version of the English translation of the charter of Svyazinvest filed as R-466 and not on Claimant's version filed as C-1002, which uses the phrase *"normal course of business"* as Respondent's version is closer to the Russian text.

Svyazinvest Charter). The competence of the board of directors of Svyaz-invest includes the *"introduction to the Agenda of the General meeting"* of a subsidiary relating to *"issues on additional emission ... of shares"* (Art. 19.2(16) Svyazinvest Charter). Moreover, the *"participation in financing and implementing large-scale investment projects of subsidiary"* fall also within the *"objectives and types of the activity"* of the board of directors of Svyaz-invest (Art. 7.2.2 and heading of Art. 7 Svyazinvest Charter).

396.  In view of the above described duties, the Proposed Witness No. 7 had to take the necessary steps to ensure that the decision not to participate in the First and the Second Capital Increase and, in particular, the decision not to exercise the Reverse Call Option are included in the agenda of a board of directors meeting of Svyazinvest and to recommend as chairman the continued investment by its subsidiary Central Telegraph in CT-Mobile. In the absence of such steps one would reasonably expect Proposed Witness No. 7 to disclose to the board of directors that he will financially bene-fit in the event of a dilution of Central Telegraph. In this context it does not matter as Claimant submits that Art. 7 Svyazinvest Charter *"does not spec-ify when Svyazinvest should participate in such funding"* and that there *"is nothing in Art. 7 to suggest that Svyazinvest should participate in funding all projects of its subsidiaries"*[433]. The importance and the potential of the transaction and his personal interest in a dilution of Central Telegraph is a sufficient reason to put the matter on an agenda of a board of directors' meeting of Svyazinvest. It is moreover not a matter of giving binding in-structions to the board of directors of Central Telegraph[434] as it is sufficient that the board of directors of Svyazinvest gives its representatives in the board of directors of Central Telegraph the instruction to vote against a di-lution, i. e. in favour of the First and Second Capital Increase or in favour of the exercise of the Reverse Call Option.

---

[433]    See p. 2 of Claimant's submission dated April 19, 2006.
[434]    For which directions Claimant state on p. 2 of its submission dated April 19, 2006 that the giving of such *"binding instruction"* referred to in Art. 6.5 Svyazinvest Charter require a stipulation in an *"agreement with the subsidiary or in the charter of the subsidiary"*.

397.  Claimant's further view that Proposed Witness No. 7 as chairman of the board of directors of Svyazinvest could not control its decisions[435] has no merit either. There is no doubt that a majority of the board of directors of Svyazinvest would have voted in favour of the aforementioned decisions had they been fully made aware by the Proposed Witness No. 7 of the potential of the *"good project"* Sonic Duo and the planned merger with Mega-Fon[436] even without being made aware of his personal interest in the transaction[437].

398.  The above-described duties of the chairman of Svyazinvest correspond to the duties of a chairman of an open-stock company incorporated under the Federal Law of the Russian Federation on Joint-Stock Companies of December 26, 1995 as amended (the **"JSC-Act"**) and universal principles of corporate governance reflected therein. The JSC-Act states in its Art. 64 that the board of *directors "carries out overall management of the activity of the company"* and in Art. 71 describes, *inter alia*, the responsibility of the members of the board of directors[438] by stipulating that the members of the board of directors *"shall act in the interest of the company and shall exercise their rights and perform their duties with regard to the company in good faith and reasonably"*. Likewise, Art. 65 JSC-Act referred to by the Proposed Witness No. 30 provides in para. 337 that the *"adoption of decision concerning the participation of the company in other organizations fall within the powers of the board of directors"* (see exhibit 8 to CE-3). This provision in the context of a holding company of a major group logically and from a practical standpoint should lead to the involvement of the company in major decisions of subsidiaries which effect the achievement of the overall objectives of the company as described in para. 394 hereinabove.

---

[435]  See pp. 2/3 of Claimant's submission dated April 12, 2005.
[436]  See paras. 354 hereinabove and paras. 402 to 404 hereinafter.
[437]  In view of this personal interest he should have exercised its *"decisive"* vote pursuant to Art. 20.3 Svyazinvest Charter in favour of a continued participation in CT-Mobile.
[438]  Translations of the relevant parts of Art. 64 and 71 JSC-Act have been prepared by the Arbitral Tribunal.

399. In view of the findings in the preceding paragraphs, it is obvious that the conduct of the Proposed Witness No. 7, be it action or inaction, with regard to the dilution of Central Telegraph can not be deemed reasonable and in good faith or as corresponding to customary business practices. Knowing his duties described above, the Proposed Witness No. 7 violated them: with direct intent he ignored his duties whilst seeking to enrich himself.

### (iii)    Conclusions

400. Being aware of the developments around Central Telegraph's participation in CT-Mobile that led to his own, personal economic benefit, the Proposed Witness No. 7, as a high ranking official responsible for the industry and as a chairman of the board of the majority owner of Central Telegraph, did not take any action to protect interests of Central Telegraph, Svyazinvest and the Russian state[439]. To the contrary, as beneficial owner of Claimant, he efficiently acted to secure the acquisition of the asset in question by making, *inter alia*, inherently necessary and unavoidable decisions such as the selection and/or approval of the target (Sonic Duo), the allocation of money (the Riversand and Augmentation Payment[440]) and resources (Witness No. 4), the review of the progress reports and feedback on demands by Witness No. 6, and matters related to the April Option Agreement[441].

401. In summary, the Proposed Witness No. 7 allowed his personal enrichment to take precedence over – and at the expense of - the state assets which he - as a high ranging public official - had an obligation to protect and to ensure their efficient management. In fact, leaving aside intermediary elements of the set-up, it was the Proposed Witness No. 7 who made or inspired arrangements for the transfer of assets to himself, being present at both ends of the deal. In fact, the Proposed Witness No. 7 had friendly and

---

[439]   This alone - even if the asset in question was designed to end up in the hands of a third party - might make Proposed Witness No. 7 an accomplice of a criminal offence to be discussed in paras. 419 to 443 hereinafter (see in particular para. 435).
[440]   See para. 66(ii) hereinabove.
[441]   Boxes 84, 86, 90, and 411 of R-334C.

long-standing relations with the Involved Person No. 2[442], who instructed the board of directors of Central Telegraph to agree to the dilution in CT-Mobile. To this the Arbitral Tribunal notes that the Involved Person No. 2 was a subordinate to the Proposed Witness No. 7. Moreover, Witness No. 4 considered him as not being a sophisticated business man[443]. This indicates that he might have acted upon instructions, or with the explicit or tacit approval, of the Proposed Witness No. 7[444]. Be that as it may, as will be shown in paras. 432, 438 and 451 hereinafter, the involvement of other persons, the existence of such instructions or explicit or tacit approval is legally not relevant.

