posed Witness No. 7, by way of the criminal offence contemplated in Art. 160 RCrC[511]; and

(ii)     the achievement of the desired economic effect and the whole *"Central Telegraph-Respondent-Claimant"* transaction was not possible without the Proposed Witness No. 7 committing a criminal offence described in Art. 289 RCrC[512].

466.    The implications of these criminal offences for the April Option Agreement under the applicable English contract law will be examined in the next Sub-chapter e).

**e)    Implications of Criminal Offences under English Contract Law**

**aa)    In General**

467.    The general principles of illegality under English contract law have been described in paras. 299 to 304 hereinabove. In this Subchapter e), the Arbitral Tribunal will now apply these principles to the facts and their legal consequences under Russian criminal law established by the Arbitral Tribunal in the preceding Subchapter d).

468.    The April Option Agreement is not a contract which is illegal on its face. And it could, under different factual circumstances, have been performed legally. The provisions of the April Option Agreement are not illegal under English law. But as seen from the Arbitral Tribunal's finding of fact described in para. 388 hereinabove, there was an illegal purpose and this illegal purpose relates to the manner in which the April Option Agreement was to be performed. By procuring on the one hand the dilution of Central Telegraph's stake in CT-Mobile and through a conduct denying protection to

---

[511]    See paras. 443 hereinabove.
[512]    See paras. 464 hereinabove.

Central Telegraph's stake in CT-Mobile on the other[513], the Proposed Witness No. 7 violated Russian criminal law[514].

469.  Illegality under English law arises when one or both parties to a contract intend to perform a contract illegally[515].

**bb)     The Relevance of an Involvement of Respondent in the Illegality**

470.  The Arbitral Tribunal has made a finding of fact that both Claimant and Respondent intended to perform the April Option Agreement in an illegal manner[516]. Whether one categorizes this in the light of Respondent's Complicity Defence or otherwise[517], the Arbitral Tribunal finds itself in a situation of having to apply the law to the April Option Agreement where the Witnesses Nos. 4 and 6 and the Proposed Witness No. 7 knew or should have known that the performance of the April Option Agreement would involve the commission of illegal acts in Russia.

471.  Be that as it may, the result at law is the same: whether one or both Parties to the April Option Agreement were aware that its performance would necessarily involve an illegality in Russia, the April Option Agreement is unenforceable.

472.  Although the Arbitral Tribunal's understanding of Respondent's primary case is that Respondent was not party to the illegality, the Arbitral Tribunal is of the view that both Claimant and Respondent were involved in this illegal purpose[518]. But even if in fact it were only the Claimant which intended to perform the April Option Agreement illegally, that would, as a matter of law, lead to the same result. Therefore, Claimant's argument referred to in para. 351(vi)[519] is of no assistance to it.

---

[513]  See paras. 396 hereinabove.
[514]  See paras. 465 hereinabove.
[515]  See para. 303 hereinabove.
[516]  See para. 405 hereinabove.
[517]  Respondent argued that Witness No. 6 was *"complicit"* with Claimant.
[518]  See para. 405 hereinabove.
[519]  See also para. 476 hereinafter.



473. The Arbitral Tribunal having found that Respondent was involved in the illegality, one may ask how a respondent who is a party involved in an illegality may profit from it by invoking it as a defence. As a matter of English law it has been held in Thomson v. Thomson (1802) 7 Ves. Jun 470, 473 per Sir William Grant M.R. that it matters not *"who complains of it; the thing is illegal"*. As discussed by Nelson Enonchong in his work *"Illegal Transactions"*[520] it is often said that the illegality defence is a *"very dishonest defence"*. But it is not for Respondent's benefit that English law allows the illegality defence to apply. The benefit is for the public at large to ensure respect for the law is what is sought after and this outweighs the injustice or lack of good faith as between the parties to the contract in question[521]. As Lord Mansfield C.J. put it in Holman v. Johnson (1775) 1 Cowp. 341, 343 (RL-33).

> *"the objection, that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff, by accident, if I may so. The principle of public policy is this: ex dolo malo non oritur action. No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causa, or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides, and the defendant was to bring his action against the plaintiff, the latter would then have the advantage of it; for where both are equally at fault, potior est condition defendentis"*[522].

---

[520]  LLP London Hong Kong 1998 p. 281.
[521]  LLP London Hong Kong 1998 p. 281.
[522]  This case is also discussed in RE-7.

**cc)    Detailed Analysis of English Case Law**

474.    In the recent case of Mahonia Ltd v. JP Morgan Chase Bank and Another [2003] 2 Lloyd's Rep. 911(RL-36) a claim arose in relation to the enforceability of a letter of credit procured by the company Enron. The case dealt with the claimant's application to strike out an illegality defence based on the impregnability of letters of credit in international trade. The Arbitral Tribunal finds the case most relevant, even on Respondent's primary case that only Claimant had an illegal purpose in performing the April Option Agreement.

475.    In that case, Colman J. held the following:

> "(1) the purpose of Enron in procuring the letter of credit was to affect a breach of United States law; it was however a purpose of which the bank was entirely ignorant; had that not been so there would have been no doubt that the enforcement of the contract at the suit of either Enron or the bank would have been contrary to public policy in the English courts; (2) if the relevant contract were entered into by the claimant for an unlawful purpose and the unlawfulness contemplated was English rather than foreign there was strong authority that the claimant could not enforce the contract; (3) _if a claimant entered into a contract lawful on its face for the purpose of using the subject matter to be derived from the contract or the consequence of its being performed for an unlawful purpose he will not be permitted to enforce it; to permit him to do so would be contrary to public policy as offending against the ex turpi cause principle;_ that the defendant was ignorant of the purpose when the contract was entered into was irrelevant; (4) an English Court will not enforce a contact lawful on its face which was entered into for an illegal purpose; a collateral right in this context normally referred to a proprietary right and did not include a right of action on a contract itself; and it did not make any difference that the purpose was unlawful, not under English law, but under the law of a foreign friendly state; (5) Enron's purpose in procuring the opening of the letter of credit, being to enable it to provide Chase the security necessary to create by means of three swaps a device for deceiving the SEC and the public, the Court would have held that to enforce the contract would be contrary to public policy; (6) _on the face of it the enforcement of the letter of credit would appear to conflict with the public policy principle of ex turpi causa, in as much as the Court was being invited to enforce_

255



> *a contract valid on its face which with the claimant's knowledge* *was created to support the unlawful purpose* *of the wider three swaps transaction; (7) the impregnability of letters of credit was a consequence of the need to insulate them from the transaction in relation to which they had been utilized as security; that was because they had a special function in international trade which required that their integrity and irrevocability should not be interfered with unless an ex turpi causa defence could be clearly provided by the bank; as a matter of public policy the Courts would not permit their process to be used to obtain benefit of an unlawful act; in such a case the policy of the law in withholding its process from enforcement of benefits derived from an unlawful act displaced the otherwise impregnable nature of the letter of credit; (8) if a beneficiary should as a matter of public policy (ex turpi causa) be precluded from utilizing a letter of credit to benefit from its own fraud, it was hard to see why he should be permitted to use the Courts to enforce part of an underlying transaction which would have been unenforceable on grounds of illegality if no letter of credit had been involved, however serious the material illegality involved; (9) on the assumed facts there was at least a strong arguable case that the letter of credit cannot be permitted to be enforced against the defendant bank; (10) the claimant's application to strike out the illegality defence and for summary judgment in respect of the defence would be dismissed." (emphasis added)*[523].

476.    Two earlier cases cited in this judgment, namely Forster v. Driscoll [1929] 1 K.B. 470 and Regazzoni v. K. C. Sethia (1944) Ltd [1958] A.C. 301, were relied upon and they are worth dealing with. Both these cases involved the knowledge of illegality by both parties, and therefore most relevant to our case. As can be seen, the result is the same as in Mahonia Ltd v. JP Morgan Chase Bank and Another.

477.    In Forster v. Driscoll [1929] 1 KB 470 (RL-185) Sankey LJ (quoting Dicey & Morris) held that:

> *"A contract is, in general, invalid in so far as ...the performance of it is unlawful by the law of the country where the contract is to be performed ... and I reserve the liberty to consider whether it is any longer an exception to this is proposition that this country will not*

---

[523]     Ibid 911-912.

