has been mainly financed by tainted funds and there is no need to determine the exact amount of such tainted funds.

541. A **predicate offence** within the meaning of Art. 305bis(1) SPC must be a serious crime within the meaning of Art. 9 SPC, i. e. is so called *"Verbrechen"/"crime"* and it is therefore not sufficient if the perpetrator commits merely a so called *"Vergehen"/"délit"*. Following the French term the Arbitral Tribunal uses in this Subchapter the English term *"crime"*. Pursuant to Art. 9 SPC a crime is a criminal offence punished with penitentiary (*"Zuchthaus"*) and not *"Gefängnis"*. Punishment by penitentiary is defined in Art. 35 SPC as the gravest punishment and may last from one year to twenty years or in some cases even for a lifetime. If the predicate offence has been committed abroad it is sufficient that the applicable foreign criminal law provides for a punishment by imprisonment in a broader sense (*"Freiheitsstrafe"* or *"Busse"*)[599] and it is therefore not required that the applicable foreign law determines the relevant criminal offence as a *"Verbrechen"*. Accordingly, a predicate offence exists if a criminal offence has been committed abroad and if this criminal offence constitutes under Swiss law a crime within the meaning of Art. 9 SPC[600]. The Arbitral Tribunal must therefore examine whether these criteria are fulfilled for the crimes committed by Proposed Witness No. 7 under Art. 285 and 289 RCrC. In examining this issue the Arbitral Tribunal will first deal with Art. 289 RCrC.

(i)     Art. 289 RCrC examined in paras. 523 et seq. hereinabove relates to the unlawful participation in a business activity by an official as defined in the note to the Art. 285 RCrC quoted in para. 445 hereinabove. Although under Swiss law a high ranking official of the federal or a cantonal government may not be allowed to be actively engaged in a business activity[601], there is no provision in Swiss crimi-

---

[599]     See Ackermann, opus cit. in fn. 624 hereinafter, N 173 to Art. 305bis SPC.
[600]     See fn. 591 hereinabove.
[601]     See e.g. Art. 144 of the Swiss constitution and in this context BGE 121 I 326 stating that a high official and thus also a federal counsel (*"Bundesrat"*) may administer his assets but not be a member of the board of directors of a private company; §3 of the *"Gesetz über die Rechtsstellung der Mitglieder des Regierungsrates des Kantons Zug"* of February 1, 1990 and Art. 27 of the *"Personalgesetz"* of May 5, 2002 of the Canton of Glarus.

nal law which declares such activity as punishable. Accordingly, the commitment of a crime pursuant to Art. 289 RCrC cannot be a predicate offence within the meaning of Art. 305bis SPC.

(ii)   Art. 285 RCrC examined in paras. 512 et seq. hereinabove relates to an abuse of official powers by an official within the meaning of the note to this prevision quoted in para. 445 hereinabove. In the Swiss Penal Code there are two provisions which could fall within the ambit of Art. 285 RCrC. These provisions are Art. 312 SPC on abuse of power (*"Amtsmissbrauch"/"abus d'autorité"*)[602] and Art. 314 SPC on *"Ungetreue Amtsführung"/"gestion déloyale des intérêts publics"*[603,604]. The criminal activity, i. e. *"Tathandlung"* committed in Russia must constitute a crime pursuant to Swiss criminal law (principle of dual incrimination). The Arbitral Tribunal has determined in para. 520 hereinabove that the Proposed Witness No. 7 has committed a *"criminal offence"* under Art. 285 RCrC *"in the form of inaction"* although *"from the surrounding circumstances"* it may be inferred that he actively instructed Witness No. 4 or the subordinated divisions of his administration. Accordingly, the inaction referred in the said para. 520 hereinabove must constitute a criminal activity under the here-relevant Art. 312 and 314 SPC. The Arbitral Tribunal must thus examine whether a criminal offence under the said two provisions of Swiss criminal law can be committed by inaction:

---

[602]   The German text of this provision reads as follows: *"Mitglieder einer Behörde oder Beamte, die ihre Amtsgewalt missbrauchen, um sich oder einem andern einen unrechtmässigen Vorteil zu verschaffen oder einem andern einen Nachteil zuzufügen, werden mit Zuchthaus bis zu fünf Jahren oder mit Gefängnis bestraft"* (the American Chamber of Commerce has not translated this provision).

[603]   The German text of this provision reads in the version in effect since January 1, 1995 as follows: *" Mitglieder einer Behörde oder Beamte, die bei einem Rechtsgeschäft die von ihnen zu wahrenden öffentlichen Interessen schädigen, um sich oder einem andern einen unrechtmässigen Vorteil zu verschaffen, werden mit Zuchthaus bis zu fünf Jahren oder mit Gefängnis bestraft. Mit der Freiheitsstrafe ist Busse zu verbinden"* (the American Chamber of Commerce has not translated this provision).

[604]   Both of these criminal offences are listed by Ackermann, opus cit. in fn. 624 hereinafter in N 144 as possible predicate offences.

a)     Art. 314 SPC on *"Ungetreue Amtsführung"/"gestion déloyale des intérêts publics"* refers to a disloyal activity committed by an official in the context of a legal transaction (*"Rechts-geschäft"/"acte juridique"*) and consequently can only be committed by action and not by inaction[605]. Therefore, the requirement of the so called dual incrimination (*"Beidseitige Strafbarkeit"*[606]) is with regard to Art. 314 SPC not fulfilled.

b)     According to the doctrine summarised in the Basel Commentary *"Amtsmissbrauch"/"abus d'autorité"* pursuant to Art. 312 SPC can, as a rule, not be committed by inaction but there are exceptions the extent of which is disputed in legal commentaries[607]. The Arbitral Tribunal has carefully examined these commentaries and the relevant case law[608] and concludes that in accordance with a proper interpretation of the term *"official power"*, i. e. *"Amtsgewalt"/"pouvoir plural de leur charge"/"poteri della loro carica"* under the present circumstances can occur also by inaction. This for the following reasons:

- Art. 312 SPC incriminates an abuse of power by an official. The German text of Art. 312 SPC speaks of *"Amtsgewalt"* and the French and Italian text of *"pou-*

---

[605]   See Stefan Trechsel, Schweizerisches Strafgesetzbuch, Kurzkommentar, 2nd Ed., at the end of N 2 to Art. 314 SPC and Marcel Alexander Niggli, Basel Commentary, N 14 to Art. 314 SPC.

[606]   See for example Ackermann, opus cit. in fn. 624 hereinafter, N 175 to Art. 305bis SPC.

[607]   See the summary of the doctrine by Stefan Heimgartner, Basel Commentary, N 13 to Art. 312 SPC reading as follows: *"Ein Missbrauch der Amtsgewalt durch **Unterlassung** ist in der Regel nicht möglich, da durch Passivität kein Zwang ausgeübt werden kann (ZIMMERLIN, Missbrauch, 294; RIEMER, ZStrR 1971, 295 unter Hinweis auf StrafGer BS, 20.3.1951; **a.A.** HAFTER, BT/2, 833 UND RASELLI, StR 1991, 450 f.; vgl. N 9). In Fällen in denen ein Amtsträger verpflichtet ist, eine Zwangsmassnahme zu beenden und er dies unterlässt, ist ein solcher indessen zu bejahren (unentschlossen: RIESEN, ZStrR 1971, 295). In der blossen Duldung eines Amtsmissbrauchs eines Untergebenen durch den Vorgesetzten kann hingegen mangels Einsatzes von Zwang kein Amtsmissbrauch erblickt werden (a.A. HAFTER, BT/2, 833".*

[608]   In particular the doctrine and case law referred to in fn. 607 above and fn. 609 to 613 hereinafter.

*voir de leur charge"* and *"poteri della loro carica"* respectively.

- Some authors seem to consider as *"Amtsgewalt"* merely the exercise of force (*"Zwang"*) or violence (*"Gewalt"*)[609].

- Other authors speak of the authority vested in an office of an official, i.e. *"Machtbefugnisse, die ihm sein Amt verleiht"*[610].

- The Arbitral Tribunal considers the latter broader meaning of the term *"Amtsgewalt"* applicable. This corresponds also to a more open wording in the French and Italian text which use - as said above - the terms *"pouvoir de leur charge"* and *"poteri della loro carica"*, respectively.

