639.  This makes the Arbitral Tribunal conclude that it cannot exercise any dis-
      cretion in Respondent's favour in its request for related declarations. Both
      Respondent's prayers for a declaration that it was entitled to and did in fact
      rescind the April Option Agreement as well as a declaration that the April
      Option Agreement is *"void, unbinding and/or unenforceable"* on the
      grounds of an alleged procurement of a breach of fiduciary duties must
      therefore be dismissed.

640.  Finally, the Arbitral Tribunal is of the view that whatever the intended per-
      formance of the April Option Agreement was when it was signed, it was ac-
      tually never fully performed. This makes Respondent's claim for *"equitable
      compensation"* and/or damages difficult to follow even if Respondent had
      established that Claimant had, on balance, procured Witness No. 6 to act
      against the interests of LVFG. As claims for damage do not form a part of
      the BID-Phase, no decision is made by the Arbitral Tribunal in this respect.

**bb)  Procuring and Assisting in a Breach of Contract**

641.  This defence can be dealt with summarily in that it is to a very large degree,
      and indeed in the words of Respondent, *"akin"* to the defence of Claimant's
      procuring and assisting in a breach of fiduciary duties.

642.  The Arbitral Tribunal notes first of all that neither Respondent nor Witness
      No. 6 produced in evidence a copy of his employment contract with Re-
      spondent and as Witness No. 6 was both a director and shareholder of Re-
      spondent it may well be that he did not actually have one.

643.  For the reasons given for the dismissal of Respondent's defence on procur-
      ing and assisting a breach of fiduciary duties the Arbitral Tribunal applies
      the same reasoning for dismissing Respondent's defence on procuring and
      assisting a breach of contract to the extent described in para. 639 herein-
      above.



## IX.    CLAIMANT'S CLAIM FOR SPECIFIC PERFORMANCE

### A.    Introduction

644.    Specific Performance is an equitable rather than legal remedy that compels a party to actually perform a contractual obligation. It is a discretionary remedy based on well-settled principles[679].

645.    The maxims of equity integrate guidelines of general principles that were developed in the Court of Chancery. One of these doctrines relevant to the present dispute is the doctrine of clean hands and is expressed thus: *"he who comes to equity must come with clean hands"*. This maxim is argued to be related to the *ex turpi causa non oritur actio* of the common law and its meaning is that Claimant must show that his past record in the transaction is clean; for *"he who has committed inequity shall not have equity"*[680]. However, this maxim cannot be construed too broadly; *"Equity does not demand that its suitors shall have led blameless lives"*[681]. For a claim to be considered under the clean hands maxim it must have an *"immediate and necessary relations to the equity sued for"*[682].

646.    There are two main limitations for the grant of specific performance: first, the existence of a valid and enforceable contract[683]. Second, that damages recoverable at law are inadequate[684].

---

[679]    See Snell, Equity (30th ed) paras. 40-11 (CL-11).

[680]    See Jones v. Lenthal (1669) 1 Ch. Cas. 154, cited in Snell, Equity (30th ed) paras. 3-15 (CL-11).

[681]    See Loughran v. Loughran 292 U.S. 216 at 229 (1934), per Brandeid J., cited in Snell, Equity (30th ed) paras. 3-15 (CL-11).

[682]    See Dering v. Earl of Winchelsea (1787) 1 Cox Eq. 318 at 319, 320 per Eyre C.B.; Moody v. Cox (1917) 2 Ch. 71 at 87; Duchess of Argyll v. Duke of Argyll (1967) Ch. 302 at 332, cited in ibid and in Hanbury and Martin, Modern Equity (17th edition), paras. 1-028 (CL-132).

[683]    See Hasham v. Zenab (1960) AC 316 (CL-3).

[684]    See Snell, Equity (30th ed) paras. 40-05 (CL-11); Hutton v. Waling (1048) Ch. 26 (1A of CL-1).

647. Damages are regarded as an adequate remedy if the claimant is fully compensated as entitled to under the agreement and where claimant can readily obtain the equivalent of what he contracted for from another source[685].

648. It is settled English law that a contract to buy shares that are not readily available on the market is specifically enforceable and that damages are considered to be an inadequate remedy[686].

649. Additionally, the remedy of specific performance is recognised as an acceptable relief in international arbitration[687] and arbitral tribunals have already issued specific performance orders which relate to third-party rights[688].

**B.      Respondent's Position**

650. Respondent's submissions to the Tribunal that it should not grant the Claimant specific performance may be summarised as follows[689].

   (i)     Withdrawal of the claim for specific performance. Respondent argued that from the *"Amended Request for Relief"*[690], it appeared that Claimant had withdrawn its request for specific performance concerning the shares in TMI, CTM and MegaFon. Respondent claimed that Claimant had become *"cognizant that all such transactions (i.e.*

---

685   See Chitty 29th ed, 27-011 (CL-127); CL XVIII Page 69, citing Harnett v. Yielding (1805) 2 Sch. & Lief, 549 at 552 (CL-2).

686   See Chitty 29th ed, 27-011, CL-127 and the cases referred in footnote no. 45.

687   See Texaco Overseas Petroleum Company and California Asiatic Oil Company v. The Government of the Libyan Arab Republic (1977), 53 I.L.R. 422, at p. 497-98 (CL-128); Final Award in Case No. 7453 of 1994, Yearbook Commercial Arbitration, Vol. XXII (1997), pp. 107-124 at pp. 121-122 (CL-129) and Coopertex v. Rue de Reves, Inc., 1990 WL 6548 (S.D.N.Y) (CL-130) at 2.

688   See Final Award in Case No. 8528 of 1996, Yearbook Commercial Arbitration, Vol. XXV (2000), pp. 341-354 at paras. 58, 67 (CL-148).

689   See para. 471 on p. 160 BID-Reply.

690   See pp. 70/71 SC and p. 21 CV IX. The latter is Claimant's submission filed on June 17, 2004 entitled *"Opposition to Money Laundering Discovery Request and Bifurcation/Jurisdictional Motion"* referred to e.g. in consid. (vi) of the Third Order.

*the sale of the stake in CTM and TMI) cannot be overturned by this Tribunal"*[691].

(ii)    Impossibility of performance. Respondent argues that because both the TMI and CTM shares have been sold on to third parties, any compliance with any order of specific performance by the Arbitral Tribunal against Respondent would be impossible[692]. Respondent cited Chitty, paras. 27-040 (RL-86) for the principle that the court cannot compel a person to do what is impossible (also argued in Fourth Hearing Transcript, Day 2, p.8 T1H Day 2). Respondent argued that Claimant's only remedy is damages.

