UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
IPOC INTERNATIONAL GROWTH FUND LIMITED,   )
)
Plaintiff,            )
v.                                       )          Civil No. 06-1109
)          (PLF)
DILIGENCE, LLC,                          )
)
and                   )
)
BARBOUR GRIFFITH & ROGERS, LLC,          )
)
Defendants.            )
_____)

## MOTION OF DEFENDANT BARBOUR GRIFFITH & ROGERS LLC FOR JUDGMENT ON THE PLEADINGS

For the reasons stated in the accompanying Memorandum, Defendant Barbour Griffith &

Rogers LLC respectfully moves the Court under FEDERAL RULE OF CIVIL PROCEDURE 12(c) to

dismiss the entire complaint of Plaintiff, IPOC International Growth Fund Ltd., because all of

Plaintiff's claims fail as a matter of law, and respectfully requests oral argument on this matter

pursuant to Local Rule 7(f).

August 17, 2006                  Respectfully submitted,

/s/ Charles J. Cooper
_____
Charles J. Cooper (D.C. Bar No. 248070)
David H. Thompson (D.C. Bar No. 450503)
Derek L. Shaffer (D.C. Bar No. 478775)
COOPER & KIRK, PLLC
Suite 750
555 Eleventh Street NW
Washington, DC 20004
202-220-9600
202-220-9601 (Fax)

*Attorneys for Barbour Griffith & Rogers LLC*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IPOC INTERNATIONAL GROWTH FUND LIMITED, )<br><br>    Plaintiff,    )<br>    v.    )<br>    )<br>DILIGENCE, LLC,    )<br>    )<br>    and    )<br>    )<br>BARBOUR GRIFFITH & ROGERS, LLC,    )<br>    )<br>    Defendants.    )<br> ) | Civil No. 06-1109<br>(PLF) |

**MEMORANDUM IN SUPPORT OF THE MOTION OF DEFENDANT BARBOUR
GRIFFITH & ROGERS LLC FOR JUDGMENT ON THE PLEADINGS**

Charles J. Cooper (D.C. Bar No. 248070)
David H. Thompson (D.C. Bar No. 450503)
Derek L. Shaffer (D.C. Bar No. 478775)
COOPER & KIRK, PLLC
Suite 750
555 Eleventh Street NW
Washington, DC 20004
202-220-9600
202-220-9601 (Fax)

August 17, 2006                    *Attorneys for Barbour Griffith & Rogers LLC*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ..................................................................................................... 1

ARGUMENT .............................................................................................................. 3

I.       Standard of Review .......................................................................................... 3

II.      All of IPOC's Claims Fail as a Matter of Law Because IPOC Has Not Adequately
         Pleaded Causation and Damages. ...................................................................... 4

III.     IPOC's Claim Under the Computer Fraud and Abuse Act Fails as a Matter of Law .......... 7

         A.      If IPOC's Claim Arises Under Section 1030(a)(2)(C), It Fails Because IPOC
                 H11as Not Alleged that Diligence's or BGR's Conduct "Involved an Interstate
                 or Foreign Communication." ...................................................................... 8

         B.      If IPOC's Claim Arises Under Section 1030(a)(5)(A)(iii), It Fails Because
                 IPOC Has Not Alleged Cognizable "Damage." ......................................... 9

         C.      IPOC's CFAA Claim Fails Because It Has Not Alleged Cognizable "Loss." ...... 11

         D.      IPOC Has Not Alleged Cognizable "Access" under the CFAA ........................... 16

IV.      Counts I, III-V, and VII Fail as a Matter of Law Because IPOC Has Not Adequately
         Alleged Underlying Wrongful Conduct ............................................................. 19

V.       Counts I and III-VII Fail as a Matter of Law Because They Are Preempted by the
         District of Columbia's Adoption of the Uniform Trade Secrets Act and IPOC Does
         Not Allege That Its Information Qualified as a Trade Secret. ............................. 19

VI.      Counts I and III–VII Fail as a Matter of Law for Additional Reasons Unique to Each
         Count. ............................................................................................................. 22

         A.      Count I: Tortious Interference with Business Expectancies. ............................ 23

         B.      Count IV: Tortious Interference with Contractual Relations ........................... 31

         C.      Count III: Procuring Information by Improper Means ..................................... 35

         D.      Count V: Common-Law Unfair Competition ................................................. 38

         E.      Count VI: Common-Law Conspiracy ........................................................... 42

         F.      Count VII: Unjust Enrichment .................................................................... 43

CONCLUSION ....................................................................................................... 45

i

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, 48 F. Supp. 2d 37
    (D.D.C. 1999) ...................................................................................................................45

*Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284 (D.C. 1977) .................4

*Allen v. Hall*, 974 P.2d 199 (Or. 1999) ......................................................................................23

*America Online v. IMS*, 24 F. Supp. 2d 548 (E.D. Va. 1998).......................................................17

*America Online, Inc. v. National Health Care Discount, Inc.*, 121 F. Supp. 2d 1255
    (N.D. Iowa 2000) .........................................................................................................17

*Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784 (W.D. Ky. 2001) ...........21

*Avco Corp. v. Precision Air Parts, Inc.*, No. 79-275-N, 1980 U.S. Dist. LEXIS 16413
    (M.D. Ala. Sept. 4, 1980) .............................................................................................36

*B & W Mgmt., Inc. v. Tasea Inv. Co.*, 451 A.2d 879 (D.C. 1982) ................................................39

*Belfiore v. B. J. Crivella, Inc.*, 60 A.2d 542 (D.C. 1948) .............................................................35

*Biocore, Inc. v. Khosrowshahi*, 96 F. Supp. 2d 1221 (D. Kan. 2000) ..........................................21

*Blinded Veterans Ass'n v. Blinded American Veterans Found.*, 872 F.2d 1035
    (D.C. Cir. 1989) ...........................................................................................................39

*Bloomgarden v. Coyer*, 479 F.2d 201 (D.C. Cir. 1973)................................................................44

*Bouchet v. National Urban League, Inc.*, 730 F.2d 799 (D.C. Cir. 1984)....................................35

*Boule v. Hutton*, 328 F.3d 84 (2d Cir. 2003) ..............................................................................39

*Branzburg v. Hayes*, 408 U.S. 665 (1972)..................................................................................25

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ......................................................3, 22, 35

*Business Equip. Ctr., Ltd. v. De Jur-Amsco Corp.*, 465 F. Supp. 775 (D.D.C. 1978).....................4

*Cacique, Inc. v. Robert Reiser & Co.*, 169 F.3d 619 (9th Cir. 1999) ...........................................39

*Carlyle Compressor Co. v. Occupational Safety & Health Review Comm'n*,
    683 F.2d 673 (2d Cir. 1982).........................................................................................12

*Carr v. Brown*, 395 A.2d 79 (D.C. 1978) ............................................................................ *passim*

*Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*, 834 A.2d 77
    (D.C. 2003) ..................................................................................................................23

*Chevron U.S.A., Inc. v. FERC*, 193 F. Supp. 2d 54 (D.D.C. 2002)...............................................36

*Civic Ctr. Motors, Ltd. v. Mason St. Imp. Cars*, 387 F. Supp. 2d 378 (S.D.N.Y. 2005) ...............15

*Connors, Fiscina, Swartz & Zimmerly v. Rees*, 599 A.2d 47 (D.C. 1991) ......................................4

*Continental Data Sys., Inc. v. Exxon Corp.*, Nos. 84-2538 & 84-5603, 1986 U.S. Dist. LEXIS 23490 (E.D. Pa. June 29, 1986) ...................................................................37

*Crocan Corp. v. Sheller-Globe Corp.*, 385 F. Supp. 251 (N.D. Ill. 1974) ......................37

*Democratic State Committee v. Bebchick*, 706 A.2d 569 (D.C. 1998) ...........................28, 29, 31

*District of Columbia v. Price*, 759 A.2d 181 (D.C. 2000) ...............................................5

*District of Columbia v. Zukerberg*, 880 A.2d 276 (D.C. 2005) .......................................5

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506 (9th Cir. 1985) ...................42

*Dornan v. Royal Motors, Inc.*, 271 A.2d 402 (D.C. 1970) ...............................................35

*Dove v. Washington Metro. Area Transit Auth.*, 402 F. Supp. 2d 91 (D.D.C. 2005) ...................43

*EDM & Assocs., Inc. v. Gem Cellular*, 597 A.2d 384 (D.C. 1991) ...................................32

*EEOC v. Astra USA, Inc.*, 94 F.3d 738 (1st Cir. 1996) ...................................................27

*EF Cultural Travel BV v. Explorica*, 274 F.3d 577 (1st Cir. 2001) .................................17

*Ellsworth Assocs. v. United States*, 917 F. Supp. 841 (D.D.C. 1996) .............................44

*Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724 (D.C. 2000) ...................43

*Fedway Assocs., Inc. v. United States Treasury, Bureau of Alcohol, Tobacco & Firearms*, 976 F.2d 1416 (D.C. Cir. 1992) .........................................................................41

*FMC Corporation v. Boesky*, 852 F.2d 981 (7th Cir. 1988) ...........................................36

*Fomby-Denson v. Department of the Army*, 247 F.3d 1366 (Fed. Cir. 2001) .......................26

*Four Seasons Hotels & Resorts B.V. v. Consorcio Barr, S.A.*, 267 F. Supp. 2d 1268 (S.D. Fla. 2003) .........................................................................................15

*Fox v. Country Mut. Ins. Co.*, 7 P.3d 677 (Or. Ct. App. 2000) ......................................29, 31

*Furash & Co. v. McClave*, 130 F. Supp. 2d 48 (D.D.C. 2001) .......................................4, 38, 40

*General Elec. Co. v. Lyon*, 894 F. Supp. 544 (D. Mass. 1995) .......................................41, 42

*Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407 (D.D.C. 1988) .............................39

*Gordon v. Noel*, 356 N.W.2d 559 (Iowa 1984) .............................................................31

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ...................................................4, 42

*Harvard Apparatus v. Cohen*, 130 F. Supp. 2d 161 (D. Mass. 2001) .............................37

*Hauck Mfg. v. Astec Indus.*, 375 F. Supp. 2d 649 (E.D. Tenn. 2004) ...........................21

*Haynesworth v. Miller*, 820 F.2d 1245 (D.C. Cir. 1987) ...............................................3

*Hopkins v. Akins*, 637 A.2d 424 (D.C. 1993) ..............................................................32

*In re Doubleclick Privacy Litigation*, 154 F. Supp. 2d 497 (S.D.N.Y. 2001) .........................9, 10

*International Airport Ctrs., L.L.C. v. Citrin*, 440 F.3d 418 (7th Cir. 2006) .................................17

*JSG Trading Corp. v. Department of Agric.*, 235 F.3d 608 (D.C. Cir. 2001) .............................41

*King v. Industrial Bank of Washington*, 474 A.2d 151 (D.C. 1984)................................................35

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) ....................................................3

*Lachman v. Sperry-Sun Well Surveying Co.*, 457 F.2d 850 (10th Cir. 1972)..............................26

*Littlepage v. Neale Publ'g Co.*, 34 App. D.C. 257 (D.C. Cir. 1910)................................................32

*Matossian v. Fahmie*, 161 Cal. Rptr. 532 (Cal. Ct. App. 1980) ................................................29

*National Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004) ....................................6, 30

*Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468 (S.D.N.Y. 2004) ........................13. 14

*Nexans Wires S.A. v. Sark-USA, Inc.*, 166 Fed. Appx. 559 (2d Cir. 2006) ..................................14

*Norris v. Green*, 656 A.2d 282 (D.C. 1995) ................................................................32

*O'Brien v. Westinghouse Electric Corp.*, 293 F.2d 1 (3d Cir. 1961)................................................39

*Oguaju v. United States*, 378 F.3d 1115 (D.C. Cir. 2004)......................................................6, 30

*Papasan v. Allain*, 478 U.S. 265 (1986) ...................................................................3

*Paul v. Howard Univ.*, 754 A.2d 297 (D.C. 2000) ..............................................................23, 42

*Primedical, Inc. v. Allied Inv. Corp.*, No. 90-1802 (NHJ), 1994 U.S. Dist. LEXIS 4517
    (D.D.C. Mar. 30, 1994)................................................................................23

*Resdev, LLC v. Lot Builders Ass'n*, No. 6:04-CV-1374-Orl-31DAB, 2005 U.S. Dist. LEXIS
    19099 (M.D. Fla. Aug. 10, 2005) .....................................................................9, 10, 15, 18

*Ridge Runner Forestry v. Veneman*, 287 F.3d 1058 (Fed. Cir. 2002) ..........................................35

*Role Models Am., Inc. v. Jones*, 305 F. Supp. 2d 564 (D. Md. 2004)...........................................18

*Rommel v. West American Ins. Co.*, 158 A.2d 683 (D.C. 1960)................................................32

*Ruder & Finn, Inc. v. Seaboard Sur. Co.*, 422 N.E.2d 518 (N.Y. 1981)................................38, 39

*SEC v. Banner Fund Int'l*, 211 F.3d 602 (D.C. Cir. 2000) ......................................................5

*Services Employees Int'l Union Health & Welfare Fund v. Philip Morris, Inc.*, 83 F. Supp.
    2d 70 (D.D.C. 1999) .................................................................................44

*Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121
    (W.D. Wash. 2000) ..................................................................................10

*Smith v. United States*, 445 A.2d 961 (D.C. 1982) ........................................................................17

*Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.*, 565 A.2d 285 (D.C. 1989) ..........32

*Sturdza v. Government of the United Arab Emirates*, 281 F.3d 1287 (D.C. Cir. 2002) ...............32

