# Exhibit 1



# In The Supreme Court of Bermuda

**COMMERCIAL COURT**
**2006 No. 176**

BETWEEN:

### LV FINANCE GROUP LIMITED          Plaintiff

**-and-**

### IPOC INTERNATIONAL GROWTH FUND LIMITED

**Defendant**

# RULING

Date of Hearing :  August 1, 2006
Date of Ruling:  August 31, 2006

Mr. Jeffrey Elkinson and Mr. Ben Adamson, Conyers, Dill & Pearman, for the Plaintiff;
Mr. Mark Diel , Marshall Diel & Myers, for the Defendant.

**Introductory**

1. By a Generally Indorsed Writ issued on June 7, 2006 in 2006: No. 170, the Plaintiff, a British Virgin Islands company ("LVFG"), seeks a permanent injunction restraining the Defendant, a Bermuda company ("IPOC"), from taking any further steps in proceedings in the Arbitration Court of the City of St. Petersburg and the Leningrad Oblast ("the St. Petersburg Proceedings") or otherwise bringing any proceedings in breach of the two Zurich arbitration awards and related declaratory and other  relief.

2. The First Partial Award is dated October 19, 2005 ("FPA") and the Second Partial Award is dated May 16, 2006("SPA"). Following an ex parte hearing, both awards were subsequently recognised by this Court on June 14, 2006 herein, when leave to enter judgment in terms of the awards was also given.  IPOC on or about June 21, 2006 filed a still pending appeal against the SPA under Swiss arbitration law, but has not obtained a stay of the latter award in support of the appeal . IPOC then applied by Summons dated July 5, 2006 to set aside the June 14, 2006 Order, which application falls for present consideration.

3. Three broad points were advanced by Mr. Diel on IPOC's behalf as grounds for setting aside the June 14, 2006 Order. Firstly, it was submitted that the present application was duplicative and an abuse of process, and accordingly should be stayed under the Court's inherent jurisdiction. Secondly, it was contended that the

Plaintiff's application was legally misconceived because (a) recognition was not available under Bermuda law, (b) only the awards and not the reasons for them were enforceable, (c) declarations were not, in any event, enforceable, and (d) there were public policy grounds for refusing to enforce the awards. Thirdly, it was argued that in light of the Defendant's pending appeal, the enforcement application should simply be adjourned under section 42(5) of the Bermuda International Conciliation and Arbitration Act 1993. Fourthly, it was argued that paragraph 1 of the Order made no legal sense and that paragraph 2(i) ought to be modified to reflect the terms of the FPA more accurately, even if the Order was not liable to be set aside.

4.  Four issues essentially fall for determination. Firstly, should the Plaintiff's application be adjourned, although it has been fully argued, no formal application for an adjournment was ever made and no evidence has been filed in support of the oral application first made at the substantive hearing of the Defendant's application to set aside the June 14, 2006 ex parte Order granting the Plaintiff leave to enter judgment in terms of the two Zurich awards? Secondly, should enforcement of the awards be refused on public policy grounds, namely that the Plaintiff is seeking to rely on its on own illegal conduct? Thirdly, a point which appears never to have been the subject of a considered judgment in a Commonwealth Court, can leave to enter judgment in terms of a declaratory award be granted at all? And, fourthly, should the terms of the June 14, 2006 Order be modified, even if it is not set aside.

**The arbitration agreements and the First and Second Partial Zurich Arbitration Award**

5.  LVFG and IPOC are, it is common ground, party to valid arbitration agreements governed by English law contained in Option Agreements dated April 14, 2001 ("the April Option Agreement") and December 10, 2001 ("the December Option Agreement") and providing for arbitration in Switzerland. A Geneva arbitration proceeding under the December Option Agreement which LVFG absented itself from resulted in a decision in favour of IPOC which is also subject to appeal ("the ICC Award). A Zurich arbitration proceeding in which both parties seemingly fully participated and which was commenced by IPOC under the April Option Agreement resulted in the FPA and the SPA. The latter award made various findings including the finding that a witness, whom LVFG contends was IPOC's main witness, lied before the Geneva tribunal and attempted to mislead the Zurich Tribunal. As a result, the Zurich Tribunal found it was entitled to disregard the ICC Award.

6.  Certified copies of both Zurich awards and the April Option Agreement containing the relevant arbitration agreement were exhibited to the First Affidavit of Justin Barrie Michaelson sworn on June 6, 2006 herein. The FPA including its reasons runs to 134 pages, but the substantive award provides as follows:

> "1.*Respondent's Prayer No. 1 referred to in para.60 hereinabove, requesting to note that Claimant's Initial Prayers for Specific Performance are withdrawn with prejudice, is hereby dismissed.*
>
> *2. The question whether Claimant's Initial Prayers for Specific Performance have been withdrawn without prejudice has become obsolete so that no decision on Respondent's alternative Prayer No.1 referred to in para. 60 hereinabove must be made.*
>
> *3. The decision on Respondent's Jurisdictional Objections referred to in paras. 68 et seq. hereinabove is deferred to a later stage of proceedings.*
>
> *4. Claimant's claim in Claimant's Prayer A/1, quoted in para. 59 hereinabove, is hereby fully dismissed.*
>
> *5. A decision on Claimant's claim in Claimant's Prayer A/2 quoted in para. 59 hereinabove, is deferred to a later stage of proceedings.*

> *6. Claimant's claim in Claimant's Prayer A/4 quoted in para. 59 hereinabove is deferred to a later stage of proceedings.*
>
> *7. Respondent's counterclaims in Respondent's Prayers Nos. 4 and 5 quoted in para. 60 hereinabove are deferred to a later stage of proceedings.*
>
> *8.Affirming Respondent's counterclaim in Respondent's Prayer No. 6 quoted in para. 60 hereinabove it is hereby declared that, Claimant has not validly exercised the April Option under the April Option Agreement by its purported option notices of July 29, 2003 (C-177) and August 12, 2003 (C-189).*
>
> *9.A decision on the cost [sic] of the Arbitral Tribunal and the Parties' costs relating to the proceedings on the Preliminary issues is deferred to a later stage of proceedings.*
>
> *10.Notice of this Partial Award will be given to the Parties by registered mail against return receipt.*"

7. The SPA including its reasons is 350 pages long, but the substantive award provides as follows:

> "*1.Respondent's Jurisdictional Objection in Respondent's BID-Prayer No. 1 (a) to (e) and referred to in paras. 174/175 et seq. hereinabove has become obsolete.*
>
> *2.Claimaint's BID-Prayer submitted in para. 1008 BID-Answer quoted in para. 163 hereinabove is hereby dismissed with regard to the Second Purported Option Notice and with regard to the Third Purported Option Notice has become obsolete in view of the unenforceability of the April Option Agreement.*
>
> *3.Claimant's BID-Prayers submitted in paras. 1009 to 1012 quoted in para. 163 hereinabove are hereby dismissed.*
>
> *4.Claimant's BID-Prayer submitted in para. 1013 BID-Answer quoted in para. 163 hereinabove has become obsolete because of the unenforceability of the April Option Agreement.*
>
> *5.Respondent's Prayer No. 4 quoted in para. 58 hereinabove is hereby dismissed except for the part requesting the Arbitral Tribunal to declare the April Option Agreement unenforceable, which part is hereby affirmed. The Arbitral Tribunal thus declares the April Option Agreement an illegal transaction: its purpose and performance are illegal, and it is therefore unenforceable.*
>
> *6.The alternative prayer contained in Respondent's Prayer No. 4 is hereby dismissed without prejudice.*
>
> *7.Respondent's Prayer No. 5 quoted in para. 58 hereinabove has become obsolete except for the part requesting the Arbitral Tribunal to declare that claims brought under the April Option Agreement are against public policy and arising ex turpi causa, which part covers Claimant's claims made in this arbitration relating to its attempted performance and enforcement of the April Option Agreement, is hereby affirmed. The Arbitral Tribunal thus declares that the claims brought by Claimant under the April Option Agreement are against public policy and arise ex turpi causa.*
>
> *8.The decision on the Costs of Arbitration as described in paras. 688 and 696 is hereby deferred to a later stage of proceedings.*

> *9. Notice of this Partial Award will be given to the Parties by registered mail against return receipt."*

**The June 14, 2006 Ex Parte Order**

8.   The Order that IPOC seeks to set aside was made by me on June 14, 2006 in the following principal terms:

> *"(1) The Awards made by the Arbitral Tribunal consisting of Dr. Daniel Wehrli, Chairman, Ian L. Meakin and Dr. Boris O. Kojevnikov at Zurich, Switzerland on the 19th day of October 2004 ('the First Partial Award') and on the 16th May 2006 ('the Second Partial Award')(collectively 'the Awards') together with their findings are hereby recognized by this Court;*
>
> *(2) The Plaintiff has leave to enforce the following declaratory judgments in the Awards by entering the following declaratory judgment:*
>
>> *(i) The Defendant has not validly exercised the April Option under the April Option Agreement (as defined in the Awards);*
>> *(ii) The April Option Agreement (as defined in the Awards) is an illegal transaction: its purpose and performance are illegal, and it is therefore unenforceable."*

9.  LVFG concedes that the Order should in any event be amended to add in paragraph 2(1) the words "*by its purported option notices of July 29, 2003 and August 12, 2003*", to more accurately reflect the terms of paragraph 8 of the FPA.

10. It is not disputed that the FPA and the SPA were made in a country, Switzerland, to which the New York Convention on the Reciprocal Enforcement of Arbitration Awards applies.

