# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IPOC INTERNATIONAL GROWTH
FUND LIMITED

               *Plaintiff,*

v.

DILIGENCE LLC, et al.

               *Defendants.*

Civil Action No. 06-1109 (PLF) (AK)

---

## DILIGENCE INC.'S MOTION FOR AN ORDER COMPELLING PLAINTIFF TO ANSWER INTERROGATORIES

Pursuant to Federal Rule of Civil Procedure 37(a), Defendant Diligence, Inc. ("Diligence") hereby moves this Court for an order requiring Plaintiff IPOC International Growth Fund Limited ("IPOC") to fully and completely answer Interrogatory Nos. 2, 3, 5, 6, and 8 under oath within five (5) days. The grounds for this Motion are set forth in the accompanying memorandum of points and authorities.

As required by Local Civil Rule 7(m), counsel for Diligence and counsel for IPOC held a meet-and-confer teleconference on November 14, 2006, and attempted in good faith to resolve the matters raised by this Motion. A follow-up teleconference was held on November 17, 2006. The parties were unable to reach agreement on Interrogatory Nos. 2, 3, 5, 6, and 8. This Motion followed.

Respectfully submitted,

November 17, 2006

AEGIS LAW GROUP LLP


By:    /s/ Paul C. Rauser
       Paul C. Rauser (D.C. Bar No. 461722)
       Michael K. Ross (D.C. Bar No. 458573)
       Oliver Garcia (D.C. Bar No. 456600)
       901 F Street, N.W., Suite 500
       Washington, D.C. 20004
       T: 202-737-3500
       F: 202-737-3330

       *Attorneys for Defendant Diligence Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IPOC INTERNATIONAL GROWTH          )
FUND LIMITED                       )
                                   )          Civil Action No. 06-1109 (PLF)
                  *Plaintiff,*     )
                                   )
v.                                 )
                                   )
DILIGENCE LLC, et al.              )
                                   )
                  *Defendants.*    )
_____  )

## **ORDER**

Upon consideration of Diligence Inc.'s Motion for an Order Compelling Plaintiff to Answer Interrogatories, the Memorandum in support thereof, and all other papers and proceedings submitted in this matter, and for good cause shown:

IT IS HEREBY ORDERED THAT Plaintiff shall, within five (5) days of the date of this Order, serve on Defendant Diligence Inc. full and complete answers Interrogatory Nos. 2, 3, 5, 6, and 8 set forth in Diligence Inc.'s First Set of Interrogatories to Plaintiff.

SO ORDERED.

Dated: _____        By: _____

                                            ALAN KAY
                                    *United States Magistrate Judge*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IPOC INTERNATIONAL GROWTH ) 
FUND LIMITED )
 )  Civil Action No. 06-1109 (PLF) (AK)
            *Plaintiff,* )
 )
v. )
 )
DILIGENCE LLC, et al. )
 )
            *Defendants.* )
_____ )

## MEMORANDUM IN SUPPORT OF DILIGENCE INC.'S MOTION FOR AN ORDER COMPELLING PLAINTIFF TO ANSWER INTERROGATORIES

Having insisted upon immediate discovery despite the pendency of four dispositive

motions, Plaintiff IPOC International Growth Fund Limited ("IPOC") now refuses to answer all

but three interrogatories served on IPOC by Defendant Diligence Inc. ("Diligence"). In particular,

IPOC refuses to provide any information about who owns it. As explained below, such

information bears directly on the viability of IPOC's claims and Diligence's anticipated

affirmative defenses to those claims.[1]

Likewise, IPOC should be required to answer Diligence's interrogatories requesting

IPOC to identify the officers and directors of each of its subsidiary and affiliated companies.

Recent arbitral and judicial decisions have placed IPOC at the apex of a network of shell

companies established to launder illegal proceeds derived from bribery and corruption schemes

committed against the Russian Federation. As nothing more than a money laundering enterprise,

---

[1] On July 20, 2006, Diligence moved to dismiss the Complaint in its entirety for failure to state a claim upon which relief can be granted. Consequently, Diligence has not filed an Answer as of the date of the instant Motion.

IPOC is precluded as a matter of law from any recovery in this case. Diligence is entitled to discovery to prove IPOC's criminality.

For the reasons set forth below, Diligence respectfully requests that the Court enter an order requiring IPOC to fully and completely answer Interrogatory Nos. 2, 3, 5, 6, and 8 under oath within five (5) days.[2]

## BACKGROUND

This case arises out of IPOC's allegation that Diligence and Defendant Barbour Griffith & Rogers, LLC ("BGR") improperly obtained information about IPOC and gave that information to IPOC's "litigation adversaries," who in turn allegedly used that information in an arbitration proceeding against IPOC held in Zurich. Complaint ¶ 21. The dispute before the Zurich arbitral tribunal was whether IPOC could enforce an agreement that purported to give it the option to purchase a large percentage of the outstanding shares of a Russian telecom company (the "April Option Agreement"). See Second Partial Award in the Ad-Hoc Arbitration in the Matter of IPOC Int'l Growth Fund Ltd. v. LV Finance Group Ltd. (May 16, 2006) (hereafter, the "Zurich Arbitration Ruling") ¶ ¶ 5, 282.[3]

After more than two years of taking evidence, the tribunal ruled that the April Option Agreement was void because enforcing it would violate English law. The lynchpin of the tribunal's ruling was its factual finding that the "beneficial owner" of IPOC is "a high-ranking

---

[2] In this Motion, Diligence seeks to compel full and complete answers to Interrogatory Nos. 2, 3, 5, 6, and 8. In so doing, Diligence does not concede the adequacy of IPOC's answers to Diligence's remaining interrogatories in Diligence's First Set of Interrogatories to Plaintiff. To the contrary, Diligence expressly reserves the right to move to compel at a later date more complete answers to Interrogatory Nos. 1 and 4.