402. Witness No. S5, a scientist by training, working for Sonera, testified that Proposed Witness No. 7 told him *"around late 1999/early 2000"* at a telecommunication conference on an *"informal basis"* about the *"possibility of setting a pan-Russian mobile phone network"* and that he got the impression that the Proposed Witness No. 7 was sending a *"signal"* that Sonic Duo could be a *"possible platform for this idea"* (para. 66 on p. 17 of RW-12). According to Witness No. 6, by *"December 2000 an idea had developed of a national roll-out, by means of a three-way merger between North West GSM, Sonic Duo, and the regional licence holders owned by Telecominvest"*[445]. In the secretly taped conversation between Witness No. S20 and Witness No. 4 the latter confirmed the remark of Witness No. 20 that the Proposed Witness No. 7 had always the idea to *"create a Pan-Russian Network"*. They *"talked about that for years"* (boxes 79 to 82 of R-334C). It is therefore not surprising that Witness No. 4 spoke at the same meeting of discussions in North-West GSM to *"create a Pan-Russian network"* (box 77 of R-334C)[446].

---

[442]   See the testimony of Witness No. 4 on p. 249 TWH Day 2.
[443]   See box 509 of R-334C where Witness No. 4 states that Svyazinvest's CEO of the time was a *"very nice person"* and did not *"understand business, basically"*.
[444]   There is no testimony or document on thereto relating communications between them in the file.
[445]   See para. 45 of RW-8.
[446]   North-West GSM is - as it will be discussed in para. 508 hereinafter - also a company of the W4-Group and thus also controlled by Proposed Witness No. 7.

403. The said pan-Russian concept was, according to Witness No. S17, a *strategy to compete with MTS and Vimpelcom*" developed in *"late 2000/early 2001"* which *"would provide the merged company with the leading position in St. Petersburg"*[447] and was implemented shortly after the signing of the April Option Agreement on July 5, 2001, respectively August 6, 2001 by the signing of the Business Combination Agreement (C-65)[448] which provided for the merger between North-West GSM (later renamed as *"MegaFon"*) with Sonic Duo. This merger was completed in March 2002 creating Mega-Fon as one of the largest mobile telephone operators in Russia (see para. 3(iv) hereinabove). After the completion of the merger, CT-Mobile had a 25.1% and Claimant a 6.5% (later increasing its shareholding to 8%)[449] participation in the final shareholders' structure of MegaFon.

404. From the above results that in April 2001 Claimant, through Witness No. 4, who represented Proposed Witness No. 7 and Respondent, through Witness No. 6, intended to conclude the April Option Agreement for the purpose of diluting Central Telegraph without paying Central Telegraph an adequate compensation or allowing Central Telegraph to remain a shareholder with a reasonable participation[450] and to profit therefrom to the detriment of Central Telegraph, its shareholder Svyazinvest and ultimately the Russian Federation. Since at that time it was intended that Respondent would keep a 22.3% interest in TMI and all of the aforementioned individuals were aware of the planned merger with North-West GSM, the dilution of Central Telegraph did not only benefit Claimant, but also Respondent – assuming that the December Option Agreement had not been concluded and that the April Option Shares were a consideration for an agreement of Proposed Witness No. 7 to make North-West GSM and the regional operators available for the creation of MegaFon by the Business Combination Agreement[451].

---

[447]  See para. 33 of RW-25 and similar considerations of Witness No. 6 in para. 46 of RW-8.
[448]  See paras. 347.29 hereinabove and para. 378 hereinabove.
[449]  See pp. 7 and 22 of C-65 and pp. 221 to 223 BID-Answer.
[450]  See para. 388 hereinabove.
[451]  See para. 347.26 hereinabove, showing that the Business Combination Agreement was already planned on April 2, 2001 and a draft existing on July 2, 2001, i.e. one month before its signing on August 6, 2001.

### hh)    Summary and Conclusion

405.    The Arbitral Tribunal came to the conclusion that Central Telegraph's aban-
doning of its shareholding in CT-Mobile, an asset of considerable value, to
the detriment of Central Telegraph, Svyazinvest and the Russian state in-
terests in favour of the Claimant for no value represents the result of a con-
duct of the Proposed Witness No. 7, beneficial owner of the Claimant, and
that Claimant and Respondent intended to achieve this result through the
April Option Agreement.

406.    In coming to this conclusion, the Arbitral Tribunal did not examine the much
disputed allegations of the Parties relating to the granting of the Sonic Duo
Licence and the allocation of the thereto relating frequencies as this issue,
in view of the conclusion made in the preceding paragraph and for the legal
conclusions reached in the following Subchapters VIII/D/d) and e), is not
relevant for deciding the Dilution Defence. Accordingly, in this Second Par-
tial Award the Arbitral Tribunal does not express any opinion on the *"legal-
ity"* or *"illegality"* of the granting of the Sonic Duo Licence and the allocation
of frequencies.

407.    In view of the allegations by the Respondent that the April Option Agree-
ment *"underlay a corrupt arrangement to loot the assets of Central Tele-
graph and transfer them to interests which lay behind"* the Claimant[452], the
Arbitral Tribunal must look now at the behaviour of the Proposed Witness
No. 7 from the point of view of the Russian criminal law[453] before analysing
the alleged illegality of the April Option Agreement under the relevant rules
of English law.

408.    In fact, if an illegality under Russian criminal law can be determined, the
Arbitral Tribunal must examine whether such illegality results under the ap-
plicable English law in the illegality of the April Option Agreement. If on the

---

[452]    See para. 519 on pp. 206 -207 BID-Statement.
[453]    Despite the fact that the April Option Agreement is subject to English law, Russian criminal
law is to be applied for the reasons set forth by Alexis Mourre, opus cit. in fn. 220
hereinabove, p. 110.

other hand no illegality under Russian law can be found, then the April Option Agreement must be considered valid and enforceable if it is legal under English law.

**d)     The Arbitral Tribunal's Analysis of Russian Criminal Law**

**aa)     Introduction**

**(i)     General Aspects**

409.    In approaching this issue the Arbitral Tribunal examined whether it can conclude that the conduct of the Proposed Witness No. 7 as described in the factual findings of the Arbitral Tribunal[454] can be qualified as falling within the ambit of the provisions of the Russian Criminal Code submitted by the Respondent together with the expert reports of the Proposed Witness No. 31. Thereby, the Arbitral Tribunal must not carry out an analysis of the events surrounding the dilution of Central Telegraph and the conduct of the Proposed Witness No. 7 from a Russian criminal law point of view, so as to act as a quasi criminal court, but rather establish - as a preliminary issue for a civil law dispute - if these events and the conduct of the Proposed Witness No. 7 are sufficient to form a punishable criminal offence. The Arbitral Tribunal evaluates these factual circumstances as an adjudicating authority in a civil law dispute[455] and its decision on the issues of criminal law is valid, relevant and applicable only so far as it can affect adjudication of civil law matters argued by the Parties in these proceedings and is in no way binding on any individual or legal entity other than the Parties to this arbitration.