> *consider the fact that the contract is obnoxious only to the revenue laws of the foreign country where it is to be performed as an obstacle to enforcing it in the English Courts......... In my view the present position of the law is that the mere fact that a vendor of goods knew that the purchaser proposes to run them into a country where they are prohibited by some revenue law is not sufficient to render the contract of sale illegal, but if beyond mere knowledge the vendor actively engages in an adventure to get the goods into such country, the Court will not assist the parties to the adventure by entertaining or settling any dispute between the parties arising out of the contract." (p. 518 of the judgment per Sankey LJ).*

478. Regazzoni v. Sethia (1944) Ltd [1956] 2 QB 490 (RL-186) it was held that a

> *"contract was unenforceable since an English court will not enforce a contract, or award damages for its breach, if its performance would involve doing an act in a foreign and friendly State which violates the law of that State. This principle is based on public policy and international comity. ".[524]*

479. Although in Regazzioni it was said that an English court will not enforce foreign revenue laws at the suit of a foreign state, they will not assist in their breach by enforcing contracts involving their contravention (p. 490, 515 and 516 of judgment). Thus, even if the performance of the April Option Agreement were to breach only Russian fiscal law, English law would not assist a plaintiff in its enforcement; *a fortiori*, the English courts will not enforce a contract the performance of which, as in the present case, would violate Russian criminal law. It was held in Euro-Diam Ltd v. Bathurst [1990] 1 Q.B. 1, 40 (RL-32) that the contention for English courts to enforce contracts which breach foreign revenue laws *"appears to fly in the face of all principles of comity"*. All the more so in the case of a breach of foreign criminal law. In Euro-Diam Ltd v. Bathurst Kerr LJ said that *"the ex turpi causa defence ultimately rests on a principle of public policy that the courts will not assist a plaintiff who has been guilty of illegal (or immoral) conduct of which the courts should take notice. It applies if in all the circumstances it would be an affront to the public conscience to grant the plaintiff the relief*

---

[524]   Forster v. Driscoll [1929] 1 KB 470 applied (RL-185).

*which he seeks because the court would thereby appear to assist or en-
courage the plaintiff in his illegal conduct or to encourage others in similar
acts".*

480.   The question as to whether something is an affront to the public conscience
was taken up in the House of Lords in Tinsley v. Milligan [1994] 1 A.C. 340.
Respondent submitted an expert legal opinion (RE-25) dealing with this
and, in particular, examined Lord Goff's disapproval of Nicolls's L.J. finding
in the Court of Appeal in which the latter held that the public conscience
test underlay the weighing up of the consequences of either granting or de-
nying relief when a defence of illegality has been raised. Lord Goff did not
disapprove of a court refusing to grant relief if it would be an affront to pub-
lic conscience but rather disapproved of a court granting relief when it
would not affront the public conscience. Interesting though that may be,
Lord Goff's judgment was a dissenting judgment in the House and the ma-
jority holding firmly rejected the affront to the public conscience test as a
reason to deny a claimant his rights despite a defence of illegality being
raised.

481.   Therefore, this Arbitral Tribunal when examining the merits of Claimant's
claims (here and subsequently) does not need to take account whether the
granting of such claims would be an affront to the public conscience. It is a
matter of English public policy based on foreign illegality[525]. As a matter of
English law, a contract is contrary to public policy where *"the harm to the
public is substantially incontestable"*[526] or that the court is *"Satisfied that
any reasonable person would agree"* that its enforcement would be a harm-
ful thing[527].

482.   The cases of Royal Boskalis Westminster NV v. Mountain [1997] 2 All E.R.
929, Mackender v. Feldia A.G. [1967] 2 Q.B. 590, Kahler v. Midland Bank

---

[525]   One notes that a mere breach of foreign public policy at the place of performance is
insufficient on its own - Lemenda Trading v. A.M.E.P.C. [1988] 1 Lloyd's Rep. 361, 166 per
Philips J. (RL-34).
[526]   See Lord Atkin in Fender v. St. John Mildway [1938] a.c.1,12.
[527]   See Donaldson LT in Cheall v. A.P.E.C.C.S. [1983] 1 Q. B. 126, 147.



[1950] A.C. 24, Zivnostensska Banka National Corporation v. Frankman [1950] A.C. 57 and Ralli Bros. v Cia Navieria Sota y Anzar [1920] 2 K.B. 287 (RL-35) all guide the Arbitral Tribunal in the same direction: even if a contract is lawful on its face under the proper law of the contract, if it was entered into with an illegal purpose and the performance of it is illegal, it will be unenforceable as a matter of English law.

dd) **Conclusions**

483. As we have seen in the findings of fact, the Proposed Witness No. 7, the beneficial owner of the Claimant, has committed acts preparatory to, and has attempted and sought performance of the April Option Agreement. These acts are illegal as a matter of Russian criminal law. As such, the April Option Agreement is unenforceable under English law. To hold otherwise would offend the public policy principle of *ex turpi causa*. This principle displaces Claimant's attempt to enforce its rights under the April Option Agreement by specific performance. It may be that Claimant, at a later stage of proceedings, brings claims against Respondent on other than contractual grounds. That will be a matter for Claimant. But Claimant cannot claim (now or in a subsequent stage of these proceedings) a right of action on the April Option Agreement itself because it is unenforceable.

484. Therefore, in view of the contraventions of Russian criminal law involved in the illegal purpose of the April Option Agreement and the performance of it with regard to the dilution of Central Telegraph's stake in CT-Mobile and in accordance with applicable English law, the Arbitral Tribunal finds that the April Option Agreement is unenforceable.

485. Having determined in para. 319 hereinabove that the standard of proof to be applied by the Arbitral Tribunal is not the standard of proof a criminal law judge would apply, but is the *"test of the balance of probabilities"* with the requirement that *"on balance ... cogent and strong evidence on the facts"* must be presented and being satisfied that such evidence is available in this case, the Arbitral Tribunal points out that the finding on the applicability of Article 160 RCrC in para. 443 hereinabove (see also para. 405



hereinabove) and Article 289 RCrC (see para. 464 hereinabove) do not amount to a conviction of the Proposed Witness No. 7 to criminal sanctions, but is merely a finding on the preliminary issue whether provisions of Russian criminal law have been contravened. Moreover, this finding is made within the framework of a civil law dispute to which the Proposed Witness No. 7, despite being the beneficial owner of Claimant, is not a party.

**E.    ML-Defence**

486.    As stated in para. 66(ii), the Money Laundering Defence relates to the Riversand Payment and the Augmentation Payment made by Riversand and Augmentation to IPOC prior to the signing of the April Option Agreement, i.e. in the period the Pre-Signing Events took place. Since Claimant – as stated in para. 192 hereinabove – sufficiently explained the source of the Augmentation payment but failed to do so with regard to the Riversand Payment, the Arbitral Tribunal will deal first with the Augmentation Payment.

487.    Before dealing with the Augmentation Payment, the Arbitral Tribunal recalls that the ML-Defence is – if justified – a defence to be considered as a matter of international public policy[528].

**a)    Augmentation Payment**

**aa)    Respondent's Position**

488.    Respondent submitted that the funds with which IPOC funded the Paid OP-Portion of USD 11'565'000.00[529] plus the Assumed CTM-Funding[530] were the proceeds of a crime:

---

[528]    See para. 186 to 189 PA and para. 198 at fn. 220 hereinabove.
[529]    Option Price of USD 15'225'000.00 less the amount of the Outstanding Funding of USD 3'660'000.00 (see para. 65(i) hereinabove and para. 95(i) PA).
[530]    See para. 65(ii) hereinabove.

(i)     The *"performance by IPOC of the funding payments required under the terms of the April Option Agreement was an act of money laundering under Swiss criminal law"* (p. 119, lines 9 to 12 T10H) as IPOC made the funding payments for the Paid OP-Portion *"out of the Augmentation subscription into IPOC"* and therefore performed the contract illegally and now attempts to rely on an *"illegal performance of the contract to enforce"* it (p. 119 line 26 to p. 120 line 8 T10H).