- This broader meaning corresponds also to the definition of the term *"Amtsgewalt"* as *"Befugnis aufgrund eines Amtes"* (authority of a public office) in Gerhard Wahrig in Bertelsmann Lexikonverlag, 7th Ed., 1997, p. 165.

- Several authors confirm that under certain circumstances an abuse of official power under Art. 312 SPC can be committed by inaction[611].

---

[609] See e.g. Jörg Rehberg, Strafrecht IV, Delikte gegen die Allgemeinheit, 2nd Ed., Zurich 1996, p. 397 and Günter Stratenwerth, schweizerisches Strafrecht, Besonderer Teil II, 5th Ed., Bern 2000, p. 363.

[610] See Andreas Donatsch / Wolfang Wohlers , Strafrecht IV, Delikte gegen die Allgemeinheit, 3rd Ed., Zurich 2004, p. 446 para. 1.2 and Willi Riesen, Amtsmissbrauch durch Staatsanwalt, ZStR 87(1971), p. 293.

[611] See Stefan Heimgartner, Basle Commentary, N 13 to Art. 312 SPC, quoted in fn. 607 hereinabove; Willi Riesen opus cit. in fn. 610, p. 294; Andreas Donatsch/Wolfgang Wohlers opus cit. in fn. 610, para. 1.2 at the end; Georges Frey/Esther Omlin, Amtsmissbrauch - Die Ohnmacht der Mächtigen, eine Analyse der Amtsmissbrauchsnorm

- Some of the authors particularly refer to the discretion of the judge in the context of an abuse of official power by inaction[612]. Others require the existence of a so-called *"Garantenpflicht"*[613].

- Such a *"Garantenpflicht"* can be seen in the Proposed Witness No. 7's obligation to represent the interests of the Russian Federation at the shareholders' meeting and in the board of directors of Svyazinvest[614].

- The examples of an inaction of an official punishable under Art. 312 SPC given by Georges Frey/Esther Omlin and Willi Riesen (failure to release a detainee) and Raselli (failure to investigate a violation of tax laws)[615] are comparable to the failure of the Proposed Witness No. 7 to act in the manner described in para. 520 hereinabove so that an incriminating inaction by Proposed Witness No. 7 must be affirmed.

(iii)  As money laundering can be committed only if the predicate offence is not time-barred[616] since in such a case in a confiscation of the tainted assets is no longer possible[617] the Arbitral Tribunal must examine whether this was the case at the time the money laundering

---

mit Blick auf die Tätigkeit der Strafverfolgungsbehörden, AJP 2005, pp. 89/90; N. Raselli, Ordnungsbussen wegen Verletzung steuerlichen Verfahrensvorschriften, Fragen und Thesen, STR 1991, p. 451; Ernst Hafter, Schweizerisches Strafrecht, Besonderer Teil, Zürich/Berlin 1943, p. 833 and, with regard to some of the cantonal criminal codes applicable before the Swiss Penal Code has been enacted, Paul Zimmerlin, Der Missbrauch der Amtsgewalt im schweizerischen Strafrecht, Bern 1922, p. 101 describing the incriminating act as a *"willkürliche[s] Verhalten zur Aussenwelt, die willkürliche Verursachung oder Nichthinderung einer Veränderung in derselben"*.

[612]  See Willi Riesen, opus cit. in fn. 610 hereinabove, p. 295.
[613]  See Andreas Donatsch/Wolfgang Wohlers, opus cit. in fn. 610 hereinabove, para. 1.2 at the end and Georges Frey/Esther Omlin, opus cit. in fn. 611 hereinabove, p. 90.
[614]  See para. 390 hereinabove.
[615]  See fn. 612 and 613 hereinabove.
[616]  See e. g. Pieth in Basel Commentary, N 18 to Art. 305bis SPC.
[617]  See Ackermann, opus cit. in fn. 624 hereinafter, N 189/190 to Art. 305bis SPC.



was committed[618]. The Arbitral Tribunal examines this issue under Swiss and Russian law[619]. Since the abuse of power constituting a criminal offence under Art. 285 SPC was committed in spring 2000 when Telecom XXI received the GSM 900 license[620] and the money laundering was committed in 2001 when Claimant received the Augmentation Payment and used it for the Paid OP-Portion[621] and the applicable limitation period under Swiss law is fifteen years[622] and under Russian law is minimum six years[623], the predicate offence was not time-barred at the time when the alleged money laundering activity occurred.

(iv)     As a result of the above the Arbitral Tribunal concludes that the predicate offence committed by the Proposed Witness No. 7 under Art. 285 RCrC in the form of inaction constitutes also a criminal offence within the meaning of Art. 312 SPC. Since the punishment for committing a criminal offence under Art. 312 SPC is *"Zuchthaus"* up to five years or imprisonment, Art. 312 SPC qualifies it as a crime within the meaning of Art. 9 SPC. Therefore the requirement of dual incrimination required by the third paragraph of Art. 305bis SPC is fulfilled with the consequence that the existence of a predicate offence must be affirmed.

---

[618]   The question whether the predicate offence is time-barred must be distinguished from the question whether the commission of money laundering pursuant to Art. 305bis SPC is time-barred. This issue is to be examined under Swiss law which provides for a limitation period of seven years. Therefore the Arbitral Tribunal can declare the unenforceability of the April Option Agreement by affirming the ML-Defense at the time of this Second Partial Award even in the event if, contrary to the Arbitral Tribunal's opinion, this would be a relevant issue. In the Arbitral Tribunal's opinion, provided the predicate offence is not time-barred when the money laundering occurs, the ML-Defence can be raised as long as the civil law claim to be adjudicated by the Arbitral Tribunal is not time-barred or, if time-barred, can be raised by an objection such as the set-off of claim.

[619]   In the doctrine it is disputed whether this issue is to be decided pursuant to Swiss law or the law where the predicate offence has been committed (see Ackermann, opus cit. in fn. 624 hereinafter, N 190 at fn. 355 and Stefan Trechsel, opus cit. in fn. 605 hereinabove, N 10 to Art. 305bis SPC).

[620]   See para. 500 hereinabove.

[621]   See paras. 490 and 65(ii) at fn. 44 hereinabove.

[622]   See Art. 70(1)b SPC.

[623]   See Art. 15, 78 and 285 RCrC.

542.  The **money laundering activity** (*"Tathandlung"*) is an act of the perpetra-
      tor suited to impede the confiscation of assets and the determination of
      their origin, respectively (*"Herkunftsermittlung"*) and localisation (*"Auf-
      findungsvereitelung"*)[624]. As Ackermann describes it, by a money launder-
      ing activity the perpetrator succeeds to create a personal, material
      (*"sachlich"*), local and temporal distance between the asset derived from a
      crime and the new asset replacing the former[625]. This creation of a distance
      can be described as concealment (*"Verschleierung"*) or, if the original asset
      is being replaced by another asset, as conversion and concealment[626]. Ap-
      plying these principles, the Arbitral Tribunal concludes for the following rea-
      sons that a criminal act (*"Tathandlung"*) as described in para. 537(iv) here-
      inabove has been committed:

    (i)     Although the pure prolongation of the paper trail alone does not con-
            stitute yet a money laundering activity, further acts of concealment,
            such as the transfer to a numbered account or the use of an off-
            shore company or intermediary, are designed to impede the confis-
            cation of tainted assets and, thus, constitute a frustration of the de-
            termination of the origin, discovery or the confiscation of assets
            within the meaning of Art. 305bis SPC[627].

    (ii)    In the present case, the illegal profit Proposed Witness No. 7
            achieved by the sale of Telecom XXI to MTS was passed through
            Augmentation to Claimant and then transferred as the Paid OP-

---

[624]   See J.-B. Ackermann, in: Commentary of Niklaus Schmid on the *"Einziehung,
        Organisiertes Verbrechen, Geldwäscherei"*, Vol. 1, 1998, pp. 484/485. The discussion
        referred to by Mark Pieth in Basle Commentary, N. 29 to Art. 305bis SPC as to whether or
        not the frustration of the determination of the origin (*"Herkunftsermittlung"*) and the
        frustration of discovery (*"Auffindungsvereitelung"*) has an independent significance seems
        to be of no relevance for the Arbitral Tribunal since the first paragraph of Art. 305bis SPC
        specifically mentions the frustration of the determination of the origin and the discovery of
        assets and because a confiscation is possible only if the tainted assets can be discovered
        and their origin be determined.
[625]   See Ackermann, opus cit. in fn. 624 hereinabove, N. 253 on p. 489.
[626]   See Pieth, in: Basle Commentary, N. 34 to Art. 305bis SPC and Ackermann, opus cit. in
        fn. 624 hereinabove.
[627]   See Ackermann, opus cit. in fn. 624 hereinabove, N 265 on p. 498 and Pieth, Basle
        Commentary, N 36 to 44 to Art. 305bis SPC.