(iii)   Constant supervision. Respondent stated that the remedy of specific performance is not available if the same requires constant supervision by the courts[693].

(iv)    Lack of interest worthy of protection. Respondent submitted that Claimant has *"no interest worthy of protection in the declaration sought; accordingly, its declaratory prayers must not be heard"*[694]. In essence, Respondent argued that under Swiss procedural law a claimant who is in a position to request an award is deemed to have no legal interest worthy of protection in requesting a declaration. As Claimant is in a position to request damages as a remedy it cannot request a declaration of its rights[695].

(v)     Jurisdiction. Additionally, Respondent argued that the present Tribunal does not have jurisdiction over TMI, CT-Mobile, MegaFon or Alfa as third parties unconnected to the April Option Agreement or the

---

[691]  See Respondent's pleading notes presented on June 24, 2004, at the Second Hearing, Part. 3 I A(1) citing p. 1 of CVIX; see also paras. 21-25 on pp. 13/14 SD.

[692]  See, para. 44.3 on p. 102 Rejoinder.

[693]  See para. 384 BID-Reply.

[694]  See paras. 34, 46-48 and 502 SD. This argument can also be found in, para. 358 on p. 127 and para. 371 on p. 129 BID-Reply.

[695]  Respondent cites a Swiss Law journal article: Edgar Habscheid, *"Die Allgemeine Feststellungsklage"*, AJP 2002, p. 269 et seq. (RL-41).

present arbitration[696]. It argued that under the April Option Agreement Claimant has no right to shares other than the TMI shares and thus, *"if any order or declaration is issued by the Tribunal, it can only relate to TMI shares"*[697]. Orders or declarations relating to shares other than TMI shares are argued to be beyond the jurisdiction of this Tribunal since the *"stake in MegaFon that Claimant ultimately seeks to possess is entirely governed by agreements between third parties and falls out of the application of the AOA arbitration clause"*[698].

(vi)  Illegality. Respondent also argued that specific performance must be refused where an agreement is unenforceable through illegality, or possible subsequent illegality[699].

(vii)  Clean hands. Respondent argued that Claimant in seeking an equitable remedy does not come with clean hands and therefore the remedy sought should be denied[700]. Under English law, a plaintiff who had an improper conduct but seeks equitable relief that relief will be refused since those who seek equity must do equity and must come with clean hands[701]. The doctrine of illegality and clean hands are independent one of another since illegality destroys all plaintiffs' rights (equitable and legal) while clean hands merely deprives plaintiff of equitable relief. It is argued that April Option Agreement's illegal purpose relating to the manner in which that agreement was to be performed (discussed in Chapter VIII) has an *"immediate and necessary relation to the equity sued for"*[702].

---

[696]  See para. 33 on p. 16 SD and paras. 360-369 BID-Reply.
[697]  See para. 362 BID-Reply.
[698]  See para. 363 BID-Reply.
[699]  See paras. 317-318, 331 and 349 SD and para. 65 BID-Reply.
[700]  See e.g. paras. 352-354 SD.
[701]  See Meagher, Heydon and Leeming, Equity Doctrine & Remedies 4th ed, paras. 3-110, p 98 and note 15 (RL-38).
[702]  See Snell, Equity (30th ed) paras. 3-15 (CL-11).

C.    **Claimant's Position**

651.   Claimant argued that it has *"consistently maintained its prayer for declaration that IPOC has validly exercised and paid for its option under the April Option Agreement with Respondent, entitling IPOC to purchase 77.7% of the share capital of TMI, with TMI holding substantially 100% of the capital of CTM, and CTM holding 25.1% of the capital of MegaFon"*[703].

652.   Claimant argued that all the requirements of specific performance are satisfied in the present case since the April Option Agreement is a valid agreement and damages would be the inadequate remedy as the rational for signing the April Option Agreement was the owning of TMI shares and, ultimately, the right to control the CTM and MegaFon. These shares are not available on the open market[704].

653.   Claimant further relied on what it called a specific binding precedent on the issue of specific performance, namely the Final Award of the ICC case relating to the December Option Agreement where it was held that damages would be inadequate remedy *"because Claimant wanted 25.1% of Mega-Fon and it could not readily acquire this stake on the open market"*[705] and rejecting the contrary evidence of Witness No. 11 and the Proposed Witness No. 2 it was also decided that *"the present holders of the relevant shares are not bona fide purchasers for value without notice"*[706].

654.   Claimant examined specifically the defences of Respondent as follows:

   (i)    Impossibility of performance. Claimant argued that Respondent's impossibility argument is misleading since where the object of specific performance is not destroyed, the impossibility is not actual but a *"construct resulting from an illegal (...) scheme"*[707] and that the

---

[703]   See p. 2 BID-Rejoinder and paras. 81, 1008-1015 BID-Answer.
[704]   See paras. 21-27 on p. 9 BID-Rejoinder.
[705]   See ICC Final Award, C-424, p. 170.
[706]   See ICC Final Award, C-424, p. 177 and paras. 30-34 on p. 9 BID-Rejoinder.
[707]   See para. 37 BID-Rejoinder.



ICC Tribunal's Award is res iudicata in this regard[708]. Under the ICC Award: *"it is not impossible that Claimant will succeed in recovering the shares from purchasers"..."In certain circumstances an English court would be entitled to require the purchaser to transfer legal title to the beneficial owner"*[709].

(ii)    Constant supervision. Claimant argued that this argument does not apply in the present dispute since the restricted acts required by Respondent in order to perform its obligations can not in any event require the courts constant supervision. Cases where specific performance has been denied on this ground *"are those in which one party is bound by continuous or ongoing duties, the due performance of which might require constant supervision by the court"*[710]. Claimant further added there is *"a distinction to be made between orders which require a defendant to carry on an activity and orders which require him to achieve a result"*[711].