*TDS Healthcare Sys. Corp. v. Humana Hosp. Ill.*, 880 F. Supp. 1572 (N.D. Ga. 1995) .........37, 38

*Theofel v. Farey-Jones*, 359 F.3d 1066 (9th Cir. 2004) .................................................................11

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, No. 02-4373, 2005 U.S. Dist.
LEXIS 11052 (E.D. Pa. Mar. 29, 2005)..........................................................................37

*Trinity Servs. Inc. v. Marshall*, 593 F.2d 1250 (D.C. Cir. 1978)....................................................12

*Trudeau v. FTC*, No. 05-5363, 2006 U.S. App. LEXIS 18940 (D.C. Cir. July 28, 2006) ........3, 35

*Tull v. United States*, 481 U.S. 412 (1987) .....................................................................................44

*Tyco Int'l (US) Inc. v. Does*, No. 01-CV-3856, 2003 U.S. Dist. LEXIS 11800 (S.D.N.Y.
July 10, 2003)..................................................................................................................15

*United States v. Di Girolamo*, 808 F. Supp. 1445 (N.D. Cal. 1992) ..............................................41

*United States v. Farrell*, 606 F.2d 1341 (D.C. Cir. 1979) .............................................................27

*United States v. Menasche*, 348 U.S. 528 (1955) ..........................................................................13

*United States v. Middleton*, 231 F.3d 1207 (9th Cir. 2000)...........................................................17

*United States v. Millot*, 433 F.3d 1057 (8th Cir. 2006) .................................................................17

*United States v. Morris*, 928 F.2d 504 (2d Cir. 1991) ...................................................................17

*Van Housen v. Monico*, 378 A.2d 609 (Conn. Super. Ct. 1976).....................................................26

*Washington Metro. Area Transit Auth. v. Quik Serve Foods, Inc.*, Nos. 04-838 (RCL)
& 04-687 (RCL), 2006 U.S. Dist. LEXIS 24510 (D.D.C. Apr. 28, 2006) .............................23

*Willig v. Gold*, 171 P.2d 754 (Cal. Ct. App. 1946)........................................................................27

## **Other**

141 Cong. Rec. S9422 (1995).................................................................................................16, 17

18 U.S.C. § 1030.................................................................................................................. *passim*

Companies Act § 132 (rev. 1989) (Bm.), *available at* <u>http://www.bermudalaws.bm</u> .......... *passim*

Economic Espionage Act, Pub. L. No. 104-294, § 201(4)(D), 110 Stat. 3488 (1996).................10

Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept
and Obstruct Terrorism Act, Pub. L. No. 107-56, § 814(d)(3), (5), 115 Stat. 272, 1384
(2001)................................................................................................................................10

D.C. CODE § 36-401 ..................................................................................20, 21

D.C. CODE § 36-407 ......................................................................................19

MASS. GEN. LAWS ch. 93, §§ 42, 42A, ch. 266 § 30(4) (effective 1967) ......................37

765 Ill. Comp. Stat. § 1065 (enacted 1987) ..................................................37

United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, art. V (New York, June 10, 1958) (codified as implemented at 9 U.S.C. § 201 *et seq.*), *available at* http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/NYConvention.html ...............30

Switzerland's Federal Code on Private International Law, art. 190 (Dec. 18, 1987) (as amended July 1, 2004) (Switz.)..................................................................30

Marcellino & Kenfield, *Legislative Developments in High-Tech*, BOSTON BAR J. 19 37 (Mar./Apr. 1984)................................................................................37

PROSSER AND KEETON ON THE LAW OF TORTS § 130 (5th ed. 1984) .............................41

Laurence H. Reece, III, *A Review and Analysis of Massachusetts Law*, 71 MASS. L. REV. 171 (1986)...........................................................................................37

RESTATEMENT (FIRST) OF CONTRACTS § 548(1) (1932) ..........................................26

RESTATEMENT (FIRST) OF TORTS § 759 ...........................................................4

RESTATEMENT (SECOND) OF TORTS div. 9, Introd. Note..........................................36

## <u>INTRODUCTION</u>

IPOC's describes its case against defendants in a single sentence:  Diligence and BGR "used improper means . . . to misappropriate confidential information provided by IPOC to KPMG FAS (which was retained by the Bermuda Government to conduct an investigation) . . . and then provided the purloined information to IPOC's litigation adversaries, who then attempted to improperly influence the Bermuda investigation and to corrupt an international arbitration."  P. IPOC's Opp'n to D. Barbour Griffith & Rogers LLC's Mot. to Dismiss ("IPOC Rule 9(b) Br.") at 1.  Although the Bermuda investigation and the Zurich arbitration are at the heart of IPOC's case, IPOC's filings are strangely silent on the details of those proceedings.

IPOC's reticence to discuss the nature of the Bermuda investigation and the Zurich arbitral tribunal's ruling is understandable, once the details of those proceedings are known. After an extensive review of evidence, the Zurich tribunal ruled that IPOC could not enforce an agreement according to which IPOC had an option to purchase shares of a Russian telecom company from LVFG.  The tribunal found that IPOC was a key tool by which a high-ranking Russian official sought to carry out several criminal schemes, including misappropriation of state assets and money laundering.  According to the tribunal, enforcing the agreement would violate public policy by enabling the Russian official to fulfill his criminal objectives.  Second Partial Award in the Ad-Hoc Arbitration in the Matter of IPOC Int'l Growth Fund Ltd. v. LV Finance Group Ltd. (May 16, 2006) ¶¶ 5, 282, 390-91, 405, 429, 471, 483-84, 501-20, 530, 545, 557, 561.[1]  IPOC does not contest here the validity of the tribunal's ruling or deny the truth of the materials that Diligence and BGR allegedly obtained from KPMG and gave to IPOC's "litigation

---

[1] A copy of the Zurich arbitral tribunal's ruling is attached as Exhibit 1 to BGR's Motion to Dismiss for Lack of Subject Matter Jurisdiction.  This Court can take judicial notice of the ruling issued by the Zurich arbitral tribunal.  *See, e.g.*, *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1326 n.3 (8th Cir. 1994).

adversaries," who in turn allegedly submitted the materials to the tribunal.

At the heart of IPOC's case, then, is the proposition that Diligence and BGR should be held accountable to IPOC for disclosing truthful evidence of IPOC's involvement in criminal wrongdoing to an adjudicatory tribunal whose very purpose was to find the truth. The law simply does not protect the desire to conceal evidence of criminal activities, whether the claim is cast as one for tortious interference with business expectancies, procuring information by improper means, tortious interference with contractual relations, or unfair competition. Therefore, IPOC's claims fail as a matter of law.

IPOC's claims suffer many other fatal defects, too. All of IPOC's claims fail because IPOC has not alleged facts to show that it has sustained an injury that was proximately caused by Diligence's or BGR's allegedly wrongful conduct. IPOC's claim under the Computer Fraud and Abuse Act fails because IPOC has not alleged cognizable "damage," "loss," or "access," or that the alleged access involved an interstate or foreign communication. IPOC's common-law claims fail for myriad reasons: they are preempted by the District of Columbia's adoption of the Uniform Trade Secrets Act; they are unsupported by adequate allegations of requisite underlying wrongful conduct, IPOC's vague and conclusory allegations of fraud and bribery notwithstanding; and each common-law claim suffers additional, unique defects, as discussed further below.

For all of these reasons, each of IPOC's counts fails as a matter of law, and therefore IPOC's case should be dismissed in its entirety.

**ARGUMENT**

**I.    Standard of Review.**

The standard governing a motion for judgment on the pleadings "is virtually identical" to the standard for a Rule 12(b)(6) motion. *Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1987). "The complaint should not be dismissed unless plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. To that end, the complaint is construed liberally in the plaintiffs' favor, and [the Court] grant[s] plaintiffs the benefit of all inferences that can be derived from the facts alleged. However, the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citations omitted).[2] "In determining whether a complaint fails to state a claim, [the court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *Trudeau v. FTC*, No. 05-5363, 2006 U.S. App. LEXIS 18940, at *11 (D.C. Cir. July 28, 2006) (quotation marks omitted).

Accordingly, for purposes of this motion, BGR assumes the truth of all of IPOC's factual allegations and relies on no factual materials outside the complaint, except those of which the Court may take judicial notice.

---

[2] *See also Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation."); *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) ("[W]e accept neither inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint, nor legal conclusions cast in the form of factual allegations.") (quotation marks omitted).

3

**II.     All of IPOC's Claims Fail as a Matter of Law Because IPOC Has Not Adequately Pleaded Causation and Damages.**

Although IPOC uses the words "cause" and "damage" in its complaint, *see* Compl. ¶¶ 28, 33, 39, 44, 49, 53, Prayer for Relief C, it does not allege that it actually suffered an injury or adduce facts to show how defendants' alleged wrongful conduct caused a injury.  All of IPOC's claims, therefore, fail as a matter of law.

Each cause of action alleged in IPOC's complaint requires proof that the plaintiff sustained an injury that was proximately caused by the defendant's wrongful conduct:

- *Count I: Tortious Interference with Business Expectancies* – It is not enough to show that the defendant interfered with the plaintiff's business expectancy.  The plaintiff must also show "that there was resulting damage."  *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 289 (D.C. 1977); *see also* IPOC's Opp'n to Diligence Inc.'s Mot. to Dismiss ("IPOC Rule 12(b)(6) Br.") at 24.

- *Count II: Violation of the Computer Fraud and Abuse Act* – Section 1030 of the Computer Fraud and Abuse Act permits a private plaintiff to bring a civil suit only if the plaintiff "suffers damage or loss by reason of a violation of this section."  18 U.S.C. § 1030(g); *see also* § 1030(a)(5)(B); IPOC Rule 12(b)(6) Br. at 5.

- *Count III: Procuring Information by Improper Means* – In jurisdictions that recognize this cause of action, a defendant is liable only for the "harm caused by his possession, disclosure or use of the information."  RESTATEMENT (FIRST) OF TORTS § 759; *see also* IPOC Rule 12(b)(6) Br. at 27.

- *Count IV: Tortious Interference with Contractual Relations* – As with tortious interference with a business expectancy, it is not enough here to show that the defendant induced a breach of the contract.  The plaintiff must also show that "damages result[ed] from the breach."  *Connors, Fiscina, Swartz & Zimmerly v. Rees*, 599 A.2d 47, 51 n.6 (D.C. 1991) (quotation marks omitted); *see also* IPOC Rule 12(b)(6) Br. at 30.

- *Count V: Common-Law Unfair Competition* – "Unfair competition is . . . defined . . . by the description of various acts that would constitute the tort if they resulted in damage." *Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 57 (D.D.C. 2001); *see also Business Equip. Ctr., Ltd. v. De Jur-Amsco Corp.*, 465 F. Supp. 775, 788 (D.D.C. 1978) ("damages are a necessary element"); IPOC Rule 12(b)(6) Br. at 33-34.

- *Count VI: Common-Law Conspiracy* – The plaintiff must prove "an injury caused by an unlawful overt act performed by one of the parties to the agreement . . . pursuant to and in furtherance of the common scheme."  *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *see also* IPOC Rule 12(b)(6) Br. at 34.

- *Count VII: Unjust Enrichment* – In an action for unjust enrichment, a court "may exercise its equitable power only over property causally related to the wrongdoing." *SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) (quotation marks omitted).

In its complaint, IPOC hints at several possible harms but never states that it suffered any of them. First, IPOC alleges that "a portion of the unlawfully obtained materials appeared almost verbatim in submissions made by LVFG to [the] Zurich arbitral tribunal," Compl. ¶ 21, and that such use of the materials interfered with its purported expectancy in the integrity of the Zurich arbitration process, Compl. ¶¶ 25, 27. IPOC's complaint does not discuss the outcome of the arbitration proceeding—an unsurprising omission since the tribunal found that IPOC was merely a tool through which a high-ranking Russian official was carrying out a complex criminal scheme—, let alone allege, as required to prove causation, any facts to show that *but for* LVFG's use of the materials, the tribunal would have ruled in IPOC's favor. *See District of Columbia v. Zukerberg*, 880 A.2d 276, 281 (D.C. 2005) (The "cause" is "that cause which, in natural and continual sequence, unbroken by any efficient intervening cause, produces the injury and *without which the result would not have occurred*.") (emphasis added) (quotation marks omitted); *District of Columbia v. Price*, 759 A.2d 181, 184 (D.C. 2000) ("If the harm suffered by a plaintiff would have occurred even in the absence of the defendant's negligence, then the defendant's conduct was not a cause-in-fact of that harm.").