**The statutory regime for enforcing arbitration awards**

11. It is common ground that The Bermuda International Conciliation and Arbitration Act 1993 is the governing statute. Section 40 provides:

> **"Effect of Convention awards**
>
>> *40      (1)      A Convention award shall, subject to this Part, be enforceable in Bermuda either by action or may by leave of the Court, be enforced in the same manner as a judgment or order to the same effect and, where leave is so given, judgment may be entered in terms of the award.*
>>
>> *(2)      Any Convention award which would be enforceable under this Part shall be treated as binding for all purposes on the persons as between whom it was made, and may accordingly be relied on by any of those persons by way of defence, set off or otherwise in any legal proceedings in Bermuda and any reference in this Part to enforcing a Convention award shall be construed as including references to relying on such an award."*

12. This provision, or subsection (1) of section 40, is replicated for non-Convention awards by section 48 of the Act, which reads as follows:

> "**Enforcement of award**
> *48      An award on an arbitration agreement may, by leave of the Court, be enforced in the same manner as a judgment or order to the same effect*

*and, where leave is so given, judgment may be entered in terms of the award."[1]*

13. Section 23(1) of the 1993 Act provides that *"the Model Law has the force of law in Bermuda"*. Section 22 provides:

> *"**Interpretation***
> *22      Except so far as the contrary intention appears, a word or expression that is used both in this Part and in the Model Law (whether or not a particular meaning is given to it by the Model Law) has, in this Part, the same meaning as it has in the Model Law.*

14. The UNCITRAL Model Law on Commercial Arbitration adopted on June 21, 1985  by the United Nations Commission on Trade Law is set out in Schedule 2 to the Act. Article 35 of the Model Law provides as follows:

> *"Article 35.   Recognition and enforcement*
>
> *(1)      An arbitral award, irrespective of the country in which it was made, shall be recognized as binding and, upon application in writing to the competent court, shall be enforced subject to the provisions of this article and of article 36.*
> *(2)      The party relying on an award or applying for its enforcement shall supply the duly authenticated original award or a duly certified copy thereof, and the original arbitration agreement referred to in article 7 or a duly certified copy thereof. If the award or agreement is  not made in an official language of this State, the party shall supply a duly certified translation thereof into such language.***[***]"*

15. So both section 40 of the Act and Article 35 of the Model Law refer to recognition or reliance and enforcement as distinct concepts, and suggest that enforcement requires a positive application by the party seeking to rely on the award while recognition entails reliance on the award in subsisting legal proceedings. Section 40 applies to Convention awards, but Article 35 renders awards made in any country liable to mandatory recognition and enforcement as well. This illustrates the broad consistency of approach under the 1993 Act towards foreign arbitral awards.

16. It is not disputed that the FPA and the SPA are awards made in a country, Switzerland, which is a party to the New York Convention on the Reciprocal Enforcement of Arbitration Awards 1958 ("the New York Convention"). Section 2 of the Act provides: *""Convention award" means an award to which Part IV applies, namely, an award made in pursuance of an arbitration agreement in a State or territory other than Bermuda, which is a party to the New York Convention"*. And it follows that Part IV of the Act, rather than Part VIII of the Model Law (*"Recognition and Enforcement of Awards"*), applies to the present application, because section 28 of the Act provides:

> *"**Chapter VIII of Model Law not to apply in certain cases***
> *28      Where, but for this section, both Chapter VIII of the Model Law and Part IV of this Act would apply in relation to an award, Chapter VIII of the Model Law does not apply in relation to the award."*

17. So Part IV of the 1993 Act, and principally section 40, governs enforcement and recognition of the Convention awards to which the present application relates. Section 48, which appears in Part V and is cited in the heading to the present

---

[1] Order 73 rule 10 (1) of the Rules of the Supreme Court makes no reference to an application under section 40 of the Act, but the parties appear to have tacitly agreed that this rule applies to the present application.
[***] The conditions set forth in this paragraph are intended to set maximum standards.  It would, thus, not be contrary to the harmonization to be achieved by the model law if a State retained even less onerous conditions.

action, has no relevance to the present application[2]. Section 41 indicates the evidence required to prove the existence of the arbitration agreement and the relevant award. The statutory provisions governing the circumstances in which enforcement can be refused are contained in section 42, which provides:

> **"*Refusal of enforcement***
>
> 42    *(1)    Enforcement of a Convention award shall not be refused except in the cases mentioned in this section.*
>
> *(2)    Enforcement of a Convention award may be refused if the person against whom it is invoked proves —*
>> *(a)    that a party to the arbitration agreement was (under the law applicable to him) under some incapacity; or*
>>
>> *(b)    that the arbitration agreement was not valid under the law to which the parties subjected it or, failing any indication thereon, under the law of the country where the award was made; or*
>>
>> *(c)    that he was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or*
>>
>> *(d)    subject to subsection (4), that the award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration or contains decisions on matters beyond the scope of the submission to arbitration; or*
>>
>> *(e)    that the composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties or, failing such agreement, with the law of the country where the arbitration took place; or*
>>
>> *(f)    that the award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, it was made.*
>
> *(3)    Enforcement of a Convention award may also be refused if the award is in respect of a matter which is not capable of settlement by arbitration, or if it would be contrary to public policy to enforce the award.*
>
> *(4)    A Convention award which contains decisions on matters not submitted to arbitration may be enforced to the extent that it contains decisions on matters submitted to arbitration which can be separated from those on matters not so submitted.*
>
> *(5)    Where an application for the setting aside or suspension of a Convention award has been made to such a competent authority as is mentioned in subsection (2)(f), the Court before which enforcement of the award is sought may, if it thinks fit, adjourn the proceedings and may, on the application of the party seeking to enforce the award, order the other party to give security."*

18. IPOC does not oppose enforcement on any of the grounds contained in section 42(2). It contends enforcement simply does not apply to declarations, and then relies on the public policy exception in section 42(3). In addition, the Court is asked to exercise its discretion under section 42(5) to adjourn the enforcement application pending appeal, on the grounds that this may give rise to an objection to enforcement under section 42(2)(f) if the SPA is set aside.

---

[2] Order 73 rule 10 of the Rules accidentally omits any reference to section 40 at all, and merely refers in the enforcement context to  an application "*under section 48 of the Bermuda International Conciliation and Arbitration Act 1993 to enforce an award, irrespective of the country in which the award was made, on an arbitration agreement in the same manner as a judgment or order*". The rule correctly uses the language of Article 35 of the Model Law, which applies in conjunction with section 48, but mistakenly omits any reference to section 40.

19. The New York Convention is reproduced in Schedule 3 to the Act, but there is no explicit suggestion in the Act that the Convention is incorporated into Bermuda law. Rather, sections 41 and 42 appear to be enacted to give effect to Articles IV and V of the Convention. Section 40 appears to be intended to give effect to Article III, which provides:

> "*Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles. There shall not be imposed substantially more onerous conditions or higher fees or charges on the recognition or enforcement of arbitral awards to which this Convention applies than are imposed on the recognition or enforcement of domestic arbitral awards.*"

20. The Convention also treats recognition and enforcement as distinct legal processes. How these concepts are dealt with in the Bermuda legislation, which makes no explicit reference to "*recognition*" in Part IV at all, was highly controversial.

**Findings- the status of the awards, IPOC's appeal and the adjournment application**

21. I find that the FPA is not subject to any appeal so that no question of adjourning the enforcement application arises in this regard. I find that IPOC has on June 21, 2006 appealed the SPA, but has not sought or obtained a suspension of the award pending appeal. These facts are not in dispute.

22. It is not suggested by LVFG that the appeal, which complains essentially about the propriety of an arbitral tribunal making criminal law findings and about the refusal of an adjournment application, has no reasonable prospects of success on merits grounds. Rather, based on the First Gross Affidavit dated July 26, 2006, the Plaintiff submits that the statistical prospects of success are low. The further technical point is taken that no formal prayer for an adjournment is set out in the Defendant's Summons. It seems to me that an oral adjournment application can always be made, and that the present application should be considered on its merits.

23. In my view the crucial facts are that neither of the two awards are currently suspended nor have yet been set aside. An appeal against one award is pending, and it is possible that such appeal may succeed. It seems likely that the result of the appeal will not be known until next year. However, I accept that in statistical terms the prospects of the appeal succeeding are low. This Court expresses no view on the prospects of success of the particular points IPOC complains of in its appeal to the Swiss Court.

24. How should the discretion to adjourn under section 42(5) be exercised? IPOC's Counsel submitted textbook authority relevant to this issue. Mr. Diel plausibly argued that since one of the grounds of appeal was based on a ground for refusing enforcement under section 42(2)(d) of the Act ( exceeding the scope of the submission), adjournment was the only proper course. The Swiss court was the best forum to determine this issue on its merits. Mr. Elkinson persuasively argued that no basis for adjourning existed based on the statistical improbability of success on appeal and, more importantly, the fact that LVFG had a positive right to enforce its awards.

25. In *IPCO (Nigeria) Ltd v Nigerian National Petroleum Corporation* [2005] 2 Lloyd's Rep 326, Gross J of the English Commercial Court summarised the applicable law in a substantially similar statutory context as follows:

> "*8. Section 103 of the Act contains the exclusive and exhaustive grounds on which enforcement of a New York Convention Award may be refused. Insofar as material:*

7

*(1) Recognition or enforcement of a New York Convention award shall not be refused except in the following cases.*

*(2) Recognition or enforcement of the award may be refused if the person against whom it is invoked proves*

*(f) that the award has. . . been. . . suspended by a competent authority of the country in which, or under the law of which, it was made.*

*(3) Recognition or enforcement of the award may also be refused. . . if it would be contrary to public policy to recognise or enforce the award.*

*9. Section 103(5) of the Act provides as follows:*

*Where an application for the setting aside or suspension of the award has been made to such a competent authority as is mentioned in subsection (2)(f), the court before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the recognition or enforcement of the award.*

*It may also on the application of the party claiming recognition or enforcement of the award order the other party to give suitable security.*

*10. By the provisions of section 103 as set out above, the Act carries into English Law the substance of articles V.1(e), V.2(b) and VI of the New York Convention.*

*11. For present purposes, the relevant principles can be shortly stated. First, there can be no realistic doubt that section 103 of the Act embodies a pre-disposition to favour enforcement of New York Convention Awards, reflecting the underlying purpose of the New York Convention itself; indeed, even when a ground for refusing enforcement is established, the court retains a discretion to enforce the award: Mustill & Boyd, Commercial Arbitration, 2nd edn, 2001 Companion, at page 87.*

*12. Secondly, section 103(2)(f) is only applicable when there has been an order or decision suspending the award by the court in the country of origin of the award ("the country of origin"). Section 103(2)(f) is not triggered automatically by a challenge brought before the court in the country of origin. This conclusion flows from the wording of section 103(2)(f) itself, it is supported by leading commentators (Van den Berg, The New York Convention of 1958 (1981), at page 352, Fouchard, Gaillard, Goldman on International Commercial Arbitration (1999), at pages 980-981) and it is consistent with the provisions of sections 103(5) of the Act - which would be otiose, or at least curious, if an application to the court in the country of origin automatically resulted in the award being suspended...*