[3] A complete copy of the Zurich Arbitration Ruling was filed in this action on August 16, 2006 as Attachment 1 (Parts I-10) to the Motion of Defendant Barbour Griffith & Rogers LLC to Dismiss for Lack of Subject Matter Jurisdiction (Docket #33).

officer of the Russian Federation with the function of coordination and regulation of activity in the sphere of communication of Russia." Zurich Arbitration Ruling ¶¶ 390. During the arbitration proceedings, the parties and the tribunal referred to this "high-ranking officer of the Russian Federation," as "Proposed Witness No. 7." Id.; see also id. at ¶¶ 231-239. The identity of "Proposed Witness No. 7" is widely understood and acknowledged to be Leonid Reiman, the Minister of Telecommunications for the Russian Federation. See, e.g., Gregory L. White, David Crawford & Glenn R. Simpson, *Why Putin's Telecom Minister Is in Investigators' Sights Abroad*, THE WALL STREET JOURNAL, October 17, 2006, at A1 (copy attached at Tab A).

The tribunal found that IPOC is a key tool by which Proposed Witness No. 7 has laundered assets misappropriated from the Russian Federation. With respect to the April Option Agreement in particular, the tribunal found that Proposed Witness No. 7 "misappropriated for his personal enrichment assets majority owned by the Russian Federation" by causing a state-owned telecom company to "abandon[]" its shares in "an asset of considerable value . . . in favour of [IPOC] for no value," with the "inten[t] to achieve this result through the April Option Agreement." Zurich Arbitration Ruling ¶¶ 405, 429; see also id. at ¶¶ 231-239.

The Zurich arbitral tribunal further concluded that IPOC's receipt of money from a company called "Augmentation," also under Proposed Witness No. 7's control, and IPOC's subsequent use of that money arose directly out of "commission by Proposed Witness No. 7 of criminal offences" — namely, "abus[ing]" his official powers over licensing to "force" a company to purchase telecom licenses from Augmentation. The tribunal thus held that, "[s]ince the performance of the April Option Agreement . . . constitutes the laundering of monies stemming from a predicate criminal offence . . ., [IPOC] cannot enforce its rights thereunder." Zurich Arbitration Ruling ¶¶ 557, 561.

3

In seeking to enforce the April Options Agreement, IPOC adamantly contended to the Zurich tribunal that Jeffrey Galmond, a Danish attorney who has performed legal work for Mr. Reiman, was the true beneficial owner of IPOC, not Proposed Witness No. 7 (i.e., Mr. Reiman). See Zurich Arbitration Ruling ¶¶ 216-230. Based on its review of voluminous documents and after presiding over testimony over more than two years, the Zurich tribunal flatly rejected IPOC's contention that Mr. Galmond owns IPOC. Id. at ¶¶ 231-239. It concluded instead that "Proposed Witness No. 7 was in June 2002 and in April 2001 the sole beneficial owner of IPOC," and that "the repeated testimony and allegation of [Mr. Galmond] that he is the beneficial owner of IPOC are proven to be clearly incorrect." Id. at 232.

Since the filing of IPOC's Complaint in this action, the Supreme Court of Bermuda —IPOC's jurisdiction of incorporation—has issued a ruling confirming the Zurich Arbitration Ruling, holding as valid and binding the Zurich tribunal's conclusion that IPOC is a money-laundering enterprise used to further criminal conduct. See Attachment 1 to Reply to Plaintiff IPOC's Opposition to Motion of Defendant Barbour Griffith & Rogers LLC to Dismiss for Lack of Subject Matter Jurisdiction (Docket #42).

## ARGUMENT

Diligence's First Set of Interrogatories to IPOC contained just eight (8) interrogatories. Nevertheless, IPOC has refused to answer the majority of them. Both in its interrogatory responses (copy attached at Tab B) and during a meet-and-confer held on November 14, 2006, IPOC refused to answer any of Diligence's interrogatories directed to IPOC's ownership (Interrogatory Nos. 2, 5, 6, and 8), and also refused to identify the officers and directors of its

subsidiary and affiliate companies (Interrogatory No. 3). Specifically, IPOC has refused to answer the following interrogatories propounded by Diligence regarding its ownership:

### INTERROGATORY NO. 2:

Please identify the name, address, and telephone number of each and every person or entity who possesses, directly or indirectly, a beneficial or ownership interest in IPOC.

### INTERROGATORY NO. 5:

State whether Mr. Reiman possesses, directly or indirectly, any beneficial or ownership interest in IPOC or any subsidiary, affiliate, or entity related to IPOC, and if so, describe with particularity the nature, extent, and duration of each such interest.

### INTERROGATORY NO. 6:

Identify the name, address, and telephone number of each and every entity in which IPOC Capital Partners Ltd. possesses, directly or indirectly, a beneficial or ownership interest.

### INTERROGATORY NO. 8:

State whether Jeffrey Galmond possesses, directly or indirectly, any beneficial or ownership interest in IPOC or any subsidiary, affiliate, or entity related to IPOC, and if so, describe with particularity the nature, extent, and duration of each such interest.

Additionally, although IPOC identified three directors of IPOC in response to Interrogatory No. 3, it flatly refused to identify the officers and directors of each affiliate, subsidiary, or entity related to IPOC as requested in Interrogatory No. 3.[4] After an unsuccessful

_____

[4] Interrogatory No. 3 states in full as follows:

### INTERROGATORY NO. 3:

Please identify the name, address, and telephone number of each officer and director (or the equivalent under Bermuda law applicable to limited liability corporations) of IPOC and each affiliate, subsidiary, or entity related to IPOC.

meet-and-confer on November 14, 2006, as well as a follow-up meet-and-confer on November 17, 2006, this Motion followed.

As detailed below, the information sought in Interrogatory Nos. 2, 3, 5, 6, and 8 is central both to the viability of IPOC's claims and to Diligence's potential affirmative defenses. Consequently, it easily falls within the ambit of information "relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1) (providing that a party is entitled to take discovery "regarding any matter, not privileged, that is relevant to the claim or defense of any party"). IPOC therefore should be ordered to provide full and complete answers to these interrogatories.