410.    Appreciating RE-20 and RE-30 prepared by Proposed Witness No. 31 with regard to the application of the Russian criminal law, the Arbitral Tribunal also considered the expert opinion of the Proposed Witness No. 30 (CE-3)

---

[454]    See in particular para. 485 and fn. 567 hereinafter. On the applicable standard of proof see para. 319 hereinabove.
[455]    As opposed to criminal proceedings.

and its propositions. The Arbitral Tribunal established that CE-3 addressed only questions 1 to 3 dealt with in RE-20 leaving questions 4 to 6 without comment although these last questions and conclusions made in RE-20 are very relevant to the situation analysed herein. At the same time, dealing with questions 1 to 3, the expert opinion CE-3 limits itself to analysis of civil law rules and civil law consequences resulting from the breach of such rules, simply stating that *"instances proposed for analysis do not speak about misappropriation or embezzlement as those terms are defined by the Russian Criminal Code, but about transactions under civil law"* (p. 3 CE-3). The Arbitral Tribunal's rationale for declining to accept CE-3 conclusions is that a certain conduct may cause consequences envisaged by civil law, as well as by criminal law, and the fact that civil law consequences exist does not exclude criminal law liability if there are sufficient grounds for it. The Arbitral Tribunal's analysis of the events considered in this Subchapter should not be limited to a consideration of the duties of the Proposed Witness No. 7 under civil law aspects, but should be carried out by examining whether the violation of such duties, if any,[456] constitutes also a violation of criminal law provisions[457].

### (ii)     The Proper Translation of the Russian Term *"Deyaniye"*

411.    In this Subchapter on Russian criminal law, the Arbitral Tribunal examines the provisions of Art. 160, 285 and 289 of the criminal code of the Russian Federation (**"RCrC"**) in the version valid in the relevant period, i.e. 2000 to 2002. All these three provisions have a common feature as they use the term *"deyaniye"* which in the English translations attached to the expert opinion of the Proposed Witness No. 31 (RE-20) is translated by "act" and in the translation attached to the expert opinion of the Proposed Witness No. 30 by *"deed"* (CE-3) while the Arbitral Tribunal thought that the proper translation would be *"conduct"*. For this reason and in order to base its decision on the actual text applicable in the relevant period, i.e. 2000 to 2002, the Arbitral Tribunal submitted in Exhibit 1 and 2 of its telefax dated April 3,

---

[456]    See para. 399 hereinabove.
[457]    See para. 407 hereinabove.

2006 its own translations of Art. 160, 285 (including its notes 1 and 2) and Art. 289 RCrC to the Parties for comments and further prepared in Exhibit 3 a translation of Art. 14 RCrC with the heading *"Definition of a Crime"* which article has not been mentioned in the Parties' pleadings and their expert opinions filed by the Proposed Witnesses Nos. 30 and 31. The Parties commented on these translations in their submissions dated April 12, 2006 to which they replied in their further submissions dated April 19, 2006. From these submissions results that the relevant difference of the Parties on the proper translations of the Art. 14, 160, 285 and 289 RCrC relates indeed to the translation and meaning of the Russian term *"deyaniye"*. While Respondent accepts the translation by the term *"conduct"*[458], Claimant insists with reference to *"the principal translation given in both general and legal dictionaries on a translation by the word 'act' and submits that the word 'deyaniye' denotes a specific and identifiable deed as opposed to a general manner of behavior"*[459].

412.    In view of the disputed translation of the Russian term *"deyaniye"*, the Arbitral Tribunal will before examining the relevant individual provisions of Art. 160, 285 and 289 RCrC determine what is the proper English translation of this term of Russian criminal law.

413.    First of all, the Arbitral Tribunal considers that the Russian Criminal Code uses the word *"deyaniye"* as a legal term and not as a colloquial expression. Although it is correct that some dictionaries translate *"deyaniye"* by *"act"* or *"deed"*, the Arbitral Tribunal cannot consult merely these dictionaries, but must determine the meaning of the legal term *"deyaniye"*.

414.    The term *"deyaniye"* used in the here relevant Art. 160, 285 and 289 RCrC can also be found in Art. 14 RCrC. This provision defines the term crime

---

[458]    While Respondent accepts the translation of the Art. 160, 285 and 289 RCrC, it suggest to comments to the translation of part 2 of Art. 14 by the words *"An act or omission is not a crime ..."*. Since *"omission"* and *"inaction"* mean essentially the same, the Arbitral Tribunal's translation does not have to be corrected by this possibly too creative translation of Respondent.

[459]    See p. 1 of Claimant's submission dated April 19, 2006.

and uses the word *"deyaniye"* in the first and the second part. The definition contained in Art. 14 RCrC clarifies that a guilty *"deyaniye"* can be an *"action"* and an *"inaction"*. Accordingly, the proper translation of *"deyaniye"* within the meaning of Art. 14 RCrC cannot be *"act"* or *"deed"* and is therefore more adequately translated by *"conduct"* or *"behaviour"*. The said Art. 14 RCrC with the heading *"Definition of a Crime"* reads therefore in English as follows[460]:

> *"1.   Guilty conduct representing social danger, prohibited by this Code under the threat of punishment, is considered a crime.*
>
> *2.   Action (inaction) is not a crime, when it, due to its insignificance, does not represent social danger, although formally it contains features of any conduct provided for by the present Code."*

415.   When translating the legal term *"deyaniye"* by *"conduct"*, the Arbitral Tribunal took also into account legal commentaries and legal encyclopedia. For example one commentary to Art. 14 RCrC[461] refers to *"deyaniye"* as comprising *"two different as to their outside expression forms of socially dangerous behaviour ..."* and states that it *"may have a form of action (that is active behaviour) or inaction (that is passive behaviour expressed in omission to take action which a person was bound to and could take"*. Another Commentary to Art. 14 RCrC[462] at pp. 38-39 states that *"... Action assumes activity of the subject of a crime: making mechanical body movements, statements ..."* and that *"inaction represents a passive form of criminal behaviour consisting in not taking actions which a guilty person was bound to and could take ..."*. Finally, the Russian Juridical Encyclopedia[463] at p. 782

---

[460]   This is the translation submitted by the Arbitral Tribunal's telefax dated April 3, 2006 to the Parties for comments. While Claimant reworded Art. 14 RCrC essentially by changing the word *"conduct"* into *"act"*, Respondent suggested to replace the word *"action (inaction)"* by the phrase *"action or omission"*. For the reasons stated in paras. 415 to 417 hereinafter and fn. 458 hereinabove, the Arbitral Tribunal does not modify its translations submitted to the Parties as Exhibit 3 to its telefax dated April 3, 2006.

[461]   Chief editor - Chairman of the Supreme Court of the Russian Federation V.M. Lebedev, 5th edition, Moscow: Yuright-Izdat, 2006, p.52.

[462]   V.V. Koryakovtsev, K.V. Pituljko, 2nd edition, SPb.: Piter, 2006.

[463]   Chief Editor A.Ya. Sukharev, Publishing House INFRA-M., Moscow, 1999.

(column 2329) explains that *"deyaniye"* as an *"act of human behaviour may be expressed in two forms: action (active behaviour of a subject) or inaction (passive behaviour of a person consisting in not taking an action which that person was bound to and could take"*. At p. 78 (column 232) this Encyclopedia defines inaction as *"... guilty, illegal behaviour expressed in not taking socially useful action which a person could and was bound to take due to legal obligations imposed on him"* and adds that the *"obligations can stem out of provisions of law, professional and official functions"*.