(ii)    The bank statements of Augmentation show that on March 30, 2001 USD 30'500'000.00 were paid by Augmentation to IPOC (p. 2 C-765) which were received by Augmentation on February 23, 2001 and March 5, 2001 from Honestas, Bermuda (**"Honestas"**), Comitas, Bermuda (**"Comitas"**) and Protec Management Trust Establishment, Liechtenstein, totaling USD 35'356'890.78 (para. 131 BID-Reply)[531]. *"Comitas funds transferred to Augmentation represented four roughly equal amounts of US$7.66 million received by Comitas in January/February 2001 from Cody Trading, Enamel Enterprises, Dottie Enterprises and Jobbie Trading, pursuant to four share sale agreements of 20 January 2001 under which each of those four companies purchased from Comitas 18.7% of the share capital in Telecom XXI"*, Russian Federation (**"Telecom XXI"**) (para. 145 BID-Reply).

(iii)   Comitas earned these funds from the purchase of Telecom XXI for approximately USD 3'000'000.00 and its sale to Mobile Telesystems OJSC, Russian Federation (**"MTS"**) in January 2001 *"for around USD 40 million"* (p. 116 lines 4 to 19 T10H referring to para. 253 of C-518f). MTS *"was ready to pay this price because it had not obtained in May 2000 a GSM 900 licence on its own application"*[532].

---

[531]   The major part, i.e. USD 30'684'198.43 was received from Comitas (see p. 1 of C-765).
[532]   See p. 116 lines 24/25 T10H and paras. 606, 610, 611, 630 BID-Statement with reference to para. 4.1.4 of RE-11.

The only reason for this substantial increase in value was the acquisition of a GSM 900 licence by Telecom XXI[533].

(iv)     Proposed Witness No. 7 *"at the time"* of his appointment as a high official *"acquired a company with a GSM 1800 licence through his privately owned company, Comitas, he granted the company a GSM 900 licence by virtue of his [official] powers, and he resold the company with a profit of well over 1'000 percent, ..., which he was able to achieve because he had made sure that the acquirer of Telecom XXI could not obtain a GSM 900 licence otherwise. ... In doing so [Proposed Witness No. 7] clearly abused the powers he disposed of in his function"* as a high official (pp. 116/117 T10H).

(v)      Proposed Witness No. 7 oversaw the allocation of licences in his function. Telecom XXI was awarded a GSM 900 licence in a very short time, while Proposed Witness No. 7 *"made sure that the application for a GSM 900 licence by MTS, a competitor which had long been trying to enter the North-West Russia[n] market, was not granted"*[534]. The grant of the GSM 900 licence to Telecom XXI cannot be compared to the grant of licences to other operators, such as Vimpelcom, because Telecom XXI was a start-up company with no expertise at that time[535].

(vi)     The Proposed Witness No. 7 *"exercised control over the entire frequency and licence process for Russian telecommunications companies"*[536]. Accordingly, Telecom XXI *"enjoyed a preferential treatment"*[537] as the period for the granting of its GSM 900 licence, which

---

[533]   See p. 352 lines 14 et seq. T10H with reference to para. G of RE-21 and C-598 to C-602.
[534]   See p. 116 lines 10 to 16 T10H Day 1 and para. 329 on p. 136 BID-Statement.
[535]   See p. 351/352 T10H, with reference to Witness S3's testimony at page 335 TSWH Day 2 and paras. 614 and 624 BID-Statement.
[536]   See p. 124 lines 18 to p.125 line 8 T10H with references to paras. 4.2 and 4.3 of RW-20, paras. 8 and 15 of RW-21, paras. 9 and 11 of RW-22.
[537]   See p. 126 lines 20/21 T10H and para. 612 BID-Statement.

it received in May 2000, was very short[538], and aimed *"to sell the company after the grant of the GSM 900 licence with as much profit as possible"* and he therefore *"arranged that MTS encountered difficulties first in obtaining the licences and frequencies it needed to develop its business"*[539].

(vii)     Respondent explained that Comitas acquired 74.9% of Telecom XXI for USD 4'780'000 from AVT Systems[540] and that by *"a further agreement dated 18 May 2000 between Telecom XXI and Comitas, Telecom XXI agreed to 'hand over' to Comitas 3,090,854 shares in Telecom XXI for"* approximately USD 1'400'000.00 (para. 149 BID-Reply referring to C-594). Respondent then referred to Claimant's allegation in para. 356 BID-Answer that the sums actually paid by Comitas were USD 500'000.00, USD 2'500'000.00 and a *"further"* amount of USD 2'000'000.00[541] and concluded that it believes that *"an option agreement entered into by"* PLD Telekom Inc., USA (**"PLD"**) *"for a stake in TCI - for which it paid US$3,000,000[542] - provided the funds for the acquisition"* of Telecom XXI (para. 150 BID-Reply).

(viii)    Respondent qualifies Proposed Witness No. 7's *"behaviour"* as a *"contravention against"* Art. 285 RCrC[543], i.e. an abuse of powers of an official for his personal benefit.

(ix)      The monies Comitas made out of the sale of Telecom XXI were *"proceeds of [Proposed Witness No. 7's] abuse of power"* which he then channeled through Augmentation into IPOC, and then used

---

[538]    See p. 127 lines 1 to 8 T10H Day 1, with reference to Witness S1's testimony on p. 138 lines 21 to 25 TSWH Day 1.

[539]    See p. 129 lines 3 to 20 T10H with references to para. 5.4 of RW-20 and p. 335 lines 4 to 14 TSWH Day 2, page 7 of RW-21 and page 5 of RW-22 as well as paras. 616 and 621 BID-Statement.

[540]    See para. 147 BID-Reply referring to the agreement dated November 15, 1999 and C-588 with its amendments C-590 and C-597.

[541]    See also para. 489(vii) hereinafter.

[542]    USD 1'780'000.00 on March 1, 2000 and approx. USD 1'400'000.00 on May 18, 2000.

[543]    See p. 117 lines 11 to 16 T10H with references to paras. 91 to 94 of RE-30.

263

them to perform the *"obligation under the April Option Agreement"*. The monies obtained through an abuse of power qualify as a crime under Russian criminal law. This is also a felony under Swiss criminal law, and the channeling of these funds into IPOC is an act suited to frustrate the confiscation of such assets. Thus, the requirements of article 305bis of the Swiss Penal Code are met. Therefore an act of money laundering was committed (p. 118/119 T10H with references to RE-30).

(x)    According to the Swiss Federal Supreme Court, *"the certitude that the assets stem from a crime suffices and there is literally no legal provision which requires that there must be any documentary proof of such predicate offense. The court has full discretion"* (p. 350/351 T10H).

(xi)   Respondent considers therefore, *"that if the contract is performed in an illegal manner, it cannot be enforced by the party with the illegal intention"* (p. 119 lines 15 to 17 T10H).

**bb)   Claimant's Position**

489.   Claimant rejected Respondent's argumentation on the following grounds:

(i)    IPOC funds paid by Augmentation do not stem from the proceeds of a crime, and in any event, according to the applicable Swiss law, the alleged predicate offense has to be fully proven by Respondent (p. 259 T10H Day 1).

(ii)   *"The deposits from Riversand and Augmentation are the source of funds which were used by Claimant to make the two undisputed payments under the AOA, in April and August 2001"* (para. 939 BID-Answer with reference to C-612 and C-862).

(iii)  On March 30, 2001, *"an amount of $30.5 million was transferred from Augmentation to IPOC"*, which Augmentation received from



Comitas and, to a lesser extent, from Honestas (para. 937 BID-Answer). The Honestas funds also stem from the Telecom XXI transaction[544].

(iv)    All funds that came from Comitas, except for the minimum deposit payment paid by the firm of Witness No. 4, were *"the product of the Telecom XXI transaction. ... Using the money paid in by Sistema/MTS, the interest gained, and the initial deposit, Comitas then made two transfers to Augmentation Investments on 23 February 2001: one in the amount of $30,318,672.57 and another in the amount of $365,525.76"* (para. 934 and 935 BID-Answer).

(v)    *"MTS used seven offshore companies, mainly from Cyprus, to acquire [the] interest [in Telecom XXI]"*, as shows the *"Letter of Intent dated 14 December 2000 between AVT, acting as representatives of all the Telecom XXI shareholders ... and Sistema Telecom (an owner of MTS), by which Sistema authorized 'foreign companies' to acquire 100% of Telecom XXI for US$40,000,000"* (para. 374 BID-Answer with reference to C-682).