Portion to the Escrow Account and from there onwards through CT-Mobile to Sonic Duo (now MegaFon), a mobile telephone operator, i.e. a company engaged in a perfectly legal business providing services to a substantial number of consumers. It does not need any further explanation that this moving of illegal profits of the sale of Telecom XXI constitutes a concealment within the meaning of Art. 305bis SPC, and this irrespective of the fact that Claimant has not and will not receive the April Option Shares which finally would allow Claimant and the Proposed Witness No. 7, respectively, to achieve a substantial multiplication of the original assets and to use such profits as deemed fit. This because money laundering is a so-called aptitude offence ("*Eignungsdelikt*"), and as a mere action offence ("*Tätigkeitsdelikt*") is not a success offence ("*Erfolgsdelikt*") [628].

543. The **conclusion** of the examination of the four objective requirements summarized in para. 537 hereinabove by the Arbitral Tribunal is that all these four requirements are met in the present case and that Claimant has therefore committed money laundering within the meaning of Art. 305bis SPC if also the subjective requirement of intention is met.

**(v)    The Intention of the Perpetrator (Subjective Requirement)**

544. Money laundering can be committed intentionally or with *dolus eventualis*. According to the "*Parallelwertung in der Laiensphäre*" theory, "*it must be apparent to the offender that any reasonable person would infer ... that the assets are derived from crime, i.e. an offence for which heavy penalties impede*"[629]. Claimant and Witness No. 4 knew or should have known that the Augmentation Payment derived from a crime according to Russian law, as Proposed Witness No. 7 (represented by Witness No. 4) was involved in the Telecom XXI transaction and at the same time was the beneficial owner of Claimant. Therefore, they should have known that the Augmentation

---

[628]    See Ackermann, opus cit. in fn. 624 hereinabove, N. 246 et seq. on p. 45 et seq. and David Zollinger, Kommentar zum Geldwäschereigesetz, Orell Füssli, Zürich, 2003, N. 3 to Art. 305bis SPC.

[629]    See para. 28 of RE-27.

Payment stemmed from a conduct of Proposed Witness No. 7 subject to heavy penalties. As Witness No. 4 is also a perpetrator[630], it is not necessary to determine whether the members of the board of directors of Claimant knew in 2001 that Claimant was beneficially owned by the Proposed Witness No. 7 or whether the knowledge of Witness No. 4 must be attributed to Claimant.

**(vi)    Conclusion**

545.    Having concluded that the subjective requirement of intention is also met, the Arbitral Tribunal concludes that the receipt of the Augmentation Payment and its use for the Paid OP-Portion constitutes money laundering within the meaning of Art. 305bis SPC and therefore must further examine in the next Subchapter ff) what the implication of money laundering is under English contract law, i. e. the law applicable to the April Option Agreement.

**ff)    Implications of Money Laundering under English Contract Law**

**(i)    Applicability of English Law on the Proceeds of Crime?**

546.    English substantive law applies to the enforceability of the April Option Agreement because the Parties expressly agreed on English law as the governing law of the said contract. A starting point with regard to what are implications of money laundering under English law is to look at English substantive law on the proceeds of crime. Two statutes are relevant, the Criminal Justice Act 1988 and the Proceeds of Crime Act 2002 (**"POCA"**). The Criminal Justice Act 1988 was superseded by the proceeds of Crime Act when the latter entered into force on February 24, 2003. The Arbitral Tribunal has examined both these statutes and determines that only the Criminal Justice Act 1988 is of interest as the alleged criminal acts (predicate offences) and the subsequent laundering of the proceeds of those criminal offences occurred before February 2003. However, the Arbitral

---

[630]    See para. 539 hereinabove.

Tribunal does not disregard the POCA as it is useful in analysing provisions of the Criminal Justice Act 1988.

547.  Section 340(2) POCA provides the definition of criminal conduct. It is a conduct which "(a) constitutes an offence in any part of the United Kingdom; or (b) would constitute an offence in the United Kingdom if it occurred there". The Criminal Justice Act 1988 does not contain a similar provision.

548.  There is no evidence to suggest that any criminal conduct actually took place in the United Kingdom.

549.  The Criminal Justice Act 1988 makes it "an offence for a person to enter into or be concerned in an arrangement whereby the retention or control by or on behalf of another of that other's proceeds of criminal conduct is facilitated (whether by concealment, removal from the jurisdiction, transfer to nominees or otherwise). It is also an offence to enter into or be concerned in an arrangement whereby another's proceeds of criminal conduct are used to secure that funds are placed at that other's disposal; or whereby another's proceeds of criminal conduct are used for that other's benefit, to acquire property by way of investment".[631]

550.  Under the Proceeds of Crime Act 2002 similar provisions exist but section 330 POCA creates a new offence applicable to those in the regulated sector for failing to report suspected money laundering on information received. Under section 327 POCA it is an offence *"to conceal, disguise, convert or transfer criminal property"*[632] and section 328 POCA provides that it is an offence *"for a person to enter into or become concerned in an arrangement, which he knows or suspects facilitates (by whatever means) the acquisition, retention, use or control of criminal property, by or on behalf of another"*[633].

---

[631]  See Section 93A, p. 4 of RE-7.
[632]  See p. 6 of RE-7.
[633]  See p. 6 of RE-7.

551.   But Respondent's expert legal witness opined that *"jurisdiction in respect of money-laundering, under the old and, probably the new, legislation, is, however, dependant upon establishing that the money-laundering conduct (as opposed to the underlying crime) occurred with the UK's territorial juris-diction"*[634]. And Claimant did not disagree with this.

552.   As there is no evidence on file that the proceeds of crime were laundered within the UK's territorial jurisdiction, the Arbitral Tribunal is bound to con-clude that the Criminal Justice Act 1993 and the Proceeds of Crime Act 2002 are inapplicable in the present case. Therefore, the issue whether Claimant's money laundering activity would have amounted to the commis-sion of a crime under English law, if carried out in England, is not relevant in the present case.

553.   The Arbitral Tribunal must therefore proceed, not by applying English statu-tory laws on the proceeds of crime but rather by examining the perspective of English public policy with regard to the enforceability of the April Option Agreement.

### (ii)    The English Public Policy Perspective

554.   Respondent's legal experts, Proposed Witnesses Nos. 13 and 14, put the matter for consideration very well, namely by asking: *"whether performance of the contract in question will itself involve illegality so that it is inappropri-ate for the court to enforce – to direct performance of – the contract, since to do so would be to condone illegal conduct"*[635].

555.   Respondent set out what the Arbitral Tribunal views as the legal essence of the matter[636]:

> *"[t]he Claimant's actions do not constitute money laundering of-fences under English domestic law because none of the relevant*

---

[634]    See p. 8 of RE-7.
[635]    See para. 49(2) on p. 22 RE-7.
[636]    See p. 62 et seq. Rejoinder, in particular para. 15.2 on p. 63.

> *conduct occurred in England and Wales. For the avoidance of doubt, the Respondent does not contend that the April Option Agreement is unenforceable due to illegality under English domestic law. However, the April Option agreement is unenforceable as a matter of English law because it is contrary to English public policy, at the place of performance and/or the Claimant's case is founded upon a deliberate commission of a crime".*

556.  Respondent relied on Lemenda Trading Co Ltd v. African Middle East Petroleum Co. Ltd [1988] 1 Q.B. 428[637]. In that case Phillips J. stated on p. 461 as follows:

> *"In my judgment, the English courts should not enforce an English law contract which falls to be performed abroad where (i) it relates to an adventure which is contrary to a head of English public policy which is founded on general principles of morality, and (ii) the same policy applies to the country of performance under the law of that country. In such a situation international comity combines with English domestic public policy to mitigate against enforcement".*

557.  In paras. 530 hereinabove, the Arbitral Tribunal found that the sources of the Funding Price payable under the April Option Agreement are the proceeds of a crime committed in Russia, and subsequently paid into Switzerland. Since the performance of the April Option Agreement under the applicable Swiss money laundering provisions constitutes the laundering of monies stemming from a predicate criminal offence committed in Russia, English law dictates to this Arbitral Tribunal that Claimant cannot enforce its rights thereunder.