(iii)   Lack of interest worthy of protection. Claimant disputed this argument[712]. First, Claimant submitted that under the Swiss law the principle of legal interest of one's rights (*"Rechtsschutzinteresse"*) is to be taken in a broad sense which allows a Claimant to request both remedies of damages and equitable relief[713]. Secondly, Claimant relied on Swiss Federal law as well as commentaries on Zurich procedural law claiming that it is entitled to both a declaration of rights and

---

[708]   See paras. 37-39 BID-Rejoinder.
[709]   See ICC Final Award (p. 172 of C-424).
[710]   See para. 43, fn. 61 BID-Rejoinder where Claimant referred to Chitty, Contracts (29th ed)(27-025 of CL-127).
[711]   Ibid where Claimant also cited Co-Operative Insurance Society Ltd v. Argyll Stores (Holdings) Ltd. (1998) AC 1.
[712]   See BGE 93 II 16 at seq., CV X, Tab 21 referred to on p. 24 of Claimant's submission referred to in fn. 690 hereinabove.
[713]   See BGE 120 II 22, with reference to Bodmer, Die allgemeine Feststellungsklage im schweizerischen Privatrecht, Diss. 1984, pp. 50 et seq., 68 and 75, (C-374); see also A. Bucher and P.Y. Tschanz, International Arbitration in Switzerland, p. 130, (1989) *"examples of partial awards under PIL Article 188 on substantive controversies include issues of liability that are bifurcated from issues of damages"* (C-375) referred to on p. 24 of Claimant's submission referred to in fn. 690 hereinabove.

an award on damages for several reasons: *"(1) it seeks to determine an unclear legal relationship (which is hampering IPOC's economic freedom) (2) the damages are not yet clearly determined and is still ongoing; and (3) because a declaration of rights is necessary for future proceedings of the due and disputed performance of the contract"*[714].

(iv)    Jurisdiction. Claimant submitted that it has not requested the Tribunal to declare or grant additional rights but merely to declare the rights it does have under that April Option Agreement. Moreover, the ICC Tribunal's Award is res iudicata in this regard[715], under which specific performance was granted without binding the third parties involved. It further argues that both parties are aware of the fact that other courts are to be used as alternative if rights against third parties, involved in the alleged fraudulent scheme, are to be declared and found to be binding[716] and that in any case, Respondent has no legal references in support of its jurisdictional argument[717]. Claimant also argued that Respondent's argument that MegaFon Interests have been alienated into the hands of other parties is misleading because Respondent failed to mention that this was done in recognised breach of contract and as a part of a *"fraudulent scheme"* together with Alfa[718].

(v)    Illegality. Claimant submitted that it maintained its position that no illegality is implicated in requiring Respondent to perform its contractual obligations under the April Option Agreement[719] and that evidence produced by Respondent can not lead the Tribunal to this

---

[714]   See Frank, Strauli & Messmer, Kommentar zur zürcherischen Zivilprozessordnung, 3rd ed. Zurich 1997, p. 265,(C-372); ATF 120 II 22 &23(C-376), ATF 144 II 256 referred to on p. 24 of Claimant's submission referred to in fn. 690 hereinabove.
[715]   See paras. 50, 47 BID-Rejoinder and ICC Final Award (C-424, p. 177 of C-424).
[716]   See para. 50 BID-Rejoinder.
[717]   See para. 47 BID-Rejoinder.
[718]   See para. 50 BID-Rejoinder.
[719]   See e.g. Section IV BID-Answer.

conclusion[720]. Claimant further argued that arbitral cases are consistent with English law on the issue that in cases where illegality is raised as a contractual defence a higher standard of proof is required[721].

   (vi)   Clean hands. Finally, Claimant disputed Respondent's argument as to Claimant's alleged unclean hands specifically in connection to April Option Agreement and argues that under English law a plaintiff can only be barred from equitable relief if *"the plaintiff's blameworthy conduct has some connection with the relief sought, as the court is not concerned with the plaintiff's general conduct"*[722].

## D.   The Arbitral Tribunal's Analysis

655.   It is undisputed by the Parties that the subject of this dispute is the April Option Shares. Claimant seeks those shares in order, ultimately, to have an interest in MegaFon. Neither the April Option Shares nor the shares in MegaFon are available on the market[723]. The Arbitral Tribunal is satisfied that this is a fact. If the April Option Shares could be the subject of an order for specific performance, damages would not be an adequate remedy.

656.   However, the Arbitral Tribunal concludes that there are *nova* or *"overriding reasons"* which permit the Arbitral Tribunal to disregard the findings in the Geneva ICC-Award. This specifically relates to Respondent's defence of unclean hands and illegality because of the Arbitral Tribunal's findings on

---

[720]   See para. 41 BID-Rejoinder.

[721]   See Westinghouse and Bruns & Roe (USA) v. National Power Company and the Republic of the Philippines, Award in ICC Caes No 6401 (1991) cited on p. 66 of the Reply. See also: C-366, Bernardo Cremades & David J Cairns, Transnational Public Policy in International Arbitral Decision-Making, in: Arbitration: Money Laundering, Corruption and Fraud (RL-168). The cases of bribery, money laundering and fraud, Dossiers of the ICC Institute of World Business Law 2003, p. 83; *"The seriousness of the allegations means that the burden of proof(...) is highly important...and the proof should be convincing. (...) Uncorroborated evidence or evidence capable of multiple explanations should be rejected"* cited on p. 67 of the Reply.

[722]   See Hanbury and Martin, Modern Equity (17th edition), paras. 1-028, CL-132 (Emphasis added) cited in para. 44 BID-Rejoinder.

[723]   See p. 4 lines 21-30 T1H Day 2.

the conduct of the Proposed Witness No. 7, the beneficial owner of the Claimant. The April Option Agreement was entered into for an illegal purpose and was to be performed illegally. The Arbitral Tribunal notes that the said agreement was partially performed by both Parties. But its performance was not completed as Claimant's efforts to perform it further were thwarted by Respondent's Onward Sales. Therefore, the April Option Agreement is unenforceable under English law with regard to any contractual remedy relating to the alleged breach of Clause 7.1.1 of the April Option Agreement by the Onward Sales. To hold otherwise would offend English public policy and be contrary to the principle of *ex turpi causa*. This principle displaces Claimant's attempt to enforce its alleged rights under the April Option Agreement by specific performance. To enforce such alleged rights would be to permit continued illegal performance of the April Option Agreement.

657.  Given that specific performance is an equitable discretionary remedy, available only to parties who come with *"clean hands"*, a court or arbitral tribunal could deny a request for it even if the contract in question were a legal and enforceable contract. *A fortiori*, this Arbitral Tribunal must deny Claimant's request for specific performance submitted as Claimant's BID-Prayers in paras. 1009 to 1012 BID-Answer. These conclusions, other arguments such as impossibility and constant supervision need not be examined because the April Option Agreement cannot be enforced due to its illegal purpose and performance.