Second, IPOC alleges that Diligence and BGR "attacked" its corporate charter by "attempt[ing] to influence the outcome of the [Bermuda] Investigation" through conduct that undermined the "evenhanded[ness] and impartial[ity]" of the Bermudan government's investigator, KPMG. Compl. ¶¶ 1, 18, 19, 23, 27. But IPOC conspicuously fails to allege that it has lost its charter; rather, the natural inference from its complaint is that the investigation remains ongoing. Furthermore, it is impossible to conclude from IPOC's allegations that *but for* Diligence's and BGR's alleged misconduct, the Bermuda investigation would reach an outcome

favorable to IPOC; any inference that KPMG's analysis and findings were affected by the alleged fraudulent request for materials is a *non sequitur*.[3]

Third, IPOC alleges that "Diligence and/or IPOC's litigation adversaries LVFG and Alfa leaked portions of the misappropriated Draft [KPMG] Report to the press, which published, as recently as January 31, 2005, articles revealing the contents of the unlawfully obtained materials." Compl. ¶ 21. IPOC does not, however, allege that it has suffered any economic injury as a result of this disclosure or even that its reputation has been damaged. Notably, IPOC has not brought a defamation claim against Diligence or BGR. Indeed, IPOC does not deny that the information allegedly leaked to the press was true. IPOC alleges that the information that was misappropriated and then leaked came from two sources: materials that IPOC had produced to KPMG and KPMG's draft report. Compl. ¶¶ 18-21, 25, 27, 41, 46-47. But surely, IPOC's own materials were accurate; IPOC does not allege otherwise. (If IPOC's own materials were false, of course, then IPOC itself would be the cause of any injury to its reputation.) And unless IPOC clearly alleges and proves that KPMG, as the Bermudan government's investigator, falsified its draft report, the Court must presume that KPMG acted properly and that its draft report was accurate. *National Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004) (government actors are presumed to discharge their duties properly absent clear evidence to the contrary); *Oguaju v. United States*, 378 F.3d 1115, 1117 (D.C. Cir. 2004) (same). IPOC has made no such allegation. Therefore, if the allegedly leaked information reflected badly on IPOC, it could only have been due to IPOC's own conduct.

In sum, IPOC has not alleged facts sufficient to show that it has suffered an injury and that it would not have suffered that injury but for Diligence's and BGR's alleged wrongful

---

[3] Note that IPOC specifically alleges that its "litigation adversaries," not Diligence and BGR, "instigated" the investigation. Compl. ¶ 1.

conduct.  All of IPOC's claims, therefore, fail as a matter of law.

### III.    IPOC's Claim Under the Computer Fraud and Abuse Act Fails as a Matter of Law.

The federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, prohibits "access[ing]" a computer under a variety of circumstances.  In Count II, IPOC claims that "Diligence and/or BGR" violated the CFAA by accessing a KPMG computer.  Compl. ¶¶ 29-34. IPOC did not identify in its complaint the particular subsection of Section 1030 on which it was basing its claim.  Initially, it appeared that IPOC was invoking Section 1030(a)(4) because IPOC alleges that Diligence or BGR acted "knowingly and with intent to defraud."  Compl. ¶ 32; *see also* Compl. ¶ 31.[4]  But, presumably in an attempt to avoid dismissal of its CFAA claim under Rule 9(b), *see* Mem. in Supp. of the Mot. of D. Barbour Griffith & Rogers LLC to Dismiss for Failure to Plead Fraud with Particularity ("BGR Rule 9(b) Br.") at 7, IPOC expressly disclaimed in its Rule 9(b) brief any reliance on Section 1030(a)(4), IPOC Rule 9(b) Br. at 8 ("the section of the CFAA under which IPOC's claim is brought does not require a showing of intent to defraud").  Yet, it is still not clear which subsection IPOC is invoking.  In its Rule 9(b) brief, IPOC says its "claim alleges a violation of CFAA § 1030(a)(5)(A)," and cites specifically to Section 1030(a)(5)(A)(iii).[5]  IPOC Rule 9(b) Br. at 8.  In its Rule 12(b)(6) brief, IPOC says that its CFAA claim arises under an entirely different provision, Section 1030(a)(2)(C).[6]  IPOC Rule 12(b)(6) Br. at 4-5, 11-12.  But later in that same brief, IPOC says that its CFAA "proceeds

---

[4] Section 1030(a)(4) prohibits "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value."  18 U.S.C. § 1030(a)(4).

[5] Section 1030(a)(5)(A)(iii) prohibits "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, caus[ing] damage."  18 U.S.C. § 1030(a)(5)(A)(iii).

[6] Section 1030(a)(2)(C) prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] information from any protected computer if the conduct involved an interstate or foreign communication."  18 U.S.C. § 1030(a)(2)(C).

under § 1030(a)(5)(A)," and again cites specifically to Section 1030(a)(5)(A)(iii).  IPOC Rule

12(b)(6) Br. at 12.

    If it arises under Section 1030(a)(2)(C), IPOC's claim fails as a matter of law because

IPOC has not alleged that Diligence's or BGR's alleged access "involved an interstate or foreign

communication."  If it arises under Section 1030(a)(5)(A)(iii), it fails as a matter of law because

IPOC has not alleged facts sufficient to establish cognizable "damage."  And under both

provisions, it fails as a matter of law because IPOC has not alleged facts sufficient to establish

cognizable "loss" or "access," which are required elements of IPOC's claims.[7]

    **A.**    **If IPOC's Claim Arises Under Section 1030(a)(2)(C), It Fails Because IPOC Has Not Alleged that Diligence's or BGR's Conduct "Involved an Interstate or Foreign Communication."**

    Section 1030(a)(2)(C) prohibits "intentionally access[ing] a computer without

authorization or exceed[ing] authorized access, and thereby obtain[ing] information from any

protected computer *if the conduct involved an interstate or foreign communication*."  18 U.S.C.

§ 1030(a)(2)(C) (emphasis added).  IPOC has not alleged that the communication through which

Diligence or BGR allegedly accessed KPMG's computer was an interstate or foreign

communication.  *See* Compl. ¶¶ 29-34.[8]  Therefore, IPOC's CFAA claim, if arising under

-------

[7] In addition, it should be noted that regardless of which subsection it arises under, IPOC's claim fails as a matter of law because IPOC has not alleged that its alleged loss was suffered *during a 1-year period*, as required by § 1030(a)(5)(B)(i).

[8] IPOC does allege that the allegedly accessed computer is "used in interstate or foreign commerce or communication."  Compl. ¶ 30; *see also* Compl. ¶ 32 (KPMG computer is "used in foreign commerce and communication in such a manner that affects foreign commerce").  This allegation pertains to the separate statutory requirement that the accessed computer be "protected."  § 1030(a)(2)(C).  The term "protected computer" means, *inter alia*, a computer that "is used in interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States."  § 1030(e)(2)(B).  It is possible to access such a "protected computer" without engaging in interstate or foreign communication by, for example, sitting at the protected computer terminal.

Section 1030(a)(2)(C), fails as a matter of law.

**B.      If IPOC's Claim Arises Under Section 1030(a)(5)(A)(iii), It Fails Because IPOC Has Not Alleged Cognizable "Damage."**

Section 1030(a)(5)(A)(iii) prohibits "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, caus[ing] damage."  18 U.S.C. § 1030(a)(5)(A)(iii).  If the CFAA claim arises under Section 1030(a)(5)(A)(iii), it fails as a matter of law because IPOC has not alleged cognizable "damage."

The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system or information."  § 1030(e)(8).  This definition is unambiguous, and courts have accordingly held repeatedly that "damage" encompasses only physical harm to the accessed computer or its content.  In *Resdev, LLC v. Lot Builders Ass'n*, the plaintiff alleged that the defendants stole a database containing trade secrets, from which the defendants then allegedly profited.  No. 6:04-cv-1374-Orl-31DAB, 2005 U.S. Dist. LEXIS 19099, at *1-2 (M.D. Fla. Aug. 10, 2005).  The plaintiff sought to recover damages for the value of the stolen trade secrets.  The court made clear that the plaintiff's alleged harm could not constitute "damage."   The court explained that because " '[i]ntegrity' . . . ordinarily means 'wholeness' or 'soundness,' " that term as used in the context of "damage" under the CFAA "contemplates . . . some diminution in the completeness or useability of data or information on a computer system."  *Id*. at *13 n.3 (quotation marks omitted).

In *In re Doubleclick Privacy Litigation*, 154 F. Supp. 2d 497, 524 (S.D.N.Y. 2001), the plaintiffs alleged that the defendant violated the CFAA by placing a "cookie" on their computers, which it used to deliver advertising to the plaintiffs and to collect demographic information about the plaintiffs.  The plaintiffs argued that they suffered "damage" in two ways.  First, the plaintiffs alleged that they incurred a "cost in remedying their computers and data in the wake of

[defendant's] access." *Id.* at 524.  The court found that this harm—"securing or remedying their systems in the wake of" the access—did not constitute "damage." *Id.*  The court explained that "damage" is "direct damage caused by a computer hacker." *Id.* at 521.   Second, the plaintiffs alleged that by collecting the plaintiffs' demographic data and by forcing the plaintiffs to view the ads that the defendant selected, the defendant had deprived the plaintiffs of the "economic value" they could have reaped by selling their demographic data and by selling to other advertisers the opportunity to present advertisements to them on their computer. *Id.* at 524-25.  The court found it "dubious" that the loss of these economic opportunities constituted "damage." *Id.*  In the court's view, lost business opportunity, like lost "reputation or goodwill," was "far removed from the damage Congress sought to punish and remedy in the CFAA—namely, damage to computer systems and electronic information by hackers." *Id.* at 525 n.34;[9] *see also, e.g., id.* at 522 ("The 'time, money, [] talent, and [efforts]' for which [plaintiff in *Letscher v. Swiss Bank Corp.*, No. 94-8277 (LBS), 1996 U.S. Dist. LEXIS 4908, at *7 (S.D.N.Y. Apr. 16, 1996),] sought compensation were clearly . . . not compensation for 'damage' to the integrity of his data or computer.") (first and second alterations supplied).[10]

---

[9] At the time of the court's decision, "damage" had a substantially similar definition to its current one.  *See id.* at 524; Economic Espionage Act, Pub. L. No. 104-294, § 201(4)(D), 110 Stat. 3488, 3493 (1996) ("damage" "means any impairment to the integrity or availability of data, a program, a system, or information, that[, *inter alia*,] causes loss aggregating at least $ 5,000 in value during any 1-year period to one or more individuals").  The current definition of "damage" was created by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act, Pub. L. No. 107-56, § 814(d)(3), (5), 115 Stat. 272, 1384 (2001).

[10] The sole decision that appears to have adopted a broader understanding of "damage" is *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121 (W.D. Wash. 2000), *cited in* IPOC Rule 12(b)(6) Br. at 9, in which the court held that the value of the trade secret that the defendant took while accessing the computer in violation of the CFAA constituted "damage."  There is no statutory or precedential basis for the court's holding.  Indeed, the court in *Resdev* not only rejected the *Shurgard* view, but also called it "an unusual

As discussed above, IPOC has not properly alleged any injury caused by Diligence's or BGR's alleged misconduct. But beyond that general failure, IPOC's conclusory use of the word "damage" is inadequate without allegations of facts sufficient to permit the reasonable inference that it suffered cognizable "damage" under the CFAA. IPOC has not alleged such facts. IPOC's only intimations of injury stemming from the alleged CFAA violation pertain exclusively to the *use* of the information allegedly obtained from KPMG's computer, namely, that the information was used in the Zurich arbitration, Compl. ¶¶ 19, 21, 28, 31, and that the information was leaked to the press, Compl. ¶ 21.[11] Neither of these allegations involves the impairment of the integrity or availability of the allegedly accessed computer, and therefore IPOC has failed to allege "damage" under the CFAA.[12] Nor does IPOC's allegation that the alleged confidentiality of the information was breached implicate the integrity of the data, and indeed IPOC does not allege that the completeness or useability of the data was affected. Consequently, if IPOC's CFAA claim arises under Section 1030(a)(5)(A)(iii), it fails as a matter of law.

### C.    IPOC's CFAA Claim Fails Because It Has Not Alleged Cognizable "Loss."

Regardless of which subsection its CFAA claim arises under, IPOC must satisfy one of the five factors set forth in Section 1030(a)(5)(B). § 1030(g). Of these five factors, IPOC purports to satisfy only one: that Diligence's or BGR's conduct caused "loss to 1 or more

---

and extraordinary interpretation of the word 'integrity.' " *Resdev*, 2005 U.S. Dist. LEXIS 19099, at *13 n.3.

[11] IPOC's suggestion that Diligence's or BGR's fraudulent conduct affected the Bermuda investigation, Compl. ¶¶ 19, 28, patently has no connection to any KPMG computer at all, but rather must pertain to the alleged interaction between Diligence or BGR and KPMG's "agents or servants."

[12] This failure is hardly surprising because KPMG, not IPOC, "possessed and utilized" the allegedly accessed computer. Compl. ¶ 30. This is not to say, however, that ownership of the allegedly accessed computer is necessary to bring a successful CFAA claim. *See Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 (9th Cir. 2004), *cited in* IPOC Rule 12(b)(6) Br. at 7.

persons during any 1-year period . . . aggregating at least $ 5,000 in value."  § 1030(a)(5)(B)(i).

Specifically, IPOC alleges that Diligence's or BGR's "access . . . caused damage and loss to

IPOC in excess of $5,000."  Compl. ¶ 33; *see also* IPOC Rule 12(b)(6) Br. at 6 ("The statutory

subsection relevant to IPOC's Complaint is subsection (a)(5)(B)(i) . . . .").  Judicial decisions

confirm what the text makes plain: "loss" is properly understood as a companion to "damage,"

reaching only harm that results from the "damage."  IPOC has not alleged cognizable "loss," and

therefore its CFAA claim fails as a matter of law.

The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of

responding to an offense, conducting a damage assessment, and restoring the data, program,

system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or

other consequential damages incurred because of interruption of service."  § 1030(e)(11).

Despite the potential breadth of the introductory phrase "any reasonable cost," traditional

principles of statutory construction and pertinent judicial decisions establish that "loss" is

properly understood to encompass only harm that relates to the performance or integrity of the

accessed computer or its content—that is, to encompass only harm that relates to "damage"—not

harm that relates to the value of the information taken or the use to which it was or could be put.