*15. ... the Act does not furnish a threshold test in respect of the grant of an adjournment and the power to order the provision of security in the exercise of the court's discretion under section 103(5). In my judgment, it would be wrong to read a fetter into this understandably wide discretion (echoing, as it does, article VI of the New York Convention). Ordinarily, a number of considerations are likely to be relevant: (i) whether the application before the court in the country of origin is brought bona fide and not simply by way of delaying tactics; (ii) whether the application before the court in the country of origin has at least a real (ie realistic) prospect of success (the test in this jurisdiction for resisting summary judgment); (iii) the extent of the delay occasioned by an adjournment and any resulting prejudice. Beyond such matters, it is probably unwise to generalise; all must depend on the circumstances of the individual case. As it seems to me, the right approach is that of a sliding scale, in any event embodied in the decision of the Court of Appeal in Soleh Boneh International Ltd v Government of the Republic of Uganda [1993] 2 Lloyd's Rep 208 in the context of the question of security:*

*. . . two important factors must be considered on such an application, although I do not mean to say that there may not be others. The first is the strength of the argument that the award is invalid, as perceived on a brief consideration by the court which is asked to enforce the award while*

> *proceedings to set it aside are pending elsewhere. If the award is manifestly invalid, there should be an adjournment and no order for security; if it is manifestly valid, there should either be an order for immediate enforcement, or else an order for substantial security. In between there will be various degrees of plausibility in the argument for invalidity; and the judge must be guided by his preliminary conclusion on the point.*
>
> *The second point is that the court must consider the ease or difficulty of enforcement of the award, and whether it will be rendered more difficult. . . if enforcement is delayed. If that is likely to occur, the case for security is stronger; if, on the other hand, there are and always will be insufficient assets within the jurisdiction, the case for security must necessarily be weakened.*
> *Per Staughton LJ, at page 212. See too: Fouchard, at page 982; Dardana Ltd v Yukos Oil Co [2003] 2 Lloyd's Rep 326."[3]*

26. The following key principles on the adjournment issue may be extracted from this decision: (a) legislation implementing the New York Convention has a bias towards enforcement, even where grounds for refusal exist, (b) the discretion to adjourn is unfettered, (c) general considerations relevant to the exercise of the discretion are likely to include whether the appeal has reasonable prospects of success, the length of the delay an adjournment will occasion and the extent of any resultant prejudice, and (d) pro-enforcement considerations will sometimes be outweighed by the need to defer to the courts of the jurisdiction chosen by the parties as the place for the arbitration to take place.

27. In the present case, the Plaintiff is not seeking to enforce a money award. So the need to protect the Defendant's commercial interests from being prejudiced if enforcement by execution proceeds and then is subsequently shown to be illegitimate, surely the implicit rationale underlying most adjournment applications, does not fall for consideration in the present context. Nor does the question of security being given during any adjournment period arise. LVFG ultimately seeks to enforce the SPA "*by applying for its permanent anti-suit injunctions.*"[4]

28. The Court on June 29, 2006, with IPOC's substantial agreement, ordered an expedited trial of the following issue which is scheduled to commence on September 5, 2006 in action 2006:170: are the Russian proceedings commenced in St. Petersburg in April 2006 in breach of the arbitration agreements contained in the option agreements, and on this ground alone liable to be permanently restrained? Subsequently, on August 2, 2006, an adjournment application in relation to that hearing was refused by this Court. If the present enforcement application is adjourned, the Plaintiff will be denied the opportunity to enforce the SPA, although it would in theory be able to enforce the less significant FPA in relation to which no case for adjournment can properly be made. For practical purposes, however, the Court could only sensibly adjourn enforcement of either both or neither of the awards.

29. It seems obvious that the primary purpose of the enforcement action is to support the permanent injunction application and related relief sought by the Plaintiff in its pending action in 2006: 270. So the prejudice the Plaintiff would suffer is clear. In 2006: 270, the Plaintiff seeks, inter alia, permanent injunctive relief not just based on the arbitration agreements, but also based on the awards. The adjournment of the present application, assuming it is otherwise meritorious, would require that the parties re-argue the enforceability arguments which have been fully argued on the present application to enable the Plaintiff to rely on the Zurich awards in the expedited trial scheduled to commence next week. And, possibly, it might result in these issues being re-argued on the trial of the other outstanding issues as well, depending on how long it takes the Swiss court to determine the appeal.

---

[3] At 328-329.
[4] Supplemental Submissions dated August 11, 2006.

30. The commencement of the present action would have been a matter of public record from as early as June 7, 2006. It seems likely that when the expedited trial of the permanent anti-suit injunction application was fixed on June 29, 2006, IPOC had already been served with the June 14, 2006 Order granting leave to enter judgment in terms of the Zurich awards, an engrossed form of which was filed for signature on June 16, 2006. Interestingly, the appeal against the May 16, 2006 SPA was lodged on June 21, 2006. It was not suggested on June 29, 2006 that the proposed expedited hearing in 2006:170 was premature, because the validity of the award was under challenge and that an application was proposed to be made to adjourn the enforcement proceedings until after the pending Swiss appeal.

31. In any event, IPOC duly filed its application to set aside the ex parte June 14, 2006 Order on July 5, 2006, and directions were ordered by consent on July 13, 2006 for the hearing of the application to set aside leave. The July 5, 2005 Summons did not, as LVFG's Counsel point out, seek an adjournment at all. At the July 13, 2006 directions hearing, it was open to IPOC to orally submit that the Summons should simply be adjourned pending the determination of the Swiss appeal. No such oral application was made. Equally, an application to amend to formally seek an adjournment could have been made. On July 20, 2006, the Second Vitou Affidavit was sworn in support of the application to set aside the June 14, 2006 leave Order. This Affidavit primarily points out the technical defects with the wording of paragraph 2(i) of the Order. Again, no hint of an application to adjourn is given. The Affidavit concludes in paragraph 19 as follows:

> "This Affidavit does not address the legal issues which arise in respect of LVFG's attempt to 'enforce' the FPA and/or the SPA under the Bermuda International Arbitration & Conciliation [sic] Act 1993...These are not matters of evidence and will be addressed in the appropriate manner."

32. It would make a mockery of rational case management and the Overriding Objective embodied in Order 1A of the Rules of the Supreme Court to both proceed with the expedited trial of LVFG's expedited anti-suit injunction application and to adjourn the present enforcement proceedings, assuming they are otherwise meritorious, especially after the enforcement application has been fully argued on its merits. Further, the evidence of Dr. Gross to the effect that the statistical prospects of success of IPOC's appeal against the SPA are less than 5% and that the appeal is not likely to be disposed of for at least six months is not contradicted by any other evidence. I also take into account the fact that any order made against the Defendant in reliance on the SPA could likely be remedied by this Court under the following provisions of its Rules:

> "**45/11   Matters occurring after judgment: stay of execution, etc.**
> **11**        Without prejudice to Order 47, rule 1, a party against whom a judgment has been given or an order made may apply to the Court for a stay of execution of the judgment or order or other relief on the ground of matters which have occurred since the date of the judgment or order, and the Court may by order grant such relief, and on such terms, as it thinks just."

33. It is difficult to identify any substantial prejudice to IPOC which would flow from refusing its adjournment application which cannot be compensated for by way of costs, the Plaintiff having elected to proceed with its permanent injunction application and to assume the risk that any order which is made in its favour in these proceedings and its injunction action may have to be discharged if the Defendant succeeds in setting aside the award through its Swiss appeal. The suggestion made in IPOC's written submissions that LVFG will in some way "*make mischief*" with any enforcement order to cause "*irreparable harm*" to

IPOC is not supported by any evidence, and is not on its face plausible in any event[5].

34.  On the other hand, there are strong policy reasons for dealing with an application to enforce a Convention award which appears to be duly enforceable in a prompt manner, and not allowing an appeal against the award which appears to have a 95% prospect of failing to delay proceedings before this Court. And on the unique facts of the present case, this Court can proceed without in any material way undermining the dignity of the foreign appellate court. The position would perhaps be different if allowing enforcement to proceed would likely result in assets being seized before the appeal was heard, thus undermining the utility of the foreign appeal.

35. Having regard to the lateness of the adjournment application as well as its lack of merit, I would refuse the application made orally on behalf the Defendant in the course of the hearing of the substantive application to set aside the June 14, 2006 ex parte Order.

**Findings: public policy grounds for refusing enforcement**

36.  Mr. Diel correctly submitted that where  an arbitration award is based on a claim which is illegal as matter of Bermuda law, enforcement can be refused under the public policy exception contained in section 42 (3) of the 1993 Act: *Soleimany-v-Soleimany* [1999] QB 785. However, this was a case which involved an award which "*refers on its face to an illegal enterprise which  the English court views as contrary to public policy.*" [6]

37.  Paragraph 7 of the SPA crucially provides as follows: "*The Arbitral Tribunal thus declares that the claims brought by Claimant under the April Option Agreement are against public policy and arise ex turpi causa*". The award does not refer on its face to an illegal transaction which neither party is able to enforce. The award merely  declares that IPOC may not enforce the April Option Agreement. LVFG is seeking to enforce an award which declares that the underlying contract is not enforceable by IPOC by reason of illegality. It is not seeking to recover money or other contractual rights under a contract which arbitrators have held it cannot enforce. Rather, it is seeking to uphold the finality of the arbitrator's decision that the April Option Agreement is not enforceable by IPOC, in circumstances where it is not contended that the arbitration agreement itself was vitiated by the illegality in question.

38. On the contrary, IPOC in its appeal against the SPA is seeking to contend that it was not open to the arbitrators to make the findings of illegality which form the subject of the award. It is an inconsistent argument to contend both that enforcement should be postponed and /or refused because the award includes findings on illegality which were beyond the arbitrators' jurisdiction (section 42(2)(d)) and at the same time to contend that the award should not be enforced because of the arbitrators' findings that the underlying contract was illegal. Unsurprisingly, IPOC has advanced these inconsistent positions merely by way of argument, unsupported by any evidence.

39.  In my view no question of any public policy impediment to enforcement arises because in the present case the award is untainted by the underlying illegality. It cannot be contrary to Bermudian public policy for an award which has found that an illegal contract cannot be enforced by the Defendant to be upheld at the instance of the Plaintiff. The position would be different if the Plaintiff was asserting a claim based on the illegality found by the arbitrators, or positively seeking to derive a benefit under the illegal contract. All that the Plaintiff seeks to do in enforcing the award is to enjoy the benefits of the agreement to arbitrate, which it is not contended is itself unenforceable.

---

[5] The mere possibility that any order made by this Court may be relied upon in foreign proceedings is not by itself a ground for refusing to grant the relief the Plaintiff seeks.
[6] Per Waller LJ at page 804.