## I.    THE OWNERSHIP OF IPOC IS AN IMPORTANT—INDEED, POTENTIALLY DISPOSITIVE—ISSUE IN THIS CASE, AND IS PLAINLY RELEVANT TO THE CLAIMS AND DEFENSES IN THIS ACTION.

Count I of the Complaint claims that Diligence tortiously interfered with IPOC's business expectancies. See Complaint ¶¶ 24-28. According to IPOC,

> The intentional and malicious actions of BGR and Diligence have interfered with IPOC's business relationships and have damaged, and will continue to damage, IPOC's business expectancies unless BGR and Diligence are restrained.

Complaint ¶ 28.

IPOC cannot prevail on this claim because it has no legitimate "business"; rather, it has been adjudged to be a criminal enterprise. As noted above, the pivotal factual determination by the Zurich arbitral tribunal was that, based upon its two-year review of the evidence, Mr. Reiman is in fact the beneficial owner of IPOC and that IPOC's assets have been unlawfully derived—i.e., stolen—from the Russian Federation and through other illegal activities, including extortion of telecom license payments to Augmentation. See Zurich Arbitration Ruling ¶¶ 390-91; see also id. at ¶¶ 501-20, 530, 545. Consequently, IPOC's uses of such criminally-derived proceeds "constitutes money laundering." Id. at ¶¶ 501-20, 530, 545.

6

Whether Mr. Reiman owns IPOC—and, if not, the identity of its actual owners—is plainly relevant to this case. If the Zurich arbitral tribunal's findings are correct, IPOC as a matter of law cannot prevail in its claims in this action for tortious interference with business expectancies, unfair competition, and its other business-tort and equitable claims for a simple, common sense reason. Just as one cannot tortiously interfere with an illegal sale of drugs, it is hornbook law that one cannot tortiously interfere with the "business expectancies" of an illegal money laundering enterprise.[5] And even if IPOC could circumvent this fundamental flaw in its case (it cannot), the fact that IPOC has been adjudged to be a money laundering enterprise raises obvious and compelling affirmative defenses to both IPOC's legal claims and its claims for equitable relief—including, among others, the affirmative defense of unclean hands.[6] It thus cannot reasonably be disputed that the identities of the owners of IPOC are "relevant to the claim or defense of a[] party" to this action—they relate directly to IPOC's criminality. Fed. R. Civ. P. 26(b)(1).

In addition to alleging tortious interference with business expectancies, IPOC's Complaint also asserts various additional business torts and equitable claims—including unfair competition, unjust enrichment, and tortious interference with contract—premised upon an alleged misuse of IPOC's confidential information in the Zurich arbitration. See Complaint Counts IV-

---

[5] See, e.g., Wager v. Pro, 603 F.2d 1005, 1008 (D.C. Cir. 1979) (it is "clearly the law in the District of Columbia for both tort and contract actions" that "parties to an illegal or immoral transaction may not seek redress in a court for wrongs suffered as a result of the transaction"); United States v. Kim, 738 F. Supp. 1002, 1004 (E.D. Va. 1990) ("Courts properly refuse to aid those whose cause of action is based on an illegal act"); accord Carruthers v. Flaum, 365 F. Supp. 2d 448, 452 (S.D.N.Y. 2005) ("one cannot tortiously interfere with an illegal and unenforceable agreement").

[6] See, e.g., Jackson v. McCall, 509 F. Supp. 504, 507 (D.D.C. 1981) (equitable relief "will not be granted in aid of those who do not come into court with clean hands").

VII.  In so doing, the Complaint expressly references the Zurich arbitration no fewer than five

times:

- Alleging that "unlawfully obtained materials appeared almost verbatim in submissions made by LVFG to a Zurich arbitral tribunal . . . ."  Complaint ¶ 21.

- Alleging that IPOC's "reasonable business expectancies" with which Defendants interfered included "the Zurich arbitration in which [IPOC] sough to enforce its rights . . . without malicious interference [by Defendants . . .[and without] taint[ing] by improper or illegal activities calculated to corrupt the Zurich arbitration for the benefit of IPOC's litigation adversaries."  Complaint ¶ 25.

- Alleging that IPOC had "reasonable business expectancies" "that the Zurich arbitration [and an investigation into IPOC's affairs by the Government of Bermuda] would be conducted in an evenhanded and impartial manner."  Complaint ¶ 27.

- "IPOC has no remedy at law for the continued harm to IPOC caused by the improper and deceitful actions of Diligence and BGR to corruptly influence both the Zurich arbitration and the [investigation of IPOC by the Government of Bermuda]."  Complaint ¶ 28.

- Alleging that Defendants wrongfully obtained information "to wrongfully influence . . . the Zurich arbitration."  Complaint ¶ 55.

Whether the Zurich arbitration correctly concluded that Mr. Reiman is in fact the

beneficial owner of IPOC—rather than Mr. Galmond, as IPOC unsuccessfully argued —bears

directly on the issues of causation and damages on IPOC's claims arising out of its allegation that

Defendants "corrupt[ed] the Zurich arbitration."  Complaint ¶ 25; see also Complaint ¶ 21 ("a

portion of the unlawfully obtained materials appeared . . . in submissions made . . . to a Zurich

arbitration tribunal in the proceedings referenced above.").  These allegations place the question of

whether Mr. Reiman is in fact the beneficial owner of IPOC squarely at issue.  If Mr. Reiman is

the beneficial owner of IPOC—just as the Zurich tribunal concluded—then the alleged use of

information allegedly wrongfully obtained by Defendants did not "corrupt" the Zurich arbitration;

8

to the contrary, the Zurich tribunal reached the correct determination irrespective of whether allegedly "unlawfully obtained materials" appeared in a portion of a brief filed by IPOC's opponent.. Complaint ¶ 21.