416.    These explanations of Russian commentaries are consistent with English law dictionaries. The Black's Law Dictionary, 7th Ed. 1999 defines *"conduct"* at p. 292 as *"personal behavior*[464] *whether by action or inaction"*[465]. Moreover, at dictionary.lp.findlaw.com, *"conduct"* is explained as *"an act or omission to act"* with the example *"a crime is that conduct which is defined as criminal"*. Further research made by the Arbitral Tribunal on the internet revealed that at www.multitran.ru *"deyaniye"* is also translated as an *"act"* but with a remark that such translation should be understood *"in a broader sense, as including also omission to act"*.

417.    Based on the above considerations the Arbitral tribunal concludes that *"conduct"* is the most appropriate translation for the Russian criminal law term *"deyaniye"* and, correspondingly, uses this translation for the purposes of this Second Partial Award.

418.    Having determined now the proper translation of the Russian term *"deyaniye"*, the Arbitral Tribunal proceeds with the examination of the relevant Art. 160, 285 and 289 RCrC and commences with the first of these three provisions.

---

[464]    Black's Law Directory defines the term on p. 380 *"criminal behaviour"* as *"Conduct that causes social harm and is defined and punished by law"*.

[465]    This definition is complemented by the following explanation: *"The word 'conduct' ... covers both acts and omissions ... In cases in which a man is able to show that his conduce, whether in the form of action or of inaction, was involuntary, he must not be held liable for any harmful result produced by it ..."* .W. Cecil Turner, Kenny's Outlines of Criminal Law 13 n.2, 24 (16th ed. 1952).

**bb)   Art. 160 RCrC on Misappropriation and Embezzlement**

**(i)   The Wording of Art. 160 RCrC in Effect in the Relevant Period**

419.   Article 160. with the heading *"Misappropriation or Embezzlement"* reads in the relevant period (2000 to 2002) as follows[466]:

> *"1. Misappropriation or embezzlement, that is theft of property belonging to others but entrusted to the guilty person – shall be punished by a penalty in the amount from two hundred up to five hundred minimal wages or in the amount of a salary or other income of the convicted person for the period from two to five months, or by compulsory labor for a term from one hundred twenty up to one hundred eighty hours, or correctional labor for a term from six months to one year, or by imprisonment up to three years.*
>
> *2. The same conduct carried out:*
>
> *a) by a group of persons by an agreement in advance;*
>
> *b) repeatedly;*
>
> *c) by a person using his official position;*
>
> *d) so as to cause substantial damage to a citizen, –*
>
> *shall be punished by a penalty in the amount from five hundred to one thousand minimal wages or in the amount of a salary or other income of the convicted person for the period from five months to one year, or by prohibition to hold certain positions or carry out certain activity for the period up to five years, or by imprisonment for a term from two to six years with a penalty in the amount up to fifty minimal wages or in the amount of a salary or other income of the convicted person for the period up to one month or without the same.*

---

[466]   See the text in the Criminal code of the Russian Federation, All versions of 1997-2005, Moscow: Eksmo, 2005, p. 133, translated by the Arbitral Tribunal and submitted to the Parties for comment as Exhibit of its telefax dated April 3, 2006 (see para. 411 hereinabove.



3.  *The conduct provided for in the first and second part of this Article in case it is carried out:*

    *a) by an organized group;*

    *b  on a large scale;*

    *c) by a person that was two or more time convicted for theft or extortion,-*

    *shall be punished by imprisonment from five to ten years with confiscation of property or without it."*

420.  The above-cited text of Art. 160 RCrC was in force from January 1, 1997 up to December 10, 2003. The current version of this article contains in general the same qualifications of the offence but adjusts and reduces to some extent the punishment. For example, presently in part one of Art. 160 RCrC the term of correctional labor has been reduced to six month instead of six months to one year, and imprisonment, has been limited to two years instead of three years. Monetary penalties were fixed in absolute amounts in Roubles, and in part 3 of Art. 160 RCrC confiscation of property was re-placed with a penalty up to 1 million Roubles or in the amount of three year salary or other income of a convicted person, etc[467].

(ii)    **The Official Definition of Certain Terms Relevant to the Application of Art. 160 RCrC**

421.  The general definition of theft, one form of which is misappropriation, is contained in the Note 1 to Art. 158 RCrC and which has been present in all versions of the Criminal Code of the Russian Federation without changes since January 1, 1997 up to the present time[468]:

---

[467]   See Criminal Code of the Russian Federation, All versions of 1997-2005, Moscow: Eksmo, 2005, pp.132-133.

[468]   See Criminal Code of the Russian Federation, All versions of 1997-2005, Moscow: Eksmo, 2005, pp. 128-131.

234

> *"Under the theft articles of this Code mean unlawful uncompen-*
> *sated seizure and (or) appropriation of somebody else's property*
> *with a mercenary purpose to the benefit of the guilty person or*
> *other persons causing damage to the owner or other holder of this*
> *property".*

422.   A more specific definition of the term *"misappropriation"* is contained in the Resolution No. 4 of the Plenum of the USSR Supreme Court of July 11, 1972 *"On Judicial Practice in Cases Involving Theft of State and Public Property"* (with revisions of September 21, 1977, November 27, 1981 and April 26, 1984). Resolutions of the Plenum are *"highly relevant to issues of general applicability"* of Russian criminal law provisions (para. 10 on p. 2 RE-20). The resolution referred to above has remained unchanged and states that (pp. 8/9 RE-30):

> *"... in accordance with the law appropriation or embezzlement dif-*
> *fers from stealing in that the guilty party exercises powers at his*
> *disposal with respect to the state or public property being stolen*
> *by him. The unlawful uncompensated appropriation for oneself or*
> *for another person of property that is in the lawful possession of a*
> *guilty party who, by virtue of his official duties, contractual rela-*
> *tionships, or special directive of a state or public organization, ex-*
> *ercised with respect to that property powers related to disposal,*
> *management, delivery, or storage... must be determined to consti-*
> *tute appropriation or embezzlement of entrusted state or public*
> *property, or of state or public property in one's charge. The taking*
> *of property that was entrusted to a guilty party by means of substi-*
> *tution of less valuable property for it, committed with the intent of*
> *appropriation for oneself or for other persons, must be determined*
> *to constitute theft in the amount of the value of the property taken.*
>
> *The theft of state or public property committed by a person who*
> *does not possess the powers specified above, but who has ac-*
> *cess to the property in connection with his assigned work or with*
> *the performance of his official duties, must be determined to con-*
> *stitute stealing...*
>
> *...Abuse by an official of his official position that consists in the*
> *unlawful uncompensated appropriation, with a mercenary motive,*
> *of state or public property for himself or for other persons must be*
> *viewed as theft..."*



(iii)   **The Four Elements Constituting a Crime under Art. 160 RCrC and the Thereto-relating Doctrine**

423.   Under any version of Art. 160 RCrC, either in the relevant period (2000 to 2002) or at the present time, the four necessary elements of misappropriation are[469]:

(i)    absence or manifest inadequacy of consideration;

(ii)   secrecy of transfer of property entrusted to the perpetrator;

(iii)  material damage to the owner of property; and

(iv)   direct intention of the perpetrator to misappropriate the property in order to enrich himself or other persons.