(vi)    Whether *"the funds used by [Witness No. 4] to fund Comitas' acquisition of an interest in Telecom XXI"* are sufficiently explained or not *"is irrelevant, as the only funds at issue here are those paid by IPOC for the AOA, and these funds were derived directly from the sale"* by Comitas *"of Telecom XXI to MTS's offshore entities"* (para. 371 BID-Answer).

(vii)    Comitas acquired its *"interest in Telecom XXI"* for USD 3'000'000.00 about 15 months before the said sale to MTS based on an agreement with AVT Systems it concluded on November 5, 1999. *"After receipt of such funds, the charter capital of Telecom XXI was to be increased and Comitas was obligated to provide a further*

---

[544]  See para. 147 BID-Rejoinder with reference to paras. 924 to 937 BID-Answer, in particular para. 930 referring to para. 6 of C-590 and C-592.

*$2,000,000 in funds"*, with the result that Comitas would own 74.9% of Telecom XXI (para. 356 BID-Answer with reference to C-587 to C-597).

(viii)    The W4-Group *"provided the funds to build the network, used their knowledge of the suppliers in the area to obtain cheaper-priced equipment, and used their technical expertise to ... construct the network"* (para. 358 BID-Answer).

(ix)    By the time Telecom XXI was granted the *"supplemental GSM-900 licence"* on April 7, 2000 (para. 358 BID-Answer) for the North-West Region of Russia, including St. Petersburg in addition to the DCS-1800 licence it received on April 28, 1998 (para. 350 BID-Answer), it *"had launched the network and commenced the provision of services"*. The value of Telecom XXI had therefore been significantly increased by the work of the W4-Group, which ensured that *"sufficient 900 MHz frequencies were available"* (para. 360 BID-Answer).

(x)    Vimpelcom's 1800 licence for Moscow was amended in August 1998 *"to allow it to develop a dual band GSM 900/1800 network"* and a year later its four other licences were amended in the same way (para. 345 BID-Answer). However, at the time Witness No. 4 purchased an interest in Telecom XXI, *"there was no assurance that a GSM 900 supplemental licence would be issued, because no one knew if the 'Vimpelcom precedent' in Moscow would be applied in St Petersburg"* (para. 354 BID-Answer).

(xi)    *"[A]nyone could have bought Telecom XXI when it had the 1800 licence"* although it was a paper company (p. 409 lines 3 to 10 T10H Day 1), as it was *"owned by a third party that had no relation to the group"* (para. 368 BID-Answer).

(xii)    *"The grant of the licence to Telecom XXI"* was not *"at the ... sole discretion"* of the Proposed Witness No. 7: *"licences are routinely granted so long as sufficient frequencies are available. The decision*



*on frequency availability is a decision made by specialists at GKRCh, not the Minister himself, before the application is even received by the Ministry's Licensing Committee"* (para. 364 BID-Answer). To support this argument, Claimant states that *"Vimpelcom, MTS and numerous other operators received re-newed or new dual-band licences"* (para. 369 BID-Answer).

(xiii)   Moreover, there was no reason for MTS to apply for a GSM 900 licence in 2001, as the Proposed Witness No. 3 states, as *"MTS's principle shareholder Sistema had signed a Letter of Intent in December 2000 to acquire Telecom XXI and its dual-band licence"* (para. 370 BID-Answer with reference to para. 4.1.2 of RE-11).

(xiv)   Swiss law is applicable *"for the burden and standard of proof"*, as it is the *"lex allegatio criminalis"* (p. 257 T10H Day 1). Claimant refers to the message of the Federal Council for the introduction of the money laundering law and states that *"in the case of foreign acts, the Swiss judge must be convinced of the criminal origins according to domestic evidentiary requirements"* and therefore *"it is absolutely key that you prove the predicate offence, and this is [Respondent's] burden, and ... they have access to proof if necessary"* (p. 258/259 T10H Day 1).

(xv)   Claimant stated that if the Augmentation funds stemmed from PLD, as Respondent alleges, *"it is proof that that is a clean source of money"* (p. 408 lines 16 to 18 T10H Day 1).

cc)   **The Arbitral Tribunal's Analysis**

490.   As was established in the Partial Award, Claimant received on March 30, 2001 a funding from Augmentation, namely the Augmentation Payment, i.e. an amount of USD 30'500'000.00. This amount was partially used for pay-

267



ments made under the April Option Agreement[545], i.e. in particular for the Paid OP-Portion[546].

491.  It is undisputed that the above indicated amount was comprised of payments made to Augmentation by the companies Honestas (USD 55'436.42) and Comitas (USD 30'318'672.57 and USD 365'525.76)[547] as a result of sale of the Russian company Telecom XXI to MTS, a major Russian telecommunications company, through a number of off-shore companies[548].

492.  The reason for MTS to purchase Telecom XXI for USD 40'000'000.00[549] was to obtain access to GSM 900/1800 licences to provide cellular radio-telephone communication services in the North-West Region of Russia, including St. Petersburg. These licences were held by Telecom XXI (the "Telecom XXI-Licence")[550]. This can be ascertained from the content of the five agreements dated January 20, 2001 entitled *"Share Sale and Purchase Agreements"* regarding Telecom XXI, which consider the Telecom XXI-Licence as Telecom XXI's *"main ... asset"* and most of the purchase price was supposed to be returned to the respective buyer as *"damages"* should the licences be withdrawn through the fault of the respective seller[551].

493.  In view of Respondents allegation that MTS was forced to buy Telecom XXI to obtain the desired licences described in para. 488(vi) hereinabove, and in an attempt to understand why a major Russian telecom operator obtains

---

[545]  See paras. 181/182 on pp. 98/99 PA, C-70, C-550A, C-612 and para 36 and 130 of R-152.
[546]  See para. 66(i) hereinabove.
[547]  See p. 1 of C-765 and the Parties' concurring account in paras. 488(ii) and 489(iv) hereinabove.
[548]  See the Parties' concurring account in paras. 488(ii) and 489(v) hereinabove and para. 360 on p. 138 SC, paras. 619/620 on pp. 246/247 of BID-Statement, p. 29 of the Funding Report, para. 2.20 on p. 16 of RE-21.
[549]  For the Purchase Price see Claimant's statement referred to in para. 489(v) and Respondent's statement in para. 488(iii) hereinabove.
[550]  See Claimant's account in para. 489(xii) and Respondent's account in para. 488(v) hereinabove. While Claimant states that the supplemented GSM 900 licence was received on April 7, 2000, Respondent dates this event in May 2000.
[551]  See the five agreements filed as C-598 to C-602, in particular Clauses 4.4.12, 6(2) and (5). While in C-598 Honestas is the seller, in C-599 to C-602 Comitas is the seller.

access to licences merely by paying a very substantial amount of money for the purchase of a company holding such licences instead of applying and obtaining the required licences in accordance with the established procedure, the Arbitral Tribunal will now explore the evidence presented in these proceedings on the issuance of licences by the Ministry for Communications and Informatisation of the Russian Federation in the relevant period of 2000 to 2002 (the **"C&I Ministry"**).

494.  The Arbitral Tribunal relied in this regard on the witness statements and oral testimonies of Witnesses Nos. S1, S3 and S4 as former employees of entities directly involved in the process of issuing licences with a significant experience and knowledge of the subjects discussed. The Arbitral Tribunal considered the evidence provided by these said witnesses as credible and assigned much less evidentiary weight to the witness statements and testimonies of Witnesses Nos. S25 and S26 as they were formal and theoretical in their description of the licensing procedures in the C&I Ministry and far removed from reality.

495.  As it was established, the process of issuance of licences in the relevant period (2000-2002) was under the control and a responsibility of the C&I Ministry. Licences as such were issued by the C&I Ministry which had a special department for that purpose. Preparatory work, such as the examination of compatibility issues, identification of availability and assignment of frequencies were carried out by *"Glavgossvyaznadzor"* (later renamed – *"Radio Frequency Centre"*) and by the *"State Commission on Radio Frequencies"* (the **"RF-Commission"**)[552]. *"Glavgossvyaznadzor"* represented a department subordinated to the C&I Ministry (R-411). The RF-Commission was established at the C&I Ministry (R-414) and its minister acted as a Chairman of the Commission (RW-22, p.3).