558.  Although the April Option Agreement is a contract lawful on its face, the (specific) performance of it is unlawful. As Colman J observed in Mahonia v. Chase [2003] Lloyd's Rep 911, 918-9 (RL-36):

> *"[I]f a claimant enters into a contract lawful on its face for the purpose of using the subject matter to be derived from the contract or the very existence of the contract or the consequence of its being*

---

[637]    See fn. 525 hereinabove and RL-34.

*performed for an unlawful purpose, he will not be entitled to enforce it".*

This case relied on other cases, namely: Forster v. Driscoll [1920] 2 K.B. 287 (RL-185), Regazzioni v. K.C. Sethia (1944) Ltd. [1958] A.C. 301 (RL-186) and Tinsley v. Milligan [1994] 1 A.C. 340 (cited in para. 9 of RE-25), all of which come to the same conclusion: a contract entered into to endeavour to perform an illegal act outside England is unenforceable.

559. As with the case of the dilution of Central Telegraph, the doctrine of *ex turpi causa non oritur actio* applies. That is to say, the law does not assist in promoting underhand enterprises or, to put it another way: *"one who knowingly enters into a contract with an improper object cannot enforce his rights thereunder"*[638].

560. On this basis, the Arbitral Tribunal can only find that the April Option Agreement under English law is unenforceable also under the ML-Defence.

gg)    **Summary and Conclusion**

561. The Arbitral Tribunal has concluded in para. 530 hereinabove that the Proposed Witness No. 7 committed criminal offences under Art. 285 and 289 RCrC, in para. 541(iv) hereinabove that the first of these criminal offences constitutes a predicate offence within the meaning of Art. 350bis SPC. The findings resulting from this predicate offence passed through Siwtzerland. as a matter of Swiss law, this constitutes money laundering by Claimant and Witness No. 4 within the meaning of the said provision. This conduct under the applicable English law makes the April Option Agreement unenforceable[639].

---

[638]    See *Chitty*, vol. 1, Chapter 16 para. 159 to RL-70.
[639]    See para. 560 hereinabove.

**b)**    **Riversand Payment**

562.    Having concluded that the Augmentation Payment constitutes money laun-
dering and considering that the Riversand Payment is only about one-sixth
of the Augmentation Payment and accepting Witness No. 7's proposition
that a mingling of tainted money with a small portion of untainted funds
does not exclude the conclusion that money laundering was committed[640],
the Arbitral Tribunal does not deem it necessary to further examine whether
also the Riversand Payment constitutes money laundering[641].

563.    In the *"List of Selected Issues to be addressed by the Parties at the Closing
Hearing"* attached to the Arbitral Tribunal's telefax dated January 12, 2006
the Arbitral Tribunal has invited the Parties to comment on the allocation *"of
the burden of substantiation and the burden of proof in connection with the
ML-Defence in general and in particular in connection with the disputed ex-
istence of a predicate offence and consequences to the failure to comply
with such burden"*[642]. The real issue is whether a predicate offence can be
assumed as a result of the alleged money launderer's failure to substanti-
ate and prove, based on evidence to which he has access to, the clean ori-
gin of the allegedly tainted funds[643] and, moreover, whether this approach,
if admissible, requires that money laundering indicators exist as alleged[644].
A further issue is whether such money laundering indicators must relate to

---

[640]    See para. 540 hereinabove.

[641]    For this reason, the Arbitral Tribunal does not need to deal with the further issue referred
to in para. 33 of the aforementioned *"List of Selected Issues to be addressed by the
Parties at the Closing Hearing"* asking whether Claimant changed its *"case on Riversand
... in a significant way"* as alleged by Respondent in para. 30 of its Bullet Point Submission
and, if so, *"what is the legal/evidentiary relevance of such change?"*

[642]    This issue was discussed by the Parties extensively in pp. 34 et seq. BID-Statement, pp.
20 et seq. BID-Reply, pp. 31 et seq. and pp. 58 et seq. BID-Answer and pp. 25 et seq.
BID-Rejoinder and pleaded at the Tenth Hearing (during which discussions Respondent
made reference to the decision of the Swiss Federal Tribunal 6P.23/2000 filed as Exhibit
PC-21 to CE-1 (see p. 317 et seq. T10H).

[643]    In the present case, the question was whether the funds Riversand received result from
legitimate and genuine transactions, in particular whether the consultancy and loan
agreements submitted to the Arbitral Tribunal are genuine, i.e. that actual consultancy
services have been provided on an arm-length basis under the consultancy agreements
and that the payments made under the loan agreements were made as actual loans with
the intention that a repayment will occur.

[644]    See e.g. para. 113 of RE-27.

the time the relevant payment (in casu the Riversand Payment) was made or whether it can also relate to earlier or later periods. Moreover, this issue has further to be seen in the context of an additional question whether such approach, if admissible, is applicable only for a preliminary issue in a civil law dispute or whether it could also be applied by a criminal court deciding whether the alleged money launderer failing to meet the described burden to substantiate and prove, can be convicted for money laundering pursuant to Art. 350bis SPC.

564. In the context of this examination, the Arbitral Tribunal would most likely have come to the conclusion that it cannot make a final determination of the issue without first hearing the Affected Witnesses, as Claimant decided to present its case by witness testimony before it learned of the German Criminal Complaint and the German Investigation as a result of the sealing of the files of this arbitration referred to in para. 99 hereinabove, unless the Arbitral Tribunal could, without reservation, accept Respondent's view that the Affected Witnesses could not contribute anything to the missing explanation of the original source of the Riversand Payment[645]. Such a conclusion constitutes an anticipatory consideration of the evidence (in German: "antizipierte Beweiswürdigung") which can only be made in exceptional cases because there is a risk to violate a party's right to be heard.

565. In the context of the question whether the Affected Witnesses must be heard again, one must consider the rule invoked by Respondent, namely that at least under Swiss procedural practice, the civil judge does not have to wait until the criminal judge has decided[646]. In the Arbitral Tribunal's view, this does not apply if the evidentiary proceeding with the concerned witnesses could not be completed by the civil judge. Since Claimant and the Affected Witnesses, at the time of the Second Witness Hearing, were not privy to the German Criminal Complaint and could not yet inspect the file in the German Investigation, the Affected Witnesses' caution in reply to

---

[645]    See paras. 14 and 27 of Respondent's Bullet Point Submission.

[646]    See para. 7 of Respondent's Bullet Point Submission and the therein-referred BGE 119 II 386 et seq., the subject of "le criminel tient le civil en l'état" has recently been discussed in an email exchange on the newsletter _arbitrage-adr@yahoogroupes.fr_.

some questions of the Arbitral Tribunal and the Parties' counsel was, irre-spective of their procedural right[647], understandable and fully accepted by the Arbitral Tribunal. Accordingly, the Affected Witnesses, in principle[648], would have had to be heard again if the Riversand Payment had become relevant in order to give them a proper opportunity to answer questions, which they declined to answer at the Second Witness Hearing. Only at that time, could the Arbitral Tribunal - if at all – close the evidentiary proceed-ings with regard to this issue on the ground that it is within Claimant's sphere of risks that the Affected Witnesses can, in view of the German In-vestigation and in exercising the aforementioned procedural right, decide not to answer certain questions of the Arbitral Tribunal and the Parties' counsel.

F.      **Currency Law Defence**

a)      **Introduction**

566.    Respondent argued that the April Option Agreement is *"unenforceable and void due to illegality, as a matter of public policy"* given that the perform-ance of it would necessarily involve the violation of Russian Currency Regulations (the **"Currency Law Defence"**)[649].

567.    The Arbitral Tribunal invited the Respondent to address the issue of Rus-sian currency law and how this could invalidate the April Option Agreement when the April Option Agreement itself does not appear to breach those currency laws[650].

b)      **Respondent's Position**

568.    Respondent submitted that Witness No. 4 admitted in his testimony that he participated in an unlawful exchange of currency in order to put Claimant in

---

[647]    See para. 114 hereinabove.
[648]    See the reservation referred to in para. 115 hereinabove.
[649]    See paras. 589 et seq BID-Statement, in particular para. 594.
[650]    See item 3 of the Arbitral Tribunal's telefax dated June 6, 2005.

funds. Respondent argued that as IPOC was a shell entity it needed funds in order to perform the April Option Agreement (pp. 203/204 T4H) and that monies from allegedly illegal transactions in Russia were passed through Riversand in Cyprus in order *"to get Roubles converted to dollars in order to send them into Bermuda"* (p. 184 TWH) to fund the Claimant. This, Respondent alleged, *"infects the performance of the April Option Agreement"* (para. 329 BID-Reply).