## X.   RESPONDENT'S COUNTERCLAIM FOR DECLARATORY JUDGMENTS

## A.   Introduction

### a)   Respondent's Prayers for Relief

658.  In Respondent's Prayers 4 to 6 quoted in para. 58 hereinabove, Respondent makes three requests for a declaration by the Arbitral Tribunal, namely:

331



(4) *"[t]hat the Arbitral Tribunal declare that the April Option Agreement is void, unbinding and/or unenforceable, in particular because of simulation, violation of public policy, inducement/procuring of breach of fiduciary and contractual duties or duress. In the alternative: That the Arbitral Tribunal avoid and/or annul the April Option Agreement."*

(5) *"[t]hat the Arbitral Tribunal declare that the April Option Agreement, if not void, unbinding and/or unenforceable, were an illegal contract, and a claim brought under it would be against public policy and arising ex turpi causa";*

(6) *"[t]hat the Arbitral Tribunal declare that IPOC has not validly exercised its options under the April Option Agreement"* (p. 3 SD).

659.  In dealing with these requests the Arbitral Tribunal must look to the substantive law of the dispute in order to determine whether such relief can be ordered and, if so, on what basis.

**b)      Declaratory Judgment in English Law**

660.  Declaratory judgments have their origin in equity. Before 1883 in an action in the common law courts there was no such thing as a declaratory judgment of existing or future rights. The only remedies were damages, recovery of money, goods or land. In the Court of Chancery, binding declarations could be ordered, providing the court was empowered to grant such relief.

661.  In 1883 the former Order 25 Rule 5 of the Supreme Court Practice introduced *"an innovation of a very important kind"*[724] and made *"a great change in the law with regard to declaratory judgments"*[725]. It empowered the Court to make declarations of right *"whether or not any consequential relief is or could be claimed"*[726]. This was confirmed in Guaranty Trust Co. of New York v. Hannay [1915] 2 K.B. 536, C.A.

---

[724]   See Lindley, M.R. in Ellis v. Bedford (Duke of) [1899] 1 Ch. 494, 515.
[725]   See Stirling L.J. in West v. Sackville [1903] 2 Ch. 378, 393.
[726]   See Fairwell, L.J. in Chapman v. Michaelson [1909] 1 Ch 238, 248.

662. This meant that an action for a declaration became an important procedural tool for ascertaining and determining the rights of parties or for determination of a point of law[727].

663. Provided an action for a declaration is confined to declaring contested legal rights, present or future, of the parties to the litigation (and not a declaration as to a moral or hypothetical question), the Court can make a binding declaration[728].

664. All this leads to the now long established rule that *"[N]o action or other proceeding shall be open to objection on the ground that a merely declaratory judgment or order is sought thereby, and the Court may make binding declarations of right whether or not any consequential relief is or could be claimed"* (Rules of the Supreme Court Order 15 Rule 16, 1991).

665. The power to make a binding declaration is discretionary (Russian Commercial and Industrial Bank v. British Bank for Foreign Trade [1921] 2 A.C. 438). Caution must be exercised in deciding whether to exercise this power. For example, a declaration will not be made against a party who has not yet formulated a specific claim or asserted a right (Re Clay [1919] 1 Ch. 66). And a declaration will not be made merely to assist a party in a foreign action (Guaranty Trust of New York v. Hannay [1915] 2 K.B. 575).

666. This historical development is important because, as Megarry V.-C set out in Tito v. Waddell (No 2) [1977] Ch. 106, 259, the discretionary remedy of an action for a declaration *"is neither legal nor an equitable remedy, but statutory"*. Therefore, the equitable maxims such as *"he who seeks equity must do equity"* and *"he who comes to equity must come with clean hands"*

---

[727]    See Bernard v. National Dock Labour Board [1953] 2 Q.B. 18; [1953] 1 All E.R. 1113; Francis v. Yiewsley and West Drayton U.D.C. [1957] 2 Q.B.136; [1957] 3 All E.R. 529; Vine v. National Dock Labour Board [1957] A.C. 488; [1956] 3 All E.R. 939; Pyx Granite Co. Ltd v. Ministry of Housing and Local Government [1960] A.C. 260; [1959] 3 All E.R. 1.

[728]    See Tindall v. Wright [1922] W.N. 124; Re Barnato [1949] Ch. 258 CA; see also the much later decision of Malone v. Metropolitan Police Commissioner [1979] Ch. 344; [1979] 2 All E.R. 620.

do not apply when a court or arbitral tribunal considers whether to exercise its discretion and make a declaration.

**c)**    **Application of English Law to the Requests for Declaratory Relief of the Respondent**

667.    Given that the Arbitral Tribunal has made a finding of fact that Witnesses Nos. 4 and 6 and Proposed Witness No. 7 were complicit in entering into the April Option Agreement for an illegal purpose, were claims for declaratory relief equitable remedies in English law, Respondent's claims for declarations would of course have to be denied.

668.    As a statutory remedy, the declarations sought by Respondent must therefore be considered not in the light of equity but from the standpoint of the Arbitral Tribunal's discretion to make such declarations.

669.    Respondent's prayers for declarations do not relate to hypothetical questions but concern, to a large degree, the reverse side of claims made by the Claimant. For example, Claimant's prayer for specific performance necessarily involves a finding that the April Option Agreement is a valid and enforceable agreement. Respondent's prayer that it is unenforceable goes to the same issue. The same applies to the parties' respective prayers as to whether Claimant has validly exercised its option under the April Option Agreement. Therefore, Respondent's request for declarations do relate to disputed rights of the parties to this litigation.

670.    The one area in which the Tribunal must approach Respondent's prayers for declaratory relief with caution in exercising its discretionary powers is with regard to foreign proceedings. It is public knowledge that litigation is pending in other jurisdictions between the same or related parties to this case and the Arbitral Tribunal must avoid making a declaration *"merely to enable the [Respondent] to utilise it in a foreign action"*[729].

---

[729]    See Guaranty Trust of New York v. Hannay [1915] 2 K.B. 575.

671.  However, the declarations sought in this arbitration are matters, which, by the very nature of the disputed rights of the parties in this case, cannot be categorised as *"merely"* enabling Respondent to use such declarations, if made, in other proceedings. Respondent's requests relate directly to the issues to be determined by this Arbitral Tribunal. As a result, the Arbitral Tribunal finds that it not only has the power to make binding declarations such as those sought by the Respondent but also it finds that it is proper to exercise its discretion and make such declarations where Respondent's requests are founded in fact and law. Therefore, some of Respondent's requests for declaratory relief are to be admitted; others must be denied.