"It is a well-settled principle of statutory construction that where specific words precede

or follow general words in an enumeration describing a particular subject, the general words are

construed to embrace only objects similar in nature to those objects enumerated by the specific

words."  *Trinity Servs. Inc. v. Marshall*, 593 F.2d 1250, 1258 (D.C. Cir. 1978).[13]  All of the

---

[13] *See, e.g.*, *Carlyle Compressor Co. v. Occupational Safety & Health Review Comm'n*, 683 F.2d
673, 675 (2d Cir. 1982) (Where an OHSA regulation required certain machines to have
protections against "hazards such as those created by point of operation, ingoing nip points,
rotating parts, flying chips and sparks," the court rejected the view that "the phrase 'such as'
covers anything flying out of machines.  We hold that the language cannot be stretched to that

specific harms enumerated in the definition of "loss" relate to the performance or integrity of the accessed computer: assessing the damage to that computer, restoring that computer to its prior state, and losing revenue or incurring costs from the interruption of that computer's service. Consequently, the phrase "any reasonable cost"—and the term "loss"—should be construed to reach only harm that relates to the performance or integrity of the accessed computer.

In addition, as noted above, it is a "cardinal principle of statutory construction . . . to give effect, if possible, to every clause and word of a statute." *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (quotation marks omitted) (citation omitted). If "loss" encompassed harms unrelated to the performance or integrity of the accessed computer, the phrase "other consequential damages incurred because of interruption of service" would be superfluous, for "loss" would include all consequential damages, even if not because of interruption of service. On the other hand, construing "loss" to reach only harm related to the performance or integrity of the accessed computer does not render superfluous the phrase "any reasonable cost" or any of the specifically enumerated harms. The list of specific harms is properly understood to identify examples of the kind of harms that come within the scope of "any reasonable cost"; other costs besides those listed could qualify as "loss" provided they related to the performance or integrity of the accessed computer. Moreover, this construction of "loss" dovetails with the definition of "damage": whereas "damage" encompasses the harm to the computer itself, "loss" encompasses harm stemming from that "damage."

Applying these traditional principles of statutory construction, courts have uniformly construed "loss" to reach only harm that relates to the performance or integrity of the accessed computer. For example, in *Nexans Wires S.A. v. Sark-USA, Inc.*, the plaintiffs alleged that the

---

extent. Where specific words follow a general word, the specific words restrict application of the general term to things that are similar to those enumerated.") (quotation marks omitted).

defendants, who were the plaintiffs' competitors, obtained "confidential proprietary information" that the plaintiffs were storing on the computers of third parties. 319 F. Supp. 2d 468, 469-70 (S.D.N.Y. 2004). The plaintiffs claimed to have suffered "loss" in two ways: travel costs incurred by their executives to meet with the third parties storing their information, and lost revenue resulting from the defendants' use of the information.[14]

"After a thorough and detailed analysis," *Nexans Wires S.A. v. Sark-USA, Inc.*, 166 Fed. Appx. 559, 563 (2d Cir. 2006), the court concluded that " 'loss' means any remedial costs of investigating the computer for damage, remedying the damage and any costs incurred because the computer cannot function while or until repairs are made. However, there is nothing to suggest that the 'loss' or costs alleged can be unrelated to the computer." 319 F. Supp. 2d at 474. The court accordingly held that the plaintiffs' travel costs were not cognizable loss: "It is clear that these meetings were held to discuss the problem of the information . . . getting into the hands of competitors. However, nothing suggests that the trips were taken to engage in any type of computer investigation or repair." *Id*. at 476. Similarly, the court held that the lost revenue was not cognizable loss: "the loss of business due to defendants' eventual *use of the information*, rather than a loss of business because of computer impairment, was too far removed from computer damage to count" as "loss." *Id*. at 477 (emphasis added).[15]

---

[14] Although the court in *Nexans* addressed the meaning of "loss" in the context of a summary judgment motion, *see* IPOC Rule 12(b)(6) Br. at 9-10, the question of whether the alleged loss is cognizable under the CFAA is one of law and therefore an appropriate basis for dismissing a case on the pleadings. BGR does not now challenge whether the alleged loss, if cognizable, reached the $5,000 minimum threshold.

[15] In a summary order, the Second Circuit affirmed the court's decision, noting that the plaintiffs had "failed to show any connection between the travel costs incurred by [their] executives in visiting New York City and 'any type of computer investigation or repair,' or any preventative security measures or inspections. Rather, the record indicates that the sole focus of the New York meetings was the business loss associated with the misappropriation. No court has

As the court in *Nexans* recognized, courts have consistently construed the term "loss" under the CFAA to reach only harm related to the performance or integrity of the allegedly accessed computer. *See, e.g.*, *Resdev*, 2005 U.S. Dist. LEXIS 19099, at *11 (lost trade secret value is not "loss" because "the CFAA plainly enumerates a narrow grouping of 'loss' distinct from—and thus excluding—the far greater range of losses that could flow from a violation of the CFAA"); *Civic Ctr. Motors, Ltd. v. Mason St. Imp. Cars*, 387 F. Supp. 2d 378, 382 (S.D.N.Y. 2005) (lost profits resulting from the defendant's *use of the information* and plaintiff's loss of investment in compiling that information were not "loss" because "costs not related to computer impairment or computer damages are not compensable under the CFAA.") (emphasis added); *Tyco Int'l (US) Inc. v. Does*, No. 01-CV-3856, 2003 U.S. Dist. LEXIS 11800, at *4-5 (S.D.N.Y. July 10, 2003) (fees incurred "to track down the offending party" were not "loss," which is "generally limited to costs necessary to assess the damage caused to the plaintiff's computer system or to resecure the system in the wake of a hacking attack").[16]

As discussed above, IPOC has not properly alleged any injury caused by BGR's allegedly unlawful conduct. Moreover, like its conclusory allegation of "damage," its conclusory use of the word "loss" is inadequate. Again, IPOC's only intimations of injury stemming from the alleged CFAA violation pertain exclusively to the *use* of the information allegedly obtained from KPMG's computer: that the information was used in the Zurich arbitration, Compl. ¶¶ 19, 21, 28, 31, and was leaked to the press, Compl. ¶ 21. Because neither of these allegations involves any

---

construed the CFAA's loss definition to extend that far." *Nexans Wires S.A. v. Sark-USA, Inc.*, 166 Fed. Appx. 559, 563 (2d Cir. 2006) (citation omitted).

[16] Although the court in *Four Seasons Hotels & Resorts B.V. v. Consorcio Barr, S.A.*, held that the value of the confidential data that the defendant obtained in violation of the CFAA constituted "loss," 267 F. Supp. 2d 1268, 1323-24 (S.D. Fla. 2003), *cited in* IPOC Rule 12(b)(6) Br. at 9, the court's holding is irrelevant to this case because the court considered (erroneously) only the superseded version of the CFAA, which did not define "loss" at all. *See Resdev*, 2005 U.S. Dist. LEXIS 19099, at *14.

costs related in any way to the performance or integrity of the allegedly accessed computer, IPOC has failed to allege "loss" under the CFAA, as required by Section 1030(g) and Section 1030(a)(5)(B)(i).[17]  Consequently, IPOC's CFAA claim fails as a matter of law, regardless of which subsection it arises under.

**D.    IPOC Has Not Alleged Cognizable "Access" under the CFAA.**

Regardless of which subsection of the CFAA provides the basis for IPOC's claim, IPOC must prove that Diligence or BGR "accesse[d]" KPMG's computer.  *See* § 1030(a)(2)(C); § 1030(a)(5)(iii).  Both the legislative history of the CFAA and numerous judicial decisions make clear that, for purposes of the CFAA, one "accesses" a computer only if one enters or uses that computer.  IPOC's conclusory allegation that Diligence or BGR "accessed . . . one or more KPMG FAS Computers," Compl. ¶ 31, is inadequate because IPOC alleges no facts that would reasonably permit the inference that Diligence or BGR entered or used KPMG's computer. IPOC's CFAA claim therefore fails as a matter of law.

The legislative history of the CFAA shows that the concept of "accessing" a computer without authorization is analogous to trespassing onto property.  As one of the sponsors of the National Information Infrastructure Protection Act of 1995, which amended the CFAA to strengthen many of its penalties for unauthorized "access," stated: "Everybody recognizes that it is wrong for an intruder to enter a home and wander around; it doesn't make sense to view a criminal who breaks into a computer system differently."  141 CONG. REC. S9422, S9423 (1995); *see also* 141 CONG. REC. at S9423 ("We can no longer accept mere trespass into computers, and regard these intrusions as incidental.").  The other sponsor likewise noted that "[u]nder the bill, . . . hackers who break into a computer could be punished for any intentional, reckless, or

---

[17] As with its failure to allege cognizable "damage," IPOC's failure to allege cognizable "loss" is predictable in light of the fact that it does not own the allegedly accessed computer.

negligent damages they cause by their trespass." 141 CONG. REC. at S9424. Indeed, the sponsors' discussion of their bill is replete with references to "trespassing" onto, "breaking into," "intrud[ing]" upon, and "us[ing]" computers. *See* 141 CONG. REC. at S9422-25. Just as in the physical world, these concepts as applied to computers entail a notion of "presence"—of being on the computer. *See America Online v. IMS*, 24 F. Supp. 2d 548, 550-51 (E.D. Va. 1998) (finding trespass to chattels where defendant "intentionally caused contact with AOL's computer network by sending bulk e-mail messages" to AOL's subscribers); *cf. Smith v. United States*, 445 A.2d 961, 971 (D.C. 1982) ("Because a person's presence on private property generally is at the pleasure of the lawful occupant, the demand of that occupant to leave in itself deprives the other party of 'lawful authority' to remain on the premises.").

Courts have uniformly interpreted "access" for purposes of the CFAA in a manner consistent with Congress's understanding that "access" requires that the defendant enter, use, or otherwise be present on the computer. For example, in *America Online, Inc. v. National Health Care Discount, Inc.*, the plaintiff claimed that the defendant had "accessed" its computers by transmitting bulk email through its network to its subscribers. 121 F. Supp. 2d 1255, 1273 (N.D. Iowa 2000). Construing "access" to mean "exercis[ing] the freedom or ability to . . . make use of something," the court held that the defendant had accessed the plaintiff's computers in violation of the CFAA. *Id.* (quotation marks omitted).[18]

---

[18] *See also, e.g.*, *United States v. Millot*, 433 F.3d 1057, 1059-60 (8th Cir. 2006) (access found where defendant "log[ged] onto" former employer's computer system to delete information); *International Airport Ctrs., L.L.C. v. Citrin*, 440 F.3d 418, 419-21 (7th Cir. 2006) (access found where defendant deleted data from laptop that former employer had loaned him); *United States v. Middleton*, 231 F.3d 1207, 1208-09 (9th Cir. 2000) (access found where defendant "logg[ed] in to" former employer's computer to alter and delete data); *EF Cultural Travel BV v. Explorica*, 274 F.3d 577, 579 (1st Cir. 2001) (access found where defendant used "scraper" software to scan plaintiff's website and extract information therefrom); *United States v. Morris*, 928 F.2d 504, 505 (2d Cir. 1991) (access found where defendant released "worm" software onto computers).

Moreover, interpreting "access" to require that the defendant enter, use, or otherwise be present on the computer accords with the meaning of "damage" and "loss." As discussed above, damage and loss are cognizable under the CFAA only if they relate to the accessed computer. If the defendant does not enter or use the computer, there would not appear to be any way in which the defendant could damage the computer or cause loss related to the computer. *See Resdev*, 2005 U.S. Dist. LEXIS 19099, at *2, *11 ("The CFAA's 'loss' definition goes on to list costs that are similar in that they are all directly associated with, or with addressing, an unauthorized-computer-access event.").

Its conclusory allegation of "access" notwithstanding, IPOC has failed to allege facts sufficient to support a finding of "access" under the CFAA because IPOC has not alleged that Diligence or BGR logged onto, hacked into, used, or otherwise had the power to be present on KPMG's computers. Rather, IPOC alleges merely that Diligence or BGR obtained the allegedly confidential materials through misrepresentions to "*agents or servants of KPMG*." Compl. ¶¶ 19-20 (emphasis added). The only reasonable inference in IPOC's favor that can arguably be drawn from this allegation is that *a KPMG agent* accessed the KPMG computer to acquire the materials and then passed those materials to Diligence or BGR. Even if KPMG had stored the materials on a computer, the mere receipt of those materials by Diligence or BGR would not alone constitute "access." *Role Models Am., Inc. v. Jones*, 305 F. Supp. 2d 564, 566-67 & n.4 (D. Md. 2004) (no "access" where third party provided to defendant information that had been stored on plaintiff's computer and sent emails to defendant from plaintiff's computer because "[r]eceiving electronic information is . . . not the same as 'accessing' the computer from which the information derived"). Therefore, IPOC's CFAA claim fails as a matter of law.

IV.    **Counts I, III-V, and VII Fail as a Matter of Law Because IPOC Has Not Adequately Alleged Underlying Wrongful Conduct.**

As detailed in BGR's Rule 9(b) reply brief, Counts I, III–V, and VII of IPOC's complaint require proof of some kind of underlying wrongful conduct. Reply to Opp'n to Mot. of D. Barbour Griffith & Rogers LLC to Dismiss for Failure to Plead Fraud with Particularity ("BGR Rule 9(b) Reply Br.") at 3-7. IPOC has ostensibly identified only two candidates: the alleged fraud and the alleged bribery. But IPOC has not pleaded its fraud allegation with the particularity required by Rule 9(b). BGR Rule 9(b) Br. at 3-5; BGR Rule 9(b) Reply Br. at 7-9. And IPOC has alleged no facts whatsoever to support its conclusory allegation that Diligence bribed KPMG. BGR Rule 9(b) Reply Br. at 10-11. Therefore, because IPOC has not adequately pleaded any underlying wrongful conduct, Counts I, III–V, and VII fail as a matter of law.