40. To what extent should this Court investigate the issue of whether the award is tainted by illegality? The following dictum of Mantell LJ, on behalf of the English Court of Appeal majority[7] in *Westacre Investments Inc v Jugoimport-SDPR Holding Co Ltd and others* [2000] 1 QB 288, is instructive:

> "*However, in the obiter passage cited by Waller LJ from the judgment in Soleimany v Soleimany [1999] 3 All ER 847, [1999] QB 785, it seems to have been suggested that some kind of preliminary inquiry short of a full scale trial should be embarked upon whenever 'there is prima facie evidence from one side that the award is based on an illegal contract'. For my part I have some difficulty with the concept and even greater concerns about its application in practice, but, for the moment and uncritically accepting the guidelines offered, it seems to me that any such preliminary inquiry in the circumstances of the present case must inevitably lead to the same conclusion, namely, that the attempt to reopen the facts should be rebuffed. I so conclude by reference to the criteria given by way of example in Soleimany v Soleimany itself. First, there was evidence before the tribunal that this was a straightforward, commercial contract. Secondly, the arbitrators specifically found that the underlying contract was not illegal. Thirdly, there is nothing to suggest incompetence on the part of the arbitrators. Finally, there is no reason to suspect collusion or bad faith in the obtaining of the award. The seriousness of the alleged illegality to which Waller LJ gives weight is not, in my judgment, a factor to be considered at the stage of deciding whether or not to mount a full scale inquiry. It is something to be taken into account as part of the balancing exercise between the competing public policy considerations of finality and illegality which can only be performed in response to the second question, if it arises, namely should the award be enforced.*"[8]

41. This passage illustrates that in the present case this Court has no grounds for going behind the findings set out in the SPA as to illegality. Those findings crucially were that the April Option Agreement was *not* void (SPA, paragraph 673), but was "*unenforceable as a matter of English public policy*" because it "*was entered into for an illegal purpose and that its performance entailed the commission of criminal offences in Russia...and any claim brought under the said agreement arises ex turpi causa.*" (paragraph 674). The arbitral tribunal expressly considered the question of whether the fact that agents of LVFG "*were complicit in entering into the April Option Agreements for an illegal purpose*" (paragraph 667) impacted on its entitlement to the declaratory relief sought. The tribunal, applying English law, concluded that if discretionary equitable relief was being sought, such relief would not be granted. Because declarations were a statutory discretionary remedy, the relief sought would be granted (paragraphs 668, 671).

42. So the arbitrators expressly considered the impact of the Plaintiff's participation in the illegal agreement on the ability of the Plaintiff to obtain the declaratory relief sought, and exercised its discretion in favour of granting the declarations which LVFG now seeks to enforce. These findings were reached in arbitration proceedings brought by IPOC, and were regarded by the tribunal as the reverse side of the relief sought by IPOC which was refused, relief which had to be granted to enable the tribunal to decide the issues referred to it under the arbitration clause. The tribunal described its findings, having regard to LVFG's implication in the illegality as "*uncomfortable*", and foreshadowed sanctioning LVFG in costs (paragraph 715).

43. In carrying out what Sir Charles Mantell in *Westacre* referred to as a "*balancing exercise between the competing public policy considerations of finality and illegality*", it seems to me that this is very clearly a case where finality prevails. The contrary conclusion would discourage parties from raising allegations of illegality in arbitration proceedings altogether, or create a situation where all

---

[7] Affirming the first instance decision of Colman J, on which the Plaintiff relied.
[8] At 316-317.

findings of illegality in the arbitration context had to be re-litigated in a court to achieve finality. Taken to its logical conclusion, the Defendant's arguments on this issue would potentially deprive the courts of the ability to decide that a contract was illegal, because the party raising the illegality defence (and implicated in the illegality) was seeking to benefit from the illegal transaction. It does not follow that any finding of illegality in relation to a contract automatically disqualifies the parties to the impugned transaction from seeking any form of legal relief relating to the illegal contract.

44. It is correct, as held in Soleimany-v- Soleimany [1999] QB 785 at  793 and by the arbitral tribunal in the SPA, that if "*at the time of making the contract there is an intent to perform it in an unlawful way, the contract, although it remains alive, is unenforceable at the suit of the party having that intent; if the intent is held in common, it is not enforceable at all*"[9]. An application for enforcement of the SPA is, on the applicable facts, wholly distinct from enforcing the underlying contract which has been held to be unenforceable. The Plaintiff is seeking to enforce the finding that the contract is not enforceable, not to enforce the unenforceable April Option Agreement. LVFG may be seeking, in an indirect sense, to retain a commercial benefit it may have derived from the illegal transaction, but this does not approach the level of offence to public policy which has been held to arise where enforcement entails recovering a direct benefit under a contract which the enforcing court considers to be void for illegality in circumstances where the arbitrators have nevertheless held the contract to be valid. In *Soleimany*, the enforcement application was indistinguishable from enforcing the illegal contract, because the purpose of enforcement was to recover monies due under the impugned contract. Here, the purpose of enforcement is to prevent the Defendant from relying on the illegal agreement.

45. No authority was cited which supports the proposition that where a party is seeking to enforce an award which grants the enforcing party a declaration that a contract is unenforceable , enforcement of such finding should be refused on public policy grounds[10]. The Court is, in general terms, under a positive duty to enforce the award, and the onus is on the Defendant to make out the public policy exception raised in argument. In this case the public policy argument was not supported by any evidence, and is diametrically opposed to the position which IPOC has taken in seeking to set aside the award itself on appeal, namely that the findings of illegality ought not to have been made in the first place.

46. In my view, no  or no sufficient public policy grounds justifying this Court exercising its discretion in favour of  refusing enforcement of the awards have been  demonstrated, and this objection to enforcement  is accordingly rejected.

**Findings : does the New York Convention as implemented by Part IV of the Bermuda International Conciliation and Arbitration Act 1993 apply to declaratory awards?**

47. The strongest argument advanced against enforcement of  both  the FPA and the SPA was that, as a matter of construction of the seemingly unique provisions of section 40 of the Bermuda International Conciliation and Arbitration Act 1993 and as a matter of general principle, enforcement (as opposed to recognition) was not available in respect of a wholly declaratory award. Both Counsel skilfully supported their positions with reference to general principles rather than directly applicable authority, there being no Bermudian or persuasive considered authority directly on point.

48. Interpreting section 40 is particularly difficult because this Court does not routinely enforce Convention awards by way of contested applications, and no Bermudian authorities were cited in argument. The Court is only aware of two Bermudian cases[11] in which contested enforcement applications have taken place,

---

[9] Stuart-Smith L.J. in a *Royal Boskalis Westminster N.V. v. Mountain* [1999] Q.B. 674, 691-692, cited with approval in *Soleimany-v-Soleimany*.

[10] Counsel for the Defendant, of course, submits that declaratory awards are not enforceable in any event.

[11] *Soujuznefteexport-v-Joc Oil Ltd.* [1989] Bda LR 11; *New Skies Satellite BV –v- FG Hemisphere Associates LLC* [2005] Bda LR 59.

and neither of those cases involved any consideration of the difference between enforcement and recognition, or (in the one case which considered section 40 itself), the interaction between subsections (1) and (2).

49. Despite recourse to electronic legal research resources, neither Counsel nor the Court were able to find any authority directly supporting or refuting the proposition that New York Convention awards which are purely declaratory are not capable of being enforced by entering a judgment in terms of such an award. In these circumstances it is impossible to fairly deal with the point summarily, even if the ultimate conclusion seems to be obvious. It is, after all, a point which does at first blush appear to be supported by persuasive English authority.

50. Mr. Diel initially contended that the most that LVFG could properly do was to rely on the award as a shield in any independent proceedings, which was all it essentially sought to do. It was seeking to defend itself against the Russian proceedings, and was free to argue in its action for permanent injunctive relief that the award should be recognised. But the logic of his interpretative analysis would mean that the Plaintiff could not even rely on the awards, because they were not "*enforceable*" as required by section 40(2).

51. Although section 40 referred to both recognition and enforcement, it only permitted enforcement of an award, and declarations that a contract was unenforceable were themselves not capable of "enforcement", and could merely be recognised. However, Counsel submitted, due to the peculiar drafting of section 40(2) of the Act, reliance was only possible on the same terms as enforcement if the award was "*enforceable*".

52. Mr. Elkinson argued that section 40 must be construed in a way which was consistent with the New York Convention, which it was intended to implement, and that properly construed recognition and enforcement were not wholly distinct concepts. In any event, the purpose of enforcement in the present case was to obtain a permanent injunction against the Defendant in 2006: 270.

53. These arguments require consideration of the meaning of section 40, as read with the New York Convention. Sections 39- 40 of the Act provide as follows:

"*PART*                                                                                      *IV*
*ENFORCEMENT OF CONVENTION AWARDS*

*Effect this Part*
39   *This Part shall have effect with respect to the enforcement of Convention awards.*

*Effect of Convention awards*
40   (1)   *A Convention award shall, subject to this Part, be enforceable in Bermuda either by action or may by leave of the Court, be enforced in the same manner as a judgment or order to the same effect and, where leave is so given, judgment may be entered in terms of the award.*

(2)   *Any Convention award which would be enforceable under this Part shall be treated as binding for all purposes on the persons as between whom it was made, and may accordingly be relied on by any of those persons by way of defence, set off or otherwise in any legal proceedings in Bermuda and any reference in this Part to enforcing a Convention award shall be construed as including references to relying on such an award.*"

54. Section 40 (1), it is on reflection clear, simply enables a party wishing to enforce a Convention award the right to apply for leave to enter judgment in terms of the award, or to enforce the award by action. It is difficult to imagine why a litigant would choose to enforce an award by action rather than simply entering a judgment by leave. But circumstances might exist where the award was incapable of being converted into a judgment (by reason of incompleteness or uncertainty or

14

because it was oral[12]), but the arbitrator's partial findings could nevertheless be relied upon in a fresh action to obtain a local judgment. Section 40(1) contains no explicit restriction to non-declaratory awards. It prescribes the two methods by which a Convention award may be directly enforced under the 1993 Act. The Plaintiff seeks to invoke the summary remedy of entering judgment in terms of the awards.

55. Section 40(2), somewhat curiously drafted, serves two functions. Its main practical purpose is to provide a party wishing to rely on an award without taking positive enforcement steps under section 40(1) with the alternative tool of relying on the award *"by way of defence, set off or otherwise in any legal proceedings in Bermuda"*. But the relying party can only do so if the award in question *"would be enforceable under this Part"*. Mr. Diel was correct when he submitted that unless an award was capable of enforcement under section 40(1) and Part IV generally, it cannot be relied upon in other proceedings under section 40(2). The subsidiary and more theoretical function of section 40(2) is to explain the legal effects of reliance on an enforceable Convention award, namely that it *"shall be treated as binding for all purposes on the persons as between whom it was made"*. The subsection concludes with the phrase: *"and any reference in this Part to enforcing a Convention award shall be construed as including references to relying on such an award."*. So Mr. Elkinson was also correct when he submitted that for the purposes of Part IV, the concept of enforcement embraces recognition or reliance as well.