In sum, no legitimate basis exists for IPOC to refuse to answer Interrogatory Nos. 2, 5, 6, and 8, each of which addresses the ownership of IPOC. At the outset of discovery, Diligence is entitled to know what IPOC's position is on the critical—indeed, potentially dispositive—issue of who owns it so that Diligence may make informed decisions on what discovery to pursue (and not to pursue) in this action. Because the ownership of IPOC plainly is "relevant to the claims and defenses of any party," Fed. R. Civ. P. 26(b)(1), IPOC should be ordered to serve Diligence with full and complete answers, under oath, to Interrogatory Nos. 2, 5, 6, and 8 within five days.

II.    **IPOC ALSO SHOULD BE ORDERED TO ANSWER FULLY INTERROGATORY NO. 3 BY IDENTIFYING ALL OFFICERS AND DIRECTORS OF EACH OF ITS SUBSIDIARIES AND AFFILIATES.**

As noted above, recent arbitral and judicial decisions have placed IPOC at the apex of a network of shell companies established to launder illegal proceeds derived from bribery and corruption schemes committed against the Russian Federation. See generally Tab B. But IPOC has refused to identify the officers and directors of its subsidiaries and affiliates in response to Interrogatory No. 3, arguing that such information is not relevant. See Tab A at 6. IPOC's objections lack merit and should be overruled. Just as the ownership of IPOC bears directly on the viability of IPOC's claims and Diligence's defenses thereto, so too do the identities of, and the people responsible for, IPOC's numerous subsidiaries and affiliates. If IPOC—together with, and through—its subsidiaries and affiliates is engaged in illegal conduct, there simply is no legitimate "business expectanc[y]" of IPOC with which Defendants could have tortiously interfered. Complaint ¶ 25. Moreover, because by all accounts IPOC and its subsidiaries and affiliates are

9

inextricably intertwined, see Tab B, Diligence is entitled to know the identities of all officers and directors of each IPOC subsidiary and affiliate so that Diligence may efficiently target its discovery. IPOC should be ordered to answer Interrogatory No. 3 fully and completely by identifying the officers and directors of each of its subsidiaries and affiliated companies.


## CONCLUSION

For the foregoing reasons, Diligence respectfully requests that the Court order IPOC to fully and completely answer Interrogatory Nos. 2, 3, 5, 6, and 8 under oath within five (5) days.

Respectfully submitted,

November 17, 2006                AEGIS LAW GROUP LLP


By:    _____/Paul C. Rauser/_____
       Paul C. Rauser (D.C. Bar No. 461722)
       Michael K. Ross (D.C. Bar No. 458573)
       Oliver Garcia (D.C. Bar No. 456600)
       901 F Street, N.W., Suite 500
       Washington, D.C. 20004
       T: 202-737-3500
       F: 202-737-3330

       *Attorneys for Defendant Diligence Inc.*

**TAB A**

 

FORMAT FOR
PRINTING
sponsored by    **TOSHIBA**
Don't copy. Lead.®

**October 17, 2006**

PAGE ONE

*Russian Connection*

# Why Putin's Telecom Minister Is in Investigators' Sights Abroad

**German and Swiss Probes Tag
Leonid Reiman as Owner
Of Businesses He Oversees**

**Commerzbank's Unusual Role**

By GREGORY L. WHITE, DAVID CRAWFORD and GLENN R. SIMPSON
*October 17, 2006; Page A1*

**DOW JONES REPRINTS**

〈R〉 This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit:
www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

Russian President Vladimir Putin said last month that the inability to root out corruption has been a chief failing of his six-year administration.

One of the most serious allegations about corruption in Russia hits close to home. It is that Mr. Putin's longtime friend and minister of telecommunications owns chunks of the industry he oversees, having surreptitiously converted telecom businesses from state ownership years ago.



No Russian investigators say this. The allegation comes from German prosecutors and a Swiss commercial tribunal, both of which say that a vast international money-laundering scheme has been used to conceal a diversion of state assets by the Russian minister, Leonid Reiman. A close examination of the allegations shows what investigators are working from: a trail of documents and witnesses unearthed in court cases and police inquiries ranging over four European jurisdictions and the British Virgin Islands.

Mr. Reiman was an executive of a state-controlled telephone company when communism collapsed in Russia 15 years ago. In the new climate, he helped set up a number of private telecom businesses. The German prosecutors and Swiss tribunal say he then used his position to shift control of the businesses to foreign holding companies he owned. The Swiss tribunal further alleges that later, after becoming telecom minister, he made decisions that yielded millions of dollars in profits for these businesses. German prosecutors are also looking into that.

*Leonid Reiman*

Mr. Reiman, in an interview, says he has never owned the telecom businesses at issue. He says they are instead owned by a Danish lawyer friend with whom he worked closely in setting them up in the early

1990s. Mr. Reiman blames the allegations on a smear campaign by a wealthy Russian oligarch with whom one of the businesses is in a dispute.

In Germany, the probe has also raised serious questions about the role of a large bank, **Commerzbank AG**. It provided loans to the Russian businesses and helped them find outside investors. The bank has acknowledged that for five years it helped to conceal the Russian businesses' true ownership, by claiming to be the owner itself.

Commerzbank, which held the assets in trust, maintains it did nothing wrong under German trust laws. Yet employees in Moscow warned management of the bank five years ago that it was helping Mr. Reiman conceal his ownership of illegally obtained state assets, according to a German police official and others with knowledge of the matter. Commerzbank says it considered and dismissed the employees' complaint.

The tangled affair offers a view inside a shadowy world of offshore accounts, oligarch deal-making, a Bermuda mutual fund with only one real shareholder and more than a dozen apparent shell companies, with U.S. addresses in locations such as Kentucky and Delaware. Those companies list their managers as being in remote spots such as Niue, a tiny Pacific coral atoll that U.S. officials suspect as a center of Russian money laundering. Among the authorities looking at aspects of the matter is the U.S. Federal Bureau of Investigation.