424.   Analyzing Russian criminal Law, the Arbitral Tribunal took note of the Russian legal doctrine expressed and formulated in a number of legal publications cited by the Proposed Witness No. 31. In particular, account was taken that the definition of property *"entrusted"* to the perpetrator in the sense of Art. 160 RCrC is construed broadly as (para. 33 on p. 10 RE-30)

> *"property that is directly or indirectly in the possession of a person who may be invested with respect to that property, by its owner, co-owner or other lawful holder, with specific powers or duties relating to its use and/or disposal".*

and that Russian legal doctrine considers the following[470]:

> *"Uncompensated taking of property occurs when the taking is carried out without proportionate reimbursement for the property value in cash (i.e. without payment), or without the provision of an*

---

[469]   See Commentary to the Criminal Code of the Russian Federation, Chief editor – Chairman of the Supreme Court of the Russian Federation V.M. Lebedev, 5th edition, Moscow: Yuright-Izdat, 2006, pp. 414-427.

[470]   See para. 35 on pp. 10/11 III RE-30 referring to the monograph of A.I. Boitsov: Crimes against Property, St. Petersburg, Judicial Center Press, p. 249.

> *equivalent in the form of labor or property of equal value, or with*
> *token or inadequate reimbursement. For this reason, partial com-*
> *pensation for the value of taken property by no means implies the*
> *absence of the element of theft (including theft in the form of ap-*
> *propriation)".*

**(iv)    Are the Four Elements Met *in Casu*?**

425.    The Arbitral Tribunal will now evaluate the factual findings made in paras. 353 to 408 hereinabove and examine whether the events determined in these findings meet the four elements of the criminal offence of *"misappropriation"* described in para. 423 hereinabove.

426.    As to the first element, the Arbitral Tribunal established that the dilution of Central Telegraph in CT-Mobile and the transfer of the majority ownership held by Central Telegraph to TMI were carried out for no value[471].

427.    The April Option Agreement providing for the transfer of the asset to the Claimant was made and kept secret from Central Telegraph and Svyazinvest[472], and the identity of the beneficial owner of the Claimant was also kept secret.

428.    The Proposed Witness No. 7 was entrusted with the assets in a broad sense discussed above not only as a high ranking state official, but also in his official capacity within Svyazinvest[473]. The transfer of Central Telegraph's 51% participation in CT-Mobile for no value caused substantial

---

[471]    See para. 386 hereinabove.
[472]    Likewise, this was kept secret from EBRD (as it results from the contracting statements in Clause 3.1 (b) and (h) and 4 of the pledge agreement signed by CT-Mobile on December 14, 2001 (see pp. 68/69 at Tab 6 C-DPA Vol. 7) and the letter from Witness No. 4 to Claimant's Bermuda counsel dated March 28, 21 (C-33b) stating that there are *"disclosure requirements of the EBRD"*. Moreover, there were misrepresentations made to financial lending institutions that there were no options, liens or other encumbrances over the shares of Sonic Duo in the documents filed on p. 242/243 at Tab. 7 C-DPA Vol. 7 (to the IFC) and on p. 10 at Tab 1 C-DPA Vol. 8 (to Nordea Bank)
[473]    See in particular paras. 393 et seq. hereinabove.

damage to Central Telegraph, Svyazinvest[474] and indirectly the Russian state.

429. It can be safely deduced from the findings in paras. 400/401 hereinabove that the direct intent of the Proposed Witness No. 7, the beneficial owner of Claimant, when arranging the transactions resulting in the dilution of Central Telegraph for no compensation, was to misappropriate for his personal enrichment assets majority owned by the Russian Federation. Therefore, it is irrelevant whether there were other persons involved who were supposed to benefit from the transaction. Such intent is further evidenced by the Zurich *Ad-Hoc* Arbitration by which Claimant – ultimately for the benefit of the Proposed Witness No. 7 – seeks to acquire the same assets that have, as time has passed, increased in value very significantly.

### (v) Organizing the Misappropriation of Property in Particular

430. Evaluating the possible involvement of Proposed Witness No. 7 in the commission of the criminal offence under Art. 160 RCrC, the Arbitral Tribunal accepts the statement of Proposed Witness No. 31 that *"it would be just as much an offence for [a] person to organize and personally carry out the acts, as it would be for that person to act through other persons (whether or not such person/bodies were criminally liable)"* (para. 11 on pp. 2/3 RE-20). This statement is based on Art. 33 RCrC which reads as follows[475]:

> *"3.    The person who has organized the commission of a crime or has directed its commission, and also the person who has created an organized group or a criminal community (criminal organization) or has guided them shall be deemed the organizer."*

431. An organiser (another translation of this term is *"a head for crime"*; RE-20, appendix 2, p. 1) is considered as one of the participants in a criminal of-

---

[474]    For the indirect possession of property see para. 424 hereinabove.
[475]    See the unchanged wording valid since January 1, 1997 up to the present time on p. 4 of Attachment 2 to RE-30.

fence together with perpetrator and instigator (Art. 33 RCrC, part 1; RE-30, attachment 2, p. 4).

432. The dilution of Central Telegraph required a concerted and coordinated involvement of a number of entities and individuals, such as Svyazinvest, Central Telegraph, TMI, CT-Mobile, Respondent, Claimant, Involved Persons No. 2, No. 3, Witness No. 4 and many others. In view of the nature of the involvement of the Proposed Witness No. 7 in the dilution of Central Telegraph, being the end beneficiary of the dilution and at the same time the person responsible for the asset diluted away to himself[476], the Arbitral Tribunal concludes that Proposed Witness No. 7 guided, supervised and acted as an organiser of the dilution constituting a misappropriation and thus a criminal offence under Art. 160 RCrC. This conclusion relating to the Proposed Witness No. 7 - establishing also that the April Option Agreement was to be performed for the purpose of his receiving the fruits of his criminal conduct - is sufficient for the purposes of this arbitration, and there is no further need to establish which other persons, where and to what extent, were involved[477].

(i)   **Misappropriation Resulting from Action/Inaction**

433. The intention to commit a criminal offence under Art. 160 RCrC had been further evidenced by the conduct of the Proposed Witness No. 7 in his capacity as chairman of the board of directors of Svyazinvest. As beneficial owner of the Claimant, the Proposed Witness No. 7 was aware that the dilution of Central Telegraph was in Claimant's favour and thus - if acting in good faith - was reasonably expected to secure the continuous participation of Central Telegraph in the *"good project"* of Sonic Duo[478], which he knew was very promising, attractive and potentially lucrative, and, moreover, designed to merge with North-West GSM, soon to be a part of MegaFon with an even higher potential. Therefore, the Proposed Witness No. 7 should

---

[476]   See paras. 391 and 401 hereinabove.
[477]   See also para. 429 hereinabove.
[478]   For the expression *"good project"* see para. 354 hereinabove.