496.  Discussing procedure for allocation of radio frequencies necessary for obtaining a licence Witness No. S3 stated that:

---

[552]     See pp. 13-19 of RW-20, pp. 8/9 of RW-21, and pp. 3/3 of RW-22.

269

(i)     *"...the only person who would really decide upon these issues was the"* head of the C&I-Ministry (p. 374 TSWH Day 2);

(ii)    he *"received direct instructions to delay the issuance of permissions which had already been agreed with the Ministry of Defense"* and that he knows *"certain facts, real life facts, when applications are made and they are rejected and rejected again and rejected again, and then a certain company comes with an application and it has been approved. And the application concerns the very same territory and the very same bands of frequencies"* (p. 376 TSWH Day 2);

(iii)   even after the approval of applications *"certain decisions, say 10 or 20 decisions,... remain unsigned for the period of six months or so. Although in accordance with the law, from the moment of the meeting of the Commission the decision is binding"* (pp. 378/379 TSWH Day 2); and

(iv)    on instructions of the Proposed Witness No. 7 a restrictive or restraining policy was pursued with regard to all other entities seeking frequencies which were put on hold until *"Mobicoms"* forming a part of MegaFon got frequencies for themselves (p. 403 TSWH Day 2).

497.    Witness No. S25 alleged that the decisions of the RF-Commission (these decisions approve the assignment of radio frequencies – a step crucial for obtaining a licence) *"are impossible to influence... because of the equal voting by all members"* of the RF-Commission (p. 4 of CW-12). Witness No. S3, however, stated that the approval of an assignment of frequencies was in fact a formal matter by noting that the said RF-Commission voted for a *"list of applicants ... as one list"* and *"do not vote on each issue"* and thus were hardly discussed on an item by item basis (p. 378 TSWH Day 2). This seems to the Arbitral Tribunal a more realistic depiction of the bureaucratic activity with 6 to 8 commission meetings per year and hundreds of applications to be decided upon. Such a conclusion is confirmed by Witness No. S1 who testified that the RF-Commission *"is attached"* to the C&I Ministry, and that the Proposed Witness No. 7 is the chairman of the RF-



Commission. The *"documents prepared for each meeting of the Commission are actually processed by the staff of the Ministry, thus it already follows that the Commission is dependent on the Ministry"* and that *"for many members of the Commission it makes no difference, or they are indifferent, as to which way this solution will be taken on many issues taken up at the Commission"* (p. 251 lines 8 to 14 and 22 to 25 TSWH Day 2).

498.    Witness No. S1 also exposed a preferential treatment of *"Mobicoms"* upon instructions, which he believed came from the Proposed Witness No. 7 (p. 12 of RW-20), and also a biased relation with regard to certain applicants (p. 13 of RW-20). A biased and arbitrary approach to some applicants and preferential and protective treatment of others was also confirmed by Witness No. S4 (p.6 of RW-22).

499.    The Arbitral Tribunal further notes that according to the unchallenged testimony of Witnesses Nos. S1 and S3[553] MTS attempted several times, including once in June of 2000, to obtain in accordance with the established procedure the same type of licences which were granted to Telecom XXI. All these applications were rejected. The application made by MTS in June of 2000 was rejected on the ground that penetration of cellular communications among the population of St. Petersburg was too low[554]. The allegation of Witness No. S25 that there were no abuses in the process of granting licences since 2000[555] cannot be relied upon since this witness was a member of the RF-Commission only since Autumn 2003 (p. 379 line 8 TSWH Day 2) and based his allegation on theoretical assumptions.

500.    At the same time, in April or May of 2000, Telecom XXI received a GSM 900 licence in addition to the 1800 licence already obtained in 1998[556].

---

[553]    Claimant questioned the thereto relating allegations of Witness No. S1 on p. 301 lines 9 et seq. TSWH Day 2 only with regard to the applications by VimpelCom and not with regard to those of MTS.

[554]    See para. 33 on p. 11 and para. 36 on p. 12 of RW-21, para. 5.9 on p. 7 of RW-20 and p. 301 lines 14 to 16 TSWH Day 2.

[555]    See pp. 7/8 of CW-12; see also para. 510 hereinafter.

[556]    See para. 5.1 on p. 5 of RW-20 and paras. 357 to 360 on pp. 137/138 BID-Answer and para. 489(iv) hereinabove.

Witness No. S1 testified in this context that Telecom XXI *"was a regional operator with very little operational history or infrastructure behind it"* and that *"procedure of obtaining the GSM 900 license followed by Telecom XXI was quite short"* (RW-20, p.6, para. 5.2) and that the time it took *"was much shorter than the period that it normally takes for reviewing similar applications from other companies"* (p. 138 lines 20 to 25 TSWH, Day 1). As Telecom XXI received the GSM 900 licence in spring 2000, Claimant's reference to an alleged letter of intent to acquire Telecom XXI signed by MTS in December 2000 (see para. 370 BID-Answer) [557] has no merits since this letter of intent, if signed, is dated after, and not before the granting of the dual licence to Telecom XXI, after the refusal of MTS' application, and one month before the five purchase agreements for the sale of Telecom XXI to MTS were signed[558].

501.    For the above reasons, the Arbitral Tribunal concludes that the issuance of licences to mobile operators by the C&I Ministry in the relevant period (2000-2002) was characterised by a high degree of bias and discretion in the withholding or granting of licences, which cannot be explained by a transparent policy of the C&I Ministry or the RF-Commission.

502.    It is undisputed that in November 1999 Comitas, a company described by Claimant as representing Witness No. 4's interests, acquired a majority of shares in Telecom XXI (finally owning together with Honestas – both subsidiaries of Augmentation - 74,9% of the shares of Telecom XXI) with the right to purchase the remaining stake[559]. It is also undisputed that on its own, i.e. without the possibility of receiving a GSM 900 licence, an 1800 licence *"was of little use or value"* (para. 254 on p. 85 of C-518f and paras. 343 and 352 BID-Answer) and that a total financial input in Telecom XXI in the amount of about USD 3'000'000.00 possibly of a further amount of USD 2'000'000.00[560] made through Comitas and Honestas allowed Telecom XXI

---

[557]    This letter of intent is not in the file.
[558]    See para. 492 hereinabove.
[559]    See C-587 to C-597, paras. 355/356 on pp. 136/137 BID-Answer.
[560]    See Respondent's account referred to in para. 488(vii) hereinabove.

to comply with the requirements of the 1800 licence to become eligible for a GSM 900 licence which, as was mentioned above, was quickly received.

503.    Augmentation as well as Comitas and Honestas (which bought and soon thereafter sold Telecom XXI) formed either a part of the W4-Group or were affiliated with it and financed the amounts referred to in the introduction of para. 488 hereinabove. It is irrelevant whether the Proposed Witness No. 7 was its beneficial owner because, *de facto*, these three companies acted in the interests of Proposed Witness No. 7.

504.    The above referred to funding for Telecom XXI in the amount of USD 3'000'000.00 was arranged through personal efforts of Proposed Witness No. 7 as a result of an agreement with PLD[561].

505.    Subsequently, in January 2001, Telecom XXI was acquired by MTS. As was noted above, Claimant's proceeds amounted to USD 30'356'000.00. After that, Comitas was liquidated because, as Witness No. 4 put it, he *"was advised that such a voluntary winding up is a common procedure in such circumstances"*, and Honestas re-named, becoming Versatile Action Holdings Limited (para. 256 on p. 85 of C-518f). In the opinion of the Arbitral Tribunal, this can be considered as an attempt to hide traces of the transaction.

506.    Thus, Telecom XXI was acquired by Proposed Witness No. 7 through Comitas and Honestas, and technically developed in order to be able to obtain the GSM 900 licence. This development allowed it to receive the said licence despite its absence of experience. In January 2001, it was sold with the Telecom XXI-Licence to MTS for a substantial profit of 8 to 13 times the amount paid 14 months earlier in November 1999[562]. During this period, at-

---

[561]    See para. 239 on p. 68 of RW-9, para. 86 on p. 30 of RW-13 and p. 1758 TSWH Day 8 (see also para. 488(vii) hereinabove).