569.    Russian law at the time of this transfer of funds provided that the sale and purchase of foreign currency could only be carried out by using authorised banks according to specific rules set down by the Central Bank of Russia (pp. 5 to 9 of RE-23). Although Witness No. 4 gave the explanation that the reason why authorised banks had not been used was because it would have taken too long, Respondent submitted that the real reason was that the purpose for which the transfer was made would have amounted to the movement of capital and therefore constituted a breach of currency laws of Russia, attracting criminal, administrative and other liabilities[651]. According to Respondent, the transfers constitute sham and void transactions as a matter of Russian law within the meaning of Art. 170 of the Civil Code of the Russian Federation[652].

570.    Respondent then argued that this violation of Russian Currency Law alone renders the April Option Agreement unenforceable under English law.

571.    Respondent relied on the principle of public policy that a court cannot aid in the creation of immoral or illegal acts (para. 330 BID-Reply). Respondent relied on Ralli Brothers v. Compania Naviera Sota y Anzar [1920] 2 K.B. 287 (RL-35) in which it was held that the agreement in that case was unenforceable because the performance of an essential term of it was illegal in the country where it had to be performed (in that case Spain). Respondent also relied on Foster v Driscoll [1929] 1 K.B. 470 (RL-185) which also pro-

---

[651]    See Section 2.4 of the Law of Currency Regulation and Currency Control dated 9 December 1992 (No 3615-1), as amended by later Federal Laws of 29 December 1998 (No 192-FZ) and 5 July 1999 (No 128-FZ).
[652]    See para. 593 BID-Statement and fn. 622.

vided that a contract is *"invalid in so far as ....the performance of it is
unlawful by the law of the country where the contract is to be performed"*
(Sankey LJ citing Dicey & Morris at page 518 of the judgment).

**c)    Claimant's Position**

572.   Claimant put the issue (taken in isolation) before the Arbitral Tribunal that
(para. 917 BID-Answer):

> *"... on the hypothesis that the allegation of exchange control vio-
> lations is proved, the question before the Tribunal, assuming Eng-
> lish law to be applicable, is whether an English court would en-
> force a contract, otherwise lawful, under which payment has been
> made utilising money which was originally raised by means of a
> currency offence overseas".*

573.   Moreover, Claimant pointed out that the candidate territories in which the
April Option Agreement is to be performed, in its submission the British Vir-
gin Islands and the Bahamas, do not have exchange control regulations
(para. 919 BID-Answer). Claimant submitted that the place of performance
was not Switzerland but argued that in any event the alleged violations of
currency laws do not violate Swiss or international public policy. As it later
put, *"currency controls are, in any event not part of international ordre pub-
lic such that their incidental violation can result in the invalidation of a con-
tract, much less one three generations removed"* (p. 98 BID-Rejoinder).

574.   Furthermore, Claimant argued that the alleged violations were not transfers
under or required by the April Option Agreement. The nexus between the
alleged violations and the April Option Agreement is *"extremely remote"*
(para. 916 BID-Answer), and *"if there were a currency control violation it
was very remote from the AOA and cannot invalidate it"* (pp. 98/99 BID-
Rejoinder).

575.   On the law, Claimant argued that the cases relied upon by Respondent are
inapplicable to the present dispute since none of them deals with currency
control and in both cases the contract was a tool for illegality in some way
or another (pp. 98/99 BID-Rejoinder).

**d)    The Arbitral Tribunal's Analysis**

576.   The alleged violations of currency or exchange laws of the Russian Federa-
       tion are considered by the Arbitral Tribunal to have taken place because of
       a clear and unequivocal admission by Witness No. 4[653]. However, the
       terms of the April Option Agreement do neither provide nor implicitly re-
       quired that such illegal transfers under Russian law be made by the Claim-
       ant in order to finance the April Option Agreement. Therefore, the cases re-
       lied upon by Respondent are distinguishable from the present case.

577.   Examining the issue of the place of the performance, the Arbitral Tribunal
       finds that the place of performance is Switzerland as that is the jurisdiction
       into which funds had to be paid under the April Option Agreement.

578.   As discussed in the Chapter on illegality it is settled English law that where
       the performance of a contract is illegal under the law of the place of per-
       formance, then irrespective of what the law of the contract is, the contract
       will be unenforceable[654].

579.   It is clear to the Arbitral Tribunal that the payment into Switzerland of funds
       raised from transactions involving a violation of currency laws in Russia
       would not render the April Option Agreement unenforceable on that basis.
       This is because the Tribunal finds that there is no evidence that the pur-
       pose of the April Option Agreement was to breach Russian currency laws
       and that the performance of this aspect of the April Option Agreement is
       not illegal at the place of performance, namely Switzerland.

---

[653]   See p. 185 lines 27 et seq. TWH Day 2 where Witness No. 4 stated: *"... I think this is the
        case they were issuing wechsels (?) to third parties, promissory notes to third parties who
        had the dollars, and the dollars were then by them paid to Riversand, and Riversand then
        had the dollars and then the dollars went to IPOC as the share subscription, and then it
        was documented as a loan so that in case you wanted to upstream the funds you could
        just repay the loans. That is how they deal with Russia these days"*, and at p. 187 line 20
        TWH Day 2 *"... we paid them Roubles against the promissory notes. They had dollars..."*.
[654]   See paras. 299 to 304 hereinabove and Royal Boskalis Westminster NV v. Mountain
        [1997] 2 All E.R. 929, Mackender v. Feldia A.G. [1967] 2 Q.B. 590, Kahler v. Midland Bank
        [1950] A.C. 24, Zivnostensska Banka National Corporation v. Frankman [1950] A.C. 57
        and Ralli Bros. v Cia Navieria Sota y Anzar [1920] 2 K.B. 287 (RL-35).

580. The Tribunal relies on Toprak Mahsulleri Ofisi v Finagrain Compagnie Commerciale Agricole et Financiere SA [1979] 2 Lloyd's Reports 98 (Court of Appeal). In this case Lord Denning, quoting Dr. Francis Mann's book *"The Legal Aspect of Money"* (on p. 417), stated that *"when it comes to the performance of an English contract, the existence of exchange restrictions in a foreign country need not, as a matter of principle, be considered"* (on p. 114). As in that case the place of performance was England, where there are no exchange control restrictions or currency laws, the Tribunal can apply the Court's reasoning with regard to this arbitration, as what was relevant to England in Toprak is relevant to Switzerland in this case: the currency laws of England and Switzerland are the same in this regard.

581. The Tribunal finds that this reasoning is in conformity with English law generally in that *"where a contract is governed by English law but performance is required not in England but in a foreign country, then if performance is lawful in that foreign country and under English law, the contract will be enforceable in England even though performance is illegal in another foreign country"*[655].

582. Therefore, absent an illegal purpose of an English law contract to breach foreign currency laws, the Arbitral Tribunal finds that such currency laws are extraneous to a contract subject to English law and performable in Switzerland.

583. For these reasons the Arbitral Tribunal must dismiss Respondent's Currency Law Defence.

---

[655]     See Nelson Enonchong, Illegal Transactions (1998) p. 68.

G.    **Sham**

a)    **Introduction**

584.    Both parties submitted case law and in their submissions basically agreed on the legal definition of a sham transaction but they disagreed as to the whether the April Option Agreement was a sham.

585.    Sham transactions were defined in the case of Snook v London & W Riding Investments [1967] 1 All ER 518, by Diplock LJ as follows:

> *"Acts done or documents executed by the parties to the "sham" which are intended by them to give to third parties or to the court the appearance of creating between the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intended to create"* (cited in para. 392 SD).