**B.     Respondent's Specific Prayers for Declaratory Relief and English Law**

**a)     Respondent's Prayer No. 4**

**aa)    Respondent's Primary Prayer**

672.  The Arbitral Tribunal must now deal with each specific prayer. Respondent's first prayer of its counterclaims, i.e. Respondent's Prayer No. 4 which primarily asks for a declaration that:

> *"the April Option Agreement is void, unbinding and/or unenforceable, in particular because of simulation, violation of public policy, inducement/procuring of breach of fiduciary and contractual duties or duress."*

673.  This prayer has several parts. The Arbitral Tribunal has dismissed Respondent's Sham Defence (in the above-quoted Prayer referred to as *"simulation"*), which in the Arbitral Tribunal's reasoning is the only defence that would have rendered the April Option Agreement void. Therefore, Respondent's request to declare that the April Option Agreement *"is void"*[730] must be dismissed.

---

[730]     See para. 604 hereinabove.

674.  The Arbitral Tribunal has also dismissed the Duress Defence, which in the Arbitral Tribunal's reasoning is the only defence that would have rendered the April Option Agreement voidable, not void. As the term *"unbinding"* in the above-quoted Prayer has been interpreted by the Arbitral Tribunal as meaning *"voidable"*[731], Respondent's request to declare the April Option Agreement as *"unbinding"* must be dismissed as well.

675.  As the Arbitral Tribunal has made a finding that the April Option Agreement was entered into for an illegal purpose and that its performance entailed the commission of criminal offences in Russia, under English law the April Option Agreement is unenforceable as a matter of English public policy and any claim brought under the said agreement arises *ex turpi causa*. Therefore, the Arbitral Tribunal should exercise its discretionary power accorded to it under English law, grant Respondent this specific declaratory relief and declare that the April Option Agreement is unenforceable.

676.  Respondent's other reasons for justifying its request for such a declaration, namely *"simulation"* (i.e. sham), *"inducement/procuring of [a] breach of fiduciary and contractual duties or duress"* have in this award been rejected by the Tribunal and therefore this part of Respondent's Prayer No. 4(1) must be dismissed.

**bb)   Respondent's Alternative Prayer**

677.  With regard to the final part of Respondent's Prayer No. 4 and Respondent's alternative requests that the Arbitral Tribunal *"avoid and/or annul the April Option Agreement"*, the Tribunal notes that this is not a request for a declaration.

678.  As this is an alternative prayer to Respondent's request for a declaration of unenforceability, which the Tribunal has made, the Arbitral Tribunal does not need to deal with this alternative prayer, save as to say that as a matter of English law such a request is meaningless.

---

[731]    See para. 298 hereinabove.

679.    Avoidance of a contract is what an innocent party may do following a breach by the other party. Annulment of a contract usually relates only to marriage contracts. As a matter of English law, non-money remedies available are injunctions, specific performance, rectification, rescission, cancellation of documents, declaration, receivership and an order for an apology in defamation proceedings.

680.    Respondent's alternative prayer falls outside these remedies. The Arbitral Tribunal is of the opinion that the closest remedy available under English law to the one sought by Respondent is that of rescission[732]. Rescission is the right of a party to a contract to have it set aside and to be restored to his former position. But rescission, strictly speaking, is not a judicial remedy because it is achieved by an act of the parties albeit on occasions invoking the assistance of the court for example in the restitution of property. The Arbitral Tribunal therefore need go no further in its analysis of this alternative prayer and thus dismisses it without prejudice.

**b)**    **Respondent's Prayer No. 5**

681.    Respondent's Prayer No. 5, i.e. its second prayer of its counterclaim is for a declaration that:

> *"that the Arbitral Tribunal declare that the April Option Agreement, if not void, unbinding and/or unenforceable, were an illegal contract, and a claim brought under it would be against public policy and arising ex turpi causa."*

682.    As the Arbitral Tribunal has found that the April Option Agreement is unenforceable it does not need to deal with the part of this prayer relating to the said agreement being *"void, unbinding and/or unenforceable"* and therefore must declare this part of Respondent's Prayer No. 5 obsolete.

683.    As to Respondent's request for a declaration that the April Option Agreement was *"an illegal contract, and a claim brought under it would be*

---

[732]    See Hanbury and Martin, Modern Equity (16th Edition, 2001) ch. 26.

*against public policy and arising ex turpi causa"* the Arbitral Tribunal treats this as a separate prayer for relief in that it differs from Respondent's Prayer No. 4 because it specifically addresses public policy.

684. The Arbitral Tribunal has found with regard to the Dilution Defence and the ML-Defence that the said agreement, although legal on its face, was entered into for an illegal purpose, the performance of which involves the commission of crimes in Russia, and as a matter of English law it is therefore unenforceable. In exercising in relation to these defences discretionary powers in making the declaration requested by Respondent the Arbitral Tribunal shall make a declaration that, based on the facts and law, the claims brought under the April Option Agreement are against public policy and arising *ex turpi causa*.

685. The Arbitral Tribunal has made a finding of fact that the April Option Agreement is not an illegal contract on its face but was entered into for an illegal purpose; its performance would involve illegality. In applying English law the Arbitral Tribunal has ruled that the April Option Agreement is unenforceable. This is not, strictly speaking, the same as finding, as Respondent invites the Arbitral Tribunal to do, that the April Option Agreement was *"an illegal contract"*. The Arbitral Tribunal prefers to describe the April Option Agreement not as an illegal contract but as an illegal transaction: its purpose and performance are illegal, rendering it unenforceable.

686. Based on this, the Arbitral Tribunal hereby finds that the April Option Agreement is not an illegal contract on its face but was a contract entered into for an illegal purpose, the performance of which involved illegality. Therefore, Respondent's prayer to declare that the April Option Agreement is an illegal contract should be dismissed. However, the claims brought by Claimant under the April Option Agreement are against public policy and arise *ex turpi causa*, and therefore this part of Prayer No. 5, to the extent it covers Claimant's claims made in this arbitration, is hereby affirmed and the Arbitral Tribunal will in the operative part of this Second Partial Award make such a declaration.



### C.    Summary

687.   Respondent's counterclaims for declaratory judgments submitted in Re-
       spondent's Prayers 4 and 5 are, for the above-stated reasons, to be partly
       dismissed with the exception of the part of Respondent's Prayer No. 4 re-
       questing that the April Option Agreement is *"unenforceable"* and the part of
       Respondent's Prayer No. 5 requesting that claims brought under it are
       against *"public policy and arising ex turpi causa"* is to be upheld in the Sec-
       ond Partial Award.