V.    **Counts I and III-VII Fail as a Matter of Law Because They Are Preempted by the District of Columbia's Adoption of the Uniform Trade Secrets Act and IPOC Does Not Allege That Its Information Qualified as a Trade Secret.**

As Diligence demonstrated in its Rule 12(b)(6) briefs, Counts I and III–VII of IPOC's complaint are preempted by the District of Columbia's adoption of the Uniform Trade Secrets Act ("UTSA"). Mem. in Supp. of Diligence, Inc.'s Mot. to Dismiss ("Diligence Rule 12(b)(6) Br.") at 8-18; Reply Mem. in Supp. of Diligence, Inc.'s Mot. to Dismiss at 10-14. BGR does not wish to burden the Court with repetitive briefing, and therefore presents only a few points to supplement Diligence's persuasive analysis.

It is clear that if IPOC's claims were predicated on the allegation of a trade secret, they would be preempted by the UTSA. The UTSA preempts all "tort [and] restitution" claims that "conflict[]" with the UTSA and are "based upon misappropriation of a trade secret." D.C. CODE § 36-407(a)-(b). The UTSA defines "misappropriation" as, *inter alia*, the "[a]cquisition" of a trade secret through "improper means" or the "disclosure or use" of a trade secret "acquired"

through "improper means." D.C. CODE § 36-401(2)(A)-(B)(i). Further, "improper means"
include "bribery, misrepresentation, breach or inducement of a breach of a duty to maintain
secrecy." D.C. CODE § 36-401(1). Each of IPOC's common-law claims—tortious interference
with business expectancies, procuring information by improper means, tortious interference with
contractual relations, unfair competition, conspiracy, and unjust enrichment—is rooted in the
allegation either that Diligence or BGR acquired IPOC's secret information through improper
means or that they disclosed or used that improperly acquired information. Specifically, IPOC's
pivotal allegation is that Diligence "obtained [from KPMG] through fraud and bribery
confidential documents and information about the IPOC investigation," which it then "provided
. . . to such litigation adversaries of IPOC." Compl. ¶¶ 20-21 (quotation marks omitted).
Therefore, if IPOC had alleged that the misappropriated information was a trade secret, there
could be no dispute that its common-law claims were not only "based upon" misappropriation of
a trade secret, but also were equivalent to misappropriation of a trade secret. This is acutely
evident for IPOC's claim of procuring information by improper means, which is a claim of
misappropriation of trade secret with a different label. *See* Diligence Rule 12(b)(6) Br. at 14-15.

Of course, IPOC does not allege that its allegedly misappropriated information qualified
as a trade secret. Nor is IPOC necessarily required to allege a trade secret in order to state valid
claims under the various common-law causes of action it has pursued, as IPOC goes to great
lengths to show. *See* IPOC Rule 12(b)(6) Br. at 21-23. Thus, the critical question in this case is
whether the UTSA preempts common-law claims for which a trade secret need not be and has
not been alleged. IPOC asserts that the UTSA preempts a common-law claim only if the
plaintiff alleges that its information qualifies as a trade secret. IPOC Rule 12(b)(6) Br. at 14-17.

IPOC's view of UTSA preemption not only is inconsistent with myriad precedents, as

20

Diligence has shown, but also would render the UTSA a dead letter. If the UTSA preempted only claims that actually involved an explicit claim of misappropriation of a "trade secret," plaintiffs would no longer need to trouble themselves with meeting the demanding standards of the UTSA. *See* D.C. CODE 36-401(4) (defining "trade secret"). They could obtain the same relief regardless of whether their information qualified as a trade secret simply by dusting off a common-law cause of action that does not include "trade secret" among its elements and then assiduously avoiding alleging that their information qualified as a trade secret. But the UTSA does more than merely codify the common-law action of misappropriation of trade secret; it defines and limits the kind of *confidential* information that is protected—namely, *only* information that qualifies as a trade secret.[19] Thus, UTSA preemption of claims based upon misappropriation of non-trade secret information does not leave the "owner" of such information with a right but no means by which to enforce it. Rather, the UTSA declares that the "owner" of non-trade secret information *has no right to enforce in the first place*. To hold that the UTSA does not preempt a common-law claim for misappropriation of non-trade secret information would be to permit plaintiffs without a valid trade secret to obtain relief despite the deficiency of their claim under the UTSA. Surely, that would "conflict" with the UTSA.[20] Therefore, the UTSA preempts IPOC's common-law claims, and because IPOC has not alleged a trade secret, IPOC's common-law claims fail as a matter of law.

---

[19] Unless, of course, the information is independently copyrighted or patented.

[20] *See, e.g.*, *Hauck Mfg. v. Astec Indus.*, 375 F. Supp. 2d 649, 656 (E.D. Tenn. 2004) (A "plaintiff surely cannot use general tort causes of action to revive claims which would otherwise not be cognizable in light of the UTSA (*i.e.*, claims alleging theft of non-trade secret information.)") (collecting decisions); *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 789 (W.D. Ky. 2001) (UTSA "replaces other law relying to the misappropriation of trade secrets, regardless of whether the Plaintiffs demonstrate that the information at issue qualifies as a trade secret."); *Biocore, Inc. v. Khosrowshahi*, 96 F. Supp. 2d 1221, 1238 (D. Kan. 2000) ("Even if confidential information can be something less than a trade secret, it must at least be a trade secret to give its owner a property right in it.").

**VI.    Counts I and III–VII Fail as a Matter of Law for Additional Reasons Unique to Each Count.**

Beyond the various defects that permeate Counts I and III–VII discussed above, legal deficiencies unique to each of these counts provide additional independent bases for dismissal.

### A.    Count I: Tortious Interference with Business Expectancies.

IPOC claims in Count I that Diligence and BGR interfered tortiously with four of IPOC's "business expectancies." Compl. ¶ 25. This claim fails as a matter of law because none of the four asserted expectancies constitutes a cognizable and protected "business expectancy."

To state a claim for tortious interference with a business expectancy, IPOC must plead "the existence of a valid business relationship or expectancy, [which] must be commercially reasonable to anticipate." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (quotation marks omitted) (citations omitted).[21] IPOC alleges that it possessed the following four expectancies:

1) that "the Zurich arbitration in which it sought to enforce its rights would be conducted without malicious interference and would not be tainted by improper or illegal activities calculated to corrupt the Zurich arbitration for the benefit of IPOC's litigation adversaries";

2) that "the Investigation would be conducted in a[n] evenhanded and impartial manner and in accord with the requirements imposed upon KPMG FAS in its position as investigator";

3) that "the materials and information provided by IPOC to KPMG FAS would be held in strict confidence, used solely in connection with the Investigation and would not be utilized to further the interests of IPOC's litigation adversaries"; and

4) that "IPOC's charter would not be attacked by improper or illegal means, including bribery, fraud and deception."

Compl. ¶ 25.

---

[21] IPOC must also show "knowledge of the relationship or expectancy on the part of the interferer, . . . intentional interference inducing or causing a breach or termination of the relationship or expectancy, and . . . resultant damage." *Browning*, 292 F.3d at 242 (quotation marks omitted).

Even if IPOC possessed these expectations, its claim fails as a matter of law. The mere fact that the expectation is held by a business does not mean that the expectation is a cognizable "business expectancy." "For the most part the 'expectancies' thus protected have been those of future contractual relations, such as the prospect of obtaining employment or employees, or the opportunity of obtaining customers." *Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978) (quotation marks omitted); *see also Washington Metro. Area Transit Auth. v. Quik Serve Foods, Inc.*, Nos. 04-838 (RCL) & 04-687 (RCL), 2006 U.S. Dist. LEXIS 24510, at *17 (D.D.C. Apr. 28, 2006) ("A valid business expectancy *requires* a probability of future contractual or economic relationship . . . .") (emphasis added). Only future contractual relations are protected because "[t]he essence of the tort of tortious interference with prospective business relations is the use of intentional and improper methods of *diverting or taking business* from another which are not within the privilege of fair competition." *Primedical, Inc. v. Allied Inv. Corp.*, No. 90-1802 (NHJ), 1994 U.S. Dist. LEXIS 4517, at *6 (D.D.C. Mar. 30, 1994) (emphasis added) (quotation marks omitted). Thus, the torts of tortious interference with a contract and tortious interference with a business expectancy "[r]un[] parallel"—the former pertaining to the breach of a present contractual relation and the latter pertaining to the loss of a future one. *Paul v. Howard Univ.*, 754 A.2d 297, 309 (D.C. 2000); *see also Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 84 (D.C. 2003) ("The elements of tortious interference with prospective business advantage mirror those of interference with contract. To prevail, however, a plaintiff obviously need not demonstrate the existence of a contract, but merely a prospective advantageous *business transaction*.") (emphasis added) (citation omitted).[22]

---

[22] Some courts outside of the District of Columbia have protected expectancies in gifts and inheritances. *See Allen v. Hall*, 974 P.2d 199, 280-81 (Or. 1999), *cited in* IPOC Rule 12(b)(6)

None of the four alleged expectations could conceivably have entailed the possibility that IPOC would form a valid contractual relationship, or the possibility that the alleged frustration of the expectation involved Diligence's or BGR's diverting business away from IPOC; therefore, IPOC has not alleged a cognizable business expectancy. First, none of the alleged expectations involves the creation of a future relation of any kind, let alone a future business relation. Rather, all pertain solely to the conduct or performance of non-business relations already existing at the time of the alleged interference, and therefore they do not even qualify as "expectancies." The first alleged expectation pertains to how the Zurich tribunal conducted an arbitration that had already begun. The second and third alleged expectations pertain to how KPMG conducted the investigation that the Bermudan Minister of Finance had already initiated. And the fourth alleged expectation pertains not to an application to obtain a charter but rather to whether IPOC's existing charter would be revoked. Accordingly, it would be more appropriate for IPOC to have cast these claims as tortious interference with contractual relations.

Of course, even if so cast, the claims would still fail as a matter of law. IPOC does not allege that the Zurich arbitral tribunal owed IPOC a *contractual* obligation, let alone that it breached it. Although IPOC does allege that it had an "agreement" with KPMG, IPOC's relationship with KPMG was not voluntary or commercial at all, but rather was mandated by the Bermudan government in order to determine whether IPOC was engaged in illicit activities, as explained more fully below. Finally, even if a corporate charter can be a contract, IPOC has not alleged that the Bermudan government breached it.

Second and more fundamentally, IPOC's purported expectations could never ripen into an enforceable contract. At the heart of IPOC's case is the proposition that Diligence and BGR

Br. at 25-26. IPOC does not allege that Diligence or BGR interfered with a gift or inheritance it was to receive, and therefore such decisions are irrelevant here.

should be held accountable to IPOC in damages for disclosing truthful evidence of IPOC's involvement in criminal wrongdoing to an adjudicatory tribunal whose very purpose was to find the truth.  In its complaint, IPOC steers clear of the nature of the Bermuda investigation, but there can be no doubt that the government of Bermuda was investigating IPOC for wrongdoing. The Bermuda Companies Act, under which the Bermudan Minister of Finance appointed KPMG to investigate IPOC, calls for investigation into "the affairs" of a company to determine whether the company has "done anything in contravention of this Act or of any licence, . . . [or whether the company has been] carrying on its affairs in a manner detrimental to the interests of the members of the company [or] the creditors of the company."  Companies Act § 132(1), (8) (rev. 1989) (Bm.), *available at* http://www.bermudalaws.bm/.  Indeed, IPOC conspicuously does not deny that the materials that Diligence or BGR allegedly obtained from the Bermuda investigation evidenced misconduct on the part of IPOC, or even that the Zurich tribunal erred in finding that IPOC serves as an obedient, money-laundering tool for the criminal enterprises of its beneficial owner, a high-ranking Russian official.  And even if these materials played a role in the Zurich tribunal's decision (and there is no allegation that they did), it follows that that the disclosure prevented IPOC from perpetrating yet another crime through the performance of the option agreement between IPOC and LVFG.  In effect, then, IPOC contends that it expected that it would be able to conceal the truthful evidence of its wrongdoing from an international arbitral tribunal, and that the law should protect that expectation.