56. It does not follow, therefore, that enforcement under section 40(1) is restricted to only those categories of awards which if converted into judgments would be capable of enforcement by way of execution. IPOC's argument in part relied on the assertion that enforcement, as opposed to reliance, was wholly inappropriate for a declaratory judgment. Yet the logical conclusion of this line of reasoning was that, if reliance under subsection (2) was only available in respect of awards capable of enforcement by way of execution, LVFG would not be able to rely on the awards in its injunction proceedings in any event, were the June 14, 2006 Order to be set aside. This section does not explicitly distinguish between *"recognition"* and *"enforcement"*, but as Mr. Elkinson rightly pointed out, these two concepts are overlapping ones. In granting leave to enter a judgment in terms of a Convention award, the Court is both recognising and facilitating enforcement the award. This construction is consistent with the New York Convention, which applies in relevant part as follows:

> "              *Article III*
> *Each Contracting State* **shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon**, *under the conditions laid down in the following articles. There shall not be imposed substantially more onerous conditions or higher fees or charges on the recognition or enforcement of arbitral awards to which this Convention applies than are imposed on the recognition or enforcement of domestic arbitral awards.*

*Article IV*

> *1      To obtain the* **recognition and enforcement** *mentioned in the preceding article, the party applying for* **recognition and enforcement shall**, *at the time of the application, supply–*
>
> *(a)     the duly authenticated original award or a duly certified copy thereof;*
>
> *(b)     the original agreement referred to in article II or a duly certified copy thereof.*
>
> *2      If the said award or agreement is not made in an official language of the country in which the award is relied upon, the party applying for* **recognition and enforcement** *of the award*

---

[12] These circumstances are discussed by Merkin, '*Arbitration Law*', at paragraphs 17.9-17.13.

*shall produce a translation of these documents into such language. The translation shall be certified by an official or sworn translator or by a diplomatic or consular agent."* [emphasis added]

57. The New York Convention clearly envisages that recognition and enforcement go together, rather than being mutually exclusive concepts, and the wording of Article III speaks of the award being "*relied upon*" reference to both recognition and enforcement. In the only Court of Appeal for Bermuda decision on enforcement proceedings under the Act (where a wholly different procedural question arose), *New Skies Satellite BV-v- FG Hemisphere Associates LLC* [2005] Bda LR 59 , Acting President Sir Anthony Evans recently observed:

> " *The scheme enacted in Bermuda by the 1993 Act is clearly different from the English equivalent. But we can approach the construction of section 40(1) of the Act on the basis that it was intended to give effect to the same international obligation to provide a summary procedure for enforcement of foreign Convention awards, as an alternative to the right to enforce the award by an action in personam. Indeed, in case of ambiguity the Act should be interpreted in a manner which gives effect to the relevant treaty obligations, rather than contradicts them.*"[13]

58. In my view these observations, albeit made in the context of considering whether Order 11 of this Court's rules applied to a section 40(1) application, apply with equal force to the question under present consideration. Does section 40(1) apply to Convention awards generally, or does it exclude declaratory awards? In my view there is no or no compelling reason for construing section 40(1) as only permitting the enforcement of non-declaratory awards. It cannot be contended credibly that the New York Convention requires recognition and enforcement of all awards save for declaratory awards. The terms of the statute are in my view not ambiguous, but if they were I would resolve the ambiguity in favour of a construction which conforms to the Convention, and hold that section 40 (1) applies to declaratory and non-declaratory awards.

59. Section 2(1) of the Act provides that " *'arbitral award' has the same meaning as in the New York Convention."* Section 2(1), most significantly for present purposes also states: "*'Convention award' means an award to which Part IV applies, namely, an award made in pursuance of an arbitration agreement in a State or territory other than Bermuda, which is a party to the New York Convention.*" So the crucial question is whether the New York Convention applies to declaratory awards or only to awards enforceable by execution.

60. Article I (2) of the New York Convention has an open-ended definition of the term award: "*The term 'arbitral awards' shall include not only awards made by arbitrators appointed for each case but also those made by permanent arbitral bodies to which the parties have submitted."* This definition first appeared in the draft of the Convention provisionally approved by the Drafting Committee on June 6, 1958 at the United Nations Conference on Commercial Arbitration. The *travaux preparatoires* of the Convention do not suggest that the application of the Convention to declaratory awards was ever explicitly considered[14]. However, there is no basis for construing the term as applying only to certain types of awards. Indeed, it has recently been observed that "*the Convention deals only with the recognition and enforcement of <u>awards</u>, that is, final and binding decisions.*"[15] The scheme of the Convention is as follows. Firstly Article I(1) limits the application of the Convention to :

---

[13] Judgment dated December 2, 2005, page 8.
[14] http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/NYConvention_travaux.html. At this time, the United Kingdom practice at least appears to have been for arbitrators to refer questions of law to the courts. Switzerland signed the convention on December 29, 1958, and ratified the Convention on June 1, 1965. The United Kingdom acceded to the Convention on September 24, 1975.
[15] Werner Melis, Chairman of the Austrian International Arbitration Court, Austrian Economic Chamber in '*Enforcing Arbitration Awards under the New York Convention:Experience and Prospects*' (United Nations: New York, 1998) page 44.

*"the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal. It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought."*

61.    Article III mandates recognition and enforcement of *"arbitral awards"*, and refusal of enforcement is spelt out in restrictive terms by Article V of the New York Convention as follows:

*"Article V*

*1        Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that–*

*(a)      the parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or*

*(b)      the party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or*

*(c)      the award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or*

*(d)      the composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or*

*(e)      the award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.*

*2        Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that—*

*(a)      the subject matter of the difference is not capable of settlement by arbitration under the law of that country; or*

*(b)      the recognition or enforcement of the award would be contrary to the public policy of that country."*

62.  The only type of award which may not be enforced, apart from awards which may be set aside on grounds relating to the arbitrators or the arbitration agreement, are awards which are made pursuant to an irregular procedure (Article V(1)(d) or awards which are not yet final (Article V(1)(e)). There is no stated ground for refusing enforcement relating to the nature of the decision involved. In my view it would be inconsistent with the New York Convention for section 40(1) of our 1993 Act to be construed in a way which automatically excluded declaratory awards from enforcement. The approach of the Convention and Part IV of the 1993 Act appears to be that the enforceability of awards is to be governed by the agreement of the parties embodied in the arbitration agreement and the supervisory law of the place they have chosen for the arbitration to take

place. Such a broad international instrument intended to support the finality of awards made globally under contractually agreed dispute resolution procedures can hardly be expected to have condescended to prescribing what forms of award should or should not fall within its ambit.

63. Article V(1) (d) does permit refusal of recognition or enforcement where the arbitral procedure is inconsistent with the arbitration agreement or the law of the place of arbitration, so it may be contended that where the law governing a contract or the curial law of the arbitration proceedings prohibits declaratory relief for the claim in question, that enforcement may be refused on such grounds. But there is nothing in the Convention itself which suggests a *carte blanche* exclusion of declaratory awards from the ambit of the Convention's application. Nor is there any suggestion in the present case that either the arbitration agreement (which requires the arbitrators to apply English law as the governing law of the contract) or Swiss law (the law of the place where the arbitration took place) prohibits the making of declaratory awards in this case.

**Findings: does the concept of "enforcement" as defined in section 40(1) of the 1993 Act make it impossible to obtain leave to enter judgment in terms of a declaratory award?**

64. In case I am wrong, and the above analysis does not completely dispose of the issue of the enforceability of the FPA and the SPA, I will proceed to deal with the further argument that the very term "*enforcement*" is wholly inapplicable to declaratory judgments, and that although the New York Convention explicitly applies to both enforcement and recognition, section 40 mandates that even reliance only applies to awards that are "*enforceable*". This argument may be illuminated by comparing and contrasting the provisions of section 40 with those of section 101 of the United Kingdom 1996 Act, which provide as follows:

> "***101 Recognition and enforcement of awards***
>
> *(1) A New York Convention award shall be recognised as binding on the persons as between whom it was made, and may accordingly be relied on by those persons by way of defence, set-off or otherwise in any legal proceedings in England and Wales or Northern Ireland.*
>
> *(2) A New York Convention award may, by leave of the court, be enforced in the same manner as a judgment or order of the court to the same effect.*
>
> *As to the meaning of "the court" see section 105.*
>
> *(3) Where leave is so given, judgment may be entered in terms of the award.*"

65. Section 40, it may be helpful to set out again for comparative purposes, provides as follows:

> "***Effect of Convention awards***
>
> *40 (1)    A Convention award shall, subject to this Part, be enforceable in Bermuda    either by action or may by leave of the Court, be enforced in the same manner as a judgment or order to the same effect and, where leave is so given, judgment may be entered in terms of the award.*
>
> *(2) Any Convention award which would be enforceable under this Part shall be treated as binding for all purposes on the persons as between whom it was made, and may accordingly be relied on by any of those persons by way of defence, set off or otherwise in any legal proceedings in Bermuda and any reference in this Part to enforcing a Convention award shall be construed as including references to relying on such an award.*"

66. It is, perhaps, more logical for the recognition provision to be set out before the leave to enforce provision, as the draftsman of section 101 of the U.K. 1996 Act chose to do. This helps to emphasise a natural hierarchy of the general over the

particular. The governing general principle is that "[a] *New York Convention award shall be recognised as binding on the persons between whom it was made*" (U.K. subsection (1)) or "[a]*ny Convention award which would be enforceable under this Part shall be treated as binding for all purposes on the persons as between whom it was made*" (Bermuda subsection (2)). The subsidiary explanatory principle describes the consequences of recognition. The effect of recognition is that a Convention award "*may accordingly be relied on by those persons by way of defence, set-off or otherwise in any legal proceedings*" (UK subsection (1)/Bermuda subsection (2)). Subsection (1) of the UK section 101 and subsection (2) of the Bermudian section 40 in identical terms provide a non-exhaustive list of the ways in which a recognised Convention award may be relied upon. Subsection (2) of the English provision and subsection (1) of the Bermudian provision both create a particular form of reliance, or enforcement, which is analogous to registration of a foreign judgment under reciprocal enforcement of judgments legislation. The English provision more simply states that "*a Convention award may, by leave of the court, be enforced in the same manner as a judgment or order to the same effect*". The Bermudian provision is to this extent identical, but adds, somewhat confusingly, a reference to the old common law remedy of an action on the award.