Jeffrey Galmond

Russian prosecutors have shown scant interest. After the Swiss tribunal concluded in May that Mr. Reiman owned telecom businesses and had taken official actions that helped them, Russian legislators asked Russian prosecutors to respond. A senior official at Russia's Prosecutor General office sent a letter saying his agency saw no evidence Mr. Reiman had abused his office.

Russian business has long been afflicted by corruption. But as the Kremlin during the Putin years has tightened its grip over economic and political life, problems have worsened, say some officials and business leaders.

They say a drive by Mr. Putin to increase state control in critical sectors like oil and gas -- squeezing out private investors and multinational companies -- has strengthened powerful Kremlin factions, which compete to expand further. Several such groups are headed by longtime Putin friends, such as the chairman of the state oil company -- which has rocketed to the top ranks among oil producers in the past two years -- and the head of the state arms exporter, which is expanding its reach into autos and metals.

Some who have pushed for change in Russia have left the country in the face of growing pressure. Some who stayed to fight have paid a heavy price. Last month, a central-bank official who led a drive to clean up the banking system was gunned down in an apparent contract hit. Even as Russian companies invite Western investors in as shareholders, business disputes in Russia continue to be fought at times with rough tactics.

In the case of the telecom businesses Mr. Reiman helped set up in the early 1990s, much less might be known about their trail were it not for a bitter commercial fight. It concerns a roughly $1 billion stake in a

large Russian mobile-phone company, OAO Megafon.



**Mikhail Fridman**

A Bermuda entity to which the bulk of the telecom empire was transferred a few years ago claims that it has the right to purchase that Megafon stake, through option agreements. So when Mikhail Fridman, one of Russia's richest men, announced in 2003 that his business had acquired it, the Bermuda entity filed a slew of lawsuits to challenge him.

Mr. Fridman, whose $20 billion Alfa Group is legendary in Russia for bare-knuckle business tactics, fought back. One of its strategies was to argue that the Bermuda entity couldn't make valid contracts -- because it was a money-laundering vehicle for Mr. Reiman.

Alfa set out to prove that, in conjunction with the seller of the Megafon stake. They deployed phalanxes of lawyers and private investigators. They paid millions of dollars to witnesses who testified and, in one case, who secretly videotaped a conversation. The Bermuda entity fought back. The result has been far-flung legal proceedings that have opened a window on the convoluted maneuvering.

The story goes back to the early 1990s, when Mr. Reiman, in his mid-30s, was an executive at Leningrad City Telephone Network. He was in position to help remake the city's antiquated telephone services for the modern age. He met Jeffrey Galmond, a Danish lawyer then about 40, who was in town to help a client. Soon the two were close friends -- vacationing together, babysitting each other's children and doing business together.

As telecommunications blossomed in the post-Soviet era, Mr. Reiman put together a network of companies for his state employer, offering a wide range of services from billing to paging. Mr. Galmond pitched in with legal help and introductions to potential foreign partners.

Mr. Reiman's employer was saddled with old technology and low regulated rates but held one trump card: Anyone seeking to provide modern phone services to the growing ranks of private businesses had to connect to its equipment. In return for its cooperation, the state company got stakes in many telecom ventures blossoming in the city, which reverted to its old name of St. Petersburg.

Mr. Reiman "was the most active person in setting up the ventures. He was a workaholic," Mr. Galmond says.

Mr. Reiman "seemed an expert in 'oiling the wheels' and had no compunction about doing it," said Anthony Georgiou, a British businessman who owned a share in one of the ventures and claims he was cheated out of it. Mr. Georgiou's statement was part of a sworn affidavit filed in court in British Virgin Islands. Along with it, he provided a 1992 receipt for a $1.04 million "bonus" transferred to Mr. Reiman's Swiss bank account. Mr. Reiman denies that such a transfer ever took place and says the receipt is a fake.

In late 1994, Mr. Reiman gathered his state-controlled employer's interests in the growing ventures into a firm called Telecominvest. His employer owned 95% of it. Mr. Galmond, the Danish lawyer, says that he indirectly owned the rest.

But just over a year later, the interest held by Mr. Reiman's employer and another state company had shrunk to 49%. Now, 51% was in the hands of an obscure Luxembourg company called First National Holding.

What had happened was that Telecominvest issued new shares. Though the state-controlled companies, represented by Mr. Reiman, had a right to invest in these shares and maintain their dominant stake, they didn't. Instead, First National Holding put up a modest $1.8 million for the new shares and wound up with the majority stake. Later its stake rose to 85% through the same process.

Who was this First National Holding? The question intrigued Russia's then-telecom minister, who says he learned about the new ownership in the local press and called state telecom executives for an explanation. They told him First National Holding was just a vehicle for the actual owner -- Commerzbank -- says the former minister, Vladimir Bulgak. So "we didn't make a scandal. We thought the Petersburgers found a good partner who would invest," he says.



**Vladimir Putin**

Telecominvest also portrayed Commerzbank as the owner. It said in regulatory filings that the bank owned First National Holding. And the German bank itself said the same. Commerzbank -- in a 2000 European Union regulatory filing, in annual reports and in letters to business partners -- said it owned First National. Now it admits that wasn't the case.

Mr. Reiman says the real owner was his Danish friend Mr. Galmond, who wanted to keep his privacy in Russia's sometimes-violent business world. Mr. Reiman adds that his state-controlled employer didn't actually suffer when its interest in the businesses was drastically diluted, because they later grew so much in value. Independent analysts estimate the businesses' value at more than $1 billion.

German police found a long internal report from Commerzbank's Moscow office warning that the bank was improperly helping Mr. Reiman conceal ownership of state assets, says a senior German police official. According to the official and to others with knowledge of the case, the employee who wrote the internal report told investigators that in 2001 he tried to give it to Commerzbank Chief Executive Klaus-Peter Müller at bank headquarters in Frankfurt, but Mr. Müller turned his back and wouldn't acknowledge it.