239

have given corresponding instructions to the responsible subordinated governmental agency of which he is the head, and/or put the issue for discussion on the agenda of a board meeting of Svyazinvest[479]. With such instructions the responsible governmental agency could have set the corresponding priorities in the development plans of the telecommunication industry, respectively of Svyazinvest and its subsidiaries and the board of directors of Svyazinvest could have set such priorities for its subsidiary. Such priorities should have foreseen that Central Telegraph continues to participate in the Sonic Duo Project and that Svyazinvest will assist Central Telegraph in getting the necessary funding from a bank engaged in the telecommunication industry[480].

434. Even if one were to assume that the implementation of such instructions were not appropriate because a withdrawal from the Sonic Duo Project was the best decision in the minds of those who made it, as an alternative, the Proposed Witness No. 7, as chairman of Svyazinvest should have at least suggested to the board of directors to give to Svyazinvest's representatives within Central Telegraph directions which should have guided Central Telegraph to negotiate for it (and thus indirectly for Svyazinvest and the Russian state) the highest possible compensation for its withdrawal from the successfully started Sonic Duo Project.

435. According to the evidence before the Arbitral Tribunal, none of these alternatives took place. Accordingly, the Arbitral Tribunal must thus conclude that the Proposed Witness No. 7 omitted to give any such instructions[481].

436. In view of the conclusion in the preceding paragraph, it is obvious that the conduct of the Proposed Witness No. 7 relating to the dilution of Central Telegraph, be it an action or inaction, cannot be qualified as reasonable, in good faith or as consistent with customary business practices. Considering

---

[479] See para. 395 hereinabove.
[480] See para. 355 and 396 hereinabove.
[481] Claimant has not even alleged that the Proposed Witness No. 7 gave any instructions or guidelines of this kind to the governmental agency he was responsible for or to the board of directors of Svyazinvest.

the duties explained in paras. 394/395 hereinabove, the Proposed Witness No. 7 has violated them with the direct intent to enrich himself[482].

437. The violation of the duties of the Proposed Witness No. 7 can be accomplished by action (such as instructing the Involved Person No. 7 and the Witnesses Nos. 4, 6 and S38 in the manner described in para. 433 hereinabove) or by inaction as found in paras. 399 and 435 hereinabove.

438. Under this legal context, the Arbitral Tribunal does not need to examine Respondent's position that circumstantial evidence proves positive instructions by the Proposed Witness No. 7[483] since it found that refraining from any actions to prevent the dilution of Central Telegraph alone constitutes, under the present circumstances, a breach of the duties of the Proposed Witness No. 7 as member and chairman of the board of directors of Svyazinvest.

439. As to the application of Art. 160 RCrC in cases involving inaction, the Arbitral Tribunal notes that it decided in para. 417 hereinabove that the proper translation of the Russian word *"deyaniye"* at the beginning of the Parts 2 and 3 of this Article is *"conduct"* and not *"act"*, i.e. the same term used in Art. 14 RCrC with the heading *"Definition of a Crime"*[484], and that this provision defines a *"conduct"* constituting a crime as *"action"* and *"inaction"*. The Arbitral Tribunal therefore concludes that Art. 160 RCrC can also be applied to situations when an abuse of official powers leading to a misappropriation takes place through inaction. This is also in line with the fact that Art. 285 RCrC examined by the Arbitral Tribunal in the next Subchapter cc) is clearly to be applied to crimes committed by action and/or inaction[485] and that the abuse of official powers pursuant to Art. 285 RCrC if committed with the intention of a *"theft of somebody's property"* is to be qualified under Art. 160 RCrC[486].

---

482 See the fourth element referred to in para. 423 hereinabove.
483 See para. 433 hereinabove.
484 See para. 414 hereinabove.
485 See paras. 447(ii) hereinabove and 514 hereinafter (see also fn. 497 hereinafter).
486 See para. 449 hereinafter.

### (ii)     Was the Criminal Offence Completed?

440.    The fact that this criminal offence was not completed and that Claimant's action before the Arbitral Tribunal only intends to achieve this completion does not in any relevant way affect the Arbitral Tribunal's conclusion since Art. 66 RCrC with the heading *"Determination of Punishment for Not-Completed Crime"*[487] provides in part 3 that in case there was an attempt to commit a criminal offence the punishment for the attempt shall not exceed three quarters of the punishment for the completed crime. Part 3 of Art. 30 RCrC provides that the attempt to commit a crime is recognised when there are *"intentional actions (inaction)"*[488] of a person immediately directed to commit a crime, if the crime was not completed due to circumstances beyond control of this person. The analysis undertaken above confirms existence of such conduct by the Proposed Witness No. 7.

441.    It is evident that the Proposed Witness No. 7's attempt to misappropriate state assets could not be completed due to circumstances beyond his control, namely Respondent's breach of the terms of the April Option Agreement. The fact that Claimant attempted - and in this arbitration indeed continues to attempt - to perform the April Option Agreement only evidences that Proposed Witness No. 7's attempt to misappropriate has been thwarted by events beyond his control.

### (iii)     Conclusions

442.    The Arbitral Tribunal concludes from its analysis in para. 425 to 441 hereinabove that all four elements necessary for the qualification of the conduct of the Proposed Witness No. 7 as a crime under Art. 160 RCrC have been proven.

---

[487]     This wording is valid and unchanged since January 1, 1997 up to the present time.
[488]     Extract of part 3 of Art. 30 RCrC of the wording valid and unchanged since January 1, 1997 up to the present time, translated by the Arbitral Tribunal.

242



443. Therefore, there are sufficient grounds to conclude that the April Option Agreement was based on, and was intended to implement the results of, a criminal offence in the form of a *"misappropriation"* pursuant to Art. 160 RCrC by the Proposed Witness No. 7.

**cc)     Art. 285 RCrC on *"Abuse of Official Powers"***

**(i)     The Wording of Art. 285 RCrC**

444. Article 285 RCrC with the heading *"Abuse of Official Powers"* read in the relevant period (2000 to 2002)[489] as follows[490]:

> *"1. In the event that an official uses his official powers contrary to the interests of his office, provided that such conduct is caused by mercenary or other personal interests and his act results in a material violation of rights and legitimate interests of individuals or organizations or any public or state interests protected by law,-*
>
> *shall be punished by a fine in the amount of one hundred to two hundred minimal wages or in the amount of salary or other income of a convicted person for a period from one to two months, or by deprivation of right to hold certain posts or engage in certain activities for a term of up to five years, or by arrest for a term of four to six months, or by imprisonment for up to four years.*
>
> *2. The same conduct of a person holding public office of the Russian Federation or public office of the subject of the Russian Federation, or by the head of local self-government,-*
>
> *shall be punished by a fine in the amount of five hundred to eight hundred minimal wages or in the amount of salary or other income of a convicted person for the period of five to eight months*

---

[489]  The current version of Art. 285 RCrC in force as from December 11, 2003 contains only changes with regard to the amounts of fines, other provisions remained unchanged (Criminal Code of the Russian Federation, all versions of 1997-2005, Moscow: Eksmo, 2005, pp. 274-276.

[490]  This translation is based on the translation on p. 4 of Appendix 2 to RE-20 but has been improved and adjusted by the Arbitral Tribunal to the text applicable in the relevant period. The improved translation has been submitted to the Parties for comments as Exhibit 2 to the Arbitral Tribunal's telefax dated April 3, 2006, (see para. 411 hereinabove).