[562]    The question whether the profit was eight or thirteen times the amount invested depends on the unclear issue whether the additional amount of USD 2'000'000.00 to which Respondent refers (see para. 488(vii) and 502 hereinabove) which Claimant seems to confirm (see para. 489(vii) hereinabove), have to be accounted as a part of the

tempts of MTS to obtain a licence through official channels were blocked[563]. Claimant's argument that Telecom XXI could have been acquired not only by Comitas and Honestas, but by anyone, including MTS, does not stand scrutiny since with only a 1800 licence, Telecom XXI had a limited value and the obtaining of a supplemental GSM 900 licence - making Telecom XXI really valuable - depended on the decision of the C&I Ministry which continued to frustrate MTS' attempts to get such a licence.

507.    The above described course of actions appears to be a well planned exercise with the intention and aim of Telecom XXI being re-sold to MTS at a high profit. Witness No. S3 stated in this regard very clearly: *"...Telecom XXI had acquired a 900 GSM license for the Northwest region. MTS had been held back in the development of its business in that region and ended up having to deal with the people behind Telecom XXI to get its license for the Northwest region. It was clear to anyone in the industry that those people were [Proposed Witness No. 7] and maybe others from his group"* (para. 19 on pp. 7/8 of RW-21).

508.    The acquisition of Telecom XXI by the Proposed Witness No. 7 (through intermediaries) for a different purpose is practically excluded since the Proposed Witness No. 7 was a beneficial owner of the successfully developing company North-West GSM[564], a mobile operator established in the same region for which Telecom XXI had its licences. There is no plausible explanation why Proposed Witness No. 7 would plan or wish to establish and the same region two competing telecommunication companies of his own, especially, if the penetration of cellular communications in this particular region was in fact low[565].

---

investment. This question can, however, be left open since already an eight-fold return on investment is extraordinary under the circumstances and cannot be justified.

[563]    See para. 7.2 on p. 11 and para. 7.7 on p. 12 of RW-20.

[564]    In April 2001, North-West GSM was controlled through TCI by FNH, a subsidiary of FCT. At that time, the Proposed Witness No. 7 was the beneficial owner of FCT. This results from the evidence in para. 238(ii), boxes 19, 34, 47, 53 and 78 R-334C, para. 60 of R-29 and para. 1.11 of CE-2, both referring to the subscription agreement with ComTel Eastern of December 19, 2001; finally the letter of wishes for FCT (formerly *"Quince Trust"*, see para. 19 of RE-29) named the Proposed Witness No. 7 as primary beneficiary.

[565]    See para. 499 hereinabove.

274

509.  Since Proposed Witness No. 7 is the beneficial owner of Claimant and a high ranking state official controlling the issuance of licences, the Arbitral Tribunal concludes that the Proposed Witness No. 7 prevented the issuance of the licences to MTS with the aim to force MTS to acquire Telecom XXI, which was with foresight supplied with the licences sought by MTS, resulting in a personal financial benefit to Proposed Witness No. 7.

510.  These factual findings clearly defeat the evidence of Witness No. S25, currently one of the next in the chain of command under Proposed Witness No. 7. Summarising the developments in the licensing process, he stated that *"...introduction of all the above described procedures as of 2000 eliminated the possibility of bias in the treatment of radio-frequency users and eliminated the incentives to provide 'informal payments' to officials via... companies related to such officials"* (p.8 of CW-12). This statement of a long term subordinate of Proposed Witness No. 7 (since 1997) unintentionally confirms the opposite conclusion of the Arbitral Tribunal.

**dd)  The Arbitral Tribunal's Analysis of the Augmentation Payment under Russian Criminal Law**

511.  Evaluating the above-described behaviour of the Proposed Witness No. 7 from the point of view of the Russian criminal law[566], the Arbitral Tribunal examines the application of Art. 285 and 289 RCrC[567] invoked by Respondent's Expert Witness in paras. 31 to 42 of RE-20.

**(i)    Article 285 RCrC on *"Abuse of Official Powers"***

512.  The wording of Art. 285 RCrC applicable in the relevant period (2000 to 2002), as well as the thereto relating legislator's notes 1 and 2, have been quoted in para. 445 hereinabove in the Subchapter on the Dilution De-

---

[566]  For the applicability of Russian criminal law see fn. 453 hereinabove.
[567]  As was noted in para. 409 hereinabove, with regard to application of the Russian criminal law the Arbitral Tribunal intended to establish whether, on the balance of probabilities, it can conclude that behaviour of the Proposed Witness No. 7 can be qualified as falling within the ambit of the provisions of the Russian Criminal Code.

fence. There it has also been concluded in para. 446 that the position of the Proposed Witness No. 7 falls within the definition of an official and a person holding a public office as described in the said notes.

513. Likewise, the four elements of an *"abuse of official powers"* pursuant to Art. 285 RCrC have been described in paras. 447 of the Subchapter on the Dilution Defence and do not have to be restated here. The Arbitral Tribunal will now examine whether these four elements are met in the context of the factual findings made with regard to the Augmentation Payment in paras. 490 to 510 hereinabove.

514. It is to be noted that the commentaries on Art. 285 RCrC[568] confirm that Art. 285 RCrC can also be violated by inaction and require that in making a determination whether an action (inaction) of an official constitute an abuse of power, it is necessary to establish the scope and nature of the official's rights and duties on the basis of statutes, regulations, charters, instructions, etc. It is further required to specify rights and duties of an official which were abused.

515. Although the Parties have not pleaded on the duties of the Proposed Witness No. 7 in detail, the Arbitral Tribunal came to a conclusion that in this particular instance such duties can be inferred from the factual background. In fact, it has been established that the issuance of licences for telecommunication services was in the relevant period (2000-2002) a function and responsibility of the C&I Ministry, and this Ministry indeed issued such licences[569]. It can be safely and reasonably assumed that the issuance of licences was supposed to take place in accordance with the established requirements and procedures, and not in the personal interests of a person holding a high public office, and that the C&I Ministry was supposed to treat

---

[568]  Commentary to the Criminal Code of the Russian Federation, chief editor - Chairman of the Supreme Court of the Russian Federation V.M. Lebedev, 5th edition, Moscow: Yuright-Izdt, 2006, para. 2 on p. 733; Commentary to the Criminal Code of the Russian Federation, V.V. Koryakovtsev, K.v. Pituljko, 2nd edition, SPb: Piter, 2006, p. 697.

[569]  See paras. 6 to 11 of CW-1, pp. 3 to 7 of CW-12, paras. 8.1 to 8.20 of RW-20, paras. 7 to 14 and 24 of RW-21, paras. 7 to 13 of RW-22.

all applicants for licences equally and to protect state interests[570]. All of these duties were violated in the course of events surrounding the granting of the Telecom XXI Licence and the sale of Telecom XXI to MTS.

516.  Although there is nothing illegal or criminally punishable in the sale of Telecom XXI *per se*, the huge profit on this sale of eight to thirteen times the initial investment determined in para. 506 hereinabove was the direct effect of MTS's inability to obtain licences otherwise caused by Proposed Witness No. 7. Therefore, a major part of the price paid for Telecom XXI to Augmentation results from the abuse of official powers by a person holding a high public office of the Russian Federation.

517.  The considerations in the above paras. 512 and 515 establish that the Proposed Witness No. 7 is an official holding a public office within the meaning of note 2 to Art. 285 RCrC who used his powers contrary to the interests of his office by a biased and prejudiced influence over the process of the issuance of telecommunication licences.

518.  The result of such behaviour of the Proposed Witness No. 7 amounted to a substantial violation of the rights and lawful interests of companies operating on the Russian telecommunication market. It occurred in the necessity of MTS to purchase the licence from a contemporaneous applicant indirectly owned by Proposed Witness No. 7 for an exorbitant amount paid in the end to the Claimant beneficially owned by Proposed Witness No. 7. This also violated the lawful interests of the society and the state, as well as damaged the reputation of the state authorities, an impact which has been noticed also by the KK-Report[571].