586.    In Jersey Royal Court in Abacus (CI) Ltd v. Sheikh Mohammed Al-Sabah (2004) WTLR 1, p.16[656], the guidelines applicable to the court's evaluation of whether a specific transaction is a sham were presented as follows:

> *"(64) An inquiry whether an act or a document is a sham requires careful analysis of the facts and the following facts emerge from the authorities.*
>
> *(65) First, in the case of a document, the court is not restricted to examining the four corners of the document. It may examine external evidence. This will include the parties' explanations and circumstantial evidence, such as evidence of the subsequent conduct of the parties.*
>
> *(66) Second, as the passage from Snook (Snook v London & W Riding Investments [1967] 2 QB 786) makes clear, the test of intention is subjective. The parties must have intended to create different rights and obligations from those appearing from (say) the relevant document, and in addition they must have intended to*

---

[656]    Cited extensively on pp. 24/25 Reply.

307

*give a false impression of those rights and obligations to third parties.*

*(67) Third, the fact that the act or document is uncommercial, or even artificial, does not mean that is a sham. A distinction is to be drawn between the situation where the parties make an agreement which is unfavourable to one of them, or artificial, and a situation where they intend some other arrangement to bind them. In the former situation, they intend the agreement to take effect according to its tenor. In the latter situation, the agreement is not to bind their relationship.*

*(68) Fourth, the fact that the parties subsequently depart from an agreement does not necessarily mean that they never intended the agreement to be effective and binding. The proper conclusion to draw may be that they agreed to vary their agreement and they have become bound by the agreement as varied (...)*

*(69) Fifth, the intention must be a common intention."*

587. Further, Stone v Hitch [2001] EWCA Civ 63, relied on by Respondent, sets out similar principles. These were laid down by Arden LJ, namely that (i) external evidence is admissible, (ii) the *"Snook test"* makes clear that the test of intention is subjective and that (iii) the parties must have intended to create different rights from those in the document. Moreover, it is not sufficient that the document is merely unfavourable to one of the parties: it must be artificial. And the fact that the parties subsequently depart from the document does not necessarily mean it is a sham (in such a case the contract may simply have been varied. Finally, the intention must be a common intention of the parties. (cited in para. 393 SD).

588. It is settled English law that sham transactions are not valid transactions due to the lack of an intention by the parties to create bona fide legal relations and as such are not enforceable[657]. Since Respondent's Prayer No. 4 quoted in para. 58 hereinabove requests the Arbitral Tribunal not only to

---

[657]    Glatzer & Warwick Shipping Co v. Bradstone Ltd (The Ocean Enterprise) [1997] 1 Lloyd's Rep 449 at 484 (RL 6) and Hitch v. Stone [2001] EWCA Civ 63 (RL 7), also argued by Respondent in para. 391 SD.

declare the April Option Agreement as *"unenforceable"*, but also to declare it as *"void"*, and since a transaction found to be a sham is void[658], the Arbitral Tribunal must examine Respondent's position that the April Option Agreement is a sham irrespective of the conclusion made in para. 483 hereinabove that the April Option Agreement is, as a result of the Dilution Defence, not enforceable[659].

**b)**    **Respondent's Position**

589.    Respondent argued that the April Option Agreement is not an enforceable contract, but an instrument by which Claimant and those behind it, that is the Proposed Witness No. 7, sought to cover up their extraction of 77.7% of TMI shares from Respondent and that the April Option Agreement was just a cover up in case third parties including this Arbitral Tribunal search for specific answers on this unlawful extraction (para. 401 on p. 113 SD). As such, it is a sham and the test in Snook is fulfilled.

590.    Respondent relied on external evidence to demonstrate this. It argued that the fact that April Option Agreement was held secretly in escrow demonstrates that the April Option Agreement's real and only purpose was a cover up for third parties, including this Arbitral Tribunal, in order to give the April Option Agreement the appearance of a genuine commercial transaction and conceal the unlawful extraction of the TMI shares.

591.    Respondent claimed that the funding received in relation to the April Option Agreement was *"merely made to maintain funding to the underlying asset (i.e. Sonic Duo) that [Proposed Witness No. 7] was planning to indirectly seize"* (para. 402 SD) and submits in para. 204 SD with regard to the payment of the Option Price, the following:

> *"Rather, it reflects no more than the payment by IPOC of what would otherwise be LVFG's funding obligations (as a shareholder) in respect of its shareholding in Sonic Duo. In other words, had*

---

[658]    See para. 296 hereinabove.
[659]    For the ML-Defence, see para. 560 hereinabove.

*LVFG simply handed over 77.7% of its TMI shares to IPOC, IPOC would obviously have had to provide funding associated with its 77.7% stake (through TMI) to Sonic Duo, or risk a substantial diminution in the value of the shareholding. IPOC's commitment to provide funding associated with the Optioned Shares obviously provided no economic benefit to LVFG, which was to cede its shares to IPOC".*

592. Respondent argued that Claimant never intended to pay the Total Purchase Price of US$18 million and that it was Witness No. 4 who requested the insertion of it in order to give the April Option Agreement the appearance of a genuine commercial transaction. Respondent further argued that the above is confirmed by Claimant in that the Total Purchase Price was *"never intended to be paid"*; *"What was clear to both IPOC and [Witness No. 6] is that the $18 million would not be payable, or if payable, would be returned"* and that: *"the insertion of the "Total Purchase Price" for the Option Shares of $18 million [    ] was only a construct insisted upon by [Witness No. 6]"* (para. 161 SD). Respondent emphasized that is was not important who had the idea to insert the Total Purchase Price but rather that it was not meant to be binding and thus, the only purpose of the Total Purchase Price was for Claimant to obtain Respondent's stake in Sonic for no consideration (paras. 398/399 SD).

593. Respondent submitted that Clause 5.3 AOA is an essential term of the April Option Agreement and thus the total purchase price is a condition precedent to the April Option Agreement (p. 10 Rejoinder). It further argued that if Claimant submits that the April Option Agreement and the Undertaking are to be read together, Claimant's case does not rely on the April Option Agreement but on some other arrangement made between Witness No. 6 and Witness No. 4 or Proposed Witness No. 7 which involves the Undertaking and renders the April Option Agreement a sham (para. 1.32 (i) on p. 11 Rejoinder).

594. This, Respondent argued, is corroborated by the Undertaking which was to be applicable in case Claimant decided to pay the Total Purchase Price after all and its purpose was to ensure that the purchase price would be returned if were ever paid. By such Undertaking, Witness No. 6 became per-

sonally liable: *"to pay promptly upon notice the said Purchase Price amounts as directed by [Witness No. 4] as the purchase price for investments prepared by [Witness No. 4] in consultation with LV Finance"* (C-38).

595.   Respondent argued that the terms of the Undertaking are vague and it is not clear what *"investment prepared by [Witness No. 4]"* actually means since it was never suggested that Witness No. 4 had to prepare any such investment (para. 400 SD).

596.   Additionally, Respondent argued that the Undertaking should be taken for an *"immediate and glaring warning that something is not right about the transaction"* (para. 1.34 Rejoinder) and demonstrated the unusual provision of the Undertaking concerning the destruction of the document itself[660].

597.   Respondent also argued in response to Claimant's submission that the insertion of the purchase price would have helped in negotiations with potential purchasers by stating that there is no logic in such an argument because since the April Option Agreement was not accessible or in the public domain (it was with the Escrow Agent in Switzerland) and, in any event, *"a prospective purchaser would have focused on the value of the underlying asset (Sonic Duo), rather than an illusory price set out in an option agreement locked in a safe in Switzerland"* (para. 405 SD). It argued also that Claimant is unable to explain why Respondent entered into the April Option Agreement and the Undertaking, the effect of which was to enable Claimant to obtain a 77.7% stake of TMI for no consideration (para. 405 SD).

c)   **Claimant's Position**

598.   Claimant submitted that the April Option Agreement was a valid commercial transaction. The fact that the April Option Agreement is not a *"sham"* can be inferred from the Parties' conduct since Respondent (or the Escrow Agent on its behalf) issued several Funding Call Notices, Claimant effected large payments to satisfy the Funding Price in response to such Funding

---

[660]    See Clause 2 of the Undertaking and para. 1.38 Rejoinder.

Call Notices in the course of eight months. These funds were deposited in Sonic Duo through CTM, all of which is claimed to be consistent with the terms of the April Option Agreement (p. 23 Reply).