### XI.    THE COSTS OF ARBITRATION

### A.    Introduction

688.   Applying by analogy the terminology of Art. 31(1) ICC Rules, the costs of
       arbitration (the **"Costs of Arbitrations"**) are on the one hand the *"fees and
       expenses of the arbitrators"* (the **"Arbitration Costs"**) and on the other
       hand the *"reasonable legal and other costs incurred by the parties"* (the
       **"Parties' Costs"**).

689.   In order to secure the Arbitration Costs, the Parties have throughout the
       Zurich Ad-Hoc Arbitration paid deposits. Until June 30, 2005, the Parties
       have done so by paying the deposits in equal shares on a trust account of
       the Chairman[733] for the Arbitration Costs incurred until June 30, 2005. The
       Arbitral Tribunal has accounted for these costs in its telefax dated July 21,
       2005 which accounting has been integrated in its detailed accounting given
       in its telefax dated February 24, 2006 (the **"February Accounting"**)[734].

---

[733]   See the total amount in line 2 on p. 3 of the Arbitral Tribunal's telefax dated July 21, 2005.
       On this amount the net interest of CHF 908.30 has been earned.
[734]   The total amount of Arbitration Costs incurred from the beginning until June 30, 2005 is
       stated in item 12 of the February Accounting and leaves a balance in the Arbitral Tribunal's
       favour referred to in item (iv) of the February Accounting. For the latter see also fn. 2 of the
       Arbitral Tribunal's telefax dated November 3, 2005.

690. As a result of the seizure of the Arbitral Tribunal's files on July 20, 2005 by the Zurich Prosecutor caused by the German Assistance Request, the Arbitral Tribunal decided that because of the money laundering reproaches to Claimant investigated by the German Prosecutor in connection with the German Criminal Complaint, it can for the time being no longer pay the Arbitration Costs without risk from deposits paid by Claimant so that Claimant's deposit, although paid, could not be used and Respondent had to pay always twice its normal share. After the Arbitral Tribunal communicated this decision to the Parties' counsel at a telephone conference of July 21, 2005, the Chairman opened two new trust accounts, one for Claimant's deposit and one for Respondent's deposit and requested from the latter a total further deposit to be paid at that time of CHF 2X and for the sake of good order confirmed the purpose of these two accounts as follows[735]:

> *"Without the Parties' consent, the Arbitral Tribunal will not withdraw for the payment of its fees and expenses more than a total amount of CHF [2X] from the said two new accounts and will decide, depending on the circumstances, from which of the said two accounts a withdrawal up to a maximum of CHF [2X] will be made and to which Party and when the exceeding amount of CHF [X] can be returned."*

691. Under the method referred to in the preceding paragraph, Claimant paid the total deposit of CHF Y and Respondent the total deposit of CHF 2Y[736] from which the uncovered balance referred to in fn. 734 hereinabove, and the Arbitration Costs incurred since July 1, 2005 until January 31, 2006[737] were paid.

---

[735] The same language has been used also in the later request of the Arbitral Tribunal to pay further deposits.

[736] For the total amount paid by Claimant see p. 6 second to the last paragraph of the February Accounting less interest of CHF 660.15 and for the amount received from Respondent item (vi) on p. 5 of the February Accounting as well as the full amount paid by Respondent as requested from Respondent on p. 2 of the Arbitral Tribunal's telefax dated February 2, 2006.

[737] The total amount for these periods corresponds to the total of the amounts listed in items 21, 30 and 41 of the February Accounting. After the withdrawal of these amounts and crediting net interest of CHF 503.50 the remaining amount on Respondent's trust account corresponds to the amount at the end of line 12 on p. 5 of the February Accounting.

692.    The deposit for the Arbitration Costs for the period as from February 1, 2006 until the rendering of this Second Partial Award on the trust account for Respondent corresponds to the amount referred to on the fifth line on p. 6 of the February Accounting plus the amount paid by Respondent pursuant to item 3 of the Twenty-First Order.

693.    The new trust account for Claimant's deposit which was not used for the reasons explained in para. 690 hereinabove, there is presently the amount referred to in the second to the last paragraph of the February Accounting and on the old trust account the amount referred to in the last paragraph of the February Accounting, which corresponds to Claimant's shares on this account, which for the same reasons could no longer be used by the Arbitral Tribunal after the seizure of its files in July 2005.

**B.      Deferral of Decision on Arbitration Costs**

694.    After this Second Partial Award has been served, the Arbitral Tribunal will submit to the Parties a detailed accounting of the Arbitration costs incurred since February 1, 2006.

695.    The Parties' Costs are not known to the Arbitral Tribunal as it decided at the Tenth Hearing, after consultation of the Parties, that the Parties must not submit the statement of the Parties' Costs since the Arbitral Tribunal will decide on the allocation of the Arbitration Costs and the Parties' Costs after this Second Partial Award has been rendered either in a separate award on costs or in the Final Award[738].

696.    For the said reasons, the Second Partial Award defers its decision on the Costs of Arbitration and thereby on Claimant's BID-Prayer submitted in para. 1014 BID-Answer and Respondent's Prayer Nos. 10 and 11 to a later stage of proceedings.

---

[738]    See the Arbitral Tribunal's telefax dated February 2, 2006 at the end.

**C.**    **Possible Criteria to be Considered in a Future Award on Costs**

697.    Before deciding on the allocation of the Arbitration Costs and the Parties' Costs, the Arbitral Tribunal will give the Parties not only the opportunity to submit their Parties' Costs, but also to comment on the allocation of the Arbitration Costs and the Parties' Costs. In these comments, the Parties shall not only consider to what extent they have succeeded on the merits in this arbitration but also on the efforts required due to their numerous procedural issues the Arbitral Tribunal had to decide.

698.    Moreover, the Parties' comments on the allocation of Arbitration Costs shall address whether Respondent's involvement in the illegal dilution of Central Telegraph referred to in para. 405 hereinabove disentitles Respondent, and if so, to what extent, from obtaining an award on costs, ordering Claimant to remunerate Respondent for the Arbitration Costs and the Parties' Costs paid by Respondent. The same applies to the noticeable delay of Respondent in the full development of its Broader Illegality Defence.

699.    For the sake of completeness, the Arbitral Tribunal recalls that the *"Deposit Splitting Application"* referred to in paras. 72 and 74 hereinabove, has been dismissed on January 6, 2006 by the Eighteenth Order and that, as stated in fn. 86 hereinabove, Respondent has, despite the announcement made in its letter dated February 10, 2006 not requested again a deposit splitting. Accordingly, for the time being, there is no deposit splitting to be considered in the forthcoming award on costs.