The law affords no such protection.  As the Supreme Court has said, "it is obvious that agreements to conceal information relevant to commission of crime have very little to recommend them from the standpoint of public policy."  *Branzburg v. Hayes*, 408 U.S. 665, 696 (1972) (journalists have no First Amendment privilege to conceal from grand jury the criminal

conduct of news source they have promised to keep confidential); *see also, e.g.*, RESTATEMENT (FIRST) OF CONTRACTS § 548(1) (1932) (A "bargain in which either a promised performance or the consideration for a promise is concealing or compounding a crime or alleged crime is illegal."). The privilege to disclose in violation of a contract prohibiting such disclosure exists whether the disclosure is of past or future unlawful conduct, and whether the disclosure is to a law enforcement official or the holder of a private right. In *Fomby-Denson v. Department of the Army*, 247 F.3d 1366 (Fed. Cir. 2001), Fomby-Denson sought to hold the Army to an agreement that would have had the effect of concealing from law enforcement authorities evidence of her forgery. The court refused to enforce the contract because "the public policy interest at stake— the reporting of possible crimes to the authorities—is one of the highest order and is indisputably well defined and dominant in the jurisprudence of contract law." *Id.* at 1375 (quotation marks omitted); *see also Van Housen v. Monico*, 378 A.2d 609, 610 (Conn. Super. Ct. 1976) ("An agreement made in whole or in part to suppress an enquiry to the commission of an offense, or to prevent, in any measure, the administration of criminal justice is void.") (quotation marks omitted). In *Lachman v. Sperry-Sun Well Surveying Co.*, 457 F.2d 850 (10th Cir. 1972), Lachman and Sperry-Sun had entered a confidentiality agreement concerning Lachman's drilling operation. While working for Lachman, Sperry-Sun learned that Lachman was infringing the rights of adjacent property owners. Sperry-Sun then informed the adjacent owners, who in turn used that information to sue Lachman successfully. Lachman then sued Sperry-Sun for breach of the confidentiality agreement. The court found that "[t]o hold [Sperry-Sun] bound by its contractual obligation to maintain silence would in this case require the court to assist [Lachman] in obtaining oil and gas to which they were not entitled." *Id.* at 853. Noting that "[i]t is public policy in Oklahoma and everywhere to encourage the disclosure of criminal activity," the court

refused to enforce the confidentiality agreement. *Id.*[23]

Third, even if IPOC's asserted expectations did not involve the concealment of evidence of IPOC's wrongdoing, they would still not be cognizable business expectancies. IPOC asserts that the first three alleged expectations pertain to the "fairness of the arbitration and investigatory processes." IPOC Rule 12(b)(6) Br. at 26. IPOC does not clearly state how it believes the fourth alleged expectation should be categorized, though presumably it views it as pertaining to the outcome of the investigatory process. *See* IPOC Rule 12(b)(6) Br. at 26-27. Either way, the claim fails because courts have rejected repeatedly the contention that a business enterprise can have a cognizable business expectancy in the integrity of an adversarial proceeding, the integrity of a reviewable governmental investigation, or the outcome of either of those processes.[24]

In *Carr*, the plaintiff argued that the defendants had "maliciously interfered with" his application to a municipal transportation committee and to the zoning board to close an alley and obtain a zoning variance to facilitate his development of real property. 395 A.2d at 82-83. Among the techniques the defendants allegedly employed to interfere with the committee's and the board's decision-making process were making statements to the committee, "incit[ing]" residents to oppose the application, "disrupting" a board meeting, and "causing delay" by using

---

[23] *See also Willig v. Gold*, 171 P.2d 754, 814 (Cal. Ct. App. 1946) (rejecting plaintiff's "startling" claim because plaintiff "cites no case, and we are sure that none can be found, that an agent is under a legal duty not to disclose his principal's dishonest acts to the party prejudicially affected by them"); *EEOC v. Astra USA, Inc.*, 94 F.3d 738, 743-45 (1st Cir. 1996) (affirming preliminary injunction against enforcement of agreements that prevented employees from giving EEOC evidence of employer's discrimination); *cf. United States v. Farrell*, 606 F.2d 1341, 1349 (D.C. Cir. 1979) ("Courts will not aid those whose cause of action is based upon an illegal act.")

[24] As will be apparent from the following discussion of decisions, the difference between an expectation in the integrity of the process and the outcome of that process is often elusive, and courts are not necessarily attentive to the distinction. Insofar as IPOC's expectations pertain to the process and not the outcome, IPOC's failure—as demonstrated above—to identify any injury that was caused by the alleged interference with the alleged expectancies is even more evident, for if the process was tainted but the outcome was the same as it would have been without the taint, it is difficult to see how IPOC was injured by Diligence's or BGR's alleged misconduct.

"various procedural maneuvers." *Id.* at 83 & n.3. As a result of the alleged interference, "the closing and rededication of the alley and the development of [the plaintiff's] property were delayed for more than nine months beyond [the plaintiff's] expectations." *Id.* Thus, the plaintiff's expectation pertained to the quality of the process, not the outcome—indeed, his application was ultimately granted. *Id.* The court found that the plaintiff "cannot contend that because he encounters opposition to his application, *some of which may be malicious*, that the opponent is thereby interfering with his 'expectancies' so as to constitute a tort. Rather the person who is 'interfering' with the applicant's petition for an alley closing and a zoning exception is participating in procedures fixed by statute which specifically invite opposition." *Id.* at 84 (emphasis added). Consequently, the court concluded that the plaintiff's alleged "expectancies" "are not of the character that may be protected by this cause of action." *Id.*

The court found *Carr* "instructive" in *Democratic State Committee v. Bebchick*, 706 A.2d 569, 573 (D.C. 1998). There, the plaintiffs had been counsel in a previous successful lawsuit, as a result of which a trust was created to compensate the victims. A panel from the D.C. Circuit retained continuing jurisdiction over the dispute and the trust. When it later appeared that the defendant in that earlier lawsuit would not fulfill its obligations under the settlement, the trust company requested permission from the D.C. Circuit to retain the plaintiffs as counsel for the trust. The senior judge on the panel then allegedly had *ex parte* communications with a rival lawyer of plaintiffs', who was subsequently appointed as counsel for the trust. The rival lawyer resolved the matter concerning the trust in such a way that the plaintiffs received a substantially smaller fee for their work in the earlier lawsuit than they could have received had it been resolved differently. *Id.* at 570-72. The plaintiffs then sued the rival lawyer for interfering with their "relationships and expectancies" "by obtaining the appointment to represent the trust." *Id.*

at 571-72 (quotation marks omitted).  Because the award of attorney fees was "totally within the

discretion of the D.C. Circuit," however, the court discerned that "the essence of plaintiff[s']

claim here goes to an asserted irregularity in the process of [their rival's] appointment involving

a member of the judicial tribunal; *viz.*, an allegedly improper *ex parte* communication, and to an

allegation that the process was not as it seemed; *viz.*, approval by the court of the trust

company's appointment of counsel, but rather direct appointment by the court itself."  *Id.* at 573.

The court determined that because "[t]he mechanism for correction and relief must be a

presentation to the tribunal itself or authority superior to it," the plaintiffs' claim was "an

unacceptable end-run around the D.C. Circuit."  *Id.* at 574.  Accordingly, the court affirmed the

dismissal for failure to state a claim.  *Id.*

    Courts in other jurisdictions have similarly rejected the contention that there is a

cognizable business expectancy in the integrity of an adversarial or reviewable proceeding.  *See,*

*e.g.*, *Fox v. Country Mut. Ins. Co.*, 7 P.3d 677, 686-91 (Or. Ct. App. 2000) (defendant interfered

with ongoing litigation between plaintiff and third party by misrepresenting key facts to

plaintiff); *Matossian v. Fahmie*, 161 Cal. Rptr. 532, 537 (Cal. Ct. App. 1980) ("where, as here, a

statute expressly invites or allows interested persons to protest, or give their views or opinions

concerning, proposed or requested governmental administrative action, such persons . . . have a

*lawful right* to do so; in such a case the law will not permit judicial or other inquiry into the

persons' purpose or motivation[,] . . . even if malicious") (quotation marks omitted).[25]

    Like the defendant in *Carr*, LVFG, with the alleged assistance of Diligence and BGR, is

_____

[25] Instead of holding that the expectancy in the integrity of an adversarial or reviewable
proceeding is not cognizable, *Carr*, *Bebchick*, and similar decisions can alternatively be
understood to hold that the "interference," even if through "malicious" or "improper" means, is
not cognizable because such a process, by definition, contemplates such "interference" and
possesses its own mechanisms to redress it.  Either way, IPOC's claim fails as a matter of law.

alleged to have interfered with the Zurich proceeding by "maliciously" advancing its opposition to IPOC as it was specifically permitted to do by virtue of its status as a party to that proceeding, by using information the truth of which IPOC does not question. *See Carr*, 395 A.2d at 85 ("Our affirmance does not, of course, leave applicants for governmental licensing unprotected from false or malicious statements from parties in opposition who appear before the various governmental bodies; false statements that are defamatory are actionable unless privileged."). And like the defendant in *Bebchick*, Diligence and BGR are alleged to have had improper contacts with a government actor—KPMG—responsible for investigating IPOC. But nothing forbade KPMG, as the Bermudan government's appointed investigator, from having contact with persons outside of IPOC. Even assuming, *arguendo*, that any irregularities may have occurred in the Zurich or Bermuda proceedings, *but cf. National Archives & Records Admin.*, 541 U.S. at 174 (government actors are presumed to discharge their duties properly absent clear evidence to the contrary); *Oguaju*, 378 F.3d at 1117 (same), "[t]he mechanism for correction and relief must be a presentation to the tribunal itself or authority superior to it." 706 A.2d at 574; *see* Federal Code on Private International Law, art. 190 (Dec. 18, 1987) (as amended July 1, 2004) (Switz.) (providing for appeal of international arbitration), *available at* http://www.umbricht.ch/pdf/SwissPIL.pdf; United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, art. V (New York, June 10, 1958) (codified as implemented at 9 U.S.C. § 201 *et seq.*), *available at* http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/NYConvention.html (providing grounds upon which enforcement court may set aside arbitral ruling); Companies Act § 132(8)-(12) (providing for judicial and executive review). Therefore, IPOC had no cognizable business expectancy in the integrity of the Zurich arbitration proceeding or the Bermuda investigation.

Courts have also rejected repeatedly the contention that an expectation in the outcome of a discretionary governmental process, such as the approval or revocation of a license, is a cognizable business expectancy. In *Carr*, the court stated that, under D.C. law, when an expectation in a particular outcome "depend[s] . . . on governmental approval," it is "simply too remote" to be protected. 395 A.2d at 84.[26] Here, the decision whether to revoke IPOC's charter will depend on the discretionary decision of the Bermudan Minister of Finance and courts, based upon the evidence before them. *See* Companies Act § 132(8)-(12). Therefore, IPOC's alleged expectancy in retaining its charter is not a cognizable business expectancy. In any event, even if IPOC had a cognizable business expectancy in the outcome, that is, in the charter itself, its claim fails as a matter of law because IPOC has not alleged that it has already lost its charter, only that its charter is being "attacked"—and so the interference with the charter has not materialized.

**B.    Count IV: Tortious Interference with Contractual Relations**

In Count IV, IPOC alleges that KPMG was contractually obligated "to hold strictly confidential all information provided by, or received as a result of, IPOC's submissions to KPMG FAS." Compl. ¶ 41. IPOC claims that Diligence and BGR "induced and/or procured a breach" of this obligation. Compl. ¶ 43. For the reasons explained in the above discussion of business expectancies, such an agreement—which would have the effect of concealing evidence of what the Zurich tribunal found to be IPOC's past role in a criminal enterprise and possibly enabling IPOC to perpetrate further crimes through the Zurich arbitration—is void on public

---

[26] *See also Bebchick*, 706 A.2d at 573 (expectation in award of attorney fees not protected because "totally within the discretion of the" court); *Fox*, 7 P.3d at 686-91 (expectation in outcome of civil litigation not protected); *cf. Gordon v. Noel*, 356 N.W.2d 559, 563 (Iowa 1984) ("[T]he public bodies made the decision that Gordon's license should be suspended. . . . This exercise of independent judgment by the licensing authorities breaks the chain of causation between the officers' allegedly false statements [to the licensing board] and Gordon's loss of business expectancies.").

policy grounds. Beyond that most fundamental defect, KPMG's alleged disclosure could not have constituted a breach of contract because, as IPOC has described the putative contract in its complaint, there was no consideration to support KPMG's supposed contractual obligation. Therefore, Count IV fails as a matter of law.

"An essential element of the tort of inducement of breach of contract is the existence of a *valid* contract." *EDM & Assocs., Inc. v. Gem Cellular*, 597 A.2d 384, 388 (D.C. 1991) (emphasis added) (quotation marks omitted); *see also Sturdza v. Government of the United Arab Emirates*, 281 F.3d 1287, 1306 (D.C. Cir. 2002) ("[T]he 'core' of a tortious interference with contract claim 'is that one who intentionally induces another to break a *valid* contract is liable.' ") (quoting *Deoudes v. G.B. Macke Corp.*, 153 A.2d 309, 310 (D.C. 1959)).[27]  It is well-established that an agreement alone does not create a contract. Rather, "[t]o be valid and binding there must be . . . consideration to support the agreement." *Rommel v. West American Ins. Co.*, 158 A.2d 683, 685 (D.C. 1960).[28]

"It of course goes without saying that the promise to do a thing which the promisor is already bound to do is not a good consideration upon which to found another promise." *Littlepage v. Neale Publ'g Co.*, 34 App. D.C. 257, 264 (D.C. Cir. 1910); *see also Norris v. Green*, 656 A.2d 282, 286-87 (D.C. 1995) (no consideration for landlord's promise to abate flooding in exchange for payment of rent because tenant was bound by pre-existing lease to pay

---

[27] "To recover in tort for intentional interference with contractual relations, the plaintiff must prove four elements: (1) existence of a contract, (2) knowledge of the contract, (3) intentional procurement of its breach by the defendant, and (4) damages resulting from the breach." *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.*, 565 A.2d 285, 289 (D.C. 1989) (quotation marks omitted).