67. It cannot be doubted, reading section 40 as a whole, that an application for leave to enter judgment in terms of an award requires the applicant to pass through two filters. Firstly, the applicant must demonstrate that the award is prima facie one which the court is bound to recognise by virtue of section 40(2), by producing certified copies of the documents referred to in section 41. The onus is on the party opposing enforcement to persuade the court that grounds for refusing enforcement under section 42 have been made out. I accept the submissions advanced on behalf of the Plaintiff in this regard. But, secondly, the applicant must demonstrate that the court may properly exercise its discretion in favour of entering judgment in terms of the particular Convention award. In this regard, I accept the submissions advanced on the Defendant's behalf.

68. Under the U.K. provision, recognition is mandatory and entitles either party to a Convention award to rely on it under section 101(1). Enforcement in the same manner as a judgment appears to be discretionary. The same is true of our section 40(2), which uses the term reliance instead of "recognition", and section 40(1), respectively. Section 102(1) of the UK 1996 Act, which is the counterpart of our section 42(1), more elegantly provides that "*Recognition or enforcement of a New York Convention award shall not be refused except in the following cases.*" Our section 42(1) simply refers to "*enforcement*", and this necessitates the rather cumbersome phrase at the end of our section 40(2), "*and any reference in this Part to enforcing a Convention award shall be construed as including references to relying on such an award*". The draftsman of the 1996 UK Act was, perhaps, given an opportunity to improve upon the Bermuda wording, which was possibly based on an earlier Hong Kong precedent.

69. But because our section 40(2) imposes as a precondition of reliance that the Convention award must be "*enforceable under this Part*", the Defendant's Counsel contends that enforcement has a narrow and distinct meaning, which qualifies the type of Convention award to which section 40 applies. In my view this analysis is misconceived. The term "*enforceable under this Part*" in section 40(2) simply means that the Convention award shall only be recognised as binding and relied upon if (a) the formal proof requirements of section 41 are complied with, and (b) there are no grounds for refusing recognition under section 42.

70. The words "*Enforcement of a Convention award shall not be refused except in the cases mentioned in this section*" in section 42(1) can only sensibly be construed as embracing both enforcement under section 40(1) and recognition and/or reliance under section 40(2), in light of the reference to enforceability in section 40(2). In other words, the term "enforcement" in section 42(2) is used in a broad *sui generis* sense commensurate with the statutory context. So the Bermudian and English approaches are, linguistic idiosyncrasies apart, essentially the same.

71. In my judgment it makes no sense to read subsection (2) of section 40 as providing that a Convention award cannot be relied upon unless it is capable of being enforced in a narrow sense, for instance, by way of execution. But section 40(2) is not engaged on the present application, in that recognition is not in issue. What is in issue is whether the declaratory awards are capable of being entered as a Bermuda judgment for the purposes of further enforcement action, under section 40(1). Mr. Elkinson is right that recognition ("shall be treated as binding") is mandatory, but I accept Mr. Diel's submission that whether or not judgment is entered in terms of the award is, to some extent at least, a discretionary matter. In this regard, it is still necessary to consider (a) the meaning of enforcement in the context of section 40(1), and (b) the authorities relied upon by IPOC for refusing to grant leave to enforce the declaratory awards under section 40(1) of the 1993 Act.

72. Redfern and Hunter, in '*The Law and Practice of International Commercial Arbitration*', 3rd edition, placed before the Court by the Plaintiff but relied upon in this regard by the Defendant's Counsel, at paragraph 10-10-10-12 observe:

> "*Recognition on its own is generally a defensive process. It will usually arise when a court is asked to grant a remedy in respect of a dispute that has been the subject of previous arbitral proceedings. The party in whose favour the award was made will object that the dispute has already been determined. To prove this, he will seek to produce the award to the court and ask the court to recognise it as valid and binding between the parties...by contrast, where a court is asked to enforce an award, it is asked not merely to recognise the legal force and effect of the award, but also to ensure that it is carried out, using such legal sanctions as are available...Enforcement of an award means applying legal sanctions to compel the party against whom the award was made to carry it out.*"

73. It seems to me that in substance, the Plaintiff seeks to use enforcement in the present case as a sword rather than a shield as it wishes to compel the Defendant in proceedings it has instigated in Bermuda to desist from re-litigating issues it contends were resolved by the awards. LVFG has deliberately chosen not to merely use the awards as a shield in the Russian proceedings commenced by IPOC. This analysis, though, is more relevant to whether the discretion to grant the application may properly be exercised than to how section 40 should be construed.   One only reaches this question if one has first concluded that a declaratory award can be enforced under section 40(1) at all.  As a matter of broad principle, however, it would produce an illogical and absurd result if a declaratory award could be recognised and relied upon in a defensive manner under section 40(2), but could not be enforced under section 40(1) at all, which is why my primary finding is that the term "*Convention award*" as used generally in Part IV of the Act applies to declaratory and non-declaratory awards alike.

74. It is clear that declaratory judgments cannot be enforced by execution in the traditional narrow sense:

> "*Many judgements and orders given or made in civil proceedings do not require to be enforced because the judgment or order itself is all that the party obtaining it requires...a declaratory judgment is complete in itself, since the relief is the declaration.*"[16]

75. But this statement is incomplete as it can hardly be contended that the need to enforce a declaratory judgment never arises. And any complete analysis of the various ways in which judgments can be enforced is bound to concede that the execution of judgments, which on their face require specific enforcement to ensure their compliance, does not adequately define the true parameters of the concept of enforcement:

---

[16] *Halsbury's Laws*, Fourth Edition Reissue, Vol. 17(1), paragraph 1.

"*Besides the various modes of execution and analogous proceedings, bankruptcy and winding-up proceedings may be utilised to enforce judgments for sums of money,* **and in certain cases it may be necessary or desirable to bring further proceedings founded on a previous judgment.**"[17] [emphasis added]

76.  Thus Forbes J observed in *Webster-v-Southwark London Borough Council* [1983]QB 698 at 706:

> "*I readily accept the proposition that where a court makes only a declaratory order it is not contempt for the party affected by the order to refuse to abide by it. If he does so refuse no doubt the other party can go back to the court and seek an injunction to enforce the order; but mere refusal of one party to an action to abide by a declaratory order is not, as I understand it, contempt of court*".

77.  So applying general domestic law principles, if the Plaintiff were able to enter judgment in terms of the Zurich awards, this would not be enforcement in the narrow sense, but would facilitate enforcement (in the narrow sense) by an application for injunctive relief to enforce the domesticated Convention award. Looked at in this light, it is clear that the concept of enforcement in the New York Convention context can only mean enforcement in a broader sense. Because all the Convention really requires is that applicable awards should be recognised for enforcement purposes under special legislation designed for this purpose, so that   generally available local enforcement procedures can then be invoked. Thus Article III of the New York Convention provides:

> "*Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon.*"

78.  The obligatory international obligations are to (a) recognise and (b) enforce Convention awards in accordance with local law. And, consistent with this analysis, this all that Part IV of the 1993 Act seeks to achieve. Section 39 states that Part IV of the 1993 Act deals with "*enforcement of Convention awards.*"   But section 40(1), in permitting leave to  be granted to enter judgment in terms of an award, merely provides that where this happens, the award may "*be enforced in the same manner as a judgment or order to the same effect*".   The 1993 Act does not seek to circumscribe what form of enforcement remedies the enforcing parties may utilise. Nor does the Act purport to circumscribe what types of awards may be recognised so that they can be enforced, if necessary, save for setting out the various grounds on which enforcement of Convention awards may be refused.

79.  This construction is supported in a general way by analogy if one considers the approach taken under the Judgments (Reciprocal Enforcement) Act 1958.  The 1958 Act provides for registration of judgments from certain Commonwealth countries, and then provides that subject to a registered judgment being set aside, a registered judgment may be enforced "*as if the judgment had been originally given in the Supreme Court and entered therein on the date of registration*": section 3(3). Sections 2 and 3 expressly provide that only money judgments enforceable by execution may be registered. Neither the New York Convention nor section 40(1) of the 1993 Act are expressly limited to money awards which are enforceable by execution[18]. But despite this limitation for registration, section 7(1) of the 1958 Act provides:

> "*Subject to this section, a judgment to which this act applies or would have applied if a sum of money had been payable thereunder, whether it can be registered or not, and whether, if it can be registered, it is registered or not, shall be recognized in any court in Bermuda as conclusive between the parties*

---

[17] *Halsbury's Laws*, Fourth Edition Reissue, Vol 37, paragraph 1230.
[18] Article 25 of the  Brussels Convention on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters applies to "*any judgment...whatever the judgment may be called*", and is regarded as applying to non-money judgments by way of contrast with the common law and Commonwealth statutory enforcement regimes: *Halsbury's Statutes*, Fourth Edition Reissue, Volume 8(3), paragraph 186 n.3.

*thereto in all proceedings founded on the same cause of action and may be relied on by way of defence or counterclaim in any such proceedings.*"

80. Under the 1958 Act, it is made explicit that foreign judgments of all kinds, including non-money judgments, shall be recognised to allow *res judicata* to be invoked as a defence or counterclaim. Having regard to this drafting approach in the related filed of reciprocal enforcement of judgments, it seems to me even more improbable that the drafters of the 1993 Act intended to use the term enforcement in section 40(1) or otherwise in a sense which would significantly restrict the range of awards which could be summarily enforced under that provision. It seems to me that express words similar to those used in the 1958 Act would have been used stating that section 40(1) only applied to judgments which could be enforced by execution, or to money judgments.

80. What authority supports the point which Mr. Diel advanced? There is, it must be conceded, seemingly no direct authority for the contrary proposition on which Mr. Elkinson relied that the New York Convention applies to declaratory awards or that declaratory awards are enforceable under legislation providing for the enforcement of Convention awards. Firstly, the Defendant's argument that declaratory awards are unenforceable is said to be supported by Merkin, '*Arbitration Law*', paragraph 16.16 in reliance on *Whitehead-v-Tattersall* (1834) 1 Ad & El 491[19]. Secondly, the argument is supported by reference to *Margulies Brothers Ltd. –v- Dafnis Thomaides & Co. (UK) Ltd.* [1958] I Lloyds Rep. 205, although the author that cites the case doubts its application in the modern context[20].