Commerzbank denies that happened. It confirms that an official in Moscow raised concerns. But "Mr. Müller isn't somebody who turns his back on problems," said a spokesman for the bank, which wouldn't make Mr. Müller available for an interview. This spring German prosecutors, not finding any documentary evidence to implicate Mr. Müller, said they had removed him from a list of suspects in the money-laundering investigation. The bank acknowledges several of its executives did read the report, and according to a person familiar with the continuing investigation, some remain on the list of suspects.

The bank's Frankfurt-based head of East European operations, Andreas De Maiziere, told the complaining Moscow employees to stay out of Frankfurt's business, according to people with knowledge of the matter. Through a lawyer, Mr. De Maiziere declined to comment.

Commerzbank reassigned one of the Moscow employees to an office building in Frankfurt that was

otherwise empty. Another quit and wrote in a resignation letter that the bank's business with Mr. Reiman made him "sick to my stomach," says someone who has seen the letter. Commerzbank says assignments weren't retribution but just temporary jobs until suitable new posts could be found.

In 2001 Commerzbank ended its trust arrangement with the telecom businesses. As a new repository for them, Mr. Galmond, the Danish lawyer, set up several Bermuda entities, including one called IPOC International Growth Fund Ltd., which he registered as a mutual fund. Several bank executives who had worked on the telecom businesses quit and moved to a firm Mr. Galmond set up in Frankfurt to manage IPOC.

By this time, Mr. Reiman had risen to the post of telecom minister in President Putin's government, with broad authority over one of the fastest-growing parts of Russia's economy. He also retained his close ties to Mr. Putin, whose wife got a job at Telecominvest after Mr. Putin moved to Moscow but before Mr. Putin made his ascent to the pinnacle of power.

IPOC's fortunes also took off. Several companies it owned benefited from regulatory decisions by Mr. Reiman's ministry or from rich contracts with the state-controlled companies his ministry oversaw, according to a ruling of the Swiss commercial tribunal, which sits in Zurich. (The tribunal got involved because of IPOC's fight with Mr. Fridman and Alfa; one of IPOC's option agreements called for arbitration of any dispute in Zurich.)

Consider the case of Telecom XXI, a small Russian company. Control of Telecom XXI was acquired in late 1999 by businesses Mr. Galmond says he owned. The price was about $3 million. Just over a year later, the businesses sold Telecom XXI for $30 million -- money that they promptly invested in IPOC.

Why this leap in value? In the short time the businesses controlled Telecom XXI, it won -- from a branch of Mr. Reiman's ministry -- a much-sought-after license to offer cellular service in and around St. Petersburg.

At the time, Russia's biggest mobile-phone company, OAO Mobile TeleSystems, or MTS, wanted to expand into that city, but its license applications were repeatedly rejected by the branch of Mr. Reiman's ministry. Ultimately, to get a license, MTS agreed to the pricey purchase of Telecom XXI.

The Zurich tribunal, although it admitted it didn't have direct evidence, concluded that Mr. Reiman had blocked MTS's applications in order to force MTS to buy a company he owned. Thus, the panel concluded, much of the huge profit on the transaction was the fruit of "abuse of official powers" by Mr. Reiman.

A spokesman for Mr. Reiman rejected this idea. He said Russian prosecutors and government auditors who looked into the granting of the license found no violations, and moreover the purchase price for Telecom XXI was in line with similar transactions. A spokesman for MTS said it hadn't overpaid.

Some other IPOC money flows are harder to fathom. In an effort to defeat the allegation it was a money-laundering vehicle for Mr. Reiman, IPOC provided financial records to several courts. But the records raised still more questions.

IPOC says it doesn't get the money that it invests from shareholders, like an ordinary mutual fund, but

from a group of subsidiary companies it owns. It says these earn income by lending to, or consulting for, a second set of companies.

Euro Resources LLC is an example of companies in the second group. It has paid at least $24 million to IPOC subsidiaries for real-estate and consulting services since 2000, IPOC records say.

Yet the payments, many from a St. Petersburg bank, began even before Euro Resources was incorporated -- and even before any consulting contracts were signed -- IPOC documents show. IPOC provided no proof its subsidiaries did work for Euro Resources in return for the $24 million.

IPOC gives Euro Resources' address as Lexington, Ky. Phone directories in Lexington list no such company. In Kentucky state registration filings, Euro Resources says that its head office is at an address in Salem, Ore. But there doesn't seem to be any listing for the company in Salem, either.

Other Kentucky filings say Euro Resources' managers are still farther away: one in a small town in the Central American country of Belize and one in the Pacific island of Niue, population 800.

Wire-transfer records show Euro Resources' payments passing through various conduits, from Cyprus to Nevada, before reaching IPOC. Along the way, they passed through the New York offices of **Barclays** PLC and **J.P. Morgan Chase** & Co. The banks say they complied with all money-laundering laws.

IPOC records list at least 14 such apparent shell companies that have U.S. addresses and pay money to IPOC. Most have bank accounts in Latvia -- a former Soviet republic where, the U.S. Treasury stated last year in the Federal Register, rampant official corruption impedes enforcement of money-laundering laws.

Regulators in Bermuda are investigating IPOC, looking at whether it committed regulatory infractions that could result in the seizure of its assets.

IPOC lists several companies as shareholders, all of which Mr. Galmond says belong to him. He says he's also the owner of other companies that hold the rest of the Russian telecom empire.

But various documents emerging in the investigation and court proceedings point to Mr. Reiman as the owner.

For instance, a 2002 letter to a Liechtenstein bank said the telecom empire belonged to Mr. Reiman. The letter bears Mr. Galmond's signature, according to an affidavit filed in a British Virgin Islands court. Mr. Galmond said the statement that the businesses belonged to Mr. Reiman was made by his staff in error.