*or by imprisonment for a term up to seven years with deprivation of right to hold certain posts or engage in certain activities for a term of up to three years or without such deprivation.*

*3. The conduct provided for by parts one and two of this article entailing grave consequences,-*

*shall be punished by imprisonment for a term of up to ten years with deprivation of right to hold certain posts or engage in certain activities for a term of up to three years."*

445.    The legislator has issued notes to Art. RCrC. Part 1 and 2 of these notes define the term *"official"* used in Art. 285 RCrC as follows[491]:

*"Notes. 1. For the purposes of the articles of this Chapter, an official shall mean a person who performs, whether on a permanent or temporary basis or on the basis of a special authority, functions of a representative of state power or organizational, managerial, administrative or executive functions in state bodies, local government bodies, state and municipal institutions, as well as in the Armed Forces of the Russian Federation or other military forces and units of the Russian Federation.*

*2. For the purposes of the articles of this Chapter and other articles of this Code, a person holding public office of the Russian Federation shall mean any person holding any post established by the Constitution of the Russian Federation, federal constitutional laws or other federal laws for the purpose of directly exercising any powers of state bodies..."*

446.    The position of the Proposed Witness No. 7 as a high ranking official of the Russian Federation falls within the above definition of an official and a person holding public office[492].

---

[491]    This translation has been prepared in the same manner as discussed in fn. 490 hereinabove.

[492]    See also the discussion regarding the limitations established for civil servants in para. 459 hereinafter.

**(ii)    The Four Elements Constituting a Crime under Art. 285 RCrC**

447.    The Arbitral Tribunal now examines the following four elements of an abuse of official powers pursuant to Art. 285 RCrC[493]:

   (i)    use by an official of his official powers contrary to the interests of this office;

   (ii)   commitment of an action or inaction out of mercenary or other personal interest;

   (iii)  results of actions or inaction which amount to a substantial violation of the rights and lawful interests of citizens or organizations or protected by law interests of the state or the society;

   (iv)   existence of a causation between actions or inaction of an official and the above referred to results.

**(iii)   Are the Four Elements Met *in Casu*?**

448.    The factual findings of the Arbitral Tribunal supply serious indications to the effect that an abuse of official powers by the Proposed Witness No. 7 and/or Involved Person No. 2 was taking place.

449.    As to Proposed Witness No. 7's possible abuse of power, the Arbitral Tribunal notes that under Russian criminal law:

> *"In case an abuse of official powers was a way of theft of somebody's property, such conduct should be considered as theft and qualified under Art. 160 RCrC"*[494].

---

[493]    See Commentary to the Criminal Code of the Russian Federation, Chief editor – Chairman of the Supreme Court of the Russian Federation V.M. Lebedev, 5th edition, Moscow: Yuright-Izdat, 2006, p. 733.

[494]    See Commentary to the Criminal Code of the Russian Federation, Chief editor - Chairman of the Supreme Court of the Russian Federation V.M. Lebedev, 5th edition, Moscow:

Since the Arbitral Tribunal has already dealt with the conduct of the Proposed Witness No. 7 under Art. 160 RCrC, there is no need to further examine a possible violation of Art. 285 RCrC[495].

450.    The same applies for the position of the Proposed Witness No. 7 as Chairman of Svyazinvest with regard to Art. 201 RCrC on an *"abuse of power"*[496] which applies only to a conduct[497] of such a person when there is no personal material gain since, if there is such gain, Art. 160 RCrC is to be applied[498].

451.    Although Respondent alleged also an abuse of official powers by the Involved Person No. 2 and others[499], it has not established that these persons, beside their corporate positions in Svyazinvest, Central Telegraph or CT-Mobile had any official rights and duties different from their corporate duties. Therefore, and because of the factual and legal conclusions made with regard to the Proposed Witness No. 7's violation of Article 160 RCrC, it has become irrelevant, from the civil law perspective, whether any other persons participated or were otherwise involved in this offence There is therefore no need for the Arbitral Tribunal to examine a possible abuse of official powers by Involved Person No. 2 or others.

**dd)    Art. 289 RCrC on Unlawful Participation in Business Activity**

**(i)      The Wording of Art. 289 RCrC**

452.    The Arbitral Tribunal further examines the applicability of Art. 289 RCrC to the above described factual findings. Art. 289 RCrC with the heading

---

Yuright-Izdat, 2006, p. 734 and para. 97 of RE-30 to which Respondent refers in para. 26 on p. 14 of Respondent's Bullet-Point submission.
[495]    See para. 439 hereinabove.
[496]    Compared to an *"abuse of official power"* pursuant to Art. 285 RCrC.
[497]    Part 1 and 2 of Art. 201 RCrC use the word *"deyaniye"* which for the reasons set forth in paras. 413 to 417 hereinabove covers action and inaction.
[498]    See para. 28 of RE-20 and - in a somewhat different context - para. 53 of RE-30.
[499]    See para. 226/227 on p. 102 BID-Statement and para 173 on p. 74 BID-Reply.



*"Unlawful Participation in Business Activity"* read in the relevant period (2000-2002) as follows[500]:

> *"An establishment by an official of an organization engaged in business activities, or participation in the management thereof, personally or through a fiduciary, contrary to the existing statutory prohibition, provided that such conduct involves granting to such organization privileges or advantages or otherwise extends patronage, -*
>
> *shall be punishable punished by deprivation of right to hold certain positions or engage in certain activities for a term of up to five years with a fine in the amount from one to two hundred minimal wages or in the amount of salary or other income of the convicted person for the period from one to two months, or by compulsory works for a term of one hundred eighty to two hundred forty hours, or by detention for a term of three to six months, or by imprisonment for up to two years."*

**(ii)    The Four Elements Constituting a Crime under Art. 289 RCrC**

453.  Necessary elements of a criminal offence pursuant to Art. 289 RCrC are[501]:

(i)    a perpetrator should be a person occupying an official position (an official);

(ii)    the official should establish or manage personally (or through a trusted person) a firm involved in commercial activity;

(iii)    an official should grant to this firm privileges, preferentially treat it or otherwise patron its activities;

---

[500]  This translation is based on the translation filed in Appendix 2 of RE-20, but adjusted by the Arbitral Tribunal to the current version of the wording valid as of December 11, 2003 differing only in the amounts of the fines. This adjusted version has been submitted to the Parties for comments as Exhibit 2 to the Arbitral Tribunal's telefax dated April 3, 2006 (see para. 411 hereinabove).

[501]  See Commentary to the Criminal Code of the Russian Federation, Chief editor – Chairman of the Supreme Court of the Russian Federation V.M.Lebedev, 5th edition, Moscow: Yuright-Izdat, 2006, p. 750-751; Commentary to the Criminal Code of the Russian Federation, V.V. Koryakovtsev, K.V. Pituljko, 2nd edition, SPb.: Piter, 2006, pp. 710-712.

    (iv)    said activities of an official should be carried out contrary to a prohi-bition established by the law.