519.  The nexus between the behaviour of the Proposed Witness No. 7 and the above referred results are the problems MTS experienced in obtaining the desired licence as a result of the intention of the Proposed Witness No. 7 to force MTS to acquire Telecom XXI and to profit himself instead of directing

---

[570]    See paras. 9, 10 and 14 on pp. 5 to 8 of CW-1 and pp. 6 to 8 of CW-12.
[571]    See paras. 2.2, 2.3 and 4.1.10 of RE-11.

the licensing authorities to consider MTS' application in an unbiased and unprejudiced manner and disclosing his personal interest in Telecom XXI. Therefore, the Arbitral Tribunal concludes that the Proposed Witness No. 7 directly caused MTS to experience difficulties in obtaining the requested licence and had the pecuniary interest to benefit the Claimant, in turn beneficially owned by the Proposed Witness No. 7.

520.   To be more specific, the Arbitral Tribunal believes that being responsible for the bureaucratic machinery issuing licences, the Proposed Witness No. 7 had every possibility to influence the issuance or non-issuance of licences leading to his personal and very substantial benefit. Since he knew of the Telecom XXI project[572] and was its beneficiary[573], he should have acted so as not to allow a discrimination of one applicant for a licence and preferential treatment of the other one in which he has a personal monetary interest. This conclusion evidences Proposed Witness No. 7's direct and deliberate intent to abuse his official powers for personal gain. The Tribunal believes that Proposed Witness No. 7 (i) acted to achieve this gain by instructing Witness No. 4 to allocate resources of TCI for the deployment of Telecom XXI's network[574] and (ii) may have ordered subordinated divisions of his administration engaged in licensing to deny a licence in one case and to issue a licence in the case of Telecom XXI. There is, however, no clear evidence that such latter acts were carried out by the Proposed Witness No. 7 as they can only be inferred from the surrounding circumstances. However, the Arbitral Tribunal does not need to do this, as the mere fact that there were no actions taken by the Proposed Witness No. 7, fully aware of and personally interested in what was going on surrounding Telecom XXI, to prevent an abuse of the licensing process, constitutes a criminal offence under Art. 285 RCrC in the form of inaction. Being intrinsically

---

[572]   See para. 504 hereinabove.
[573]   See para. 503 hereinabove.
[574]   See Witness No. S26 in para. 28 on p. 14 of CW-1 and his testimony on pp. 2133-2138 and 2148 to 2153 TSWH Day 10 where he states that he worked on Telecom XXI project at the request of Witness No. 4.

related to action, inaction alone is sufficient to result in an abuse of official powers[575].

521. The Arbitral Tribunal asked itself whether there could be a reasonable alternative explanation of the sequence of these events and concluded that there is no evidence to support a different account of what has happened if one is realistic and reasonable. Coming to this conclusion the Arbitral Tribunal notes that Claimant has not provided any alternative explanation of the events surrounding the acquisition and sale of Telecom XXI after it was disclosed that its beneficial owner is Proposed Witness No. 7. The only earlier explanation was that the sale of Telecom XXI with an unusually high profit represented a result of a shrewd business judgment and vision of Witness No. 4 who was allegedly the owner of Telecom XXI and of Claimant. This explanation, in itself unconvincing, was not adapted to reflect the later discovered facts as to the beneficial ownership of the Proposed Witness No. 7.

522. The conclusion is that all elements of a criminal offence envisaged by Art. 285 RCrC by Proposed Witness No. 7 are met.

(ii)    Article 289 RCrC on *"Unlawful Participation in Business Activity"*

523. The wording of Art. 289 RCrC applicable in the relevant period (2000 to 2002) has been quoted in para. 452 hereinabove in the Subchapter on Dilution Defence.

524. The four elements of an *"Unlawful Participation in Business Activities"* pursuant to Art. 289 RCrC have already been set out in para. 453 hereinabove in the Subchapter on the Dilution Defence. The Arbitral Tribunal will now examine whether these four elements are met with regard to the granting of a licence to Telecom XXI and this company's subsequent sale.

---

[575]    See also para. 514 hereinabove at fn. 568.

525. The Arbitral Tribunal has already dealt with the legislator's definition in notes 1 and 2 to Art. 285 RCrC of the notion of an *"official"* in para. 445 hereinabove and came in para. 446 to the conclusion that the position of the Proposed Witness No. 7 as a high ranking official of the Russian Federation falls within the said definition of an official and a person holding public office of the Russian Federation.

526. An actual involvement of Proposed Witness No. 7 in the acquisition, development and disposal of Telecom XXI was confirmed by Witness No. S19 and by Witness No. S20[576] and by the fact that proceeds of the sale of Telecom XXI flowed to Claimant and were used for the purposes of the April Option Agreement[577]. As was established in para. 503 hereinabove, Claimant, the major beneficiary of the Augmentation Payment and, accordingly, of the Telecom XXI transaction, was managed on behalf of the Proposed Witness No. 7 by Witness No. 4. Proposed Witness No. 7 was briefed on the developments of the business of Claimant, took decisions regarding business matters and gave corresponding instructions and thereby was in charge of and exercised control over the Claimant[578]. In view of such evidence it would be indefensible to assume that substantial sums could have been accumulated, transferred to and subscribed by Claimant without knowledge and involvement of the Proposed Witness No. 7. Moreover, the acquisition of Telecom XXI, the investments in its development through funds of the Proposed Witness No. 7[579], the providing of specialized knowledge and technical support to Telecom XXI out of resources of TCI[580] another beneficially owned company of the Proposed Witness No. 7 and the subsequent sale of Telecom XXI, including the determination of the price, constitute in the opinion of the Arbitral Tribunal activities of the Proposed Witness No. 7 falling within the notion of *"participa-*

---

[576]    See p. 1758 TSWH Day 8 and para. 86 on p. 30 of RW-13 as well as para. 239 on p. 68 of RW-9.
[577]    See the introduction in para. 490 hereinabove.
[578]    See boxes 84, 86, 90, 243, 269, 287, 347, 411 and 499 of R-334C.
[579]    See para. 504 hereinabove.
[580]    See pp. 2134, 2150 to 2152 and 2163 TSWH Day 10.

*tion in the management"* of an organization engaged in business activity envisaged by Art. 289 RCrC.

527.   In para. 509 hereinabove, the Arbitral Tribunal concluded that the Proposed Witness No. 7 secured preferential treatment and extended patronage to Telecom XXI on the basis of the established fact that Telecom XXI received a telecommunication licence within a very short period of time while a competitor (MTS) was refused the same licence about two months later. The fruits of this preferential treatment and patronage – which was the necessary element for the success of the planned sale of Telecom XXI – were enjoyed by Claimant. At the same time, the discrimination of MTS in licensing matters discussed in para. 499 hereinabove created for Telecom XXI a preferred position and gave Comitas strong negotiating power vis-à-vis MTS. Accordingly, the whole Telecom XXI transaction was based on the creation of unjust privileges and preferences for one player and unjustifiable problems and disadvantages for another player for the purpose of personal enrichment.

528.   In para. 464 hereinabove, the Arbitral Tribunal concluded in the context of the Dilution Defence that the Proposed Witness No. 7 was prohibited by Russian law from an involvement in the business or the management of commercial entities, such as Telecom XXI and Claimant (both directly and through his trusted person).

529.   Consequently, all elements required for recognizing the perpetration of a criminal offence under Art. 289 RCrC by Proposed Witness No. 7 in the course of the acquisition by Comitas and Honestas of Telecom XXI, its development and obtaining of a licence, subsequent sale to MTS through offshore companies and the transfer of proceeds by the Augmentation Payment to Claimant are met. As to the intent of the Proposed Witness No. 7, the Arbitral Tribunal refers to its respective conclusions in para. 463 hereinabove on the Dilution Defence, which are also applicable to the factual circumstances relating to the Augmentation Payment.



### (iii)    Conclusion

530.   For the reasons set out in paras. 512 to 529 hereinabove, the Arbitral Tribunal concludes that money received by Claimant from Augmentation and used for payments under the April Option Agreement (in particular the Paid OP-Portion) were obtained through a commission by the Proposed Witness No. 7 of criminal offences described in Art. 285 and 289 RCrC. The implications of these criminal offences and the applicable money laundering laws, as well as their legal effects on the April Option Agreement under the applicable English law, will be examined in the Subchapters ee) and ff) hereinafter.

531.   Before proceeding with this examination, the Arbitral Tribunal notes that Respondent did not play any role in the Augmentation Payment. Respondent's involvement in monies obtained from Telecom XXI sale took place only after the funds at issue left Claimant as payments for the funding obligation due under the April Option Agreement.