599. Claimant maintained its position that Respondent has not offered any evidence concerning its sham argument and that Claimant's payments and adherence to the Funding Call Notice referenced in the April Option Agreement alone show that the Parties' common intention was to abide by the essential terms of the April Option Agreement. Moreover, Claimant argued that the contemporaneous Undertaking was clear evidence that the Parties' common intention was not to have some other arrangement bind them, and therefore not a sham (p. 26/27 Reply).

600. Claimant further denied Respondent's position concerning the corroboration by the timing of the December Option Agreement and asserted that the December Option Agreement was entered at a time when the future of MegaFon merger was uncertain (section II.A.4 of the Reply).

601. Claimant argued that the only deviation from the April Option Agreement here in issue was the Total Purchase Price, the USD 18 million that it submits was inserted by Witness No. 6 in order to confuse potential purchasers and bolster the value of Respondent's remaining stake in Sonic Duo (p. 26 Reply and p. 36 SC). It submitted that there was no intention to actually pay the USD 18 million since neither Party acted in reliance on it[661]. It also argued that this could be inferred in the present dispute from the fact that after the negotiation and signing of the April Option Agreement the Total Purchase Price was never mentioned again by any of the parties and Respondent has never requested payment of the Total Purchase Price. *"What was clear to both IPOC and [Witness No. 6] is that the $18 million would not be payable, or if payable, would be returned"* (p. 36 SC and p. 26 Reply).

602. Moreover, Claimant argued that under English law the English courts can invalidate a particular term, for example the obligation to pay the Total Pur-

---

[661]    See p. 36-39 SC and relying on Chitty on Contract, General Principles, at 2-146.

chase Price, but that does not mean that the whole contract is invali-
dated[662]. Additionally, it is argued by Claimant that Clause 15 AOA con-
firms Claimant's submission with regard to partial invalidity of a contract
under English law since it expressly provides that invalidity of any provision
in the agreement shall not affect or impair the validity of any other provision
in the agreement (p. 27 Reply and p. 38 SC).

### d)    The Arbitral Tribunal's Analysis

603.   Applying English law on sham transactions to the arguments and evidence
on file the Arbitral Tribunal notes that although the April Option Agreement
was in some respects uncommercial[663] and, on Respondent's case, en-
tered into for little or no consideration, this is not sufficient to satisfy the test
of a sham transaction (although the Arbitral Tribunal in its Partial Award
decided that the Total Purchase Price of USD 18 million was binding on the
Parties). As discussed in its dealing with illegality at para. 483 hereinabove,
the Arbitral Tribunal is of the view that the April Option Agreement is a con-
tract valid on its face but that the Parties intended to perform it in a manner
which would involve the commission of a crime, and the Claimant in fact
performed it through commission of a crime.

604.   However, as found in para. 465/466 hereinabove, legal rights and obliga-
tions were intended to be created by this agreement in order to put into ef-
fect an illegal purpose. There is nothing artificial about the April Option
Agreement and there is no extrinsic evidence to suggest that the terms and
conditions set out therein were to be performed differently: on the contrary,
illegality occurred as a result of the Parties' adherence to the conditions of
the agreement and as such the April Option Agreement cannot be qualified
as a sham transaction. As a result, this defence and the corresponding re-
quest in Respondent's Prayer No. 4 quoted in para. 58 hereinabove to de-
clare the April Option Agreement as "void" must be dismissed.

---

[662]    See Chitty on Contracts, General Principles, at 2-164, citing Orion Ins. Co. plc v. Sphere
Dark Ins. Plc, (1990) 1 Lloyd's Rep. 465, 505 cited on p. 38 SC.
[663]    See para. 388 hereinabove.

**H.    Assisting and Procuring a Breach of Contract Defense**

**a)    Introduction**

605.    This defence falls into two parts: procuring a breach of fiduciary duties and procuring a breach of contract.

606.    The Arbitral Tribunal notes that although this defence was pleaded at some length prior to the Partial Award, apart from a letter dated 11 January 2005 addressed by the Respondent to the Arbitral Tribunal, these defences have been largely ignored in the BID-Phase of this case. Be that as it may, Respondents submissions and Claimant's responses thereto have not been withdrawn and these defences remain part of Respondent's prayers for relief and therefore must now be examined by the Arbitral Tribunal.

**b)    Respondent's Position**

**aa)    Procuring and Assisting a Breach of Fiduciary Duties**

607.    Respondent sought a declaration that it was entitled to and did in fact rescind the April Option Agreement as well as an *"award of equitable compensation"* for Claimant's procuring of a breach of Witness No. 6's fiduciary duties.

608.    In Respondent's specific prayers (Prayers Nos. 4 and 7, pp. 4 and 5 SD) it requests a declaration that *"the April Option Agreement is void, unbinding and/or unenforceable ... because of ...inducement/procuring of breach [sic] of fiduciary ... duties"* and that *"IPOC be ordered to pay LVFG damages, or alternatively compensation in equity, in an amount to be determined by the Arbitral Tribunal, in particular by reason of a) IPOC's actions in procuring or inducing a breach of contract and trust on part of its officer, [Witness No. 6] and knowing assistance in breach of fiduciary duties"*.



609. Respondent argued that the April Option Agreement was the product of Claimant's alleged procurement of a breach of Witness No. 6's fiduciary duties it owed to Respondent.

610. As a director, Witness No. 6 owed a duty of skill and care as well as to act in good faith in the interests of LVFG[664].

611. The test as to whether a director's actions are bona fide and in the interests of the company is a subjective one. Thus, directors must so act in what they (and not a court) consider to be in the best interests of the company[665]. Respondent submitted that Witness No. 6 did not act in LVFG's interests.

612. Respondent then submitted that a director exercising his powers for a proper purpose is subject to an objective test and that Witness No. 6 acted for an improper purpose in that the April Option Agreement involved the transfer of company assets at a gross undervalue[666].

613. In particular, Respondent relied on Criterion Properties plc v. Stratford UK Properties LLC and others [2003] 1 W.L.R: 2108 (CA) (RL-18). In Respondent's words, this concerned (para. 432 SD)

> "a 'poison pill' agreement designed to thwart an anticipated takeover provided for the transfer of company assets on terms that were very favourable to the other party to the agreement, the transfer to occur on the happening of certain events. The Court held that although the agreement was (it was assumed) entered by the directors in good faith and for good commercial reasons, there had nevertheless been a breach of the duty to exercise the power to deal with the company's assets for proper purposes. The Court looked in particular at the net economic effect of the agreement".

---

[664] Palmer's Company Law volume 2, paras 8-405, 8-505, 8-511, 8-512 and 8-516 (RL 17).
[665] Re Smith & Fawcett Ltd (1942) Ch. 304, 306 (RL-47).
[666] Hogg v. Cramphorn (1967) Cg.254 (RL-48).

315

614.  Respondent then argued that in application of this Court of Appeal decision the April Option Agreement provided for the transfer of Respondent's assets on *"very favourable terms"*, the economic effect of which was to enrich Claimant to the detriment of Respondent. Respondent submitted that this was a breach of Witness No. 6's fiduciary duties to Respondent, and indeed an express breach of Respondent's memorandum and articles of association dated 14 October 1998 (R-7). The conclusion must therefore be, in Respondent's submission, that Witness No. 6 used Respondent's assets for an improper purpose.

615.  In addition, Respondent invited the Arbitral Tribunal to assess the evidence in accordance with the applicable subjective test laid down in English law that the April Option Agreement contained terms which *"defy any logical commercial analysis"* (para 435 SD).

616.  Finally, as a director's duty to a company is akin to those imposed on a trustee, Respondent submitted that Witness No. 6 was fully aware that the April Option Agreement was a transaction for the transfer of Respondent's assets at *"gross undervalue"* (para. 436 SD) and therefore contrary to Respondent's best interests meant that Witness No. 6 failed to act *bona fide*[667].

617.  Respondent submitted that Claimant assisted Witness No. 6 in the breach of his fiduciary duties. This requires not only proof of the breach but also that Claimant had sufficient knowledge of the said breach, which, Respondent argued, *"is clearly the case here"* (para 439 SD).

618.  This lead to Respondent submitting that there were two ways this was relevant for this defence, namely that

(i)  the April Option Agreement should not be enforced *"since it would be unconscionable to do so"* (para 440 SD); and

---

[667]  Palmer's Company Law vol. 2 para. 8-405 (RL-17) and Lewin on Trusts 17th Edition 2000 para. 40-15 (RL-18).