**XII.**    **CONCLUSIONS**

700.    In this final Chapter XII, the Arbitral Tribunal will summarise the decisions made in the Partial Award and the decisions to be made in this Second Partial Award and add to this summary some final comments. As a last topic the Arbitral Tribunal will then recapitulate the matters yet to be dealt with.



**A.     Summary of Decisions Made**

**a)     In Partial Award**

701.    The operative part of the Partial Award has been quoted in para. 64 and the further relevant findings made in the Partial Award have been summarised in paras. 65 to 70 hereinabove.

702.    Relevant for this Chapter is merely that Respondent's Prayer No. 1 referred to in para. 60 PA, respectively in para. 58 hereinabove, was dismissed in item 1 of the operative part of the Partial Award quoted in para. 64 hereinabove, that Claimant's Prayer A/1 relating to the valid exercise of the April Option quoted in para. 69 PA, respectively in para. 57 hereinabove, was dismissed in item 4 of the operative part and consequently that Respondent's Counterclaim in Respondent's Prayer No. 6 quoted in para. 60 PA, respectively in para. 58 hereinabove, was affirmed by declaring that *"Claimant has not validly exercised the April Option under the April Option Agreement by its purported option notices of July 29, 2003 (C-117) and August 12, 2003 (C-189)"*, i.e. the Purported Option Notice[739].

703.    With regard to all the other prayers relevant for the First Phase, i.e. for the Preliminary Issues summarised in para. 62 hereinabove, the Partial Award either made no decision (item 2 of the operative part) or deferred its decision to a later stage of proceedings (items 3, 5, 7 and 9 of the operative part of the Partial Award quoted in para. 64 hereinabove).

**b)     In Second Partial Award**

704.    In this BID-Phase, the validity and enforceability of the April Option Agreement was at the centre of the dispute between the Parties. In this regard, the Arbitral Tribunal has come to the conclusion that the April Option Agreement is not void because the Sham Defence is to be dismissed[740]

---

[739]    With regard to the later purported option notices see fn. 187 hereinabove.
[740]    See para. 296, 604 and 673 hereinabove.

and not voidable because the Duress Defence is to be dismissed[741], but found that the Dilution Defence and, respectively the ML-Defence, as far as it relates to the Augmentation Payment, are to be affirmed with the effect that the April Option Agreement is unenforceable[742]. Accordingly, the primary prayer of Respondent's Prayer No. 4 quoted in para. 58 hereinabove must be partly affirmed and the April Option Agreement be declared unenforceable because its purpose and performance are illegal[743].

705.  Moreover, the Arbitral Tribunal, exercising its discretionary powers, found with respect to the Dilution Defence and the ML-Defence that the claims brought under the April Option Agreement are against public policy and arising *ex turpi causa*. Therefore, the Arbitral Tribunal must affirm this part of Respondent's Prayer No. 5[744] by declaring that Claimant's claims brought under the April Option Agreement are against public policy and arise *ex turpi causa*, considering the other parts obsolete[745].

706.  As a consequence of the unenforceability of the April Option Agreement, Claimant's BID-Prayer relating to the valid exercise of the April Option quoted in para. 1008 BID-Answer must be dismissed[746]. As noted in para. 166 hereinabove, Respondent's corresponding Prayer No. 6 quoted in para. 58 PA, respectively in para. 58 hereinabove, is no longer before the Arbitral Tribunal and therefore need not be decided.

707.  Also as a consequence of the unenforceability of the April Option Agreement, Claimant's BID-Prayers relating to the specific performance of this agreement submitted in paras. 1009 to 1012 BID-Answer quoted in para. 163 hereinabove must be dismissed as well[747].

---

[741]  See paras. 291, 334 and 682 hereinabove, resulting in the partial dismissal in item 5(1) of the operative part of this Second Partial Award (the "**Operative Part**").
[742]  See paras. 295, 482, 483, 560 and 561 hereinabove.
[743]  See paras. 683 and item 5(1) of the Operative Part .
[744]  See the quote in para. 58 and para. 689 hereinabove.
[745]  See paras. 691/692 hereinabove and item 6 of the Operative Part.
[746]  See para. 279 hereinabove and item 2 of the Operative Part.
[747]  See paras. 663/664 hereinabove and item 3 of the Operative Part.

708.  Claimant's BID-Prayer submitted in para. 1013 BID-Answer relating to the Onward Sales is quoted in para. 163 hereinabove. As the Arbitral Tribunal concluded that the April Option Agreement is unenforceable, this prayer is obsolete for lack of legal interest because of the unenforceability of the April Option Agreement[748].

709.  Three of Respondent's further defences, i.e. the Complicity Defence, the Currency Law Defence and the Assisting and Procuring a Breach of Contract Defence, in Respondent's view, seem to be a basis to hold the April Option Agreement as void and/or unenforceable[749]. As these defences have been dismissed, the proposition of voidness is covered by the partial dismissal of the primary prayer of Respondent's Prayer No. 4 referred to in para. 704 hereinabove at fn. 741.

710.  The alternative prayer in Respondent's Prayer No. 4 quoted in para. 60 PA, respectively in para. 58 hereinabove, has been found to be *"meaningless"* and thus must be dismissed without prejudice[750].

711.  Respondent's Jurisdictional Objections quoted in para. 165 and summarized in paras. 174 to 177 hereinabove must - as stated in para. 177 hereinabove - be decided only in the event Claimant's BID-Prayers submitted in para. 1013 BID-Answer relating to the Onward Sales quoted in para. 163 hereinabove could be considered to be upheld. Since this requires - as stated in para. 305 hereinabove - that the *"April Option Agreement is a valid and enforceable contract"*, which requirement is, as a result of the finding in para. 704 hereinabove, not met, Respondent's Jurisdictional Objections have become obsolete. The Operative Part will take note of this fact in its item 1.

---

[748]   See para. 285 hereinabove and item 4 of the Operative Part.

[749]   For the Currency Law Defence, see paras. 566 and 578 hereinabove. With regard to to Complicity Defence, Respondent does not plead what the consequences should be in its view. As Respondent starts its argument with the proposition that the April Option Agreement is an *"uncommercial deal"* (see para. 338 hereinabove), it seems it suggests the same consequences as for the Currency Law Defence.

[750]   See paras. 686/687 hereinabove and item 5(2) of the Operative Part.

712. The Parties' prayers relating to the Costs of Arbitration in the prayers re-
ferred to in para. 696 must, for the reasons given in para. 695 hereinabove,
be deferred to a later stage of proceedings[751].