[28] *See also Hopkins v. Akins*, 637 A.2d 424, 427 (D.C. 1993) (contract exists only if obligee either "bestow[s] a benefit on another to give valid consideration for a contract . . . [or incurs] a detriment"); *Norris v. Green*, 656 A.2d 282, 287 (D.C. 1995) (promise is binding only if "supported by a valid consideration")

rent anyway). As IPOC has described its "agreement" with KPMG, however, both IPOC and

KPMG were under a pre-existing statutory duty to perform precisely what IPOC alleges each

agreed to perform for the other. IPOC alleges that in exchange for KPMG's "promise" "to hold

strictly confidential all information provided by, or received as a result of, IPOC's submissions

to KPMG FAS," IPOC "agree[d] . . . [to] provide to KPMG FAS information, including

documents and testimony of witnesses, on a confidential basis, to assist KPMG FAS in carrying

out its Investigation." Compl. ¶ 41; *see also* Compl. ¶ 16 ("IPOC has provided information to

KPMG FAS only pursuant to KPMG FAS' agreement that such confidentiality would be

maintained."). But Bermuda's Companies Act *required* IPOC to make documents and witnesses

available to KPMG. Under that Act, "[e]very officer, agent or employee of the company" under

investigation—here, IPOC—"shall produce to the inspector"—here, KPMG—"such books or

documents as the inspector may require for the purpose of his investigation." Companies Act

§ 132(3). The Act establishes a fine for "[a]ny officer, agent or employee of the . . . company

who, in the course of an investigation of the affairs of the company, . . . refuses to produce any

book or document required by the inspector to be produced." Companies Act § 132(4).

Therefore, IPOC was already statutorily required to produce the documents. In addition, the Act

establishes a fine for "[a]ny officer, agent or employee of the . . . company who, in the course of

an investigation of the affairs of the company, . . . refuses to answer any question relating to the

affairs of the company." Companies Act § 132(4). Therefore, IPOC was already statutorily

required to make witnesses available to testify.

      Similarly, the Act mandates that "[a]ny investigation under this section shall be held in

private unless the company requests that it be held in public." Companies Act § 132(6). The Act

also specifies that "[n]o other person shall be informed of the nature or contents of the report

[prepared by the investigator] save at the request of the company or on the direction of the Minister." Companies Act § 132(7). Therefore, KPMG was statutorily required to maintain the confidentiality of the information IPOC gave it, as IPOC has admitted. Compl. ¶ 17 ("[P]ursuant to statutory and contractual understandings of confidentiality, KPMG FAS obtained internal IPOC business documents and interviews from IPOC personnel."); Compl. ¶ 37.

Indeed, there was nothing voluntary at all about IPOC's interaction with KPMG. The Bermudan Minister of Finance appointed KPMG to investigate IPOC for illicit activities. Compl. ¶ 15; *see* Companies Act § 132(1). IPOC, as the investigated entity, then complied (to what extent is unknown) with KPMG's demands for information necessary to fulfill its governmental, investigatory mandate. Even if it is true that IPOC paid KPMG $8 million, it is certainly not true that this was paid voluntarily, let alone paid in exchange for KPMG's "promise" of confidentiality, as IPOC suggests in its Rule 12(b)(6) brief. *See* IPOC Rule 12(b)(6) Br. at 26 ("[S]ome aspects of IPOC's relationship with KPMG FAS were voluntarily created and indeed, commercial. IPOC paid KPMG FAS over $8 million to conduct the investigation."); *see also* IPOC Rule 12(b)(6) Br. at 31. As IPOC admits in its complaint, KPMG was under a pre-existing statutory duty to reimburse KPMG for "[a]ll expenses of and incidental to the" investigation. Companies Act § 132(2); *see also* Compl. § 14 ("The Bermuda Companies Act of 1981 also requires the company being investigated to pay for the costs of the investigation."). And IPOC explicitly pleads that it paid the $8 million to cover KPMG's "costs." Compl. ¶ 15. Thus, not only was IPOC under a pre-existing statutory duty to pay KPMG, but also the alleged $8 million it paid KPMG has no connection to any confidentiality obligation KPMG is under. It is certainly possible for a private entity to form a contract with a government or a government's agent, but this is not such a case.

Consequently, neither party to the putative agreement gave anything of value to the other.

Thus unsupported by consideration, the putative agreement between IPOC and KPMG was not a

valid contract, and KPMG's alleged failure to fulfill its "promise" to maintain the confidentiality

of the information IPOC provided cannot constitute a breach of contract.  IPOC's claim for

tortious interference with a contract accordingly fails as a matter of law.[29]

### C.    Count III: Procuring Information by Improper Means

IPOC alleges in its third Count that "Diligence and BGR procured by improper and

illegal means information about IPOC's business that was held by KPMG FAS in the strictest

confidence pursuant to agreement and statute."  Compl. ¶¶ 37-38.  Because this cause of action

does not and cannot exist under District of Columbia law, this claim fails as a matter law.

D.C. has never recognized the tort for procuring information by improper means.  The

D.C. Circuit has stated that federal courts "cannot create a new tort on behalf of the District in [a]

---

[29] Without citation, IPOC asserts that whether a valid contract exists is a question of fact.  IPOC Rule 12(b)(6) Br. at 31.  Actually, it is a mixed question of law and fact.  *Dornan v. Royal Motors, Inc.*, 271 A.2d 402, 403 (D.C. 1970).  Thus, where there are no disputed underlying facts as to what was promised or given, the question whether a contract is invalid for lack of consideration is one of law.  *See King v. Industrial Bank of Washington*, 474 A.2d 151, 156 (D.C. 1984) (finding consideration where there were no material issues of fact); *Belfiore v. B. J. Crivella, Inc.*, 60 A.2d 542, 544 (D.C. 1948) ("Considering the evidence in the light most favorable to defendant, such evidence disclosed as a matter of law that the promissory note was executed upon valid and sufficient consideration."); *Ridge Runner Forestry v. Veneman*, 287 F.3d 1058, 1061-62 (Fed. Cir. 2002).  For purposes of this 12(c) motion, BGR assumes IPOC's allegations to be true, and therefore it is appropriate to hold at this stage that the "agreement" between IPOC and KPMG is not a valid contract for lack of consideration.  But even if this question were one of fact, it would still be appropriate to resolve this question on the pleadings in this case.  For the reasons explained in the text, the facts that IPOC has pleaded (gratuitously or not) are necessarily inconsistent with a finding that the "agreement" between IPOC and KPMG was supported by consideration.  IPOC has thus pleaded itself out of court.  *See Browning*, 292 F.3d at 242, 244 ("Rule 12(b)(6) dismissal is appropriate where the allegations contradict the claim asserted.") (affirming dismissal where plaintiff's allegation "contradict[ed] any basis for her claim"); *Trudeau*, 2006 U.S. App. LEXIS 18940, at *45 ("But it also is possible for a plaintiff to plead too much: that is, to plead himself out of court by alleging facts that render success on the merits impossible.") (quotation marks omitted).

diversity action." *Bouchet v. National Urban League, Inc.*, 730 F.2d 799, 807 (D.C. Cir. 1984).

And even if it might otherwise be appropriate for a federal court to create a new cause of action

on behalf of D.C., it would be inappropriate here because there is a very clear reason why D.C.

courts could not adopt this tort today: as shown above, by adopting the Uniform Trade Secrets

Act, D.C. specifically preempted all common-law claims for the improper procurement of

information, whether or not that information is alleged to be a trade secret.

IPOC has drawn the Court's attention to several entirely irrelevant authorities.  IPOC

Rule 12(b)(6) Br. at 27-29.  IPOC points to sections 757 and 759 of the *first* Restatement of

Torts, which was adopted in 1930s.  The second Restatement, adopted in the 1960s,

conspicuously omitted these and comparable sections precisely because "these subjects have

become substantial specialties in their own right, governed extensively by legislation and largely

divorced from their initial grounding in the principles of tort."  *Avco Corp. v. Precision Air

Parts, Inc.*, No. 79-275-N, 1980 U.S. Dist. LEXIS 16413, at *8 n.7 (M.D. Ala. Sept. 4, 1980)

(quotation marks omitted); *see* RESTATEMENT (SECOND) OF TORTS div. 9, Introd. Note.

Following the modern trend, D.C. adopted the UTSA in the 1980s, thereby defining statutorily

the scope of protection for confidential information.[30]

IPOC also points to a few decisions in which the court recognized the tort of procuring

information by improper means.  IPOC Rule 12(b)(6) Br. at 28-29.  In those decisions, the court

---

[30] IPOC cites *Chevron U.S.A., Inc. v. FERC*, 193 F. Supp. 2d 54, 61 (D.D.C. 2002), for the
proposition that "the District's courts have recognized the existence of the protections uniquely
afforded by §§ 757 and 759."  IPOC 12(b)(6) Br. at 28.  But the court did not purport to be
applying D.C. law—it cited a Seventh Circuit decision, *FMC Corp. v. Boesky*, 852 F.2d 981,
989-90 (7th Cir. 1988)—and a decision by a federal district court does not make D.C. law.
Moreover, the court was merely making the point that an interference with confidential
information could constitute a cognizable injury under the Constitution; that says nothing about
whether D.C. law creates a right of action upon that interference, particularly when D.C.'s
adoption of the UTSA specifically forecloses protection of confidential information that does not
rise to the level of a trade secret.

applied the law of Pennsylvania, Illinois, Massachusetts, and Georgia.  *See Toledo Mack Sales &*

*Serv., Inc. v. Mack Trucks, Inc.*, No. 02-4373, 2005 U.S. Dist. LEXIS 11052, at *30-31, *36-37

(E.D. Pa. Mar. 29, 2005); *Continental Data Sys., Inc. v. Exxon Corp.*, Nos. 84-2538 & 84-5603,

1986 U.S. Dist. LEXIS 23490, at *7-8 (E.D. Pa. June 29, 1986); *Crocan Corp. v. Sheller-Globe*

*Corp.*, 385 F. Supp. 251, 254-55 (N.D. Ill. 1974); *Harvard Apparatus v. Cohen*, 130 F. Supp. 2d

161, 165 (D. Mass. 2001); *TDS Healthcare Sys. Corp. v. Humana Hosp. Ill.*, 880 F. Supp. 1572,

1584-86 (N.D. Ga. 1995).  But Pennsylvania has not adopted the UTSA, and so has not

purported to preempt this common-law action.  Illinois adopted the UTSA 13 years after *Crocan*

was decided.  765 Ill. Comp. Stat. § 1065 (enacted 1987).  Since then, no Illinois court has

recognized this cause of action.  It is true that long before *Harvard Apparatus* was decided,

Massachusetts statutorily defined "trade secret" and provided a civil remedy for the

misappropriation thereof.  *See* MASS. GEN. LAWS ch. 93, §§ 42, 42A, ch. 266 § 30(4) (effective

1967).  But the Massachusetts statute does not purport to preempt the common law insofar as it

may protect confidential information.  Not only did the statute, as the court in *Harvard*

*Apparatus* recognized, "not change the ambit of trade secret protection under the common law,"

*Harvard Apparatus*, 130 F. Supp. 2d at 165, but also the existence of the statute has had almost

no effect on Massachusetts trade secret law.  As one commentator has observed, "trade secret

law in Massachusetts has developed primarily as common law, rather than under the statutes."

Marcellino & Kenfield, *Legislative Developments in High-Tech*, BOSTON BAR J. 19, 21

(Mar./Apr. 1984); *see also* Laurence H. Reece, III, *A Review and Analysis of Massachusetts Law*,

71 MASS. L. REV. 171, 181-82 (1986) ("This statute . . . has been of little significance in

litigation since it simply restates what is available from the courts under common law and

general equity principles.").  Thus, the Massachusetts statute cannot reasonably be understood to

have occupied the field of the regulation of confidential information.  Finally, *TDS Healthcare* is

an aberration: its recognition of this common-law action despite Georgia's adoption of the UTSA

appears to be the only instance in any jurisdiction of a court recognizing this tort after adoption

of the UTSA.  Moreover, the court in *TDS Healthcare* did not address the question of UTSA

preemption at all, and in fact granted summary judgment against the claimant.  880 F. Supp. at

1584-86.  Thus, these decisions confirm rather than rebut the fact that adoption of the UTSA

preempts actions for procuring information by improper means.

### D.    Count V: Common-Law Unfair Competition

In Count V, IPOC claims that Diligence and BGR, on behalf of IPOC's "litigation

adversaries," competed unfairly.  Compl. ¶ 46.  IPOC's claim turns the doctrine of unfair

competition on its head.  In effect, IPOC contends that, as explained further above, LVFG and

Alfa, through Diligence and BGR, competed unfairly by obtaining and using evidence of IPOC's

involvement in a criminal enterprise to prevent IPOC from carrying out further criminal

activities in the Zurich arbitration.  IPOC evidently believes that it would have been "fair" for it

to conceal from LVFG and the arbitral tribunal the evidence of its prior wrongdoing.  Such a

perverse and self-serving conception of the doctrine of unfair competition finds no support in the

law.  But even if IPOC were not asserting that it has a right to conceal evidence of wrongdoing,

its claim for unfair competition would still fail as a matter of law because IPOC has not alleged a

cognizable commercial interest that was harmed.

"Unfair competition is not defined in terms of specific elements, but by the description of

various acts that would constitute the tort if they resulted in damage."  *Furash*, 130 F. Supp. 2d

at 57.  The "cornerstone" of unfair competition is "the principle of misappropriation of another's

commercial advantage."  *Ruder & Finn, Inc. v. Seaboard Sur. Co.*, 422 N.E.2d 518, 522 (N.Y.

1981); *see also O'Brien v. Westinghouse Electric Corp.*, 293 F.2d 1, 13 (3d Cir. 1961) ("It has

long been held that the doctrine of unfair competition extends to the misappropriation for the

commercial advantage of one person of a benefit or a property right belonging to another.").

Protected commercial advantages include "labor, skill, and money,"[31] trademark,[32] goodwill or

reputation,[33] trade secret,[34] and business expectancy.[35]  Consistent with these principles, the D.C.