81. The case of *Whitehead-v-Tattersall* does not appear to support the proposition that declaratory awards are not enforceable at all. It merely decided that where a landlord and a tenant agreed that the quantum of damages should be decided by an arbitrator, the arbitrator's award was binding and would be recognised in an action for breach of covenant. It was cited by *Merkin* in support of the somewhat different and technical point that declaratory awards were an exception to the rule that all rights under the contract were merged into the arbitration award. An editorial note in the more modern version of the original report of the case indicates that *Whitehead and Tattersall* was referred to in *Commings-v-Heard* (1869) 4 LRQB 669. The latter case was also a case involving a money award, and did not deal with declarations[21] at all. It decided that an award was final and binding as regards all the matters which were actually decided by the arbitrators in the same way as a judgment of a court would be binding.

82. Mr. Diel primarily relied on the *Margulies* case, which in turn was referred to in the case of *Tongyuan (USA) Trading Group –v- Uni-Clan Limited* (2001) XXVI Yearbook of Commercial Arbitration 886-882. *Margulies Brothers Ltd. –v- Dafnis Thomaides & Co. (UK) Ltd.* [1958] I Lloyds Rep. 205 , as Mr. Elkinson pointed out, was a case involving discretionary enforcement of a domestic award under the Arbitration Act 1950, a wholly distinct statutory context. Further, it concerned a money award, which was unclear, and for this reason was held by the English Court of Appeal not to be enforceable. Evershed MR observed:

> "…*you cannot enforce a document which merely says by way of declaration (in effect) that certain contracts with three numbers should be set off against certain other contracts with three numbers and that [the defendant] should pay the difference between them.*"[22]

83. This case is not authority for any broad principle according to which, irrespective of the statutory provisions governing enforcement, declaratory awards are not enforceable. Indeed, '*Russell on Arbitration*' more accurately cites *Margulies* as authority for the proposition that "*the court will not grant leave to enforce an award for the payment of money which does not specify the sum due.*"[23] In *Tongyuan*, another money award case, Moore-Bick J held that an arbitration award which was sufficiently clear could be

---

[19] (1834) 110 E.R. 1295.
[20] David Joseph QC, '*Jurisdiction and Arbitration Agreements and their Enforcement*' (Sweet & Maxwell: London, 2005), paragraphs 15-72-15-73.
[21] There is a reference on the first page of the report to a "declaration", but this was obviously an ancient form of pleading, not relief granted by the court.
[22] At page 207.
[23] 21st edition, paragraph 8-005.

enforced under the 1996 United Kingdom Act. No considered reference to a purely declaratory award ( as opposed to a non-declaratory award which is expressed "in declaratory terms") may fairly be implied when he observed with reference to *Margulies*:

> "*That case is authority for the proposition that an award which is effectively couched in purely declaratory terms cannot be enforced as a judgment, and for the wider proposition that, in order to be enforceable as a judgment…the award must be framed in terms which would make sense if those were translated straight into the body of a judgment. It highlights the fact that, on an application of this kind, the court is concerned with the form of the award, not its substance.*"

84.    In his Supplementary Skeleton Argument Mr. Diel relies on the Australian case of *Tridon Australia Pty Ltd. –v-ACD Tridon Inc.* [2004] NSWCA 14 to explain the distinction between recognition and enforcement, and to support the submissions that (a) leave may only be granted under section 40(1) on grounds of practical utility, and (b) paragraph 1 of the June 14, 2006 Order has no place in an enforcement order made under section 40(1), because it states that the awards are "*recognised*".    But this case, which IPOC's Counsel should be commended for very properly placing before the Court,    appears to be possibly  the only identifiable Commonwealth considered judgment dealing with the enforcement of a truly declaratory Convention award. This case implicitly supports two propositions, one of which contradicts the primary submission advanced on behalf of IPOC on the present application. The *Tridon* case suggests firstly, that declaratory  Convention awards are indeed enforceable and, secondly, that the only question which properly arises on a section 40(1) application is whether leave to enter judgment in terms of the award ought to be given, based on any practical need for the relief sought . The following extract from the leading judgment of Giles JA demonstrates the approach taken by the New South Wales court of Appeal to an application to enforce a Convention award under a statutory provision substantially the same as section 40(1) of the Bermuda 1993 Act:

> "*4      Section 33 of the Act provides -*
>
> '*33     Enforcement of award*
>
> (1)     *An award made under an arbitration agreement may, by leave of the Court, be enforced in the same manner as a judgment or order of the Court to the same effect, and where leave is so given, judgment may be entered in terms of the award.*'
>
> *5      Smart AJ declined to make the order essentially because there was no utility in making it.  His Honour contemplated the possibility that declarations made by arbitrators could be enforced in the same manner as a judgment or order of the Court, was of the view that there was no utility in this case in granting leave to enforce the declarations.*
>
> *6      It is important to note that s 33 begins by referring to enforcement by leave, the entry of judgment in terms of the award being consequential upon the grant of leave.  The first question, then, must be what is desired by way of enforcement, and it is only when that question is asked and satisfactorily answered that there can be sensible attention to whether leave should be granted.*
>
> *7      When the question was asked in the present application two answers were given.*
>
> *8      The first answer was that there is no discretion under s 33, and that the applicant for an order pursuant to that provision is entitled as of right to the entry of judgment in terms of the award.  Exceptions to this were recognised, but it was submitted that the exceptions went to jurisdictional facts enlivening the entry of judgment in terms of the*

*award.   Reference was made to Russell on Arbitration, 21st ed, para 8-003.*

*9       I do not agree that there is no discretion.  It is connoted by the words "by leave of the Court" in s 33, and the paragraph in Russell on Arbitration clearly shows that there is a discretion.  But in any event the purported answer is not an answer to the question.  It is still necessary to know what is meant by enforcement and what is intended by way of enforcement in order to determine whether leave should be given.*

*10      That takes one to the second answer, which was that there was an entitlement to have not just the declarations in the interim award, but declarations which would "speak to the world" through being translated into a judgment entered in terms of the award.  It was submitted that that translation was itself enforcement.*

*11      I do not think that it is.  Enforcement is a plain word, and means something quite different from a restatement of the effect of the award in the form of a judgment.  The summary procedure provided by s 33 of the Act is a procedure with a purpose, the purpose of enabling the victorious party in an arbitration to obtain the material benefit of the award in its favour in an easier manner than having to sue on the award.  There has been nothing put forward in this case to suggest any occasion for enforcement of the declarations made in the interim award.  They are binding on the parties, and bind them for the balance of the arbitration and beyond that.*

*12      I agree with Smart AJ's view that there is no utility in making the order sought, but for the perhaps more fundamental reason that there is just no question of enforcement yet arising.  In the absence of any question of enforcement arising, it would not be appropriate to grant leave to enforce the award."*

85. In a contested enforcement application, it was seemingly neither contended by Counsel nor suggested by the New South Wales court (at either trial or appellate levels) that the declaratory awards were not enforceable at all. The reference to the application for leave to enter judgment turning on utility is, interestingly, reflective of the views and terminology expressed by *Joseph*, in the passage cited below. As the learned author of '*Jurisdiction and Arbitration Agreements and their Enforcement*' points out:

> "*It is suggested that there ought not to be any blanket prohibition on a party seeking to convert  a declaratory award on substantive jurisdiction into  a declaratory judgment…the touchstone ought to be utility. Where it would serve a useful purpose and where none of the defences identified in that section are applicable, a party ought to be able to convert an award into a declaratory judgment.*"[24]

86.  In my view, no clear authority has been cited for the proposition that declaratory Convention awards are not capable of being recognised and enforced either  under section 40 of the 1993 Act or otherwise. It is true that our 1993 Act, unlike section 48 (3) of the 1996 United Kingdom Act, does not expressly empower the making of declaratory awards, but it cannot be seriously doubted that declaratory awards may be made in international commercial arbitrations in Bermuda. The New York Convention defines arbitration award in an open-ended way, and so does Part IV of the Act is regulating enforcement of Convention awards. Section 42 spells out in considerable detail grounds for refusing enforcement, and the fact that an award is declaratory is not included. One would have expected such a significant limitation on the availability of enforcement to have been explicitly spelt out, as

---

[24] Joseph, at paragraph 15.73.

under the Judgments (Reciprocal Enforcement) Act 1958, which explicitly only applies to money-judgments.

87. The restrictive interpretation contended for would, in any event, potentially drive a coach and horses through the entire edifice of reciprocal enforcement of arbitral awards, because declarations of liability and/or non-liability and declarations on points of construction are an important feature of commercial arbitration law, particularly in the field of insurance and reinsurance law[25]. And the reciprocal enforcement regime is intended to provide a summary mechanism for enforcing awards, with a strong policy bias against refusing enforcement. It is also noteworthy, in terms of appreciating the mischief which could result from excluding declaratory Convention awards from recognition and enforcement, that such awards are more likely today than in the past.

88. Under the old English legislation, on which our own former legislation (still retained for domestic arbitrations) was based, arbitrators were either empowered to refer questions of law to the court and/ or the courts were empowered to entertain appeals from arbitrators on questions of law. Section 48(3) of the 1996 UK Act now expressly empowers arbitrators to make declaratory awards. The UK court's power to decide preliminary points of law is now substantially restricted by section 45, as is the scope of appeals on points of law by section 69. The construction contended for by IPOC would mean that UK declaratory Convention awards would not be enforceable in Bermuda, a manifestly undesirable result. Other jurisdictions, especially model law jurisdictions, are likely to have a similar statutory regime expressly or impliedly supporting declaratory awards.

89. The Bermuda legislative scheme under the UNCITRAL Model law is not dissimilar to the UK framework, in the sense that international commercial arbitrations taking place in Bermuda explicitly empower the arbitrators to make legal rulings on the validity of the arbitration agreement and the contract in which it is contained, by way of preliminary ruling or as part of their award : Model Law, Article 16. By necessary implication, Bermuda arbitral tribunals are empowered to make declaratory awards. Mischief would also result from holding that declaratory Convention awards cannot be enforced in Bermuda, in that it could potentially undermine the practical enforceability of declaratory awards made in Bermuda.