Another document shows that Mr. Reiman was the beneficiary of a trust that controlled First National Holding, the main holder of the telecom businesses after 1996. And he had authority to order this trust to make payouts to its beneficiary -- himself. Mr. Galmond says nothing has been disbursed from the trust. The document was described in an affidavit filed in Britain's Privy Council appellate court.

Commerzbank executives considered Mr. Reiman to be the bank's client, said a person familiar with its handling of the matter. The bank did due diligence on him as "the economic beneficiary" of the assets, said an affidavit filed in the Privy Council, quoting a Galmond adviser. Mr. Reiman's explanation is that the bank's lawyers looked into whether it would be legal for him to get a stake in some of the companies

in the late 1990s as part of a deal Mr. Galmond proposed but that such a transaction never happened.

German prosecutors and regulators unearthed some of these documents. Germany's financial regulator, known as Bafin, knew of the concerns raised by Commerzbank's Moscow employees in 2001, but Bafin investigated no further than Commerzbank's compliance with banking regulations. Bafin closed its inquiry in 2005, without imposing any sanctions.

By then, prosecutors in the German state of Hesse had taken an interest, and police raided offices and homes of several top Commerzbank executives. Soon after, Mr. De Maiziere resigned from the bank's executive board, accepting responsibility for its failures in the Russian region. An annual report shows he left with a €2.14 million severance payment, quadruple his annual salary, which the bank says stemmed from his contract. Prosecutors in Hesse say he remains a suspect in their money-laundering investigation.

The documents unearthed by German investigators and by litigation in the various courts played a role in the May ruling by the Zurich commercial tribunal. After it heard more than two weeks of testimony from four dozen witnesses, and had reviewed reams of bank records and other documents, it declared Telecom Minister Reiman to be the owner of the Russian telecom businesses. The tribunal concluded he had misused his position to build the business empire from assets that once belonged to the Russian state, and expanded it by abusing his office as minister. IPOC says it has appealed the ruling to the Swiss Supreme Court.

In the spat with the oligarch Mr. Fridman's Alfa Group that set off all this probing of IPOC, the Bermuda fund has scored a round within Russia. There, prosecutors recently ordered the arrest of the man who sold the stake in the Megafon cellphone company to IPOC's nemesis, Alfa. Mr. Reiman is preparing libel lawsuits against several witnesses who testified against him, a spokesman for the telecom minister says.

German prosecutors say their money-laundering investigation is complicated by the need to establish that a crime occurred at the beginning of the chain in Russia. They would need to show that the money that coursed through Commerzbank was dirty to begin with.

In Russia, authorities have shown little interest beyond a 1997 investigation by prosecutors in St. Petersburg, which found no significant violations in the 1994 formation of Telecominvest. No senior Russian official other than Mr. Reiman has publicly commented on the allegations against him. Russian prosecutors, when asked by legislators to respond to the Zurich tribunal's ruling, said they saw no evidence that IPOC had engaged in suspicious financial operations.

**Write to** Gregory L. White at greg.white@wsj.com[1], David Crawford at david.crawford@wsj.com[2] and Glenn R. Simpson at glenn.simpson@wsj.com[3]

**URL for this article:**
http://online.wsj.com/article/SB116104584097394612.html

**Hyperlinks in this Article:**
(1) mailto:greg.white@wsj.com
(2) mailto:david.crawford@wsj.com
(3) mailto:glenn.simpson@wsj.com

Copyright 2006 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact **Dow Jones** Reprints at 1-800-843-0008 or visit **www.djreprints.com**.

**TAB B**

**INTERROGATORY NO. 2:**

Please identify the name, address, and telephone number of each and every person or entity who possesses, directly or indirectly, a beneficial or ownership interest in IPOC.

**RESPONSE TO INTERROGATORY NO. 2:**

IPOC objects to this interrogatory on the ground that it seeks information that is not relevant to the claim or defense of any party and is not reasonably calculated to lead to the discovery of admissible evidence, and is overly broad, vague and unduly burdensome. IPOC's Complaint seeks injunctive relief and monetary damages to compensate IPOC for harm resulting from the Defendants' intentional and unlawful actions, including, but not limited to the theft of confidential documents and intentional interference with an ongoing confidential investigation of IPOC being carried out by KPMG FAS for the Government of Bermuda. The identity of the persons and/or entities who possess, directly or indirectly, a beneficial or ownership interest in IPOC is not relevant to the allegations of the Complaint or to any defense.

**INTERROGATORY NO. 3:**

Please identify the name, address, and telephone number of each officer and director (or the equivalent under Bermuda law applicable to limited liability corporations) of IPOC and each affiliate, subsidiary, or entity related to IPOC.

**RESPONSE TO INTERROGATORY NO. 3:**

The names of the officers and directors (or the equivalent under Bermuda law applicable to limited liability corporation) of IPOC are David Hauenstein, Director; Mads Braemer-Jensen, Director; Michael North, President and Director. These individuals can be contacted through Winston & Strawn, LLP. IPOC objects to the balance of this interrogatory on the ground that it seeks information that is not relevant to the claim or defense of any party and is not reasonably calculated to lead to the discovery of admissible evidence, and is overly broad, vague and unduly burdensome. IPOC's Complaint seeks injunctive relief and monetary damages to compensate IPOC for harm resulting from the Defendants' intentional and unlawful actions, including, but not limited to the theft of confidential documents and intentional interference with an ongoing confidential investigation of IPOC being carried out by KPMG FAS for the Government of Bermuda, and the identity of the officers and directors each affiliate, subsidiary, or entity related to IPOC is not relevant to the allegations of the Complaint or to any defense.

**INTERROGATORY NO. 4:**

Please identify the caption and case number for each lawsuit and arbitration to which IPOC has been a party or in which it has provided a written statement, affidavit, declaration, or deposition since June 16, 2001.