454.    The definition of the notion *"official"* is contained in a note to Art. 285 RCrC quoted in para. 445 hereinabove.

    **(iii)    Are the Four Elements Met *in Casu*?**

455.    As stated in para. 446 hereinabove, the position of the Proposed Witness No. 7 as a high ranking official of the Russian Federation falls within the definition of an official and a person holding public office quoted in para. 445 hereinabove[502].

456.    The involvement of the Proposed Witness No. 7 in the management of Claimant was claimed by Witnesses Nos. 6 and 9 and implied by Witness No. 10[503]. Decisive for the Arbitral Tribunal's finding are, however, the statements made by Witnesses Nos. 4 and S20[504], which indicate that the Proposed Witness No. 7 was actively involved, through Witness No. 4, in the management of Claimant, was briefed on the developments of the business of Claimant, took decisions regarding business matters and gave corresponding instructions[505]. Accordingly, the Proposed Witness No. 7 exercised control over Claimant.

457.    The Arbitral Tribunal concludes that the Proposed Witness No. 7 secured preferential treatment and extended patronage to the Claimant because it allowed Claimant to obtain an option to a valuable asset without this asset being offered on a competitive basis to any third party and on the ground that the asset was transferred and optioned for no value[506]. In the case of the dilution of Central Telegraph in favour of TMI there was nothing pro-

---

[502]    See also the discussion regarding the limitations established for civil servants in para. 459 hereinafter.
[503]    See para. 74 on p. 24 and para. 82 on p. 25 RW-8 as well as paras. 5.15 to 5.17 on pp. 50/51 R-28 and para. 2.2 on p. 3 RW-6.
[504]    See boxes 84, 86, 90, 243, 269, 287, 347, 411, 499 of R-334C.
[505]    See para. 392 hereinabove.
[506]    See para. 374 hereinabove.

vided for in return[507]. In the case of the option to the shares of TMI by Respondent in favour of Claimant, the Arbitral Tribunal concluded earlier that under the April Option Agreement *"Claimant was entitled to serve an Option Notice irrespective of the fact that it did not fully pay the Option Price"* (para. 114 on p. 66 PA), and that Claimant's assuming of the funding obligations under the April Option Agreement does not constitute a compensation[508] and Claimant itself proceeded on the assumption that the Total Purchase Price was not payable. Such behaviour clearly indicates that Claimant acted in the belief that the arrangement allowed the acquisition of a valuable asset for no compensation at all. This arrangement cannot be classified as anything other than a very lucrative and, therefore, preferential to Claimant.

458.   In fact, the whole transaction was to the clear detriment of Central Telegraph, Svyazinvest and the Russian state, and at the same time was aimed to benefit Claimant. Without this patronage it is not likely that Respondent would obtain Central Telegraph's shareholding in CT-Mobile and could grant Claimant the right to acquire 77.7% thereof. Concerted activities of the board of directors of Central Telegraph, top management of Svyazinvest and of Respondent allowing Claimant to get an option to the asset at issue also demonstrate patronage on the part of the Proposed Witness No. 7 who organised and secured the grant of this option in favour of his own company.

459.   The issue whether the Proposed Witness No. 7 was prohibited from participating in any business activity is dealt with in the Russian Federal Law of July 31, 1995 No. 119-FZ *"On the Fundamentals of Civil Service of the Russian Federation"* as amended by Federal Law No. 58-FZ of May 27, 2003. According to this law, a *"public position is a position in the federal bodies of state power, in the bodies of state power of the full-status political subdivisions of the Russian Federation, as well as other state bodies ...*"[509],

---

[507]   See paras.383 and 386 hereinabove.
[508]   See para. 384 hereinabove.
[509]   For this quote of the said law see p.12 Attachment 3 of RE-30.

which includes a position such as the one of the Proposed Witness No. 7. A civil servant is defined as a citizen of the Russian Federation performing the duties of a public position of civil service for a monetary compensation paid out of the federal budget, which qualifies the Proposed Witness No. 7 as such civil servant.

460.    Finally, Art. 11 of the said Federal Law provides that civil servants shall have no right to *"engage in any other paid activity, except for teaching, scientific, or other creative activities"*, and no right to *"engage in entrepreneurial activity, either directly or through an agent"*. The existence of prohibitions and their applicability to the Proposed Witness No. 7 asserted by Respondent were not challenged by Claimant. Moreover, Witness No. S33 testified that the Federal Law referred to above was applicable to the Proposed Witness No. 7 after he assumed his present position in 1999 (p. 261 T7H Day 2) and confirmed that a person serving in that capacity should be considered as a state civil servant (p. 265 T7H Day 2).

461.    In addition, by the Decree of the President of the Russian Federation of April 4, 1992 *"On Fight with Corruption in the System of State Service"* (as amended on November 16, 1992) state officials are prohibited from[510]:

(i)      engaging in commercial activity;

(ii)     rendering any assistance, not allowed by the law, to natural and legal persons using his official position in carrying out commercial activity and to receive for this remuneration, privileges, services;

(iii)    participating independently or through intermediaries in the management of joint stock companies, partnerships with limited liability and other business entities.

---

[510]    See Commentary to the Criminal Code of the Russian Federation, Chief editor – Chairman of the Supreme Court of the Russian Federation V.M.Lebedev, 5th edition, Moscow: Yuright-Izdat, 2006, p. 752.

### (iv)    Summary and Conclusion

462.    The conclusion reached by the Arbitral Tribunal is that the Proposed Wit-
ness No. 7 is an official who was prohibited by Russian law from an in-
volvement into the business of Claimant as well as in its management (both
directly and through a trusted person) and who extended patronage to the
business activities of Claimant.

463.    The involvement of the Proposed Witness No. 7 into the business activity of
the Claimant was in a clear defiance and violation of the prohibitions de-
scribed in para. 459 hereinabove. The public nature of these prohibitions
allows the Arbitral Tribunal to ascertain that the Proposed Witness No. 7
was well aware of them and intended to conceal their infringement by his
failure to disclose his involvement in the Claimant's business, as well as his
subsequent attempts to secure abstention of a potential witness to provide
testimony to this effect (see, for example, boxes 269, 287 and 499 of R-
334C). The Arbitral Tribunal thus concludes that the Proposed Witness No.
7 knew that his conduct was in breach of the prohibitions established for his
high position and, nevertheless, acted in violation of the law, realising that
there might be adverse consequences but hoped, and indeed attempted, to
conceal his perpetrations. Therefore, it is established that the Proposed
Witness No. 7 had had the direct intent to unlawfully participate in a busi-
ness activity within the meaning of Art. 289 RCrC.

464.    The summary in the preceding paras. 462/463 shows that all elements of a
criminal offence under Art. 289 RCrC by the proposed Witness No. 7 are
met. The transfer of Central Telegraph's shareholding in CT-Mobile to TMI
and the optioning of it in favour of the Claimant resulted from the said
criminal offence.

465.    It follows from the findings made by the Arbitral Tribunal and analysis de-
scribed in this Subchapter d) that

(i)    the April Option Agreement was the legal instrument designed to ac-
complish the economic effects intended by the conduct of the Pro-