### ee)    Does the Augmentation Payment of the Option Price Constitute Money Laundering?

### (i)    The Applicable Money Laundering Law

532.   The Parties agree that the issue whether the money received by Claimant from Augmentation and used for payments under the April Option Agreement, in particular the Paid OP-Portion, constitutes an act of money laundering, is to be examined pursuant to Swiss criminal law[581]. The Arbitral Tribunal agrees with this proposition on the ground that the relevant elements of the alleged money laundering activity ("*Tathandlung*") took place

---

[581]   See para. 36 BID-Reply where Respondent states that *"if the money used was tainted, IPOC is liable for money laundering in accordance with Swiss law"* and para. 93 BID-Answer where Claimant states that *"Respondent bears the burden of proving the elements of a money laundering offence, which must be determined pursuant to Swiss penal law"*.

in Switzerland [582]. The Escrow Agent was a Zurich based law firm, the Escrow Account was with Credit Suisse Zurich and later with Hypo Swiss Private Bank Ltd, Zurich, Switzerland[583], and the payment of the Paid OP-Portion into the Escrow Account and the later transfer from the Escrow Account through CT-Mobile to Sonic Duo[584] thus passed through Switzerland.

533.    For the said reasons, the Arbitral Tribunal will now examine whether Claimant's use of the Augmentation Payment it had received constitutes money laundering for the Paid OP-Portion pursuant to Swiss criminal law.

534.    In addition, Swiss law applies irrespective of the issue discussed by the Parties whether the place of performance under English law, as the applicable law to the contract, is in Bermuda or Switzerland[585]. The application of Swiss criminal law depends not on the contractual arrangement of the parties on the contractual place of performance, but merely on the place where the act (*"Tathandlung"*) has been carried out or the place where the result has been achieved (*"Erfolgsort"*)[586].

535.    Money laundering pursuant to Swiss law and in the international context has been addressed in detail by Respondent's expert opinions of Witness No. 7 assisted by Proposed Witness No. 16 filed as RE-12 and RE-27 and Claimant's expert opinion of Witness No. S37 filed as CE-1. Witness No. 7 and Witness No. S37 have been heard at a witness conference on the first day of the Eighth Hearing.

---

[582]    For the money laundering activities see para. 542 hereinafter and the fact that this is a sufficient connex to Switzerland see e.g. Marc Pieth, Basle Commentary, N. 41 and 42 to Art. 305bis SPC.

[583]    See paras. 10(i) and 11 hereinabove.

[584]    See pp. 18 to 20 Reply and C-246a.

[585]    On this discussion see para. 130 et seq. BID-Answer and para. 35 BID-Reply as well as para. 341 et seq. SD.

[586]    See also Art. 7 SPC defined in para. 536 hereinafter.



      **(ii)**    **Article 305bis Swiss Penal Code**

536.   Article 305bis of the Swiss penal code (the **"Swiss Penal Code"** or **"SPC"**) in effect since August 1, 1990, entitled *"Money laundering"* reads as follows[587]:

> *"1. Whoever commits an act suited to frustrate the determination of the origin, the discovery or the confiscation of assets that he knows or should know derive from a crime,*
>
> *shall be punished with imprisonment or a fine.*
>
> *2. In serious cases, the punishment shall be sentencing to the penitentiary for up to five years or imprisonment. The confinement shall be combined with a fine of up to 1 million Swiss francs.*
>
> *In particular, a case is serious if the offender:*
>
> *a. acts as a member of a criminal organization;*
>
> *b. acts as a member of a gang which was formed with the purpose of continuing money laundering;*
>
> *c. achieves a high turnover or a substantial profit by laundering money as a business.*
>
> *3. The offender shall also be punished if the main offense has been committed abroad and if such offense is also punishable in the country where it was committed."*

      **(iii)**    **Requirements of Article 305bis SPC**

537.   Witness No 7 names the **objective requirements** of the Swiss money laundering provision in para. 23 to 27 of RE-27, to which Witness No S37 agrees in general[588]. The objective requirements state the following:

---

[587]   Translation by the Swiss-American Chamber of Commerce.
[588]   See para. 62 of CE-1.

(i)     the perpetrator can be *"any individual"*, as well as *"companies"*[589];

(ii)    *"the object of the offense are all assets obtained by a criminal act"*, including *"any kind of valuables"*[590];

(iii)   the predicate offence must be a serious crime *"as set out in Art. 9 SPC, i.e. offences that may be punished with penitentiary ('Zuchthaus')"*. In case the predicate offence was committed abroad, the perpetrator shall be punished if *"the predicated offence is punishable in the country where it was committed and it would qualify as a crime in the sense of Art. 9 SPC under Swiss law"*[591];

(iv)    *"the money laundering activity"*[592] (*"Tathandlung"*) is to be an act *"suited to impede the confiscation of assets"*[593].

538.    As to the **subjective requirements** of Art. 305bis SPC the Arbitral Tribunal notes that it is an offence that *"can only be committed intentionally"* or with *dolus eventualis*. The intention is measured according to what a *"reasonable person would infer"* considering the situation at hand: such *"reasonable person"* must induce from the circumstances that *"the assets are derived from a crime, i.e. an offence for which heavy penalties impend"*[594]. The decision of the offender to commit the money laundering act is based on such knowledge or supposed knowledge of the origin of the assets.

(iv)    **Applicability of Article 305bis SPC to the Behaviour of the Claimant (Objective Requirements)**

539.    A **perpetrator** can be an individual or a company (legal entity) [595]. A legal entity organized pursuant to the laws of Bermuda accepted the Augmenta-

---

[589]   See para. 23 of RE-27, with reference to Art. 100 quater para. 2 SPC and doctrine.
[590]   See para. 24 of RE-27, with reference to doctrine.
[591]   See paras. 25/26 of RE-27, with reference to doctrine.
[592]   See para. 62 (i) of CE-1.
[593]   See para. 27 of RE-27, with reference to doctrine.
[594]   See para. 28 of RE-27.
[595]   See para. 23 and fn. 4 of RE-27 and para. 56 of RE-12.

tion Payment and used it for the Paid OP-Portion in order to receive, after having exercised the April Option, the April Option Shares and thus indirectly the MegaFon Interests in return. Provided this activity constitutes money laundering, Claimant is a perpetrator. If this is the case, there is no need to determine which of the members of Claimant's board of directors or officers has actually committed the money laundering. Moreover, it is not relevant whether Proposed Witness No. 7, as the perpetrator of the violations of Art. 285 and 289 RCrC determined in paras. 528 and 535 hereinabove, was involved as perpetrator or participant in the money laundering committed in Switzerland[596]. Moreover, Witness No. 4, the alleged beneficial owner of Claimant, who obviously instructed Claimant to conclude the April Option Agreement and to finance it through the Augmentation Payment is an accomplice (*"Mittäter"*) or instigator (*"Anstifter"*) and as such also a perpetrator (Art. 24 SPC).

540.  As the Paid OP-Portion has been paid by transfers of money from bank to bank, there is an **object** as required by Art. 305bis SPC and the only question to be examined is whether this object has been *"obtained by a criminal act"*. This question can be clearly affirmed as it has been established that the Paid OP-Portion has been financed by the Augmentation Payment and that the Augmentation Payment is of criminal origin as the Augmentation Payment has been obtained through commission of the criminal offences under Art. 285 and 289 RCrC[597]. The question of commingling of tainted funds with non-tainted funds referred to in para. 80 of CE-1, i.e. whether the Augmentation Payment has been commingled with untainted funds of Claimant is irrelevant in the present case since the Augmentation Payment is clearly the major source for funding the Paid OP-Portion[598] and since for a contractual dispute it is sufficient to determine that the Paid OP-Portion

---

[596]  See Basle Commentary N 1 and 2 to Art. 305bis SPC, Ackermann, opus cit. in fn. 624 hereinafter N 115 et seq. with reference in fn. 217 of N 115 to BGE 120 IV 323. According to Ackermann, the Proposed Witness No. 7 could not be convicted pursuant to Art. 305bis SPC.

[597]  See paras. 522 and 529 hereinabove.

[598]  See para. 117 of RE-27 with further references and para. 80 of CE-1 which examines merely the issue which part of commingled funds can be forfeited.