316

 

(ii)      Claimant *"is liable to account for the profits received, or compensate LVFG for losses suffered by reason of procuring and participating in [Witness No. 7]'s breach of duty, if he did so dishonestly"*[668].

619.    Respondent then pleaded that there were two consequences of the above, i.e. that Claimant:

      (i)      cannot enforce, and Respondent has a right to rescind (and has rescinded), the April Option Agreement; and

      (ii)      is accountable to Respondent for all profits it received, or alternatively, Claimant is liable to pay equitable compensation to Respondent.

**bb)    Procuring and Assisting in a Breach of Contract**

620.    Respondent sought the same declarations from the Arbitral Tribunal as well as *"equitable compensation"* and/or damages for this alleged tort, which is defined in English law as *"knowingly to procure or, as it is often put, to induce a third party to break his contract to the damage of the other contracting party without reasonable justification or excuse"*[669].

621.    This defence is akin to the defence that Claimant procured and assisted in a breach of fiduciary duties, the difference being that whereas fiduciary duties are equitable this defence relates to a breach of contractual duties which Witness No. 6 owed as a result of his contract of employment with Respondent.

---

[668]    Criterion Properties plc v. Stratford UK Properties LC and others [2003] 1 W.L.R. 108 (CA) paras 28, 30 and 38 (RL-19); Crown Dilmun and ors v Sutton and ors [2004] EWHC 52 (Ch.) at paras. 188 and 204 (RL-21); Twinsectra Ltd v. Yardley [2002] 2 A.C. 164 (RL-22); Royal Brunei Airlines v. Tan [1995] 2 A.C. 378, 390 A-B (RL-24); Lewin on Trusts 17th Edition 2000, paras. 40-37 (RL-18).
[669]    Clerk and Lindsell on Torts 18th Edition 2003, para 24-15 (RL-23).

622. Respondent highlighted that it is not a requirement of the law that this breach benefits the person who commits it. Moreover, Respondent argued that whether Claimant knew of the actual terms of Witness No. 6's contract of employment with Respondent is immaterial[670]. All that is required is an intentional invasion of contractual rights[671].

623. Moreover, the test of whether Claimant knew whether Witness No. 6's actions would breach his employment contract is an objective one[672]. Respondent relied on the words of Neill, L.J. in Middlebrook Mushrooms Ltd v. T.G.W.U [1993] I.C.R. 612 at 621 (RL-29) by submitting that Claimant must be *"deemed to know of the almost certain existence of a contract"* between Witness No. 6 and Respondent.

c)    **Claimant's Position**

aa)   **Procuring and Assisting in a Breach of Fiduciary Duties and Breach of Contract**

624. Claimant dealt with these defences together.

625. Claimant replied to this defence by submitting that Witness No. 6 was not merely a director of Respondent was *"its main founder and controlling shareholder; he owned or controlled over 50% of the shares in LVFG, a company set up for his benefit, and with which [Witness No. 6] was synonymous with the Russian business community"* (p. 51 SC).

626. Claimant argued that for Respondent's defence to succeed it had to demonstrate

      (i)    that the April Option Agreement was to the obvious disadvantage of Respondent and

---

[670]   Stratford v. Lindley [1965] A.C. (HL) (RL 27).
[671]   Rickless v. United Artists Corp. [1986] F.S.R. 507, 518 (RL-30).
[672]   Greig v. Insole [1978] 1 W.L.R. 302, 338 (p. 7 of RL-28).



  (ii)  that Witness No. 6's entry into it was a breach of his duties as a di-
    rector. A poor commercial decision is not enough[673].

627. Claimant stated that the allegation by Respondent that the April Option
  Agreement was economically absurd does not stand with what Sonic Duo,
  Respondent's most significant asset, was worth at the time. Claimant had
  to pay millions of dollars to fund Sonic Duo and therefore undertook to pro-
  vide considerable consideration for the Option Shares.

628. Finally, Claimant submitted that there was no evidence that Witness No. 6
  acted *ultra vires*, namely acting without the appropriate authority, and, in
  any event, Respondent's claims are waived or stopped under English law
  because such breaches would have been cured by the shareholder or the
  company[674].

629. Claimant concluded that both defences of the Respondent must be dis-
  missed.

**bb) Respondent's Comments on the House of Lords Decision in Criterion
  Properties plc v. Stratford UK Properties LLC [2004] 1 W.L.R. 1846**

630. Following Respondent's Statement of Defence and prior to the publication
  of the Partial Award, the House of Lords handed down its decision in Crite-
  rion Properties plc v. Stratford UK Properties LLC. ([2004] 1 W.L.R. 1846).
  Thus, in the Partial Award the Arbitral Tribunal noted that as Claimant had
  pointed out that the House of Lords had decided this case, Respondent
  may wish to comment on this case in subsequent pleadings (paras.
  250/251 PA).

---

[673] Daniels v Anderson [1995] 13 ACLC 614 and Re City Equitable Fire Insurance Co Ltd.
  [1925] Ch. 407.

[674] Halsbury's Laws, Companies 585, states that "*on the same principle that the powers of the
  directors are fiduciary ... [if] they exercise any of their intra vires powers improperly, their
  acts may be ratified by an ordinary resolution after full and frank disclosure by the directors
  to the shareholders*".

631.  In a letter dated January 11, 2005 Respondent set out its position with re-
      gard to the House of Lords decision. It noted that in Criterion the issue of
      the honesty of the directors of the company in an allegedly analogous posi-
      tion to Claimant in these proceedings was conceded for the purposes of the
      application for summary judgment. Respondent however argued that no
      such concession is made in the present case as Respondent contends that
      Claimant *"knowingly and dishonestly procured or assisted [Witness No. 6]'s
      breaches of his duties to LVFG"*[675]. This distinguishing element between
      Criterion and the facts in the present proceedings is, in Respondent's sub-
      mission, *"crucial"*[676].

**d)    The Arbitral Tribunal's Analysis**

**aa)   Procuring and Assisting in a Breach of Fiduciary Duties**

632.  Respondent requests several remedies which must be dealt with in turn.

      a)    A declaration that the April Option Agreement is *"void, unbinding
            and/or unenforceable...because of inducement/procuring of breach
            of fiduciary....duties"*;

      b)    A declaration that it was entitled to and did in fact rescind the April
            Option Agreement (para. 421 SD);

      c)    An *"award of equitable compensation"* (para. 421 SD);

      d)    Damages (Prayer No. 7 para. 7 on p.4 SD);

633.  Before examining these prayers however the Arbitral Tribunal comments
      on the House of Lords decision in Criterion.

---

[675]    See Respondent's letter dated 11 January 2005 p. 3.
[676]    See Respondent's letter dated 11 January 2005 p. 2.

634.  Criterion Properties plc v. Stratford UK Properties LLC [2004] 1 W.L.R. 1846 turned on the issue of authority of parties who entered into an agreement which was argued to be against the interest of Criterion and unconscionable.

635.  In that case it was held that if the directors in question entered into the so-called unconscionable agreement had *"neither actual nor apparent authority to conclude [the agreement] then [the agreement] could not be held enforceable against Criterion"*. The directors *"might be liable to [the company] for breach of warranty of authority, but the [agreement] would not be Criterion's contract. The consciability or unconscionability of [the company]'s behaviour in seeking to hold Criterion to [the agreement] would in either case be irrelevant"*[677].

636.  As the matter of authority, the crucial issue in Criterion, is not in question in these proceedings, the Arbitral Tribunal is bound to conclude that this decision is not helpful in determining the merits of Respondent's defence of procuring and assisting in a breach of fiduciary duties. The consciability argument is therefore irrelevant and this may indeed explain why Respondent withdrew its *"unconscionable bargain"* defence.

637.  The Arbitral Tribunal finds that Respondent has not provided sufficient evidence to support its allegations of Claimant's procuring and assisting in a breach of fiduciary duties and has not even substantiated existence of any damage.

638.  Where there are such *lacunae* in the evidence the Arbitral Tribunal is bound to draw adverse inferences against Witness No. 6. The Arbitral Tribunal considers that Witness No. 6 was not transparent, suffered from a selective memory when he gave evidence, and despite the Arbitral Tribunal's efforts to hear this witness again Witness No. 6 chose not to assist[678].

---

[677]  Lord Scott of Foscote para. 30 of judgment.
[678]  See Claimant's telefax to Witness No. 6's counsel dated December 5, 2005 and his reply thereto dated December 20, 2005.