## B.    Final Comments

713. The Arbitral Tribunal has determined that the April Option Agreement is
unenforceable for two reasons: the Dilution Defence and the ML-Defence
relating to the Augmentation Payment. Therefore, Claimant's Prayers sub-
mitted in paras. 1008 to 1012 BID must be dismissed even in the event
only one of these two defences of Respondent's had been upheld.

714. Having come to the conclusion that Respondent's Dilution Defence is justi-
fied and that the April Option Agreement is therefore unenforceable, the
Arbitral Tribunal asked itself whether it was necessary to decide also on the
ML-Defence. The Arbitral Tribunal considered that the said two defences
are closely linked with each other insofar as the Proposed Witness No. 7
used the Augmentation Payment to finance the Paid OP-Portion with the
aim of financially benefitting from the April Option Agreement through the
dilution of Central Telegraph. Moreover, the topic of money laundering and
international arbitration, and the thereto-related duties of arbitrators, has
been widely discussed in legal commentaries in recent years[752] and there-
fore needs to be developed by arbitral practice. An arbitral tribunal would
not fulfill its duties if it were to avoid a decision on this delicate subject
merely on the ground that an agreement must already be declared as un-
enforceable for another reason.

715. The Arbitral Tribunal is of course aware that its finding that the April Option
Agreement is unenforceable and that the claims brought by Claimant under
it are against public policy and arise *ex turpi causa* is an uncomfortable
one[753] as Respondent's participation in the illegal dilution[754] of Central

---

[751]    See item 8 of the Operative Part.
[752]    See para. 198 hereinabove.
[753]    In this context, see para. 473 hereinabove.
[754]    For the ML-Defence relating to the Augmentation Payment, see para. 531 hereinabove.

346

Telegraph is not sanctioned in this Second Partial Award[755]. Moreover, Respondent and/or its past or present shareholders may have financially benefitted from the illegal dilution of Central Telegraph as a result of the Onward Sales. The correction of this possible economic imbalance of the outcome of this Second Partial Award is, however, a matter which is either not covered by the specific prayers of the Parties in this phase of the arbitration or is a matter which goes beyond the jurisdiction of the Arbitral Tribunal. Be that as it may, the Arbitral Tribunal's decisions represent the appropriate application of the relevant laws to the findings of fact within the scope of the Abitration Clause.

**C.    Matters yet to be Dealt With**

716.    The Parties' prayers for relief not to be decided in the BID-Phase are listed in para. 173 hereinabove. They relate to the following matters:

(i)    Claimant's BID-Prayer in para. 1015 BID-Answer (*"Such further relief or other relief as may be found to be just and proper"*);

(ii)    Claimant's BID-Prayers under items 1 to 3 of para. 1016 BID-Answer (Award of *"damages, interest, and/or equitable compensation in addition to or in lieu of specific performance"*, *"further costs, inclusive of attorney's fees, through date of the final damage Award"* and *"such further or other relief as may be just and proper"*);

(iii)    Respondent's Prayers Nos. 7 to 9 (award of damages or *"compensation in equity"* for Claimant's actions in *"procuring or inducing a breach of contract and trust"* and *"knowing assistance in breach of fiduciary duties"* as well as for *"various disputes, and legal proceedings"*, reservation of right to claim damages for the *"forced"* sale by TMI of its shares in CT-Mobile *"at an undervalue"* and payment of the *"illegal profit"* out of Claimant's *"procurement, or inducement of*

---

[755]    For possible sanctions in the next phase of this arbitration see para. 698 hereinabove.

*breach of contract and trust, and knowing assistance in breach of fiduciary duties"*).

717. All of the above-summarised prayers for relief quoted in paras. 58, 163 and 165 hereinabove and the prayers relating to the Costs of Arbitration which, as stated in para. 712 hereinabove, are deferred to a later stage of proceedings, will have to be dealt with in the next phase following the rendering of this Second Partial Award.

718. The Arbitral Tribunal will, for this purpose, after it has served this Second Partial Award, issue an order inviting the Parties to state, after having received this Second Partial Award, whether they wish to maintain all these prayers and, if not, to formally withdraw the prayers they do not wish to maintain and state whether such withdrawal should be with or without prejudice and to give reasons if a withdrawal without prejudice is sought.

719. A further matter to be addressed in the next phase of this arbitration is, as indicated in para. 211 hereinabove, the survival of the confidentiality regimes established during the Zurich *Ad-Hoc* Arbitration after the conclusion of this arbitration.



**and, after deliberations in meetings, by correspondence and telephone,
renders the following
AWARD**

1.  Respondent's Jurisdictional Objection in Respondent's BID-Prayer No. 1 (a) to (e) and referred to in paras. 174/175 et seq. hereinabove has become obsolete.

2.  Claimant's BID-Prayer submitted in para. 1008 BID-Answer quoted in para. 163 hereinabove is hereby dismissed with regard to the Second Purported Option Notice and with regard to the Third Purported Option Notice has become obsolete in view of the unenforceability of the April Option Agreement.

3.  Claimant's BID-Prayers submitted in paras. 1009 to 1012 quoted in para. 163 hereinabove are hereby dismissed.

4.  Claimant's BID-Prayer submitted in para. 1013 BID-Answer quoted in para. 163 hereinabove has become obsolete because of the unenforceability of the April Option Agreement.

5.  Respondent's Prayer No. 4 quoted in para. 58 hereinabove is hereby dismissed except for the part requesting the Arbitral Tribunal to declare the April Option Agreement unenforceable, which part is hereby affirmed. The Arbitral Tribunal thus declares the April Option Agreement an illegal transaction: its purpose and performance are illegal, and it is therefore unenforceable.

    The alternative prayer contained in Respondent's Prayer No. 4 is hereby dismissed without prejudice.

6.  Respondent's Prayer No. 5 quoted in para. 58 hereinabove has become obsolete except for the part requesting the Arbitral Tribunal to declare that claims brought under the April Option Agreement are against public policy

349



and arising *ex turpi causa,* which part covers Claimant's claims made in this arbitration relating to its attempted performance and enforcement of the April Option Agreement, is hereby affirmed. The Arbitral Tribunal thus declares that the claims brought by Claimant under the April Option Agreement are against public policy and arise *ex turpi causa.*

7.  The decision on the Costs of Arbitration as described in paras. 688 and 696 is hereby deferred to a later stage of proceedings.

8.  Notice of this Partial Award will be given to the Parties by registered mail against return receipt.

Zurich, May 16, 2006

The Arbitral ~~Arbitral~~ Tribunal

Dr. Daniel Wehrli
Chairman

Ian L. Meakin

Dr. Boris Kojevnikov