Court of Appeals has noted that the following acts "may constitute unfair competition at

common law: defamation, disparagement of a competitor's goods or business methods,

intimidation of customers or employees, interference with access to the business, threats of

groundless suits, commercial bribery, inciting employees to sabotage, false advertising or

deceptive packaging likely to mislead customers into believing goods are those of a competitor."

*B & W Mgmt., Inc. v. Tasea Inv. Co.*, 451 A.2d 879, 881 n.3 (D.C. 1982), *quoted in* IPOC Rule

12(b)(6) Br. at 32.

    Although IPOC asserts that the "conduct of Diligence and BGR was calculated to harm

IPOC and to advance rival litigation and commercial interests," Compl. ¶ 48, none of the

interests it has identified is a cognizable commercial interest.  First, IPOC points to the alleged

"misappropriation" of its "business information."  Compl. ¶ 46; *see also* Compl. ¶ 47.  As

demonstrated above, because D.C.'s adoption of the UTSA preempts common-law protection for

confidential business information, and because IPOC has not alleged that its business

---

[31] *Ruder & Finn*, 422 N.E.2d at 522.

[32] *Blinded Veterans Ass'n v. Blinded American Veterans Found.*, 872 F.2d 1035, 1043 (D.C. Cir. 1989).

[33] *Boule v. Hutton*, 328 F.3d 84, 93-94 (2d Cir. 2003) (disparagement of business or product).

[34] *Cacique, Inc. v. Robert Reiser & Co.*, 169 F.3d 619, 624 (9th Cir. 1999).

[35] *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 423 (D.D.C. 1988) (" 'Unfair competition' is essentially an unprivileged interference with prospective advantage.").

information qualifies as a trade secret under the UTSA, IPOC does not have a protected commercial interest in the allegedly misappropriated information.  Second, IPOC refers to the alleged "interference with the Investigation of IPOC's business."  Compl. ¶ 48.  Again, as demonstrated above, IPOC does not have a cognizable business interest in the integrity of the investigation.  Third, although IPOC does not specifically include in its unfair competition count allegations that its interest in the other purported business expectancies or the purported confidentiality agreement with KPMG were harmed, it should be noted that, for reasons explained above, none of those interests is a cognizable commercial or otherwise-protected interest, either.  *See Furash*, 130 F. Supp. 2d at 57 (where unfair competition claim "essentially . . . restate[d]" breach of fiduciary duty and tortious interference with contract claims, court denied motion for summary judgment on unfair competition claim with respect to one defendant and granted motion with respect to other defendant "[f]or the reasons discussed in th[e] sections" relating to fiduciary duty and tortious interference claims).

In addition, in its brief in opposition to Diligence's Rule 12(b)(6) brief, IPOC emphasizes that Diligence and BGR competed unfairly by "engag[ing] in employee intimidation and bribery."  IPOC Rule 12(b)(6) Br. at 33.  IPOC then points out that the court in *B & W Management* expressly included " 'bribery' " and " 'intimidation . . . of employees' " among the acts that may constitute unfair competition.  IPOC Rule 12(b)(6) Br. at 33 (quoting *B & W Mgmt.*, 451 A.2d at 881 n.3).  IPOC overlooks that unfair competition does not reach bribery or intimidation of *any* employee, but rather only those instances that entail the interference with the plaintiff's commercial interests.

With respect to bribery, IPOC does not allege that Diligence or BGR bribed an agent or employee *of IPOC* to act against IPOC's interests.  Rather, IPOC alleges that Diligence or BGR

bribed "one or more agents or servants *of KPMG FAS*."  Compl. ¶ 19 (emphasis added).  As

demonstrated above, however, IPOC did not have a commercial or business relationship with

KPMG at all; it had an involuntary, official relationship with KPMG because KPMG was

appointed by the Bermudan government to investigate IPOC for misconduct.  Contrary to

IPOC's suggestion, the *B & W Management* court did not list "bribery"; it listed "*commercial*

bribery."  The difference is dispositive, as reflected by the very case on which IPOC relies.

Although commercial bribery is often defined by statute in ways specific to the context covered

by the statute, "[t]he essence of the commercial bribery offense . . . is the corruption or attempted

corruption by the produce seller of its buyer's agent or employee."  *JSG Trading Corp. v.

Department of Agric.*, 235 F.3d 608, 615 (D.C. Cir. 2001) (referring to the Perishable

Agricultural Commodities Act of 1930, 7 U.S.C. § 499b(4)).[36]  Thus, even if Diligence or BGR

did bribe KPMG, that bribe did not interfere with a cognizable commercial interest of IPOC's.

*Cf. General Elec. Co. v. Lyon*, 894 F. Supp. 544, 551 (D. Mass. 1995) (denying motion to

dismiss claim under statute prohibiting "acts that are unfair . . . in the conduct of any trade or

commerce" where plaintiff alleged that its competitor "exerted improper influence on a third

party to force it to terminate a business relationship with" plaintiff) (quotation marks omitted).

Similarly, employee intimidation must be directed toward the agent of an entity that

transacts business with the plaintiff or an agent of the plaintiff itself.  *See* PROSSER AND KEETON

ON THE LAW OF TORTS § 130, at 1013 (5th ed. 1984) (acts qualifying as unfair competition

---

[36] *See also Fedway Assocs., Inc. v. United States Treasury, Bureau of Alcohol, Tobacco &
Firearms*, 976 F.2d 1416, 1419 (D.C. Cir. 1992) ("[C]ommercial bribery" provision of Federal
Alcohol Administration Act, 27 U.S.C. § 205 (c), makes it unlawful for "a wholesaler to induce a
retailer to purchase its alcohol products to the exclusion in whole or in part of alcohol products
distributed by rival wholesalers.") (quotation marks omitted); *United States v. Di Girolamo*, 808
F. Supp. 1445, 1448 n.1 (N.D. Cal. 1992) ("Commercial bribery may assume any form of
corruption where an employee is induced to act against the best interests of his employer or to
compete unfairly with a competitor.").

include "intimidation or harassment of the plaintiff's customers or employees"); *see also*

*General Elec.*, 894 F. Supp. at 551 (harassment of competitor's employees constitutes a

"practice[] or act[] that [is] unfair . . . in the conduct of any trade or commerce"); *Dolphin Tours,*

*Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1510 (9th Cir. 1985) ("harassing

[competitor's] employees who tried to distribute promotional material" violates antitrust laws).

But again, only KPMG's employees are alleged to have been intimidated.  Compl. ¶ 48.

Therefore, for the same reason that the alleged bribery did not, as a matter of law, impinge on a

cognizable commercial interest, the alleged intimidation did not, as a matter of law, impinge on a

cognizable commercial interest.

IPOC has identified no other interest that might arguably be a cognizable commercial

interest, and so its unfair competition claim fails as a matter of law.

### E.    Count VI: Common-Law Conspiracy

IPOC claims in Count VI that Diligence and BGR conspired "to accomplish, by

concerted action, unlawful and tortious acts."  Compl. ¶ 51.  This claim fails as a matter of law

because it is not predicated on a valid independent tort claim.

"To prove a civil conspiracy, IPOC must show "(1) an agreement between two or more

persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury

caused by an unlawful overt act performed by one of the parties to the agreement; (4) which

overt act was done pursuant to and in furtherance of the common scheme."  *Halberstam v.*

*Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).  Thus, unlike under the criminal law, "there is no

recognized *independent* tort action for civil conspiracy in the District of Columbia [because]

liability for civil conspiracy depends on performance of some underlying tortious act."  *Id.*

(citations omitted).  Rather, civil conspiracy "is a means for establishing vicarious liability for

the underlying tort." *Id.*[37]

IPOC argues that the torts alleged in Counts I–V underlie its claim of civil conspiracy: "intentional interference with contractual relationships and business expectancies, violation of the Computer Fraud and Abuse Act, procurement of information by improper means and engaging in unfair competition."  Compl. ¶ 51; *see also* Compl. ¶ 53.  But as shown above, Counts I–V fail as a matter of law for assorted reasons.  Without a valid independent underlying tort claim, IPOC's claim for civil conspiracy also fails as a matter of law, as IPOC implicitly concedes.[38]  *See* IPOC Rule 12(b)(6) Br. at 35 ("[E]ach of IPOC's [other] claims is adequately pleaded.  Thus, the requirements to state a claim of civil conspiracy have been met . . . .").[39]

### F.     Count VII: Unjust Enrichment

"[T]o make out [a] case [for unjust enrichment], it is not enough for the plaintiff to prove merely that he has conferred an advantage upon the defendant, but he must demonstrate that retention of the benefit without compensating the one who conferred it is unjustified."

---

[37] *See also Paul v. Howard Univ.*, 754 A.2d 297, 310 n.27 (D.C. 2000) ("[C]onspiracy is not an independent tort but only a means for establishing vicarious liability for [an] underlying tort.") (quotation marks omitted) (second alteration supplied).

[38] In addition, the Court of Appeals for the District of Columbia has suggested "that a claim of civil conspiracy does not lie . . . [when the claim is based on] an action created by statute, which did not exist at common law, and therefore cannot give rise to tort liability."  *Executive Sandwich Shoppe*, *Inc. v. Carr Realty Corp.*, 749 A.2d 724, 739 (D.C. 2000) (quotation marks omitted).  Because the CFAA's private right of action did not exist at common law, IPOC's assertion of civil conspiracy with respect to the alleged CFAA violation (Count II) would fail as a matter of law even if IPOC's CFAA claim did not independently fail as a matter of law.

[39] *See also Executive Sandwich Shoppe*, 749 A.2d at 738 ("Because we affirm the trial court's determination regarding the alleged contract breaches, ESS's civil conspiracy claim premised on an economic tort theory fails as a matter of law for lack of an underlying tortious act."); *Dove v. Washington Metro. Area Transit Auth.*, 402 F. Supp. 2d 91, 99 (D.D.C. 2005) ("Because the court has granted summary judgment as to all of the plaintiff's other claims against WMATA, the court finds no tortious act to serve as a predicate for the plaintiff's conspiracy claim.  For this reason, the court grants the defendant's motion for summary judgment as to the plaintiff's claim of conspiracy.").

*Bloomgarden v. Coyer*, 479 F.2d 201, 211 (D.C. Cir. 1973); *see also Services Employees Int'l Union Health & Welfare Fund v. Philip Morris, Inc.*, 83 F. Supp. 2d 70, 93 (D.D.C. 1999) ("Plaintiffs must establish that . . . Defendants accepted or retained the benefit under inequitable circumstances.").  IPOC contends that the benefit Diligence and BGR received was the fees they were paid for their work, and that the retention of those fees would be unjust because they were earned "in exchange for" the alleged tortious actions that IPOC identifies in Counts I–IV. Compl. ¶ 55.  Because those counts fail as a matter of law for reasons discussed above, IPOC's unjust enrichment count also fails as a matter of law.

More fundamentally, a claim for unjust enrichment lies only if the " '[*plaintiff*] conferred a legally cognizable benefit upon Defendants,' " as IPOC acknowledges.  IPOC Rule 9(b) Br. at 9-10 (emphasis added) (alteration supplied) (quoting *Services Employees*, 83 F. Supp. 2d at 93); *see also* IPOC Rule 12(b)(6) Br. at 35 ("plaintiff must establish that . . . *it* conferred a legally cognizable benefit upon defendant") (emphasis added).  IPOC, however, does not seek restitution of a benefit that it conferred upon Diligence and BGR.  Rather, IPOC appears to seek disgorgement of "funds" paid to Diligence and BGR by their own clients.  *See* Compl. ¶¶ 55, 18, Prayer for Relief D.  A plaintiff may disgorge a benefit conferred by a third party only if the plaintiff had a prior right to the benefit conferred.  *See Tull v. United States*, 481 U.S. 412, 424 (1987) ("An action for disgorgement of improper profits[, however,] . . . is limited to restoring the status quo and ordering the return of that which rightfully belongs to the" plaintiff) (quotation marks omitted).  IPOC obviously had no prior right to any funds Diligence and BGR received from their clients, and therefore IPOC's unjust enrichment action fails as a matter of law.  *See Ellsworth Assocs. v. United States*, 917 F. Supp. 841, 848-49 (D.D.C. 1996) (plaintiffs failed to state valid unjust enrichment claim because "nowhere do the plaintiffs allege that any benefit has

been conferred on the . . . defendants *by the plaintiffs*" and because "there is no showing that the plaintiffs had any right to the benefit" that was conferred upon the defendants by a third party); *cf. Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, 48 F. Supp. 2d 37, 40 (D.D.C. 1999) (plaintiffs stated valid unjust enrichment claim where they sought disgorgement of their overpayments made to one defendant and passed through to other defendant).

## CONCLUSION

For the foregoing reasons, and for the reasons stated in Diligence's Rule 12(b)(6) briefs and BGR's Rule 9(b) briefs, the Court should dismiss this case in its entirety with prejudice. Oral argument on this matter is respectfully requested pursuant to Local Rule 7(f).

August 17, 2006                          Respectfully submitted,

                                         /s/ Charles J. Cooper
                                         _____
                                         Charles J. Cooper (D.C. Bar No. 248070)
                                         David H. Thompson (D.C. Bar No. 450503)
                                         Derek L. Shaffer (D.C. Bar No. 478775)
                                         COOPER & KIRK, PLLC
                                         Suite 750
                                         555 Eleventh Street NW
                                         Washington, DC 20004
                                         202-220-9600
                                         202-220-9601 (Fax)

                                         *Attorneys for Barbour Griffith & Rogers LLC*