**Findings: are there any residual discretionary grounds for setting aside the ex parte June 14, 2006 Order granting leave to enter judgment in terms of the awards?**

90. It remains to consider whether there are any grounds, not involving recognition or enforcement in general terms, for refusing to enter judgment in terms of the award. While recognition is mandatory, summary relief under section 40(1) does not automatically follow. It is, perhaps, easy to confuse the mandatory obligation to enforce the award in the sense of recognising a Convention award, and by permitting a party to rely on it under section 40(2), with the discretion to grant a particular form of enforcement relief. On a case by case basis, this Court does have a limited discretion as to whether or not to grant leave to enter a judgment in terms of an award. But, following the *Tridon* case, it seems to me that all the applicant for leave to enter judgment in terms of the award needs to do is to meet a very low threshold by showing that there is some practical reason for the application to be made. The section 42 grounds for refusing recognition are the first line of attack a defendant opposing enforcement may choose to mount, but if this attack fails (or is not invoked at all), a defendant may still contend, on grounds unconnected with section 42, that the Court should decline to grant the leave sought under section 40(1). The Plaintiff's application could, possibly, be refused if the declarations were unintelligible, or if they related to matters which would not qualify for the grant of similar relief under Bermuda law, points not taken here.

---

[25] Order 11rule 1(1)(n) was recently enacted to make it clear that leave to serve proceedings out of the jurisdiction could be granted in support of a "claim brought for a declaration that no contract exists", it being generally accepted that paragraph 1(1)(d) of the rule already covered declarations of non-liability.

91.  In the present case it is obvious that LVFG wishes to rely on a Bermuda judgment in terms of the awards in its application for a permanent anti-suit injunction, and generally in its other civil action against IPOC. The utility of the present enforcement application is that once judgment is entered in terms of the awards, the issue of recognition need not be re-argued, not only in 2006: 170, but in any other Bermuda proceedings between the parties to a highly litigious and substantial commercial dispute. In 2006: 170, LVFG seeks, inter alia, a permanent injunction restraining IPOC from pursuing proceedings in breach of the FPA and the SPA, and related declaratory relief. If the present application under section 40(1) is granted, no application for recognition of the awards will need to be made in those proceedings. The awards will have been recognised under section 40(1) by the grant of leave to convert them into Bermuda judgments. Although this may be a matter for argument in other pending action, it seems likely that recognition of the Zurich awards implicitly constitutes recognition of the existence and validity of the underlying arbitration agreements as well, in relation to which relief is also sought.

92.  One should, at this juncture, also bear in mind that Order 15 rule 16 of the Rules of the Supreme Court 1985, which was not referred to in argument, provides with respect to civil proceedings generally:

> "*No action or other proceedings shall be open to objection on the ground that a merely declaratory judgment or order is sought thereby, and the Court may make binding declarations of right whether or not any consequential relief is or could be claimed.*"

93.  The Rules of the Supreme Court clearly apply to the present application, notwithstanding the clearly accidental omission of section 40(1) from Order 73 rule 10 of the Rules of the Supreme Court. The Court of Appeal for Bermuda has held that a "lacuna" in Order 73 is no ground for refusing to enter judgment in terms of an award under section 40(1) of the 1993 Act[26]. But in my view Order 15 rule 12 applies to the present application because Order 1 rule 2(1) of the Rules provides: "*Subject to the provisions of this rule, these Rules shall apply to all proceedings in the Supreme Court.*" The application of the Rules generally to arbitration proceedings is not expressly excluded or modified by Order 1 rule 2(2), although their application is obviously, by necessary implication, qualified by context and relevance.

94.  But one is here concerned with an application to obtain a declaratory judgment, albeit in terms of two Convention awards. It is difficult to imagine why Order 15 rule 16 should not apply, absent, of course, express or implied contrary provision in Part IV itself.  The force of this particular analysis may be somewhat diminished by the fact that this comparatively peripheral point did not receive the benefit of Counsel's otherwise comprehensive and valuable argument.  This was because argument, understandably, focussed on the more fundamental threshold issue of whether Convention awards which were purely declaratory could be recognised or enforced at all.

95.  In summary, although the present proceedings were commenced the day after the Plaintiff's application for injunctive and other relief pursuant to the two Zurich awards, I find that the application for leave to enter judgment in terms of the award was clearly made for a legitimate and practical purpose, in circumstances where the Defendant, very arguably, "*has failed to recognise or comply with these Awards.*"[27] One of the accepted grounds for the grant of a declaratory judgment is to restrain an attempt to enforce a contract the Plaintiff contends is invalid: *Supreme Court Practice 1999*, paragraph 15/16/8.

96.  The application to set aside the Order of June 14, 2006 is, accordingly, refused.

---

[26] *New Skies Satellite BV –v- Hemisphere Associates LLC*[2005] Bda LR 59., at page 8.
[27] First Affidavit of Justin Barrie Michaelson sworn on June 6, 2006 herein, paragraph 12.

**Findings: terms of June 14, 2006 Order**

97. Mr. Elkinson and Mr. Adamson in their Supplemental Submissions sensibly conceded that paragraph 2(i) of the ex parte Order should be varied and re-worded as Mr. Diel suggested as follows:  "The Defendant has not validly exercised the April Option Agreement (as defined in the Awards) <u>by its purported option notices of July 29 2003 and August 12, 2003</u>." They did not concede that paragraph 1 of the Order should be deleted, a paragraph which provides as follows:

> "*The Awards made by the Arbitral Tribunal consisting of  Dr. Daniel Wehrli, Chairman, Ian L. Meakin and Dr. Boris O. Kojevnikov at Zurich, Switzerland on the 19th day of October 2004 ("the First Partial Award") and on the 16th May 2006 ("the Second Partial Award") (collectively "the Awards") together with their findings are hereby recognised by this Court.*"

98. Mr. Diel had two objections to this paragraph. Firstly he contended that section 40(2) of the Act did not empower the Court to make a declaration of recognition at all. Secondly, he complained that the reasons for a decision could not be legally enforced, and submitted that the reference to "*findings*" was in any event improper. In my view recognising "*findings*" is entirely different thing to recognising reasons, and factual and legal findings do in fact form part of the awards. Nevertheless, the inclusion of the word "findings" does appear to be redundant.

99. It is true that section 40(1) incorporates an element of recognition by necessary implication. In granting leave to enter judgment in terms of the awards, the Court is recognising the relevant Convention awards and permitting the Plaintiff to enforce them as if they were originally embodied in a Bermuda judgment in equivalent terms. Section 40(2) does not envisage an application for recognition at all. This is because section 40(2) prescribes (a) the obligation to recognise and the legal effects of recognition "*for all purposes*", and (b) the various ways in a Convention award which is enforceable and, accordingly, must be recognised may be relied upon "*in any legal proceedings in Bermuda*". The latter phrase would include an application under section 40(1); but section 40(2) cannot be construed as empowering the Court to grant a formal declaration of recognition, either under that subsection or under subsection (1).

100.     This conclusion is somewhat technical, because in my judgment an order under section 40(1) cannot be granted unless the Court first finds that the relevant Convention award is one to which subsection (2) would in any event apply. Because the Court is bound under subsection (1) to find that the award is "*enforceable*", and an enforceable award is "shall be treated as *binding for all purposes*" under subsection (2). Where the enforceability issue is not challenged, of course, all the section 40(1) applicant need to is to produce the evidence prescribed by section 41. The logic of this construction is supported by the fact that  once judgment is entered in terms of the award, the judgment (until set aside) is itself binding for all purposes. The further enforcement action will always depend on the circumstances of the particular case, and this instance, an anti-suit injunction is sought. The Court should not be astute to dictate to enforcing parties the remedies they should seek.   Joseph, in '*Jurisdiction and Arbitration Agreements and their Enforcement*', under the heading "*Anti-Suit Injunctions*", notes:

> " *The landscape of enforcement is particularly sensitive to the individual circumstances of the case and the preferences of the litigator with the conduct of the case.*"

101.     Nevertheless, Mr. Diel's complaint about the inclusion of paragraph 1 in the June 14, 2006 Order is justified. Therefore,  I would order that  paragraph 1 of the June 14, 2006 Order be deleted and that existing paragraphs 2 and 3 be renumbered accordingly. However,  for the avoidance of doubt, and for

convenience of drafting, I would also order that the following words be inserted at line three of the preamble to the Order:

> "AND *The Awards made by the Arbitral Tribunal consisting of Dr. Daniel Wehrli, Chairman, Ian L. Meakin and Dr. Boris O. Kojevnikov at Zurich, Switzerland on the 19th day of October 2004 ("the First Partial Award") and on the 16th May 2006 ("the Second Partial Award") (collectively "the Awards") having been recognised by this Court.*"

**Conclusion**

102.    Essentially by agreement, paragraph 2(i) of the Order of this Court dated June 14, 2006 is amended to read as follows: "The Defendant has not validly exercised the April Option Agreement (as defined in the Awards) by its purported option notices of July 29 2003 and August 12, 2003." Paragraph 1 of the ex parte Order is deleted, and substantially reproduced in the preamble.

103.    However, the Defendant's application to set aside the Order is refused. In my view section 40(1) of the Bermuda International Conciliation and Arbitration Act 1993 entitles the enforcing party to obtain leave to enter judgment in terms of any award which is enforceable both under the 1993 Act and as a judgment under Bermuda law generally. No prohibition on the enforcement or enforceability of declaratory Convention awards can properly be inferred.

104.    The Court does have a discretion to refuse to enforce a Convention award under section 42(3) of the Act where enforcement would contravene public policy. But permitting enforcement of a Convention award which holds that the underlying contract is unenforceable, but not wholly void, because its performance was tainted by illegality in which the enforcing party was to some extent complicit, is not contrary to Bermuda public policy. The only authority supporting refusal on public policy grounds dealt with contracts which were void for illegality which were being positively relied upon by the enforcing party.

105.    The application for enforcement until the determination of the pending appeal in Switzerland against the SPA which is unlikely to be decided until early 2007, and which has statistically small prospects of success, is refused. Acceding to the belated application would, it seems to me, be inconsistent with the sensible case management of the Plaintiff's application for permanent injunctive relief in 2006: 270, due to be heard on September 5, 2006. The enforcement application in the present proceedings was commenced in aid of that separate action. The only obvious prejudice to the Defendant in refusing the adjournment can be compensated for in costs, a risk the Plaintiff has assumed in pressing for the expedited trial while the Swiss appeal is pending. Moreover, the present decision is without prejudice to the right of the parties to apply for appropriate relief from this Court in the event that the said appeal is successful, and in no way prejudges the substantive merits of the pending appeal.

106.    The application to discharge the June 14, 2006 Order is, subject to the modifications referred to above, dismissed. Unless either party applies to be heard as to costs within 28 days, I would award the costs of the present application to the Plaintiff.

Dated this 31st day of August, 2006

_____
KAWALEY J.