**RESPONSE TO INTERROGATORY NO. 4:**

IPOC objects to this interrogatory on the ground that it seeks information that is not relevant to the claim or defense of any party and is not reasonably calculated to lead to the

6

discovery of admissible evidence, and is overly broad, vague and unduly burdensome. IPOC's Complaint seeks injunctive relief and monetary damages to compensate IPOC for harm resulting from the Defendants' intentional and unlawful actions, including, but not limited to the theft of confidential documents and intentional interference with an ongoing confidential investigation of IPOC being carried out by KPMG FAS for the Government of Bermuda. The identity of each lawsuit and arbitration to which IPOC has been a party or in which it has provided a written statement, affidavit, declaration, or deposition since June 16, 2001, is not relevant to the allegations of the Complaint or to any defense in this lawsuit. Subject to and without waiving any objections, IPOC answers as follows:

IPOC has been involved in the following arbitrations:

International Chamber of Commerce International Court of Arbitration

> No. 12875/MS between IPOC International Growth Fund Limited and LV Finance Group Limited

> Appeal No. 4P.208/2004 between LV Finance Group Limited and (1) IPOC International Growth Fund Limited and (2) ICC Arbitral Tribunal No. 12875/MS

> Appeal No. 4P.102/2006 between LV Finance Group Limited and (1) IPOC International Growth Fund Limited and (2) ICC Arbitral Tribunal No. 12875/MS

Zurich Ad Hoc Arbitration between IPOC International Growth Fund Limited and LV Finance Group Limited, Appeal No. 4P.168/2006 between IPOC International Growth Fund Limited and LV Finance Group Limited

Stockholm Chamber of Commerce Arbitration No. 142/2003 between IPOC International Growth Fund Limited and (1) OAO "CT-Mobile" (2) OAO "Telecominvest" (3) Sonera Holding BV (4) Telia International AB and (5) Telia International Management AB

**INTERROGATORY NO. 5:**

State whether Mr. Reiman possesses, directly or indirectly, any beneficial or ownership interest in IPOC or any subsidiary, affiliate, or entity related to IPOC, and if so, describe with particularity the nature, extent, and duration of each such interest.

**RESPONSE TO INTERROGATORY NO. 5:**

IPOC objects to this interrogatory on the ground that it seeks information that is not relevant to the claim or defense of any party and is not reasonably calculated to lead to the discovery of admissible evidence, and is overly broad, vague and unduly burdensome. IPOC's Complaint seeks injunctive relief and monetary damages to compensate IPOC for harm resulting from the Defendants' intentional and unlawful actions, including, but not limited to the theft of confidential documents and intentional interference with an ongoing confidential investigation of IPOC being carried out by KPMG FAS for the Government of Bermuda. The identity of the persons and/or entities who possesses, directly or indirectly, a beneficial or ownership interest in IPOC or any subsidiary, affiliate, or entity related to IPOC, is not relevant to the allegations of the Complaint or to any defense.

**INTERROGATORY NO. 6:**

Identify the name, address, and telephone number of each and every entity in which IPOC Capital Partners Ltd. possesses, directly or indirectly, a beneficial or ownership interest.

**RESPONSE TO INTERROGATORY NO. 6:**

IPOC objects to this interrogatory on the ground that it seeks information that is not relevant to the claim or defense of any party and is not reasonably calculated to lead to the discovery of admissible evidence, and is overly broad, vague and unduly burdensome. IPOC's Complaint seeks injunctive relief and monetary damages to compensate IPOC for harm resulting from the Defendants' intentional and unlawful actions, including, but not limited to the theft of confidential documents and intentional interference with an ongoing confidential investigation of

IPOC being carried out by KPMG FAS for the Government of Bermuda. The identity of each and every entity in which IPOC Capital Partners Ltd. possesses, directly or indirectly, a beneficial or ownership interest is not relevant to the allegations of the Complaint or to any defense.

## INTERROGATORY NO. 7:

Identify the name, address, and telephone number of each and every entity or person possessing, directly or indirectly, a beneficial or ownership interest in IPOC.

## RESPONSE TO INTERROGATORY NO. 7:

IPOC objects to this interrogatory on the grounds that it is identical to Interrogatory No. 2 and on the same grounds as set forth in response to Interrogatory 2, which response is incorporated and made a part of this response as if fully set forth herein.

## INTERROGATORY NO. 8:

State whether Jeffrey Galmond possesses, directly or indirectly, any beneficial or ownership interest in IPOC or any subsidiary, affiliate, or entity related to IPOC, and if so, describe with particularity the nature, extent, and duration of each such interest.

## RESPONSE TO INTERROGATORY NO. 8:

IPOC objects to this interrogatory on the ground that it seeks information that is not relevant to the claim or defense of any party and is not reasonably calculated to lead to the discovery of admissible evidence, and is overly broad, vague and unduly burdensome. IPOC's Complaint seeks injunctive relief and monetary damages to compensate IPOC for harm resulting from the Defendants' intentional and unlawful actions, including, but not limited to the theft of confidential documents and intentional interference with an ongoing confidential investigation of IPOC being carried out by KPMG FAS for the Government of Bermuda. The identity of the any person or entity who possesses, directly or indirectly, a beneficial or ownership interest in IPOC

or any subsidiary, affiliate, or entity related to IPOC, is not relevant to the allegations of the

Complaint or to any defense to any defense.

IPOC INTERNATIONAL GROWTH FUND
LIMITED

OF COUNSEL:

Kimball R. Anderson
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
Tel:     (312) 558-5858
Fax:    (312) 558-5700
kanderson@winston.com

Timothy M. Broas (D.C. Bar No. 391145)
Carol A. Joffe (D.C. Bar No. 351528)
Anne W. Stukes (D.C. Bar No. 469446)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006
Tel:     (202) 282-5000
Fax:    (202) 282-5100
tbroas@winston.com
cjoffe@winston.com
astukes@winston.com

10